No. 23-3190

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

DONALD J. TRUMP,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Columbia

## OPENING BRIEF OF DEFENDANT-APPELLANT
## PRESIDENT DONALD J. TRUMP

LAURO & SINGER
John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A. PARTIES AND *AMICI CURIAE***

The parties in the district court include the United States of America and President Donald J. Trump. The district court denied leave to file to proposed *amici curiae*. The parties before this Court include the United States of America and President Donald J. Trump.

***Disclosure Statement:*** No Disclosure Statement under Federal Rule of Appellate Procedure 26.1 or under Circuit Rule 26.1 is necessary, as Defendant is not a corporation or similar entity.

**B. RULINGS UNDER REVIEW**

The parties are before this Court on appeal from the October 17, 2023, Opinion and Order of the district court issued by Hon. Tanya S. Chutkan, D.Ct. Doc. No. 105 in *United States v. Trump*, No. 1:23-cr-00257 (TSC), -- F. Supp. 3d --, 2023 WL 6818589 (D.D.C. Oct. 17, 2023), J.A.229.

**C. RELATED CASES**

There are no related cases as defined by Circuit Rule 28(a)(1)(C).

*/s/ D. John Sauer*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............i

TABLE OF CONTENTS...................................................................ii

TABLE OF AUTHORITIES..........................................................iv

GLOSSARY.................................................................................ix

INTRODUCTION..........................................................................1

STATEMENT OF JURISDICTION................................................2

STATEMENT OF THE ISSUES.....................................................6

STATEMENT OF THE CASE..........................................................6

     A.    Core Political Speech About the Prosecution of President Trump......6

     B.    The Prosecution Seeks to Gag President Trump........................13

     C.    The District Court Enters the Gag Order Against President Trump...18

SUMMARY OF ARGUMENT........................................................20

STANDARD OF REVIEW............................................................25

ARGUMENT................................................................................25

I.    The Gag Order Violates the First Amendment Rights of President Trump and His Audiences of Over One Hundred Million Americans........25

     A.    The Gag Order Is Either Invalid on Its Face or Subject to the Strictest Level of Scrutiny............................................26

     1.    Gag orders in judicial proceedings require a showing of "clear and present danger to the administration of justice."..........26

     2.    The Gag Order is a prior restraint on speech subject to the

            "most exacting scrutiny."…………………………………………………29

3.      The Presidential campaign calls for the First Amendment's "fullest and most urgent application."………………………………31

4.      The Gag Order violates the First Amendment rights of the tens of millions of Americans who listen to President Trump………………34

5.      The Gag Order imposes an impermissible heckler's veto…………..36

6.      The Gag Order shields public figures from public criticism………..39

7.      The Gag Order involves viewpoint discrimination…………………40

B.      The Gag Order Cannot Survive Any Level of Scrutiny……………..43

1.      The prosecution failed to establish any compelling interest for a prior restraint on speech…………………………………………43

2.      The Gag Order failed to consider less speech-restrictive alternatives………………………………………………………..45

3.      The Gag Order is sweepingly overbroad…………………………48

II.     The Gag Order Is Unconstitutionally Vague………………………49

CONCLUSION………………………………………………………...55

CERTIFICATE OF SERVICE………………………………………………56

CERTIFICATE OF COMPLIANCE………………………………………...57

# TABLE OF AUTHORITIES

**Cases**

*ACLU, Inc. v. Zeh*,
 864 S.E.2d 422 (Ga. 2021)…………………………………………………..40

*Armstrong v. D.C. Pub. Library*,
 154 F. Supp. 2d 67 (D.D.C. 2001)………………………………………...34

*Bailey v. Sys. Innovation, Inc.*,
 852 F.2d 93 (3d Cir. 1988)……………………………………………………5

*Brandenburg v. Ohio*,
 395 U.S. 444 (1969)………………………………………………37, 38, 39

*Brown v. Louisiana*,
 383 U.S. 131 (1966)…………………………………………………...21, 37

*Buckley v. Valeo*,
 424 U.S. 1 (1976)……………………………………………………….50

*Burton v. City of Belle Glade*,
 178 F.3d 1175 (11th Cir. 1999)………………………………………..24, 52

*Capital Cities Media, Inc. v. Toole*,
 463 U.S. 1303 (1983)………………………………………...30, 31, 45

*Carson v. Am. Brands, Inc.*,
 450 U.S. 79 (1981)……………………………………………………….4

*Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*,
 542 U.S. 367 (2004)……………………………………………………...5

*City of Houston v. Hill*,
 482 U.S. 451 (1987)……………………………………………………25

*Cohen v. Beneficial Indus. Loan Corp*.,
 337 U.S. 541 (1949)…………………………………………………...2, 3

*Collin v. Chicago Park Dist.*,
460 F.2d 746 (7th Cir. 1972)…………………………………………37

*Connally v. General Constr. Co.*,
269 U.S. 385 (1926)…………………………………………………54

*Counterman v. Colorado*,
600 U.S. 66 (2023)………………………………………………...37

*Cox v. Louisiana*,
379 U.S. 536 (1965)…………………………………………………37

*Craig v. Harney*,
331 U.S. 367 (1947)…………………………………………………48

*Crane v. Ariz. Republic*,
972 F.2d 1511 (9th Cir. 1992)……………………………………..40

*Diesen v. Hessburg*,
455 N.W.2d 446 (Minn. 1990)……………………………………..40

*Edwards v. South Carolina*,
372 U.S. 229 (1963)…………………………………………………37

*Elrod v. Burns*,
427 U.S. 347 (1976)………………………………………………...3

*Forsyth County v. Nationalist Movement*,
505 U.S. 123 (1992)…………………………………………………37

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991)………………………………………………27, 28

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)………………………………………………...39, 49

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)………………………………………………...25, 52

*Hynes v. Mayor & Council of Borough of Oradell*,
425 U.S. 610 (1976)……………………………………………………24, 50, 54

*In re Murphy-Brown, LLC*,
907 F.3d 788 (4th Cir. 2018)…………………………………………………..5, 6

*In re Rafferty*,
864 F.2d 151 (D.C. Cir. 1988)…………………………………………………...3

*In re Reporters Comm. for Freedom of the Press*,
773 F.2d 1325 (D.C. Cir. 1985)…………………………………………………4

*Landmark Communications, Inc. v. Virginia*,
435 U.S. 829 (1978)…………………………………………...20, 26, 27, 28, 44, 45

*Matal v. Tam*,
582 U.S. 218 (2017)…………………………………………………...22, 38, 40, 41

*McCullen v. Coakley*,
573 U.S. 464 (2014)…………………………………………………………….39

*McIntyre v. Ohio Elec. Comm'n*,
514 U.S. 334 (1995)…………………………………………………………….31

*Meyer v. Grant*,
486 U.S. 414 (1988)…………………………………………………………….32

*Monitor Patriot Co. v. Roy*,
401 U.S. 265 (1971)…………………………………………………………….31

*NAACP v. Button*,
371 U.S. 415 (1963)…………………………………………...24, 50, 51, 52, 53

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)…………………………………………………………….25

*Nebraska Press Association v. Stuart*,
427 U.S. 539 (1976)………………………..21, 22, 29, 30, 43, 44, 46, 47, 49, 51

*N.Y. Times Co. v. Sullivan,*
　　376 U.S. 254 (1964)……………………………………………………48

*Packingham v. North Carolina,*
　　582 U.S. 98 (2017)……………………………………………………...34

*Parker v. CBS, Inc.,*
　　230 F.2d 937 (2d Cir. 1963)……………………………………………...5

*Procunier v. Martinez,*
　　416 U.S. 396 (1974)……………………………………………………46

*R.A.V. v. City of St. Paul,*
　　505 U.S. 377 (1992)…………………………………………………...23, 49

*Red Lion Broad. Co. v. F.C.C.,*
　　395 U.S. 367 (1969)……………………………………………………34

*Republican Party of Minnesota v. White,*
　　536 U.S. 765 (2002)…………………………………………………...1, 33, 34

*Rosenblatt v. Baer,*
　　383 U.S. 75 (1966)……………………………………………………22, 40

*Saxe v. State Coll. Area Sch. Dist.,*
　　240 F.3d 200 (3d Cir. 2001)…………………………………………...38, 39

*Seattle Times Co. v. Rhinehart,*
　　467 U.S. 20 (1984)……………………………………………………...46

*Sheppard v. Maxwell,*
　　384 U.S. 333 (1966)…………………………………………...23, 27, 46, 47

*Sierra Club v. U.S. Dep't of Agric.,*
　　716 F.3d 653 (D.C. Cir. 2013)…………………………………………...4

*Smith v. Daily Mail Pub. Co.,*
　　443 U.S. 97 (1979)……………………………………………………21, 30

*Snyder v. Phelps*,
    562 U.S. 443 (2011)……………………………………………….31

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)……………………………………….21, 31, 35

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017)………………………………..25, 52

*United States v. Brown*,
    218 F.3d 415 (5th Cir. 2000)…………………………3, 4, 5, 32, 35, 46

*United States v. Doe*,
    968 F.2d 86 (D.C. Cir. 1992)……………………………………...25

*United States v. Ford*,
    830 F.2d 596 (6th Cir. 1987)…………………………4, 5, 27, 32, 35, 47

*United States v. Popa*,
    187 F.3d 672 (D.C. Cir. 1999)…………………………………...25, 39

*United States v. Schiavo*,
    504 F.2d 1 (3d Cir. 1974)……………………………………………...4

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)……………………………………….21, 34, 35

*Watson v. City of Memphis*,
    373 U.S. 526 (1963)……………………………………………….37

**Statutes**

18 U.S.C. § 3231……………………………………………………...2

28 U.S.C. § 1291……………………………………………………...2

28 U.S.C. § 1292(a)(1)……………………………………………..2, 4

# GLOSSARY

Gag Order……………………………Opinion and Order in *United States v. Trump*, No. 1:23-cr-257-TSC, 2023 WL 6818589, D. Ct. Doc.105 (Oct. 17, 2023), J.A.229

J.A.__…………………………………Joint Appendix (page number)

President Trump……………………Defendant-Appellant Donald J. Trump

the prosecution………………………..Appellee United States of America

# INTRODUCTION

The Supreme Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *Republican Party of Minnesota v. White*, 536 U.S. 765, 781-82 (2002). Accordingly, no court has ever imposed a gag order on the political speech of a candidate for public office, let alone the leading candidate for President of the United States—until now.

On October 17, 2023, the district court entered a sweeping prior restraint on the speech of Defendant-Appellant Donald J. Trump ("President Trump") in the middle of his Presidential campaign. J.A.229-31 (the "Gag Order"). The Gag Order restricts President Trump from making public statements about key aspects of his prosecution at the hands of the Administration he is seeking to replace—issues that are central to, and inextricably entwined with, the 2024 Presidential campaign. The Gag Order violates President Trump's most fundamental First Amendment rights. Even worse, it gives no consideration to the First Amendment rights of President Trump's audience, the American public, to receive and listen to his speech.

Given its extraordinary nature, one would expect an extraordinary justification for the Gag Order. None exists. The Gag Order rests entirely, and wrongfully, on a classic heckler's veto—*i.e.*, the district court's speculation that President Trump's audiences might react to his speech with "harassment" or "threats" to prosecutors, witnesses, or court staff. The First Amendment forbids this

1

heckler's veto, and even if it were legally viable—which it is not—no convincing evidence supports it. President Trump has made many public statements about this case in the three months since his indictment, and yet the Department of Justice ("the prosecution") submitted no evidence of any "threats" or "harassment" to prosecutors, witnesses, or court staff during that time. Instead, the prosecution admitted, "of course this prejudice is speculative."

A prior restraint cannot be based on speculation. The district court cannot silence President Trump based solely on the anticipated reaction of his audiences. The district court lacks the authority to muzzle the core political speech of the leading candidate for President at the height of his re-election campaign. President Trump is entitled to proclaim, and the American public is entitled to hear, his core political messages. The Gag Order should be immediately reversed.

## STATEMENT OF JURISDICTION

The district court exercised subject-matter jurisdiction over the underlying federal criminal case under 18 U.S.C. § 3231. The district court entered the Gag Order on October 17, 2023. J.A.229. President Trump filed a timely notice on October 17, 2023. J.A.232. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546-47 (1949).

Under *Cohen*, the Gag Order is an immediately appealable collateral order that is a "final" order under 28 U.S.C. § 1291. *Cohen*, 337 U.S. at 546-47. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The freedom to speak about the case is an issue that is separate from the merits, and the Gag Order is final on that separate issue. J.A.231.

The Gag Order, therefore, "fall[s] in that small class which finally determine claims of right separate from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *In re Rafferty*, 864 F.2d 151, 153 (D.C. Cir. 1988) (quoting *Cohen*, 337 U.S. at 546). *Rafferty* held that an order preventing dissemination of information that was subject to civil discovery was an appealable collateral order, because it "conclusively determine[d] a disputed question," which was "an important question completely separate from the merits of the action," and "would be effectively unreviewable on appeal from a final judgment." *Id.* at 154.

Following this reasoning, courts that have reviewed orders restricting criminal defendants' speech during the pendency of their criminal cases have concluded that those gag orders were appealable collateral orders. *United States v. Brown*, 218 F.3d 415, 420 (5th Cir. 2000) (holding that a gag order against a criminal defendant was

immediately appealable); *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987) (same). As the Fifth Circuit noted in *Brown*, this "conclusion finds support in the fact that this Court and other Courts of Appeals have repeatedly held, in both civil and criminal trials, that gag orders imposed on members of the press are appealable under the collateral order doctrine." *Brown*, 218 F.3d at 422 (citing cases); *see also In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1330 (D.C. Cir. 1985) (holding that an order restricting media access to civil discovery materials until after the conclusion of trial was an appealable collateral order); *United States v. Schiavo*, 504 F.2d 1, 5 (3d Cir. 1974) (en banc) (holding that a gag order on the press during a criminal trial was an appealable collateral order). The Fifth Circuit correctly "perceive[d] no reason to limit the appealability of this type of order to members of the media alone." *Brown*, 218 F.3d at 422; *see also Ford*, 830 F.2d at 598. As *Brown* noted, the criminal defendant's "asserted right to contemporaneously comment on his case in public and defend his reputation would … be irretrievably lost if review were postponed until trial is completed." 218 F.3d at 421 (citation and quotation marks omitted).

In the alternative, the Gag Order is immediately appealable under 28 U.S.C. § 1292(a)(1) because the district court's order has the "practical effect" of granting an injunction. *Sierra Club v. U.S. Dep't of Agric.*, 716 F.3d 653, 659 (D.C. Cir. 2013) (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981)). Orders prohibiting a

4

party from speaking are "in the nature of a preliminary injunction, and therefore appealable under" that provision. *Parker v. CBS, Inc.*, 230 F.2d 937, 938 (2d Cir. 1963) (per curiam); *see also Ford*, 830 F.2d at 598 ("Courts of Appeals have found orders restraining speech in connection with pending cases appealable ... injunctive orders under §1292(a)(1)."); *Bailey v. Sys. Innovation, Inc.*, 852 F.2d 93, 96 (3d Cir. 1988) (finding imposition of a local rule limiting attorneys' speech to the litigants and their attorneys to be the equivalent of a requested preliminary injunction). *But see Brown*, 218 F.3d at 422 n.7 (rejecting appellate jurisdiction over a gag order under §1292(a)(1) but finding appellate jurisdiction under § 1291).

Finally, if the Court determines that the Gag Order is not an appealable order, President Trump respectfully requests that the Court treat this appeal as a petition for writ of mandamus against the Gag Order and grant it for the reasons stated herein. *See, e.g., In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018). The three factors governing mandamus are satisfied here. *See Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 380 (2004). First, if this Court determines that direct appeal is not available, then President Trump will "have no other adequate means to attain the relief he desires." *Id.* at 380-81. Second, President Trump's "right to issuance of the writ is 'clear and indisputable,'" *id.* at 381, for the reasons discussed at length in the Argument section below. Third, "the writ is appropriate

under the circumstances," *id.*, because "mandamus plays an important and necessary role in protecting First Amendment freedoms." *Murphy-Brown*, 907 F.3d at 796.

## STATEMENT OF THE ISSUES

I.     Whether the Gag Order violates the First Amendment rights of both President Trump and tens of millions of Americans to engage in and hear core political speech in the middle of an ongoing Presidential campaign.

II.    Whether the Gag Order is unconstitutionally vague.

## STATEMENT OF THE CASE

President Donald J. Trump is the leading candidate for President of the United States.  He holds dominating leads in polls for the Republican nomination, and he holds a substantial lead over President Biden in general election head-to-head polling.[1]  President Trump has over 100 million followers across social-media platforms.[2]  In addition, his public statements and social-media posts are both amplified by social media users, including his followers, and widely reported on in national media, reaching audiences far wider than his social-media followers alone.

### A.     Core Political Speech About the Prosecution of President Trump.

---

[1] *See, e.g.,* Shane Goldmacher, *Trump Leads in 5 Critical States as Voters Blast Biden, Times/Siena Poll Finds*, N.Y. Times (Nov. 5, 2023), https://www.nytimes.com/2023/11/05/us/politics/biden-trump-2024-poll.html.
[2] *See, e.g., Number of Followers of Donald Trump on Select Social Media Platforms as of January 2023*, Statista.com (Jan. 30, 2023), https://www.statista.com/statistics/1336497/donald-trump-number-of-followers-selected-social-platforms/.

On August 1, 2023, President Trump was indicted for alleged conduct in disputing the outcome of the 2020 Presidential election. J.A.20. The indictment does not charge President Trump for the protests at the Capitol on January 6, 2021. *See id.* Instead, it charges him with supposedly "obstructing official proceedings" and "defrauding the United States" by making First Amendment-protected statements disputing the outcome of the Presidential election, and by engaging in First Amendment-protected advocacy to public officials about investigating and certifying the election's outcome. *Id.*

The indictment in this case, and the issues surrounding it, are inextricably intertwined with President Trump's campaign for re-election to the Presidency. One commentator has aptly described the issues surrounding the indictment as "central to [Biden's] re-election argument." Kevin Liptak, et al., *Trump's Third Indictment Is the Most Personal – and Trickiest – One for Biden*, CNN.com (Aug. 2, 2023), https://www.cnn.com/2023/08/02/politics/joe-biden-donald-trump-indictment/index.html. President Trump is being prosecuted by the Administration he is seeking to defeat at the ballot box. President Trump's opponents—including purported witnesses in this case—routinely attack him by citing the indictment and the issues raised it, challenging President Trump's fitness to be re-elected as

President, or arguing that the risk of conviction should disqualify his candidacy.[3] President Trump frequently responds to such attacks in public statements and on social media, criticizing his opponents and stating that this prosecution is a politically motivated campaign to interfere with the election, silence President Trump's core political speech, and derail his candidacy for the Presidency.[4]

On August 1, 2023, the day the indictment was filed, the Special Counsel prosecuting President Trump gave a speech at a press conference falsely implying that President Trump is responsible for "[t]he attack on our nation's Capitol on January 6, 2021," even though the indictment makes no such charge. *See, e.g.,*

---

[3] *See, e.g.,* Olafimihan Oshin, *Christie Says Trump's Lead in 2024 Race is "Fatally Flawed"*, THE HILL (Oct. 24, 2023), https://thehill.com/homenews/campaign/4272286-christie-trump-2024-primary-fatally-flawed/; Joan E. Greve, *Mitt Romney: Trump Is Unfit for Office but New York Charges Are Political*, THE GUARDIAN (Apr. 4, 2023), https://www.theguardian.com/us-news/2023/apr/04/mitt-romney-trump-unfit-office-new-york-charges-political; Lucien Bruggeman, *Republican Liz Cheney Calls Trump "Clearly Unfit for Future Office"*, ABC NEWS (Jan. 2, 2022), https://abcnews.go.com/Politics/republican-liz-cheney-calls-trump-unfit-future-office/story?id=82039304.

[4] *See, e.g.,* Mallory Wilson, *Trump Slams Judge for Reimposing Gag Order, Vows to Appeal It*, WASHINGTON TIMES (Oct. 30, 2023), https://www.washingtontimes.com/news/2023/oct/30/trump-slams-judge-reimposing-gag-order-vows-appeal/; Andrew Zhang, *Trump Blasts Special Counsel Jack Smith for Seeking Gag Order*, POLITICO (Sept. 15, 2023), https://www.politico.com/news/2023/09/15/trump-blasts-special-counsel-jack-smith-for-seeking-gag-order-00116376; Jared Gans, *Trump Rages over Legal Problems on Truth Social*, THE HILL (July 24, 2023), https://thehill.com/homenews/campaign/4115921-trump-rages-over-legal-problems-on-truth-social/.

Caitlin Yilek, *Special Counsel Jack Smith Announces New Trump Charges, Calling Jan. 6 an "Unprecedented Assault"*, CBS NEWS (Aug. 1, 2023), https://www.cbsnews.com/news/trump-indictment-jack-smith-statement-watch-live-stream-today-2023-08-01/. The Special Counsel reportedly stated:

> The attack on our nation's Capitol on Jan. 6, 2021, was an unprecedented assault on the seat of American democracy…. As described in the indictment, it was fueled by lies. Lies by the defendant targeted at obstructing a bedrock function of the U.S. government: the nation's process of collecting, counting and certifying the results of the presidential election.

*Id.* This statement egregiously mischaracterized the indictment, which does not charge that President Trump is responsible for "[t]he attack on our nation's Capitol." *Id.* Despite its inaccuracy, the Special Counsel's statement drove negative headlines about the indictment, falsely implying that President Trump was criminally charged with unlawfully fomenting violence at the Capitol on January 6, 2021.[5]

---

[5] *See, e.g.,* Ryan Knappenberger, *Donald Trump Indicted for Role in Jan. 6 Capitol Riot*, COURTHOUSE NEWS SERVICE (Aug. 1, 2023), https://www.courthousenews.com/donald-trump-indicted-for-role-in-jan-6-capitol-riot/; Rebecca Cohen, et al., *Trump Was Indicted over His Involvement in the January 6 Capitol Riot and Efforts to Overturn the Election Results. Here's What the 4 Charges Against Him Mean.*, BUSINESS INSIDER (Aug. 1, 2023), https://www.businessinsider.com/trump-january-6-criminal-indictment-charges-explained-2023-7; *Donald Trump Indicted on Charges Related to Jan. 6 Capitol Riots*, VARIETY (Aug. 1, 2023), https://variety.com/2023/politics/news/donald-trump-indicted-january-6-capitol-riot-1235677884/; Michael Macagnone, et al., *Trump Indicted in Washington over Jan. 6 Attack on Capitol*, ROLL CALL (Aug. 1, 2023), https://rollcall.com/2023/08/01/trump-indicted-in-washington-over-jan-6-attack-on-capitol/.

Before and after the indictment, sources familiar with the investigation have perpetrated a long series of leaks of confidential information about the investigation and prosecution of President Trump to national news media, driving relentlessly negative media coverage of President Trump and this case.[6]  In many cases, it is obvious that those leaks—which report on issues like the timing of charges, the prosecution's internal thinking, and confidential grand-jury matters—could have come only from the prosecution.  *See id.*

---

[6] *See, e.g.,* Katherine Faulders, *Ex-Chief of Staff Mark Meadows Granted Immunity, Tells Special Counsel He Warned Trump About 2020 Claims: Sources*, ABC NEWS (Oct. 24, 2023), https://abcnews.go.com/US/chief-staff-mark-meadows-granted-immunity-tells-special/story?id=104231281; Alan Feuer and Maggie Haberman, *Prosecutors Follow Multiple Strands as Jan. 6 Indictment Decision Looms*, N.Y. TIMES (July 25, 2023), https://www.nytimes.com/2023/07/25/us/politics/jan-6-indictment-decision.html;  Michael S. Schmidt and Maggie Haberman, *Prosecutors Ask Witnesses Whether Trump Acknowledged He Lost 2020 Race*, N.Y. TIMES (July 13, 2023), https://www.nytimes.com/2023/07/13/us/politics/kushner-grand-jury-trump.html;  Katelyn Polantz *et al.*, *Special counsel is locked in at least 8 secret court battles in Trump investigations*, CNN (Feb. 16, 2023), https://www.cnn.com/2023/02/16/politics/secret-grand-jury-special-counsel-trump/index.html; Jared Gans, *Meadows testified before grand jury in special counsel's Trump probe: report*, THE HILL (June 6, 2023), https://thehill.com/regulation/court-battles/4037692-meadows-testified-before-grand-jury-in-special-counsels-trump-probe-report/; Jonathan Dienst *et al.*, *Trump ally Bannon subpoenaed in special counsel Jack Smith's Jan. 6 grand jury probe*, NBC NEWS (June 7, 2023), https://www.nbcnews.com/politics/donald-trump/steve-bannon-subpoenaed-special-counsel-jan-6-rcna88248; Ryan J. Reilly *et al.*, *Trump grand jury hears testimony from aide who was with him on Jan. 6*, NBC NEWS (July 20, 2023), https://www.nbcnews.com/politics/justice-department/trump-grand-jury-hear-testimony-aide-was-jan-6-rcna94998.

Likewise, potential witnesses in the case—such as former Vice President Mike Pence, former Attorney General Bill Barr, and former Chairman of the Joint Chiefs of Staff Mark Milley—routinely make public statements attacking President Trump and his fitness for office, often with specific reference to this case. For example, Attorney General Barr recently stated, ridiculously, that President Trump's "verbal skills are limited," leading to a strong response from President Trump. *See* Marina Pitofsky, *"Couldn't Do the Job": Donald Trump Responds after Bill Barr Says His "Verbal Skills Are Limited"*, USA TODAY (Oct. 30, 2023), https://www.usatoday.com/story/news/politics/2023/10/30/donald-trump-bill-barr-trade-insults/71387619007/. Attorney General Barr has also made many statements opposing President Trump's re-election campaign, stating baselessly that "another Trump term would amount to a 'horror show,' and that Trump would 'deliver chaos' instead of policies." Thomas Kika, *Bill Barr's Grim Prediction on What Will Happen if Donald Trump Wins*, NEWSWEEK (Oct. 28, 2023), https://www.newsweek.com/bill-barrs-grim-prediction-what-will-happen-if-donald-trump-wins-1838811. Attorney General Barr profits personally from such statements, as he has written a book about his time in the Trump Administration. WILLIAM P. BARR, ONE DAMN THING AFTER ANOTHER (William Morrow/HarperCollins Publishers 2022).

Vice President Pence routinely makes similar statements, including statements directly related to this case. *See, e.g.,* Meg Kinnard, et al., *Pence Calls Trump's Attacks on Milley "Utterly Inexcusable" at AP-Georgetown Foreign Policy Forum*, ASSOCIATED PRESS (Oct. 3, 2023), https://apnews.com/article/pence-foreign-policy-ap-georgetown-2024-7909c44b2bfb38db5224b73bf324cf3f; Adam Wren, et al., *Pence Slams Trump, GOP "Voices of Appeasement" as Israel Comes Under Attack*, POLITICO (Oct. 7, 2023), https://www.politico.com/news/2023/10/07/gop-presidential-hopefuls-reaffirm-support-for-israel-following-hamas-attack-00120481; Jacob Rosen, et al., *Pence Says "History Will Hold Donald Trump Accountable" for His Election Denial*, CBS NEWS (Mar. 11, 2023), https://www.cbsnews.com/news/mike-pence-says-history-will-hold-donald-trump-accountable-election-denial/.

While this case is pending, President Trump continues to campaign for office, engage in core political speech, respond to his critics, and publicly address issues relating to the indictment. Since August 1, 2023, he has routinely posted public statements about this case and issues that relate to it. In such statements, he often criticizes the Biden Administration, the public figures who attack him, as well as the Special Counsel and his team of prosecutors—whom he views as willing participants in the Biden Administration's campaign of political persecution and election interference.

For example, President Trump has described the indictment as "the FREE SPEECH Indictment of me by my political opponent, Crooked Joe Biden's Department of InJustice." J.A.80. He has stated, "we have a Department of Injustice rigging the election for Crooked Joe Biden." J.A.81. He has posted that "Deranged Jack Smith … and his many Thug prosecutors, are illegally leaking, everything and anything, to the Fake News Media!!!" J.A.82. He has stated that "Deranged Jack Smith & his team of Thugs … decided to bring [the indictment] smack in the middle of Crooked Joe Biden's Political Opponent's campaign against him. Election interference!" *Id.* He has posted, "It has just been reported that aides to TRUMP prosecutor, Deranged Jack Smith, met with high officials at the White House just prior to these political sleazebags indicting me OVER NOTHING." J.A.83. He has also made statements criticizing those who publicly attack him, such as Vice President Pence, Attorney General Barr, and General Milley. *See, e.g.,* J.A.129-30.

None of President Trump's public statements constitutes a threat, "fighting words," or incitement to imminent lawless action. The prosecution did not contend that they fall within these or any other First Amendment exception, and the district court did not find that they do. *See* J.A.229-31.

## B. The Prosecution Seeks to Gag President Trump.

On September 15, 2023, the prosecution filed its motion to impose a gag order on President Trump. J.A.74. The motion focused heavily on what the prosecution

13

described as President Trump's attempt to "undermine confidence in the criminal justice system" and "prejudice the jury pool" by making "disparaging and inflammatory" statements criticizing the prosecutors and the district court. J.A.75; *see also* J.A.74, 79, 81, 88, 91. The district court did not ultimately credit the prosecution's concerns about "confidence in the criminal justice system" or "prejudice [to] the jury pool." J.A.229-31.

The prosecution did not contend that President Trump's comments constitute threats, nor that President Trump incited others to break the law. Instead, the motion cited examples of several individuals who claimed that they received threatening and harassing communications from unidentified third parties after President Trump publicly criticized them in late 2020—almost three years ago, and long before this case was brought. J.A.76-78. The motion did not contend that President Trump's own comments were threatening or unlawful, but relied entirely on the claim that independent third parties supposedly made such comments in reaction to President Trump's speech. *See id.* The most recent statement of President Trump that was supposedly followed by "threats" or "harassment" from third parties, according to the prosecution, was made in December 2020. *Id.*

The prosecution then provided screen shots of ten social-media posts that President Trump had posted since his indictment on August 1, 2023. J.A.79-83. These posts were dated August 4, 5, 6, 7, 8, 21, 23, and 28, 2023. *Id.* The first post

made no reference to the case at all.  J.A.79.[7]  The next two posts accused the district court of bias.  J.A.80.  The fourth post called for a "federal takeover" of the District of Columbia due to its mismanagement and high crime rate.  J.A.81.

The next four posts contained criticisms of the Department of Justice and the Special Counsel's team, describing DOJ as the "Department of InJustice" that is "rigging the election for Crooked Joe Biden," the Special Counsel as "Deranged Jack Smith," and his prosecutors as a "team of Thugs."  J.A.81-83.  The prosecution then quoted two more posts criticizing the prosecution team.  J.A.83-84.

Finally, the prosecution complained that President Trump "posted publicly about individuals whom he has reason to believe will be witnesses in his trial."

---

[7] This post simply stated, "If you go after me, I'm coming after you!" in capital letters.  J.A.79.  Even though this post made no reference to the case, prosecutors and media immediately claimed that it was somehow a "threat" to "witnesses or court personnel."  *See, e.g.,* Kyle Cheney, et al., *Feds Alert Judge to Trump's "If You Go After Me, I'm Coming After You!" Post*, POLITICO (Aug. 4, 2023), https://www.politico.com/news/2023/08/04/feds-alert-judge-to-trumps-if-you-go-after-me-im-coming-after-you-post-00109944; David Jackson, *"I'm Coming after You:" Donald Trump Threatens Rivals; Prosecutor Seeks Protective Order"*, USA TODAY (Aug. 4, 2023), https://www.usatoday.com/story/news/politics/2023/08/04/im-coming-after-you-trump-issues-new-threats-after-new-indictment/70529404007/.  The Trump campaign stated that the post referred to political attacks by anti-Trump super PACs, and did not refer to the case.  Nick Robertson, *Trump Campaign Defends Threatening Social Media Posts as Free Speech*, THE HILL (Aug. 5, 2023), https://thehill.com/regulation/court-battles/4139012-trump-campaign-defends-threatening-social-media-posts-as-free-speech/ ("The Truth post cited is the definition of political speech, and was in response to the RINO, China-loving, dishonest special interest groups and Super PACs, like the ones funded by the Koch brothers and the Club for No Growth.").

J.A.84. It stated that he posted a video "attacking the former Attorney General of the United States, a potential witness in this case, on the very subject of his testimony." *Id.* It included two screen shots of posts by President Trump. The first criticized Rudy Giuliani's arrest in Fulton County, Georgia, as "sad for our country." J.A.85. The second criticized Vice President Pence on various grounds, calling him "Liddle' Mike Pence," describing him as having "gone to the Dark Side" and "newly emboldened," noting his "2% poll numbers," and describing him as "delusional" and "not a good person." *Id.*

The prosecution did not present any evidence that any prosecutor, potential witness, or court staff had experienced any threats or harassment after any of President Trump's public statements occurring since August 1, 2023; or any evidence that any such individual had *felt* threatened or intimidated by such statements. J.A.79-85. The prosecution did not present any statements by President Trump about any court staff. *See id.* The prosecution's motion did not present any evidence of the availability or efficacy of alternative measures, other than a prior restraint on President Trump's speech. *See id.*

On September 29, 2023, the prosecution filed its reply brief in the district court. J.A.121. The reply brief quoted or referred to six more social-media posts by President Trump from September 5, 6, 22, 23, and 26, 2023, and it cited an interview of President Trump by NBC's Meet the Press on September 17, 2023. J.A.129-30.

These included a post criticizing "a Special Counsel's Office prosecutor" as "Really corrupt!," J.A.129; two posts criticizing Vice President Pence as going to the "Dark Side" and "mak[ing] up stories about me, which are absolutely false," *id.*; a post criticizing General Milley for "actually dealing with China to give them a heads up on the thinking of the President of the United States" during 2021, J.A.130; a post referring to the Georgia Secretary of State as "What a mess!," *id.*; and a post calling the prosecutors a "team of Lunatics working so hard on creating Election Interference," *id.* The Meet the Press interview, according to the prosecution, included statements about the Georgia Secretary of State and Attorney General Barr. J.A.129.

Again, the reply brief did not include any evidence that any witness, prosecutor, or court staff had experienced any threats or harassment from third parties after President Trump's statements. J.A.129-30. It did not present any evidence that any such individual felt threatened or intimidated by such statements. *See id.* It did not present any evidence about the availability or efficacy of any less speech-restrictive alternative measures to address its concerns. *See id.*

On October 16, 2023, the district court held a hearing on the prosecution's motion. J.A.143. The prosecution presented no new evidence at the hearing. *See id.* During argument, the district court repeatedly expressed concern that President Trump's comments might inspire independent third parties to engage in threats or

harassment toward witnesses, prosecutors, or court staff.  J.A.183, 187, 192, 195, 202, 209.  Defense counsel emphasized that the prosecution had submitted no evidence to substantiate its concerns about such harassment or intimidation.  J.A.162, 168, 199.  The court responded, "Why should they have to?"  J.A.199.  When the district court asked the prosecution about the lack of evidence for its showing of prejudice, the prosecution responded, "*of course this prejudice is speculative*."  J.A.204 (emphasis added).

Defense counsel proposed that "the easiest solution … is to adjourn the case [until] after the presidential election."  J.A.162.[8]  The district court refused to consider this proposal: "This trial will not yield to the election cycle and we're not revisiting the trial date."  J.A.162-63.  The other two times that defense counsel raised this alternative, the court again dismissed it out of hand.  J.A.208, 221.

### C.     The District Court Enters the Gag Order Against President Trump.

On October 17, 2023, the district court entered the Gag Order.  J.A.229.  The Gag Order rested on the court's determination that unidentified third parties might react to President Trump's speech with threats or harassment: "[W]hen Defendant has publicly attacked individuals … those individuals are consequently threatened

---

[8] Though the case involves nearly 13 million pages of discovery and hundreds of potential witnesses, the district court has set trial for March 4, 2023—a mere seven months after indictment.  This date falls the day before Super Tuesday, at the height of the Republican primary campaign.

and harassed." J.A.230. The Gag Order cited no evidence and made no findings that any such threats or harassment had occurred since the case was filed. *Id.*

The Gag Order recited that "alternative measures such as careful *voir dire*, jury sequestration, and cautionary jury instructions are sufficient to remedy only some of the potential prejudices that the government's motion seeks to address." J.A.229-30. The Gag Order cited no evidence and made no other findings on this point. The Gag Order did not consider or even mention the possibility of a trial continuance until after the Presidential election as such an "alternative measure[]." *Id.* The Gag Order declined to give weight to the fact that President Trump is conducting a political campaign, J.A.231, and it gave no consideration to the rights of over 100 million Americans to receive President Trump's speech as they decide whether to support him in the upcoming Presidential election. J.A.229-31.

Based on this threadbare analysis, the district court ordered that:

All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

J.A.231. The court then included exemptions allowing President Trump to "criticiz[e] the government generally," to state "that Defendant is innocent of the charges against him, or that his prosecution is politically motivated," and to

"criticiz[e] the campaign platforms or policies of" candidates such as "Vice President Pence." *Id.*

President Trump filed a notice of appeal and moved for stay pending appeal. J.A.233. On October 29, 2023, the district court denied the motion for stay pending appeal. J.A.334.

**SUMMARY OF ARGUMENT**

I.     The Gag Order violates the First Amendment rights of both President Trump and over 100 million Americans who listen to him. President Trump is the leading Republican candidate for President of the United States, and he has a fundamental right to spread his core political speech and message. His audiences, and the American public, have a fundamental right to receive his campaign speech. The Gag Order violates these fundamental rights by imposing a viewpoint-based prior restraint on campaign speech, based on an impermissible "heckler's veto" theory, without any plausible justification.

A.     Because it violates a series of fundamental First Amendment precepts, the Gag Order is either invalid on its face or subject to the most exacting scrutiny conceivable. As a restriction on speech about judicial proceedings, the Gag Order requires a "clear and present danger to the administration of justice," *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 844 (1978), yet no such showing was made. And, as a prior restraint on speech, the Gag Order imposes "the most

serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Association v. Stuart* 427 U.S. 539, 559 (1976), and is subject to the "most exacting scrutiny." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979).

Because it restricts President Trump's *campaign* speech, the Gag Order calls for the "fullest and most urgent application" of the First Amendment. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). The Gag Order gave no consideration to the First Amendment rights of President Trump's audiences, comprising over 100 million Americans, even though his audiences enjoy an equal and "reciprocal" interest in hearing President Trump's speech, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976)— especially when he is the leading candidate for President of the United States.

The Gag Order's sole justification is that President Trump's speech might hypothetically lead unidentified, independent third parties to subject prosecutors, potential witnesses, or court staff to "threats" or "harassment." J.A.230. This is a classic heckler's veto. Under the First Amendment, speakers "are not chargeable with the danger" that their audiences "might react with disorder or violence." *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality op.). The government may not "t[ie] censorship to the reaction of the speaker's audience… [A] speech burden based on audience reactions is simply government hostility and intervention in a different

guise." *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment).

The Gag Order also restricts criticism of public figures on matters of enormous public concern, even though such speech receives the highest level of First Amendment protection. *Rosenblatt v. Baer*, 383 U.S. 75, 85-86 (1966). Further, by criticizing only speech that disparages, the Gag Order engages in unconstitutional viewpoint discrimination. *Matal*, 582 U.S. at 243 (plurality op.).

Thus, the Gag Order is invalid on its face or, at the very least, subject to the strictest conceivable scrutiny—which it cannot withstand.

B.    Given its extraordinary nature, one would expect an extraordinary justification for the Gag Order. But none exists. The Gag Order cannot satisfy any level of constitutional scrutiny.

First, the prosecution made no showing that the Gag Order was necessary to advance any important or compelling interest. When the Gag Order was entered, the case had been pending for nearly three months, and President Trump had made many statements about it. Yet the prosecution presented no evidence of any "threats" or "harassment" of any prosecutors, court staff, or potential witnesses during all that time. Instead, the prosecution admitted, "of course this prejudice is speculative." J.A.204. This falls far short of the "heavy burden of showing justification for" a prior restraint. *Nebraska Press Ass'n*, 427 U.S. at 558.

The Gag Order also gave no meaningful consideration to alternative, less speech-restrictive measures to advance its interests. The prosecution presented no evidence on this issue, and the district court made no specific findings, other than a one-sentence recital. The Supreme Court has held that, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates…." *Sheppard v. Maxwell*, 384 U.S. 333, 362–63 (1966). Yet the district court refused to consider this most natural alternative. J.A.162-63.

The Gag Order is also sweepingly overbroad. It restricts large amounts of core political speech that poses no plausible threat to the administration of justice. The entire Gag Order rests on an unconstitutional "heckler's veto" theory, so it is overbroad in its entirety. The Gag Order silences public criticism of public figures who openly attack President Trump in public statements, media interviews, political debates, and books. The Gag Order is impermissibly one-sided, permitting President Trump's opponents to attack him without restriction while silencing his ability to respond in kind. The Gag Order thus "license[s] one side of the debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92 (1992).

II.    The Gag Order is also unconstitutionally vague. "Stricter standards of permissible statutory vagueness" apply to restrictions on speech, *Hynes v. Mayor &*

*Council of Borough of Oradell*, 425 U.S. 610, 620 (1976), and "standards of permissible statutory vagueness are strict in the area of free expression," *NAACP v. Button*, 371 U.S. 415, 432 (1963).

The Gag Order cannot satisfy those exacting standards of clarity. The key operative word of the Order, "target," has a range of meanings that include statements refer to a person in any way, statements that "attack" a person, statements that "ridicule" or "criticize" a person, or statements that might "affect" a person without even naming them. Compounding this vagueness, the district court later explained that *any* of these meanings of "target" might apply, depending on "context," and that "target" means any statement that poses a "significant and immediate risk to the integrity of the proceedings." J.A.338. This is an impermissible "obey the law" injunction, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999), that is tailor-made to chill core political speech.

The Gag Order suffers from other vagueness problems. It prohibits statements that "target" any "reasonably foreseeable witness." J.A.231. However, the discovery in this case approaches 13 million pages, and the prosecution has not provided a witness list or even a list of potential witnesses. Thus, President Trump is left to guess as to who those "reasonably foreseeable" witnesses might be. The Gag Order also prohibits statements about "the substance of their testimony," which is indeterminate and unknowable, especially months before trial. The Gag Order's

24

carve-outs authorizing "general" criticism of the Government, while prohibiting specific statements that "target" government officials, make the vagueness even worse.  President Trump must therefore guess when criticizing the prosecution as "politically motivated" (which the Gag Order permits) becomes "target[ing] … the Special Counsel … or his staff" (which the Gag Order forbids).  All these problems make the Gag Order subject to "arbitrary and discriminatory application."  *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

## STANDARD OF REVIEW

The question whether the Gag Order violates the First Amendment presents a question of law that is subject to *de novo* review.  *See, e.g., United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999); *United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992); *see also City of Houston v. Hill*, 482 U.S. 451, 458 n.6 (1987) ("An independent review of the record is appropriate where the activity in question is arguably protected by the Constitution.") (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915-16, n.50 (1982)).

The question whether the Gag Order is unconstitutionally vague is a "pure question[] of law" subject to *de novo* review.  *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017).

## ARGUMENT

I.    **The Gag Order Violates the First Amendment Rights of President Trump and His Audiences of Over One Hundred Million Americans.**

The Gag Order is a viewpoint-based prior restraint on core political speech during an historic Presidential campaign that imposes an indefensible heckler's veto and silences criticism of major public figures on matters of enormous public interest and concern. The prosecution submitted no current evidence to justify this extraordinary restriction, admitting instead that "of course this prejudice is speculative." The Gag Order violates the First Amendment rights of both President Trump and over 100 million Americans who listen to his speech.

### A. The Gag Order Is Either Invalid on its Face or Subject to the Strictest Level of Scrutiny.

Because it violates virtually every fundamental principle of the First Amendment, the Gag Order is either invalid on its face, or subject to the strictest scrutiny conceivable.

### 1. Gag orders in judicial proceedings require a showing of "clear and present danger to the administration of justice."

In *Landmark Communications*, the Supreme Court held that restrictions on speech about pending judicial proceedings require a showing of "clear and present danger to the administration of justice." 435 U.S. at 844. "The operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Id.* at 839. This public concern is at its highest in criminal cases, because public scrutiny and criticism of court proceedings "guards against the miscarriage of justice by

subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Id.* (quoting *Sheppard*, 384 U.S. at 350).

*Landmark Communications* concerned restrictions on the media. *See id.* In *Ford*, the Sixth Circuit applied the same standard to a gag order on a criminal defendant who was a political candidate. 830 F.2d at 598. Adopting "the exacting 'clear and present danger' test for free speech," the Sixth Circuit reasoned that the First Amendment does not draw distinctions between ordinary individuals and the corporate media: "We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the press." *Id.*

In the district court, the prosecution contended that the "substantial likelihood of material prejudice" standard of *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1063 (1991), should apply to the Gag Order. As Justice Kennedy's plurality opinion in *Gentile* points out, that "substantial likelihood" standard was intended to "approximate the clear and present danger test," and that the "difference" between the two standards "could prove mere semantics." *Id.* at 1037 (plurality opinion).

To the extent that the tests differ, the higher standard applies here. *Gentile* rested heavily on the fact that attorneys are not ordinary citizens, but officers of the court, subject to unique regulations and restrictions in that role. *See id.* at 1066-75. *Gentile*, therefore, addressed the unique status of *attorneys* in gagging speech related

to pending court proceedings—in direct contrast to "the common rights of citizens." *Id.* at 1074. In upholding the State Bar's use of the "substantial likelihood" test, *Gentile* repeatedly emphasized the *attorney-specific* rationale for its holding, based on the unique duties and ethical obligations of attorneys. The Court emphasized that "lawyers in pending cases [a]re subject to ethical restrictions on speech to which an ordinary citizen would not be." *Id.* It relied on "decisions dealing with a lawyer's right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics," which "have not suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses." *Id.* at 1073. It focused on "the State's interest in the regulation of a specialized profession." *Id.* It distinguished "the common rights of citizens" from the rights of a lawyer, because "[a]s a lawyer he was an officer of the court, and like the court itself, an instrument of justice." *Id.* at 1074 (citations omitted). In fact, *Gentile* repeatedly contrasted the rights of an "attorney" with the rights of an "ordinary citizen" or "private citizen." *Id.* at 1071, 1072 n.5, 1074.

Accordingly, the Gag Order requires, at minimum, a "clear and present danger to the administration of justice." *Landmark Commc'ns*, 435 U.S. at 844. No such showing supports the Gag Order here. A "clear and present danger" requires a showing of *immediacy* based on strong evidence. *See id.* Here, the Gag Order's central rationale is that unidentified third parties *might* engage in threats or

harassment of prosecutors, potential witnesses, or court staff after hearing President Trump's speech.  J.A.230.  The only evidence claimed to support this inference is nearly three years old.  President Trump made many public statements about the case in the months it was pending, yet the prosecution produced no evidence of any threats or harassment during that time.  Instead, the prosecution admitted, "of course this prejudice is speculative."  J.A.204.

### 2. The Gag Order is a prior restraint on speech subject to the "most exacting scrutiny."

The Gag Order violates a series of additional First Amendment doctrines, each of which independently calls for the most exacting scrutiny.

First, unlike the restrictions at issue in *Landmark Communications* and *Gentile*, which imposed minor penalties on speech after the fact, the Gag Order is a prior restraint on speech.  J.A.231.  The Gag Order "prohibit[s]" President Trump and others, *ex ante*, "from making any public statements, or directing others to make any public statements," about specific persons or on forbidden topics.  *Id.*  That is a quintessential prior restraint.

In *Nebraska Press Association*, the Supreme Court emphasized "that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."  427 U.S. at 559.  "[A] prior restraint" is "one of the most extraordinary remedies known to our jurisprudence."  *Id.* at 562.  Prior restraints in the context of judicial proceedings are particularly suspect:

"Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment." *Id.* And "the protection against prior restraint should have particular force as applied to reporting of criminal proceedings…." *Id.*

"Prior restraints have been accorded the most exacting scrutiny." *Smith*, 443 U.S. at 102. For example, in *Capital Cities Media, Inc. v. Toole*, Justice Brennan stayed a gag order that prevented the publication of "the names or addresses of any juror" in a high-profile criminal case. 463 U.S. 1303, 1304 (1983). Emphasizing "the special importance of swift action to guard against the threat to First Amendment values posed by prior restraints," Justice Brennan held that "even a short-lived 'gag' order in a case of widespread concern to the community constitutes a substantial prior restraint and causes irreparable injury to First Amendment interests as long as it remains in effect." *Id.* He questioned whether *any* justification could support such an order: "Our precedents make clear … that far more justification than appears on this record would be necessary to show that this categorical, permanent prohibition against publishing information already in the public record was 'narrowly tailored to serve that interest,' if indeed any justification would suffice to sustain a permanent order." *Id.* at 1306.

So also here, "far more justification than appears on this record would be necessary" to justify the Gag Order, "if indeed any justification would suffice to sustain" it. *Id.*

### 3. The Presidential campaign calls for the First Amendment's "fullest and most urgent application."

Another grave defect of the Gag Order is its failure to consider President Trump's heightened First Amendment interests as a political candidate in spreading his core political speech during his campaign. This affects both President Trump and the reciprocal interests of his listeners and American voters.

"Speech on matters of public concern is at the heart of the First Amendment's protection. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (cleaned up) (citing numerous cases). "No form of speech is entitled to greater constitutional protection" than "[c]ore political speech." *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995).

Likewise, no form of core political speech receives greater protection than campaign speech. The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Susan B. Anthony List*, 573 U.S. at 162 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). Campaign speech lies "at the core of our electoral process of the First Amendment freedoms—an area … where protection of robust

discussion is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (citations and quotations omitted).

The only two cases addressing gag orders on criminal defendants who were also political candidates—*Ford* and *Brown*—granted virtually complete exemptions for the defendant's campaign speech. In *Ford*, the Sixth Circuit stated:

> Here the defendant … is entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views and his race…. He is entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion, as well as in the courtroom and on the floor of Congress. He will soon be up for reelection. His opponents will attack him as an indicted felon. He will be unable to respond in kind if the District Court's order remains in place.

830 F.2d at 600-01. In *Brown*, the Fifth Circuit noted that "[t]he district court also made special allowances for Brown's re-election campaign by lifting most of the order … for the duration of the campaign…. Brown was able to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race." 218 F.3d at 430.

Thus, in prior cases involving criminal defendants who were political candidates, the courts imposed virtually no restrictions on their speech. Here, the speaker is the leading Republican candidate for President of the United States. And the Gag Order restricts speech that is inextricably entwined with his campaign. The issues underlying the indictment are "central to [Biden's] re-election argument." Liptak, *supra*. President Trump's message that the criminal cases against him are

part of a politically motivated, unconstitutional campaign to silence him and derail his candidacy lies at the heart of his campaign—and the heart of the First Amendment.

The district court attempted to set metes and bounds for President Trump's campaign speech by dictating that certain "general[]" topics are permissible, while specific statements that "target" certain people are unacceptable. J.A.231. At oral argument, the district court repeatedly questioned why it was "necessary" to President Trump's campaign to make public comments about specific individuals. J.A.183-84, 189, 195; *see also* J.A.205-06. The district court then tried to cordon off what it considered to be "necessary" or appropriate campaign speech, authorizing President Trump to make "general[]" statements, while forbidding him to make "public statements that target" the Special Counsel, his prosecutors, and political rivals like Attorney General Barr and Vice President Pence. J.A.231.

The Supreme Court has rejected similar attempts to dictate the scope of permissible campaign speech. In *Republican Party of Minnesota*, the Supreme Court rejected a restriction on campaign speech that prohibited candidates for judicial office from discussing their "views on disputed legal or political issues." 536 U.S. at 768. Minnesota defended the restriction on the ground that the law "still leaves plenty of topics for discussion on the campaign trail," including "a list of

preapproved questions which judicial candidates are allowed to answer." *Id.* at 774.

The Supreme Court rejected the argument:

> [T]he notion that the special context of electioneering justifies an abridgment of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. Debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance. It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign. We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.

*Id.* at 781–82 (citations and quotation marks omitted).

### 4. The Gag Order violates the First Amendment rights of the tens of millions of Americans who listen to President Trump.

The Gag Order also violates the equal, reciprocal, and independent rights of President Trump's audiences and the American public. The First Amendment's "protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharm.*, 425 U.S. at 756 (citing many cases); *see also Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (recognizing the right to "speak and listen, and then … speak and listen once more," as a "fundamental principle of the First Amendment"); *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969); *Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 75 (D.D.C. 2001) (citing "long-standing precedent supporting plaintiff's First Amendment right to receive information and ideas"). A restriction on President Trump's speech inflicts a

"reciprocal" injury on the tens of millions of Americans who listen to him. *Va. State Bd. of Pharm.*, 425 U.S. at 757.

Like the right to speak, this right to listen has its "fullest and most urgent application precisely to the conduct of campaigns for political office," especially for the Presidency. *Susan B. Anthony List*, 573 U.S. at 162. Both the Sixth Circuit in *Ford* and the Fifth Circuit in *Brown* recognized this paramount interest. In *Ford*, the court emphasized that, if Congressman Ford were silenced, "reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance." 830 F.2d at 601. Likewise, *Brown* held that "[t]he urgency of a campaign … may well require that a candidate, for the benefit of the electorate as well as himself, have absolute freedom to discuss his qualifications…." 218 F.3d at 430.

Indeed, both before and after it was entered, the Gag Order has been widely criticized from across the political spectrum for restricting the rights of the American public to hear from the leading Presidential candidate in the middle of campaign season. *See, e.g.,* Terry Evans, Democrats' Drive To Impose 'Gag' Orders on Trump Is Blow to Free Speech, THE MILITANT (Nov. 13, 2023), https://themilitant.com/2023/11/04/democrats-drive-to-impose-gag-orders-on-trump-is-blow-to-free-speech/; Besty McCaughey, *Why the ACLU Is Going To Bat For Donald Trump*, N.Y. POST (Nov. 1, 2023) (the Gag Order violates "the public's

right to hear Trump's views so it can decide 'whether he deserves to be elected again'"); Jonathan Turley, *The Trump Gag Order Should Be Struck Down*, THE HILL (Oct. 18, 2023), https://thehill.com/opinion/judiciary/4262942-the-trump-gag-order-should-be-struck-down/; The Editors, *The Trump Gag Order Goes Too Far*, NATIONAL REVIEW (Oct. 18, 2023) ("Not only is free speech his right—it is the right of voters in the forthcoming primary and general elections to hear it before choosing the nation's next president."); Andrew McCarthy, *The Trump Gag Order Is Judicial Overkill*, NATIONAL REVIEW (Oct. 17, 2021); Isaac Arnsdorf et al., *In Trump Cases, Experts Say Defendant's Rhetoric Will Be Hard To Police*, WASHINGTON POST (Aug. 23, 2023) (the judge should "permit voters access to the defendant's statements as they decide how to cast their ballots…"); Jason Willick, *Go Ahead, Silence Donald Trump*, WASHINGTON POST (Sept. 19, 2023).

Though President Trump repeatedly raised the issue, J.A.98-99, 104, 117; J.A.186, 201-02, the district court gave the First Amendment rights of President Trump's audiences no meaningful consideration.  The Gag Order does not mention it, *see* J.A.229-31, and the district court declined to consider it when President Trump raised it, J.A.186, 201-02.  This, too, was error.

### 5.    The Gag Order imposes an impermissible heckler's veto.

The Gag Order's central justification is to protect trial participants from supposed "threats" and "harassment" by independent third parties.  J.A.230-31.  This

was the Court's predominant concern at oral argument, *see* J.A.183, 186-87, 201-02, 204, 210, 221, and it is the only justification stated within the Gag Order.  J.A.230. The court did not hold, and the prosecution does not contend, that any of President Trump's public statements constitute threats, "fighting words," or incitement to imminent lawless action.  *See, e.g., Counterman v. Colorado*, 600 U.S. 66, 73 (2023); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).  Thus, the Gag Order restricts President Trump's speech based solely on the anticipated *reaction* of unidentified, independent third parties.

This is a classic heckler's veto, which the First Amendment categorically forbids.  Under the First Amendment, public speakers "are not chargeable with the danger" that their audiences "might react with disorder or violence."  *Brown v. Louisiana*, 383 U.S. at 133 n.1 (plurality op.).  "[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise."  *Cox v. Louisiana*, 379 U.S. 536, 551 (1965) (cleaned up) (citing *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963); and *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963)); *see also, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("Speech cannot be … punished or banned, simply because it might offend a hostile mob.");  *Collin v. Chicago Park Dist*., 460 F.2d 746, 754 (7th Cir. 1972).  "The Supreme Court has made it clear … that the government may not prohibit speech under a 'secondary effects' rationale based solely on the emotive impact that

its … content may have on a listener." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001) (citing cases).

Thus, a heckler's veto arises from the anticipated unruly "reaction of the speaker's audience," whether that audience is favorable or unfavorable to the speaker: "The Government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience." *Matal*, 582 U.S. at 250 (Kennedy, J., concurring in part and concurring in the judgment). "Indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise." *Id.*

Thus, speech that falls short of incitement may not be silenced solely because it might inspire others to engage in violence or other unruly behavior—regardless of how predictable (or not) those unruly reactions might be. The Supreme Court's incitement "decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. A speech restriction that seeks to silence speech because it might provoke violence or unlawful behavior from the audience "impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth

Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Id.* (citing eight cases).

Moreover, the Gag Order silences President Trump's speech largely to prevent "harassment" of prosecutors, court staff, or potential witnesses. J.A.230. But "harassment" is a vague term that itself includes significant amounts of First Amendment-protected speech. *See, e.g., Popa*, 187 F.3d at 672; *Saxe*, 240 F.3d at 204 ("There is no categorical 'harassment exception' to the First Amendment's free speech clause."); *see also McCullen v. Coakley*, 573 U.S. 464, 491 n.8 (2014). Thus, the district court held that President Trump's First Amendment rights must be suppressed largely to prevent *others* from exercising *their* First Amendment rights. *See id.* That is the worst kind of heckler's veto.

**6.    The Gag Order shields public figures from public criticism.**

Further, the Gag Order suppresses criticism of quintessential public figures— a form of speech entitled to the highest level of First Amendment protection. The Special Counsel and his team are high-level government officials who volunteered for this high-profile prosecution and thus "thrust" themselves "into the vortex of this public issue." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 352 (1974). Likewise, the "witnesses" who supposedly might be "intimidated" by President Trump's speech are current and former officials from the highest echelons of government who have

repeatedly attacked President Trump in public statements, televised debates, national media interviews, and even books.

In *Rosenblatt*, the Supreme Court held that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion" and so such criticisms "must be free, lest criticism of government itself be penalized." 383 U.S. at 85. Every prosecutor on the case, and every potential witness identified by the prosecution, plainly constitutes a public figure. *Compare, e.g., Crane v. Ariz. Republic*, 972 F.2d 1511, 1524-25 (9th Cir. 1992) (prosecutor and head of federal task force are public figures); *Diesen v. Hessburg*, 455 N.W.2d 446, 450 (Minn. 1990) (county attorney is public figure); *ACLU, Inc. v. Zeh*, 864 S.E.2d 422, 437-38 (Ga. 2021) (county public defender for misdemeanors is a public figure). The First Amendment does not tolerate an order shielding such public figures from criticism.

### 7. The Gag Order involves viewpoint discrimination.

The Gag Order is content-based on its face, as it restricts speech on particular topics and about particular individuals. J.A.231. It also involves unconstitutional viewpoint discrimination. By forbidding speech that "target[s]" certain individuals, the Gag Order prohibits only (vaguely defined) *negative* speech about them. *See also infra*, Part II. In *Matal*, the Supreme Court unanimously agreed that prohibiting only negative or "disparaging" speech constitutes forbidden viewpoint discrimination. *See* 582 U.S. at 243 (plurality op.). Such a prohibition "constitutes

40

viewpoint discrimination—a form of speech suppression so potent that it must be subject to rigorous constitutional scrutiny." *Id.* at 247 (Kennedy, J., concurring in part and concurring in the judgment). To prohibit "disparaging" speech "reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination." *Id.* at 249.

The Gag Order's unlawful viewpoint discrimination is also reflected in the district court's rationale for adopting the Order. At oral argument, the district court expressed particular concern about President Trump's post about General Milley, in which he accused General Milley of "actually dealing with China to give them a heads up on the thinking of the President of the United States," stated that "[a] war between China and the United States could have been the result of this treasonous act," and stated that "[t]his is an act so egregious that, in times gone by, the punishment would have been DEATH!" J.A.130. The district court, incorrectly, viewed this statement as a call for violence against General Milley. J.A.200-01, 204, 221. The district court specifically referred to this post in the Gag Order. J.A.230 (stating that President Trump has "made statements … that particular individuals … deserve death").

The district court interpreted this post divorced from its context and in the most negative (and unreasonable) conceivable light. *See* J.A.201-02 (defense counsel explaining the post's context). The post makes no reference whatsoever to

the case.  As reported in a book by Bob Woodward and Robert Costa, "in the final

months of the Trump Administration," General Milley, then President Trump's

Chairman of the Joint Chiefs of Staff, made "secret phone calls" to "his Chinese

counterpart, General Li Zuocheng of the People's Liberation Army," without

President Trump's knowledge or authorization, in which General Milley "pledge[d]

he would alert his [Chinese] counterpart in the event of a U.S. attack," stating, "[i]f

we're going to attack, I'm going to call you ahead of time.  It's not going to be a

surprise."  Isaac Stanley-Becker, *Book: Top General Feared Trump Might Spark*

*War, Secretly Called Chinese Counterpart*, San Diego Union-Tribune (Sept. 14,

2021),        https://www.sandiegouniontribune.com/news/politics/story/2021-09-

14/book-top-general-feared-trump-might-spark-war-secretly-called-chinese-

counterpart.  "Milley … did not relay the conversation[s] to Trump."  *Id.*

　　　After this report, General Milley's actions were widely criticized by many

commentators—including U.S. Senators—as possibly treasonous.[9]    President

---

[9] *See, e.g.,* Samuel Chamberlain, *Calls Grow for Milley to Come Clean over Calls with Chinese Counterpart,* New York Post (Sept. 16, 2021), https://nypost.com/2021/09/16/senators-call-for-gen-mark-milley-to-come-clean-over-calls-with-chinese-counterpart/ (Sen. Rubio stated, "This is treacherous, it was dangerous, it's unconstitutional, and General Milley needs to answer questions about it, because if this is true, he should be fired."); Bill Gertz, *Milley War-Scare Calls to Chinese General Questioned*, Washington Times (Oct. 12, 2021), https://www.washingtontimes.com/news/2021/oct/12/milley-war-scare-calls-chinese-general-questioned/;  Jack Durschlag, *Milley-China Calls Weren't Authorized, Trump's Ex-Acting Defense Chief Says*, Fox News (Sept. 16, 2021), https://www.foxnews.com/us/milley-china-calls-authorized-trump-defense-chief.

Trump's statement that General Milley engaged in a "treasonous act" that would have been punishable by death in "times gone by," J.A.130, thus refers to General Milley's secret, unauthorized communications with China in 2020 and 2021—an issueof urgent public importance separate from this case. *Nebraska Press Association* calls for the court to place the "heavy burden of showing justification for the imposition of such a restraint" on the party *seeking* the gag order, not the gagged party. 427 U.S. at 558. By interpreting President Trump's speech out of context and in the most negative possible light, the district court discriminated against his viewpoint.

## B. The Gag Order Cannot Survive Any Level of Scrutiny.

The Gag Order is either invalid on its face or subject to the most exacting scrutiny. The Gag Order cannot survive any level of scrutiny.

### 1. The prosecution failed to establish any compelling interest for a prior restraint on speech.

First, the prosecution made no showing that suppressing President Trump's speech would serve any important or compelling interest. As noted above, the party seeking to justify a gag order bears "the heavy burden of demonstrating, in advance of trial, that without prior restraint a fair trial will be denied." *Nebraska Press Ass'n*, 427 U.S. at 569. This "heavy burden," *id.*, is an *evidentiary* burden: Where "the record is lacking in evidence to support" the gag order, it will not be upheld. *Id.* at

565; *see also id.* at 563; *Landmark Commc'ns*, 435 U.S. at 843 (holding that "actual facts" are necessary to support a gag order).

Here, the Gag Order's justification is to protect prosecutors, potential witnesses, and court staff from possible threats and harassment inspired by President Trump's speech. J.A.230-31. Yet by the time the Gag Order was entered, the case had been pending for almost three months, and President Trump had spoken about it very often. The prosecution provided at least 17 examples of public statements by President Trump between August 2 and September 26, 2023, that it considered objectionable. J.A.77-85; J.A.129-30. But it did not produce any evidence that, during all that time, any prosecutor, witness, or court staff experienced "threats" or "harassment" after—let alone based on—President Trump's speech. Likewise, it did not produce any evidence that any witness or prosecutor even *felt* threatened or intimidated by President Trump's speech—however subjectively. *See id.*

Instead, the prosecution relied on a handful of instances from almost three years ago. J.A.76-78. When asked about the dearth of *current* evidence, the prosecution admitted, "of course this prejudice is speculative." J.A.204. But a prior restraint cannot be based on speculation. *Nebraska Press Ass'n*, 427 U.S. at 569. Even if unruly actions by President Trump's listeners could be considered—which they cannot, *supra* Part I.A.5—the prosecution failed to submit evidence to establish them. On the contrary, the prosecution provided evidence that, in the 77 days

between the indictment and the entry of the Gag Order, President Trump made constant public statements about the case and people involved in it, yet it presented no evidence that those statements led any third parties to threaten or harass prosecutors, witnesses, or court staff. As in *Landmark Communications*, "the record before [the district court] was devoid of … 'actual facts.'" 435 U.S. at 843.

No doubt because actual evidence was so scarce, the district court repeatedly relied on information outside the record. Instead of relying on President Trump's actual statements, the district court focused on "a list of hypothetical statements" that President Trump never said. J.A.182, 193-94, 211-18. With regard to court staff, the district court relied on misleading media reports regarding President Trump's core political speech criticizing the conduct of a civil trial in New York. J.A.192-94. The district court's perusal of such extra-record materials was evidently the sole basis for including the "court's staff" in the Gag Order, *see id.*, since the prosecution presented no evidence that President Trump made any statements about court staff. Again, "far more justification than appears on this record would be necessary" to justify this order. *Capital Cities Media*, 463 U.S. at 1306.

### 2. The Gag Order failed to consider less speech-restrictive alternatives.

The Gag Order also failed to meaningfully consider less speech-restrictive alternatives before imposing a prior restraint on President Trump's speech. "It is axiomatic that the limitation on First Amendment freedoms must be 'no greater than

45

is essential to the protection of the particular governmental interest involved.'" *Brown*, 218 F.3d at 429 (quoting *Procunier v. Martinez*, 416 U.S. 396, 412 (1974)); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984) (considering "whether the limitation of First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved"). *Sheppard* emphasized the lower court's failure to consider alternative measures, such as change of venue and jury sequestration. *Sheppard*, 384 U.S. at 352-53. The trial court was required to "consider[] other means … to reduce the appearance of prejudicial material and to protect the jury from outside influence." *Id.* at 358.

*Nebraska Press Association* reinforced the necessity of considering less speech-restrictive measures. 427 U.S. at 562 (considering "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity"). The Supreme Court emphasized the importance of evidence and specific findings of fact: "We find little in the record that goes to another aspect of our task, determining whether measures short of an order restraining all publication would have insured the defendant a fair trial…. [T]he trial court made no express findings to that effect…." *Id.* at 563. The Supreme Court provided examples of a wide range of alternative measures, including a "change of trial venue," "postponement of the trial to allow public attention to subside," "searching questioning of prospective jurors," "the use of emphatic and clear [jury] instructions," and "[s]equestration of jurors."

*Id.* at 563–64. The Gag Order contains no meaningful consideration of such alternatives. "There is no finding that alternative measures would not have protected [defendant's] rights…. Moreover, the record is lacking in evidence to support such a finding." *Id.* at 565; *see also Ford*, 830 F.2d at 600.

Here, the prosecution presented no evidence on the availability or efficacy of any less speech-restrictive alternatives. The Gag Order cites no evidence on this question, and it makes no specific findings, other than its one-sentence recital that "alternative measures such as careful *voir dire*, jury sequestration, and cautionary jury instructions are sufficient to remedy only some of the *potential* prejudices that the government's motion seeks to address." J.A.229-30 (emphasis added). A prior restraint requires much more. There is "little in the record that goes to … determining whether measures short of an order retraining all publication would have insured the defendant a fair trial." *Nebraska Press Ass'n*, 427 U.S. at 563.

This deficiency is starkest with respect to the most obvious alternative— delaying the trial date until after the Presidential election. *Sheppard* held that the *principal* method of addressing pretrial publicity, and by far the least restrictive, is granting a continuance of the trial: "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case until the threat abates*…." 384 U.S. at 362-63 (emphasis added); *see also Nebraska Press Ass'n*, 427 U.S. at 563-64 (raising "postponement of the trial to

allow public attention to subside" as a less restrictive measure). Yet when defense counsel repeatedly urged this alternative, the district court refused even to entertain the idea. J.A.162-63 ("This trial will not yield to the election cycle and we're not revisiting the trial date…."); *see also* J.A.208, 221. This was clear error.

### 3. The Gag Order is sweepingly overbroad.

Further, the Gag Order fails any tailoring analysis because it sweeps in huge amounts of constitutionally protected, core political speech that presents no plausible threat to the administration of justice. *See supra*, Part I.A. The entire Gag Order rests on an impermissible "heckler's veto" theory, so it is overbroad to its core. *Supra*, Part I.A.5. The Gag Order bans criticism of high-level public figures like Vice President Pence, Attorney General Barr, General Milley, and others—speech that presents no plausible threat to the administration of justice. Criticisms of such public figures, like criticism of judges—even criticism that uses "strong language, interpretate language" and is "unfair"—cannot be so restricted. *Craig v. Harney*, 331 U.S. 367, 376 (1947). "Judges are supposed to be [people] of fortitude, able to thrive in a hardy climate." *Id.* "[T]he same is true of other government officials," like the Special Counsel and his staff, the former Vice President, the former Attorney General, and others. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964). These individuals are long accustomed to President Trump's speech and openly challenge

him in the public square.  The notion that any such individual may somehow be "intimidated" or "threatened" by President Trump's public criticism is baseless.

On this point, the Gag Order's one-sided nature is particularly offensive to First Amendment values.  It prevents President Trump from "targeting" senior public figures—such as Vice President Pence and Attorney General Barr—who routinely attack him and his fitness for the Presidency, thus thrusting themselves into the "vortex" of the campaign's public debate. *Gertz*, 418 U.S. at 352.  The district court "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 391-92.

## II. The Gag Order Is Unconstitutionally Vague.

Both the Due Process Clause and the First Amendment require prior restraints on speech to employ clear and precise language.  The Gag Order is unconstitutionally vague and contemplates severe penalties on President Trump, in addition to the First Amendment harms on him and the public, based on subjective and unpredictable hindsight-based enforcement.

The Supreme Court imposes exacting standards of clarity on prior restraints, because they are "the most serious and the least tolerable infringement on First Amendment rights," and "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Ass'n*, 427 U.S. at 559, 562; *see also id.* at 568

(holding that the gag order was "too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights").  "The general test of vagueness applies with particular force in review of laws dealing with speech.  Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech…."  *Hynes*, 425 U.S. at 620; *see also, e.g., Buckley v. Valeo*, 424 U.S. 1, 77 (1976) ("Where First Amendment rights are involved, an even 'greater degree of specificity' is required."); *Button*, 371 U.S. at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").

Under these heightened standards, the Gag Order is unconstitutionally vague. First, the central operative verb in the prohibition, "target," is incurably vague. J.A.231 (prohibiting "the parties and their counsel … from making any public statements … that target" a series of persons).  The verb "target" means "to make a target of," whereas the noun "target" may mean "a mark to shoot at," "something or someone marked for attack," "a goal to be achieved," "an object of ridicule or criticism," or "something or someone to be affected by an action or development," among several other meanings.  *Target*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/target.

Thus, public statements that "target" the listed persons could include (1) any statement that refers to them in any way (i.e., any "mark to shoot at"), *id*.; (2) any

statements that "attack" them in any way, *id.*; (3) any statement that subjects any person to "ridicule or criticism" of any kind, *id.*; and/or (4) any statement that might "affect" a person in any way, even if they are not directly mentioned, *id.* The Supreme Court has held that far more precise language is impermissibly vague. *Nebraska Press Ass'n*, 427 U.S. at 568 (holding that the word "implicative" in a pretrial gag order was unconstitutionally vague). Moreover, under the Supreme Court's exacting vagueness scrutiny, the court may not presume or speculate that a narrower meaning was intended. *Button*, 371 U.S. at 432 ("If the line drawn … is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression.").

In denying President Trump's motion for stay pending appeal, the district court held that any or all these meanings of "target" *might* apply: "[D]epending on their context, statements matching each of the definitions Defendant proffers for the term 'target' could pose such risks." J.A.338. The statements that impermissibly "target" people, the district court explained, are those "that could result in 'significant and immediate risks' to 'the integrity of these proceedings.'" *Id.* Thus, the Gag Order boils down to an order directing President Trump not to say anything that presents "a significant and immediate risk to the integrity of these proceedings." *Id.* This "clarification" makes the vagueness even worse. A gag order cannot simply

command a party to "obey the law" and comply with a vague, potentially subjective legal standard. *See, e.g., Burton*, 178 F.3d at 1201. The threat of "arbitrary and discriminatory application" in such cases is manifest. *Grayned*, 408 U.S. at 108-09.

The district court relied on *Bronstein* to argue that dictionaries are not relevant to vagueness inquiry. J.A.338. This misconstrues *Bronstein*. The statute at issue in *Bronstein* was not a prior restraint, and the Court did not analyze it as one, nor apply the exacting standards of clarity that apply to prior restraints. *See Bronstein*, 849 F.3d at 1102. And *Bronstein* held that the words "harangue" and "oration" at issue had a simple, commonsense meaning—"public speeches." *Id.* at 1108. This straightforward meaning was rendered even more narrow and specific by the statute's immediate context. *Id.* at 1109. The Gag Order differs from the statute in *Bronstein* because its key terms are vague from the outset, they draw no clarification from immediate context, and the district court's subsequent gloss made the vagueness problems even worse. *See id.* Further, *Bronstein* consciously sought to employ every possible interpretative tool to narrow the statute and eliminate its vagueness. *Id.* at 1106. But for a prior restraint like the Gag Order, the reviewing court "will not presume that the [restraint] curtails constitutionally protected activity as little as possible." *Button*, 371 U.S. at 432.

The Gag Order suffers from other vagueness problems as well. It applies to all "interested parties," which clearly includes unspecified persons *in addition to*

"the parties and their counsel."   J.A.231 ("All interested parties in this matter, including the parties and their counsel, are prohibits….").   An "interested" party is one "affected or involved" by the proceedings.   *Interested*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/interested   (defining   "interested"   as "being affected or involved: interested parties").   Thus, the Gag Order might apply to everyone "affected" by or "involved" in the case—the potential witnesses, the prosecutors, the Department of Justice, President Trump's attorneys in other cases, the Trump campaign, and the Biden campaign, or even the media covering it.   Again, attempting to adopt a narrowing construction of this broad, imprecise language cannot cure it.   *Button*, 371 U.S. at 432.

Likewise, the Gag Order's references to "any reasonably foreseeable witness" and "the substance of their testimony" are incurably vague.   The discovery in this case comprises nearly 13 million pages and references hundreds of individuals.   It is anyone's guess which witnesses may be "reasonably foreseeable" at this stage, and this   future-looking   standard   invites   impermissible   enforcement-by-hindsight. Likewise, unless and until any such witnesses are called, President Trump will have to guess what the "substance of their testimony" may involve—but the Gag Order binds him now.   The vagueness doctrine prevents *ex post* enforcement, or a standardless judgment as to which witnesses were "reasonably foreseeable" after the fact.   When it comes to the Gag Order's scope, people "of common intelligence must

necessarily guess at its meaning," rendering it fatally vague. *Hynes*, 425 U.S. at 620 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

The Gag Order's carve-outs exacerbate the vagueness problems. J.A.231. The carve-outs seem to authorize "criticizing the government generally, including the current administration or the Department of Justice," but evidently do not allow criticism the most relevant figures in the Department of Justice, *i.e.*, the Special Counsel and his prosecutors. *See id.* The carve-outs supposedly allow President Trump to state "that his prosecution is politically motivated," but the Gag Order prevents him from "targeting" the specific actors involved in his prosecution. *Id.* Thus, President Trump must guess when criticizing the prosecution as "politically motivated" ends, and "targeting" those politically motivated prosecutors begins. *Id.* The carve-outs apparently authorize "statements criticizing the platforms or policies of … former Vice President Pence," *id.*, but the "platforms or policies" of candidates like Pence (and Biden) are deeply intertwined with their views on election integrity, with specific reference to the issues in the indictment—as their own public statements demonstrate. When does criticism of Mike Pence's "platforms or policies" become a statement "that target[s] … the substance of [his] testimony," *id.*, when questions about the integrity of the 2020 election are central to both the 2024 Presidential campaign and this case? Liptak, *supra*. All must guess—and all will guess differently. The Gag Order is unconstitutionally vague.

## CONCLUSION

The district court's Opinion and Order, J.A.229, should be reversed in its entirety. If the Court affirms any portion of the Order, President Trump respectfully requests that the Court extend the administrative stay for seven days to permit him to seek emergency relief from the U.S. Supreme Court.

Dated: November 8, 2023

LAURO & SINGER

John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW

Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

Respectfully Submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ D. John Sauer*
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald Trump*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 8, 2023, I caused a true and correct copy
of the foregoing to be filed by the Court's electronic filing system, to be served by
operation of the Court's electronic filing system on counsel for all parties who have
entered in the case.

*/s/ D. John Sauer*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,767 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer