**PUBLIC APPENDIX—SEALED MATERIAL**
**IN SEPARATE SUPPLEMENT**

**ORAL ARGUMENT SET NOVEMBER 20, 2023**

**No. 23-3190**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA,

*Appellee*,

v.

DONALD J. TRUMP,

*Defendant-Appellant*.

_____

On Appeal from the United States District Court
for the District of Columbia

**PUBLIC JOINT APPENDIX**

LAURO & SINGER

John F. Lauro, Esq.
D.C. Circuit Bar No. 64896
jlauro@laurosinger.com
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

JAMES OTIS LAW GROUP, LLC

D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald Trump*

# TABLE OF CONTENTS

1.   Docket Sheet……………………………………………………………1

2.   Indictment (Aug. 1, 2023), Doc. 1…………………………………………..20

3.   Defendant Donald J. Trump's Motion for Recusal of District Judge
     Pursuant to 28 U.S.C. § 455(a) (Sept. 11, 2023), Doc. 50…………………...65

4.   Government's Opposed Motion to Ensure That Extrajudicial
     Statements Do Not Prejudice These Proceedings (Redacted)
     (Sept. 15, 2023), Doc. 57…………………………………………………...74

5.   Exhibit 1 (Sealed) Coversheet (Sept. 15, 2023), Doc. 57-1…………………93

6.   Government's Proposed Order (Sept. 15, 2023), Doc. 57-2………………...94

7.   President Trump's Response in Opposition to Prosecution's Motion
     for Prior Restraints (Sept. 25, 2023), Doc. 60………………………………96

8.   Government's Reply in Support of Opposed Motion to Ensure That
     Extrajudicial Statements Do Not Prejudice These Proceedings
     (Sept. 29, 2023), Doc. 64……………………………………………………121

9.   Transcript of Motion Hearing (Oct. 16, 2023), Doc. 103…………………..143

10.  Opinion and Order (Oct. 17, 2023), Doc. 105……………………………..229

11.  Notice of Appeal (Oct. 17, 2023), Doc. 106………………………………232

12.  President Trump's Opposed Motion for Stay Pending Appeal, Request
     for Temporary Administrative Stay, and Memorandum in Support
     (Oct. 20, 2023), Doc. 110……………………………………………………233

13.  President Trump's Motion to Dismiss for Selective and
     Vindictive Prosecution (Oct. 23, 2023), Doc. 116…………………………266

14.  Government's Response in Opposition to Motion to Stay
     (Oct. 25, 2023), Doc. 120……………………………………………………277

15.    President Trump's Reply in Support of Motion for Stay of Gag Order
       Pending Appeal (Oct. 28, 2023), Doc. 123……………………………...309

16.    Opinion and Order (Oct. 29, 2023), Doc. 124……………………………..334

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:23–cr–00257–TSC All Defendants

Case title: USA v. TRUMP                     Date Filed: 08/01/2023

Assigned to: Judge Tanya S. Chutkan

Appeals court case number: 23–3190

**Defendant (1)**

| | | |
|---|---|---|
| **DONALD J. TRUMP** | represented by | **John F. Lauro** |

LAURO & SINGER
400 N. Tampa Street
15th Floor
Tampa, FL 33602
(813) 222–8990
Fax: (813) 222–8991
Email: jlauro@laurosinger.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Emil Bove**
BLANCHE LAW
99 Wall Street, Suite 4460
New York, NY 10005
212–716–1250
Email: emil.bove@blanchelaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Filzah I. Pavalon**
LAURO & SINGER
400 N. Tampa Street
15th Floor
Tampa, FL 33602
(813) 222–8990
Fax: (813) 222–8991
Email: fpavalon@laurosinger.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Todd Blanche**
BLANCHE LAW
99 Wall Street
New York, NY 10005
(212) 716–1250
Email: toddblanche@blanchelaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Hac Vice*

| **Pending Counts** | **Disposition** |
|---|---|
| 18 U.S.C. 371; CONSPIRACY TO DEFRAUD THE UNITED STATES; Conspiracy to Defraud | |

the United States
(1)

18 U.S.C. 1512(k); TAMPERING
WITH WITNESS, VICTIM, OR
AN INFORMANT; Conspiracy
to Obstruct an Official
Proceeding
(2)

18 U.S.C. 1512(c)(2), 2;
TAMPERING WITH A
WITNESS, VICTIM OR
INFORMANT; Obstruction of,
and Attempt to Obstruct, an
Official Proceeding
(3)

18 U.S.C. 241; CONSPIRACY
AGAINST RIGHTS OF
CITIZENS; Conspiracy Against
Rights
(4)

**Highest Offense Level
(Opening)**

Felony

**Terminated Counts**                              **Disposition**

None

**Highest Offense Level
(Terminated)**

None

**Complaints**                                     **Disposition**

None

---

**Plaintiff**

**USA**                          represented by   **J.P. Cooney**
                                                  U.S. ATTORNEY'S OFFICE FOR THE
                                                  DISTRICT OF COLUMBIA
                                                  555 Fourth Street, NW
                                                  Washington, DC 20530
                                                  (202) 252–7281
                                                  Email: joseph.cooney@usdoj.gov
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*
                                                  *Designation: Assistant U.S. Attorney*

                                                  **James Pearce**
                                                  U.S. DEPARTMENT OF JUSTICE
                                                  CRIMINAL DIVISION APPELLATE
                                                  SECTION
                                                  Department of Justice, Criminal Division
                                                  950 Pennsylvania Ave NW
                                                  Suite 1250
                                                  Washington, DC 20530
                                                  (202) 532–4991
                                                  Fax: (202) 305–2121

Email: james.pearce@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Molly Gulland Gaston**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–7803
Email: molly.gaston@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Thomas Windom**
555 Fourth Street NW
Washington, DC 20530
202–252–7846
Email: thomas.windom@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/01/2023 | 1 | INDICTMENT as to DONALD J. TRUMP (1) count(s) 1, 2, 3, 4. (zltp) (Entered: 08/01/2023) |
| 08/01/2023 | 3 | MOTION to Seal Case by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(zltp) (Entered: 08/01/2023) |
| 08/01/2023 | 4 | ORDER granting 3 Motion to Seal Case as to DONALD J. TRUMP (1). Signed by Magistrate Judge Moxila A. Upadhyaya on 8/1/2023. (zltp) (Entered: 08/01/2023) |
| 08/01/2023 | | Case unsealed as to DONALD J. TRUMP (zltp) (Entered: 08/01/2023) |
| 08/03/2023 | 5 | NOTICE OF ATTORNEY APPEARANCE: John F. Lauro appearing for DONALD J. TRUMP (Lauro, John) (Entered: 08/03/2023) |
| 08/03/2023 | 7 | MOTION for Leave to Appear Pro Hac Vice Todd Blanche Filing fee $ 100, receipt number ADCDC–10252226. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 08/03/2023) |
| 08/03/2023 | 8 | Summons Returned Executed on 8/3/2023 as to DONALD J. TRUMP. (ztl) (Entered: 08/04/2023) |
| 08/03/2023 | | MINUTE ORDER as to Donald J. Trump: As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges and contempt proceedings.Signed by Magistrate Judge Moxila A. Upadhyaya on 8/3/2023. (ztl) (Entered: 08/04/2023) |
| 08/03/2023 | | ORAL MOTION for Speedy Trial by USA as to DONALD J. TRUMP. (ztl) (Entered: 08/04/2023) |
| 08/03/2023 | | Minute Entry for proceedings held before Magistrate Judge Moxila A. Upadhyaya: Return on Summons/Initial Appearance/Arraignment as to Counts 1,2,3,4 held on 8/3/2023. Plea of Not Guilty entered as to all counts. The Court advised the Government of its due process obligation under Rule 5(f).Status Conference set for 8/28/2023 at 10:00 AM in Courtroom 9– In Person before Judge Tanya S. Chutkan. Bond Status of Defendant: Defendant Remain on Personal Recognizance; Court Reporter: Jeff Hook; Defense Attorney: John Lauro and Todd Blanche; US Attorney: Thomas Windom and Molly Gaston; Pretrial Officer: Takeysha Robinson. (ztl) (Entered: 08/04/2023) |

| 08/03/2023 | | MINUTE ORDER as to DONALD J. TRUMP: A status conference will be held in this matter on August 28, 2023 at 10:00 AM in Courtroom 9 before Judge Tanya S. Chutkan. The court waives the requirement for Defendant to appear at that conference. It is hereby ORDERED that Defendant shall file any motion for excluding the time until the next status conference from the Speedy Trial Act clock by August 8, 2023; and that the government shall file any opposition to that motion by August 13, 2023. It is FURTHER ORDERED that by August 10, 2023, the government shall file a brief proposing a trial date and providing an estimate of the time required to set forth the prosecution's case in chief during that trial; and that by August 17, 2023, Defendant shall file a response brief likewise proposing a trial date and estimating, to the extent possible, the time required to set forth the defense at trial. Signed by Judge Tanya S. Chutkan on 8/3/2023. (ztl) (Entered: 08/04/2023) |
| 08/03/2023 | 13 | ORDER Setting Conditions of Release as to DONALD J. TRUMP (1) Personal Recognizance. Signed by Magistrate Judge Moxila A. Upadhyaya on 8/3/2023. (Attachment: # 1 Appearance Bond) (znjb) (Entered: 08/07/2023) |
| 08/04/2023 | 9 | MOTION for Leave to Appear Pro Hac Vice Filzah I. Pavalon Filing fee $ 100, receipt number ADCDC−10255735. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 08/04/2023) |
| 08/04/2023 | 10 | MOTION for Protective Order by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Gaston, Molly) (Entered: 08/04/2023) |
| 08/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by 5:00 PM on August 7, 2023, Defendant shall file a response to the government's 10 Motion for Protective Order, stating Defendant's position on the Motion. If Defendant disagrees with any portion of the government's proposed Protective Order, ECF No. 10−1, his response shall include a revised version of that Protective Order with any modifications in redline. Signed by Judge Tanya S. Chutkan on 08/05/2023. (lcss) (Entered: 08/05/2023) |
| 08/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 9 Motion for Leave to Appear Pro Hac Vice. Filzah I. Pavalon is hereby admitted pro hac vice to appear in this matter on behalf of Defendant. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions. Signed by Judge Tanya S. Chutkan on 08/05/2023. (lcss) (Entered: 08/05/2023) |
| 08/05/2023 | 11 | MOTION for Extension of Time to File Response/Reply as to 10 MOTION for Protective Order , MOTION for Hearing by DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Lauro, John) (Entered: 08/05/2023) |
| 08/05/2023 | 12 | RESPONSE by USA as to DONALD J. TRUMP re 11 MOTION for Extension of Time to File Response/Reply as to 10 MOTION for Protective Order MOTION for Hearing (Gaston, Molly) (Entered: 08/05/2023) |
| 08/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's 11 Motion for Extension of Time is hereby DENIED. Defendant may continue to confer with the government regarding its proposed protective order before or after the August 7, 2023 5:00 PM deadline for his response. The court will determine whether to schedule a hearing to discuss the proposed protective order after reviewing Defendant's response and, if included, his revised proposed protective order with modifications in redline. Signed by Judge Tanya S. Chutkan on 08/05/2023. (lcss) (Entered: 08/05/2023) |
| 08/06/2023 | | Set/Reset Deadline as to DONALD J. TRUMP: Defendant shall file a response to the government's 10 Motion for Protective Order, stating Defendant's position on the Motion by 5:00 PM on August 7, 2023. If Defendant disagrees with any portion of the government's proposed Protective Order, (Dkt. #10−1), his response shall include a revised version of that Protective Order with any modifications in redline. (jth) (Entered: 08/06/2023) |
| 08/07/2023 | 14 | RESPONSE by DONALD J. TRUMP re 10 MOTION for Protective Order (Lauro, John) (Entered: 08/07/2023) |
| 08/07/2023 | 15 | REPLY in Support by USA as to DONALD J. TRUMP re 10 MOTION for Protective Order (Gaston, Molly) (Entered: 08/07/2023) |

| | | |
|---|---|---|
| 08/07/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Upon consideration of the government's 10 Motion for Protective Order and Defendant's 14 Response, as well as the government's 15 Reply, the court will schedule a hearing on the parties' respective proposals. The court will waive the requirement of Defendant's appearance. Accordingly, it is hereby ORDERED that no later than 3:00 PM on August 8, 2023, the parties shall meet and confer and file a joint notice of two dates and times on or before August 11, 2023 when both parties are available for a hearing. Signed by Judge Tanya S. Chutkan on 08/07/2023. (lcss) (Entered: 08/07/2023) |
| 08/08/2023 | | Set/Reset Deadline as to DONALD J. TRUMP: by 3:00 PM on 8/8/2023, the parties shall meet and confer and file a joint notice of two dates and times on or before 8/11/2023 when both parties are available for a hearing. (jth) (Entered: 08/08/2023) |
| 08/08/2023 | 16 | TRANSCRIPT OF RETURN ON SUMMONS/INITIAL APPEARANCE/ARRAIGNMENT in case as to DONALD J. TRUMP before Magistrate Judge Moxila A. Upadhyaya held on August 3, 2023. Page Numbers: 1 – 24. Date of Issuance: August 8, 2023. Court Reporter: Jeff Hook. Contact Information: 202–354–3373 \| jeff_hook@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/29/2023. Redacted Transcript Deadline set for 9/8/2023. Release of Transcript Restriction set for 11/6/2023.(Hook, Jeff) (Entered: 08/08/2023) |
| 08/08/2023 | 17 | NOTICE *by the Parties in Response to Court's August 7, 2023 Minute Order* by USA as to DONALD J. TRUMP re Order,, (Gaston, Molly) (Entered: 08/08/2023) |
| 08/08/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The court hereby schedules a hearing on the parties' respective protective order proposals in this matter on August 11, 2023 at 10:00 AM in Courtroom 9. The requirement of Defendant's appearance is waived for this hearing. Signed by Judge Tanya S. Chutkan on 08/08/2023. (lcc) (Entered: 08/08/2023) |
| 08/08/2023 | 18 | MOTION to Exclude *Time Under Speedy Trial Act* by DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Granting Motion)(Lauro, John) (Entered: 08/08/2023) |
| 08/09/2023 | | Set/Reset Hearing as to DONALD J. TRUMP: A Hearing on the Parties' Respective Protective Order Proposals is set for August 11, 2023, at 10:00 AM in Courtroom 9. before Judge Tanya S. Chutkan. The requirement of Defendant's appearance is waived for this hearing. (jth) (Entered: 08/09/2023) |
| 08/09/2023 | 19 | ENTERED IN ERROR.....NOTICE *Updated Certificate of Good Standing* by DONALD J. TRUMP re 7 MOTION for Leave to Appear Pro Hac Vice Todd Blanche Filing fee $ 100, receipt number ADCDC–10252226. Fee Status: Fee Paid. (Lauro, John) Modified on 8/9/2023 (zhsj). (Entered: 08/09/2023) |
| 08/09/2023 | | NOTICE OF ERROR as to DONALD J. TRUMP regarding 19 Notice (Other). The following error(s) need correction: Incorrect format (Letter)– correspondence is not permitted (LCrR 49(f)(4)). Please refile as a Notice of Filing attaching your Certificate of Good Standing to a Notice of Filing Document Containing the Caption of the Court. (zhsj) (Entered: 08/09/2023) |
| 08/09/2023 | 20 | NOTICE *of Filing* by DONALD J. TRUMP re 7 MOTION for Leave to Appear Pro Hac Vice Todd Blanche Filing fee $ 100, receipt number ADCDC–10252226. Fee Status: Fee Paid. (Lauro, John) (Entered: 08/09/2023) |

| 08/09/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 7 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions as to DONALD J. TRUMP (1). Signed by Magistrate Judge Moxila A. Upadhyaya on 8/9/2023. (zcll) (Entered: 08/09/2023) |
|---|---|---|
| 08/09/2023 | 21 | NOTICE OF ATTORNEY APPEARANCE: Filzah Pavalon appearing for DONALD J. TRUMP (Pavalon, Filzah) (Entered: 08/09/2023) |
| 08/10/2023 | 22 | MOTION for Leave to Appear Pro Hac Vice Gregory M. Singer Filing fee $ 100, receipt number ADCDC–10266892. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 08/10/2023) |
| 08/10/2023 | 23 | RESPONSE TO ORDER OF THE COURT by USA as to DONALD J. TRUMP re Order,,,, Set Deadlines,,, *Government's Response to Court's August 3, 2023 Minute Order* (Gaston, Molly) (Entered: 08/10/2023) |
| 08/10/2023 | 25 | MOTION for Hearing *Pursuant to Classified Information Procedures Act* by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Windom, Thomas) (Entered: 08/10/2023) |
| 08/10/2023 | 26 | Memorandum in Opposition by USA as to DONALD J. TRUMP re Motion for Speedy Trial, 18 Motion to Exclude (Gaston, Molly) (Entered: 08/10/2023) |
| 08/10/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 22 Motion for Leave to Appear Pro Hac Vice. Gregory M. Singer is hereby admitted pro hac vice to appear in this matter on behalf of Defendant. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions. Signed by Judge Tanya S. Chutkan on 08/10/2023. (lcc) (Entered: 08/10/2023) |
| 08/10/2023 | 27 | NOTICE OF ATTORNEY APPEARANCE: Todd Blanche appearing for DONALD J. TRUMP (Blanche, Todd) (Entered: 08/10/2023) |
| 08/10/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 24 Sealed Motion for Leave to Submit Exhibit Ex Parte and Under Seal is hereby DENIED without prejudice. Signed by Judge Tanya S. Chutkan on 8/10/2023. (zjd) (Entered: 08/10/2023) |
| 08/11/2023 | | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Hearing on the Parties' Respective Protective Order Proposals as to DONALD J. TRUMP held on 8/11/2023. The Court shall issue a protective order consistent with the rulings made on the record. Oral Order of the Court granting Government's 25 Motion for Pretrial Conference Pursuant to the Classified Information Procedures Act. This hearing shall proceed on August 28, 2023 at 10:00 AM in Courtroom 9 before Judge Tanya S. Chutkan. Bond Status of Defendant: remains on Personal Recognizance; Court Reporter: Bryan A. Wayne; Defense Attorneys: John F. Lauro, Gregory M. Singer, and Todd Blanche; US Attorneys: Thomas Windom and Molly G. Gaston. (zjd) (Entered: 08/11/2023) |
| 08/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 25 Motion for Hearing Pursuant to Classified Information Procedures Act (CIPA) is GRANTED. Defense counsel consented to the motion during the August 11, 2023 hearing. Accordingly, the court will hold a hearing pursuant to CIPA Section 2 during the status conference currently scheduled for August 28, 2023. Signed by Judge Tanya S. Chutkan on 8/11/2023. (zjd) (Entered: 08/11/2023) |
| 08/11/2023 | 28 | PROTECTIVE ORDER GOVERNING DISCOVERY AND AUTHORIZING DISCLOSURE OF GRAND JURY TESTIMONY as to DONALD J. TRUMP. Consistent with the rulings made on the record during the hearing on August 11, 2023, the Court grants in part and denies in part the Government's 10 Motion for Protective Order. Signed by Judge Tanya S. Chutkan on 8/11/2023. (zjd) (Entered: 08/11/2023) |
| 08/11/2023 | 29 | TRANSCRIPT OF HEARING ON PROTECTIVE ORDER in case as to DONALD J. TRUMP before Judge Tanya S. Chutkan held on August 11, 2023; Page Numbers: 1–73. Date of Issuance: 8/11/2023. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form |

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 9/1/2023. Redacted Transcript Deadline set for 9/11/2023. Release of Transcript Restriction set for 11/9/2023.(Wayne, Bryan) (Main Document 29 replaced on 8/23/2023) (zhsj). (Entered: 08/11/2023)

| | | |
|---|---|---|
| 08/17/2023 | 30 | RESPONSE TO ORDER OF THE COURT by DONALD J. TRUMP re Order,,,, Set Deadlines,,, (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Lauro, John) (Entered: 08/17/2023) |
| 08/21/2023 | 31 | MOTION for Leave to File *Reply Brief* by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Proposed Order)(Windom, Thomas) (Entered: 08/21/2023) |
| 08/21/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 31 Motion for Leave to File Reply is hereby GRANTED. The government may file a reply in support of its brief proposing a trial date by August 22, 2023. The reply brief shall be limited to six pages. Signed by Judge Tanya S. Chutkan on 8/21/2023. (zjd) (Entered: 08/21/2023) |
| 08/21/2023 | 32 | RESPONSE TO ORDER OF THE COURT by USA as to DONALD J. TRUMP re Order,,,, Set Deadlines,,, Order on Motion for Leave to File,, Set/Reset Deadlines, *(Reply Brief)* (Windom, Thomas) (Entered: 08/21/2023) |
| 08/21/2023 | 40 | LEAVE TO FILE DENIED–Motion of D.A. Feliciano for Leave to File Amicus Curiae Brief Supporting Neither Plaintiff Nor Defendant as to DONALD J. TRUMP. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 41 | LEAVE TO FILE DENIED– Motion for Judicial Notice Affidavit of Victor Shorkin as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 42 | LEAVE TO FILE DENIED–Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 43 | LEAVE TO FILE DENIED–Petition for a Writ of Habeas Corpus as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from |

| | | |
|---|---|---|
| | | the ordinary procedures course by permitting this filing".. Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 44 | LEAVE TO FILE DENIED as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 45 | LEAVE TO FILE DENIED– Amicus Curiae in Support of Donald Trump as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 46 | LEAVE TO FILE DENIED– Moton of Former Judges and Senior Legal Officials for Leave to File an Amicus Curiae Brief in Support of Government Proposed Trial Date and Schedule as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 81 | LEAVE TO FILE DENIED– MOTION TO INTERVENE THE OUTCOME OF CASE AFFECTS DAVID REGINALD HERON AFTER MOTION INTERVENE GRANTED [DAVID FILE SEPARATE MOTION – RULING TO HIRE ATTORNEY] as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing thissubmission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 10/06/2023) |
| 08/22/2023 | 33 | Consent MOTION to Appoint a Classified Information Security Officer by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Proposed Order)(Windom, Thomas) (Entered: 08/22/2023) |
| 08/22/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 33 Consent Motion to Appoint a Classified Information Security Officer is hereby GRANTED. The court will issue a separate sealed order designating the Officer and any alternate Officers. Signed by Judge Tanya S. Chutkan on 8/22/2023. (zjd) (Entered: 08/22/2023) |
| 08/22/2023 | 35 | Unopposed MOTION for Protective Order *Pursuant to the Classified Information Procedures Act* by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Proposed CIPA Protective Order)(Windom, Thomas) (Entered: 08/22/2023) |
| 08/22/2023 | 37 | ORDER as to DONALD J. TRUMP granting 35 Unopposed MOTION for Protective Order Pursuant to the Classified Information Procedures Act. Signed by Judge Tanya S. Chutkan on 8/22/2023. (zjd) (Entered: 08/22/2023) |
| 08/28/2023 | | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Status Conference and Hearing Pursuant to Classified Information Procedures Act (CIPA) as to DONALD J. TRUMP held on 8/28/2023. In the interests of justice (XT), and for the reasons stated on the record, the Court grants Defendant's 18 Motion for Exclusion of Time Under Speedy Trial Act. The time from 8/3/2023 through and including |

| | | |
|---|---|---|
| | | 8/28/2023 shall be excluded in computing the date for speedy trial in this case. Jury Trial in this matter is set for March 4, 2024 at 9:30 AM in Courtroom 9 before Judge Tanya S. Chutkan. Bond Status of Defendant: appearance waived, remains on personal recognizance; Court Reporter: Bryan Wayne; Defense Attorneys: John F. Lauro and Todd Blanche; US Attorneys: Molly G. Gaston and Thomas Windom. (zjd) (Entered: 08/28/2023) |
| 08/28/2023 | 38 | TRANSCRIPT OF 8/28/23 STATUS HEARING in case as to DONALD J. TRUMP before Judge Tanya S. Chutkan held on August 28, 2023; Page Numbers: 1–61. Date of Issuance: 8/28/2023. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 9/18/2023. Redacted Transcript Deadline set for 9/28/2023. Release of Transcript Restriction set for 11/26/2023.(Wayne, Bryan) (Entered: 08/28/2023) |
| 08/28/2023 | 39 | PRETRIAL ORDER as to DONALD J. TRUMP: Upon consideration of the parties' Proposed Briefing Schedules 23 30 32 , the court hereby sets the following pretrial schedule. All pre–trial motions, excluding motions in limine, due 10/9/23, oppositions due 10/23/23, and replies due 11/6/23. Motions in limine and Suppression Motions due 12/27/23, oppositions due 1/9/24, and replies due 1/22/24. Not later than 12/4/23, the government shall provide notice of evidence it intends to offer pursuant to Fed. R. Evid. 404(b). Parties shall exchange expert witnesses on 12/11/23. Parties shall exchange exhibit lists by 12/18/23 and file any objections to exhibits by 1/3/24; replies due 1/9/24. Proposed jury instructions and voir dire questions due 1/15/24. Parties shall exchange witness lists by 2/19/24. Trial will commence on 3/4/24 at 9:30 a.m. in Courtroom 9 unless otherwise specified. See Order for additional details and instructions. Signed by Judge Tanya S. Chutkan on 8/28/2023. (zjd) **Modified on 10/6/2023: See 82 Opinion and Order for amendments made to this order.** (zjd). (Entered: 08/28/2023) |
| 09/05/2023 | | VACATED PURSUANT TO MINUTE ORDER FILED 9/5/2023.....MINUTE ORDER as to DONALD J. TRUMP: The Government's 47 Motion for Leave to File Unredacted Motion Under Seal, and to File Redacted Motion on Public Docket is hereby GRANTED. The Clerk of the Court is directed to file under seal the unredacted copy of the Government's Motion (ECF No. 47–1), attaching Exhibit 1 to the Government's Motion (ECF No. 47–2). The Clerk of the Court is further directed to file on the public docket the redacted copy of the Government's Motion (ECF No. 47–3), attaching a placeholder sheet for Exhibit 1 to the Motion (ECF No. 47–4), and the two proposed orders referenced in the Motion (ECF Nos. 47–5 and 47–6). Signed by Judge Tanya S. Chutkan on 9/5/2023. (zjd) Modified on 9/5/2023 (zjd). (Entered: 09/05/2023) |
| 09/05/2023 | 48 | MOTION to Vacate by DONALD J. TRUMP. (Lauro, John) (Entered: 09/05/2023) |
| 09/05/2023 | 49 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 48 Motion to Vacate (Gaston, Molly) (Entered: 09/05/2023) |
| 09/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's 48 Motion to Vacate is hereby GRANTED. The court's previous Minute Order of September 5, 2023 is VACATED. Defendant shall respond to the government's 47 Motion for Leave to File by September 11, 2023; the government may file a Reply by September 13, 2023. Any opposition or reply may be filed under seal. Going forward, all motions, including motions for leave to file, must (1) indicate whether the movant has conferred with |

| | | |
|---|---|---|
| | | opposing counsel, and (2) state the nonmovant's position on the motion, if known. As it has done here, the court may require briefing on motions for leave to file under seal on a timeline shorter than the default periods provided for in the Local Criminal Rules. However, all such briefing may be filed under seal without further order of the court. Signed by Judge Tanya S. Chutkan on 9/5/2023. (zjd) (Entered: 09/05/2023) |
| 09/11/2023 | 50 | MOTION for Recusal by DONALD J. TRUMP. (Attachments: # 1 Exhibit Transcript Excerpt 1, # 2 Exhibit Transcript Excerpt 2)(Lauro, John) (Entered: 09/11/2023) |
| 09/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Upon consideration of Defendant's 50 Motion for Recusal, it is hereby ORDERED that the government shall file any opposition no later than September 14, 2023, and the defense shall file any reply within three calendar days from the filing date of the government's opposition. All other deadlines set by the court remain in effect. Defense counsel is reminded of the requirement to confer with opposing counsel before filing any motion and to indicate whether the motion is opposed. See 09/05/2023 Second Minute Order. Future motions that fail to comply with that requirement may be denied without prejudice. Signed by Judge Tanya S. Chutkan on 9/11/2023. (zjd) (Entered: 09/11/2023) |
| 09/13/2023 | 77 | LEAVE TO FILE DENIED–Application for Relief in a Criminal Case by a Person not a Party–Applicant Charles E. Hill as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 78 | LEAVE TO FILE DENIED–Application for Relief in a Criminal Case by a Person not a Party–Applicant Charles E. Hill as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretionto permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedurenor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the courtdoes not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 79 | LEAVE TO FILE DENIED– Petition for a Writ of Habeas Corpus Continued Application to Arrest Protective Order Dated: 8/11/23 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time,the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 80 | LEAVE TO FILE DENIED–Letter Regarding Defendant's Right to Attend Trial as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courtshave in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinaryprocedural course by permitting this filing" Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 83 | LEAVE TO FILE DENIED–Motion to Decriminalize as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 84 | LEAVE TO FILE DENIED– Petition for Intervention as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rareinstances exercised their discretion to permit third–partysubmissions in criminal cases, neither the Federal Rulesof Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At thistime, the court does not find it necessary to depart fromthe |

10

| | | |
|---|---|---|
| | | ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/14/2023 | 53 | MOTION FOR BRIEFING SCHEDULE as to DONALD J. TRUMP. (Lauro, John) Modified on 9/15/2023 (zhsj). (Entered: 09/14/2023) |
| 09/14/2023 | 54 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 50 Motion for Recusal (Gaston, Molly) (Entered: 09/14/2023) |
| 09/15/2023 | 55 | Opinion and Order as to DONALD J. TRUMP granting the government's 47 Motion for Leave to File Unredacted Motion Under Seal, and to File Redacted Motion on Public Docket, and granting in part and denying in part Defendant's 53 Motion for Briefing Schedule. Defendant shall file any Opposition to the government's substantive Motion by September 25, 2023, and the government shall file any Reply by September 30, 2023. The Clerk of the Court is directed to file under seal the unredacted copy of the government's substantive Motion (ECF No. 47–1), attaching Exhibit 1 to the that Motion (ECF No. 47–2) under seal as well. The Clerk of the Court is further directed to file on the public docket the redacted copy of the government's Motion (ECF No. 47–3), attaching a placeholder sheet for Exhibit 1 to the Motion (ECF No. 47–4), and attaching the two proposed orders referenced in the Motion (ECF Nos. 47–5 and 47–6). Finally, the Clerk of the Court is directed to unseal Defendant's motion, ECF No. 53. See Order for details. Signed by Judge Tanya S. Chutkan on 9/15/2023. (zjd) (Entered: 09/15/2023) |
| 09/15/2023 | 57 | MOTION to Ensure that Extrajudicial Statements Do Not Prejudice these Proceedings by USA as to DONALD J. TRUMP. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order Exhibit 47–5, # 3 Text of Proposed Order Exhibit 47–6) (zhsj) (Attachment 2 replaced on 9/21/2023) (zhsj). (Entered: 09/15/2023) |
| 09/17/2023 | 58 | REPLY in Support by DONALD J. TRUMP re 50 MOTION for Recusal (Lauro, John) (Entered: 09/17/2023) |
| 09/25/2023 | 59 | NOTICE of Filing by USA as to DONALD J. TRUMP (Attachments: # 1 Cover Sheet)(Gaston, Molly) (Entered: 09/25/2023) |
| 09/25/2023 | 60 | Memorandum in Opposition by DONALD J. TRUMP re 57 Motion for Miscellaneous Relief, (Lauro, John) (Entered: 09/25/2023) |
| 09/27/2023 | 61 | MEMORANDUM OPINION and ORDER as to DONALD J. TRUMP denying 50 Defendant's Motion for Recusal of District Judge Pursuant to 28 U.S.C. § 455(a). See attached memorandum opinion and order for full details. Signed by Judge Tanya S. Chutkan on 9/27/2023. (zjd) (Entered: 09/27/2023) |
| 09/27/2023 | 62 | MOTION for Extension of Time to *File CIPA Sect. 5 and response to ex parte notice* by DONALD J. TRUMP. (Blanche, Todd) (Entered: 09/27/2023) |
| 09/27/2023 | 67 | LEAVE TO FILE DENIED– Petition for Writ of Error Corum Noblis and Memorandum of Law in Support Thereof as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 68 | LEAVE TO FILE DENIED–Motion to Intervene as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases,neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |

| 09/27/2023 | 69 | LEAVE TO FILE DENIED– Application for Relief in a Criminal Case by a Person not a Party–Applicant Charles E. Hill as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 70 | LEAVE TO FILE DENIED–Motion for Reconsideration of Order Date 8/21/2023 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–partysubmissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 71 | LEAVE TO FILE DENIED– Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 72 | LEAVE TO FILE DENIED– Motion of D.A. Feliciano for Leave to File Amicus Curiae Brief Supporting Neither Plaintiff Nor Defendant as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised theirdiscretion to permit third–party submissions in criminalcases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicuscuriae briefs. At this time, the court does not find it necessaryto depart from the ordinary procedural course by permittingthis filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 73 | LEAVE TO FILE DENIED– New Motion to Intervene–New Fresh Most Recent Evidence Relate 6/4/2009 &11/4/2008 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretion topermit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinary procedural course by permitting this filing".. Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 86 | LEAVE TO FILE DENIED– Petition for Writ of Error Coram Nobis as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 87 | LEAVE TO FILE DENIED– Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Even if construed as a motion for leave to file anamicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courtshave in rare instances exercised their discretion topermit third–party submissions in criminal cases,neither the Federal Rules |

| | | |
|---|---|---|
| | | of Criminal Procedure northe Local Criminal Rules contemplate the filing ofamicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinaryprocedural course by permitting this filing." Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 88 | LEAVE TO FILE DENIED– Proof of Service as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicuscuriae brief, the court is not persuaded that filing thissubmission is warranted. Although courts have in rareinstances exercised their discretion to permit third–partysubmissions in criminal cases, neither the Federal Rulesof Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At thistime, the court does not find it necessary to depart fromthe ordinary procedural course by permitting this filing".. Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 89 | LEAVE TO FILE DENIED– Motion for Reconsideration of Order Date 8/21/2023 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicuscuriae brief, the court is not persuaded that filing thissubmission is warranted. Although courts have in rareinstances exercised their discretion to permit third–partysubmissions in criminal cases, neither the Federal Rulesof Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At thistime, the court does not find it necessary to depart fromthe ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 90 | LEAVE TO FILE DENIED– Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Even if construed as a motion for leave to file anamicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courtshave in rare instances exercised their discretion topermit third–party submissions in criminal cases,neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing ofamicus curiae briefs. At this time, the court doesnot find it necessary to depart from the ordinaryprocedural course by permitting this filing." Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 91 | LEAVE TO FILE DENIED– Motion of D.A. Feliciano for Leave to File Amicus Curiae Brief Supporting Neither Plaintiff Nor Defendant as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised theirdiscretion to permit third–party submissions in criminalcases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicuscuriae briefs. At this time, the court does not find it necessaryto depart from the ordinary procedural course by permittingthis filing." Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 92 | LEAVE TO FILE DENIED– New Motion to Intervene–New Fresh Most Recent Evidence Relate 6/4/2009 &11/4/2008 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretion topermit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/28/2023 | 63 | MOTION for Extension of Time to *File Pretrial Motions* by DONALD J. TRUMP. (Lauro, John) (Entered: 09/28/2023) |
| 09/28/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by October 3, 2023, the government shall file any opposition to both Defendant's 62 Motion for Access to CIPA § 4 Filing and an Adjournment of the CIPA § 5 Deadline and Defendant's 63 Motion for Extension of Time to File Pretrial Motions; and that the defense shall file any reply within three calendar days from the filing date of the government's opposition. Signed by Judge Tanya S. Chutkan on 9/28/2023. (zjd) (Entered: 09/28/2023) |

| 09/29/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The court hereby schedules a hearing on the government's 57 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings on October 16, 2023 at 10:00 AM in Courtroom 9. The requirement of Defendant's appearance is waived for this hearing. Signed by Judge Tanya S. Chutkan on 9/29/2023. (zjd) (Entered: 09/29/2023) |
| 09/29/2023 | 64 | REPLY in Support by USA as to DONALD J. TRUMP re 57 MOTION to Ensure that Extrajudicial Statements Do Not Prejudice these Proceedings (Gaston, Molly) (Entered: 09/29/2023) |
| 10/02/2023 | 65 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 62 Motion for Extension of Time to *File CIPA Section 5 and Response to Ex Parte Notice* (Windom, Thomas) (Entered: 10/02/2023) |
| 10/02/2023 | 66 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 63 Motion for Extension of Time to *File Pretrial Motions* (Windom, Thomas) (Entered: 10/02/2023) |
| 10/03/2023 | | MINUTE ORDER as to DONALD J. TRUMP: By October 10, 2023, defense counsel John F. Lauro and Gregory M. Singer shall initiate and complete all security clearance tasks as directed by the Litigation Security Group of the U.S. Department of Justice, and thereafter file a Notice of Compliance by October 11, 2023. The Notice shall also state whether the defense anticipates that any other of its members, whose assistance is reasonably required, will need to obtain a security clearance. Signed by Judge Tanya S. Chutkan on 10/3/2023. (zjd) (Entered: 10/03/2023) |
| 10/03/2023 | | Set/Reset Deadlines as to DONALD J. TRUMP: Notice of Compliance due by 10/11/2023. (mac) (Entered: 10/03/2023) |
| 10/04/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that court will hold an ex parte Classified Information Procedures Act hearing with the defense at a time and place arranged with defense counsel. Signed by Judge Tanya S. Chutkan on 10/4/2023. (zjd) (Entered: 10/04/2023) |
| 10/05/2023 | 74 | MOTION to Dismiss Case by DONALD J. TRUMP. (Lauro, John) (Entered: 10/05/2023) |
| 10/05/2023 | 75 | REPLY in Support by DONALD J. TRUMP re 63 MOTION for Extension of Time to *File Pretrial Motions* (Lauro, John) (Entered: 10/05/2023) |
| 10/05/2023 | 76 | REPLY in Support by DONALD J. TRUMP re 62 MOTION for Extension of Time to *File CIPA Sect. 5 and response to ex parte notice* (Lauro, John) (Entered: 10/05/2023) |
| 10/06/2023 | 82 | OPINION and ORDER as to DONALD J. TRUMP granting in part and denying in part Defendant's 62 Motion for Access to CIPA § 4 Filing and An Adjournment of the CIPA § 5 Deadline; granting in part and denying in part Defendant's 63 Motion for Extension of Time to File Pretrial Motions; and amending in part the court's 39 Pretrial Order. Defense objections to ex parte nature of government's CIPA § 4 submission due October 11, 2023; government response due October 18, 2023. Defense CIPA § 5 notice due on October 26, 2023, with supplemental notices due within 20 days of receiving access to additional classified discovery materials. Dispositive motions, including motions to dismiss, due October 23, 2023; oppositions due within 14 days of motion's filing; replies due within 10 days of opposition's filing. Rule 17(c) motions and motions to compel due November 9, 2023; oppositions due November 24, 2023; replies due December 1, 2023. See Opinion & Order for details. Signed by Judge Tanya S. Chutkan on 10/6/2023. (zjd) (Entered: 10/06/2023) |
| 10/06/2023 | 94 | LEAVE TO FILE DENIED– Notice of Appeal as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even assuming a third party could file a notice of appeal in a criminal case which the Federal Rules of Criminal Procedure and Local Criminal Rules do not contemplate, this filing does not comply with Rule 3(c) of the Circuit Rules of the U.S. Court of Appeals for the District of Columbia Circuit". Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/06/2023 | 96 | LEAVE TO FILE DENIED– Petition for a Writ of Habeas Corpus, Continued Judge Chutkan Impermissibly Held First Amendment to be Unconstitutional as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Even if construed as a motion for leave to file an amicus curiae brief, the court is not |

| | | |
|---|---|---|
| | | persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretionto permit third–party submissions in criminal cases, neither the Federal Rules of CriminalProcedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time,the court does not find it necessary to depart from the ordinary procedural course by permittingthis filing". Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/09/2023 | 85 | MOTION for Leave to Appear Pro Hac Vice Emil Bove Filing fee $ 100, receipt number ADCDC–10406576. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 10/09/2023) |
| 10/10/2023 | 93 | LEAVE TO FILE DENIED– Notice of Appeal as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even assuming a third partycould file a notice of appeal in acriminal cases, which theFederal Rules of CriminalProcedure and and LocalCriminal Rules do notcontemplate, this filing does notcomply with Rule 3(c) of theCircuit Rules of the U.S. Courtof Appeals for the District ofColumbia Circuit".. Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/10/2023 | 95 | LEAVE TO FILE DENIED– Notice of Appeal as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even assuming a third partycould file a notice of appeal in acriminal cases, which theFederal Rules of CriminalProcedure and and LocalCriminal Rules do notcontemplate, this filing does notcomply with Rule 3(c) of theCircuit Rules of the U.S. Courtof Appeals for the District ofColumbia Circuit".. Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/10/2023 | 97 | MOTION for Order for Fair and Protective Jury Procedures by USA as to DONALD J. TRUMP. (Gaston, Molly) (Entered: 10/10/2023) |
| 10/10/2023 | 98 | MOTION for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Windom, Thomas) (Entered: 10/10/2023) |
| 10/10/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by October 20, 2023, the defense shall file any opposition to the government's 97 Motion for Fair and Protective Jury Procedures and 98 Motion for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense; and that the government shall file any reply in support of those motions by October 25, 2023. Signed by Judge Tanya S. Chutkan on 10/10/2023. (zjd) (Entered: 10/10/2023) |
| 10/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 85 Motion for Leave to Appear Pro Hac Vice. Emil Bove is hereby admitted pro hac vice to appear in this matter on behalf of Defendant. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions. Signed by Judge Tanya S. Chutkan on 10/11/2023. (zjd) (Entered: 10/11/2023) |
| 10/11/2023 | 99 | MOTION for Discovery *(PRE–TRIAL RULE 17(c) SUBPOENAS)* by DONALD J. TRUMP. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit)(Lauro, John) (Entered: 10/11/2023) |
| 10/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by October 25, 2023, the government shall file any opposition to Defendant's 99 Motion for Pre–Trial Rule 17(c) Subpoenas; and the defense shall file any reply in support of its motion by November 1, 2023. Signed by Judge Tanya S. Chutkan on 10/11/2023. (zjd) (Entered: 10/11/2023) |
| 10/11/2023 | 100 | NOTICE *of Compliance* by DONALD J. TRUMP re Order,,, Set Deadlines,, (Lauro, John) (Entered: 10/11/2023) |
| 10/11/2023 | 101 | MOTION to Access *CIPA Section 4 Filing* by DONALD J. TRUMP. (Blanche, Todd) (Entered: 10/11/2023) |
| 10/13/2023 | 102 | NOTICE OF ATTORNEY APPEARANCE: Emil Bove appearing for DONALD J. TRUMP (Bove, Emil) (Entered: 10/13/2023) |

| 10/16/2023 | | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Motion Hearing as to DONALD J. TRUMP held on 10/16/2023 re 57 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings. Order forthcoming. Bond Status of Defendant: appearance waived, remains on personal recognizance; Court Reporter: Bryan Wayne; Defense Attorneys: John F. Lauro and Todd Blanche; US Attorneys: Molly G. Gaston and Thomas Windom. (zjd) (Entered: 10/16/2023) |
|---|---|---|
| 10/16/2023 | 103 | TRANSCRIPT OF MOTION HEARING in case as to DONALD J. TRUMP before Judge Tanya S. Chutkan held on October 16, 2023; Page Numbers: 1–86. Date of Issuance: 10/16/2023. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/6/2023. Redacted Transcript Deadline set for 11/16/2023. Release of Transcript Restriction set for 1/14/2024.(Wayne, Bryan) (Entered: 10/16/2023) |
| 10/16/2023 | 104 | NOTICE OF ATTORNEY APPEARANCE James Pearce appearing for USA. (Pearce, James) (Main Document 104 replaced on 10/17/2023) (zhsj). (Entered: 10/16/2023) |
| 10/17/2023 | 105 | OPINION and ORDER as to DONALD J. TRUMP: Granting in part and denying in part the government's 57 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings; and denying as moot the government's sealed 56 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings. Signed by Judge Tanya S. Chutkan on 10/17/2023. (zjd) Modified on 10/20/2023: Opinion and Order administratively stayed pursuant to Minute Order filed 10/20/2023 (zjd). Modified on 10/29/2023: Administrative stay lifted pursuant to 124 Opinion and Order (zjd). (Entered: 10/17/2023) |
| 10/17/2023 | 106 | NOTICE OF APPEAL (Interlocutory) by DONALD J. TRUMP re 105 Memorandum Opinion,, Order,. Filing fee $ 505, receipt number ADCDC–10425241. Fee Status: Fee Paid. Parties have been notified. (Lauro, John) (Entered: 10/17/2023) |
| 10/18/2023 | 107 | Transmission of the Notice of Appeal, 105 Opinion and Order, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid on 10/17/2023 as to DONALD J. TRUMP re 106 Notice of Appeal – Interlocutory. (zhsj) (Entered: 10/18/2023) |
| 10/18/2023 | | USCA Case Number as to DONALD J. TRUMP 23–3190 for 106 Notice of Appeal – Interlocutory filed by DONALD J. TRUMP. (zhsj) (Entered: 10/18/2023) |
| 10/18/2023 | 108 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 101 Motion to Access *CIPA Section 4 Filing* (Windom, Thomas) (Entered: 10/18/2023) |
| 10/19/2023 | 109 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 74 Motion to Dismiss Case (Pearce, James) (Entered: 10/19/2023) |
| 10/20/2023 | 110 | MOTION to Stay *Pending Appeal, Request for Temporary Administrative Stay, and Memorandum in Support* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/20/2023) |
| 10/20/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Upon consideration of Defendant's opposed 110 Motion for Stay Pending Appeal, Request for Temporary Administrative Stay, and Memorandum in Support, it is hereby ORDERED that the court's 105 Opinion and Order is administratively STAYED to permit the parties' briefing and the court's consideration of Defendant's Motion. It is FURTHER ORDERED that the government shall file any opposition to Defendant's Motion by October 25, 2023, and |

16

| | | |
|---|---|---|
| | | that Defendant shall file any Reply by October 28, 2023. Signed by Judge Tanya S. Chutkan on 10/20/2023. (zjd) (Entered: 10/20/2023) |
| 10/20/2023 | 111 | RESPONSE by DONALD J. TRUMP re 97 MOTION for Order for Fair and Protective Jury Procedures (Lauro, John) (Entered: 10/20/2023) |
| 10/20/2023 | 112 | RESPONSE by DONALD J. TRUMP re 98 MOTION for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense (Lauro, John) (Entered: 10/20/2023) |
| 10/23/2023 | 113 | MOTION to Dismiss Case *Based on Constitutional Grounds* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/23/2023) |
| 10/23/2023 | 114 | MOTION to Dismiss Case *Based on Statutory Grounds* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/23/2023) |
| 10/23/2023 | 115 | MOTION to Strike *Inflammatory Allegations From the Indictment* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/23/2023) |
| 10/23/2023 | 116 | MOTION to Dismiss Case *for Selective and Vindictive Prosecution* by DONALD J. TRUMP. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4)(Bove, Emil) (Entered: 10/23/2023) |
| 10/25/2023 | 117 | REPLY in Support by USA as to DONALD J. TRUMP re 97 MOTION for Order for Fair and Protective Jury Procedures (Attachments: # 1 Text of Proposed Order)(Gaston, Molly) (Entered: 10/25/2023) |
| 10/25/2023 | 118 | REPLY in Support by USA as to DONALD J. TRUMP re 98 MOTION for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense (Windom, Thomas) (Entered: 10/25/2023) |
| 10/25/2023 | 119 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 99 Motion for Discovery, (Windom, Thomas) (Entered: 10/25/2023) |
| 10/25/2023 | 120 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 110 Motion to Stay (Gaston, Molly) (Entered: 10/25/2023) |
| 10/26/2023 | 121 | NOTICE *of CIPA § 5 Filing and Objection to Unauthorized Deletions of Classified Information* by DONALD J. TRUMP (Blanche, Todd) (Entered: 10/26/2023) |
| 10/26/2023 | 122 | REPLY in Support by DONALD J. TRUMP re 74 MOTION to Dismiss Case (Lauro, John) (Entered: 10/26/2023) |
| 10/27/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's combined response, if any, to the 1 Media Coalition's Application for Audiovisual Access to Criminal Trial Proceedings, filed in Case No. 23–mc–99–TSC, and 1 Application of NBCUniversal Media, LLC to Permit Video and Audio of Trial in United States v. Donald Trump, filed in Case No. 23–mc–107–TSC, is due November 10, 2023. It is FURTHER ORDERED that any response shall be docketed in Case No. 23–mc–99–TSC. Signed by Judge Tanya S. Chutkan on 10/27/2023. (zjd) (Entered: 10/27/2023) |
| 10/28/2023 | 123 | REPLY in Support by DONALD J. TRUMP re 110 MOTION to Stay *Pending Appeal, Request for Temporary Administrative Stay, and Memorandum in Support* (Lauro, John) (Entered: 10/28/2023) |
| 10/29/2023 | 124 | OPINION and ORDER as to DONALD J. TRUMP: Denying Defendant's 110 Motion to Stay Pending Appeal, and lifting the administrative stay imposed by the court's October 20, 2023 Minute Order. Signed by Judge Tanya S. Chutkan on 10/29/2023. (zjd) (Entered: 10/29/2023) |
| 10/31/2023 | 125 | LEAVE TO FILE DENIED– Motion of the American Civil Liberties Union & the American Civil Liberties Union of the District of Columbia for Leave to File Brief Amici Curae in Aid of the Court's Re–Evaluation of its Gag Order as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the LocalCriminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary proceduralcourse by permitting this filing." Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: |

| | | |
|---|---|---|
| | | 10/31/2023) |
| 10/31/2023 | 131 | LEAVE TO FILE DENIED– Amicus Declaration in Support of United States Opposition to Defendant's Motion to Dismiss Dkt 74 Due "Presidential Immunity" as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 132 | LEAVE TO FILE DENIED– Plaintiff's Demand for Default Judgments in Third Party Joinder Under FRCP, Rule 18(a) and (b) as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 133 | LEAVE TO FILE DENIED– Motion to Withdraw New Motion to Intervene – New Fresh Most Recent Evidence Relate 6/4/2009 & 11/4/2008 Set June Date Kill Reddie as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 134 | LEAVE TO FILE DENIED– Motion of Former Officials in Five Republican Administrations, Et Al for Leave to File an Amici Curiae Brief in Opposition to Defendant's Motion to Dismiss Indictment Based on Presidential Immunity as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing" Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 135 | LEAVE TO FILE DENIED– Pro Se Amicus Curiae re: Defendant's Motion to Dismiss Indictment Based on Presidential Immunity as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) Modified on 11/3/2023 (zhsj). (Entered: 11/03/2023) |
| 11/01/2023 | 126 | OPINION and ORDER as to DONALD J. TRUMP: Granting the government's Classified Ex Parte, In Camera, and Under Seal Motion for a Protective Order Pursuant to Section 4 of the Classified Information Procedures Act and Rule 16(d)(1) of the Federal Rules of Criminal Procedure; and denying Defendant's Motion for Access to CIPA § 4 Filing, ECF No. 101. See Opinion and Order for details. Signed by Judge Tanya S. Chutkan on 11/1/2023. (zjd) (Entered: 11/01/2023) |
| 11/01/2023 | 127 | REPLY in Support by DONALD J. TRUMP re 99 MOTION for Discovery *(PRE–TRIAL RULE 17(c) SUBPOENAS)* (Lauro, John) (Entered: 11/01/2023) |

| 11/01/2023 | 128 | MOTION to Stay *Case Pending Immunity Determination* by DONALD J. TRUMP. (Lauro, John) (Entered: 11/01/2023) |
|---|---|---|
| 11/01/2023 | 129 | MOTION for Extension of Time to *File Motions for Rule 17(c) Subpoenas and Motions to Compel* by DONALD J. TRUMP. (Lauro, John) (Entered: 11/01/2023) |
| 11/02/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that the government shall file any opposition to Defendant's 129 Motion for Extension of Time by November 4, 2023; and that Defendant shall file any reply in support of that Motion by November 6, 2023. Signed by Judge Tanya S. Chutkan on 11/2/2023. (zjd) (Entered: 11/02/2023) |
| 11/02/2023 | 130 | ORDER as to DONALD J. TRUMP: Granting the government's 97 Motion for Fair and Protective Jury Procedures. See Order for details. Signed by Judge Tanya S. Chutkan on 11/2/2023. (zjd) (Entered: 11/02/2023) |
| 11/03/2023 | 136 | MOTION for Leave to File *Oversized Brief* by USA as to DONALD J. TRUMP. (Windom, Thomas) (Entered: 11/03/2023) |
| 11/03/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that Defendant shall file any opposition to the government's 136 Motion for Leave to File Oversized Brief by 7:00 PM on November 4, 2023. This will allow the court to rule on the Motion in advance of the November 6, 2023 deadline for the brief in question. Signed by Judge Tanya S. Chutkan on 11/3/2023. (zjd) (Entered: 11/03/2023) |
| 11/03/2023 | 137 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 129 Motion for Extension of Time to *File Pretrial Motions Related to Discovery and Subpoenas* (Windom, Thomas) (Entered: 11/03/2023) |
| 11/04/2023 | 138 | RESPONSE by DONALD J. TRUMP re 136 MOTION for Leave to File *Oversized Brief* (Lauro, John) (Entered: 11/04/2023) |
| 11/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 136 Motion for Leave to File Oversized Brief is hereby GRANTED. The government may submit a combined opposition brief to Defendant's 113 Motion to Dismiss Based on Constitutional Grounds and 114 Motion to Dismiss Based on Statutory Grounds. The brief may not exceed 90 pages in total. The discussion of each Motion therein shall not exceed 45 pages. Signed by Judge Tanya S. Chutkan on 11/5/2023. (zjd) (Entered: 11/05/2023) |
| 11/06/2023 | 139 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 113 Motion to Dismiss Case, 114 Motion to Dismiss Case (Pearce, James) (Entered: 11/06/2023) |
| 11/06/2023 | 140 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 115 Motion to Strike (Gaston, Molly) (Entered: 11/06/2023) |
| 11/06/2023 | 141 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 116 Motion to Dismiss Case *for Selective and Vindictive Prosecution* (Windom, Thomas) (Entered: 11/06/2023) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** |
| | * | |
| **v.** | * | **GRAND JURY ORIGINAL** |
| | * | |
| **DONALD J. TRUMP,** | * | **VIOLATIONS:** |
| | * | |
| Defendant. | * | **Count 1: 18 U.S.C. § 371** |
| | * | **(Conspiracy to Defraud the United** |
| | * | **States)** |
| | * | |
| | * | **Count 2: 18 U.S.C. § 1512(k)** |
| | * | **(Conspiracy to Obstruct an Official** |
| | * | **Proceeding)** |
| | * | |
| | * | **Count 3: 18 U.S.C. §§ 1512(c)(2), 2** |
| | * | **(Obstruction of and Attempt to** |
| | * | **Obstruct an Official Proceeding)** |
| | * | |
| | * | **Count 4: 18 U.S.C. § 241** |
| | * | **(Conspiracy Against Rights)** |
| | * | |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates

and at the approximate times stated below:

## INTRODUCTION

1.     The Defendant, **DONALD J. TRUMP,** was the forty-fifth President of the United

States and a candidate for re-election in 2020. The Defendant lost the 2020 presidential election.

2.     Despite having lost, the Defendant was determined to remain in power. So for more

than two months following election day on November 3, 2020, the Defendant spread lies that there

had been outcome-determinative fraud in the election and that he had actually won. These claims

were false, and the Defendant knew that they were false. But the Defendant repeated and widely

disseminated them anyway—to make his knowingly false claims appear legitimate, create an intense national atmosphere of mistrust and anger, and erode public faith in the administration of the election.

3.      The Defendant had a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won.  He was also entitled to formally challenge the results of the election through lawful and appropriate means, such as by seeking recounts or audits of the popular vote in states or filing lawsuits challenging ballots and procedures.  Indeed, in many cases, the Defendant did pursue these methods of contesting the election results.  His efforts to change the outcome in any state through recounts, audits, or legal challenges were uniformly unsuccessful.

4.      Shortly after election day, the Defendant also pursued unlawful means of discounting legitimate votes and subverting the election results.  In so doing, the Defendant perpetrated three criminal conspiracies:

    a.    A conspiracy to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat the lawful federal government function by which the results of the presidential election are collected, counted, and certified by the federal government, in violation of 18 U.S.C. § 371;

    b.    A conspiracy to corruptly obstruct and impede the January 6 congressional proceeding at which the collected results of the presidential election are counted and certified ("the certification proceeding"), in violation of 18 U.S.C. § 1512(k); and

    c.    A conspiracy against the right to vote and to have one's vote counted, in violation of 18 U.S.C. § 241.

Each of these conspiracies—which built on the widespread mistrust the Defendant was creating through pervasive and destabilizing lies about election fraud—targeted a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the presidential election ("the federal government function").

- 2 -

## COUNT ONE
### (Conspiracy to Defraud the United States—18 U.S.C. § 371)

5.     The allegations contained in paragraphs 1 through 4 of this Indictment are re-
alleged and fully incorporated here by reference.

### The Conspiracy

6.     From on or about November 14, 2020, through on or about January 20, 2021, in the
District of Columbia and elsewhere, the Defendant,

### DONALD J. TRUMP,

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and
unknown to the Grand Jury, to defraud the United States by using dishonesty, fraud, and deceit to
impair, obstruct, and defeat the lawful federal government function by which the results of the
presidential election are collected, counted, and certified by the federal government.

### Purpose of the Conspiracy

7.     The purpose of the conspiracy was to overturn the legitimate results of the 2020
presidential election by using knowingly false claims of election fraud to obstruct the federal
government function by which those results are collected, counted, and certified.

### The Defendant's Co-Conspirators

8.     The Defendant enlisted co-conspirators to assist him in his criminal efforts to
overturn the legitimate results of the 2020 presidential election and retain power.  Among these
were:

>    a.    Co-Conspirator 1, an attorney who was willing to spread knowingly false
>          claims and pursue strategies that the Defendant's 2020 re-election campaign
>          attorneys would not.
>
>    b.    Co-Conspirator 2, an attorney who devised and attempted to implement a
>          strategy to leverage the Vice President's ceremonial role overseeing the

- 3 -

certification proceeding to obstruct the certification of the presidential election.

c. Co-Conspirator 3, an attorney whose unfounded claims of election fraud the Defendant privately acknowledged to others sounded "crazy." Nonetheless, the Defendant embraced and publicly amplified Co-Conspirator 3's disinformation.

d. Co-Conspirator 4, a Justice Department official who worked on civil matters and who, with the Defendant, attempted to use the Justice Department to open sham election crime investigations and influence state legislatures with knowingly false claims of election fraud.

e. Co-Conspirator 5, an attorney who assisted in devising and attempting to implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding.

f. Co-Conspirator 6, a political consultant who helped implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding.

### The Federal Government Function

9. The federal government function by which the results of the election for President of the United States are collected, counted, and certified was established through the Constitution and the Electoral Count Act (ECA), a federal law enacted in 1887. The Constitution provided that individuals called electors select the president, and that each state determine for itself how to appoint the electors apportioned to it. Through state laws, each of the fifty states and the District of Columbia chose to select their electors based on the popular vote in the state. After election day, the ECA required each state to formally determine—or "ascertain"—the electors who would represent the state's voters by casting electoral votes on behalf of the candidate who had won the popular vote, and required the executive of each state to certify to the federal government the identities of those electors. Then, on a date set by the ECA, each state's ascertained electors were required to meet and collect the results of the presidential election—that is, to cast electoral votes based on their state's popular vote, and to send their electoral votes, along with the state executive's

- 4 -

23

certification that they were the state's legitimate electors, to the United States Congress to be counted and certified in an official proceeding. Finally, the Constitution and ECA required that on the sixth of January following election day, the Congress meet in a Joint Session for a certification proceeding, presided over by the Vice President as President of the Senate, to count the electoral votes, resolve any objections, and announce the result—thus certifying the winner of the presidential election as president-elect. This federal government function—from the point of ascertainment to the certification—is foundational to the United States' democratic process, and until 2021, had operated in a peaceful and orderly manner for more than 130 years.

## Manner and Means

10.    The Defendant's conspiracy to impair, obstruct, and defeat the federal government function through dishonesty, fraud, and deceit included the following manner and means:

      a.    The Defendant and co-conspirators used knowingly false claims of election fraud to get state legislators and election officials to subvert the legitimate election results and change electoral votes for the Defendant's opponent, Joseph R. Biden, Jr., to electoral votes for the Defendant. That is, on the pretext of baseless fraud claims, the Defendant pushed officials in certain states to ignore the popular vote; disenfranchise millions of voters; dismiss legitimate electors; and ultimately, cause the ascertainment of and voting by illegitimate electors in favor of the Defendant.

      b.    The Defendant and co-conspirators organized fraudulent slates of electors in seven targeted states (Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin), attempting to mimic the procedures that the legitimate electors were supposed to follow under the Constitution and other federal and state laws. This included causing the fraudulent electors to meet on the day appointed by federal law on which legitimate electors were to gather and cast their votes; cast fraudulent votes for the Defendant; and sign certificates falsely representing that they were legitimate electors. Some fraudulent electors were tricked into participating based on the understanding that their votes would be used only if the Defendant succeeded in outcome-determinative lawsuits within their state, which the Defendant never did. The Defendant and co-conspirators then caused these fraudulent electors to transmit their false certificates to the

- 5 -

Vice President and other government officials to be counted at the certification proceeding on January 6.

c.      The Defendant and co-conspirators attempted to use the power and authority of the Justice Department to conduct sham election crime investigations and to send a letter to the targeted states that falsely claimed that the Justice Department had identified significant concerns that may have impacted the election outcome; that sought to advance the Defendant's fraudulent elector plan by using the Justice Department's authority to falsely present the fraudulent electors as a valid alternative to the legitimate electors; and that urged, on behalf of the Justice Department, the targeted states' legislatures to convene to create the opportunity to choose the fraudulent electors over the legitimate electors.

d.      The Defendant and co-conspirators attempted to enlist the Vice President to use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results. First, using knowingly false claims of election fraud, the Defendant and co-conspirators attempted to convince the Vice President to use the Defendant's fraudulent electors, reject legitimate electoral votes, or send legitimate electoral votes to state legislatures for review rather than counting them. When that failed, on the morning of January 6, the Defendant and co-conspirators repeated knowingly false claims of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused.

e.      After it became public on the afternoon of January 6 that the Vice President would not fraudulently alter the election results, a large and angry crowd—including many individuals whom the Defendant had deceived into believing the Vice President could and might change the election results—violently attacked the Capitol and halted the proceeding. As violence ensued, the Defendant and co-conspirators exploited the disruption by redoubling efforts to levy false claims of election fraud and convince Members of Congress to further delay the certification based on those claims.

**The Defendant's Knowledge of the Falsity of His Election Fraud Claims**

11.     The Defendant, his co-conspirators, and their agents made knowingly false claims that there had been outcome-determinative fraud in the 2020 presidential election. These prolific

lies about election fraud included dozens of specific claims that there had been substantial fraud

in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise

ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to

votes for Biden. These claims were false, and the Defendant knew that they were false. In fact,

the Defendant was notified repeatedly that his claims were untrue—often by the people on whom

he relied for candid advice on important matters, and who were best positioned to know the facts—

and he deliberately disregarded the truth. For instance:

a. The Defendant's Vice President—who personally stood to gain by remaining in office as part of the Defendant's ticket and whom the Defendant asked to study fraud allegations—told the Defendant that he had seen no evidence of outcome-determinative fraud.

b. The senior leaders of the Justice Department—appointed by the Defendant and responsible for investigating credible allegations of election crimes—told the Defendant on multiple occasions that various allegations of fraud were unsupported.

c. The Director of National Intelligence—the Defendant's principal advisor on intelligence matters related to national security—disabused the Defendant of the notion that the Intelligence Community's findings regarding foreign interference would change the outcome of the election.

d. The Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA")—whose existence the Defendant signed into law to protect the nation's cybersecurity infrastructure from attack—joined an official multi-agency statement that there was no evidence any voting system had been compromised and that declared the 2020 election "the most secure in American history." Days later, after the CISA Director—whom the Defendant had appointed—announced publicly that election security experts were in agreement that claims of computer-based election fraud were unsubstantiated, the Defendant fired him.

e. Senior White House attorneys—selected by the Defendant to provide him candid advice—informed the Defendant that there was no evidence of outcome-determinative election fraud, and told him that his presidency would end on Inauguration Day in 2021.

f.    Senior staffers on the Defendant's 2020 re-election campaign ("Defendant's Campaign" or "Campaign")—whose sole mission was the Defendant's re-election—told the Defendant on November 7, 2020, that he had only a five to ten percent chance of prevailing in the election, and that success was contingent on the Defendant winning ongoing vote counts or litigation in Arizona, Georgia, and Wisconsin. Within a week of that assessment, the Defendant lost in Arizona—meaning he had lost the election.

g.    State legislators and officials—many of whom were the Defendant's political allies, had voted for him, and wanted him to be re-elected—repeatedly informed the Defendant that his claims of fraud in their states were unsubstantiated or false and resisted his pressure to act based upon them.

h.    State and federal courts—the neutral arbiters responsible for ensuring the fair and even-handed administration of election laws—rejected every outcome-determinative post-election lawsuit filed by the Defendant, his co-conspirators, and allies, providing the Defendant real-time notice that his allegations were meritless.

12.    The Defendant widely disseminated his false claims of election fraud for months, despite the fact that he knew, and in many cases had been informed directly, that they were not true. The Defendant's knowingly false statements were integral to his criminal plans to defeat the federal government function, obstruct the certification, and interfere with others' right to vote and have their votes counted. He made these knowingly false claims throughout the post-election time period, including those below that he made immediately before the attack on the Capitol on January 6:

a.    The Defendant insinuated that more than ten thousand dead voters had voted in Georgia. Just four days earlier, Georgia's Secretary of State had explained to the Defendant that this was false.

b.    The Defendant asserted that there had been 205,000 more votes than voters in Pennsylvania. The Defendant's Acting Attorney General and Acting Deputy Attorney General had explained to him that this was false.

c.    The Defendant said that there had been a suspicious vote dump in Detroit, Michigan. The Defendant's Attorney General had explained to the Defendant that this was false, and the Defendant's allies in the Michigan

state legislature—the Speaker of the House of Representatives and Majority Leader of the Senate—had publicly announced that there was no evidence of substantial fraud in the state.

d.  The Defendant claimed that there had been tens of thousands of double votes and other fraud in Nevada. The Nevada Secretary of State had previously rebutted the Defendant's fraud claims by publicly posting a "Facts vs. Myths" document explaining that Nevada judges had reviewed and rejected them, and the Nevada Supreme Court had rendered a decision denying such claims.

e.  The Defendant said that more than 30,000 non-citizens had voted in Arizona. The Defendant's own Campaign Manager had explained to him that such claims were false, and the Speaker of the Arizona House of Representatives, who had supported the Defendant in the election, had issued a public statement that there was no evidence of substantial fraud in Arizona.

f.  The Defendant asserted that voting machines in various contested states had switched votes from the Defendant to Biden. The Defendant's Attorney General, Acting Attorney General, and Acting Deputy Attorney General all had explained to him that this was false, and numerous recounts and audits had confirmed the accuracy of voting machines.

### The Criminal Agreement and Acts to Effect the Object of the Conspiracy

#### The Defendant's Use of Deceit to Get State Officials to
Subvert the Legitimate Election Results and Change Electoral Votes

13.  Shortly after election day—which fell on November 3, 2020—the Defendant launched his criminal scheme. On November 13, the Defendant's Campaign attorneys conceded in court that he had lost the vote count in the state of Arizona—meaning, based on the assessment the Defendant's Campaign advisors had given him just a week earlier, the Defendant had lost the election. So the next day, the Defendant turned to Co-Conspirator 1, whom he announced would spearhead his efforts going forward to challenge the election results. From that point on, the Defendant and his co-conspirators executed a strategy to use knowing deceit in the targeted states to impair, obstruct, and defeat the federal government function, including as described below.

*Arizona*

14.     On November 13, 2020, the Defendant had a conversation with his Campaign

Manager, who informed him that a claim that had been circulating, that a substantial number of

non-citizens had voted in Arizona, was false.

15.     On November 22, eight days before Arizona's Governor certified the ascertainment

of the state's legitimate electors based on the popular vote, the Defendant and Co-Conspirator 1

called the Speaker of the Arizona House of Representatives and made knowingly false claims of

election fraud aimed at interfering with the ascertainment of and voting by Arizona's electors, as

follows:

> a.      The Defendant and Co-Conspirator 1 falsely asserted, among other things,
> that a substantial number of non-citizens, non-residents, and dead people
> had voted fraudulently in Arizona. The Arizona House Speaker asked Co-
> Conspirator 1 for evidence of the claims, which Co-Conspirator 1 did not
> have, but claimed he would provide. Co-Conspirator 1 never did so.

> b.      The Defendant and Co-Conspirator 1 asked the Arizona House Speaker to
> call the legislature into session to hold a hearing based on their claims of
> election fraud. The Arizona House Speaker refused, stating that doing so
> would require a two-thirds vote of its members, and he would not allow it
> without actual evidence of fraud.

> c.      The Defendant and Co-Conspirator 1 asked the Arizona House Speaker to
> use the legislature to circumvent the process by which legitimate electors
> would be ascertained for Biden based on the popular vote, and replace those
> electors with a new slate for the Defendant. The Arizona House Speaker
> refused, responding that the suggestion was beyond anything he had ever
> heard or thought of as something within his authority.

16.     On December 1, Co-Conspirator 1 met with the Arizona House Speaker. When the

Arizona House Speaker again asked Co-Conspirator 1 for evidence of the outcome-determinative

election fraud he and the Defendant had been claiming, Co-Conspirator 1 responded with words

to the effect of, "We don't have the evidence, but we have lots of theories."

17.     On December 4, the Arizona House Speaker issued a public statement that said, in

part:

> No election is perfect, and if there were evidence of illegal votes or
> an improper count, then Arizona law provides a process to contest
> the election: a lawsuit under state law.  But the law does not
> authorize the Legislature to reverse the results of an election.
>
> As a conservative Republican, I don't like the results of the
> presidential election.  I voted for President Trump and worked hard
> to reelect him.  But I cannot and will not entertain a suggestion that
> we violate current law to change the outcome of a certified election.
>
> I and my fellow legislators swore an oath to support the U.S.
> Constitution and the constitution and laws of the state of Arizona.  It
> would violate that oath, the basic principles of republican
> government, and the rule of law if we attempted to nullify the
> people's vote based on unsupported theories of fraud.  Under the
> laws that we wrote and voted upon, Arizona voters choose who
> wins, and our system requires that their choice be respected.

18.     On the morning of January 4, 2021, Co-Conspirator 2 called the Arizona House

Speaker to urge him to use a majority of the legislature to decertify the state's legitimate electors.

Arizona's validly ascertained electors had voted three weeks earlier and sent their votes to

Congress, which was scheduled to count those votes in Biden's favor in just two days' time at the

January 6 certification proceeding.   When the Arizona House Speaker explained that state

investigations had uncovered no evidence of substantial fraud in the state, Co-Conspirator 2

conceded that he "[didn't] know enough about facts on the ground" in Arizona, but nonetheless

told the Arizona House Speaker to decertify and "let the courts sort it out."  The Arizona House

Speaker refused, stating that he would not "play with the oath" he had taken to uphold the United

States Constitution and Arizona law.

19.     On January 6, the Defendant publicly repeated the knowingly false claim that

36,000 non-citizens had voted in Arizona.

*Georgia*

20.     On November 16, 2020, on the Defendant's behalf, his executive assistant sent Co-Conspirator 3 and others a document containing bullet points critical of a certain voting machine company, writing, "See attached – Please include as is, or almost as is, in lawsuit." Co-Conspirator 3 responded nine minutes later, writing, "IT MUST GO IN ALL SUITS IN GA AND PA IMMEDIATELY WITH A FRAUD CLAIM THAT REQUIRES THE ENTIRE ELECTION TO BE SET ASIDE in those states and machines impounded for non-partisan professional inspection." On November 25, Co-Conspirator 3 filed a lawsuit against the Governor of Georgia falsely alleging "massive election fraud" accomplished through the voting machine company's election software and hardware. Before the lawsuit was even filed, the Defendant retweeted a post promoting it.  The Defendant did this despite the fact that when he had discussed Co-Conspirator 3's far-fetched public claims regarding the voting machine company in private with advisors, the Defendant had conceded that they were unsupported and that Co-Conspirator 3 sounded "crazy." Co-Conspirator 3's Georgia lawsuit was dismissed on December 7.

21.     On December 3, Co-Conspirator 1 orchestrated a presentation to a Judiciary Subcommittee of the Georgia State Senate, with the intention of misleading state senators into blocking the ascertainment of legitimate electors.  During the presentation:

> a.      An agent of the Defendant and Co-Conspirator 1 falsely claimed that more than 10,000 dead people voted in Georgia. That afternoon, a Senior Advisor to the Defendant told the Defendant's Chief of Staff through text messages, "Just an FYI. [A Campaign lawyer] and his team verified that the 10k+ supposed dead people voting in GA is not accurate. . . . It was alleged in [Co-Conspirator 1's] hearing today." The Senior Advisor clarified that he believed that the actual number was 12.
>
> b.      Another agent of the Defendant and Co-Conspirator 1 played a misleading excerpt of a video recording of ballot-counting at State Farm Arena in Atlanta and insinuated that it showed election workers counting "suitcases" of illegal ballots.

- 12 -

> c. Co-Conspirator 2 encouraged the legislators to decertify the state's legitimate electors based on false allegations of election fraud.

22. Also on December 3, the Defendant issued a Tweet amplifying the knowingly false claims made in Co-Conspirator 1's presentation in Georgia: "Wow! Blockbuster testimony taking place right now in Georgia. Ballot stuffing by Dems when Republicans were forced to leave the large counting room. Plenty more coming, but this alone leads to an easy win of the State!"

23. On December 4, the Georgia Secretary of State's Chief Operating Officer debunked the claims made at Co-Conspirator 1's presentation the previous day, issuing a Tweet stating, "The 90 second video of election workers at State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators. Shows normal ballot processing. Here is the fact check on it." On December 7, he reiterated during a press conference that the claim that there had been misconduct at State Farm Arena was false.

24. On December 8, the Defendant called the Georgia Attorney General to pressure him to support an election lawsuit filed in the Supreme Court by another state's attorney general. The Georgia Attorney General told the Defendant that officials had investigated various claims of election fraud in the state and were not seeing evidence to support them.

25. Also on December 8, a Senior Campaign Advisor—who spoke with the Defendant on a daily basis and had informed him on multiple occasions that various fraud claims were untrue—expressed frustration that many of Co-Conspirator 1 and his legal team's claims could not be substantiated. As early as mid-November, for instance, the Senior Campaign Advisor had informed the Defendant that his claims of a large number of dead voters in Georgia were untrue. With respect to the persistent false claim regarding State Farm Arena, on December 8, the Senior Campaign Advisor wrote in an email, "When our research and campaign legal team can't back up any of the claims made by our Elite Strike Force Legal Team, you can see why we're 0-32 on our

- 13 -

cases. I'll obviously hustle to help on all fronts, but it's tough to own any of this when it's all just conspiracy shit beamed down from the mothership."

26. On December 10, four days before Biden's validly ascertained electors were scheduled to cast votes and send them to Congress, Co-Conspirator 1 appeared at a hearing before the Georgia House of Representatives' Government Affairs Committee. Co-Conspirator 1 played the State Farm Arena video again, and falsely claimed that it showed "voter fraud right in front of people's eyes" and was "the tip of the iceberg." Then, he cited two election workers by name, baselessly accused them of "quite obviously surreptitiously passing around USB ports as if they are vials of heroin or cocaine," and suggested that they were criminals whose "places of work, their homes, should have been searched for evidence of ballots, for evidence of USB ports, for evidence of voter fraud." Thereafter, the two election workers received numerous death threats.

27. On December 15, the Defendant summoned the incoming Acting Attorney General, the incoming Acting Deputy Attorney General, and others to the Oval Office to discuss allegations of election fraud. During the meeting, the Justice Department officials specifically refuted the Defendant's claims about State Farm Arena, explaining to him that the activity shown on the tape Co-Conspirator 1 had used was "benign."

28. On December 23, a day after the Defendant's Chief of Staff personally observed the signature verification process at the Cobb County Civic Center and notified the Defendant that state election officials were "conducting themselves in an exemplary fashion" and would find fraud if it existed, the Defendant tweeted that the Georgia officials administering the signature verification process were trying to hide evidence of election fraud and were "[t]errible people!"

29. In a phone call on December 27, the Defendant spoke with the Acting Attorney General and Acting Deputy Attorney General. During the call, the Defendant again pressed the

- 14 -

unfounded claims regarding State Farm Arena, and the two top Justice Department officials again rebutted the allegations, telling him that the Justice Department had reviewed videotape and interviewed witnesses, and had not identified any suspicious conduct.

30.     On December 31, the Defendant signed a verification affirming false election fraud allegations made on his behalf in a lawsuit filed in his name against the Georgia Governor. In advance of the filing, Co-Conspirator 2—who was advising the Defendant on the lawsuit— acknowledged in an email that he and the Defendant had, since signing a previous verification, "been made aware that some of the allegations (and evidence proffered by the experts) has been inaccurate" and that signing a new affirmation "with that knowledge (and incorporation by reference) would not be accurate." The Defendant and Co-Conspirator 2 caused the Defendant's signed verification to be filed nonetheless.

31.     On January 2, four days before Congress's certification proceeding, the Defendant and others called Georgia's Secretary of State. During the call, the Defendant lied to the Georgia Secretary of State to induce him to alter Georgia's popular vote count and call into question the validity of the Biden electors' votes, which had been transmitted to Congress weeks before, including as follows:

> a.     The Defendant raised allegations regarding the State Farm Arena video and repeatedly disparaged one of the same election workers that Co-Conspirator 1 had maligned on December 10, using her name almost twenty times and falsely referring to her as "a professional vote scammer and hustler." In response, the Georgia Secretary of State refuted this: "You're talking about the State Farm video. And I think it's extremely unfortunate that [Co-Conspirator 1] or his people, they sliced and diced that video and took it out of context." When the Georgia Secretary of State then offered a link to a video that would disprove Co-Conspirator 1's claims, the Defendant responded, "I don't care about a link, I don't need it. I have a much, [Georgia Secretary of State], I have a much better link."

b.    The Defendant asked about rumors that paper ballots cast in the election were being destroyed, and the Georgia Secretary of State's Counsel explained to him that the claim had been investigated and was not true.

c.    The Defendant claimed that 5,000 dead people voted in Georgia, causing the Georgia Secretary of State to respond, "Well, Mr. President, the challenge that you have is the data you have is wrong. . . . The actual number were two. Two. Two people that were dead that voted. And so [your information]'s wrong, that was two."

d.    The Defendant claimed that thousands of out-of-state voters had cast ballots in Georgia's election, which the Georgia Secretary of State's Counsel refuted, explaining, "We've been going through each of those as well, and those numbers that we got, that [Defendant's counsel] was just saying, they're not accurate. Every one we've been through are people that lived in Georgia, moved to a different state, but then moved back to Georgia legitimately . . . they moved back in years ago. This was not like something just before the election."

e.    In response to multiple other of the Defendant's allegations, the Georgia Secretary of State's Counsel told the Defendant that the Georgia Bureau of Investigation was examining all such claims and finding no merit to them.

f.    The Defendant said that he needed to "find" 11,780 votes, and insinuated that the Georgia Secretary of State and his Counsel could be subject to criminal prosecution if they failed to find election fraud as he demanded, stating, "And you are going to find that they are—which is totally illegal— it's, it's, it's more illegal for you than it is for them because you know what they did and you're not reporting it. That's a criminal, you know, that's a criminal offense. And you know, you can't let that happen. That's a big risk to you and to [the Georgia Secretary of State's Counsel], your lawyer."

32.    The next day, on January 3, the Defendant falsely claimed that the Georgia Secretary of State had not addressed the Defendant's allegations, publicly stating that the Georgia Secretary of State "was unwilling, or unable, to answer questions such as the 'ballots under table' scam, ballot destruction, out of state 'voters', dead voters, and more. He has no clue!"

33.    On January 6, the Defendant publicly repeated the knowingly false insinuation that more than 10,300 dead people had voted in Georgia.

*Michigan*

34.     On November 5, 2020, the Defendant claimed that there had been a suspicious dump of votes—purportedly illegitimate ballots—stating, "In Detroit, there were hours of unexplained delay in delivering many of the votes for counting. The final batch did not arrive until four in the morning and—even though the polls closed at eight o'clock. So they brought it in, and the batches came in, and nobody knew where they came from."

35.     On November 20, three days before Michigan's Governor signed a certificate of ascertainment notifying the federal government that, based on the popular vote, Biden's electors were to represent Michigan's voters, the Defendant held a meeting in the Oval Office with the Speaker of the Michigan House of Representatives and the Majority Leader of the Michigan Senate. In the meeting, the Defendant raised his false claim, among others, of an illegitimate vote dump in Detroit. In response, the Michigan Senate Majority Leader told the Defendant that he had lost Michigan not because of fraud, but because the Defendant had underperformed with certain voter populations in the state. Upon leaving their meeting, the Michigan House Speaker and Michigan Senate Majority Leader issued a statement reiterating this:

> The Senate and House Oversight Committees are actively engaged
> in a thorough review of Michigan's elections process and we have
> faith in the committee process to provide greater transparency and
> accountability to our citizens. We have not yet been made aware of
> any information that would change the outcome of the election in
> Michigan and as legislative leaders, we will follow the law and
> follow the normal process regarding Michigan's electors, just as we
> have said throughout this election.

36.     On December 1, the Defendant raised his Michigan vote dump claim with the Attorney General, who responded that what had occurred in Michigan had been the normal vote-counting process and that there was no indication of fraud in Detroit.

- 17 -

37.     Despite this, the next day, the Defendant made a knowingly false statement that in Michigan, "[a]t 6:31 in the morning, a vote dump of 149,772 votes came in unexpectedly. We were winning by a lot. That batch was received in horror. Nobody knows anything about it. . . . It's corrupt. Detroit is corrupt. I have a lot of friends in Detroit. They know it. But Detroit is totally corrupt."

38.     On December 4, Co-Conspirator 1 sent a text message to the Michigan House Speaker reiterating his unsupported claim of election fraud and attempting to get the Michigan House Speaker to assist in reversing the ascertainment of the legitimate Biden electors, stating, "Looks like Georgia may well hold some factual hearings and change the certification under ArtII sec 1 cl 2 of the Constitution. As [Co-Conspirator 2] explained they don't just have the right to do it but the obligation. . . . Help me get this done in Michigan."

39.     Similarly, on December 7, despite still having established no fraud in Michigan, Co-Conspirator 1 sent a text intended for the Michigan Senate Majority Leader: "So I need you to pass a joint resolution from the Michigan legislature that states that, * the election is in dispute, * there's an ongoing investigation by the Legislature, and * the Electors sent by Governor Whitmer are not the official Electors of the State of Michigan and do not fall within the Safe Harbor deadline of Dec 8 under Michigan law."

40.     On December 14—the day that electors in states across the country were required to vote and submit their votes to Congress—the Michigan House Speaker and Michigan Senate Majority Leader announced that, contrary to the Defendant's requests, they would not decertify the legitimate election results or electors in Michigan. The Michigan Senate Majority Leader's public statement included, "[W]e have not received evidence of fraud on a scale that would change

- 18 -

the outcome of the election in Michigan." The Michigan House Speaker's public statement read, in part:

> We've diligently examined these reports of fraud to the best of our ability. . . .
>
> . . . I fought hard for President Trump. Nobody wanted him to win more than me. I think he's done an incredible job. But I love our republic, too. I can't fathom risking our norms, traditions and institutions to pass a resolution retroactively changing the electors for Trump, simply because some think there may have been enough widespread fraud to give him the win. That's unprecedented for good reason. And that's why there is not enough support in the House to cast a new slate of electors. I fear we'd lose our country forever. This truly would bring mutually assured destruction for every future election in regards to the Electoral College. And I can't stand for that. I won't.

41.     On January 6, 2021, the Defendant publicly repeated his knowingly false claim regarding an illicit dump of more than a hundred thousand ballots in Detroit.

*Pennsylvania*

42.     On November 11, 2020, the Defendant publicly maligned a Philadelphia City Commissioner for stating on the news that there was no evidence of widespread fraud in Philadelphia. As a result, the Philadelphia City Commissioner and his family received death threats.

43.     On November 25, the day after Pennsylvania's Governor signed a certificate of ascertainment and thus certified to the federal government that Biden's electors were the legitimate electors for the state, Co-Conspirator 1 orchestrated an event at a hotel in Gettysburg attended by state legislators. Co-Conspirator 1 falsely claimed that Pennsylvania had issued 1.8 million absentee ballots and received 2.5 million in return. In the days thereafter, a Campaign staffer wrote internally that Co-Conspirator 1's allegation was "just wrong" and "[t]here's no way to defend it."

The Deputy Campaign Manager responded, "We have been saying this for a while. It's very frustrating."

44.     On December 4, after four Republican leaders of the Pennsylvania legislature issued a public statement that the General Assembly lacked the authority to overturn the popular vote and appoint its own slate of electors, and that doing so would violate the state Election Code and Constitution, the Defendant re-tweeted a post labeling the legislators cowards.

45.     On December 31 and January 3, the Defendant repeatedly raised with the Acting Attorney General and Acting Deputy Attorney General the allegation that in Pennsylvania, there had been 205,000 more votes than voters. Each time, the Justice Department officials informed the Defendant that his claim was false.

46.     On January 6, 2021, the Defendant publicly repeated his knowingly false claim that there had been 205,000 more votes than voters in Pennsylvania.

<em>Wisconsin</em>

47.     On November 29, 2020, a recount in Wisconsin that the Defendant's Campaign had petitioned and paid for did not change the election result, and in fact increased the Defendant's margin of defeat.

48.     On December 14, the Wisconsin Supreme Court rejected an election challenge by the Campaign. One Justice wrote, "[N]othing in this case casts any legitimate doubt that the people of Wisconsin lawfully chose Vice President Biden and Senator Harris to be the next leaders of our great country."

49.     On December 21, as a result of the state Supreme Court's decision, the Wisconsin Governor—who had signed a certificate of ascertainment on November 30 identifying Biden's electors as the state's legitimate electors—signed a certificate of final determination in which he

- 20 -

recognized that the state Supreme Court had resolved a controversy regarding the appointment of Biden's electors, and confirmed that Biden had received the highest number of votes in the state and that his electors were the state's legitimate electors.

50.     That same day, in response to the court decision that had prompted the Wisconsin Governor to sign a certificate of final determination, the Defendant issued a Tweet repeating his knowingly false claim of election fraud and demanding that the Wisconsin legislature overturn the election results that had led to the ascertainment of Biden's electors as the legitimate electors.

51.     On December 27, the Defendant raised with the Acting Attorney General and Acting Deputy Attorney General a specific fraud claim—that there had been more votes than voters in Wisconsin. The Acting Deputy Attorney General informed the Defendant that the claim was false.

52.     On January 6, 2021, the Defendant publicly repeated knowingly false claims that there had been tens of thousands of unlawful votes in Wisconsin.

<u>The Defendant's Use of Dishonesty, Fraud, and Deceit to Organize Fraudulent Slates of Electors and Cause Them to Transmit False Certificates to Congress</u>

53.     As the Defendant's attempts to obstruct the electoral vote through deceit of state officials met with repeated failure, beginning in early December 2020, he and co-conspirators developed a new plan: to marshal individuals who would have served as the Defendant's electors, had he won the popular vote, in seven targeted states—Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin—and cause those individuals to make and send to the Vice President and Congress false certifications that they were legitimate electors. Under the plan, the submission of these fraudulent slates would create a fake controversy at the certification proceeding and position the Vice President—presiding on January 6 as President of the Senate—

to supplant legitimate electors with the Defendant's fake electors and certify the Defendant as
president.

54.     The plan capitalized on ideas presented in memoranda drafted by Co-Conspirator 5,

an attorney who was assisting the Defendant's Campaign with legal efforts related to a recount in

Wisconsin. The memoranda evolved over time from a legal strategy to preserve the Defendant's

rights to a corrupt plan to subvert the federal government function by stopping Biden electors'

votes from being counted and certified, as follows:

a.     The November 18 Memorandum ("Wisconsin Memo") advocated that,
because of the ongoing recount in Wisconsin, the Defendant's electors there
should meet and cast votes on December 14—the date the ECA required
appointed electors to vote—to preserve the alternative of the Defendant's
Wisconsin elector slate in the event the Defendant ultimately prevailed in
the state.

b.     The December 6 Memorandum ("Fraudulent Elector Memo") marked a
sharp departure from Co-Conspirator 5's Wisconsin Memo, advocating that
the alternate electors originally conceived of to preserve rights in Wisconsin
instead be used in a number of states as fraudulent electors to prevent Biden
from receiving the 270 electoral votes necessary to secure the presidency
on January 6. The Fraudulent Elector Memo suggested that the Defendant's
electors in six purportedly "contested" states (Arizona, Georgia, Michigan,
Nevada, Pennsylvania, and Wisconsin) should meet and mimic as best as
possible the actions of the legitimate Biden electors, and that on January 6,
the Vice President should open and count the fraudulent votes, setting up a
fake controversy that would derail the proper certification of Biden as
president-elect.

c.     The December 9 Memorandum ("Fraudulent Elector Instructions")
consisted of Co-Conspirator 5's instructions on how fraudulent electors
could mimic legitimate electors in Arizona, Georgia, Michigan, Nevada,
Pennsylvania, and Wisconsin. Co-Conspirator 5 noted that in some states,
it would be virtually impossible for the fraudulent electors to successfully
take the same steps as the legitimate electors because state law required
formal participation in the process by state officials, or access to official
resources.

55.     The plan began in early December, and ultimately, the conspirators and the Defendant's Campaign took the Wisconsin Memo and expanded it to any state that the Defendant claimed was "contested"—even New Mexico, which the Defendant had lost by more than ten percent of the popular vote. This expansion was forecast by emails the Defendant's Chief of Staff sent on December 6, forwarding the Wisconsin Memo to Campaign staff and writing, "We just need to have someone coordinating the electors for states."

56.     On December 6, the Defendant and Co-Conspirator 2 called the Chairwoman of the Republican National Committee to ensure that the plan was in motion. During the call, Co-Conspirator 2 told the Chairwoman that it was important for the RNC to help the Defendant's Campaign gather electors in targeted states, and falsely represented to her that such electors' votes would be used only if ongoing litigation in one of the states changed the results in the Defendant's favor. After the RNC Chairwoman consulted the Campaign and heard that work on gathering electors was underway, she called and reported this information to the Defendant, who responded approvingly.

57.     On December 7, Co-Conspirator 1 received the Wisconsin Memo and the Fraudulent Elector Memo. Co-Conspirator 1 spoke with Co-Conspirator 6 regarding attorneys who could assist in the fraudulent elector effort in the targeted states, and he received from Co-Conspirator 6 an email identifying attorneys in Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin.

58.     The next day, on December 8, Co-Conspirator 5 called the Arizona attorney on Co-Conspirator 6's list. In an email after the call, the Arizona attorney recounted his conversation with Co-Conspirator 5 as follows:

> I just talked to the gentleman who did that memo, [Co-Conspirator 5]. His idea is basically that all of us (GA, WI, AZ, PA,

- 23 -

> etc.) have our electors send in their votes (even though the votes
> aren't legal under federal law -- because they're not signed by the
> Governor); so that members of Congress can fight about whether
> they should be counted on January 6th. (They could potentially
> argue that they're not bound by federal law because they're
> Congress and make the law, etc.) Kind of wild/creative -- I'm happy
> to discuss. My comment to him was that I guess there's no harm in
> it, (legally at least) -- i.e. we would just be sending in "fake"
> electoral votes to Pence so that "someone" in Congress can make an
> objection when they start counting votes, and start arguing that the
> "fake" votes should be counted.

59.     At Co-Conspirator 1's direction, on December 10, Co-Conspirator 5 sent to points

of contact in all targeted states except Wisconsin (which had already received his memos) and

New Mexico a streamlined version of the Wisconsin Memo—which did not reveal the intended

fraudulent use of the Defendant's electors—and the Fraudulent Elector Instructions, along with

fraudulent elector certificates that he had drafted.

60.     The next day, on December 11, through Co-Conspirator 5, Co-Conspirator 1

suggested that the Arizona lawyer file a petition for certiorari in the Supreme Court as a pretext to

claim that litigation was pending in the state, to provide cover for the convening and voting of the

Defendant's fraudulent electors there.  Co-Conspirator 5 explained that Co-Conspirator 1 had

heard from a state official and state provisional elector that "it could appear **treasonous** for the AZ

electors to vote on Monday if there is no pending court proceeding . . . ."

61.     To manage the plan in Pennsylvania, on December 12, Co-Conspirator 1, Co-

Conspirator 5, and Co-Conspirator 6 participated in a conference call organized by the Defendant's

Campaign with the Defendant's electors in that state.  When the Defendant's electors expressed

concern about signing certificates representing themselves as legitimate electors, Co-Conspirator 1

falsely assured them that their certificates would be used only if the Defendant succeeded in

litigation.  Subsequently, Co-Conspirator 6 circulated proposed conditional language to that effect

for potential inclusion in the fraudulent elector certificates. A Campaign official cautioned not to offer the conditional language to other states because "[t]he other States are signing what he prepared – if it gets out we changed the language for PA it could snowball." In some cases, the Defendant's electors refused to participate in the plan.

62.    On December 13, Co-Conspirator 5 sent Co-Conspirator 1 an email memorandum that further confirmed that the conspirators' plan was not to use the fraudulent electors only in the circumstance that the Defendant's litigation was successful in one of the targeted states—instead, the plan was to falsely present the fraudulent slates as an alternative to the legitimate slates at Congress's certification proceeding.

63.    On December 13, the Defendant asked the Senior Campaign Advisor for an update on "what was going on" with the elector plan and directed him to "put out [a] statement on electors." As a result, Co-Conspirator 1 directed the Senior Campaign Advisor to join a conference call with him, Co-Conspirator 6, and others. When the Senior Campaign Advisor related these developments in text messages to the Deputy Campaign Manager, a Senior Advisor to the Defendant, and a Campaign staffer, the Deputy Campaign Manager responded, "Here's the thing the way this has morphed it's a crazy play so I don't know who wants to put their name on it." The Senior Advisor wrote, "Certifying illegal votes." In turn, the participants in the group text message refused to have a statement regarding electors attributed to their names because none of them could "stand by it."

64.    Also on December 13, at a Campaign staffer's request, Co-Conspirator 5 drafted and sent fraudulent elector certificates for the Defendant's electors in New Mexico, which had not previously been among the targeted states, and where there was no pending litigation on the Defendant's behalf. The next day, the Defendant's Campaign filed an election challenge suit in

- 25 -

New Mexico at 11:54 a.m., six minutes before the noon deadline for the electors' votes, as a pretext so that there was pending litigation there at the time the fraudulent electors voted.

65.     On December 14, the legitimate electors of all 50 states and the District of Columbia met in their respective jurisdictions to formally cast their votes for president, resulting in a total of 232 electoral votes for the Defendant and 306 for Biden. The legitimate electoral votes that Biden won in the states that the Defendant targeted, and the Defendant's margin of defeat, were as follows: Arizona (11 electoral votes; 10,457 votes), Georgia (16 electoral votes; 11,779 votes), Michigan (16 electoral votes; 154,188 votes), Nevada (6 electoral votes; 33,596 votes), New Mexico (5 electoral votes; 99,720 votes), Pennsylvania (20 electoral votes; 80,555 votes), and Wisconsin (10 electoral votes; 20,682 votes).

66.     On the same day, at the direction of the Defendant and Co-Conspirator 1, fraudulent electors convened sham proceedings in the seven targeted states to cast fraudulent electoral ballots in favor of the Defendant. In some states, in order to satisfy legal requirements set forth for legitimate electors under state law, state officials were enlisted to provide the fraudulent electors access to state capitol buildings so that they could gather and vote there. In many cases, however, as Co-Conspirator 5 had predicted in the Fraudulent Elector Instructions, the fraudulent electors were unable to satisfy the legal requirements.

67.     Nonetheless, as directed in the Fraudulent Elector Instructions, shortly after the fraudulent electors met on December 14, the targeted states' fraudulent elector certificates were mailed to the President of the Senate, the Archivist of the United States, and others. The Defendant and co-conspirators ultimately used the certificates of these fraudulent electors to deceitfully target the government function, and did so contrary to how fraudulent electors were told they would be used.

68.      Unlike those of the fraudulent electors, consistent with the ECA, the legitimate electors' signed certificates were annexed to the state executives' certificates of ascertainment before being sent to the President of the Senate and others.

69.      That evening, at 6:26 p.m., the RNC Chairwoman forwarded to the Defendant, through his executive assistant, an email titled, "Electors Recap – Final," which represented that in "Six Contested States"—Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin— the Defendant's electors had voted in parallel to Biden's electors.  The Defendant's executive assistant responded, "It's in front of him!"

The Defendant's Attempt to Leverage the Justice Department to Use Deceit to Get
State Officials to Replace Legitimate Electors and Electoral Votes with the Defendant's

70.      In late December 2020, the Defendant attempted to use the Justice Department to make knowingly false claims of election fraud to officials in the targeted states through a formal letter under the Acting Attorney General's signature, thus giving the Defendant's lies the backing of the federal government and attempting to improperly influence the targeted states to replace legitimate Biden electors with the Defendant's.

71.      On December 22, the Defendant met with Co-Conspirator 4 at the White House. Co-Conspirator 4 had not informed his leadership at the Justice Department of the meeting, which was a violation of the Justice Department's written policy restricting contacts with the White House to guard against improper political influence.

72.      On December 26, Co-Conspirator 4 spoke on the phone with the Acting Attorney General and lied about the circumstances of his meeting with the Defendant at the White House, falsely claiming that the meeting had been unplanned.  The Acting Attorney General directed Co-Conspirator 4 not to have unauthorized contacts with the White House again, and Co-Conspirator 4 said he would not.

73. The next morning, on December 27, contrary to the Acting Attorney General's direction, Co-Conspirator 4 spoke with the Defendant on the Defendant's cell phone for nearly three minutes.

74. That afternoon, the Defendant called the Acting Attorney General and Acting Deputy Attorney General and said, among other things, "People tell me [Co-Conspirator 4] is great. I should put him in." The Defendant also raised multiple false claims of election fraud, which the Acting Attorney General and Acting Deputy Attorney General refuted. When the Acting Attorney General told the Defendant that the Justice Department could not and would not change the outcome of the election, the Defendant responded, "Just say that the election was corrupt and leave the rest to me and the Republican congressmen."

75. On December 28, Co-Conspirator 4 sent a draft letter to the Acting Attorney General and Acting Deputy Attorney General, which he proposed they all sign. The draft was addressed to state officials in Georgia, and Co-Conspirator 4 proposed sending versions of the letter to elected officials in other targeted states. The proposed letter contained numerous knowingly false claims about the election and the Justice Department, including that:

     a.    The Justice Department had "identified significant concerns that may have impacted the outcome of the election in multiple States[.]"

     b.    The Justice Department believed that in Georgia and other states, two valid slates of electors had gathered at the proper location on December 14, and that both sets of ballots had been transmitted to Congress. That is, Co-Conspirator 4's letter sought to advance the Defendant's fraudulent elector plan by using the authority of the Justice Department to falsely present the fraudulent electors as a valid alternative to the legitimate electors.

     c.    The Justice Department urged that the state legislature convene a special legislative session to create the opportunity to, among other things, choose the fraudulent electors over the legitimate electors.

76.     The Acting Deputy Attorney General promptly responded to Co-Conspirator 4 by email and told him that his proposed letter was false, writing, "Despite dramatic claims to the contrary, we have not seen the type of fraud that calls into question the reported (and certified) results of the election." In a meeting shortly thereafter, the Acting Attorney General and Acting Deputy Attorney General again directed Co-Conspirator 4 not to have unauthorized contact with the White House.

77.     On December 31, the Defendant summoned to the Oval Office the Acting Attorney General, Acting Deputy Attorney General, and other advisors. In the meeting, the Defendant again raised claims about election fraud that Justice Department officials already had told him were not true—and that the senior Justice Department officials reiterated were false—and suggested he might change the leadership in the Justice Department.

78.     On January 2, 2021, just four days before Congress's certification proceeding, Co-Conspirator 4 tried to coerce the Acting Attorney General and Acting Deputy Attorney General to sign and send Co-Conspirator 4's draft letter, which contained false statements, to state officials. He told them that the Defendant was considering making Co-Conspirator 4 the new Acting Attorney General, but that Co-Conspirator 4 would decline the Defendant's offer if the Acting Attorney General and Acting Deputy Attorney General would agree to send the proposed letter to the targeted states. The Justice Department officials refused.

79.     The next morning, on January 3, despite having uncovered no additional evidence of election fraud, Co-Conspirator 4 sent to a Justice Department colleague an edited version of his draft letter to the states, which included a change from its previous claim that the Justice Department had "concerns" to a stronger false claim that "[a]s of today, there is evidence of

significant irregularities that may have impacted the outcome of the election in multiple States . . . ."

80.  Also on the morning of January 3, Co-Conspirator 4 met with the Defendant at the White House—again without having informed senior Justice Department officials—and accepted the Defendant's offer that he become Acting Attorney General.

81.  On the afternoon of January 3, Co-Conspirator 4 spoke with a Deputy White House Counsel. The previous month, the Deputy White House Counsel had informed the Defendant that "there is no world, there is no option in which you do not leave the White House [o]n January 20th." Now, the same Deputy White House Counsel tried to dissuade Co-Conspirator 4 from assuming the role of Acting Attorney General. The Deputy White House Counsel reiterated to Co-Conspirator 4 that there had not been outcome-determinative fraud in the election and that if the Defendant remained in office nonetheless, there would be "riots in every major city in the United States." Co-Conspirator 4 responded, "Well, [Deputy White House Counsel], that's why there's an Insurrection Act."

82.  Also that afternoon, Co-Conspirator 4 met with the Acting Attorney General and told him that the Defendant had decided to put Co-Conspirator 4 in charge of the Justice Department. The Acting Attorney General responded that he would not accept being fired by a subordinate and immediately scheduled a meeting with the Defendant for that evening.

83.  On the evening of January 3, the Defendant met for a briefing on an overseas national security issue with the Chairman of the Joint Chiefs of Staff and other senior national security advisors. The Chairman briefed the Defendant on the issue—which had previously arisen in December—as well as possible ways the Defendant could handle it. When the Chairman and another advisor recommended that the Defendant take no action because Inauguration Day was

only seventeen days away and any course of action could trigger something unhelpful, the Defendant calmly agreed, stating, "Yeah, you're right, it's too late for us. We're going to give that to the next guy."

84.    The Defendant moved immediately from this national security briefing to the meeting that the Acting Attorney General had requested earlier that day, which included Co-Conspirator 4, the Acting Attorney General, the Acting Deputy Attorney General, the Justice Department's Assistant Attorney General for the Office of Legal Counsel, the White House Counsel, a Deputy White House Counsel, and a Senior Advisor. At the meeting, the Defendant expressed frustration with the Acting Attorney General for failing to do anything to overturn the election results, and the group discussed Co-Conspirator 4's plans to investigate purported election fraud and to send his proposed letter to state officials—a copy of which was provided to the Defendant during the meeting. The Defendant relented in his plan to replace the Acting Attorney General with Co-Conspirator 4 only when he was told that it would result in mass resignations at the Justice Department and of his own White House Counsel.

85.    At the meeting in the Oval Office on the night of January 3, Co-Conspirator 4 suggested that the Justice Department should opine that the Vice President could exceed his lawful authority during the certification proceeding and change the election outcome. When the Assistant Attorney General for the Office of Legal Counsel began to explain why the Justice Department should not do so, the Defendant said, "No one here should be talking to the Vice President. I'm talking to the Vice President," and ended the discussion.

The Defendant's Attempts to Enlist the Vice President to Fraudulently Alter the
Election Results at the January 6 Certification Proceeding

86.     As the January 6 congressional certification proceeding approached and other
efforts to impair, obstruct, and defeat the federal government function failed, the Defendant sought
to enlist the Vice President to use his ceremonial role at the certification to fraudulently alter the
election results. The Defendant did this first by using knowingly false claims of election fraud to
convince the Vice President to accept the Defendant's fraudulent electors, reject legitimate
electoral votes, or send legitimate electoral votes to state legislatures for review rather than count
them. When that failed, the Defendant attempted to use a crowd of supporters that he had gathered
in Washington, D.C., to pressure the Vice President to fraudulently alter the election results.

87.     On December 19, 2020, after cultivating widespread anger and resentment for
weeks with his knowingly false claims of election fraud, the Defendant urged his supporters to
travel to Washington on the day of the certification proceeding, tweeting, "Big protest in D.C. on
January 6th. Be there, will be wild!" Throughout late December, he repeatedly urged his
supporters to come to Washington for January 6.

88.     On December 23, the Defendant re-tweeted a memo titled "Operation 'PENCE'
CARD," which falsely asserted that the Vice President could, among other things, unilaterally
disqualify legitimate electors from six targeted states.

89.     On the same day, Co-Conspirator 2 circulated a two-page memorandum outlining
a plan for the Vice President to unlawfully declare the Defendant the certified winner of the
presidential election. In the memorandum, Co-Conspirator 2 claimed that seven states had
transmitted two slates of electors and proposed that the Vice President announce that "because of
the ongoing disputes in the 7 States, there are no electors that can be deemed validly appointed in
those States." Next, Co-Conspirator 2 proposed steps that he acknowledged violated the ECA,

- 32 -

advocating that, in the end, "Pence then gavels President Trump as re-elected." Just two months earlier, on October 11, Co-Conspirator 2 had taken the opposite position, writing that neither the Constitution nor the ECA provided the Vice President discretion in the counting of electoral votes, or permitted him to "make the determination on his own."

90.      On several private phone calls in late December and early January, the Defendant repeated knowingly false claims of election fraud and directly pressured the Vice President to use his ceremonial role at the certification proceeding on January 6 to fraudulently overturn the results of the election, and the Vice President resisted, including:

    a.    On December 25, when the Vice President called the Defendant to wish him a Merry Christmas, the Defendant quickly turned the conversation to January 6 and his request that the Vice President reject electoral votes that day. The Vice President pushed back, telling the Defendant, as the Vice President already had in previous conversations, "You know I don't think I have the authority to change the outcome."

    b.    On December 29, as reflected in the Vice President's contemporaneous notes, the Defendant falsely told the Vice President that the "Justice Dept [was] finding major infractions."

    c.    On January 1, the Defendant called the Vice President and berated him because he had learned that the Vice President had opposed a lawsuit seeking a judicial decision that, at the certification, the Vice President had the authority to reject or return votes to the states under the Constitution. The Vice President responded that he thought there was no constitutional basis for such authority and that it was improper. In response, the Defendant told the Vice President, "You're too honest." Within hours of the conversation, the Defendant reminded his supporters to meet in Washington before the certification proceeding, tweeting, "The BIG Protest Rally in Washington, D.C., will take place at 11.00 A.M. on January 6th. Locational details to follow. StopTheSteal!"

    d.    On January 3, the Defendant again told the Vice President that at the certification proceeding, the Vice President had the absolute right to reject electoral votes and the ability to overturn the election. The Vice President responded that he had no such authority, and that a federal appeals court had rejected the lawsuit making that claim the previous day.

91.     On January 3, Co-Conspirator 2 circulated a second memorandum that included a new plan under which, contrary to the ECA, the Vice President would send the elector slates to the state legislatures to determine which slate to count.

92.     On January 4, the Defendant held a meeting with Co-Conspirator 2, the Vice President, the Vice President's Chief of Staff, and the Vice President's Counsel for the purpose of convincing the Vice President, based on the Defendant's knowingly false claims of election fraud, that the Vice President should reject or send to the states Biden's legitimate electoral votes, rather than count them. The Defendant deliberately excluded his White House Counsel from the meeting because the White House Counsel previously had pushed back on the Defendant's false claims of election fraud.

93.     During the meeting, as reflected in the Vice President's contemporaneous notes, the Defendant made knowingly false claims of election fraud, including, "Bottom line—won every state by 100,000s of votes" and "We won every state," and asked—regarding a claim his senior Justice Department officials previously had told him was false, including as recently as the night before—"What about 205,000 votes more in PA than voters?" The Defendant and Co-Conspirator 2 then asked the Vice President to either unilaterally reject the legitimate electors from the seven targeted states, or send the question of which slate was legitimate to the targeted states' legislatures. When the Vice President challenged Co-Conspirator 2 on whether the proposal to return the question to the states was defensible, Co-Conspirator 2 responded, "Well, nobody's tested it before." The Vice President then told the Defendant, "Did you hear that? Even your own counsel is not saying I have that authority." The Defendant responded, "That's okay, I prefer the other suggestion" of the Vice President rejecting the electors unilaterally.

94.     Also on January 4, when Co-Conspirator 2 acknowledged to the Defendant's Senior

Advisor that no court would support his proposal, the Senior Advisor told Co-Conspirator 2,

"[Y]ou're going to cause riots in the streets."  Co-Conspirator 2 responded that there had

previously been points in the nation's history where violence was necessary to protect the republic.

After that conversation, the Senior Advisor notified the Defendant that Co-Conspirator 2 had

conceded that his plan was "not going to work."

95.     On the morning of January 5, at the Defendant's direction, the Vice President's

Chief of Staff and the Vice President's Counsel met again with Co-Conspirator 2.  Co-

Conspirator 2 now advocated that the Vice President do what the Defendant had said he preferred

the day before: unilaterally reject electors from the targeted states.  During this meeting, Co-

Conspirator 2 privately acknowledged to the Vice President's Counsel that he hoped to prevent

judicial review of his proposal because he understood that it would be unanimously rejected by

the Supreme Court.  The Vice President's Counsel expressed to Co-Conspirator 2 that following

through with the proposal would result in a "disastrous situation" where the election might "have

to be decided in the streets."

96.     That same day, the Defendant encouraged supporters to travel to Washington on

January 6, and he set the false expectation that the Vice President had the authority to and might

use his ceremonial role at the certification proceeding to reverse the election outcome in the

Defendant's favor, including issuing the following Tweets:

> a.     At 11:06 a.m., "The Vice President has the power to reject fraudulently
> chosen electors."  This was within 40 minutes of the Defendant's earlier
> reminder, "See you in D.C."
>
> b.     At 5:05 p.m., "Washington is being inundated with people who don't want
> to see an election victory stolen . . . . Our Country has had enough, they
> won't take it anymore!  We hear you (and love you) from the Oval Office."

- 35 -

      c.      At 5:43 p.m., "I will be speaking at the SAVE AMERICA RALLY tomorrow on the Ellipse at 11AM Eastern. Arrive early — doors open at 7AM Eastern. BIG CROWDS!"

97.     Also on January 5, the Defendant met alone with the Vice President. When the Vice President refused to agree to the Defendant's request that he obstruct the certification, the Defendant grew frustrated and told the Vice President that the Defendant would have to publicly criticize him. Upon learning of this, the Vice President's Chief of Staff was concerned for the Vice President's safety and alerted the head of the Vice President's Secret Service detail.

98.     As crowds began to gather in Washington and were audible from the Oval Office, the Defendant remarked to advisors that the crowd the following day on January 6 was going to be "angry."

99.     That night, the Defendant approved and caused the Defendant's Campaign to issue a public statement that the Defendant knew, from his meeting with the Vice President only hours earlier, was false: "The Vice President and I are in total agreement that the Vice President has the power to act."

100.    On January 6, starting in the early morning hours, the Defendant again turned to knowingly false statements aimed at pressuring the Vice President to fraudulently alter the election outcome, and raised publicly the false expectation that the Vice President might do so:

      a.      At 1:00 a.m., the Defendant issued a Tweet that falsely claimed, "If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!"

      b.      At 8:17 a.m., the Defendant issued a Tweet that falsely stated, "States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval. All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!"

101.   On the morning of January 6, an agent of the Defendant contacted a United States Senator to ask him to hand-deliver documents to the Vice President. The agent then facilitated the receipt by the Senator's staff of the fraudulent certificates signed by the Defendant's fraudulent electors in Michigan and Wisconsin, which were believed not to have been delivered to the Vice President or Archivist by mail. When one of the Senator's staffers contacted a staffer for the Vice President by text message to arrange for delivery of what the Senator's staffer had been told were "[a]lternate slate[s] of electors for MI and WI because archivist didn't receive them," the Vice President's staffer rejected them.

102.   At 11:15 a.m., the Defendant called the Vice President and again pressured him to fraudulently reject or return Biden's legitimate electoral votes. The Vice President again refused. Immediately after the call, the Defendant decided to single out the Vice President in public remarks he would make within the hour, reinserting language that he had personally drafted earlier that morning—falsely claiming that the Vice President had authority to send electoral votes to the states—but that advisors had previously successfully advocated be removed.

103.   Earlier that morning, the Defendant had selected Co-Conspirator 2 to join Co-Conspirator 1 in giving public remarks before his own. When they did so, based on knowingly false election fraud claims, Co-Conspirator 1 and Co-Conspirator 2 intensified pressure on the Vice President to fraudulently obstruct the certification proceeding:

>   a.   Co-Conspirator 1 told the crowd that the Vice President could "cast [the ECA] aside" and unilaterally "decide on the validity of these crooked ballots[.]" He also lied when he claimed to "have letters from five legislatures begging us" to send elector slates to the legislatures for review, and called for "trial by combat."
>
>   b.   Co-Conspirator 2 told the crowd, "[A]ll we are demanding of Vice President Pence is this afternoon at one o'clock he let the legislatures of the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not. We no

longer live in a self-governing republic if we can't get the answer to this question."

104.  Next, beginning at 11:56 a.m., the Defendant made multiple knowingly false statements integral to his criminal plans to defeat the federal government function, obstruct the certification, and interfere with others' right to vote and have their votes counted. The Defendant repeated false claims of election fraud, gave false hope that the Vice President might change the election outcome, and directed the crowd in front of him to go to the Capitol as a means to obstruct the certification and pressure the Vice President to fraudulently obstruct the certification. The Defendant's knowingly false statements for these purposes included:

a.  The Defendant falsely claimed that, based on fraud, the Vice President could alter the outcome of the election results, stating:

> I hope Mike is going to do the right thing. I hope so. I hope so.
>
> Because if Mike Pence does the right thing, we win the election. All he has to do—all, this is, this is from the number one, or certainly one of the top, Constitutional lawyers in our country—he has the absolute right to do it. We're supposed to protect our country, support our country, support our Constitution, and protect our Constitution.
>
> States want to revote. The states got defrauded. They were given false information. They voted on it. Now they want to recertify. They want it back. All Vice President Pence has to do is send it back to the states to recertify and we become president and you are the happiest people.

b.  After the Defendant falsely stated that the Pennsylvania legislature wanted "to recertify their votes. They want to recertify. But the only way that can happen is if Mike Pence agrees to send it back," the crowd began to chant, "Send it back."

- 38 -

      c.     The Defendant also said that regular rules no longer applied, stating, "And fraud breaks up everything, doesn't it? When you catch somebody in a fraud, you're allowed to go by very different rules."

      d.     Finally, after exhorting that "we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore," the Defendant directed the people in front of him to head to the Capitol, suggested he was going with them, and told them to give Members of Congress "the kind of pride and boldness that they need to take back our country."

105.     During and after the Defendant's remarks, thousands of people marched toward the Capitol.

### The Defendant's Exploitation of the Violence and Chaos at the Capitol

106.     Shortly before 1:00 p.m., the Vice President issued a public statement explaining that his role as President of the Senate at the certification proceeding that was about to begin did not include "unilateral authority to determine which electoral votes should be counted and which should not."

107.     Before the Defendant had finished speaking, a crowd began to gather at the Capitol. Thereafter, a mass of people—including individuals who had traveled to Washington and to the Capitol at the Defendant's direction—broke through barriers cordoning off the Capitol grounds and advanced on the building, including by violently attacking law enforcement officers trying to secure it.

108.     The Defendant, who had returned to the White House after concluding his remarks, watched events at the Capitol unfold on the television in the dining room next to the Oval Office.

109.     At 2:13 p.m., after more than an hour of steady, violent advancement, the crowd at the Capitol broke into the building.

110.     Upon receiving news that individuals had breached the Capitol, the Defendant's advisors told him that there was a riot there and that rioters had breached the building. When

advisors urged the Defendant to issue a calming message aimed at the rioters, the Defendant refused, instead repeatedly remarking that the people at the Capitol were angry because the election had been stolen.

111. At 2:24 p.m., after advisors had left the Defendant alone in his dining room, the Defendant issued a Tweet intended to further delay and obstruct the certification: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!"

112. One minute later, at 2:25 p.m., the United States Secret Service was forced to evacuate the Vice President to a secure location.

113. At the Capitol, throughout the afternoon, members of the crowd chanted, "Hang Mike Pence!"; "Where is Pence?  Bring him out!"; and "Traitor Pence!"

114. The Defendant repeatedly refused to approve a message directing rioters to leave the Capitol, as urged by his most senior advisors—including the White House Counsel, a Deputy White House Counsel, the Chief of Staff, a Deputy Chief of Staff, and a Senior Advisor. Instead, the Defendant issued two Tweets that did not ask rioters to leave the Capitol but instead falsely suggested that the crowd at the Capitol was being peaceful, including:

        a.    At 2:38 p.m., "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country.  Stay peaceful!"

        b.    At 3:13 p.m., "I am asking for everyone at the U.S. Capitol to remain peaceful.  No violence!  Remember, WE are the Party of Law & Order – respect the Law and our great men and women in Blue.  Thank you!"

115. At 3:00 p.m., the Defendant had a phone call with the Minority Leader of the United States House of Representatives.  The Defendant told the Minority Leader that the crowd at the Capitol was more upset about the election than the Minority Leader was.

- 40 -

116. At 4:17 p.m., the Defendant released a video message on Twitter that he had just taped in the White House Rose Garden. In it, the Defendant repeated the knowingly false claim that "[w]e had an election that was stolen from us," and finally asked individuals to leave the Capitol, while telling them that they were "very special" and that "we love you."

117. After the 4:17 p.m. Tweet, as the Defendant joined others in the outer Oval Office to watch the attack on the Capitol on television, the Defendant said, "See, this is what happens when they try to steal an election. These people are angry. These people are really angry about it. This is what happens."

118. At 6:01 p.m., the Defendant tweeted, "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!"

119. On the evening of January 6, the Defendant and Co-Conspirator 1 attempted to exploit the violence and chaos at the Capitol by calling lawmakers to convince them, based on knowingly false claims of election fraud, to delay the certification, including:

 a. The Defendant, through White House aides, attempted to reach two United States Senators at 6:00 p.m.

 b. From 6:59 p.m. until 7:18 p.m., Co-Conspirator 1 placed calls to five United States Senators and one United States Representative.

 c. Co-Conspirator 6 attempted to confirm phone numbers for six United States Senators whom the Defendant had directed Co-Conspirator 1 to call and attempt to enlist in further delaying the certification.

 d. In one of the calls, Co-Conspirator 1 left a voicemail intended for a United States Senator that said, "We need you, our Republican friends, to try to just slow it down so we can get these legislatures to get more information to you. And I know they're reconvening at eight tonight but the only strategy we can follow is to object to numerous states and raise issues so that we get ourselves into tomorrow—ideally until the end of tomorrow."

- 41 -

e.   In another message intended for another United States Senator, Co-Conspirator 1 repeated knowingly false allegations of election fraud, including that the vote counts certified by the states to Congress were incorrect and that the governors who had certified knew they were incorrect; that "illegal immigrants" had voted in substantial numbers in Arizona; and that "Georgia gave you a number in which 65,000 people who were underage voted." Co-Conspirator 1 also claimed that the Vice President's actions had been surprising and asked the Senator to "object to every state and kind of spread this out a little bit like a filibuster[.]"

120.   At 7:01 p.m., while Co-Conspirator 1 was calling United States Senators on behalf of the Defendant, the White House Counsel called the Defendant to ask him to withdraw any objections and allow the certification. The Defendant refused.

121.   The attack on the Capitol obstructed and delayed the certification for approximately six hours, until the Senate and House of Representatives came back into session separately at 8:06 p.m. and 9:02 p.m., respectively, and came together in a Joint Session at 11:35 p.m.

122.   At 11:44 p.m., Co-Conspirator 2 emailed the Vice President's Counsel advocating that the Vice President violate the law and seek further delay of the certification. Co-Conspirator 2 wrote, "I implore you to consider one more relatively minor violation [of the ECA] and adjourn for 10 days to allow the legislatures to finish their investigations, as well as to allow a full forensic audit of the massive amount of illegal activity that has occurred here."

123.   At 3:41 a.m. on January 7, as President of the Senate, the Vice President announced the certified results of the 2020 presidential election in favor of Biden.

124.   The Defendant and his co-conspirators committed one or more of the acts to effect the object of the conspiracy alleged above in Paragraphs 13, 15-16, 18-22, 24, 26, 28, 30-33, 35, 37-39, 41, 43-44, 46, 50, 52, 54, 56, 57-64, 67, 71-75, 78-82, 84, 85, 87-97, 99-100, 102-104, 111, 114, 116, 118-119, and 122.

(In violation of Title 18, United States Code, Section 371)

- 42 -

61

## COUNT TWO
### (Conspiracy to Obstruct an Official Proceeding—18 U.S.C. § 1512(k))

125.    The allegations contained in paragraphs 1 through 4 and 8 through 123 of this Indictment are re-alleged and fully incorporated here by reference.

126.    From on or about November 14, 2020, through on or about January 7, 2021, in the District of Columbia and elsewhere, the Defendant,

### DONALD J. TRUMP,

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to corruptly obstruct and impede an official proceeding, that is, the certification of the electoral vote, in violation of Title 18, United States Code, Section 1512(c)(2).

(In violation of Title 18, United States Code, Section 1512(k))

## COUNT THREE
### (Obstruction of, and Attempt to Obstruct, an Official
### Proceeding—18 U.S.C. §§ 1512(c)(2), 2)

127.    The allegations contained in paragraphs 1 through 4 and 8 through 123 of this

Indictment are re-alleged and fully incorporated here by reference.

128.    From on or about November 14, 2020, through on or about January 7, 2021, in the

District of Columbia and elsewhere, the Defendant,

### DONALD J. TRUMP,

attempted to, and did, corruptly obstruct and impede an official proceeding, that is, the certification

of the electoral vote.

(In violation of Title 18, United States Code, Sections 1512(c)(2), 2)

- 44 -

## COUNT FOUR
### (Conspiracy Against Rights—18 U.S.C. § 241)

129.   The allegations contained in paragraphs 1 through 4 and 8 through 123 of this Indictment are re-alleged and fully incorporated here by reference.

130.   From on or about November 14, 2020, through on or about January 20, 2021, in the District of Columbia and elsewhere, the Defendant,

### DONALD J. TRUMP,

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to injure, oppress, threaten, and intimidate one or more persons in the free exercise and enjoyment of a right and privilege secured to them by the Constitution and laws of the United States—that is, the right to vote, and to have one's vote counted.

(In violation of Title 18, United States Code, Section 241)

A TRUE BILL

_____

FOREPERSON

_____

JACK SMITH
SPECIAL COUNSEL
UNITED STATES DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.                                             Case No. 1:23-cr-257-TSC

DONALD J. TRUMP,

     Defendant.

_____ /

**DEFENDANT DONALD J. TRUMP'S MOTION FOR RECUSAL OF**
**DISTRICT JUDGE PURSUANT TO 28 U.S.C. § 455(a)**

President Donald J. Trump, through undersigned counsel, respectfully moves to recuse and disqualify the Honorable Tanya S. Chutkan pursuant to 28 U.S.C. § 455(a).

Fairness and impartiality are the central tenets of our criminal justice system. Both a defendant and the public are entitled to a full hearing, on all relevant issues, by a Court that has not prejudged the guilt of the defendant, and whose neutrality cannot be reasonably questioned.

Judge Chutkan has, in connection with other cases, suggested that President Trump should be prosecuted and imprisoned. Such statements, made before this case began and without due process, are inherently disqualifying. Although Judge Chutkan may genuinely intend to give President Trump a fair trial—and may believe that she can do so—her public statements unavoidably taint these proceedings, regardless of outcome. The public will reasonably and understandably question whether Judge Chutkan arrived at all of her decisions in this matter impartially, or in fulfillment of her prior negative statements regarding President Trump. Under these circumstances, the law and the overwhelming public interest in the integrity of this historic proceeding require recusal.

1

## THE DISQUALIFYING STATEMENTS

In October 2022, before the Special Counsel's appointment or the filing of this case, Judge

Chutkan stated:

> This was nothing less than an attempt to violently overthrow the government, the legally, lawfully, peacefully elected government by individuals who were mad that their guy lost. I see the videotapes. I see the footage of the flags and the signs that people were carrying and the hats they were wearing and the garb. And the people who mobbed that Capitol were there in fealty, in loyalty, to one man -- not to the Constitution, of which most of the people who come before me seem woefully ignorant; not to the ideals of this country; and not to the principles of democracy. It's a blind loyalty *to one person who, by the way, remains free to this day.*

*United States v. Christine Priola* 1:22-cr-242, ECF #66 at 29:17–30:3 (sentencing transcript)

(emphasis added) (relevant portions attached as Ex. A).

The public meaning of this statement is inescapable—President Trump is free, but should

not be. As an apparent prejudgment of guilt, these comments are disqualifying standing alone.

However, this was not the first time Judge Chutkan expressed such an opinion. In December 2021,

Judge Chutkan similarly suggested that, in her view, President Trump was responsible for the

events of January 6, 2021, and should be prosecuted:

> He went to the Capitol because, despite election results which were clear-cut, despite the fact that multiple court challenges all over the country had rejected every single one of the challenges to the election, Mr. Palmer didn't like the result. He didn't like the result, and he didn't want the transition of power to take place because his guy lost. And it is true, Mr. Palmer -- *you have made a very good point*, one that has been made before -- *that the people who exhorted you and encouraged you and rallied you to go and take action and to fight have not been charged.* That is not this court's position. I don't charge anybody. I don't negotiate plea offers. I don't make charging decisions. I sentence people who have pleaded guilty or have been convicted. The issue of who has or has not been charged is not before me. I don't have any influence on that. *I have my opinions*, but they are not relevant.
>
> \*\*\*
>
> So you have a point, that the people who may be the people who planned this and funded it and encouraged it haven't been charged, but that's not a reason for you to get a lower sentence.

2

*United States v. Palmer*, No. 1:21-cr-00328-TSC, ECF #33 at 21:6–22:13 (sentencing transcript) (emphasis added) (relevant portions attached as Ex. B).

In making these statements, Judge Chutkan agreed with portions of defendant Palmer's sentencing memorandum, which similarly (and wrongly) placed blame on President Trump and complained that he had not been charged. No. 1:21-cr-00328-TSC, ECF #31 at 8–9 (Sentencing Memorandum) ([Palmer Defense Counsel]: "Those voices, including the voice of the then-president himself, had convinced persons such as Mr. Palmer that the election was fraudulent and that they must take action to stop the transition of the presidency. . . . While many of the people who participated in the Capitol riot will be going to prison, the architects of that horrific event will likely never be charged with any criminal offense.").

Although Judge Chutkan correctly noted that she does not have any influence on charging decisions, her above comments stating "*you have made a very good point . . . that the people who exhorted you and encouraged you and rallied you to go and take action and to fight have not been charged*" and "*you have a point, that the people who may be the people who planned this and funded it and encouraged it haven't been charged, but that's not a reason for you to get a lower sentence*" reflect her apparent opinion that President Trump's conduct: (1) occurred, and (2) supports charges (otherwise, she would not have characterized the point as "very good."). Similarly, Judge Chutkan's statement that "*I have my opinions*" suggests that in her view—formed almost two years before the initiation of this matter—President Trump should be charged.

Public statements of this sort create a perception of prejudgment incompatible with our justice system. In a case this widely watched, of such monumental significance, the public must have the utmost confidence that the Court will administer justice neutrally and dispassionately.

Judge Chutkan's pre-case statements undermine that confidence and, therefore, require disqualification.

## APPLICABLE LAW

"Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label." *In re Al-Nashiri*, 921 F.3d 224, 233–34 (D.C. Cir. 2019). Thus, "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455; *see also* Code of Judicial Conduct, Canon 2A ("A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary").[1]

Under settled law, what matters "is not the reality of bias or prejudice but its appearance." *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (*statement of* Rehnquist, C.J.) (quoting *Liteky v. United States*, 510 U.S. 540, 548 (1994)). Therefore, "all that must be demonstrated to compel recusal . . . is a showing of an appearance of bias . . . sufficient to permit the average citizen reasonably to question a judge's impartiality." *In re Al-Nashiri*, 921 F.3d at 234. "This inquiry is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Microsoft Corp.*, 530 U.S. at 1302 (citations omitted).

---

[1] "Impartiality--and the appearance of impartiality--are the foundation of judicial decision-making, judicial morality, and the public's trust in the rule of law." Zygmont A. Pines, *Mirror, Mirror, on the Wall-Biased Impartiality, Appearances, and the Need for Recusal Reform*, 125 Dickinson L. Rev. 69 (2020). These concerns should not be "relegated to the periphery of our administration of justice when its rightful place should be its nucleus." *Id.* at 152; *see also Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980) ("[T]he protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system." (citation omitted)).

In other words, "[i]t is of no consequence that the judge is not *actually* biased because §

455(a) 'concerns not only fairness to individual litigants, but, equally important, it concerns the

public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to

proceed before a judge who *appears* to be tainted.'" *In re Kensington Int'l Ltd.*, 353 F.3d 211, 220

(3d Cir. 2003) (citations omitted) (emphasis in original); *Hall v. Small Bus. Admin.*, 695 F.2d 175,

178–79 (5th Cir. 1983) ("[T]his portion of the disqualification statute is to exact the appearance of

impartiality . . . it focuses on what is revealed to the parties and the public, as opposed to the

existence in fact of any bias or prejudice"); As the Fifth Circuit stated:

> This overriding concern with appearances, which also pervades the Code of Judicial
> Conduct and the ABA Code of Professional Responsibility, stems from the
> recognized need for an unimpeachable judicial system in which the public has
> unwavering confidence. As this court has noted, "the protection of the integrity and
> dignity of the judicial process from any hint or appearance of bias is the palladium
> of our judicial system." Any question of a judge's impartiality threatens the purity
> of the judicial process and its institutions.

*Potashnick,* 609 F.2d at 1111 (quoting *United States v. Columbia Broadcasting System,*

*Inc.,* 497 F.2d 107, 109 (5th Cir. 1974)).

"Such a stringent rule, to be sure, may sometimes bar trial by judges who have no actual

bias and who would do their very best to weigh the scales of justice equally between contending

parties." *In re Al-Nashiri*, 921 F.3d at 234 (citation and quotation marks omitted). However, "to

perform its high function in the best way, the Supreme Court has emphasized, justice must satisfy

the appearance of justice." *Id*. (citation and quotation marks omitted).

Therefore, to "preserve both the reality and appearance of impartiality," a judge should

recuse herself when her impartiality "might" be reasonably questioned. *Id*.; *see also United States*

*v. Microsoft Corp.*, 253 F.3d 34, 114–15 (D.C. Cir. 2001) ("The very purpose of § 455(a) is to

promote confidence in the judiciary by avoiding even the appearance of impropriety whenever

possible . . . Appearance may be all there is, but that is enough to invoke the Canons [of Judicial

Conduct] and § 455(a)." (quotation omitted)).[2] Indeed, Congress's use of the word "might" in § 455(a) counsels a low threshold, requiring disqualification if *any* reasonable citizen could question a judge's impartiality, even if some do not. Accordingly, "when a judge harbors any doubts concerning whether his disqualification is required [s]he should resolve the doubt in favor of disqualification." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988) (citations omitted).[3]

## ARGUMENT

There is little doubt that reasonable members of the public "might," in viewing Judge Chutkan's statements, believe she has prejudged both the facts pertinent to this case and President Trump's alleged culpability.

Judge Chutkan's statement that "[i]t's a blind loyalty to one person who, by the way, remains free to this day," Ex. A at 29:17–30:3, straightforwardly (and of course incorrectly in the defense's view) suggests that President Trump has culpability for the events of that day and should not be free. This would be a natural interpretation of her comments in any context, but is particularly poignant here, where Judge Chutkan directed her statements to a defendant she was about to sentence to an extended term of incarceration. Indeed, her comments suggest that she

---

[2] The Due Process Clause mandates a similar requirement of judicial impartiality, and like Section 455(a), has been implemented by objective standards that do not require proof of actual bias. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009) (citations omitted).

[3] *See also Cheney v. U.S. District Court for D.C.*, 541 U.S. 913, 915 (2004) (*memorandum of* Scalia, J.) ("Let me respond, at the outset, to Sierra Club's suggestion that I should 'resolve any doubts in favor of recusal.' That might be sound advice if I were sitting on a Court of Appeals."); *Potashnick,* 609 F.2d at 1112 ("[T]he new statute requires a judge to exercise his discretion in favor of disqualification if he has any question about the propriety of his sitting in a particular case.").

6

reached a conclusion, before this case, that President Trump is more deserving of a term of imprisonment than the defendant she was sentencing.

Likewise, most reasonable observers would understand Judge Chutkan's statements that "it is true, Mr. Palmer -- you have made a very good point, one that has been made before -- that the people who exhorted you and encouraged you and rallied you to go and take action and to fight have not been charged. . . . I don't have any influence on that. *I have my opinions*, but they are not relevant," Ex. B at 21:6–22:13, as both a pre-case determination of disputed facts (that President Trump "exhorted," "encouraged," or "rallied" others for unlawful action) and a suggestion that President Trump may and should be prosecuted based on those facts.[4]

"Courts have found an impermissible level of bias when a judge's remarks or actions reveal [s]he has prejudged the guilt of a defendant." *United States v. Nickl*, 427 F.3d 1286, 1298 (10th Cir. 2005). Judge Chutkan made her comments from the bench during court proceedings, which only amplifies the concern of prejudgment. President Trump was not a party to these cases and had no ability or "opportunity to object, perhaps even to persuade, and the Judge would have made a record for review on appeal." *Microsoft Corp.*, 253 F.3d at 115.

Moreover, because the statements were made on the record in support of the Court's sentences of incarceration, the public must reasonably understand them to be the product of considerable thought on the part of Judge Chutkan, reflective of her core views that are unlikely to change. And, as President Trump's supposed culpability was not an issue for Judge Chutkan to

---

[4] The Indictment does not allege President Trump personally entered the Capitol on January 6, 2021, or incited violence, but it makes numerous allegations that he knowingly made false claims of election fraud to his supporters and somehow "exploited" the protests at the Capitol. While President Trump categorically denies these and many other allegations in the Indictment, Judge Chutkan's comments can be reasonably understood to mean she has already formed an opinion about President Trump's guilt and about many of the key, and disputed, allegations of this case.

decide in the *Palmer* or *Priola* sentencings, the public can reasonably understand that her views on President Trump derive from extrajudicial sources. *See Liteky v. United States*, 510 U.S. 540, 554–56 (1994).

Every judge must uphold her oath of office. That is, to "faithfully and impartially discharge and perform all duties incumbent upon me under the Constitution and law of the United States. So help me God." 28 U.S.C. § 453. The foundation of that oath is a judicial branch designed by our founders to be entirely impartial and avoiding even the perception of prejudgment. Our system guarantees that the government prove a defendant guilty, in front of a jury of his peers, as part of a trial without any suggestion of partiality on the part of the presiding judge. Only when all three prongs are present and beyond dispute does our system function as intended.

Both by its procedure and its content, this trial is a test of the very foundations upon which our government is built. There is an overwhelming public interest in ensuring the perceived fairness of these proceedings. In a highly charged political season, naturally all Americans, and in fact, the entire world, are observing these proceedings closely. Only if this trial is administered by a judge who appears entirely impartial could the public ever accept the outcome as justice.[5]

Section 455(a) commands a judge to recuse herself if her impartiality *might* reasonably be questioned. The standard is not particularly high, especially in a case, as here, where the Department of Justice answers to a President who is prosecuting his main, leading opponent in an

---

[5] *See* Testimony of Norman L. Reimer, Executive Director, National Association of Criminal Defense Lawyers, *Hearings Before the House Comm. on the Judiciary*, 111th Cong. 1 2009, Serial No. 111-118 ("The people's confidence in the system hinges on the perception by the guilty, by the innocent, by all who are touched by the criminal justice system and the larger community, that judges are not predisposed to decide a case one way or another."); Lonnie T. Brown*, Criticizing Judges: A Lawyer's Professional Responsibility*, 56 Ga. L. Rev. 161 (2021) ("[T]he very nature of a judge's role requires avoidance of even the 'appearance of impropriety.' When judges fail to adhere to this standard, decisional accuracy is called into question, and the perception of fairness, so important to the judicial process, is diminished.").

election that will take place in just over a year. Now is not the time for the American people to second-guess a judge's impartiality. Rather, the Court should ensure the public remains "unwavering[ly] confiden[t]" in its decisions and its commitment to the fair and impartial administration of justice. *Potashnick*, 609 F.2d at 1111. Therefore, President Trump requests Judge Chutkan recuse herself from further proceedings.

## CONCLUSION

For the foregoing reasons, Judge Chutkan should recuse herself from this case and direct the Clerk to randomly assign this matter to another District Judge.[6] Additionally, given the overriding public interest in ensuring the appearance of fairness in this proceeding, President Trump requests the Court consider this Motion on an expedited basis and, pending resolution, withhold rulings on any other pending motion.

Dated: September 11, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

/s/John F. Lauro
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

*Counsel for President Donald J. Trump*

---

[6] President Trump reserves all rights to challenge venue in this District based on applicable law.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **v.** | *    **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * |
| **DONALD J. TRUMP,** | * |
| | * |
| **Defendant.** | * |
| | * |

**GOVERNMENT'S OPPOSED MOTION TO ENSURE THAT EXTRAJUDICIAL
STATEMENTS DO NOT PREJUDICE THESE PROCEEDINGS**

Since the grand jury returned an indictment in this case, the defendant has repeatedly and widely disseminated public statements attacking the citizens of the District of Columbia, the Court, prosecutors, and prospective witnesses. Through his statements, the defendant threatens to undermine the integrity of these proceedings and prejudice the jury pool, in contravention of the "undeviating rule" that in our justice system a jury's verdict is to "be induced only by evidence and argument in open court, and not by any outside influence." *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (quotations omitted). In accordance with the Court's duty to "protect [its] processes from prejudicial outside interferences," *id.* at 363, the Government requests that the Court take the following immediate measures to ensure the due administration of justice and a fair and impartial jury: (1) enter a narrowly tailored order pursuant to Local Criminal Rule 57.7(c) that restricts certain prejudicial extrajudicial statements; and (2) enter an order through which the Court can ensure that if either party conducts a jury study involving contact with the citizens of this District, the jury study is conducted in a way that will not prejudice the venire. The Government obtained the defendant's position from counsel for the defendant, and he opposes this motion.

# I.    Background

As set forth in the indictment, after election day in 2020, the defendant launched a disinformation campaign in which he publicly and widely broadcast knowingly false claims that there had been outcome-determinative fraud in the presidential election, and that he had actually won.  ECF No. 1 at ¶¶ 2, 4.  In service of his criminal conspiracies, through false public statements, the defendant sought to erode public faith in the administration of the election and intimidate individuals who refuted his lies.  ECF No. 1 at ¶¶ 2, 28, 31-32, 42, 44, 74, 97, 100, 104, 111.  The defendant is now attempting to do the same thing in this criminal case—to undermine confidence in the criminal justice system and prejudice the jury pool through disparaging and inflammatory attacks on the citizens of this District, the Court, prosecutors, and prospective witnesses.  The defendant's conduct presents a "substantial likelihood of material prejudice" to these proceedings, and the Court can and should take steps to restrict such harmful extrajudicial statements.  *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991).

## A.    <u>The Defendant Has a History of Inflammatory and Misleading Statements That He Knew or Should Have Known Would Cause Others to Harass and Harm Perceived Critics or Adversaries</u>

The defendant has an established practice of issuing inflammatory public statements targeted at individuals or institutions that present an obstacle or challenge to him.  In the period between the presidential election on November 3, 2020, and the congressional certification proceeding on January 6, 2021, the defendant trained his focus on the election system, including election officials and other individuals carrying out civic duties to implement fair elections in various states.  As a result, the defendant engendered widespread mistrust in the administration of the election, and the individuals whom he targeted were subject to threats and harassment.

MATERIAL UNDER SEAL DELETED

Examples of this pattern, from the indictment and the Government's investigation, include the following:

- ████████████████████████████████ whom the defendant specifically targeted on the social media platform Twitter because ██████ had publicly stated that there was no evidence of election fraud. *See* ECF No. 1, Indictment, ¶ 42; https://twitter.com/realDonaldTrump/status/1326525851752656898. After the defendant's tweet, ████████ observed an increase in the volume and severity of threats against him and his family. *See* House Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee"), 6/13/22 Hr'g, at 1:47:14–1:47:43 ("After the President tweeted at me by name, calling me out the way that he did, the threats became much more specific, much more graphic, and included not just me by name but included members of my family by name, their ages, our address, pictures of our home. Just every bit of detail that you could imagine. That was what changed with that tweet.").[1]

- ████████████████████████████████████████████ during the 2020 election, whose home address was listed on the internet and whose family was threatened with violence after the defendant and surrogates publicly derogated ████████ for certifying the election. *See* Exhibit 1 at 3-6.

- ████████████████████████████████████████ during the 2020 election, who received threatening communications after ████████ certified the election and the defendant issued public posts about them. *See* Exhibit 1 at 26-27 (████████████████████████████████████████████████████████████████████████████████████████████████████ ).

- ██████████████████████████████████ who required additional police protection after the defendant targeted ████████ on Twitter for ████████████ rejecting one of the defendant's election challenges. *See* Exhibit 1 at 41-44.

The defendant knows that when he publicly attacks individuals and institutions, he inspires others to perpetrate threats and harassment against his targets. On December 1, 2020, as the defendant was fueling an intense national atmosphere of mistrust and anger regarding the election, a Georgia election official held a widely televised press conference in which he pleaded with the

---

[1] *See* https://january6th-benniethompson.house.gov/legislation/hearings/06132022-select-committee-hearing.

defendant to stop, stating that if he did not, "Someone's going to get hurt, someone's going to get shot, someone's going to get killed."[2]  The defendant did not stop.  Instead, he continued—even to the present—to attack individuals whom he knows already suffered threats and harassment as a result of his words.  For instance:

- On November 17, 2020, the defendant fired ██████████, his appointed director of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency after ████ made statements assuring the public of the integrity of the election.  *See* ECF No. 1 ¶ 11(d).  Later that month, after ████ appeared on a news program and again stated publicly that the presidential election had been secure, the defendant attacked him on Twitter, and on November 30, an agent of the defendant publicly stated that ████ "should be drawn and quartered.  Taken out at dawn and shot."[3]  This statement was so dangerous that the above-described Georgia election official mentioned it in his press conference when warning the defendant and others that such rhetoric would lead to violence.[4]  ████ and his family received death threats and had to evacuate their home, and through a December 8, 2020 lawsuit put the defendant on explicit notice of the threats and harassment the defendant had caused.[5]  The defendant continued to publicly attack ████ anyway.

- In 2020, the defendant and co-conspirators[6] spread false accusations of misconduct against ██████████, a Georgia election worker, and ██████████████████████████.  As a result, ██████████████████ were inundated by threats.  *See* ECF No. 1 ¶ 26.  ████ subsequently described the pernicious threats and intimidation she endured as a result of these false allegations in an interview with the House Select Committee, which publicly released a transcript of the interview on December 29, 2022.  *See* Select Committee Press

---

[2] *See* NBC News, Georgia Secretary of State Press Conference (Dec. 1, 2020), https://www.youtube.com/watch?v=nH9FnY0qvNI.

[3] *See* CBC News, 60 Minutes (Nov. 29, 2020), https://www.cbsnews.com/news/election-results-security-chris-krebs-60-minutes-2020-11-29/; Newsmax, Howie Carr Radio Show (Nov. 30, 2020).

[4] *See* NBC News, Georgia Secretary of State Press Conference (Dec. 1, 2020), https://www.youtube.com/watch?v=nH9FnY0qvNI.

[5] *See* Case No. 484243V (Montgomery County, Maryland Circuit Court), Complaint (Dec. 8, 2020).

[6] A court in this District recently entered a default judgment against one of the defendant's co-conspirators in a lawsuit filed against him by ██████████████ for his defamatory false claims.  *See* 21-cv-3354 (BAH), ECF No. 93, Order (Aug. 30, 2023).

Release, Release of Select Committee Materials (Dec. 29, 2022);[7] Select Committee Transcript at 8 ("Do you know how it feels to have the President of the United States to target you?  The President of the United States is supposed to represent every American, not to target one.  But he targeted me . . .  a small-business owner, a mother, a proud American citizen who stood up to help Fulton County run an election in the middle of the pandemic. . . . And, lo and behold, when someone as powerful as the President of the United States eggs on a mob, that mob will come.  They came for us with their cruelty, their threats, their racism, and their hats.  They haven't stopped even today.").[8]  Within ten days of the public release of ███████ interview transcript, the defendant—despite the known threats the election worker had received, and the established falsity of the claims of misconduct— publicly attacked ██████ again on Truth Social through a series of repeated false claims.[9]

- Likewise, the defendant recently renewed attacks on former Georgia Lieutenant Governor ███████, whose harassment the defendant inspired in the aftermath of the election. In December 2020, after Georgia's Governor and Lieutenant Governor rejected the defendant's calls to appoint the defendant's illegitimate electors in Georgia, the defendant issued a post labeling ██████ a "Rino Never Trumper" who was "dumb or corrupt" and urged, "We need every great Georgian to call him out!"  *See* https://twitter.com/realDonaldTrump/status/ 1336148836495069185.  Thereafter, ██████, reported, he received death threats.[10]  Nonetheless, last month, on August 14, 2023, when it was publicly reported that ██████ had been called to testify before a state grand jury in Fulton County, Georgia, the defendant posted on Truth Social that "[h]e shouldn't" testify. *See* https://truthsocial.com/@realDonaldTrump/posts/110888087440060991.

The defendant continues these attacks on individuals precisely because he knows that in doing so, he is able to roil the public and marshal and prompt his supporters.  As he acknowledged in a televised town hall on May 10, 2023, his supporters listen to him "like no one else."[11]

---

[7]  *See*  https://january6th-benniethompson.house.gov/news/press-releases/release-select-committee-materials-4.

[8]   https://january6th-benniethompson.house.gov/sites/democrats.january6th.house.gov/files/20220531_███████████████.pdf.

[9]   https://truthsocial.com/@realDonaldTrump/posts/109623460421938942; https://truthsocial.com/@realDonaldTrump/posts/109623536630848334; https://truthsocial.com/@realDonaldTrump/posts/109623623674619588.

[10]   MSNBC, Morning Joe, https://www.msnbc.com/morning-joe/watch/georgia-s-lieutenant-governor-won-t-seek-reelection-turns-focus-to-gop-2-0-112276037799.

[11]  *See* CNN, Transcript of CNN's Town Hall with Former President Donald Trump (May 11, 2023), https://www.cnn.com/2023/05/11/politics/transcript-cnn-town-hall-trump/index.html.

**B.  Since the Indictment, the Defendant Has Deployed Misleading and Inflammatory Statements About this Case to Undermine Confidence in the Justice System and Prejudice the Jury Pool**

The defendant made clear his intent to issue public attacks related to this case when, the day after his arraignment, he posted a threatening message on Truth Social:



And he has made good on his threat.  Since the indictment in this case, the defendant has spread disparaging and inflammatory public posts on Truth Social on a near-daily basis regarding the citizens of the District of Columbia, the Court, prosecutors, and prospective witnesses.  Like his previous public disinformation campaign regarding the 2020 presidential election, the defendant's recent extrajudicial statements are intended to undermine public confidence in an institution—the judicial system—and to undermine confidence in and intimidate individuals—the Court, the jury pool, witnesses, and prosecutors.  Below are select examples of the defendant's disparaging and inflammatory Truth Social posts.

    i.   Posts Attacking, Undermining, and Attempting to Intimidate the Court and the Jury Pool

The defendant has posted repeated, inflammatory attacks on the judicial system, the Court, and the citizens of the District of Columbia who comprise the jury pool in this case.  The defendant has made baseless claims—cited or inserted below—that the justice system is "rigged"[12] against him; that the Court is "a fraud dressed up as a judge in Washington, D.C. who is a radical Obama

---

[12] *See* https://truthsocial.com/@realDonaldTrump/posts/110857162338915853.

hack" or is a "biased, Trump-hating judge";[13] and that he cannot get a fair trial from the residents

of this "filthy and crime ridden" District that "is over 95% anti-Trump."[14]



Donald J. Trump ✅
@realDonaldTrump

The Obama appointed Judge in  the FREE SPEECH Indictment of me by my political opponent, Crooked Joe Biden's Department of InJustice, shared professional ties at the law firm that worked for Energy Company Burisma, based in Ukraine, of which Hunter Biden and his associate were "proud" MEMBERS OF THE BOARD, and were paid Millions of Dollars, even though Hunter knew almost NOTHING about Energy. How much was the law firm paid? So Horrible. This is a CLASSIC Conflict of Interest! "GATEWAY PUNDIT"

6.85k ReTruths   19.6k Likes                Aug 08, 2023, 4:47 PM



Donald J. Trump ✅
@realDonaldTrump

THERE IS NO WAY I CAN GET A FAIR TRIAL WITH THE JUDGE "ASSIGNED" TO THE RIDICULOUS FREEDOM OF SPEECH/FAIR ELECTIONS CASE. EVERYBODY KNOWS THIS, AND SO DOES SHE! WE WILL BE IMMEDIATELY ASKING FOR RECUSAL OF THIS JUDGE ON VERY POWERFUL GROUNDS, AND LIKEWISE FOR VENUE CHANGE, OUT IF D.C.

11.2k ReTruths   42.6k Likes                Aug 06, 2023, 9:26 AM

---

[13]  *See*  re-post  of  https://truthsocial.com/@marklevinshow/posts/110973488250507373; https://truthsocial.com/@realDonaldTrump/posts/110980188106641474.

[14] *See* https://truthsocial.com/@realDonaldTrump/posts/110823476578708544.



ii.  <u>Posts Attacking, Undermining, and Attempting to Intimidate Prosecutors</u>

Similarly, the defendant has posted false and disparaging claims regarding the Department

of Justice and prosecutors in the Special Counsel's Office in an attempt to undermine confidence

in the justice system and prejudice the jury pool against the Government in advance of trial.  In a

video posted to Truth Social, the defendant called the Special Counsel's Office a "team of thugs."[15]

---

[15] *See* https://truthsocial.com/@realDonaldTrump/posts/110980188106641474.



Recently, the defendant has spread knowingly false accusations of misconduct against a prosecutor in the Special Counsel's Office working on the case in which the defendant was indicted in the Southern District of Florida in June 2023, *see United States v. Donald J. Trump, et al*, Case No. 9:23-cr-80101-AMC, ECF No. 30 at 1 (S.D. Fla. June 21, 2023), and connected those false accusations to this case in the District of Columbia by calling the Court a "biased, Trump Hating Judge," as shown below.  In his posts on this topic, the defendant repeatedly makes the knowingly false claim that Special Counsel's Office prosecutors went to the White House in advance of the defendant's June 2023 indictment for improper reasons.





In fact, as the defendant well knows from the formal FBI FD-302 interview report and agent notes that he received in discovery on June 21, 2023, in the Southern District of Florida case, on March 31, 2023, the Special Counsel's Office prosecutor conducted a routine investigative interview of a career military official at that official's duty station—the White House.  The defendant's objective in spreading a knowing lie to the contrary—including by re-posting others' Truth Social posts naming the prosecutor and repeating the lie[16]—is an attempt to prejudice the public and the venire in advance of trial.

With that same goal, the defendant has posted misleading claims on Truth Social to insinuate misconduct by the Special Counsel's Office in pursuing ordinary court-approved process or seeking the indictment in this case.  Regarding a search warrant and non-disclosure order that the Government received from the court consistent with the law, for instance, the defendant falsely claimed that the Special Counsel's Office broke into his former Twitter account[17] in a "major 'hit' on my civil rights" and queried whether the Special Counsel directed the Select Committee to

---

[16] On August 28, the defendant re-posted a Truth Social post doing exactly this.  *See* https://truthsocial.com/@marklevinshow/110969978988667723.

[17] *See* https://truthsocial.com/@realDonaldTrump/posts/110886100439412597.

"DESTROY & DELETE all evidence."[18]  And on August 2, the defendant posted a quote alleging, without any basis, that the indictment that a federal grand jury in this case returned had been directed by the sitting president: "'Joe Biden directed his Attorney General to prosecute his rival. This is not an independent Justice Department, this is not an independent special counsel.  This is being directed by the Commander-in-Chief."[19]  Through such posts, the defendant is attempting to submit his false and inflammatory claims to the public and jury pool outside of court, because he knows that any such claims made before the Court in the form of motions to suppress or of vindictive prosecution will fail because they must be supported by evidence—of which there is none.

### iii.   Posts Bolstering or Attacking and Attempting to Intimidate Witnesses

The defendant has also posted publicly about individuals whom he has reason to believe will be witnesses in this trial.  For instance, on August 30, the defendant posted a video attacking the former Attorney General of the United States, a potential witness in this case, on the very subject of his testimony.[20]  Steadily since indictment, the defendant has publicly bolstered certain prospective witnesses in this case, while attacking others, in an effort to influence the public's and the jury pool's impressions of potential witnesses outside of the courtroom.  Examples of such posts are below.

---

[18] *See* https://truthsocial.com/@realDonaldTrump/posts/110860965885418709.

[19] *See* https://truthsocial.com/@realDonaldTrump/posts/110823008009285486.

[20] *See* https://truthsocial.com/@realDonaldTrump/posts/110980538393058556.





**C.  The Defendant's Public Posts Regarding this Case are Reasonably Likely to Prejudice the Jury Pool**

The defendant's relentless public posts marshaling anger and mistrust in the justice system, the Court, and prosecutors have already influenced the public.  For instance, on August 5, 2023, an individual was arrested because she called the Court's chambers and made racist death threats to the Court that were tied to the Court's role in presiding over the defendant's case.  *See United States v. Shry*, Case No. 4:23-mj-1602, ECF No. 1 at 3 (Criminal Complaint) (S.D. Tex. August 11, 2023).  In addition, the Special Counsel has been subject to multiple threats, and the specific Special Counsel's Office prosecutor that the defendant has targeted through recent, inflammatory public posts has been subject to intimidating communications.  Given the defendant's history described above and the nature of the threats to the Court and to the Government, it is clear that

the  threats are prompted by the defendant's repeated and relentless posts.  To the extent that the defendant's public posts reach the general public, they also reach the jury pool for this trial.

In addition, if unfettered, the way that the defendant is known to use public statements to intimidate individuals could affect potential jurors.  A recent incident in this District illustrates the potential issue.  Last week, in a trial against a self-professed supporter of the defendant who claimed to have been at the United States Capitol on January 6 because of the defendant's tweets, the jury sent the court a note expressing concern that the trial defendant (Fellows) might have information about the identity of jurors.  *See United States v. Brandon Fellows*, Case No. 21-cr-83 (TNM) at ECF No. 141, Note ("We wanted to confirm that the defendent [sic] does not have any personal information on individual jurors, since he was defending himself.  Includes name, address, etc.").  This demonstrates the need to protect potential jurors from fear of threats and harassment that stem from the defendant's disparaging and inflammatory public statements.

## II.    The Court Should Ensure That Public Statements by the Defendant and His Agents Do Not Prejudice These Criminal Proceedings

The defendant's repeated, inflammatory public statements regarding the District of Columbia, the Court, prosecutors, and potential witnesses are substantially likely to materially prejudice the jury pool, create fear among potential jurors, and result in threats or harassment to individuals he singles out.  Put simply, those involved in the criminal justice process who read and hear the defendant's disparaging and inflammatory messages (from court personnel, to prosecutors, to witnesses, to potential jurors) may reasonably fear that they could be the next targets of the defendant's attacks.  To protect the due administration of justice in these proceedings and ensure the impartiality of the venire, the Government proposes two narrowly tailored orders that impose modest, permissible restrictions on prejudicial extrajudicial conduct by the parties and counsel.

A.  **The Court Should Issue an Order Pursuant to Local Criminal Rule 57.7(c) That Prohibits Certain Narrowly Defined Statements**

The Court has recognized its "obligation to prevent what the Supreme Court called in *Sheppard v. Maxwell* 'a carnival atmosphere of unchecked publicity and trial by media rather than our constitutionally established system of trial by impartial jury.'"  8/11/23 Hr'g Tr. at 71.  To fulfill that obligation, the Court may "take such steps by rule and regulation that will protect their processes from prejudicial outside interferences," including by "proscrib[ing] extrajudicial statements by any lawyer, party, witness, or court official which divulge[s] prejudicial matters." *Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966).  Consistent with these principles, the Court should enter an order pursuant to this District's Local Criminal Rules imposing limited restrictions on certain extrajudicial public statements by the parties and attorneys in this case.

Local Criminal Rule 57.7 permits the Court, "[i]n a widely publicized or sensational criminal case," upon a motion or *sua sponte*, to "issue a special order governing such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury."   LCrR 57.7(c); *see also* LCrR 57.7(b)(1), (3) (prohibiting pre-trial, public statements by lawyers that might prejudice the due administration of justice).  Courts in this District have exercised their authority under Local Criminal Rule 57.7(c) to issue orders restricting statements of counsel and parties in appropriate cases.  *See United States v. Stone*, No. 19-cr-18, ECF No. 36 at 3 (D.D.C. Feb. 15, 2019) (ordering, *inter alia*, attorneys to "refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case"); *United States v. Butina*, No. 18-cr-218, ECF No. 31 at 2 (D.D.C. Sept. 12, 2018) (ordering "all interested participants, in the matter, including the parties, any potential witnesses, and counsel for the parties and witnesses . . . to refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice

to this case"). Other jurisdictions are in accord. *See United States v. Brown*, 218 F.3d 415, 428 (5th Cir. 2000) (upholding district court order restricting extrajudicial statements, and reasoning that the rationale of *Gentile* applies equally to attorneys and parties).

The Government seeks a narrow, well-defined restriction that is targeted at extrajudicial statements that present a serious and substantial danger of materially prejudicing this case. The Government's proposed order specifies that such statements would include (a) statements regarding the identity, testimony, or credibility of prospective witnesses; and (b) statements about any party, witness, attorney, court personnel, or potential jurors that are disparaging and inflammatory, or intimidating. *See* Exhibit 2. The Government's order also specifies that, consistent with other clarifications in Local Criminal Rule 57.7, the order is not intended to prohibit quotation or reference to public court records of the case or the defendant's proclamations of innocence. *Id*. This proposal is consistent with the permissible balance approved by the Supreme Court in *Gentile*, 501 U.S. at 1074-75, and specific enough to provide adequate notice to the parties and counsel of prohibited statements.

The defendant's past conduct, including conduct that has taken place after and as a direct result of the indictment in this case, amply demonstrates the need for this order. As illustrated by the examples discussed above, the defendant's statements reasonably could have a material impact on the impartiality of the jury pool while simultaneously influencing witness testimony. The defendant's repeated posts that he cannot receive a fair trial from this Court or from a jury of his peers in this District are substantially likely to undermine confidence in the justice system, affect the jury pool, or otherwise prejudice the due administration of justice. His misleading statements regarding the Special Counsel's Office and its investigation are designed to do the same. And his

targeting of specific witnesses seeks to either bolster or impeach witnesses not before this Court but instead in the court of public opinion before trial begins.

A supplemental order that extends some of the prohibitions that apply to defense counsel to the defendant himself is particularly warranted.  Shortly after the indictment in this case was unsealed, the defendant's lead counsel began a series of lengthy and detailed interviews in which he potentially tainted the jury pool by disseminating information and opinions about the case and a potential witness and described in detail legal defenses that he plans to mount, including defenses that may never be raised in court or that may be rejected by the Court before ever reaching the jury.[21]  Many of these statements by lead counsel violated Local Criminal Rule 57.7(b), which prohibits attorneys from releasing public extrajudicial statements regarding, among other things, "the identity, testimony, or credibility of prospective witnesses" and the "merits of the case or the evidence in the case."  In the time since the Court admonished the parties and counsel at the hearing regarding the motion for a protective order on August 11, 2023, *see* 8/11/23 Hr'g Tr. at 72, the Government is unaware of lead counsel making any additional public statements of this nature. The defendant, however, has persisted.  The Court should therefore enter the order proposed by

---

[21] *See, e.g.*, CNN (August 1, 2023), https://www.youtube.com/watch?v=GW7Bixvkpc0; NPR (August 2, 2023), https://www.npr.org/2023/08/02/1191627739/trump-charges-indictment-attorney-jan-6-probe; CNN (August 6, 2023), https://www.cnn.com/videos/politics/2023/08/06/sotu-lauro-full.cnn; ABC, This Week (August 6, 2023), https://abcnews.go.com/ThisWeek/video/mike-pence-best-witnesses-trial-john-lauro-102054360; NBC, Meet the Press (August 6, 2023), https://www.nbcnews.com/meet-the-press/video/august-6-john-lauro-and-rep-jamie-raskin-190118469904; CBS, Face the Nation (August 6, 2023), https://www.cbsnews.com/video/face-the-nation-lauro-phillips-krebs/; Fox, Fox News Sunday (August 6, 2023), https://www.foxnews.com/video/6332525513112; CBS, Face the Nation (August 6, 2023); For the Defense with David Oscar Marcus (August 6, 2023), https://podcasts.apple.com/us/podcast/john-lauro-for-donald-j-trump/id1536699806?i=1000623609326.

the Government to ensure the defendant does not undermine the integrity of these proceedings by disseminating statements defense counsel cannot make.

**B.** **The Court Should Issue an Order That Prohibits Contacting the Citizens of This District to Conduct Jury Studies Without First Notifying and Receiving Authorization from the Court**

The Court has already taken steps to protect the venire related to polling of prospective jurors related to this case. At the status hearing on August 28, 2023, after the Government raised the issue of jury studies, and the defense suggested they may "sooner rather than later" conduct outreach to the jury pool to gather information for a potential change of venue motion, the Court instructed the defendant to notify the Court *ex parte* before conducting any polling in the District of Columbia in connection with a potential motion to change the trial venue. *See* 8/18/23 Hr'g Tr. at 59-60. In so doing, the Court noted that such polling "might affect the same jury pool you are claiming is not fair" and might "actually affect their ability to render a fair verdict by virtue of the kinds of questions you're asking, because questions can be phrased in all kinds of ways." *Id.*

Because of the potential prejudice that polling may cause, the Government respectfully requests that the Court set forth a process to review efforts by either party to engage in contacts with members of the jury venire in this District undertaken for the purpose of discussing case-specific facts, including any pretrial survey, poll, focus group, or similar study (hereinafter, "jury study").[22] Specifically, the Court should (1) require either party to notify the Court before the party—or any individual or entity acting at the party's direction or under its control—undertakes any jury study in this District; (2) require the completion of any such jury study no later than 30 days before jury selection begins; (3) require either party to submit the proposed questions and

---

[22] At a later date, the Government intends to file a motion regarding other issues related to the jury, including the use of a juror questionnaire.

methodology *ex parte* for the Court's review before undertaking any jury study; and (4) require filing under seal of the name and address of each participant contacted in any jury study at least two weeks before jury selection.  A proposed order is attached as Exhibit 3.

Such an order is consistent with the Court's inherent authority to protect the "integrity and fairness" of the judicial system through preventing "comments that are likely to prejudice the jury venire."  *Gentile*, 501 U.S. at 1075.  Though pretrial surveys are neither inherently suspect nor uncommon in trial litigation, *see Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 717 (Tex. 2020); *see also* Ellen Kreitzberg & Mary Procaccio-Flowers, *The Law, Art & Science of Selecting a Jury* § 3:3 (2022) (noting the utility of pretrial surveys), courts nonetheless maintain the authority to supervise and oversee their use.  *See United States v. Collins*, 972 F.2d 1385, 1398 (5th Cir. 1992) (district court reviewed materials related to Government's polling to determine whether it had compromised the integrity of jury selection); *Brewer v. Lennox Hearth Prod., LLC*, 546 S.W.3d 866, 877 (Tex. App. 2018) (finding that pretrial surveys are "subject to review by the presiding court in order to determine whether anything was done to compromise the integrity of the jury selection process"), *rev'd on other grounds*, 601 S.W.3d 704 (Tex. 2020).  If questions in a pretrial survey are worded to advocate for a certain party's position, or test the effectiveness of a party's message in addition to gathering information, they can have a potentially prejudicial effect.  *See Brewer*, 601 S.W.3d at 726 ("A campaign of disinformation, in whatever form, undermines the sanctity of the judicial process and is inimical to the constitutional promise of a fair and impartial jury trial.); *cf. United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (finding that the district court did not err in relying more on comprehensive voir dire than "a poll taken in private by private pollsters and paid for by one side").

To guard against the damage that a pretrial survey could inflict on the venire—whether intentionally or not—this Court should exercise its inherent authority here.  At least one district court has a standing order that requires the parties to provide advance notification "[w]hen the party decides that it will, or is likely to, commission" a pretrial mock trial, focus group, or similar study of the jury venire.  *See* The Honorable Ron Clark, E.D. Tex. Standing Order RC-47 (Aug. 11, 2010).  An order of this type "do[es] not *prohibit* use of surveys as a litigation tool" but instead "*regulate[s]* the practice . . . by (1) requir[ing] pretrial notice of intent to conduct such a study; (2) requir[ing] disclosure . . .  of the methodology; (3) temporally limit[ing] proximity to trial; and (4) requir[ing] *in camera* submission of each participant's name and address in advance of the pre-trial conference."  *Brewer*, 601 S.W.3d at 726 (emphasis in original).  The Government has attached a proposed order that contains these features.

### III.    Conclusion

Consistent with its obligations to guard the integrity of these proceedings and prevent prejudice to the jury pool, while respecting the defendant's First Amendment rights, the Court should enter the proposed orders imposing certain narrow restrictions on the parties' public statements regarding this case and governing any jury studies the parties may undertake.

Respectfully submitted,

JACK SMITH
Special Counsel

By:     /s/Molly Gaston
        Molly Gaston
        Thomas P. Windom
        Senior Assistant Special Counsels
        950 Pennsylvania Avenue NW
        Room B-206
        Washington, D.C. 20530

MATERIAL UNDER SEAL DELETED

# Exhibit 1 (Sealed)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

## ORDER

Having considered the parties' filings, and mindful of the Court's responsibility to protect

the fundamental right to a fair trial by impartial jurors from comments that are likely to influence

the outcome of the trial or prejudice the jury venire, *see Gentile v. State Bar of Nevada*, 501 U.S.

1030, 1075 (1991), upon the Court's finding that a narrowly tailored order governing extrajudicial

statements by the parties is the least restrictive measure to protect this process from materially

prejudicial outside interference, and pursuant to Local Criminal Rule 57.7(c), the Court orders as

follows:

1.      The parties in this case and their attorneys are prohibited from making or

authorizing statements to the media or in public settings, including through social media, that pose

a substantial likelihood of material prejudice to this case.  Such statements include, but are not

limited to, (a) statements regarding the identity, testimony, or credibility of prospective witnesses;

and (b) disparaging and inflammatory or intimidating statements about any party, witness,

attorney, court personnel, or potential jurors.  The defendant is also prohibited from causing

surrogates to make such statements on his behalf.

2.      Consistent with Local Criminal Rule 57.7, this prohibition does not preclude the

defendant or his attorneys, agents, or others acting on his behalf from (a) quoting or referring

without comment to public records of the court in the case; (b) announcing the scheduling or result of any stage in the judicial process; (c) requesting assistance in obtaining evidence; or (d) announcing without further comment that the defendant denies the charges.

_____

HON. TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.                                          Case No. 1:23-cr-257-TSC

DONALD J. TRUMP,

    Defendant.
_____/

**PRESIDENT TRUMP'S RESPONSE IN OPPOSITION**
**TO PROSECUTION'S MOTION FOR PRIOR RESTRAINTS**

President Trump respectfully submits this response in opposition to the prosecution's motion to impose unconstitutional prior restraints on President Trump's political speech. (the "Motion," Doc. 57, seeking the "Proposed Gag Order," Doc. 57-2).

On August 1, 2023, the prosecution publicly released a forty-five-page speaking Indictment that read very much like a campaign press release. As if the Indictment's media talking points were not enough, prosecutor Jack Smith then held a press conference to deliver an incendiary attack upon President Trump, falsely claiming that he "fueled . . . an unprecedented assault on the seat of American democracy." This inflammatory rhetoric, which violated long-standing rules of prosecutorial ethics, was then repeated daily by media publications across the country. Following these efforts to poison President Trump's defense, the prosecution now asks the Court to take the extraordinary step of stripping President Trump of his First Amendment freedoms during the most important months of his campaign against President Biden. The Court should reject this transparent gamesmanship and deny the motion entirely.

**INTRODUCTION**

For hundreds of years, our country has embraced the core value that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content,"

*In re Murphy-Brown, LLC*, 907 F.3d 788, 796–97 (4th Cir. 2018) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted)). This freedom from government censorship is fundamental to our national ethos and "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

Tossing these foundational principles aside, the Biden Administration charged President Trump—the leading contender in the 2024 Presidential Election—for statements he made as president. Now, keenly aware that it is losing that race for 2024, the prosecution seeks to unconstitutionally silence President Trump's (but not President Biden's) political speech on pain of contempt. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech.").

In support, the prosecution presents nothing but pretexts, claiming that the Court must muzzle President Trump to ensure that: (1) the prosecution, the Court, and witnesses are not "intimidated" by political criticism; and (2) the District of Columbia citizenry (who voted by a margin of around 95% for Biden in the 2020 election) do not magically transform and become biased *in President Trump's favor*.

The prosecution does not present one shred of evidence to demonstrate either of these claims—let alone enough to establish, as it must, a "clear and present danger to the administration of justice." *See Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 844-845 (1978). Neither the prosecution nor the Court are reluctant to proceed with this case, and none of the public figures the prosecution references in its Motion have refused to participate, either. Just the opposite, these individuals appear to relish the notoriety they have gained through their proximity to President

Trump, variously writing books about their experiences, appearing for interviews with national media, and even running for president in their own right. Similarly, despite repeatedly claiming President Trump's statements threaten "the impartiality of the venire," Motion at 13, the prosecution does not identify a single potential juror who has allegedly become partial against the government due to President Trump's statements.

Worse, the Proposed Gag Order lacks any semblance of narrow tailoring, sweeping in, for instance, all "disparaging" statements about any "potential witness," regardless of subject, and including individuals who are actively waging political campaigns against President Trump. And it does so in a unilateral way, preventing President Trump from defending himself in the political arena, while giving President Biden and his surrogates (including those in the corporate media) free reign to say whatever they want. All for no legitimate reason—the purported goals of the Proposed Gag Order would not be served by the order itself; the media would still feature this case, and the prosecutors, the Court, and "potential witnesses" (yet unidentified by the prosecutors) would still be criticized in the public arena. The prosecution, therefore, cannot come close to "eliminat[ing] . . . the exact source of the evil" it purportedly seeks to remedy. *See City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 808–10 (1984) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

At bottom, the Proposed Gag Order is nothing more than an obvious attempt by the Biden Administration to unlawfully silence its most prominent political opponent, who has now taken a commanding lead in the polls. Indeed, this very Motion came on the heels of adverse polling for President Biden. His administration's plan is quite simple: unleash a 45-page speaking indictment, discuss and leak its talking points in the press, and then cynically attempt to invoke the Court's authority to prevent President Trump and those acting on his behalf from presenting his side of the

story to the American people during a political campaign. This desperate effort at censorship is unconstitutional on its face. *NAACP v. Button,* 371 U.S. 415, 445 (1963) (the First Amendment is a value-free provision whose protection is not dependent on "the truth, popularity, or social utility of the ideas and beliefs which are offered").

## APPLICABLE LAW

"Even among first amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored," and presumptively unconstitutional, "forms of expressive limitations: prior restraints and content-based restrictions." *In re Murphy-Brown, LLC*, 907 F.3d at 796–97.

"In light of these twin presumptions, gag orders must survive strict scrutiny." *Id.* at 797; *see also* Erwin Chemerinsky, *Lawyers Have Free Speech Rights Too: Why Gag Orders On Trial Participants Are Almost Always Unconstitutional*, 17 LOY. L.A. ENT. L. REV. 311 (1997).[1]

Strict scrutiny, in turn, requires the prosecutors to prove the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 774–75 (2002); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 804 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). The prosecutors must meet both exacting standards "to ensure that communication has not been prohibited merely because public officials disapprove the speaker's view." *U.S. Postal Serv. v. Council of Greenburgh Civic Assocs.,* 453 U.S. 114, 132 (1981) (citation and quotation marks omitted).

---

[1] "[C]ourt orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993).

In the context of pending litigation, the prosecutors can only establish "a compelling state interest" by proving the speech at issue "constitute[s] a clear and present danger to the administration of justice." *Landmark Commc'ns, Inc.*, 435 U.S. at 844. This requires far more than just speculation regarding potential harm. Rather, the prosecution must proffer a "solidity of evidence" proving "[t]he danger [is not just] remote or even probable," but "immediately imperil[s]" the administration of justice. *Id.* at 845; *see also id.* ("What emerges from these cases is the 'working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.'"); *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 664 (1994) ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." (citations and internal quotation marks omitted)).[2]

Accordingly, the Supreme Court has "consistently rejected the argument that" "out-of-court comments concerning pending cases or grand jury investigations" may be censored. *Landmark Commc'ns, Inc.*, 435 U.S. at 844; *see also United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987) (rejecting lower "likelihood" of prejudice standard and holding the "exacting 'clear and

---

[2] As the Supreme Court instructed:

> To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.

*Texas v. Johnson*, 491 U.S. 397, 419 (1989) (quotation omitted).

present danger' test" applies); *id*. ("We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the press."); *Chi. Council of Lawyers v. Bauer,* 522 F.2d 242, 251 (7th Cir.1975) ("We do not believe that there can be a blanket prohibition on certain areas of comment[,] a per se proscription- without any consideration of whether the particular statement posed a serious and imminent threat of interference with a fair trial."); *Karhani v. Meijer,* 270 F. Supp. 2d 926, 933 (E.D. Mich. 2003) (a court must find "clear and present danger" in order to impose a prior restraint on a civil litigant); *Hammes Co. Healthcare, LLC v. Tri-City Healthcare Dist.*, 2011 WL 6182423, at *18 (S.D. Cal. Dec. 13, 2011) (citing *CBS Inc. v. Young,* 522 F.2d 234, 239 (6th Cir.1975) (quoting *Craig v. Harney,* 331 U.S. 367, 373 (1947)) ("Before a trial court can limit parties' and their attorneys' right to freedom of speech, the court must make sufficient specific findings establishing that the party's conduct is "a serious and imminent threat to the administration of justice."); *Coomer v. Noel*, 2023 WL 1862617, at *2 (S.D. Ind. Feb. 9, 2023) ("[A] Court should restrict the speech of lawyers and litigants only when the comments in question 'pose a serious and imminent threat of interference with the fair administration of justice.'"); *Bianchi v. Tonigan*, 2012 WL 5966543, at *6 (N.D. Ill.

Nov. 28, 2012) (Courts require a showing of a "clear and present danger" or a "serious and imminent threat" to a fair trial before restraining litigant speech.).[3]

    "The thread running through all these cases is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Thus, even where a "prior restraint [is] imposed to protect [another] vital constitutional guarantee," such as the right to a fair trial, "the explicit command . . . that the freedom to speak and publish shall not be abridged" remains of paramount importance, "and the presumption against its [abridgment] continues intact." *Id.* (reversing prohibition on case commentary and holding the government had not met the "heavy burden imposed as a condition to securing a prior restraint").[4]

---

[3] The prosecution inappositely cites *Gentile v. State Bar of Nevada*, to suggest it must meet a lower (but still quite high) standard of "a substantial likelihood of materially prejudicing an adjudicative proceeding." 501 U.S. 1030, 1056 (1991). *Gentile*, however, addressed the First Amendment rights of attorneys, not parties. Thus, "[m]uch of the reasoning in *Gentile* justifying a lower standard for regulating attorney speech in pending cases does not apply to non-attorneys," and the case provides "no cause to limit the speech of the parties." *Nelle as Next Friend of B.N. v. Huntsville Sch. Dist.*, No. 5:21-CV-05158, 2021 WL 6135690, at *3 n.2 (W.D. Ark. Dec. 29, 2021) (citing *Gentile* discussion of the unique role and responsibilities of attorneys as officers of the court)). Additionally, *Gentile* did not concern a prior restraint, which is subject to higher scrutiny. *See Nelle,* 2021 WL 6135690, at *3 ("[T]he higher standard used in *Nebraska Press Association* for a prior restraint on the press would apply to a prior restraint on a party."). Regardless, the Proposed Gag Order fails under either standard.

[4] The prosecution relies on *Sheppard v. Maxwell*, 384 U.S. 333 (1966) to justify depriving President Trump of his free speech rights. But *Sheppard* did not concern the First Amendment. Rather, it addressed the need to protect a *defendant's* due process rights from a "carnival atmosphere at trial." *Id.* at 358. The prosecution has no parallel due process right, *see United States v. Cardinal Mine Supply,* 916 F.2d 1087, 1089 n.3 (6th Cir.1990) (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 323–24 (1966)), meaning the Motion does not pit two constitutional guarantees against each other, but rather attempts to subordinate President Trump's free speech rights in favor of the prosecution's preference for silence.

**ARGUMENT**

**1.      President Trump's Posts Do Not Endanger the Administration of Justice**

Throughout its Motion, the prosecution complains that President Trump's political statements "undermine confidence in the criminal justice system," which it asserts somehow justifies the Proposed Gag Order. Motion at 2, 6, 8, 15. The prosecution cites no authority in support of this bizarre claim. Nor can it. As the Supreme Court has repeatedly emphasized, "speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile*, 501 U.S. at 1034; *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) ("Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations."). This includes criticism of the Court and the Special Counsel.

> The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations. . . . It would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted. . . . Public awareness and criticism have even greater importance where, as here,... the criticism questions the judgment of an elected public prosecutor. Our system grants prosecutors vast discretion at all stages of the criminal process . . . The public has an interest in its responsible exercise.

*Gentile*, 501 U.S. at 1035–36 (citations and quotation marks omitted).

The prosecution would silence President Trump, amid a political campaign where his right to criticize the government is at its zenith, all to avoid a public rebuke of this prosecution. However, "above all else, the First Amendment means that government has no power to restrict expression

8

because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).[5]

The prosecution may not like President's Trump's entirely valid criticisms, but neither it nor this Court are the filter for what the public may hear. Rather, "[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind . . . In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." *Meyer v. Grant*, 486 U.S. 414, 419–20 (1988) (citations and internal quotations omitted); *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 537–38 (1980) ("If the marketplace of ideas is to remain free and open, governments must not be allowed to choose which issues are worth discussing or debating. . . . To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." (citations and internal quotations omitted)).

If the prosecution wishes to avoid criticism for abusing its power, the solution is simple: stop abusing its power. The Constitution allows no alternative.[6]

---

[5] No one can doubt that substantial segments of the U.S. public harbor deep suspicions regarding the prosecution's motives in this case. President Trump has a constitutional right to speak on this subject, both as a political candidate and as a citizen of this country.

[6] Enforcing "confidence in the judicial system" through censorship is repugnant to the First Amendment in every respect; however, even if it were a "compelling government interest," the prosecution utterly fails to establish that any confidence has been lost due to President Trump's comments, or that censoring him would do anything to restore or preserve such confidence. It cites no statistics, provides no affidavits, and does not even explain how many people have seen President Trump's comments. To satisfy strict scrutiny, harm must not be speculative or assumed, but rather demonstrated through compelling evidence. *Landmark Commc'ns, Inc.*, 435 U.S. at 844. Likewise, the prosecution does not, and cannot, explain how the Proposed Gag Order is the least restrictive method of achieving its purported goal of preserving public confidence.

A.   *President Trump Has Not Intimidated Anyone*

Next, the prosecution argues (without evidence) that it needs the Proposed Gag Order to prevent the purported "intimidation" of the prosecution, the Court, and "potential witnesses." Motion at 15. This claim is meritless.

First, it is absurd to suggest the prosecution and the Court are "intimidated" by critical social media posts, let alone to such an extent that it "constitute[s] a clear and present danger to the administration of justice." *Landmark Commc'ns, Inc.*, 435 U.S. at 844. The prosecution does not point to a single prosecutorial or judicial function that has been impaired due to the cited social media posts, or otherwise suggest that it would be unable to fulfill its duties absent the Proposed Gag Order. Every hearing in this case has gone forward on schedule, without incident, and there is zero reason to believe that will change due to President Trump's political expressions.

Similarly, no witness has suggested that he or she will not testify because of anything President Trump has said. To the contrary, witnesses appear eager to share their expected testimony with the media and will undoubtedly testify at a potential trial, if called to do so.[7] Nor has any witness suggested that President Trump's protected statements have "influenc[ed] [his or her] testimony," as the prosecution baselessly suggests. Motion at 15.

This is entirely unsurprising, as President Trump has never called for any improper or unlawful action. Quite the opposite, the prosecution's cited posts show that President Trump

---

[7] Two "potential witnesses" the prosecution does not want President Trump speaking about, for example, are former Attorney General Bill Barr and former Vice President Mike Pence. Both have written books about their tenure with President Trump and the latter is currently running for president. *See, e.g.*, Geoff Bennett, *Bill Barr: Trump Committed a "Grave Wrongdoing" in Jan. 6 Case*, PBS NEWSHOUR, Aug. 3, 2023. Neither shies away from a hearty public debate with President Trump. Both were at the very top of government and it is absurd to think that they would be intimidated by social media posts. Others the prosecution identifies as "harassed," are likewise current and former government officials who have made politics, for all its discord and discourse, a large part of their lives.

10

intends to redress the unfairness of this proceeding through legitimate means. This includes, for example, filing motions with the Court—a form of relief that President Trump has every right to pursue and talk about. This is a far cry from the type of "true threat" the prosecution would need to show to justify a prior restraint. *Virginia v. Black*, 538 U.S. 343, 360 (2003) ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.").[8]

Unable to identify any instance where President Trump uttered any threat, the prosecution points to others, claiming President Trump "knows that when he publicly attacks individuals and institutions, he inspires others to perpetrate threats and harassment against his targets." Motion at 3. Again, the prosecution offers no evidence of any causal connection between his speech and the alleged unlawful acts of others to support this meritless claim. Regardless, it goes without saying that the Constitution does not permit the censorship of President Trump for the unprovoked acts of third parties, and no such alleged acts can justify a prior restraint of President Trump. Indeed,

---

[8] The prosecution once again cites President Trump's August 4, 2023, Truth Social post; however, as previously explained, Doc. 14 at 7–8 n.8, that post did not concern this case. *See* Nick Robertson, *Trump campaign defends threatening social media posts as free speech*, The Hill (August 5, 2023) (quoting a Trump campaign statement that "[t]he Truth post cited is the definition of political speech, and was in response to the RINO, China-loving, dishonest special interest groups and Super PACs, like the ones funded by the Koch brothers and the Club for No Growth.").

In today's environment, this Court could easily take judicial notice that "[t]he language of the political arena . . . is often vituperative, abusive, and inexact," *Watts*, 394 U.S. at 708 (citations omitted), and even "very crude [or] offensive method[s] of stating a political opposition" are not true threats. *Id*.

Finally, the prosecution raised (and President Trump addressed), this same post in connection with its motion for a protective order. Doc. 14 at 7–8 n.8. Despite having ample opportunity to dispute President Trump's explanation, including in a reply brief, Doc. 15, and at oral argument, Doc. 29, the prosecution chose not to do so. Now, the prosecution once again tries to revive this debunked position in support of its Motion. The Court should accord such unpersuasive arguments no weight.

the Supreme Court consistently holds that speech cannot be prohibited based on an incitement

theory unless it "is directed to inciting or producing imminent lawless action and is likely to incite

or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447–448 (1969).

The prosecution does not and cannot explain how President Trump's statements would

provoke any reasonable listener to lawlessness, or otherwise "fall within that small class of

'fighting words' that are likely to provoke the average person to retaliation, and thereby cause a

breach of the peace." *Texas v. Johnson*, 491 U.S. 397, 409 (1989) (citation and quotation marks

omitted). Rather, President Trump's statements are pure "expression[s] of dissatisfaction with the

policies of this country" that are "situated at the core of our First Amendment values," *Id*. at 411.[9]

Criticism of prosecution witnesses, likewise, is core protected speech absent a true threat.

Again, the First Amendment requires far more than bare speculation that third parties *might*

interact with the individuals President Trump comments on. Instead, the prosecution must proffer

a "solidity of evidence" proving President Trump's statements "immediately imperil" the

administration of justice. *Landmark Commc'ns, Inc.*, 435 U.S. at 845 (citations omitted). That

means proving genuine, material harm to this proceeding and drawing a direct causal link between

that alleged harm and President Trump's protected speech. The prosecution has done neither.

But even if the prosecution could meet this test by identifying some utterance of a true

threat or incitement sufficient to satisfy the *Brandenburg* standard—and it emphatically cannot—

---

[9] Nor has the prosecution established that President Trump's statements actually incited anyone. Fallacious *post hoc ergo prompter hoc* assertions aside, no evidence links President Trump's social media posts to any alleged lawlessness and there is no reason to think the Proposed Gag Order would resolve the harms the prosecution alleges. *See Playboy Ent. Grp., Inc.*, 529 U.S. at 822 ("[A]side from conclusory statements during the debates by proponents of the bill, . . . the congressional record presented to us contains no evidence as to how effective or ineffective the . . . regulations were or might prove to be." (citation omitted)). Unknown third parties who, in a raucous political atmosphere, allegedly crossed, or may hypothetically cross, a line is not a reason to prevent President Trump from speaking.

that would only justify a very narrow restriction on the specific language at issue. It would not allow, as the prosecution demands, categorical restrictions on all "disparaging" statements regarding the prosecution, the Court, and an unknown set of all "potential witnesses," and certainly not all "comment" on this case.

Finally, the prosecution bemoans the disparaging messages directed to it, Motion at 12, but ignores the equal amount of vitriol directed to the defense. Counsel for President Trump receives harassing messages by phone or email nearly every day. Others associated with President Trump have received the same treatment. Yet the prosecution seeks only to bar President Trump from speaking. Such inequitable restrictions offend the First Amendment on their face and have no place in our jurisprudence.

B.    *President Trump's Posts Will Not Prejudice the Jury*

The prosecution next speculates that President Trump's public statements "could affect potential jurors," and impact the "impartiality of the jury pool," Motion at 13, 15, but fails to explain how. *Playboy Ent. Grp., Inc.*, 529 U.S. at 822 ("The Government must present more than anecdote and supposition."). That argument is laughable given the jury pool.

In the prosecution's view, President Trump simply talking about a witness (who might be a public critic, author, or political opponent) would prejudice the jury through improper "bolster[ing] or impeach[ment]." Motion at 16. That is not the law, and no authority permits a blanket gag order that would prevent a defendant from exercising his First Amendment rights. For good reason: "[a]n impartial jury . . . need not be wholly unaware of information—including potentially prejudicial information—outside the record. Prominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." *In re Murphy-Brown, LLC*, 907 F.3d at 798; *Gentile*, 501 U.S. at 1054-1055 ("Empirical research suggests that in the few instances

when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it and base their verdict upon the evidence presented in court.").[10]

Further, to promote impartiality, "[t]he law empowers trial courts to ensure fair jury trials using a number of tools short of gag orders…include[ing] enlarged jury pools, *voir dire*, changes to a trial's location or schedule, cautionary jury instructions, and, in more unusual circumstances, sequestration." *In re Murphy-Brown, LLC*, 907 F.3d at 799. The Supreme Court discussed many other alternatives to prior restraints in *Nebraska Press Ass'n v. Stuart*, including: (a) change of trial venue to a place less exposed to the intense publicity; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court; and (e) sequestration of jurors. 427 U.S. 539, 563–64 (1976). "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy Ent. Grp., Inc.*, 529 U.S. at 816.

The prosecution has not demonstrated why any of the plausible alternatives above would be inadequate, or offered a single less restrictive alternative to a near complete gag order that would preclude any "comment" on these proceedings or "potential witnesses." This is insufficient. The prosecution cannot just claim that the Proposed Gag Order is narrowly tailored. It must prove that

---

[10] In *Gentile*, the Supreme Court was unable to identify "a single example where a defense attorney has managed by public statements to prejudice the prosecution" and found "no convincing case for restrictions upon the speech of defense attorneys." 501 U.S. at 1055. Rather, it is "[t]he police, the prosecution, other government officials, and the community at large hold innumerable avenues for the dissemination of information adverse to a criminal defendant," and in part because of this imbalance, "blanket rules restricting speech of defense attorneys should not be accepted without careful First Amendment scrutiny." *Id.* at 1056.

it is the least restrictive method of protecting a compelling interest and that *no* other alternative would suffice. The prosecution falls hopelessly short of meeting this high burden.

"The question, therefore, is neither whether a case has garnered public attention nor whether public discussion of it risks revealing potentially prejudicial information. Guidance is the critical concept. The question is whether the judge finds it likely that he or she will be unable to guide a jury to an impartial verdict. If judges can guide the jury to an impartial verdict, then no gag order may issue." *In re Murphy-Brown, LLC*, 907 F.3d at 798.

Here, the prosecution has not pointed to any statements by President Trump, as distinct from the countless statements by others about these proceedings, that present "a danger of the necessary gravity, imminence, or likelihood" necessary to warrant a violation of his First Amendment rights. *Gentile*, 501 U.S. at 1058.[11]

The speaking Indictment, as part of an obvious strategy, launched false and derogatory public accusations against President Trump, which the prosecution then expanded with gratuitous, out-of-court statements wrongly insinuating that President Trump was responsible for the events of January 6—an allegation not made in the Indictment. In this respect, the prosecution and its media allies represent a far greater threat of prejudice to the venire than anything President Trump has or will say—particularly, in the District of Columbia. *See Gentile*, 501 U.S. at 1042. President Trump, his counsel, and agents, have the right to counter this harmful publicity with public

---

[11] The size of the potential venire and the timing of President Trump's statements both also weigh against any suggestion of prejudice. In *Gentile*, for example, the Supreme Court held that prejudice was unlikely in a community of 600,000 potential jurors,[11] particularly where, as here, trial remains several months away. *See Gentile*, 501 U.S. at 1044 (citing ABA Annotated Model Rules of Professional Conduct 243 (1984) ("timing of statement a significant factor in determining seriousness and imminence of threat"); *see also Gentile*, 501 U.S. at 1039 ("[T]he Nevada court's conclusion that petitioner's abbreviated, general comments six months before trial created a 'substantial likelihood of materially prejudicing' the proceeding is, to say the least, most unconvincing.").

statements of their own. *See Id.* at 1043 ("[Defendant's attorney] sought only to stop a wave of publicity he perceived as prejudicing potential jurors against his client and injuring his client's reputation in the community."). Such efforts, far from prejudicing these proceedings, protect President Trump's rights and are core free speech. *Id.*

In sum, for alleged "jury influence" to justify a prior restraint, the prosecution must establish that President Trump's political commentary irrevocably biases District citizens (against the Biden Administration prosecution) such that *voir dire* and other alternative remedies cannot remedy. Because the prosecution fails to meet this heavy burden, the Proposed Gag Order is unconstitutional.

## 2.    The Proposed Gag Order is Not Narrowly Tailored

"[T]he seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as *precisely* tailored as possible." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (emphasis in original).

"A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minnesota*, 416 F.3d at 751 (collecting cases); *see also City Council of L.A.,* 466 U.S. at 808–10 ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

Any restraint must "provide fair notice to those to whom it is directed" and not leave the speaker to "guess at its contours." *Gentile*, 501 U.S. at 1030, 1048. A "grammatical structure" that relies on "classic terms of degree" that "have no settled usage or tradition of interpretation in law"

violates the Constitution because the speaker has "no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated." *Id*. at 1048–49.

The Proposed Gag Order does not meet either of these tests. It is sweepingly broad and many of its terms are undefined. For example, the prosecution proposes that President Trump and his attorneys be restricted from making or "authorizing"[12] any statements that pose "a substantial likelihood of material prejudice." Doc. 57-2 at 1. This is not only the wrong standard, *see Landmark Commc'ns, Inc.*, 435 U.S. at 844, but it is vague on its face, providing no settled boundaries and utilizing prohibited "classic terms of degree" that leave President Trump to guess at what the prosecution or the Court might consider "substantial" or "material" despite obvious disagreement on those issues. *Gentile*, 501 U.S. at 1030, 1048. Determining whether a single, specific statement poses "a substantial likelihood of material prejudice" is a difficult, fact-intensive question that Courts struggle to resolve. *See Gentile*, 501 U.S. at 1048–49. To expect President Trump and his counsel to make that judgment in real-time, every time he speaks, is utterly intolerable. *Id*. Let's be clear: the prosecution hopes to create a contempt trap for President Trump and his attorneys.

Although the prosecution offers some examples of conduct it would consider prohibited, it simultaneously cautions the examples are non-exhaustive. Doc. 57-2 at 1 ("Such statements include, but are not limited to . . .). Further, the prosecution's examples are intentionally vague in order to chill the First Amendment rights of President Trump and his counsel.

---

[12] "Authorize" could mean to allow or permit. Under this entirely too broad proposed order, President Trump could arguably be sanctioned if he simply failed to prevent others from making statements. The Proposed Gag Order also attempts to ensnare President Trump's "surrogates" within its reach. Of course, "surrogates" is not defined. But it would presumably include members of the media, which is forbidden by *Nebraska Press*, or other citizens, including politicians, which is a straightforward infringement of the First Amendment.

For instance, the prosecution would prohibit *any* statement regarding the identity, testimony, or credibility of prospective witnesses. Doc. 57-2 at 1 (emphasis added). The prosecution provides no list of "prospective witnesses," nor does it define "prospective." That group could include anyone who worked in the federal government around January 6 or anyone who was involved in a state election. Further, that broad characterization likely still does not include everyone who the prosecution could claim is a "prospective witness." The group of "prospective witnesses" could also arguably include many of President Trump's political rivals in the upcoming election. Thus, the Proposed Gag Order places President Trump at risk of contempt any time he speaks about anyone relevant to his political campaign. That is plainly unconstitutional and would inevitably lead to repeated and needless collateral litigation. *Gentile*, 501 U.S. at 1051 ("The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement, for history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law." (citations omitted)).

The prosecution's second example seeks to preclude President Trump from making or authorizing "disparaging and inflammatory or intimidating statements" regarding another wide and undefined set of individuals. Doc. 57-2 at 1. The government does not define those adjectives, but by the content of its motion, it appears this example would include speech far below the constitutional requirement of a "clear and present danger" to the administration of justice.

The only speech the government appears willing to permit is basic case information, communicated "without comment." Doc. 57-2 at 2. However, none of the cases the prosecution cites allow such a significant restriction on speech. "Comment" is at the very core of the First Amendment. The United States Constitution may be inconvenient for the Biden Administration,

but public speech in response to unfair and widely disseminated attacks is President Trump's right.[13]

Finally, as stated above, the Proposed Gag Order is entirely disconnected from the specific harms the prosecution alleges in its Motion, and the prosecution makes no attempt to minimize the burden these sweeping restraints would have on President Trump's rights. In short, the Proposed Gag Order is unconstitutionally overbroad and vague in nearly every respect, and therefore fails to satisfy strict scrutiny's narrow tailoring requirement.

### 3. President Trump's Attorneys' Statements Are Entirely Appropriate

Little of the Motion is devoted to President Trump's attorneys' speech. Nonetheless, the prosecution seeks to place the same unconstitutional restrictions on counsel. In support, the prosecution cites comments made by Present Trump's co-lead counsel in the immediate aftermath of the speaking Indictment and the Special Counsel's false and derogatory public statements regarding President Trump. Doc. 57 at 16. Although the prosecution acknowledges defense counsel has not spoken recently on this subject, it nonetheless seeks to unlawfully restrain counsel's ethical duty to defend President Trump moving forward. Not surprisingly, the prosecution makes no mention of Smith's comments, while seeking to censor defense counsel.

Without question, the misleading allegations in the 45-page speaking Indictment sought to skew public opinion against President Trump in this historic case. *See, e.g.,* Mark Berman, Assailed by Trump, *Special Counsel Jack Smith Lets Indictments Speak for Him*, THE WASHINGTON POST, Aug. 3, 2023.

---

[13] Silencing President Trump would only make publicity regarding this case unfairly one-sided. *See Gentile*, 501 U.S. at 1042 ("[H]is primary motivation was the concern that, unless some of the weaknesses in the State's case were made public, a potential jury venire would be poisoned by repetition in the press of information being released by the police and prosecutors.").

The Special Counsel's improper, out-of-court statements have had the same effect. Despite D.C. Bar Rule 3.8(f)'s specific prohibition on prosecutors' "extrajudicial comments which serve to heighten condemnation of the accused,"[14] the Special Counsel falsely told the press that President Trump "fueled . . . an unprecedented assault on the seat of American democracy,"[15] matching rampant leaks to the same press. *See, e.g.,* Zoe Tillman, *The Trump Indictments Won't End Special Counsel's Investi*gations, PORTLAND PRESS HERALD, Aug. 2, 2023; Katelyn Polantz, Kristen Holmes, Paula Reid and Jeremy Herb, *Special Counsel Smith speeds ahead on criminal probes surrounding Trump*, CNN.com, Dec. 11, 2022.

The prosecution has engineered negative press towards President Trump and now seeks to censor his counsel. Under settled law, counsel had, and has, the right to counter this false narrative with statements of their own. *Gentile*, 501 U.S. at 1043 ("An attorney's duties do not begin inside the courtroom door. He or she cannot ignore the practical implications of a legal proceeding for the client . . . [S]o too an attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment, especially in the face of a prosecution deemed unjust or commenced with improper motives.").

---

[14] *See also* ABA Model Rule of Professional Conduct 3.8(f) "except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule."

[15] The statement read in part: "The attack on our nation's capital on January 6, 2021, was an unprecedented assault on the seat of American democracy. As described in the indictment, it was fueled by lies. Lies by the defendant targeted at obstructing a bedrock function of the U.S. government, the nation's process of collecting, counting, and certifying the results of the presidential election." The statement ended by "bolstering" the prosecution and law enforcement team, some of whom will certainly be witnesses in the case, one of the types of speech the prosecution wants restricted by its motion.

As recognized by the Supreme Court, public debate about a criminal case almost always skews in favor of the prosecution: "[i]n the context of general public awareness, these police and prosecution statements were no more likely to result in prejudice than were petitioner's statements, but given the repetitive publicity from the police investigation, it is difficult to come to any conclusion but that the balance remained in favor of the prosecution." *Gentile*, 501 U.S. at 1046. "By prohibiting only certain kinds of information from selected sources, a gag order can actually warp and distort discussion, thereby enhancing prejudice rather than mitigating it." *In re Murphy-Brown, LLC*, 907 F.3d at 798.

Thus, both this Court and the "disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment," *Gentile*, 501 U.S. at 1054, and attorney speech about ongoing proceedings is afforded "traditional First Amendment Protections." *Id*. at 1055. Indeed, "there are circumstances in which [the Supreme Court] will accord speech by attorneys on public issues and matters of legal representation the strongest protection our Constitution has to offer." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995) (citing *Gentile,* 501 U.S. at 1030; *In re Primus,* 436 U.S. 412 (1978)).

For that reason, ABA Model Rule of Professional Conduct 3.6 regarding pretrial publicity, does not restrict attorney speech made to "protect a client from the substantial undue prejudicial effect of recent publicity…" *See* ABA Model Rule 3.6(c).[16] D.C. Bar Rule 3.6, Cmt. 1, likewise recognizes the need to protect counsel's ability to publicly defend their clients:

> It is difficult to strike a proper balance between protecting the right to a fair trial
> and safeguarding the right of free expression, which are both guaranteed by the

---

[16] ABA Model Rule 3.6(c) provides: "Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity."

Constitution. On one hand, publicity should not be allowed to influence the fair administration of justice. On the other hand, litigants have a right to present their side of a dispute to the public, and the public has an interest in receiving information about matters that are in litigation. Often a lawyer involved in the litigation is in the best position to assist in furthering these legitimate objectives. No body of rules can simultaneously satisfy all interests of fair trial and all those of free expression.

Every statement counsel has made in this matter has been appropriate under applicable law and in response to the prejudicial environment created by the media and the prosecution. In a case with this much widely disseminated scrutinization, President Trump's attorneys cannot adequately and ethically defend him and assure a fair trial without responding to these sources of pretrial prejudice. Otherwise, the prejudice will remain one-sided. *See, e.g.,* Zack Beauchamp, *What the New Trump Indictment Has Already Proven*, VOX, Aug. 2, 2023; Carlos Lozada, *The Trump Indictments are an Indictment of America*, THE NEW YORK TIMES, Aug. 21, 2023.

Counsel has met every ethical obligation imposed by D.C. Bar Rule 3.6 and otherwise, consistent with the First Amendment and *Gentile*. The prosecution's baseless efforts to tarnish the reputation of counsel who has practiced before this Court for forty years should be condemned rather than entertained. Regardless, the Court should decline to enter any order further restricting counsel's speech.

### 4. President Trump's Attorneys Should Not Be Required to Seek Permission Before Conducting Public Polling or Studies

In a related request, the prosecution asks that the Court prohibit President Trump from conducting any public polling or jury study in the District of Columbia unless he: (1) discloses to the Court "(a) a brief description of the intended methodology; (b) all questions that will be asked in the pretrial survey, poll, or study; and (c) the expected number of participants," (2) obtains Court permission, and (3) completes all polling at least 30 days before the start of jury selection. Doc.

22

57-3. In support, the prosecution argues in conclusory fashion that this protocol is necessary to avoid prejudicing the venire. Motion at 17–19.

President Trump has no objection to informing the Court of the dates and sample sizes of his polling in the District of Columbia; however, he opposes the remainder of the prosecution's request. As an initial matter, jury studies and polling have almost no chance of influencing the jury. Washington D.C. has almost 700,000 residents. A statistically significant sample size would ordinarily include only a few hundred people, meaning it is highly unlikely that any polled individuals would be in the jury venire. Moreover, it would be simple enough to ask potential jurors during *voir dire* if they participated in any pretrial polling, which would adequately screen for any minimal influence a poll might have. (Keeping in mind, the purpose of polling and jury studies is not to influence respondents, but to get a true read on the community's opinions or feelings on certain issues).[17]

In addition, polls and jury studies commissioned by defense counsel are work product and some parts, if not all, are attorney-client privileged. *See Blankenship v. Fox News Network, LLC*, 2020 WL 7225765, at *1 n.3 (S.D.W. Va. Dec. 8, 2020) (material such as questions and methodologies, "venue reports, venue comparative survey findings, juror profiling surveys, jury research, voir dire research, juror investigation and consulting research as well as in-court jury assistance, which appears to collectively fall under opinion and fact work product."). The government has not articulated a basis to overcome these privileges.

---

[17] The prosecution also ignores that the media, academics, and others are conducting polling of their own, without prompting from the parties. *See, e.g.,* "D.C. POLL: 64% of Residents Would Find Trump Guilty Ahead of Trial," EMERSON COLLEGE, September 5th, 2023, https://emersoncollegepolling.com/d-c-poll-64-of-residents-would-find-trump-guilty-ahead-of-trial/. Given this, the proposed restrictions, even if imposed, would not resolve the government's inexplicable concern that polling will influence the venire.

The lone Circuit Court opinion cited by the prosecution, *United States v. Collins*, 972 F.2d 1385 (5th Cir. 1992), also does not support the notion that a District Court should always review pretrial polling. The issue there was whether pretrial polling by the *government* deprived the *defendant* of a fair trial. *Id*. at 1398–99. That is not the issue here as both parties have an equal opportunity to poll. Ultimately, the *Collins* court was satisfied because, as here, "[n]one of the jurors who served on the jury was contacted, and the court specifically inquired as to this matter in voir dire." *Id*. at 1398. The Court emphasized: "[a]lthough a survey of community attitudes may aid a party in deciding what to *emphasize* at trial, our adversarial system with its liberal discovery mechanisms does not permit a party to 'contrive' a conviction that is not based on the evidence. There is no evidence that the Government manufactured or 'tailored' evidence based on the survey." *Id.* at 1400 (internal quotation marks omitted).

Preventing any polling 30 days before trial is also detrimental to the defense. With the immense pretrial publicity in this case, public opinion could sway dramatically as the trial approaches. Thus, polling is most valuable if conducted close to trial. Thirty days before jury selection is an arbitrary and unnecessary restriction, and it does not matter when a person is polled if they will be queried during *voir dire*.

The prosecution in this case already knows the population of Washington D.C. and knows that it does not favor President Trump. Any restrictions on pretrial polling would only work as a further disadvantage to the defense, which has the right to prepare for trial without prosecutorial interference. Accordingly, the Court should reject the government's proposed polling order.

**CONCLUSION**

The Court should deny the Motion in its entirety. Given the significant First Amendment issues presented by the Motion, President Trump respectfully requests the Court schedule a hearing at the first opportunity.

Respectfully submitted,

Dated: September 25, 2023

Todd Blanche, Esq. (PHV)                        /s/Gregory M. Singer
toddblanche@blanchelaw.com                      John F. Lauro, Esq.
BLANCHE LAW                                     D.C. Bar No. 392830
99 Wall St., Suite 4460                         jlauro@laurosinger.com
New York, NY 10005                              Gregory M. Singer, Esq. (PHV)
(212) 716-1250                                  gsinger@laurosinger.com
                                                Filzah I. Pavalon, Esq. (PHV)
                                                fpavalon@laurosinger.com
                                                LAURO & SINGER
                                                400 N. Tampa St., 15th Floor
                                                Tampa, FL 33602
                                                (813) 222-8990
                                                *Counsel for President Trump*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S REPLY IN SUPPORT OF OPPOSED MOTION TO ENSURE THAT
EXTRAJUDICIAL STATEMENTS DO NOT PREJUDICE THESE PROCEEDINGS**

After the defendant and his counsel engaged in weeks of widespread public statements threatening the orderly administration of justice in this case, the Government filed a motion seeking: (1) a narrowly tailored order placing restrictions on all parties' extrajudicial statements, which carefully balances the defendant's free speech right with the Court's responsibility to ensure a fair trial free from outside influence, and (2) a common-sense order through which the Court can ensure that no jury study conducted by any party prejudices the venire. In the defendant's opposition—premised on inapplicable caselaw and false claims—he demands special treatment, asserting that because he is a political candidate, he should have free rein to publicly intimidate witnesses and malign the Court, citizens of this District, and prosecutors. But in this case, Donald J. Trump is a criminal defendant like any other. And as this Court has correctly stated, it has an obligation to protect the integrity of these proceedings from prejudicial interference: "In a criminal case such as this one, a defendant's free speech is subject to the release conditions imposed at arraignment and must also yield to the orderly administration of justice." Tr. of Protective Order Hr'g, at 6:4-7 (Aug. 11, 2023). The defendant should not be permitted to continue to try this case in the court of public opinion rather than in the court of law, and thereby undermine the fairness and integrity of this proceeding. The Government's motion should be granted.

**I.      The Government's Proposed 57.7(c) Order Is Necessary and Appropriate**

The Government's proposed order restricting the parties' statements under Local Criminal

Rule 57.7(c) is necessary and appropriate to protect the due administration of justice in this case.

The defendant's opposition to it is based on several faulty premises: that the defendant need not

face even the most limited imposition in order to protect the public interest in the due

administration of justice; that the legal standard for imposing reasonable restrictions on

extrajudicial statements in a criminal case is higher than it actually is; that the defendant's

statements to date have not been intimidating or prejudicial; and that the proposed order would

impose sweeping restrictions that it plainly would not.  In fact, the proposed order readily meets

the relevant legal standard set forth below.

A.   Legal Background

Courts have an obligation to "take such steps by rule and regulation that will protect their

processes from prejudicial outside interferences."  *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

At times, this obligation may require a court to impose limited and reasonable restrictions on

parties to a criminal case—including defendants—if their conduct risks prejudicial interference

with the due administration of justice.  "Neither prosecutors, counsel for defense, the accused,

witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should

be permitted to frustrate [the Court's] function."  *Id*.  The proposed order would do precisely what

Rule 57.7(c) authorizes the Court to do in this particular type of case: establish a reasonable and

narrowly tailored restriction that prevents all parties—including the defendant—from making

materially prejudicial statements that threaten the integrity of this proceeding and a fair trial.

The defendant's opposition proffers several standards—including strict scrutiny, clear and

present danger, incitement, and true threats—by which to assess the constitutionality of a limitation

on extrajudicial statements. None of these is correct. In fact, as the Supreme Court concluded in *Gentile v. State Bar of Nevada*, a restriction on extrajudicial statements that pose "a substantial likelihood of material prejudice" survives First Amendment scrutiny. 501 U.S. 1030, 1038-39, 1075-76 (1991). In *Gentile*, a defense attorney was held in contempt of court for violating a court rule that prohibited an attorney from making an "extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." 501 U.S. at 1033 (quoting court rule). The Supreme Court explained that although under *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976), the First Amendment requires "a showing of a 'clear and present danger' that a malfunction in the criminal justice system will be caused before a State may prohibit media speech or publication about a particular pending trial," *Gentile*, 501 U.S. at 1070-71, "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press," *id.* at 1074.

Specifically, in *Gentile*, the Court arrived at the "substantial likelihood of material prejudice" standard by assessing that the restriction on extrajudicial statements by defense counsel was "designed to protect the integrity and fairness" of judicial proceedings because it was aimed at "(1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found." *Id.* at 1075. The Court further determined that "[t]he restraint on speech is narrowly tailored to achieve those objectives," *id.* at 1076, because "[w]hile supported by the substantial state interest in preventing prejudice to an adjudicative proceeding by those who have a duty to protect its integrity,

the Rule is limited on its face to preventing only speech having a substantial likelihood of materially prejudicing that proceeding." *Id.*

Although *Gentile* based its conclusion in part on the role of attorneys as "officer[s] of the court" who "in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be," 501 U.S. at 1071-72 (quotation omitted), the "substantial likelihood of material prejudice" standard applies to restrictions on extrajudicial statements by defendants as well. *See United States v. Brown*, 218 F.3d 415, 428 (5th Cir. 2000) (concluding that *Gentile*'s substantial-likelihood-of-material-prejudice standard applies to restrictions on extrajudicial statements by a defendant); *United States v. Hill*, 420 F. App'x 407, 411-12 (5th Cir. 2011) (same); *United States v. Batiste*, No. 06-20373-CR, 2008 WL 11333659, at *5 (S.D. Fla. Jan. 31, 2008) (same); *United States v. Calabrese*, No. 02 CR 1050, 2007 WL 2075630, at *1 (N.D. Ill. July 13, 2007) (same); *United States v. Fieger*, No. 07-20414, 2008 WL 474084, at *3-4 (E.D. Mich. Feb. 19, 2008) (report & recommendation) (same); *United States v. Rodriguez*, No. 2:04-cr-55, 2006 WL 8438023, at *3 (D.N.D. June 29, 2006) (same); *United States v. Koubriti*, 307 F. Supp. 2d 891, 899 (E.D. Mich. 2004) (same); *United States v. Scrushy*, No. 2:03-cr-530, 2004 WL 848221, at *4-6 (N.D. Ala. April 13, 2004) (same); *United States v. Hernandez*, No. 1:98-cr-721, 2001 WL 37126807, at *7-9 (S.D. Fla. Feb. 20, 2001) (same); *United States v. Davis*, 902 F. Supp. 98, 102 (E.D. La. 1995) (same). *But see United States v. Carmichael*, 326 F. Supp. 2d 1267, 1293 (M.D. Ala. 2004) (concluding that the clear-and-present-danger standard should apply to defendants); *United States v. McGregor*, 838 F. Supp. 2d 1256, 1260-62 (M.D. Ala. 2012) (same); *United States v. Schock*, No. 16-cr-30061, 2016 WL 7176578, at *1-2 (C.D. Ill. Dec. 9, 2016) (applying test of "serious and imminent threat to the administration of justice"); *Nelle ex rel. B.N. v. Huntsville Sch. Dist.*, No. 5:21-cv-5158, 2021 WL 6135690 (E.D. Ark. Dec. 29, 2021) (concluding

that the clear-and-present-danger standard should apply to parties in a civil case).  In *Gentile*, the Supreme Court distinguished "between participants in the litigation and strangers to it," and the court explained that its prior cases "expressly contemplated that the speech of those participating before the courts could be limited."  501 U.S. at 1072-73.  The Court noted its admonition in *Sheppard*, cited above, that included "the accused" among the parties that should not be "permitted to frustrate" the court's function.  501 U.S. at 1072 (quoting *Sheppard*, 384 U.S. at 363); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (noting that the First Amendment rights of litigants "may be subordinated to other interests" and that "on several occasions this Court has approved restriction[s] on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant").

Courts in this District are in accord, and have adopted the *Gentile* standard in Rule 57.7(c) orders, including those that apply to defendants as well as attorneys.  *See, e.g.*, *United States v. Stone*, No. 19-cr-18, ECF No. 36 at 3 (D.D.C. Feb. 15, 2019) (Rule 57.7(c) order to attorneys to "refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case"); *United States v. Butina*, No. 18-cr-218, ECF No. 31 at 2 (D.D.C. Sept. 12, 2018) (Rule 57.7(c) order to "all interested participants, in the matter, including the parties, any potential witnesses, and counsel for the parties and the witnesses . . . to refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice"); *United States v. Manafort*, No. 17-cr-201, ECF No. 38 at 2 (D.D.C. Nov. 8, 2017) (Rule 57.7(c) order citing *Gentile* and ordering "all interested participants in the matter, including the parties, any potential witness, and counsel for the parties and the witnesses . . . to refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case"); *United States v. Clemens*, No. 10-223, 2011 WL 1256628, *1

(D.D.C. Apr. 4, 2011) (cautioning defendant, among others, that his public statements regarding the case had been "precariously close to violating, if not violating," the court's order under *Gentile* directing "all interested participants in this matter" to "refrain from making any further statements about this case to the media or in public settings outside the courtroom that are 'substantially likely to have a materially prejudicial effect' on this case") (internal citations omitted).

        For various reasons, the cases the defendant cites (ECF No. 60 at 4-6) to support a different standard are inapposite.  Many of them merely discuss general First Amendment principles that do not apply in this context.  The cases cited that more squarely address extrajudicial statements by litigants are either civil cases, cases decided before *Gentile*, or both.  The only criminal case that the defendant cites is *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987); that case, in which the Sixth Circuit applied the clear-and-present-danger standard, was decided before *Gentile*, which "foreclose[s] the applicability of" the clear-and-present-danger standard "to the regulation of speech by trial participants." *Brown*, 218 F.3d at 427 (discussing *Ford*).  Since *Gentile*, district courts in the Sixth Circuit have recognized that *Gentile*, rather than *Ford*, supplies the applicable standard.  *See, e.g.*, *Koubriti*, 307 F. Supp. 2d at 899; *Fieger*, 2008 WL 474084, at *3-4.  The civil cases cited by defendant, such as the Fourth Circuit's opinion in *In re Murphy-Brown*, LLC, 907 F.3d 788 (4th Cir. 2018), do not govern here.  *See, e.g.*, *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (after *Brown*, separately addressing the standard that applies in civil litigation).  The defendant fails to inform the Court, for example, that the Fourth Circuit distinguishes between restraints on extrajudicial statements in civil and criminal cases.  *See Hirschkop v. Snead*, 594 F.2d 356, 373 (4th Cir. 1979) (en banc) (per curiam).  In fact, the Fourth Circuit permits restraints on extrajudicial statements by participants in criminal cases if there is a ''reasonable likelihood'' that extrajudicial commentary will prejudice a fair trial.  *In re Russell*,

726 F.2d 1007, 1010 (4th Cir. 1984); *see also In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999) (concluding that *Gentile* did not overrule *Hirschkop*).

In sum, the Court may enter an order in this case restricting the parties' extrajudicial statements if the statements present a "substantial likelihood of material prejudice" as long as the Court's order is narrowly tailored to the objectives of preventing comments that are likely to influence the actual outcome of trial or are likely to prejudice the venire.[1] *Gentile*, 501 U.S. at 1075-1076.   As described in the Government's initial motion, ECF No. 57, and below, the proposed order targets only extrajudicial statements that present a substantial likelihood of material prejudice and is narrowly tailored to precisely those objectives.

B.   The Proposed Order Is Necessary and Constitutional, and the Defendant's Claims to the Contrary Misstate the Facts

The proposed order under Rule 57.7(c) is consistent with *Gentile* and necessary under the circumstances—circumstances that the defendant himself has created by waging a sustained campaign of prejudicial public statements regarding witnesses, the Court, the District, and prosecutors.   To argue otherwise, the defendant's opposition ignores the substantial record of the defendant's prejudicial statements, misstates the facts, and claims that the proposed order imposes restrictions that it clearly does not.

---

[1] Even if the highest of the many standards the defendant proffers—the clear-and-present danger standard—were applicable, the Government would meet that standard as well.  *See Levine v. U.S. Dist. Ct. for Cent. Dist. of California*, 764 F.2d 590, 598 (9th Cir. 1985) (district court's findings—that defense attorneys' detailed statements to media about case presented "serious and imminent threat to a fair trial" that outweighed any First Amendment rights at stake—were sufficient).

### i.  The  Proposed Order

The proposed order is consistent with *Gentile* and is more narrowly tailored than similar orders entered by other courts in this District.  First, the proposed order applies the *Gentile* standard and prohibits only statements "that pose a substantial likelihood of material prejudice to this case." *See* ECF No. 57-2 at 1.  To further tailor the restriction and focus on statements most likely to prejudice the jury venire or the outcome of the trial, *see Gentile* at 1075-76, the proposed order specifies that such statements include those regarding the identity, testimony, or credibility of prospective witnesses, and statements that are disparaging and inflammatory, or intimidating.  ECF No. 57-2 at 1.  Far from being the "contempt trap"[2] that the defendant claims, ECF No. 60 at 17, the proposed order is more targeted than others previously entered in this District, as described above.  Finally, while the order that the government has proposed is narrowly tailored, the Court may consider modifications, suspensions, or reinstatements of the order as changing circumstances may warrant.  *See, e.g., Brown*, 218 F.3d at 418-420, and Brief of Appellee at *21, *United States v. Brown*, No. 00-30134, 2000 WL 33981267 (5th Cir. Mar. 9, 2000) (where, in the final two months leading up to an election, the district court suspended an order restricting a defendant's speech, but reinstituted an order almost immediately because various defendants released prejudicial audio recordings in its absence).

---

[2] Defense counsel previously used this same "contempt trap" language when opposing the imposition of a protective order in this case.  The Court rejected the suggestion that balancing the defendant's interests with the need to protect the due administration of justice was tantamount to a contempt trap.  *See* Tr. of Protective Order Hr'g, at 17:12-17 (Aug. 11, 2023) ("Protective Order Hr'g") (COURT: "[N]obody's talked about contempt.  What we're talking about now are the parameters of the order, and the parameters of this order that we're all considering means that there are certain things, if they have an impact on the administration of justice or on witnesses, can't be said regardless of what endeavors the defendant is currently engaged in.").

The need for the proposed order is further evidenced by a review of the defendant's prejudicial statements in the weeks since the Government initially filed its motion on September 5.  *See* ECF No. 47-3.  Since that date, the defendant has continued to make statements that pose a substantial likelihood of material prejudice to this case and that fall within the narrowly tailored order proposed by the Government.  These include:

- On September 5, shortly before the Government filed its motion, the defendant posted an article on the social media platform Truth Social, on which the defendant has more than 6 million followers, making claims about the Court with the sarcastic caption, "Oh, I'm sure she will be very fair" and an article circulating a false accusation against a Special Counsel's Office prosecutor with the caption, "Really corrupt!" [3]

- On September 6, on Truth Social, the defendant issued two posts attacking the former Vice President, a witness identified in the indictment, in relation to this case, saying that he had seen the Vice President "make up stories about me, which are absolutely false," and that the witness had gone to the "Dark Side";[4]

- In an interview aired on NBC's Meet the Press on September 17,[5] the defendant answered questions for more than an hour, and said, among other things:

  - That the Georgia Secretary of State, a witness identified in the indictment, recently said things that he had not, including that the defendant "didn't do anything wrong" during a phone call constituting an overt act in the indictment;

  - That another witness identified in the indictment, the former Attorney General, "didn't do his job" during the charged conspiracy because he was afraid of being impeached;

---

[3] https://truthsocial.com/@realDonaldTrump/posts/111013216116097929; https://truthsocial.com/@realDonaldTrump/posts/111013180388667397.

[4] https://truthsocial.com/@realDonaldTrump/posts/111019762094553476; https://truthsocial.com/@realDonaldTrump/posts/111019761485786681.

[5]https://www.nbcnews.com/meet-the-press/transcripts/full-transcript-read-meet-the-press-kristen-welker-interview-trump-rcna104778.

- On September 22, on Truth Social, the defendant falsely claimed that the retiring Chairman of the Joint Chiefs of Staff, a witness cited in the indictment, had committed treason and suggested that he should be executed:[6]



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> Mark Milley, who led perhaps the most embarrassing moment in American history with his grossly incompetent implementation of the withdrawal from Afghanistan, costing many lives, leaving behind hundreds of American citizens, and handing over BILLIONS of dollars of the finest military equipment ever made, will be leaving the military next week. This will be a time for all citizens of the USA to celebrate! This guy turned out to be a Woke train wreck who, if the Fake News reporting is correct, was actually dealing with China to give them a heads up on the thinking of the President of the United States. This is an act so egregious that, in times gone by, the punishment would have been DEATH! A war between China and the United States could have been the result of this treasonous act. To be continued!!!
>
> 6.95k ReTruths   20.6k Likes                    Sep 22, 2023, 7:59 PM

- On September 23, on Truth Social, the defendant re-posted with the caption "What a mess!" the false claim that the Georgia Secretary of State "knew [of tens of thousands of fraudulent votes in Georgia in 2020] and covered it up";[7] and

- On September 26, on Truth Social, the defendant posted a link to an article singling out a specific prosecutor in the Special Counsel's Office and claiming that the SCO is a "team of Lunatics that are working so hard on creating Election Interference . . . "[8]

The defendant's baseless attacks on the Court and two individual prosecutors not only could subject them to threats—it also could cause potential jurors to develop views about the

---

[6] https://truthsocial.com/@realDonaldTrump/posts/111111513207332826.

[7] https://truthsocial.com/@realDonaldTrump/posts/111112757748267246.

[8] https://truthsocial.com/@realDonaldTrump/posts/111133017255697239.

propriety of the prosecution, an improper consideration for a juror prior to trial. *See Fieger*, 2008 WL 474084 at *3-6 (E.D. Mich. Feb. 19, 2008) (magistrate judge imposing an order, adopted in relevant part by district court, preventing defendant from publicizing, including through commercials, his claims of improper, selective, or vindictive prosecution because they "create the danger that potential jurors will associate the content of these commercials to this criminal prosecution of Defendant Fieger. The commercials therefore are substantially likely to materially prejudice a fair trial even though this pending criminal action is not explicitly mentioned."); *Scrushy,* 2004 WL 848221, at *4-*6 & n.5 (N.D. Ala. April 13, 2004) (ordering all trial participants, including the defendant, to "remove from their existing webpages . . . allegations of prosecutorial misconduct," and ordering the defendant not to use "his morning television show . . . to make statements about the case that his lawyers would be precluded from making by the Rules of Professional Conduct").

Likewise, the defendant's continuing public statements about witnesses are substantially likely to materially prejudice a fair trial. In his opposition, the defendant makes light of some of his previous attacks on witnesses—some of whom are federal and state government figures in their own right—by stating that such witnesses do not "sh[y] away from a hearty public debate with [the defendant]" and were not intimidated by the defendant, or by implying that government officials somehow have asked for his attacks because they "have made politics, for all its discord and discourse, a large part of their lives." ECF No. 60 at n.7. Even assuming that certain witnesses are not intimidated by the defendant's statements, other witnesses see and may be affected by what the defendant does to those who are called to testify in this case. And regardless of whether certain witnesses are intimidated by the defendant's extrajudicial statements, the defendant should not be

permitted to attack or bolster the credibility of any witness in a manner that could influence prospective jurors.

In addition, the defendant's argument essentially concedes that he is trying this case in the public sphere, not in the courtroom, which is precisely the harm that Rule 57.7(c) is designed to prevent. The defendant is publicly maligning witnesses and very intentionally commenting on the specific topics of their potential testimony at trial. In the context of a pending criminal case and trial, it is not the solution to the defendant's improper and prejudicial statements to encourage a "hearty public debate" in the media regarding witnesses and the merits of the case—it is the problem. *See Sheppard*, 384 U.S. at 351 ("legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper" and "freedom of discussion . . . must not be allowed to divert the trial from the very purpose of a court system to adjudicate controversies . . . in the calmness and solemnity of the courtroom according to legal procedures") (internal citations omitted). From the defendant's statements, potential jurors may form improper views about various witnesses' reputations, veracity, or what they will say at trial. The Court can and should prevent such improper dissemination of information about the substance of this case. *Id*. at 363; *see also Marshall v. United States*, 360 U.S. 310, 312-13 (1959) (prejudice arising from jurors' exposure to evidence from extrajudicial sources can be particularly acute because "it is then not tempered by protective procedures."); *United States v. Lindh*, 198 F. Supp. 2d 739, 743 (E.D. Va. 2002) ("Defendant has no constitutional right to use the media to influence public opinion concerning his case so as to gain an advantage at trial. No such right inheres in either the Sixth Amendment right to a public trial, or the public's First Amendment right to a free press.").

Contrary to the defendant's claim, the Government is not trying to "unconstitutionally silence" the defendant, ECF No. 60 at 2, and the proposed order would have no such effect. Since

the Government's initial filing, beyond the prejudicial examples cited above, the defendant has made a large volume and wide variety of public statements—through social media posts, interviews, and speeches—that would be unaffected by the proposed order.  If the Court entered the proposed order, it would in no way hinder the defendant's ability to campaign and publicly maintain his innocence.  All it would limit is the defendant's use of his candidacy as a cover for making prejudicial public statements about this case—and there is no legitimate need for the defendant, in the course of his campaign, to attack known witnesses regarding the substance of their anticipated testimony or otherwise engage in materially prejudicial commentary in violation of the proposed order.

### ii.   *The Defendant's Opposition Misstates the Facts*

The defendant's opposition makes no attempt to address most of the factual record that the Government submitted to the Court regarding the defendant's history and current practice of using public statements to target individuals, *see* ECF No. 57 at 2-13, and instead advances conclusory statements that the Government's claims are baseless.  That is because he cannot explain away the obvious intent and well-known effect of his words.  The single statement that the defendant does address—in a footnote—is the threatening Truth Social post that he issued on August 4, the day after his arraignment in this case: "IF YOU GO AFTER ME, I'M COMING AFTER YOU!"  The defendant complains that the Government's motion did not note that after public outcry—given the objectively reasonable understanding of the defendant's post as a threat related to this case— a spokesperson issued a statement claiming that the defendant had issued the threat "in response to . . . special interest groups and Super PACs."  ECF No. 60 at n.8.  But the spokesperson's after-the-fact explanation is implausible on its face.  The truth is clear: the defendant was caught making a public threat and then had a spokesperson issue an excuse.  As the Court has stated, "even

arguably ambiguous statements from parties or their counsel, if they could reasonably be interpreted to intimidate witnesses or to prejudice potential jurors, can threaten the process." Protective Order Hr'g  72:7-10.  The defendant should not be permitted to obtain the benefits of his incendiary public statements and then avoid accountability by having others—whose messages he knows will receive markedly less attention than his own—feign retraction.[9]  Likewise, no other criminal defendant would be permitted to issue public statements insinuating that a known witness in his case should be executed; this defendant should not be, either.

The defendant's opposition also makes the self-serving claim that rather than address the source of the material prejudice—the defendant's inflammatory statements—the Court should employ alternatives to a Rule 57.7(c) order, such as change of venue, postponement of trial, voir

---

[9] The defendant recently was caught potentially violating his conditions of release, and tried to walk that back in similar fashion. In particular, on September 25, the defendant's campaign spokesman posted a video of the defendant in the Palmetto State Armory, a Federal Firearms Licensee in Summerville, South Carolina.  The video posted by the spokesman showed the defendant holding a Glock pistol with the defendant's likeness etched into it.  The defendant stated, "I've got to buy one," and posed for pictures with the FFL owners.  The defendant's spokesman captioned the video Tweet with the representation that the defendant had purchased the pistol, exclaiming, "President Trump purchases a @GLOCKInc in South Carolina!"  The spokesman subsequently deleted the post and retracted his statement, saying that the defendant "did not purchase or take possession of the firearm" (a claim directly contradicted by the video showing the defendant possessing the pistol).  *See* Fox News, Trump campaign walks back claim former president purchased Glock amid questions about legality (Sept. 25, 2023), https://www.foxnews.com/politics/trump-campaign-walks-back-claim-former-president-purchased-glock-amid-questions-about-legality (accessed Sept. 26, 2023).  Despite his spokesperson's retraction, the Defendant then re-posted a video of the incident posted by one of his followers with the caption, "MY PRESIDENT Trump just bought a Golden Glock before his rally in South Carolina after being arrested 4 TIMES in a year."

The defendant either purchased a gun in violation of the law and his conditions of release, or seeks to benefit from his supporters' mistaken belief that he did so.  It would be a separate federal crime, and thus a violation of the defendant's conditions of release, for him to purchase a gun while this felony indictment is pending.  *See* 18 U.S.C. § 922(n).

dire, or jury instructions.  ECF No. 60 at 14.  But such alternatives are not adequate because they would not address the source of the prejudice: the defendant's repeated efforts to try this case in the media.  The Court's duty here is to implement "measures that will prevent the prejudice at its inception," *Sheppard*, 384 U.S. at 363, and so long as the defendant persists in making materially prejudicial statements on social media, in interviews, and in speeches, the defendant will continue to affect the potential venire for this trial.  In addition, the defendant's statements have such broad reach that as long as he makes them, he will taint potential jurors anywhere in the country.  *See Gentile*, 501 U.S. at 1075 (even "[e]xtensive *voir dire* may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effect of [trial participants'] statements"); *Brown*, 218 F.3d at 431 (jury instruction may fail to address threat of "carnival atmosphere" around trial).  Finally, the alternatives that the defendant suggests the Court consider would have the perverse incentive of encouraging, rather than curbing, the defendant's prejudicial statements.  The defendant has, for instance, already stated publicly that he intends to seek a change of venue in this case.  *See* ECF No. 57 at 7-8.  He should not be permitted to pollute the jury pool in this District with his prejudicial statements and then seek a change of venue based on the complaint that the venire is tainted.

The defendant seeks to deflect responsibility for his own prejudicial statements by claiming that the indictment in this case was "false and derogatory" and that the Special Counsel's brief statement upon its unsealing was prejudicial because it ascribed to the defendant responsibility for the events of January 6, 2021—which, according to the defendant's opposition, the indictment does not allege.  ECF No. 60 at 19-20.  The defendant is wrong.  First, the indictment, filed in court, does what indictments are supposed to do: set forth the criminal charges against the

defendant and give notice of the factual allegations that underpin them.  The defendant provides

no support for his claim that the indictment can be a source of unfair prejudice here—because there

is no such support.  And second, the indictment does in fact clearly link the defendant and his

actions to the events of January 6.  It alleges—and at trial, the Government will prove—the

following:

- The defendant's criminal conspiracies targeted, in part, the January 6 certification and capitalized "on the widespread mistrust the [d]efendant was creating through pervasive and destabilizing lies about election fraud," ECF No. 1 at ¶4.

- In advance of January 6, the defendant "urged his supporters to travel to Washington on the day of the certification proceeding, tweeting, 'Big protest in D.C. on January 6th.  Be there, will be wild!,'" *id.* at ¶87.  He then "set the false expectation that the Vice President had the authority to and might use his ceremonial role at the certification proceeding to reverse the election outcome in [his] favor, *id.* at ¶96.

- Then, despite his awareness "that the crowd [ ] on January 6 was going to be 'angry,'" *id.* at ¶98, on the morning of January 6, the defendant "decided to single out the Vice President in public remarks," *id.* at ¶102, and "repeated knowingly false claims of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused," *id.* at ¶10d.

- Finally, on the afternoon of January 6, after "a large and angry crowd—including many individuals whom the [d]efendant had deceived into believing the Vice President could and might change the election results—violently attacked the Capitol and halted the proceeding," the defendant exploited the disruption in furtherance of his efforts to obstruct the certification, *id.* at ¶10e.

In short, the indictment alleges that the defendant's actions, including his campaign of knowingly

false claims of election fraud, led to the events of January 6.

The defendant's motion also attempts to downplay defense counsel's clear violations of

Rule 57.7(b), and appears to suggest that the defendant's attorneys reserve the right to violate that

Rule in the future.  *See* ECF No. 60 at 19-22.  But it is uncontroverted that, on multiple occasions

in the week following the unsealing of the indictment, defense counsel appeared on media

programs and talked extensively about this case, including on topics that Rule 57.7(b) prohibits attorneys from discussing. *See* ECF No. 57 at 16 (citing Rule 57.7(b) and linking to lead counsel's appearances). The defendant's opposition then complains that the Court would render his attorneys inadequate if it were to restrict them from further public statements through the Government's proposed 57.7(c) order, but fails to recognize that most of its terms mirror existing restrictions on all attorneys practicing in this District under Local Criminal Rule 57.7(b). *Compare* Local Criminal Rule 57.7(b) (prohibiting attorneys from making extrajudicial statements regarding, among other things, the "identity, testimony, or credibility of prospective witnesses") *with* ECF No. 57-2 (same, with prohibition on "disparaging and inflammatory or intimidating statements" about parties, witnesses, attorneys, court personnel, or potential jurors).

Finally, the defendant's opposition makes faulty claims about the scope and applicability of the proposed order. In addition to making inaccurate claims about the proposed order's breadth, *see* ECF No. 60 at 17, the defendant suggests that the Government seeks to prevent the defendant from "redress[ing] the unfairness of this proceeding through legitimate means" including "for example, filing motions with the Court." ECF No. 60 at 10-11. But nothing in the proposed order prevents the defendant from doing so—rather, it explicitly states that he can. *See* ECF No. 57-2 at 1-2 (order "does not preclude the defendant or his attorneys, agents, or others acting on his behalf from (a) quoting or referring without comment to public records of the court in the case"). Similarly, the defendant's opposition states that "the prosecution seeks only to bar [the defendant] from speaking." ECF No. 60 at 13. Not so. The proposed order applies to all parties—including the Government. But the defendant's allegation here is telling, in that it highlights that the defendant—and no other party—is making materially prejudicial public statements in this case.

In sum, the Government has provided the Court with a robust factual record to establish that the defendant's pervasive public comments about this case, the witnesses, the Court, and prosecutors present a substantial likelihood of material prejudice to these proceedings. To prevent that prejudice, the Government has proposed a narrowly tailored order pursuant to Rule 57.7(c) placing limited restrictions on the public statements of all parties to this case. In response, the defendant's opposition demands special treatment, asserting that the defendant's desire to publicly malign witnesses without restriction prevails over all other interests—including that of the public in the fair administration of justice. *See Koubriti*, 307 F. Supp. 2d at 897 ("the vigilance of trial courts against the prejudicial effects of pretrial publicity also protects the interest of the public and the Government in the fair administration of criminal justice"). The Court should treat this defendant like all others, and enter the Government's proposed 57.7(c) order.

## II. The Government's Proposed Order on Jury Studies Seeks Only to Protect the Venire, and the Defendant's Arguments Against it Are Unavailing

Although he does not challenge the Court's discretionary power to enter it, the defendant also opposes the Government's request for an order that would provide the Court with an opportunity to ensure that jury studies by the parties do not prejudice the jury pool. ECF No. 60 at 23-25. At the outset, it is important to reiterate the limited scope of what the Government actually proposes in contrast to the defendant's inaccurate characterization of it. The Government does not seek to prohibit the defendant from using a jury study, nor does it seek to intrude into the defense strategy. Instead, the Government has proposed that the Court enter an order with five reasonable conditions: (1) any party—whether the Government or the defendant—must notify the Court *ex parte* before the party or "any individual or entity acting at the party's direction or under the party's control undertakes any jury study in the District of Columbia;" (2) the notice must include a brief description of the intended methodology, all questions to be asked, and the expected

number of participants; (3) the party cannot begin the jury study, or use any results from it, absent the Court's approval, which may be conditioned on editing or removing portions of the intended jury study that threaten to materially prejudice the jury pool; (4) the jury study must be completed 30 days before the start of jury selection; and (5) the party must maintain the names and addresses of the study participants and provide that information to the Court at least two weeks prior to jury selection. *See* ECF No. 57-3. The defendant objects to every one of these provisions.[10]

First, the defendant posits that "jury studies and polling have almost no chance of influencing the jury," noting that "Washington D.C. has almost 700,000 residents" and "[a] statistically significant sample size would ordinarily include only a few hundred people." ECF No. 60 at 23. But the size of the jury pool is immaterial; indeed, the Government's motion cites to a standing order on jury studies in a Division of the Eastern District of Texas with a population exceeding that of this District. *See* ECF No. 57 at 19 (citing Judge Clark's standing order in the Beaumont and Lufkin Divisions); https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html (estimating the 2020 population of the counties comprising the Division to be approximately 832,000). In addition, nothing would prevent the defendant from creating and implementing a biased jury study and then publicizing its results—or answers to specific, slanted questions—on a widespread basis to the entire potential jury pool. The Court should exercise its discretion to protect against such prejudice by taking the simple step of reviewing the proposal *ex parte*.

---

[10] The defendant objects to the Government's proposal, but "has no objection to informing the Court of the dates and sample sizes of his polling in the District of Columbia." ECF No. 60 at 23. The defendant's alternative, however, would not address the potential tangible harm—materially prejudicing the jury pool—posed by inappropriate studies.

Second, the defendant suggests that no Court regulation is needed because "the purpose of polling and jury studies is not to influence respondents, but to get a true read on the community's opinions or feelings on certain issues." ECF No. 60 at 23. But in practice, jury studies, like other polls, may be skewed to influence the participants or shape the results. *See* Ellen Kreitzberg & Mary Procaccio-Flowers, *Jury Selection: The Law, Art & Science of Selecting a Jury* § 3:4 (2002) ("Providing respondents with a misleading description of the facts may produce responses that are pleasing to the client, but will be useless in providing insight into the reactions of the jurors who will hear the whole truth during trial.").[11] Because skewed studies could influence potential jurors, the questions should be subject to review by the Court. *See Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 726 (Tex. 2020) ("A campaign of disinformation, in whatever form, undermines the sanctity of the judicial process and is inimical to the constitutional promise of a fair and impartial jury trial.").

Third, the defendant objects to a requirement that any jury study be concluded 30 days before trial because "polling is most valuable if conducted close to trial." ECF No. 60 at 24. Yet at the status hearing one month ago, defense counsel suggested the defendant would "likely need to do it sooner rather than later," Transcript of Status Hearing, at 59 (Aug. 28, 2023), in reference to polling for a Rule 26 motion, the filing deadline for which is October 9, 2023. *See* ECF No. 39 at ¶2 (setting deadline for "[a]ll other pre-trial motions, excluding motions *in limine*"). In any

---

[11] While in office, the defendant provided an example of one type of distorted polling the proposed order seeks to prevent: "A poll should be done on which is the more dishonest and deceitful newspaper, the Failing New York Times or the Amazon (lobbyist) Washington Post! They are both a disgrace to our County, the Enemy of the People, but I just can't seem to figure out which is worse?" *See* Trump Tweet, June 16, 2019, 9:39:22 EST, *available at* https://www.thetrumparchive.com/ (last visited Sept. 27, 2023).

event, the proposed 30-day limit creates a reasonable buffer that would reduce the potential impact of any jury study on the venire. *See Brewer*, 601 S.W.3d at 726.

Fourth, relying on *Blankenship v. Fox News Network, LLC*, No. 2:19-cv-00236, 2020 WL 7225765, at *1 n.3 (S.D.W. Va. Dec. 8, 2020), the defendant contends that "polls and jury studies commissioned by defense counsel are work product and some parts, if not all, are attorney-client privileged." ECF No. 60 at 23. That inapposite case, though, dealt with a civil subpoena seeking "all documents and communications that underlie these investigations as well as analyses carried out on Plaintiff's behalf and documents and communications between Plaintiff and his attorneys and [the jury consulting company] pertaining to the criminal trial." *Id.* at *2. Here, the proposed order addresses a far more limited set of information—"a brief description of the intended methodology. . . all questions that will be asked. . . [and] the expected number of participants," as well as the participants' names and addresses. ECF No. 57-3 at 1-2. Assuming any privileges applied to such information, they would dissipate when the "questions to be asked" were actually asked of the participants. In other words, the parties cannot shield from the Court, on privilege grounds, the questions they intend to broadcast to hundreds, if not thousands, of District residents. Setting that aside, the defendant's argument ignores that the proposed order calls for information about proposed jury studies to be provided *ex parte* to the Court—not to the Government—and does not require that the results or analysis of any jury study be disclosed at all. Moreover, the Court could enter an order under Federal Rule of Evidence 502(d) to further mitigate any concern. *See id.* ("A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other federal or state proceeding.").

The rationale for the proposed order is to protect the integrity of the trial and the jury pool, and the regulations it would impose are modest.  The defendant's complaints are unfounded, and the Court should exercise its  discretion to enter the order.

**III.    Conclusion**

Through both of its proposed orders, the Government seeks appropriate processes for protecting the jury pool in this case and the integrity of this proceeding.  The Court should grant the Government's motion and enter them.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    /s/Molly Gaston
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .   CR No. 23-0257 (TSC)
                                   .
     v.                            .
                                   .
DONALD J. TRUMP                    .   Washington, D.C.
                                   .   Monday, October 16, 2023
          Defendant.               .   10:02 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          MOLLY G. GASTON, ESQ.
                             THOMAS WINDOM, ESQ.
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530


For Defendant:               JOHN F. LAURO, ESQ.
                             GREGORY M. SINGER, ESQ.
                             Lauro & Singer
                             400 North Tampa Street
                             15th Floor
                             Tampa, FL 33602

                             TODD BLANCHE, ESQ.
                             Blanche Law
                             99 Wall Street
                             New York, NY 10005

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

1

2      THE DEPUTY CLERK:  Good morning, Your Honor.  This is

3  criminal case No. 23-257, United States of America versus

4  Donald J. Trump.

5      Counsel, please approach the lectern and state your

6  appearances for the record.

7      MS. GASTON:  Good morning, Your Honor.  Molly Gaston

8  and Thomas Windom for the United States, and with us at

9  counsel table is Special Agent Jamie Garman.

10      THE COURT:  Good morning.

11      MR. LAURO:  Good morning, Your Honor.  John Lauro on

12  behalf of President Trump, and with me is my partner, Greg

13  Singer.

14      MR. BLANCHE:  And good morning, Your Honor.  Todd

15  Blanche on behalf of President Trump.  I'm joined by two folks

16  from my office, Emil Bove and Stephen Weiss.  Good morning.

17      THE COURT:  Good morning.  All right.  We are here for

18  a hearing on the government's opposed motion to ensure that

19  extrajudicial statements do not prejudice these proceedings.

20  And that was ECF 57.  I granted leave for the government to

21  file that motion partially under seal to redact identifying

22  information for certain individuals named in the motion.  The

23  motion asks for two things:

24      First, an order restricting out-of-court statements.

25  Sometimes it's referred to as a gag order.  Specifically an

1    order prohibiting the parties, all parties, from making or

2    authorizing statements to the media or in public settings,

3    including through social media, that pose a substantial

4    likelihood of material prejudice to this case.

5        Such statements include but are not limited to, (a),

6    statements regarding the identity, testimony, or credibility

7    of prospective witnesses, and (b), disparaging and

8    inflammatory or intimidating statements about any party,

9    witness, attorney, court personnel or potential jurors.  The

10   defendant is also prohibited from causing surrogates to make

11   such statements on his behalf.

12       Second, the government seeks a court order establishing

13   rules for any pretrial surveys of the jury pool.  In

14   particular, the proposed order would require that the parties

15   notify me before conducting any survey, including (a) a brief

16   description of the intended methodology; (b) all questions

17   that will be asked in the pretrial survey, poll, or study; and

18   (c), the expected number of participants.

19       The parties could not begin the survey until I approved it,

20   possibly with my own modifications.  And the parties would be

21   required to record the name and address of each participant

22   contacted and submit them to the Court two weeks before jury

23   selection.

24       So I would like to address these issues in reverse order

25   today, because I think the issue of survey requirements will

1    be a simpler one to resolve.  As an initial matter, the

2    parties seem to agree that I have some authority to review

3    pretrial surveys as necessary to protect the integrity and

4    the fairness of these proceedings.  For example, *United States*

5    *v. Collins*, 972 F.2d 1385 at 1398.

6        But they don't cite to anything definitively setting a

7    standard for that review or offering guidance as to how I

8    should go about it, perhaps because judicial supervision of

9    surveys appears to be relatively unusual and so the law is not

10   very developed.

11       Ultimately, however, that may not matter very much here

12   because I see little reason to impose much in the way of

13   survey requirements.  At the hearing that we held on August 28

14   of this year, the defense agreed when I asked to submit an ex

15   parte notice before it conducted a survey.  And in its

16   opposition brief the defense states that it has no objection

17   to informing the Court of the dates and sample sizes of its

18   polling in the District of Columbia.

19       So, Ms. Gaston, are you going to be speaking for the

20   government?  So why isn't that sufficient at this point?

21       MS. GASTON:  Your Honor, if the Court believes that

22   that is sufficient, then that is sufficient for the

23   government.  Really, our position was -- what we proposed was

24   what we thought might be helpful to the Court in discerning

25   whether the questions posed in the course of any such study

1       might prejudice the jury pool.  But if the Court feels that

2       what the Court has already done is sufficient, then that is

3       sufficient for the government.

4               THE COURT:  All right.  Thank you.

5           So I think the defense agreement to notify the Court of

6       their intent to conduct a survey and the dates and sample

7       sizes of the proposed survey is enough for the moment.  So I'm

8       going to deny the government's motion as to that point.  I

9       don't see the need for anything more.  As the defense points

10      out, a survey's sample size would ordinarily include only a

11      few hundred people, which means it would not meaningfully

12      affect public opinion even if the questions were somewhat

13      slanted.

14          Likewise, there's a low probability that anyone polled

15      would end up in the jury venire, and if they were, a voir dire

16      question would reveal that.  So unless the defense tries to

17      poll 100,000 people or something, I don't foresee any issues

18      with it conducting surveys, just provided you abide your

19      representation that you let the Court know.

20          Now, of course, if the defense later chooses to rely on the

21      results of surveys to, for example, move for a change of

22      venue, then I may need to review the survey methodology in

23      greater detail, including the wording of the questions asked.

24      But that's not a reason for me to preemptively prevent or

25      micromanage defense's surveys.  So the motion is denied as it

1    pertains to additional survey requirements.

2        Now we go on to the government's request for an order

3    governing the parties' out-of-court statements.  I'll note

4    that Local Criminal Rule 57.7(c) states that "in a widely

5    publicized or sensational criminal case the Court may issue a

6    special order governing such matters as extrajudicial

7    statements by parties, witnesses, and attorneys likely to

8    interfere with the rights of the accused to a fair trial by an

9    impartial jury."

10       There is no question that this case is widely publicized.

11   And so the question is whether I should issue such an order,

12   and if so, what its contours should be.

13       At the outset, the parties disagree about the appropriate

14   standard that I should apply in this case.  The government

15   argues that the appropriate standard is the one set forth by

16   the Supreme Court in *Gentile v. State Bar of Nevada*, 501 U.S.

17   1030.  In that case the Supreme Court held that it does not

18   violate the First Amendment to prohibit a criminal defense

19   counsel's speech if the lawyer knows or reasonably should know

20   that it will have a substantial likelihood of materially

21   prejudicing an adjudicative proceeding.

22       The Court explained that those restrictions served the

23   integrity and fairness of the judicial system and imposed only

24   narrow and necessary limitations aimed at two principal evils:

25   one, comments that are likely to influence the actual outcome

of the trial, and two, comments that are likely to prejudice the jury venire.

By contrast, the defense argues that the *Gentile* standard only applies to defense lawyers, and that any speech restrictions on defendants themselves must satisfy a higher standard.  Specifically, the defense argues that any so-called gag orders must survive strict scrutiny, and that the government must prove that any prohibited speech would constitute a clear and present danger to the administration of justice.

Neither the Supreme Court nor the D.C. Circuit have addressed the issue of the standard that applies to criminal defendants in a case such as this.  However, the Fifth Circuit has expressly applied *Gentile's* substantial likelihood of material harm test to criminal defendants as well as their counsel.  And that case is *United States v. Brown*, 218 F.3d 415 at 428.

I'm not aware of any circuits that have declined to do so since *Gentile,* and, in addition, while courts in some other districts have adopted a higher standard for restricting defendant's speech than *Gentile*'s, it appears that courts in this district generally apply the substantial likelihood of material harm test.

In any event, I don't think I need to make a ruling on the question of which standard applies because I intend for any

1    order I issue to meet -- to satisfy either test.

2         So before considering whether additional restrictions are

3    warranted, I want to briefly review the restrictions that are

4    already in place as a result of this case.  So to begin with,

5    Local Criminal Rule 57.7(b) limits the public statements of

6    attorneys in criminal cases.

7         For instance, attorneys may not issue extrajudicial

8    statements concerning the identity, testimony, or credibility

9    of prospective witnesses, or any opinion as to the accused's

10   guilt or innocence or as to the merits of the case or the

11   evidence in the case.  And that's 57.7(b)(3).

12        The rule does not preclude attorneys, in the proper

13   discharge of official or professional obligations, from

14   describing the offenses charged, quoting from the case's

15   public record, or announcing without further comment that the

16   accused denies the charge.

17        As for Mr. Trump himself, his pretrial release conditions,

18   which he signed, require that he not communicate about the

19   facts of the case with any individual known to him to be a

20   witness, except through counsel or in the presence of counsel.

21   That's in ECF No. 13.

22        Mr. Trump's conditions of release also require him to abide

23   by all federal, state, and local laws.  One such federal law

24   is U.S. Code Title 18, § 1512, which broadly prohibits efforts

25   to influence witness testimony, cause the withholding or

1    destruction of evidence, or hinder, delay, or prevent the

2    communication to a law enforcement officer or judge of the

3    United States of information relating to the commission or

4    possible commission of a federal offense or a violation of

5    conditions of release pending judicial proceedings.

6        Section 1512 bars not only physical force or the threat of

7    physical force, as in subsection (a)(2), but also, under

8    subsection (b), the knowing use of intimidation, threats,

9    corrupt persuasion, or misleading conduct, and under

10   subsection (d), the knowing harassment of another person.

11   These prohibitions apply to everyone -- defendants, the

12   government, their lawyers, and third parties.

13       In addition, the D.C. Circuit has held that Section 1512's

14   prohibitions apply to foreseeable as well as actual witnesses,

15   even when it is not certain whether they will testify.  In

16   *United States v. Morrison*, the defendant challenged his

17   conviction under Section 1512 by arguing that at the time that

18   he contacted a witness the government had not yet announced

19   that the person was a potential witness, and the defendant

20   hadn't specifically asked the witness to testify for the

21   defense.  That's 98 F.3d 619 at 630.

22       The D.C. Circuit squarely rejected that argument,

23   concluding that it was foreseeable by the defendant that the

24   government would use the witness because the witness had dealt

25   with the defendant during the events at issue and would

1        testify regarding the defendant's actions and behavior at the

2        time.  So long as a witness is foreseeable, then, attempts to

3        unduly influence them may run afoul of Section 1512.

4            All that said, the government's motion does not seem to

5        allege that Mr. Trump has actually violated any of his

6        conditions of release or other federal law.  Rather, the

7        government seems to contend that some of his statements

8        nonetheless warrant imposing additional speech restrictions

9        above and beyond any limits already in place.

10           Is that correct, Ms. Gaston?

11                MS. GASTON:  Yes, Your Honor.

12                THE COURT:  So with that backdrop in mind, I want to

13       ask some general questions about the government's proposed

14       order.  You can come up.

15                MS. GASTON:  Thank you, Your Honor.

16                THE COURT:  So first I want to understand exactly what

17       your proposed order would prohibit that is not already

18       prohibited by the local criminal rules, federal law or

19       Mr. Trump's conditions of release.  And I'm just trying to

20       nail down what the marginal change would be.

21                MS. GASTON:  Yes, Your Honor.  So I want to start by

22       making clear that the government's sole objective with this

23       motion is to ensure the fair administration of justice in this

24       case, by preventing extrajudicial statements that prejudice

25       the trial.  We have no interest in stopping the defendant from

running for office or defending his reputation, nor does our proposed order do that.

There are two specific sources of prejudice that the government's motion seeks to prevent, and this goes to the question that Your Honor just asked.  The first is derogatory and inflammatory or intimidating statements attacking witnesses.  These are statements that would not, for instance, go to Section 1512, as Your Honor just identified, but these are statements that risk influencing both the individual who has been publicly attacked, and other witnesses who see the public attack and are perhaps chilled in their own right.

And then the other source of prejudice is the trial of this case out in the public rather than in this courtroom, because when potential jurors are inundated by public and sometimes false renditions of the expected evidence, or attacks on witness credibility, or attacks on the motives of court personnel or the prosecutors, it risks biasing the jury before it is empaneled.

THE COURT:  Okay.  One part of the order that you have requested would prohibit, as you said, disparaging and inflammatory or intimidating statements about any party, witness, attorney, court personnel, or potential juror.  So let's set aside for a minute the potential subjects of those statements.  How do you define disparaging and inflammatory or intimidating?  And again, how different is that from the kinds

1    of intimidating statements that are already illegal?  I mean,

2    "disparaging" is pretty wide.

3        MS. GASTON:  Yes, Your Honor.  So the definitions that

4    we would propose for both of these are the commonly understood

5    definitions and the dictionary definitions.  So "disparaging"

6    means vilifying, bringing reproach, discredit.  "Inflammatory"

7    means inflaming anger or animosity.  And we combined

8    "disparaging" and "inflammatory" in this proposed order

9    because it is the combination of those things that might

10   prejudice the jury pool.

11      So there could be fair ways to disparage somebody, to say a

12   factual thing that is true about them.

13        THE COURT:  But you use the word "fair," and that

14   concerns me, because an order has to be narrowly tailored.

15   And when you use the word "fair," I am pretty sure that what

16   you consider fair is not what Mr. Lauro considers fair or his

17   client.  And then you're asking the Court to get involved in

18   making these kinds of decisions for what appears to be a very

19   wide variety of statements.  So what's your standard here?

20        MS. GASTON:  Right.  The standard, Your Honor, is that

21   this is about the participants, the witnesses in this trial.

22   It is limited to those individuals and it is limited to

23   statements that are meant to influence the venire or public

24   opinion.

25      And one thing I would like to point out, there was an

1      article in *The Washington Post* on Saturday that quoted the

2      defendant's spokesperson, and it quoted him saying that the

3      defendant's intent with his public statements regarding this

4      trial is to "try this case in the court of public opinion."

5      And that is exactly what the Supreme Court has said in cases

6      like *Sheppard* should not and cannot happen.

7          The Rule 57.7(c) order that we have proposed is narrowly

8      tailored to the two harms that I just mentioned, the attacks

9      on witnesses and the trial in the public sphere.  And it does

10     do so in a narrowly tailored and least restrictive way

11     possible.  And we are not wedded, Your Honor, to the exact

12     words in this order.  We stand ready to work with the Court

13     and the defense to get the order right.

14         But what can't be is that because this is hard -- and we

15     know that it is hard, because it is hard whenever one is

16     balancing constitutional rights and thinking about these

17     difficult questions -- but the answer cannot be that the

18     defendant is permitted to intentionally try this case in the

19     court of public opinion and intentionally prejudice the

20     venire.

21         THE COURT:  I'm going to get to you in a moment,

22     Mr. Lauro.  I already asked my question as to whether the

23     order could be overinclusive.  But I also have a question as

24     to whether it could be underinclusive.  Because only

25     prohibiting disparaging statements doesn't really cover an

1    attempt to unduly influence a witness by publicly praising

2    them before a trial.  Something like, you know, Mr. Jones is

3    great, I know Mr. Jones will do the right thing when the time

4    comes.  Would that be covered under the order?

5            MS. GASTON:  So that, Your Honor, is what we were

6    trying to get at with part 1(a), which is statements regarding

7    the testimony or credibility of expected witnesses, witness

8    bolstering in terms of trying to get out in the court of

9    public opinion that someone is particularly trustworthy so

10   that at trial, if a juror has heard that, they will regard the

11   witness in a different way from other witnesses.

12           THE COURT:  All right.  And finally -- well, not

13   finally because I'm going to have some more questions.  But

14   the proposed order has a carve-out for Mr. Trump or his

15   lawyers to announce without further comment that the defendant

16   denies the charges.  So, in effect, are you saying that the

17   defendant should be limited and his lawyers should be limited

18   to statements such as "I deny the charges" and "I have filed a

19   motion to dismiss"?  Sort of, that's it?  I mean, what would

20   be allowable?

21           MS. GASTON:  It would be statements like that, but it

22   would also, Your Honor, allow the defendant to campaign.  So

23   if he is asked generally by a nonparty to the case if he

24   committed the crimes he is accused of, he could say no, I

25   didn't and I acted appropriately in regard to those

1    activities.

2         THE COURT:  Oh, you're envisioning a very different

3    scenario than what is currently in existence, Ms. Gaston.

4      All right.  Mr. Lauro.  I have some further questions, but

5    I want to hear Mr. Lauro.

6         MR. LAURO:  I had to chuckle as well, Your Honor.

7    We're in the middle of a campaign.

8         THE COURT:  I know, Mr. Lauro.

9         MR. LAURO:  And we're dealing with prior restraint on

10   content-based political speech, which is the highest degree of

11   constitutional protection.  The prosecutor couldn't answer

12   your questions because she ignores the fact that the Biden

13   administration is seeking to censor a political candidate in

14   the middle of a political campaign.

15        THE COURT:  Mr. Lauro, let me stop you.  Mr. Trump is a

16   criminal defendant.  He is facing four felony charges.  He is

17   under the supervision of the criminal justice system, and he

18   must comply with the conditions of release.  He does not have

19   the right to say and do exactly as he pleases.  Do you agree

20   with that?

21        MR. LAURO:  Hundred percent.  And in fact, Your Honor,

22   you have installed a regimen of rules and regulations that

23   everybody's abiding by.  But like Mr. *Ford* --

24        THE COURT:  Wait.  Did you just say everybody's abiding

25   by?

```
 1         MR. LAURO:  Yes, Your Honor.  And including -- and let
 2    me just say this.  We have two cases, only two cases that have
 3    dealt with this issue:  The Ford case, which dealt with
 4    Congressman Ford.  And that was clearly an instance where the
 5    Court ruled that he should not be censored during his
 6    political campaign.
 7         In fact, during his entire position in Congress he was
 8    able to say that the case was racially based and racially
 9    motivated.  He criticized the prosecution for that reason.
10    He criticized the prosecution for being politically motivated,
11    and that was permissible under the Sixth Amendment.
12         And the other case that you mentioned, Brown, what the
13    government doesn't tell you is that in that case the judge
14    specifically said there would be no order of censorship during
15    the political campaign.  Here, these prosecutors want to prevent
16    President Trump from speaking out on the issues of the day.  All
17    of the issues in this case are inextricably intertwined with
18    campaign issues:  Presidential competency, the role of
19    prosecutors, the role of the DOJ, the role of political
20    interference, the issue of appointment of judges.  Every single
21    issue that relates to this case also has political implications.
22         The prosecutors identify numerous social postings that they
23    say would violate some kind of order now --
24         THE COURT:  I'm going to ask you about them, but I'm
25    going to interrupt you for a minute because I want to make
```

```
1       sure that I'm clear on this recurring theme that you raise

2       that -- throughout the motion and throughout this case and

3       here this morning, that the fact that Mr. Trump is running for

4       president and his corresponding need to speak freely somehow

5       entitles him to make statements that would otherwise be

6       unlawful?  Is that what you're saying --

7               MR. LAURO:  No, Your Honor.

8               THE COURT:  -- that because he's running for

9       president --

10              MR. LAURO:  Of course not.

11              THE COURT:  -- he gets to --

12              MR. LAURO:  No.

13              THE COURT:  -- to make threats?

14              MR. LAURO:  Absolutely not.  And he hasn't made

15      threats.  But what I'm saying is if the Court follows the *Ford*

16      case and the *Brown* case, the Court will apply strictest

17      scrutiny with respect to any kind of censorship order that's a

18      prior restraint on campaign speech.  And that's what the law

19      requires.

20              THE COURT:  This is -- it's not just a prior restraint

21      on -- your argument is a prior restraint on campaign speech.

22      But he has restraints on his speech.  Do you disagree that

23      those restraints, the restraints that are in place, his

24      conditions of release, override his First Amendment rights in

25      his campaign?  In other words, if he wants to talk about the
```

1     subject matter of a witness's testimony in his campaign, he

2     can't because he's subject to conditions of release that

3     prevent him from doing that.

4          MR. LAURO:  I've said it twice, Your Honor.  He's

5     subject to Your Honor's conditions of release, which he has

6     abided by.  We don't disagree with that and we don't challenge

7     that.  What we challenge is an effort by the Biden

8     administration to censor their leading opponent during a

9     political campaign.  That is unheard of.  The strictest

10    scrutiny should be applied by the Court.

11         Mr. Trump is allowed to say things like this is a

12    politically motivated prosecution.  He's entitled to say

13    things that he's being treated unfairly.  He's entitled to

14    speak truth to oppression.  He's entitled to say that the

15    Department of Justice is acting unlawfully.  He's entitled to

16    even say things that are insulting to these prosecutors, as

17    difficult as it may be for them to hear.  But that is the

18    essence of free speech.

19         We have a marketplace -- a marketplace of free ideas in

20    our country, and free speech.  The answer to oppression, the

21    answer to tyranny, is the ability of Americans to speak

22    freely.  And here we have a situation where the Biden

23    administration, with all the powers --

24         THE COURT:  Mr. Lauro, I understand you have a message

25    you want to get out.

1           MR. LAURO:  No, it's not a message --

2           THE COURT:  I want to address the motion and the law.

3    I do not need to hear any campaign rhetoric in my courtroom.

4           MR. LAURO:  It is not campaign rhetoric, Your Honor.

5    What it is is the essence of how the courts have dealt with

6    these issues, both in the *Brown* case and in the *Ford* case.

7    And in both of those cases the courts have said we are not

8    going to censor political candidates.  There is not one case

9    in the United States, not one case in which a court has

10   entered a censorship order against a political candidate who

11   is a party to litigation.  Not once.  This would be the first

12   time.  And this is extraordinary, given the fact that we are

13   in the middle of a political campaign.

14      These prosecutors decided to bring this case in the middle

15   of a campaign.  They chose to have this case inextricably

16   intertwined with a political campaign, following President

17   Biden's statement in November 2022 that he would do anything

18   he could to prevent President Trump from assuming office

19   again.  That's in the public record.

20      President Trump is entitled to respond to that by saying

21   that these proceedings are unfair, it's an effort of political

22   interference, it's abhorrent to the basic structure of

23   American policy and the Constitution.  He's entitled to say

24   that as a political candidate.  And no court has ever

25   restricted a candidate from doing that.  What he is required

1       to do is abide by Your Honor's orders and he's done that.  And

2       one other --

3              THE COURT:  Well, I'm going to take issue with that.

4       I'm going to let you finish your point, but then I'm going to

5       have some specific questions about some specific statements

6       he's made.  But first I have some questions for Ms. Gaston.

7              MR. LAURO:  Okay.

8              THE COURT:  Finish your point.

9              MR. LAURO:  One last thing, Your Honor.  There is no

10      suggestion that the government has provided anything other

11      than speculation and conjecture that there's been any

12      influence on any jury pool with respect to these matters.

13      We're in the middle of a presidential campaign.  The easiest

14      solution to all of this is an obvious one.  And the Court in

15      *Landmark* and the courts have identified the easiest solution,

16      and that is to adjourn the case after the presidential

17      election.  That's the solution.

18         If these prosecutors were really interested in justice,

19      that's what would happen.  We would have a trial where

20      President Trump's right to effective assistance of counsel

21      would be guaranteed and provided for.  We wouldn't have a rush

22      to judgment.  We wouldn't have a trial immediately preceding

23      one of the most important days in the election cycle.  That's

24      the way to deal with this issue.

25             THE COURT:  This trial will not yield to the election

1    cycle and we're not revisiting the trial date, Mr. Lauro.

2          MR. LAURO:  Your Honor, I'm not asking that.  All I'm

3    saying is that President Trump, in the middle of a campaign,

4    that they chose to bring this case in, is entitled to exercise

5    his First Amendment rights.  We are talking about a censorship

6    order of a candidate that is unheard of in our constitutional

7    history.  It's never happened before.  Ever.

8          THE COURT:  There are a lot of things in this case that

9    have never happened before, Mr. Lauro.

10          MR. LAURO:  I understand, Your Honor.  Absolutely.

11          THE COURT:  All right.  Let me hear -- Ms. Gaston, let

12    me ask you -- and I'm going to come back to -- I have some

13    questions about some of these specific statements.  But I want

14    to ask Ms. Gaston about basically how this would work.

15      So let's say I entered the order as the government proposed

16    it, and Mr. Trump or one of the attorneys in this case makes a

17    statement that the government believes violates the order's

18    restrictions.  What are you proposing to happen next?  Would

19    you be asking for revocation of supervised release?  Financial

20    penalties?  Home detention?  Criminal contempt?  Moving the

21    trial date up?  How would that work?

22      You know, I've stressed that this case is going to proceed

23    as any other case, that this defendant is going to be treated

24    the same as any other defendant, but there are realities that

25    we have to face because the defendant is a former president.

1    There are accommodations I have made, for instance, allowing

2    the defendant to -- waiving his presence today, which I have

3    done occasionally but not often.

4        How does it work?  What do you propose?

5        MS. GASTON:  Yes, Your Honor.  The first thing I would

6    say is all of the options that you just mentioned are

7    available to the Court.  There are the options to -- the Court

8    could admonish the defendant, the Court could pursue financial

9    penalties.  The Court could, like in the *Stone* case, determine

10    that if the defendant violates this order then it's

11    appropriate to modify his conditions of release.

12        THE COURT:  What would be the procedural posture?  I'm

13    sorry.  Would it be an order to show cause?  The Court should

14    sua sponte find a violation?

15        MS. GASTON:  Either of those things is possible,

16    Your Honor.  The Court could take action sua sponte or the

17    government could move.  But what I would say is that is a

18    hypothetical that the defendant is going to violate the order,

19    and I would suggest in the first instance that we get in place

20    an order to see if --

21        THE COURT:  An order is sort of pointless if you don't

22    have a mechanism to enforce it.

23        MS. GASTON:  And as I said, Your Honor, there is an

24    array of options for enforcement.

25        THE COURT:  Mr. Lauro, assuming I were to issue such an

1    order and there was an allegation of a violation, what would

2    be the proper procedural posture?  Again, I know you disagree

3    that there should be an order, but assuming there was such an

4    order.

5            MR. LAURO:  Here's the problem.  It's asymmetrical.  It

6    doesn't prevent Joe Biden from making statements --

7            THE COURT:  Joe Biden is not a party to this court,

8    neither is he under --

9            MR. LAURO:  I'm sorry, Your Honor?

10           THE COURT:  He's not a party to this case; he's not

11   subject to conditions of release.

12           MR. LAURO:  Well, I understand.  We're not talking

13   about conditions of release.  We're talking about a censorship

14   order, and gag orders traditionally have applied to both

15   sides.  So what the prosecutors are not suggesting is that

16   President Biden would equally be subject to a censorship --

17           THE COURT:  I want you to answer my question.

18           MR. LAURO:  How to enforce an order in the middle of a

19   campaign is impossible under the circumstances that they've

20   alleged.  It's actually impossible.  How can Your Honor either

21   fathom or create an order that deals with all the issues that

22   might come up?

23     Let me give you an example.  President Trump wants to

24   criticize Vice President Pence for his activities as vice

25   president.  Is he allowed to do that?  Is that disparaging?

1    Is that witness intimidation?  He says something contrary --

2         THE COURT:  I'm going to get to that, Mr. Lauro.  I'm

3    going to get to the parameters and the contours of any

4    proposed order and what type of speech it affects and what

5    type of speech it doesn't.

6    What I'm asking you for at this point is were there an

7    order, what is the procedural posture that you believe would

8    govern enforcement of such an order.

9         MR. LAURO:  Your Honor, that is impossible to say

10   because I can't conceive of an order that would be lawful.

11   Obviously, we would appeal it immediately.  But the bottom

12   line is what we're talking about is a procedure where Your

13   Honor is entertaining an order of the Court which, if

14   violated, would have civil or criminal consequences.

15   However, under the circumstances that the prosecutor has

16   described -- and she's not answered a single question in

17   response to your questions in terms of how this would be

18   organized -- it's absolutely ridiculous to think of an order

19   that would prevent a candidate from speaking out on these

20   issues.

21   I don't know what Your Honor would do under the

22   circumstances, but I do know that there's no limits to the

23   kind of order that's being suggested.  It's not narrowly

24   tailored, it's completely vague, it's overbreadth, it violates

25   every single aspect of the First Amendment.  You can't come

1    up with a better hypothetical for violating the First

2    Amendment than what these prosecutors have suggested under

3    the circumstances.

4        So I can't solve your problem, Your Honor, because in my

5    view the issue is there should not be an order under any

6    circumstances.  We have a free society where people can speak

7    freely.  What President Trump cannot do is violate the

8    conditions of his release.  He's not done that.  No one has

9    done that.  There's been no threats.  There's been no

10   accusations against any kinds of witnesses.  There's been

11   nothing that amounts to intimidation.

12       What you have put in place, respectfully, is working.

13   This --

14           THE COURT:  I'm going to have to take issue with that,

15   Mr. Lauro.

16           MR. LAURO:  Well, you know, it's politics, Your Honor,

17   and people say vituperative things or colorful things in

18   politics.  And that's what's going on.

19           THE COURT:  Politics stops at this courthouse door.

20           MR. LAURO:  Absolutely.  And there's no politics in

21   this courtroom.  But there is politics out there.  There's a

22   presidential election going on right now.

23           THE COURT:  All right.  Mr. Lauro --

24           MR. LAURO:  And people are entitled to speak about --

25           THE COURT:  -- I have some particular questions about

1    the specific type of statements that have been made at issue,

2    but I'm going to ask the government some things first.

3        MR. LAURO:  But one other thing if I may, Your Honor.

4    The harm that's being suggested by the prosecution or the

5    Biden administration is completely speculative and conclusory.

6    They have not come forward with any identifiable witness who

7    says I feel intimidated by these political discussions.  They

8    have not come forward with any data suggesting that the jury

9    pool is prejudiced in any way.

10       THE COURT:  The government filed along with its motion

11   redacted information from people who are involved in this case

12   who attested to what happened to them after they participated

13   and spoke out.  That's not sufficient?

14       MR. LAURO:  Of course not, Your Honor.  First of all,

15   that predated this case.  Second of all, President Trump's

16   speech cannot be censored by Your Honor because of some third

17   party that does something outside of his control.  That's

18   abhorrent to the First Amendment.  Are we going to tell

19   Americans they can't speak because there's a possibility that

20   some crazed person might do something inappropriate?  That

21   would end the First Amendment as we know it.

22       THE COURT:  All right.  Thank you, Mr. Lauro.  At this

23   point I'd like to review and discuss some of the statements

24   that Mr. Trump has made since his indictment, including some

25   that he made after the government filed this particular motion

1    for an order.

2        In my view the statements fall into roughly five

3    categories.  The first, statements about the District of

4    Columbia and its jury pool; the second, statements about the

5    Biden administration or the Justice Department; the third,

6    statements about Special Prosecutor Smith and his staff; the

7    fourth, statements about judges and their staff; and the fifth

8    is statements about political witnesses.

9        Now, I think our discussion would be most productive if I

10   walk through each of these categories.  So the first is

11   statements about the District of Columbia and the jury pool.

12   So let's begin with Mr. Trump's statements about the District

13   of Columbia.

14       On August 6, 2023 he posted this statement on social media:

15   "No way can I get a fair trial, or even close to a fair trial

16   in Washington, D.C.  There are many reasons for this but just

17   one is that I am calling for a federal takeover of this filthy

18   and crime-ridden embarrassment to our nation where murders

19   have just shattered the all-time record, other violent crimes

20   have never been worse, and tourists have fled.  The federal

21   takeover is very unpopular with potential area jurors but

22   necessary for safety, greatness, and for all the world to

23   see."

24       I don't think there's much question that calling the

25   District of Columbia a filthy and crime-ridden embarrassment

1   to our nation disparages the District and the people who live

2   in it, including those who could eventually make up the jury

3   pool in this case.  The government argues that such statements

4   must be prohibited lest they cause members of the D.C. jury

5   pool to become biased against Mr. Trump.

6        So, Ms. Gaston, let's assume that these statements have

7   affected some D.C. residents' impartiality.  Why can't that

8   problem be addressed through narrow measures such as careful

9   voir dire or cautionary jury instructions?

10        MS. GASTON:  Yes, Your Honor.  The issue there is that

11   *Sheppard* stands for the principle that the Court has an

12   obligation to prevent prejudice to the venire if it's possible

13   to do so, rather than just trying to fix it on the back end.

14   And the government fully expects the Court to engage in

15   searching voir dire as we suggested in a more recent motion.

16        But that doesn't solve the -- that doesn't really fix the

17   problem.  And it's not really fair for the defendant to issue

18   repeated public statements about the venire in the District of

19   Columbia and then later complain that jurors know about his

20   statements criticizing the venire in the District of Columbia,

21   which is no doubt what he plans to do, as he has stated

22   repeatedly that he intends to try to change venues.

23        THE COURT:  All right.  Mr. Lauro, just to clarify on

24   this limited question.  Do you disagree or agree that

25   Mr. Trump's statements could be understood as disparaging the

```
 1          District of Columbia?

 2                  MR. LAURO:  Totally disagree, Your Honor.  What he is

 3          disparaging is the Biden administration that has allowed this

 4          great city --

 5                  THE COURT:  That's not what he said.  That's not what

 6          he said.

 7                  MR. LAURO:  It's what --

 8                  THE COURT:  No, he called the District a filthy and

 9          crime-ridden embarrassment to our nation.  I don't see

10          anything about the president in there.

11                  MR. LAURO:  He's deeply concerned about what's happened

12          to the District of Columbia -- I may be the only person in the

13          well of this courtroom that's served as an advisory --

14                  THE COURT:  I -- yes.

15                  MR. LAURO:  -- commissioner in the District of

16          Columbia --

17                  THE COURT:  Before it became a filthy and crime ridden

18          embarrassment?

19                  MR. LAURO:  Well, Your Honor, before the Biden

20          administration allowed crime to go to the extent that it has.

21          And that's a perfect example.  And there's laughter in the

22          courtroom, and that's fine.  But the reality is, Your Honor,

23          that President Trump is entitled to speak out about what's

24          happened to the District of Columbia in the last three years

25          since the Biden administration has been in office.  And no one
```

1    can doubt that crime has gone up and the quality of life of

2    the people in the District of Columbia has been implicated, as

3    well as everybody who's a tourist coming to this great city.

4    Mr. Trump is allowed to speak out on those issues.

5         Now, his language may be language that the prosecution

6    doesn't like, but that's part of living with the First

7    Amendment.  He's entitled to draw attention to the fact that

8    there are deep problems in this city that need to be addressed

9    that haven't been addressed by the Biden administration.

10   That's in no way a suggestion or some kind of defamatory

11   comment with respect to the people that live in this great

12   city.

13        And by the way, if you suggest, as the prosecution

14   suggests, that it's an attack on jurors, then they would be

15   likely to be biased against President Trump, not for him.  So

16   the reality is that these comments on public policy highlight

17   why an order of censorship is impossible to enforce,

18   impossible to fathom.

19        But I don't look at those statements in any way as

20   disparaging as to the people of the District of Columbia.  It

21   goes to the people who are running the District of Columbia.

22             THE COURT:  Well, those statements can be a

23   double-edged sword when they are considered in light of a

24   motion to change venue.

25             MR. LAURO:  But isn't that the problem with censorship?

1     Isn't that the problem?  Because people --

2              THE COURT:  Mr. Lauro, you keep saying censorship.

3              MR. LAURO:  Right.

4              THE COURT:  There is no question that a court is

5     entitled to draw restrictions on a defendant's behavior and a

6     defendant's speech pending trial.  So you keep talking about

7     censorship like the defendant has unfettered First Amendment

8     rights.  He doesn't.  So -- I mean, you can keep using that

9     term for whatever reason you want to, but we're not talking

10    about censorship here; we're talking about restrictions to

11    ensure that there is a fair administration of justice in this

12    case.

13             MR. LAURO:  Your Honor, a prior restraint on

14    content-based political speech is censorship.  I think I'm

15    entitled to say that.  Whether you want to call it a gag

16    order -- if that's a better description, that's fine.

17        But what does a gag order do?  It censors speech.  And the

18    bottom line here is that as Your Honor struggles with these

19    comments, I think it's very helpful for all of us to see how

20    difficult it would be.  For example, if Your Honor entered an

21    order along the lines that the prosecution has suggested,

22    would that posting violate the order?

23             THE COURT:  If I were to enter an order saying he

24    couldn't disparage the District of Columbia, it might.

25             MR. LAURO:  It might.  But that chills speech during a

1      political campaign.  That's the problem.

2              THE COURT:  What would --

3              MR. LAURO:  That's the problem.

4              THE COURT:  But wait -- no.

5              MR. LAURO:  Okay.  I'll wait for you.

6              THE COURT:  An order such as the Government has

7      requested -- and I'm not by any means suggesting I would enter

8      an order having to do with the District --

9              MR. LAURO:  Right.

10             THE COURT:  -- of Columbia -- that would not stop

11     Mr. Trump from saying the Biden administration has neglected

12     the city, the Biden administration has resulted in all sorts

13     of problems for the District of Columbia.  That is different

14     from saying the District of Columbia is a filthy crime-ridden

15     embarrassment to the nation.  Those are two different types of

16     statements.

17             MR. LAURO:  So now we're going to have a court

18     directing how a presidential candidate should talk about

19     issues relative to the campaign.

20             THE COURT:  Under the order in this case, a defendant

21     would have to curb their speech so as to comply with an order.

22     And it is not a difficult or impossible task.

23             MR. LAURO:  But as Your Honor said, it might violate.

24     That's the problem with violating the First Amendment.  It

25     might violate it.  So now we're going to have a situation

1    where a presidential candidate cannot say that Washington,

2    D.C., is crime ridden and infested with rats even though we

3    know factually that's the truth.  So I consider that

4    censorship, Your Honor.

5        The truth is that anybody who lives in this city right now

6    understands what's happened in the last couple of years, and

7    if President Trump cannot speak to that issue, then he's not

8    able to talk about the leading questions in the campaign.  And

9    that's what's so harmful about what the prosecution is trying

10   to do.  They're trying to squelch political speech.

11       THE COURT:  Okay.  I'll get back to that.  Did you want

12   to respond to that, Ms. Gaston?

13       MS. GASTON:  Yes, Your Honor, there are multiple things

14   I'd like to respond to.  So what Mr. Lauro is saying is that

15   the defendant is above the law and he is not subject to the

16   rules of this court like any other defendant is.

17       So I'd like to talk first about Mr. Lauro's statement that

18   the defendant can't campaign if such an order is in place.

19   That's just not true.  All this order would do is prevent him

20   from using his campaign as an opportunity to broadcast

21   materially prejudicial statements about this case, statements

22   that risk improperly influencing witnesses and jurors.

23       The post that Your Honor just used is an example.  That was

24   not a criticism of the District of Columbia in general or the

25   Biden administration's governance of the District of Columbia.

1    That was attacking the jury pool in this case.  It explicitly

2    says it's about his trial in this district.

3        THE COURT:  All right.  I know you have some more

4    general comments, responses with regard to the political

5    speech issue, but there are five categories of statements, and

6    I want to get through them, and we just did one.  So let me

7    ask you while you're up here about statements about the Biden

8    administration or the Justice Department.

9        As I've said before, Mr. Trump, as someone under criminal

10   indictment, does not have unfettered First Amendment rights

11   when exercise of that right conflicts with his conditions of

12   release, the protection of witnesses, and the administration

13   of justice.  But I do have some concerns about the breadth of

14   the order that the government proposes.

15       Mr. Trump has repeatedly referred to the President of the

16   United States and the Department of Justice using such terms

17   as "Crooked Joe Biden" and the "Department of Injustice."

18   These kinds of statements would seem to fall within the

19   category of disparaging statements, as your motion lists them,

20   about one party, the government.

21       But again, wouldn't that be casting a rather broad net?

22   How would this kind of name calling affect the administration

23   of justice in this case?  And I'm simply referring here again

24   to the second category, which is name calling of the president

25   and Department of Justice.  I haven't gotten on to witnesses

1    and court staff and so on.

2         MS. GASTON:  So let me talk about that category in two

3    parts, because the first part, criticizing President Biden, is

4    an example of how this order really doesn't restrict the

5    defendant.

6         THE COURT:  I'm going to interrupt you.  So would

7    saying "Crooked Joe Biden," does that violate the order?

8         MS. GASTON:  So, Your Honor, the defendant talks about

9    "Crooked Joe Biden" all of the time.  His Truth Social page is

10   replete with that and other criticisms of President Biden.

11   That's the majority of his posts.  The vast majority of his

12   speech would be untouched.

13        THE COURT:  So your answer to my question then is, no,

14   that would not violate the order?  "Crooked Joe Biden"?

15        MS. GASTON:  His criticisms of "Crooked Joe Biden" are

16   not.

17        THE COURT:  What about the "Department of Injustice"?

18        MS. GASTON:  Your Honor, that does present a concern

19   that a juror will think, oh, the Department of Justice is

20   crooked.  But let me just -- I want to sort of confront one

21   thing head on that Mr. Lauro said, which is he suggested that

22   the government's criticisms of the post attacking special

23   counsel's office or prosecutors was because we didn't like

24   what the defendant was saying.  That's not what that is about.

25   Our concerns about those posts or the posts about the special

1    counsel's office or the Court are not because we're trying to

2    defend ourselves or defend the Court.  It's because of a

3    concern that a juror will come to jury selection and not be

4    able to follow the Court's instructions because of having read

5    these things.

6        THE COURT:  But, why wouldn't we be able to elicit that

7    through voir dire?

8        MS. GASTON:  We will certainly get at that through voir

9    dire, Your Honor, but *Sheppard* stands for the principle that

10   we can't just allow that to happen up until the point of voir

11   dire, allow the jury pool to be prejudiced and then try to

12   solve it on the back end.

13       THE COURT:  But again, I am -- Mr. Lauro has a point

14   that this order is broad.  What are disparaging statements?

15   So I'm trying to get a sense from you.  So "Crooked Joe Biden"

16   would not be a violation, but the "Department of Injustice"

17   would?

18       MS. GASTON:  He can criticize President Biden to his

19   heart's content, Your Honor, because President Biden has

20   nothing to do with this case.

21       THE COURT:  All right.  I take the basic message of

22   these statements -- and I'm still here on the subject of

23   statements about President Biden and the Department of

24   Justice.  I take the basic message of the statements to be

25   that Mr. Trump believes that his prosecution is politically

1    motivated.  But how do they materially prejudice this

2    proceeding?  You just talked about a juror coming in here, but

3    again, I think that issue could be developed and those

4    feelings would be raised and fleshed out during voir dire.

5        It seems awfully close to his right to assert his innocence

6    and criticize the government.  And the Supreme Court

7    emphasized in *Gentile* that speech critical of the exercise of

8    the state's power lies at the very center of the First

9    Amendment.

10       So again, the problem with your order as it is written at

11   the moment is it would seem to include statements like

12   "Crooked Joe Biden" because it's disparaging, and there's an

13   argument to be made that that's legitimate, I suppose,

14   criticism of a political opponent.  What's the answer to that?

15       MS. GASTON:  Your Honor, the answer to that is there is

16   a proper place for those claims in a criminal case, and that

17   is for the defendant to file the selective and vindictive

18   prosecution motion that he has stated that he is going to

19   file.  The proper place in a criminal case for the claims

20   about the Court were in --

21       THE COURT:  I'll get to those.  But I mean, there's a

22   political campaign going on, as Mr. Lauro reminds us.  How

23   does his criticism of the Biden administration and the

24   Department of Justice factor in to my assessment as to whether

25   he's violated the protective order if I simply issue an order

1    that says he's not allowed to make disparaging statements as

2    you've described them in the order?  Won't "Crooked Joe Biden"

3    or the "Department of Injustice" cause a problem?

4         MS. GASTON:  Yes.  Your Honor, if we look at the order,

5    disparaging and inflammatory or intimidating statements about

6    any party, witness, attorney, court personnel, or potential

7    jurors.  So we're talking about the participants in this case.

8    And so I can't say it again, the "Crooked Joe Biden" thing,

9    he's not a participant in this case.  The defendant can say

10   that.

11        THE COURT:  All right.  So I'm going to move on to the

12   third category, statements about the special prosecutor and

13   his staff.

14        MR. LAURO:  May I respond?

15        THE COURT:  Yes, you can.  You may.  I do take your

16   point about the problems with the very wide category of

17   disparaging.  But can you confine your response to the issue

18   of President Biden and the Department of Justice because I'm

19   moving on to statements about the special prosecutor.

20        MR. LAURO:  Thank you, Your Honor.  Thank you for the

21   time to respond.

22        What if President Trump were to say "Crooked Joe Biden, who

23   was bribed by millions of dollars, also approved of this

24   prosecution which I believe is politically motivated to

25   interfere in the election"?  What if he said that?  Does it

1          violate the prosecutor --

2                    THE COURT:  Well, address your question to me.

3                    MR. LAURO:  I'm sorry, Your Honor.  The reality is,

4          does it violate the order as joined by the prosecution?

5                    THE COURT:  Ms. Gaston.  And you all can speak into the

6          microphone at counsel table if you like or come on up.

7                    MS. GASTON:  Yes, Your Honor, because that is falsely

8          suggesting that President Biden directed this prosecution,

9          which he did not.  And that could prejudice the venire.

10                   THE COURT:  Well, the problem, Ms. Gaston, is there is

11         a -- you know, there's an argument to be made the Department

12         of Justice is, you know, under the control of the Executive

13         Branch and -- I mean, it's going to be part of a campaign.

14         Is it your position that a statement by the defendant that this

15         campaign is politically motivated and brought about by his

16         political rival, that violates the gag order?

17                   MS. GASTON:  That -- I'm sorry?

18                   THE COURT:  A statement such as the one Mr. Lauro just

19         proposed or hypothesized, that the prosecution of the

20         defendant is directed by the president through his Justice

21         Department to silence a political rival or eliminate a

22         political rival, that would be barred by the order?

23                   MS. GASTON:  Your Honor, by the plain language of the

24         order, it would not because Joe Biden is not a party, witness,

25         attorney, court personnel or potential juror.

1          THE COURT:  There's your answer, Mr. Lauro.

2          MR. LAURO:  They said in their papers, and they said

3     that what President Trump said was false, that Biden did

4     not --

5          THE COURT:  Get closer to the microphone.

6          MR. LAURO:  And they used that as an example of

7     something that would violate the order.  So they have to read

8     their own papers before they respond to the Court.

9       But the other issue is what if President Trump said "Hunter

10    Biden is allowed to sue witnesses in his case, and his lawyers

11    are allowed to talk publicly about Hunter Biden's case, but my

12    lawyers cannot, and I have an order against me where my speech

13    is being regulated"?  What if he said that during a political

14    campaign?

15         THE COURT:  You know, actually, Mr. Lauro, I have a

16    list of hypothetical statements I'm going to get to in a

17    moment, but not yet.

18         MR. LAURO:  Okay.

19         THE COURT:  As far as I know, Hunter Biden --

20         MR. LAURO:  We're just trying --

21         THE COURT:  -- is not before this court --

22         MR. LAURO:  I know, Your Honor.  But we're just trying

23    to struggle with the circumstances of what's being proposed

24    here.  And I know you're trying to struggle with it as well,

25    and you're asking excellent questions.  I'm sitting here

1   thinking George Orwell would have a field day with what we're

2   hearing from these prosecutors.

3   THE COURT:   George Orwell would definitely have a field

4   day.

5   All right.   The third category is statements about the

6   special prosecutor and his staff.   And Mr. Trump has

7   repeatedly targeted individual members of the prosecution in

8   this case.   In the examples cited in the government's motion,

9   the defendant repeatedly refers to Special Counsel Jack Smith

10   as "deranged" and his staff as "thugs," and he did so again

11   last night.   These statements are more troubling.

12   I know that counsel for both the defense and the government

13   have spent significant time as prosecutors.   And so I think

14   that we all understand that at some point a defendant's

15   targeted disparagement of government officials can go from

16   permissible criticism of those officials to encouraging harm

17   against them.   "Will no one rid me of this meddlesome priest"

18   comes to mind.

19   If you call certain people "thugs" enough times, doesn't

20   that suggest, Mr. Lauro, that someone should get them off the

21   streets?   How is calling a civil servant, doing their job, a

22   job which they've done through several administrations, a

23   thug, necessary to advance a political debate or campaign?

24   And I'm trying to understand the First Amendment values

25   here, because if the message Mr. Trump wants to express is my

1   prosecution is politically motivated, what additional purpose

2   does it serve to use derogatory labels about the prosecutors?

3   Again, public servants who are doing their job as they have

4   been doing for many years.  And not just derogatory labels but

5   highly charged language.  What does that advance?

6       MR. LAURO:  Yeah.  So Harold *Ford*, who was a

7   congressman from Tennessee, African American congressman,

8   accused his prosecutors of being racist.  And the Sixth

9   Circuit court of appeals said he's entitled to do that in

10  connection with his political activities.  Now, the words used

11  here are "deranged," which I looked up in Merriam dictionary.

12  That means insane or out of your mind.  "Thug" is another word

13  for bully.

14      I think it's fair for President Trump to say, number one,

15  this prosecution is insane and deranged, and number two, that

16  he is being bullied in the process, throughout these

17  proceedings, where the government has denied him due process

18  and effective assistance of counsel.  He's entitled to make

19  those statements.

20      But most importantly, even a criminal defendant, believe it

21  or not, still has First Amendment rights to criticize the

22  prosecutor that's bringing the case.  And in this case we have

23  Jack Smith, who made outrageous, outrageous statements the day

24  of the indictment trying to link President Trump to violence,

25  which Prosecutor Smith knew was incorrect and false.  He did

1    everything he could to tamper with this jury pool.  President

2    Trump is entitled to respond by saying that's deranged.

3         THE COURT:  Well, Mr. Lauro, I'm not getting into your

4    opinion as to whether Mr. Smith's statements were true or

5    false.  What I want to know is -- and you were a career

6    prosecutor.  Okay?  You were a career prosecutor --

7         MR. LAURO:  I've been called worse.

8         THE COURT:  -- and I want to know in what kind of case

9    do you think it would be appropriate for a criminal defendant

10   to call the prosecutor a thug and stay on the streets?

11        MR. LAURO:  Your Honor, first of all, whether or not

12   that is language that I would use is irrelevant.

13        THE COURT:  I'm not asking whether you would use it.

14   I'm asking if in a normal criminal prosecution a defendant

15   would be allowed to call the prosecutor a thug?

16        MR. LAURO:  Your Honor, this is not a normal

17   prosecution.  Look at it a moment -- and I know you were a

18   defense lawyer.  Look at it a moment from what President Trump

19   sees.  Okay?  He has Joe Biden in November 2022 saying I'm

20   going to take out President Trump, okay?  He says that.  He

21   makes a public statement.  Then we have a special prosecutor

22   appointed, not just any prosecutor but a prosecutor that went

23   after Bob McDonnell, a leading Republican candidate, and was

24   ultimately convicted, only to have his case reversed nine

25   nothing by the Supreme Court.

1          Then we have a prosecution here which is unprecedented,

2    which has never been brought in the history of the

3    United States, using statutes in all kinds of crazy ways to

4    take President Trump out of an election cycle.  What is a

5    candidate supposed to do under those circumstances?  Is he

6    supposed to just sit quietly?

7          And what the government is proposing here is an order not

8    just directed against President Trump but against the American

9    electorate that wants to hear from President Trump under these

10   circumstances.  What's happening in this courtroom right now

11   will affect this country for years to come.  Whether -- and

12   President Trump is entitled to respond to it.  This is the

13   first time we've had a sitting administration prosecute a

14   political opponent.  These are grave --

15          THE COURT:  Mr. Lauro, no.  I'm going to interrupt you.

16          MR. LAURO:  Okay.

17          THE COURT:  You have said that.  You have said it

18   repeatedly.  I have heard it.  Obviously, you have an audience

19   other than me in mind.

20          MR. LAURO:  I don't, Your Honor.

21          THE COURT:  I have heard you say now multiple times

22   that this is an unprecedented prosecution.  What I want you to

23   do is to answer my question as to why a criminal defendant

24   should be allowed to call a prosecutor a thug.  There are many

25   words you can use to criticize a prosecution or a prosecutor.

1   But when you start using language like "thug" to describe

2   someone doing their job, that wouldn't be allowed by any other

3   defendant.  And just because this defendant happens to be

4   running a political campaign does not give him the right to

5   use any kind of language that he wants.

6       So tell me how the word "thug" is justified here.

7   Politically based prosecution.  I mean, why this kind of

8   language that frankly risks a real possibility of violence?

9           MR. LAURO:  It certainly doesn't suggest that and

10  there's no imminent threat.  But what does someone do in the

11  face of oppression?  What kind of language do you use in a

12  system that now is bordering on totalitarianism and

13  authoritative actions that are being taken?  What does a

14  citizen say?  What does a citizen say in countries that are

15  veering towards tyranny?  What do you say?

16      What do we say in the history of the United States when

17  there have been issues of government oppression and brave

18  citizens have risen and said very, very vituperative speech in

19  response to powerful people that have oppressed rights?  What

20  is a citizen supposed to say when he's denied due process?  I

21  don't know, Your Honor.  I have never been confronted with

22  that, thank God.

23      But in President Trump's mind, that's what he's facing

24  right now.  He is facing every single right being taken away

25  from him: the right to due process, the right to free speech,

1     the right to effective assistance of counsel.

2          THE COURT:  Mr. Trump tweeted, posted -- whatever you

3     call it -- last night that he would be -- he's in Iowa

4     campaigning today while we are sitting here debating as to

5     whether he has violated his conditions of release and whether

6     there should be limits placed on his speech.  So, please,

7     Mr. Lauro, let's tone this down a bit.  Okay?

8          MR. LAURO:  Your Honor, it's toned down, but as an

9     advocate -- and my voice is toned down.  I know that Your

10    Honor has suggested before that it was not toned down.  My

11    voice is very toned down.  But I'm entitled to make arguments

12    on behalf of my client.  But if Your Honor wants to censor my

13    speech too --

14         THE COURT:  You're entitled to make arguments, but I

15    would ask that you answer my questions.

16         MR. LAURO:  And, Your Honor, the question is, under the

17    circumstances what is someone supposed to do when faced with

18    those circumstances?  And that was the word that President

19    Trump chose.  Now, it may not be the word that you like, or it

20    may not be the word that the prosecution likes, but he's

21    entitled under the First Amendment to make those statements,

22    particularly in connection with the circumstances of this

23    case.

24         THE COURT:  So what about statements disparaging the

25    prosecutors' families?  I don't think the government cited

1   this in their motion, but I believe Mr. Trump has publicly

2   targeted Special Counsel Smith's family in general and his

3   spouse in particular.  In what world is it permissible,

4   Mr. Lauro?  In what world, in what case would it be allowable

5   for a criminal defendant to attack a prosecutor's family?

6        MR. LAURO:  Your Honor, I don't think there was an

7   attack on a family member.  What it was was an indication that

8   there might be political bias in light of Mr. Smith, and

9   certainly a First Amendment exercise of speech would allow a

10  criminal defendant to observe that a prosecution is

11  politically biased --

12       THE COURT:  By mentioning their spouse, who has nothing

13  to do with this case?

14       MR. LAURO:  Well, it deals with political issues

15  relating to Mr. Smith.  And by the way, Your Honor, in terms

16  of whether or not those types of statements would violate an

17  order of the Court, there's no order in place that limits

18  President Trump from indicating that this is a politically

19  biased prosecution by a politically biased prosecutor.  He's

20  entitled to do that.  I know we're all uncomfortable about

21  that, but he's entitled to do that.

22       THE COURT:  I'm not uncomfortable.  I want to know why,

23  in criticizing the prosecution against him, he would feel it

24  necessary and you feel it appropriate for him to talk about a

25  prosecutor's spouse or family.

1           MR. LAURO:  You're asking two different questions.

2      You're asking whether I personally --

3           THE COURT:  No, no.  I'm asking whether you as his

4      lawyer standing here are going to tell me that that speech is

5      appropriate and should be allowed despite the fact that your

6      client is under conditions of release.

7           MR. LAURO:  Your Honor, what I'm saying is that it

8      meets the boundaries of the First Amendment.  I'm not saying

9      whether or not it's appropriate from a lawyer's standpoint,

10     okay?  My views as an attorney may be widely different than my

11     client's views as a candidate.  But he is certainly entitled

12     to describe why he believes this prosecution is politically

13     motivated.

14          THE COURT:  And he's allowed to do that in unfettered

15     terms, even if it means mentioning a prosecutor's family.

16          MR. LAURO:  I think it comes part and parcel of the

17     First Amendment.  I mean, certainly in my situation, people

18     have attacked me.  I'm not able to take any kind of action.

19     That's part of the reality of being involved in a case of this

20     nature.  And it's clearly within the First Amendment.  It's

21     not something that as an officer of the court that I would

22     engage in, and Your Honor knows I haven't engaged in anything

23     like that.

24          But President Trump firmly believes, firmly believes that

25     these proceedings are politically motivated by a politically

1   motivated prosecutor, and he has pointed out examples of how

2   this prosecutor is politically motivated.

3         THE COURT:  Ms. Gaston?

4         MS. GASTON:  Thank you, Your Honor.  I think you

5   identified the reason why the government paired "disparaging"

6   with "inflammatory" in the proposed order.  Because what the

7   defendant is doing here is not just disparaging; it is

8   inflammatory.  He knows and understands the effect of these

9   statements, and it is that they are amplified, it is that they

10  motivate people to threaten others, and it not only prejudices

11  the jury pool, but in the case of witnesses -- and I know

12  that's Your Honor's final category so I will save most of this

13  for that -- but in the case of witnesses, it threatens and

14  chills witnesses too.

15      And one thing I would like to say is that the defendant has

16  demonstrated that he has the ability to regulate his speech.

17  There is no reason to use false and inflam- -- to use

18  disparaging and inflammatory rhetoric to make these points in

19  such a prejudicial way.

20      So in the September 17th *Meet the Press* interview in which

21  the defendant said false things about the potential testimony

22  of one of the witnesses in this case, he also demonstrated his

23  ability to decline to answer questions when it suits him.  He

24  was asked repeatedly by the interviewer about his conduct on

25  the day of January 6, 2021, and he said, "Why would I tell you

1    that?  I'm not going to tell you anything."

2         He is able to not say these things.  But he is using his

3    campaign as a platform to make these statements with the

4    intention of trying the case in the court of public opinion

5    rather than in this courtroom.

6         THE COURT:  All right.  I want to turn to the fourth

7    category, which is the statements about the Court and its

8    staff.  The government's motion reports that at various times

9    Mr. Trump has issued or reposted statements labeling me as "a

10   fraud dressed up as a judge," "a radical Obama hack" or "a

11   biased Trump-hating judge."  And I noted that he did so again

12   last night.

13        Now, I am not the first judge to whom Mr. Trump has applied

14   such labels.  And candidly, I am less concerned about

15   shielding myself from those kinds of statements.  But as I've

16   already noted, Mr. Trump's free speech rights do not extend to

17   speech that knowingly invites threats or harassment,

18   especially when it could compromise the integrity of judicial

19   proceedings or result in the harassment or threats to people

20   who are simply doing their jobs.

21        So I was deeply disturbed to learn that just last week,

22   while the motion for a gag order in this case was pending,

23   Mr. Trump publicly targeted a staff member of a judge

24   presiding in another case.  During the trial in that case, he

25   made a social media post that identified the staff member by

1    name and included a photograph of her with Senator Schumer,

2    which apparently led Mr. Trump to call her "Schumer's

3    girlfriend" and claimed "she was running this case against

4    me."

5        The judge in that case immediately ordered the removal of

6    the post and prohibited any further public statements about

7    members of his staff.

8        Now, Mr. Lauro, I know you're not counsel in that case, but

9    do you think that a defendant posting a photograph of a

10   judge's law clerk on social media is acceptable?

11       MR. LAURO:  Your Honor, that is something that I

12   believe the Court in New York dealt with.

13       THE COURT:  I'm not asking about what happened in

14   New York.  I'm asking do you think it would be appropriate --

15   all right.  Let me give you a hypothetical.  Would it be

16   appropriate for Mr. Trump to post a photograph of a member of

17   my staff online while this case is pending?

18       MR. LAURO:  If President Trump asks for my advice with

19   respect to that issue, I would advise him strongly not to do

20   that, for a number of reasons.  So in answer to your

21   question --

22       THE COURT:  That really wasn't my question.

23       MR. LAURO:  Well, you know what my answer is.

24       THE COURT:  My question is would it be appropriate to

25   do that?

1              MR. LAURO:  I'm advising the Court that what I would

2        tell my client to do is not to do something like that.

3              THE COURT:  And why?

4              MR. LAURO:  Because, obviously, I believe that that's

5        not something that should be done in the course of a

6        campaign -- in the course of a court proceeding.  And that was

7        directed and that was ultimately addressed by the court in

8        New York.

9              THE COURT:  But that's what we're dealing with --

10             MR. LAURO:  But that has nothing to do with --

11             THE COURT:  Yes, Mr. Lauro, it does have something to

12       do with this case --

13             MR. LAURO:  Well, it's nothing --

14             THE COURT:  -- because that's the kind of behavior

15       we're dealing with here.

16             MR. LAURO:  But nothing has happened like that in this

17       case and nothing like that will happen.  What President Trump

18       has addressed is the issue of potential judicial bias, which

19       we raised very professionally and very appropriately with Your

20       Honor, and very respectfully, which is something we had to do

21       as a matter of our oath of office to adhere -- and represent a

22       client zealously.  And it was addressed by the Court.

23          But in terms of judicial bias, once again, that's something

24       that the Supreme Court dealt with in the *Landmark* case, which

25       said, you know, yes, judges are subject to criticism, and

1      that's something that is well within the core of the First

2      Amendment.

3           THE COURT:  So I guess even though this incident

4      occurred in another case, I want the parties' position on why

5      I shouldn't issue a similar order as Judge Engoron did in that

6      case, given the defendant's apparent willingness to post

7      personally identifying information, as well as disparaging and

8      obviously untrue remarks about court personnel, even after he

9      was on notice that the government was seeking a gag order in

10     this case.

11       Such behavior puts court staff, who are, again, just doing

12     their jobs, at tremendous risk of harassment, and it is

13     totally unnecessary for Mr. Trump in order for Mr. Trump to

14     publicly proclaim his innocence or to campaign for the

15     Republican nomination.  So in light of the fact that, as you

16     said, you would advise your client not to do it, why shouldn't

17     I have an order that says he can't do it?  Because he did it.

18          MR. LAURO:  There's no need to.  Because if Your Honor

19     makes that kind of admonition, it will be followed, and it has

20     been followed.  Every time that Your Honor has directed us in

21     terms of what you find acceptable, we have conveyed that to

22     the client.

23       So if Your Honor tells me, as an officer of the court, this

24     is what I believe -- and I will, under absolute circumstances,

25     as you have directed, I will instruct my client along with

1      what you have just suggested.

2         And I think the court dealt with that issue in New York.

3      There's no reason for the Court to have to deal with it here.

4      It's not an issue in Washington, D.C.  But the Court's

5      instructions and admonition is heard by all, and I will

6      certainly convey that to my client and he will understand that

7      the expectation is that he abide by Your Honor's instructions

8      in that regard.

9         Everything that's happened in this case, Your Honor, you've

10     had full control over this court, and you've been able to

11     issue orders that have been obeyed and have been followed, and

12     no one is suggesting that there's been a violation of any

13     order.  The prosecution refers to the *Sheppard* case, which was

14     a situation where there was press in the well of the

15     courtroom.  Nothing like that is going on here.  Your Honor is

16     in control of the process.

17              THE COURT:  All right.

18              MR. LAURO:  But I will say, Your Honor, that some of

19     the things written about you have been very complimentary.

20              THE COURT:  Don't believe everything you read.

21         (Laughter.)

22              THE COURT:  Ms. Gaston.

23              MS. GASTON:  Your Honor, Mr. Lauro suggests nothing

24     like what happened in New York has happened here.  That is not

25     true.  The defendant has repeatedly attacked this court in

1    disparaging and inflammatory ways, and this court has been the

2    subject of a criminal threat in relation to this case.

3        We are happy to have the Court enter an order preventing

4    the defendant from disparaging and inflaming comments

5    regarding court staff.  But we think that should also be part

6    of an order expanding it further to protect other parties and

7    witnesses.

8        And I'm not sure what Mr. Lauro is getting at in saying he

9    will convey the Court's expectations to his client.  That is

10   why we need an order expressing clearly on the record what the

11   Court's order is, not expectations.

12            THE COURT:  All right.  I want to talk about the final

13   category of statements, which is statements about prospective

14   witnesses in the case.  The government's briefing identifies

15   several instances of such statements.  I'll go over a few.

16       For example, on August 5th of this year, Mr. Trump stated

17   that former Vice President Pence had gone to the dark side, in

18   quotes, and publicly lied about conversations the two of them

19   had shared related to this case.

20       On September 5 of this year Mr. Trump repeated the

21   assertion that Mr. Pence had gone to the dark side and had

22   "made up stories about me which are absolutely false."

23       Mr. Trump also posted on social media a video attacking

24   former Attorney General William Barr and separately claimed in

25   an interview that Mr. Barr didn't do his job with respect to

1    the allegedly rigged election because he was afraid of being

2    impeached.

3        On September 22, Mr. Trump posted a statement celebrating

4    the retirement of the chairman of the Joint Chiefs of Staff

5    General Mark Milley.  He stated, "This guy turned out to be

6    a woke train wreck who if the fake news reporting is correct

7    was actually dealing with China to give them a heads-up on the

8    thinking of the President of the United States.  This is an

9    act so egregious that in times gone by the punishment would

10   have been death."

11       And Mr. Trump has said about Georgia's former Secretary of

12   State Brad Raffensperger:  "I appreciate that he said that.  I

13   didn't do anything wrong" during a phone call that was central

14   to the indictment in this case.

15       The defense argues that these potential witnesses are

16   public figures who have willingly entered into a hearty public

17   debate with Mr. Trump and so are unlikely to be intimidated

18   when Mr. Trump pushes back.  And that in any event, Mr. Trump

19   has a right to engage with them politically.  The defense also

20   claims that none of the statements directly threaten or call

21   for harm to those potential witnesses, and Mr. Trump's speech

22   shouldn't be limited based on speculation about what third

23   parties might do based on the statements.

24       And the defense counsel further contends that limits on

25   disparaging speech about prospective witnesses as the

1      government proposes is unworkable because the full set of

2      potential witnesses isn't yet known.

3          So I'm going to discuss each of these arguments in turn.

4      Let's start with the point about the witnesses who are

5      identified in the government's motion as being public figures.

6          Mr. Lauro, I take your point that it would be impossible

7      for Mr. Trump to not criticize Mike Pence, for example, since

8      both men are actively campaigning for the Republican

9      nomination.  But it doesn't appear that any of the other

10     potential witnesses in this case fit that description, and I

11     know the government hasn't listed the witnesses or their

12     identities, but I'll get to that issue.

13         So why shouldn't I at least prohibit Mr. Trump from making

14     public remarks about other witnesses who aren't running for

15     president?

16             MR. LAURO:  The government had every opportunity to get

17     affidavits from Mr. Barr, General Milley, or

18     Mr. Raffensperger --

19             THE COURT:  Why should they have to?

20             MR. LAURO:  Well, if they're claiming there is some

21     kind of intimidation, then they should have something more

22     than speculation and conjecture.  For example, all three have

23     been very, very, very prominent in criticizing President

24     Trump, very strongly worded comments.  Two of them have

25     written books about their experiences.  So they've monetized

1    their interaction with President Trump.  None of them have

2    ever suggested that the criticism of President Trump has led

3    to any diminution in their ability to do their job or testify

4    or do whatever they want to do in terms of criticizing

5    President Trump.  Just the opposite.  They give as good as

6    they take.

7         THE COURT:  Really?  And so you're suggesting that

8    Mr. Barr or Mr. Milley have suggested that Mr. Trump should be

9    executed?  Is that what you're suggesting?

10        MR. LAURO:  Well, Your Honor, first of all, the post

11   with respect to General Milley was not that he should be

12   executed.  It related to what was written about in a Bob

13   Woodward book where General Milley described a conversation

14   with the Chinese authorities, the Chinese military, where he

15   said that he would give advance notice if the United States

16   took any action.  Let me just finish, Your Honor.  If I can,

17   you asked me the question, if I can answer.

18        THE COURT:  But you're not answering it.

19        MR. LAURO:  I am answering it.  I am answering it.

20   So what President Trump responded -- and by the way, the

21   description in that book was General Milley, who apparently

22   leaked that information, went around the chain of civilian

23   command, did not tell the president, did not tell the

24   Secretary of Defense, and had a private conversation with our

25   enemy with respect to what the military was going to do.

1     In the middle of a campaign, President Trump, under his First

2     Amendment right, is entitled to say that that's inappropriate.

3     I would never have a joint chief of staff head that's engaging

4     in that kind of conduct.

5             THE COURT:  Sure he is.  Sure he is.  What he's not

6     entitled to say is that kind of punishment would be -- in days

7     gone by, that kind of activity would in days gone by be

8     punishable by death.

9             MR. LAURO:  It's true.

10            THE COURT:  That is an absolute suggestion that that

11    is an appropriate thing to happen.

12            MR. LAURO:  Your Honor, absolutely not.  Again, that's

13    taking words I think a bridge too far.  What he did say is

14    that the seriousness, the seriousness of that kind of

15    misconduct by a joint chief of staff is intolerable in a

16    democratic society where you have the military going around

17    the civilian chain of command -- can you imagine that?  The

18    military ignoring the civilian chain of command and conversing

19    directly with our enemy?  And President Trump in the middle of

20    a campaign is entitled to put the spotlight on it.  The

21    American people are entitled to understand that and understand

22    the consequences of that.  Can you imagine in days going

23    forward --

24            THE COURT:  Mr. Lauro, why is he entitled to do that --

25    why is he entitled to suggest that an appropriate punishment

1        would be death?

2               MR. LAURO:  Because we have a First --

3               THE COURT:  No.  As part of that.  But again, the First

4        Amendment protections must yield to the administration of

5        justice and the protection of witnesses.  And to write in all

6        caps "death" about someone who's a potential witness in this

7        case, doesn't that go too far?

8               MR. LAURO:  Your Honor, first of all, it's true,

9        factually true that in years gone by -- in fact, I think it

10       still may be the penalty.  It could be, where -- the death

11       penalty for treason.  But the bottom line is, what if somebody

12       who commits a murder and is subject to the death penalty and a

13       political candidate says, you know what, what you did, you're

14       subject to the death penalty?  That's factually true.  It's

15       not inciting that somebody's going to take action like that.

16              THE COURT:  That's right up to "Would no one rid me of

17       this meddlesome priest."  If you suggest that someone is

18       deserving of execution, then it's not a far stretch to imagine

19       a situation where one of the millions of followers of this

20       person decides to go ahead and do that.

21              MR. LAURO:  Well, you've hit the nail on the head

22       again.  And the reality of the First Amendment, as I read the

23       First Amendment, and most people do, is you can't be penalized

24       for First Amendment speech because of something someone else

25       can do in a deranged speech.

1          I mean, after all, we had Democratic politicians

2     criticizing a Republican administration, and someone went out

3     and took a gun and shot Representative Scalise.  Are we going

4     to say that Democrats can't criticize Republicans because it's

5     going to create the risk that somebody might do something

6     crazy?

7          And by the way, what President Trump was doing was

8     describing what existed in days gone past and indicating how

9     serious a breach that this was by General Milley.  Apparently

10    he admitted to it to Bob Woodward.

11         So again, Your Honor, again, we're in the zone of clear

12    First Amendment speech, political speech, that we have to

13    tolerate in a free society.  Even though there's criminal

14    prosecutions going on, under the circumstances that's core

15    First Amendment speech.  First of all, there's nothing

16    untruthful about it.  Second of all, under the *Brandenburg*

17    standard, it doesn't incite any type of action against any

18    individuals.

19         THE COURT:  All right.  Thank you.

20       Ms. Gaston.

21         MS. GASTON:  Thank you, Your Honor.  We both know that

22    the tweet or the post about General Milley was a threat.  It

23    was a threat to him, and it was a threat to all witnesses in

24    this case that if you come after the defendant, he will come

25    after you.  And Mr. Lauro is talking about all of these

1  nuances about chain of command when in truth, other witnesses

2  have come forward and said that General Milley was following

3  the chain of command and had permission for these

4  conversations.

5      THE COURT:  The problem is that's neither here nor

6  there.  There may be a legitimate conversation to have, a

7  debate, or statements to be made about what General Milley did

8  or didn't do.  That's really none of my concern.  What is my

9  concern is when potential witnesses are targeted.  And my

10  concern is using the word "death" in all caps in a post about

11  a disagreement or a criticism of a potential witness in this

12  case could incite violence.  But I want --

13      What is your response to Mr. Lauro's criticism that you

14  didn't provide any affidavits from either Mr. Barr or General

15  Milley?

16      MS. GASTON:  Your Honor, the *Sheppard* and *Gentile* cases

17  stand for the proposition that this -- of course this

18  prejudice is speculative.  We're not going to know if these

19  witnesses are intimidated or if this threatening activity is

20  intimidating other witnesses until folks testify at trial, and

21  we may not even know then because they may be chilled in ways

22  that we do not know.  But it is the Court's duty to prevent

23  this prejudice from occurring, not to wait and see if it has

24  happened.

25      I'd also just like to address a couple things.  So the post

1    about Mr. Raffensperger, who is a witness in this case,

2    misstated what Mr. Raffensperger said.  And it was about the

3    exact topic that Mr. Raffensperger would be expected to

4    testify --

5          THE COURT:  And that troubles me for a couple reasons.

6    It falls in the category of praising a witness with the

7    possible effect that the witness is given a message about what

8    their expected behavior should be.  But it also, because it

9    concerns the subject matter of a witness's testimony, it makes

10   statements about the witness's expected testimony that the

11   government cannot respond to.  And that subject matter is --

12   that testimony should happen in this courtroom, not out in the

13   public sphere.

14      So that's concerning.  But I also have a question with

15   regard to Mr. Trump's statements about Mr. Pence and Mr. Barr

16   in particular.  I'm not only concerned that he's talking about

17   them generally.  And I guess the statement about

18   Mr. Raffensperger is included.  I'm more concerned that he's

19   specifically disparaging what from the indictment appears

20   likely to be the subject matter of the expected testimony.

21      Mr. Trump is not campaigning against Mr. Barr, who by the

22   way previously served in his administration, nor is he

23   campaigning against Mr. Raffensperger or General Milley.  So

24   why should he be making public remarks about them at all as

25   far as it goes to his campaign?  They're not running against

1    him.

2         Mr. Trump is facing felony charges and he does not get to

3    respond to every criticism of him if that response could

4    affect a potential witness.  And that's the bottom line here.

5         His statements also have the very real potential to

6    misstate the facts in this case that are to be determined by a

7    jury, and the government cannot respond.  They can't respond

8    to what he posted about Mr. Raffensperger.  What am I going to

9    do with that, Mr. Lauro?

10        MR. LAURO:  Well, first of all, Your Honor, with

11   respect to General Barr, I think the president is entitled to

12   describe what he would like in an attorney general, and in

13   particular compare how Attorney General Barr conducted himself

14   with what kind of attorney general he would like.

15        THE COURT:  You know, Mr. Lauro, it appears that what

16   we're talking about here is really a question of language and

17   semantics, because no one -- I have not said, and I don't

18   think the government has said, that Mr. Trump cannot respond

19   to criticism or that Mr. Trump cannot campaign.  What the

20   issue is here is the language that Mr. Trump is using.  And

21   that's -- you know, he doesn't get to use all the words.

22        MR. LAURO:  Yeah.

23        THE COURT:  He is constrained.  And he is constrained

24   by not being able to use words that could be communicated as

25   threats or efforts to affect testimony.

1        MR. LAURO:  That's the problem with censorship, is that

2   the government doesn't like the language that the person is

3   using.  So none of these are threats, obviously --

4        THE COURT:  Well, no.  No.  I disagree.  I don't think

5   it's obvious.

6        MR. LAURO:  I don't think anybody feels threatened;

7   otherwise they would have come before Your Honor.  President

8   Trump certainly has a history of using forceful language and

9   creative language to draw attention to the problems of this

10  country.  That's what he's done since 2016.  He has every

11  right to criticize Mr. Barr.  In fairness to Mr. Barr, he was

12  limited by prosecutors in the Department of Justice who

13  obstructed investigations into election fraud.

14      But the bottom line is that President Trump is entitled to

15  say things that are critical of Mr. Barr and Mr. Raffensperger.

16  These are people in the political sphere.  These are public

17  officials.  We're entitled to criticize people who exercise

18  power as a public official.  There's nothing bad about that.

19  If anything, Your Honor, we need more speech, not less speech.

20      The reality is that the overwhelming amount of speech in

21  this case in this district has been anti-President Trump.  You

22  had J6 hearings, you had television, you had all kinds of

23  things.  In terms of the jury pool, if anything, this jury

24  pool is completely biased against President Trump.  To

25  suggest --

1        THE COURT:  And so repeatedly calling the District a

2   filthy crime-ridden embarrassment is going to aid in that

3   effort to make sure the venire isn't further tainted?

4        MR. LAURO:  Well, as I said, it's indicative of what's

5   happened under the Biden administration, and certainly

6   President Trump is going to change that in 2024 and take the

7   rats off the street.  But the bottom line is that what's

8   happened here, and this entire discussion, when you talk about

9   semantics and language, that's the problem that we have with a

10  censorship order.

11      You know what's going to happen, Your Honor?  We are going

12  to be litigating ad infinitum all of these issues instead of

13  dealing with the case.  We should be preparing for jury trial

14  right now instead of having these angels on a pin discussions

15  about what might violate a Biden administration censorship

16  order.  We should be dealing with the issues in the case, not

17  about hypotheticals about what could and could not do to

18  violate an order during a political campaign.

19      And again, Your Honor, one simple solution.  One simple

20  solution.  Let's have this trial after the election and solve

21  the problem.

22        THE COURT:  All right.  Mr. Lauro, your point seems to

23  be that if Mr. Trump were threatening witnesses directly in

24  his statements or telling his followers to threaten witnesses,

25  that would be one thing, but him simply calling certain people

1    out doesn't rise to that level.  But when Mr. Trump has

2    singled out certain people in public statements in the past,

3    hasn't that led to them being threatened and harassed, as

4    demonstrated in the statements attached by the government?

5        MR. LAURO:  Your Honor, that's totally irrelevant.

6    I had Biden surrogates call me deranged and I've had all kinds

7    of --

8        THE COURT:  No, no.  Mr. Lauro, you signed on to this

9    case I assume with full awareness of what that would mean.

10   These are people who are doing their jobs.  The transcripts

11   that were attached are people who were doing their jobs.  And

12   the government's motion cites several of them who averred in

13   the kinds of statements that you've asked for under oath that

14   threats and harassment toward them had increased significantly

15   as a result of Mr. Trump's statements about them.

16       So this statement -- you know, your argument seems to be,

17   well, you know, he's just responding to criticism, he doesn't

18   have any control over what all these people out there are

19   doing, is disingenuous.

20       MR. LAURO:  No, it's not, Your Honor.  First of all,

21   those people are public officials and they signed up for it

22   too.  Just like I signed up --

23       THE COURT:  Really?  Election poll workers?

24       MR. LAURO:  Well, with respect to that, I mean, first

25   of all, there's no suggestion that President Trump in the

1    course of this case has ever done anything that amounts to a

2    threat or an incitement with respect to anyone, and they can't

3    show that and they haven't shown that.

4         There's no question that someone who is exercising First

5    Amendment speech can't control what others do.  They just

6    simply can't.  If we're going to have a society where someone

7    is going to be penalized for free speech because of what a

8    third party can do, then the First Amendment will no longer

9    mean anything.  It will be exorcised out of the constitution.

10   So the bottom line here is that we have to tolerate -- we have

11   to tolerate as a free society a bit of colorful, vituperative

12   speech.  The Supreme Court is filled with opinions along those

13   lines.

14        THE COURT:  So if there's a little violence or some

15   threats, it's just the price we pay for robust debate?

16        MR. LAURO:  Absolutely not, Your Honor.  No one

17   condones violence or threats.  Absolutely not.  Those would be

18   unlawful.  There's ways of dealing with that.  And no one is

19   suggesting here that President Trump has suggested violence or

20   threats against anyone; otherwise we'd be dealing with much

21   different proceedings than a proposed censorship order.  And

22   there's been no suggestion that he's violated his terms of

23   release or that he's threatened a witness or anyone else.

24        THE COURT:  All right.  I have some questions regarding

25   some hypothetical statements, but I'll hear from Ms. Gaston

1      first.

2          MS. GASTON:  Your Honor, the Court does not have to

3      tolerate the defendant intimidating witnesses and polluting

4      the jury pool.  In fact, it is the Court's duty to prevent

5      those things.  And what Mr. Lauro is saying is that his client

6      is above the law, that he can say whatever he wants about this

7      case.  That's the thing.  The statements about Mr. Pence,

8      about Mr. Barr, about General Milley, about Mr. Raffensperger,

9      those were about them in the context of this case, because the

10     defendant isn't campaigning, he is using his campaign to try

11     to try this case outside of this courtroom and to pollute the

12     jury pool.  And that is improper and the Court has an

13     obligation to stop it.

14         THE COURT:  Mr. Lauro -- thank you.

15     Maybe it will help us establish some common ground, if

16     there's any to be found, if we were to use some examples.  So

17     let me ask you about some hypothetical public statements, and

18     you tell me if you think it would be appropriate for Mr. Trump

19     to make them.  Because the government has already used him as

20     an example of a potential witness, I'll use Mr. Barr as the

21     hypothetical subject of the statements just to keep things

22     simple.

23     So let's go through them.  So first, "Bill Barr should be

24     executed for his many treasonous acts."  Is that appropriate?

25         MR. LAURO:  Are you asking me what's appropriate or

1        what's lawful?

2             THE COURT:  If you think it would be lawful under the

3        existing conditions of release and whether you think it should

4        be permissible as a defendant facing a criminal trial.  "Bill

5        Barr should be executed for his many treasonous acts."

6          I'm not asking if it's nice.  I'm asking if you think he

7        should be allowed to make such statements.

8             MR. LAURO:  Your Honor, first of all, again, I would

9        advise anyone not to make statements like that.

10            THE COURT:  Why?  Why?

11            MR. LAURO:  Because I personally as an officer of the

12       court, okay, I personally as an officer of the court will

13       advise clients not to make statements like that.

14            THE COURT:  And again, why would you advise a client --

15            MR. LAURO:  Because I don't believe personally, okay,

16       as an officer of the court, that statements like that are --

17       necessarily need to be made in the context of a court

18       proceeding.  However, you need to ask the second question,

19       does it violate the First Amendment --

20            THE COURT:  No, no.

21            MR. LAURO:  -- and the answer is no.

22            THE COURT:  Well, you know, is it a threat?

23            MR. LAURO:  It is not a threat, Your Honor.

24            THE COURT:  Okay.

25            MR. LAURO:  It's absolutely not a threat.

1          THE COURT:  "I hope Bill Barr stays loyal to me or he

2     can forget about having a job in my next administration."

3          MR. LAURO:  Your Honor, you're asking me hypotheticals

4     or things that were asked?

5          THE COURT:  Hypotheticals.  This is a hypothetical.

6          MR. LAURO:  And when was that posted?

7          THE COURT:  No.  It's a hypothetical.

8          MR. LAURO:  Was it posted during the time of this case,

9     or was it posted previously?

10          THE COURT:  That's a statement that I am using as a

11     hypothetical.  I don't know if it's been made before.  But

12     assume your client was to make this statement during the

13     pendency of this case.  Is that permissible?

14          MR. LAURO:  Well, let me --

15          THE COURT:  Or is that an attempt to influence the

16     testimony of a potential witness?

17          MR. LAURO:  Well, here it's a clearly political

18     statement because it goes to the core of whether or not

19     somebody might have a position in a future administration.

20     So it certainly could be read understandably as I want Bill

21     Barr's support in the course of this campaign.  And that I

22     think is fair game.

23          THE COURT:  Okay.

24          MR. LAURO:  And if Bill Barr is not supporting me in

25     the campaign, then he doesn't have a position in 2024.  I

1    think that's fair game under the First Amendment.

2         THE COURT:  Okay.  Next hypothetical.  "Bill Barr is

3    a smart guy, but he better learn to keep his mouth shut."

4    Permissible?  Or an attempt to obstruct justice or intimidate

5    a witness?

6         MR. LAURO:  Well, first of all, I'm grateful for these

7    hypotheticals.

8         THE COURT:  Takes you back to law school.

9         MR. LAURO:  Ones I didn't ask for.  But as I would

10   tell the professor, it depends on the context, Your Honor.

11   And if it related to Bill Barr arguing with President Trump

12   and calling him out and calling him unfit for office, then

13   that might be a fair comment because Bill Barr has done that

14   repeatedly.  Bill Barr has attacked President Trump perhaps

15   more vociferously than Joe Biden has, and the hypotheticals

16   you're giving me are fair comment and fair response within

17   that context.

18      Now, if it happened the day before Bill Barr testified at

19   trial, that might be a different hypothetical.  But --

20        THE COURT:  "Bill Barr is a slimy liar and can't be

21   trusted."  Permissible?

22        MR. LAURO:  Well, I'm not going to say truth is a

23   defense, but I'm also going to say --

24      (Laughter.)

25      -- that the bottom line is that President Trump, I believe

1    in his public statements, has said that he was not told the

2    truth by Bill Barr with respect to what happened with the

3    Department of Justice investigation.

4        Now, I know Bill Barr was facing unusual circumstances

5    because there were people embedded in the department, in the

6    public integrity section that were blocking him from doing

7    what he wanted to do.  But the bottom bottom line is that

8    President Trump is allowed, I believe, under these

9    circumstances in the First Amendment, to comment on Bill

10   Barr's activity as attorney general.  Are we going to say that

11   he can't do that in the middle of a campaign?

12       THE COURT:  No.  No.  What we're talking about is

13   whether he's allowed to make comments that would go to

14   influencing or potentially influencing a witness's testimony

15   or intimidating or chilling that witness's participation.

16       MR. LAURO:  I wish Bill Barr were here.  He's a tough

17   guy.  He's not going to say he's intimidated by anything that

18   President Trump has ever said.  In fact, he's gone on TV

19   repeatedly, repeatedly saying that.

20       THE COURT:  But it also has the effect of casting

21   into doubt the truthfulness or veracity of a potential witness

22   in a way that the government cannot and is not allowed to

23   respond to.

24       MR. LAURO:  Your Honor, of course they can.  Mr. Barr

25   can, the White House surrogates can.  Everybody can.  The

1    bottom line is that these are tough-edged political people.

2    Bill Barr, Mike Pence, Milley, Raffensperger, these are

3    politicians.  These are people that are used to the rough and

4    tumble.  They're not lilies that get offended by any little

5    comment about being deranged or otherwise.  These are people

6    that have, as you have said, they signed up for it.  They know

7    what they're talking about.  And candidly, they're all

8    monetizing their relationship.

9        Do you think for a moment that anything President Trump

10   said prevented Mike Pence from writing a book, or Bill Barr,

11   or Mr. Raffensperger.  General Milley is probably going to

12   write his own book as well.

13           THE COURT:  Mr. Lauro, would your answers change if

14   Mr. Trump reposted or liked or re-truthed or whatever you call

15   it social media posts with those statements rather than

16   actually typing the words himself?

17           MR. LAURO:  Well, I think if Your Honor were to give a

18   statement to counsel in terms of what Your Honor would like to

19   see in the course of these proceedings, that is something that

20   we would certainly communicate to President Trump in no

21   uncertain terms -- circumstances.  But he should not be

22   prevented, should not be prevented from speaking his mind on

23   these issues.

24       And everything you have raised goes to what a vice

25   president should be, what an attorney general should be, what

1    a secretary of state in a state should be and what a member of

2    the joint chiefs of staff should be.  These are all pressing

3    public issues.  The public wants to know what kind of people

4    President Trump will have in his cabinet in 2024.

5                THE COURT:  All right.  Ms. Gaston?

6                MS. GASTON:  Thank you, Your Honor.  I will run through

7    your examples in order.

8                THE COURT:  I think I know your answers.

9                MS. GASTON:  So first, about Mr. Barr, "he should be

10   executed for many treasonous acts."  The defendant should not

11   be able to do that because that is intimidating and

12   threatening toward a known witness in this case who is in the

13   indictment, and it could chill not only his speech, his

14   testimony, but those of others who are watching what happens

15   to more powerful people.

16       In terms of "I hope he stays loyal," that is intimidating,

17   it impinges on his credibility and the contents of his

18   testimony at trial, and it's potentially a violation of the

19   defendant's conditions of release because it could be seen as

20   an indirect message to a witness in this case.

21       The same goes for "he's a smart guy but he needs to keep

22   his mouth shut."  That is intimidating, it has to do with his

23   potential testimony and credibility, and it could be a

24   violation of the defendant's conditions of release.

25       And again, the "slimy lawyer and cannot be trusted," that

1    goes to his credibility and the potential topics of his

2    testimony.

3        In addition to all of those, all of these statements could

4    cause these individuals to respond in kind, which is what has

5    happened in the past.  When these individuals are attacked,

6    they have responded.  And so that involves all of the details

7    of their potential testimony being out in the open in advance

8    of trial.  And as the Court identified, the government does

9    not respond because it does not make extrajudicial comments

10   like the defendant has been.

11       As I mentioned before, it also -- these kinds of statements

12   also chill other witnesses.  Mr. Lauro seems to suggest that

13   these powerful people have asked for these threats.  But what

14   about other witnesses who don't live on a military base and

15   have constant protection?  What are they to think about the

16   defendant's attacks publicly on more high-profile witnesses?

17       And Mr. Lauro again seems to be suggesting that the Court

18   should not enter an order because he'll just tell the

19   defendant what the Court wants.  I think that's because

20   Mr. Lauro does not want this to be enforceable.  The Court

21   should enter an order to protect the venire and to prevent

22   this case from being tried in the court of public opinion,

23   which is exactly the defendant's stated intent.

24           THE COURT:  All right.  I want to talk about the scope

25   of the government's proposed order, which would forbid

1    statements regarding the identity, testimony, or credibility

2    of prospective witnesses.  And naturally, it may be possible

3    to infer the identity of a least some people who are likely to

4    be witnesses in this case.  But the universe of prospective

5    witnesses seems quite large and almost certainly includes

6    public figures with whom Mr. Trump has public disagreements.

7    And his disagreement could reflect his view of the

8    credibility.

9        So how is he supposed to know with whom he can or can't

10   publicly disagree?  And I'm considering the D.C. Circuit's

11   holding in *Morrison* with regard to the foreseeability of

12   evidence and witnesses.

13          MS. GASTON:  Yes, Your Honor.  As an initial matter,

14   the witnesses whom the defendant has publicly attacked to date

15   are all folks who are identifiable in the indictment, and so

16   he knows these are witnesses.  But furthermore, in the

17   defendant's conditions of release there is a requirement that

18   he not contact any potential witnesses, and the government's

19   understanding is that the defendant is on notice of who are

20   potential witnesses based on the discovery that the government

21   has provided, which includes logs of the interviews that the

22   government conducted in the course of its investigation.

23          THE COURT:  All right.

24          MR. LAURO:  Your Honor, if I can very briefly.  The

25   courts have recognized that individuals, parties to a lawsuit

1      who are involved in a political campaign are to be treated

2      differently.  The courts have recognized that in *Brown* and in

3      *Ford*.  There's no doubt that this is a different equation than

4      if we had a situation where President Trump was not running

5      for office.  That's just a given fact, and that is the law.

6          Any kind of order would be asymmetrical in the sense that

7      Bill Barr could attack President Trump repeatedly during

8      campaign --

9          THE COURT:  But again, Bill Barr is not a criminal

10     defendant.  So, yes, there's going to be some asymmetry

11     because your client is subject to restrictions that Bill Barr

12     is not.

13         MR. LAURO:  And both under *Ford* and under *Brown* the

14     courts decided that in order to protect the electoral process,

15     that censorship order should not be entered, full stop.  Not

16     even a narrowly tailored order was entered in either one of

17     those cases during the campaign.  So the Court would be

18     embracing new ground which no court has ventured into with

19     respect to First Amendment jurisprudence, which is entering

20     even some kind of order that would regulate campaign speech.

21     No court in the history of the United States has done that.

22     This would be the first time in the context of what's going on

23     in this case.

24         And Your Honor has struggled and you've asked me, you know,

25     pointed hypotheticals.  But it's not really a law school

1    exercise, Your Honor; it's what's playing out in a campaign

2    right now.  And what's going to happen if in the middle of a

3    heated debate President Trump says something about Mike Pence

4    or Bill Barr?  Are we going to be back here on a motion for

5    contempt?

6         THE COURT:  Depends on what he says.

7         MR. LAURO:  And then what's going to happen?  Is Your

8    Honor going to put President Trump in jail during the course

9    of a campaign?  I mean, look what they've opened up here.

10   This is a massive can of worms.  The better way to deal with

11   it, candidly, Your Honor --

12        THE COURT:  Is to move the trial date until after the

13   election.

14        MR. LAURO:  No, I wasn't going to say that only.  No, I

15   wasn't just going to say that.  I know you're mocking me, but

16   I wasn't going to say that.  What I was going to say is that

17   we can also deal with it, if there's something that's said,

18   after the fact Your Honor can --

19        THE COURT:  We're in here because of that.  We're in

20   here because he keeps calling the prosecutors thugs, deranged,

21   because he's made comments about court staff, because he's

22   made comments about the death penalty for a potential witness.

23   We are in here today because of statements that he's made, not

24   just before the government filed its motion but after, right

25   up to last night.  And so I -- I'm not confident that without

1    some kind of a restriction we won't be in here all the time.

2    MR. LAURO:  Well, the reality is that everything that

3    he has said with respect to these issues are protected First

4    Amendment speech.  So we're back to square one, Your Honor,

5    which is the reality is that he's entitled to do this under

6    the First Amendment as long as he doesn't violate the order of

7    the Court regarding his release and threaten or intimidate any

8    witness, which he hasn't done.

9    But in the context of a political campaign it's impossible

10   to fashion an order that is going to censor or control

11   political speech.  And that's why, in both the *Brown* and the

12   *Ford* cases, circuit courts of appeal have recognized that no

13   such order should be entered.

14   THE COURT:  All right.  Ms. Gaston, I'll let you finish

15   since it's your motion, and then I want to take a short

16   recess.

17   MS. GASTON:  Thank you very much, Your Honor.  I just

18   briefly want to address what Mr. Lauro just said about those

19   two cases.  First of all, the *Ford* case is a case in which the

20   court entered -- what the Sixth Circuit called "a broad

21   no-discussion-of-the-case order," and the Court did it sua

22   sponte.  There was not a motion by the parties.  There is

23   nothing in the decision along the lines of the incredibly

24   prolific and prejudicial statements that the defendant in this

25   case is making.  So that is really not analogous to this case.

1        And then with respect to the *Brown* case, that is actually a

2   cautionary tale for the Court.  In that case the court lifted

3   an order that was restricting the defendant's extrajudicial

4   statements.  And soon after he did, they began to disseminate

5   evidence from the case, recordings, and to talk about it.  And

6   he had to implement another order.

7        It's also important to remember that *Brown* happened in the

8   last two months leading up to that election.  Here our trial

9   will be completed well in advance of November 2024.

10        It is important to emphasize again that the statements at

11   issue here, these statements that we have been discussing are

12   a fraction of the defendant's speech.  He is talking about the

13   actual issues of the campaign freely, and he will be able to

14   continue to do so.  And he's demonstrated his ability to

15   regulate his speech, as I said before.  All the government

16   wants is for him to stop attacking witnesses in this case and

17   prejudicing the venire.

18        THE COURT:  All right.  Thank you all.  I'm going to

19   take a brief recess.

20        (Recess from 11:56 a.m. to 12:18 p.m.)

21        THE COURT:  All right.  Thank you for the argument and

22   the briefing.  After this hearing concludes I will issue an

23   order setting forth my ruling on the government's motion in

24   greater detail, but for now I will share the basic contours of

25   my decision.

1          First, as already noted, I am going to deny the

2     government's motion with respect to imposing additional jury

3     pool survey requirements.  The defense has already agreed to

4     notify me of the dates and sample sizes of surveys for this

5     case, and I'm not going to require anything more.

6          Second, I am going to grant in part and deny in part the

7     government's motion with respect to additional restrictions to

8     be placed on out-of-court statements by the parties or their

9     counsel.

10          The defense has sought to represent every statement as part

11     and parcel of Mr. Trump's First Amendment right to argue that

12     this prosecution is politically motivated.  One could come

13     away from these arguments with a mistaken understanding that

14     the First Amendment is an absolute right.

15          That is false.  First Amendment protections yield to the

16     administration of justice and to the protection of witnesses.

17     That is in fact the standard the defense took in its brief

18     when it acknowledged that some speech could be prohibited.

19          There is a compelling interest in the administration of

20     justice and in protecting potential witnesses in this case,

21     and it is possible to craft a narrowly tailored order to serve

22     that interest.

23          This is not about whether I like the language Mr. Trump

24     uses.  This is about language that presents a danger to the

25     administration of justice.  Accordingly, I will not impose any

1    additional restrictions about statements regarding the

2    District of Columbia or its jury pool.  I am confident that

3    the voir dire process and cautionary jury instructions can

4    filter out those statements' influence on the jury.  To the

5    extent that Mr. Trump continues to cast aspersions on the city

6    and its residents, his statements will be considered in

7    assessing any future motion for a change of venue.

8        I will not impose any additional restrictions on statements

9    criticizing the government generally, including the Biden

10   administration or the Justice Department, or statements

11   communicating that Mr. Trump believes this prosecution to be

12   politically motivated.

13       I will, however, prohibit all parties, including Mr. Trump,

14   along with the attorneys in this case, from making or

15   reposting any statements publicly targeting the special

16   counsel, his staff, including government counsel here today,

17   as well as any statements publicly targeting any of my staff

18   or any other court personnel.  It should go without saying

19   that statements targeting the families of any of these people

20   are absolutely prohibited as well.

21       Mr. Trump can certainly claim he's being unfairly

22   prosecuted, but I cannot imagine any other criminal case in

23   which a defendant is permitted to call the prosecutor

24   "deranged" or "a thug," and I will not permit it here simply

25   because the defendant is running a political campaign.  His

1    presidential candidacy does not give him carte blanche to

2    vilify and implicitly encourage violence against public

3    servants who are simply doing their job.

4        Finally, I will also prohibit statements from all parties

5    and attorneys about potential witnesses or the substance of

6    their expected testimony.  If Mr. Trump wants to criticize his

7    political rival, Mr. Pence, he may do so.  But he cannot make

8    statements about Mr. Pence's role in the events underlying

9    this case.

10       My review of past statements made by Mr. Trump in

11   particular, as well as the evidence that they have led to

12   harassment and threats for the people he has targeted,

13   persuades me that without this restriction there is a real

14   risk that witnesses may be intimidated or unduly influenced

15   and that other potential witnesses may be reluctant to come

16   forward lest they be subjected to the same harassment and

17   intimidation.

18       Now, let me be clear:  Mr. Trump may still vigorously seek

19   public support as a presidential candidate, debate policies

20   and people related to that candidacy, criticize the current

21   administration, and assert his belief that this prosecution is

22   politically motivated.  But those critical First Amendment

23   freedoms do not allow him to launch a pretrial smear campaign

24   against participating government staff, their families, and

25   foreseeable witnesses.  No other criminal defendant would be

1    allowed to do so, and I am not going to allow it in this case.

2        For the reasons discussed during this hearing, therefore, I

3    find that these measures are consistent with the rights

4    secured by the First, Fifth, and Sixth Amendments, and that

5    they are both necessary and narrowly tailored to safeguard the

6    integrity of these proceedings as well as to protect the

7    safety of the people assisting with them.

8        If any party or counsel violates these restrictions or the

9    other laws or obligations by which they are bound, I will,

10   either upon receipt of a motion or sua sponte, consider

11   sanctions as may be necessary.

12       Thank you.  We're adjourned.

13        (Proceedings adjourned at 12:25 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **DONALD J. TRUMP**, <br><br> Defendant. | Criminal Action No. 23-257 (TSC) |

**OPINION AND ORDER**

For the reasons set forth below and during the hearing in this case on October 16, 2023, the government's Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings, ECF No. 57, is **GRANTED** in part and **DENIED** in part.

Under binding Supreme Court precedent, this court "must take such steps by rule and regulation that will protect [its] processes from prejudicial outside interferences." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). The First Amendment does not override that obligation. "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice. But it must not be allowed to divert the trial from the very purpose of a court system to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." *Id.* at 350–51 (cleaned up); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) ("Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in this setting. For instance, on several occasions this Court has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant.") (quotation omitted). Here, alternative measures

Page **1** of **3**

229

such as careful *voir dire*, jury sequestration, and cautionary jury instructions are sufficient to remedy only some of the potential prejudices that the government's motion seeks to address.

In order to safeguard the integrity of these proceedings, it is necessary to impose certain restrictions on public statements by interested parties.  Undisputed testimony cited by the government demonstrates that when Defendant has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed.  *See* ECF No. 57 at 3–5.  Since his indictment, and even after the government filed the instant motion, Defendant has continued to make similar statements attacking individuals involved in the judicial process, including potential witnesses, prosecutors, and court staff.  *See id.* at 6–12.  Defendant has made those statements to national audiences using language communicating not merely that he believes the process to be illegitimate, but also that particular individuals involved in it are liars, or "thugs," or deserve death.  *Id.*; ECF No. 64 at 9–10.  The court finds that such statements pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment.  And that risk is largely irreversible in the age of the Internet; once an individual is publicly targeted, even revoking the offending statement may not abate the subsequent threats, harassment, or other intimidating effects during the pretrial as well as trial stages of this case.

The defense's position that no limits may be placed on Defendant's speech because he is engaged in a political campaign is untenable, and the cases it cites do not so hold.  The Circuit Courts in both *United States v. Brown* and *United States v. Ford* recognized that First Amendment rights must yield to the imperative of a fair trial.  218 F.3d 415, 424 (2000); 830 F.2d 596, 599 (1987).  Unlike the district courts in those cases, however, this court has found that

even amidst his political campaign, Defendant's statements pose sufficiently grave threats to the integrity of these proceedings that cannot be addressed by alternative means, and it has tailored its order to meet the force of those threats.  *Brown*, 218 F.3d at 428–30; *Ford*, 830 F.2d at 600. Thus, limited restrictions on extrajudicial statements are justified here.  The bottom line is that equal justice under law requires the equal treatment of criminal defendants; Defendant's presidential candidacy cannot excuse statements that would otherwise intolerably jeopardize these proceedings.

Accordingly, and pursuant to Local Criminal Rule 57.7(c), it is hereby **ORDERED** that:

All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

This Order shall not be construed to prohibit Defendant from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence.

In addition, the sealed version of the government's Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings, ECF No. 56, is **DENIED** as moot.

Date: October 17, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

Page **3** of **3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

DONALD J. TRUMP,

   *Defendant*.

Case No. 1:23-cr-00257-TSC

## **NOTICE OF APPEAL**

Defendant President Donald J. Trump hereby provides notice that he appeals to the U.S. Court of Appeals for the District of Columbia Circuit from the Opinion and Order of the District Court dated October 17, 2023, ECF No. 105.

Dated: October 17, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

*/s/John F. Lauro*
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
*Counsel for President Trump*

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

DONALD J. TRUMP,

*Defendant*.

Case No. 1:23-cr-00257-TSC

## PRESIDENT TRUMP'S OPPOSED MOTION FOR STAY PENDING APPEAL, REQUEST FOR TEMPORARY ADMINISTRATIVE STAY, AND MEMORANDUM IN SUPPORT

## **INTRODUCTION**

No Court in American history has imposed a gag order on a criminal defendant who is campaigning for public office—least of all, on the leading candidate for President of the United States. This Court's Opinion and Order of October 17, 2023, Doc. 105 (the "Gag Order"), is the first of its kind. Given its extraordinary nature, one would expect an extraordinary and compelling justification for the Gag Order. But that is conspicuously absent. Instead, the Court generically states it must enter the Gag Order to prevent supposed "threats" and "harassment." This theory falters under even minimal scrutiny.

First, as the prosecution concedes, President Trump has not unlawfully threatened or harassed anyone. Doc. 103 at 10:4–6 (Oct. 16, 2023 H'rg. Tr., hereafter "Tr.") ("[T]he government's motion does not seem to allege that [President] Trump has actually violated any of his conditions of release or other federal law."). Thus, unsurprisingly, the prosecution presents no witness who says they feel threatened or harassed by President Trump. In fact, when asked at oral argument about evidence supporting this concern, the prosecution admitted "*of course this prejudice is speculative. We're not going to know if these witnesses are intimidated or if this threatening activity is intimidating other witnesses until folks testify at trial, and we may not even know*." Tr. at 62:18–21. The Court, likewise, cited no evidence on this point, made no specific findings, and declined to give any meaningful consideration to the prosecution's lack of proof. These are fatal omissions. A prior restraint cannot be based on speculation. Rather, the prosecution must demonstrate a "clear and present danger" to a compelling government interest. *United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987).

Unable to justify the Gag Order based on President Trump's actions, the prosecution pivots to third parties, alleging that unnamed others, outside of President Trump's control, acted

improperly before this case began. Such concerns cannot justify the Gag Order. The Supreme Court has repeatedly explained that citizens of this country cannot be censored based on a fear of what others might do. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy . . . except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

Equally important, the prosecution submitted, and the Court considered, no evidence on the critical question of whether alternative, non-speech-restricting measures might be effective in advancing the asserted interest in protecting witnesses. This resulted in a breathtakingly overbroad Gag Order that, outside of a handful of narrow exceptions, prohibits any public comment regarding a wide and undefined set of individuals and subjects. In doing so, the Gag Order shields public officials in the highest echelons of government from criticism, including key political rivals.

At bottom, the Gag Order violates virtually every fundamental principle of our First Amendment jurisprudence. It imposes an overbroad, content-based prior restraint on the leading Presidential candidate's core political speech—notwithstanding the Supreme Court's instruction that First Amendment rights have their fullest and most urgent application precisely in the conduct of campaigns for political office. Likewise, by restricting President Trump's speech, the Gag Order eviscerates the rights of his *audiences*, including hundreds of millions of American citizens who the Court now forbids from listening to President Trump's thoughts on important issues.

Neither the prosecution nor the Court come close to justifying such restrictions. Instead, in a dizzying irony, the Gag Order lists a long line of Supreme Court cases protecting the civil rights of *criminal defendants* in hopes of silencing the criminal defendant in this case. This violation of the First Amendment is egregious and intolerable. Accordingly, pursuant to Rule 8(a)(1)(A) of the

Federal Rules of Appellate Procedure and this Court's Rules, the Court should immediately stay the Gag Order pending appeal.

## **FACTUAL BACKGROUND**

President Trump is the forty-fifth President of the United States and the leading candidate in the upcoming Presidential Election. He has dominating leads in the race for the Republican nomination, and he leads President Biden—the executive currently prosecuting him—in general election polling. President Trump's political speech reaches the largest audience in American history, including over 100 million followers on social media across several platforms and countless other citizens who listen to President Trump's messages in person, on television, the internet, newspapers, and other media.[1]

The prosecution filed the indictment in this matter on August 1, 2023. Doc. 1. As this case is pending, President Trump continues to campaign for President, and one of his core messages is that the prosecutions against him are part of an unconstitutional strategy to attack and silence the Biden Administration's chief political rival. To advance this message, President Trump has made many public statements criticizing individuals he believes are wrongly prosecuting him, including President Biden, Attorney General Garland, and Special Prosecutor Jack Smith and his team. This viewpoint—that the prosecution is politically motivated—is one shared by countless Americans.

On September 15, 2023, the prosecution filed a motion to impose a gag order on President Trump, seeking sweeping restrictions on President Trump's political speech. Doc. 57. In support, the prosecution made three principal arguments.

---

[1] For example, as of January 2023, President Trump had over 87 million followers on Twitter, 34 million on Facebook, 23 million on Instagram, almost 5 million on Truth Social, and 2.65 million on YouTube. *See Number of Followers of Donald Trump on Select Social Media Platforms as of January 2023*, STATISTA.COM, *at* https://www.statista.com/statistics/1336497/donald-trump-number-of-followers-selected-social-platforms/.

First, the prosecution claimed, in conclusory fashion, that silencing President Trump was necessary to prevent "prejudic[ing] the jury pool." *Id.* at 1. Second, that President Trump was allegedly "attempting … to undermine confidence in the criminal justice system and prejudice the jury pool through disparaging and inflammatory attacks on the citizens of this District, the Court, prosecutors, and prospective witnesses." *Id.* at 2. And third, that expansive content-based restrictions were somehow necessary to prevent threats and harassment to third parties. *Id.*

The Court declined to adopt the prosecution's first argument, relating to jury prejudice. For good reason, as the prosecution submitted no evidence that the jury pool has been actually affected by any of President Trump's statements. Likewise, the Court declined to credit the prosecution's amorphous, and constitutionally invalid, concern regarding "public confidence" in the prosecution or the Court.

Instead, in crafting the Gag Order, the Court looked to the prosecution's last argument, that witnesses, prosecutors, and court personnel have somehow been intimidated or harassed. However, in making this claim, the prosecution did not present any evidence that President Trump harassed or intimidated anyone. Rather, the prosecution relied exclusively on the allegation that third parties, with no relationship to President Trump, engaged improperly with political actors—most of whom had already been criticized by millions of people across the country before President Trump commented on them. *Id.* at 3-5.

The prosecution also did not submit any evidence that: (1) any member of its team has been threatened or harassed; (2) that any potential witness has actually felt threatened or harassed by President Trump's core political speech; (3) that President Trump made any public statement about any "court staff," other than the district judge herself; or (4) that any alleged threat, harassment, or

intimidation by third parties could not be addressed by means less restrictive than an expansive prior restraint on President Trump's speech. *See id.*

Nonetheless, on October 17, 2023, this Court entered the Gag Order against President Trump. Doc. 105. Among other things, the Gag Order prevents President Trump from making statements "that target … the Special Counsel prosecuting this case or his staff," or that "target … any reasonably foreseeable witness or the substance of their testimony." Doc. 105, at 3.

In entering the Gag Order, the Court relied heavily on the anticipated reactions of unidentified, independent third parties to President Trump's speech. The Court found that "when Defendant has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed." *Id.* at 2. But the Court cited no evidence that President Trump's statements—as distinct from the statements of millions of others—caused such alleged threats or harassment, let alone that the statements were directed to inciting imminent lawless action.

Notwithstanding the complete lack of evidence, the Court "f[ound] that [President Trump's] statements pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." *Id.*

Based on these perfunctory findings, unsupported by evidence, the Court imposed sweeping restrictions on President Trump's core political speech:

> All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

*Id.* at 3. The Court then entered a carve-out:

> This Order shall not be construed to prohibit Defendant from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence.

*Id.* President Trump immediately filed a notice of appeal. Doc. 106.

Despite the extraordinary breadth of these restrictions, the Court held, in conclusory fashion, that President Trump's "statements pose sufficiently grave threats to the integrity of these proceedings that cannot be addressed by alternative means, and it has tailored its order to meet the force of those threats." *Id.*

The Court did not explain, as it must, how nearly all public statements regarding hundreds of individuals and topics (sans three narrow carveouts) pose a "clear and present" danger to any compelling interest. Nor did the Court cite any evidence or provide any analysis to support its conclusion that less restrictive means were unavailable to address its perceived threats, and it did not address or consider any specific alternative means. The statements above were the sum total of the Court's findings regarding its constitutionally mandated task to narrowly tailor its order and exhaust all "alternative means" before gagging President Trump's speech. *Id.*

## **LEGAL STANDARD**

A motion for stay pending appeal is governed by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). All four factors favor President Trump here.

## ARGUMENT

As an initial matter, the Gag Order is an immediately appealable collateral order. Court orders restricting the freedom of expression for even "minimal" time periods impose *per se* irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Gag Order, therefore, "fall[s] in that small class which finally determine claims of right separate from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *In re Rafferty*, 864 F.2d 151, 153 (D.C. Cir. 1988) (quoting *Cohen v. Beneficial Indus. Loan Corp*., 337 U.S. 541, 546 (1949)); *see also United States v. Brown*, 218 F.3d 415, 420 (5th Cir. 2000) and *Ford*, 830 F.2d at 598, both finding jurisdiction under collateral order doctrine to consider appeals by criminal defendant politicians contesting the validity of gag orders.

## I.    President Trump Is Likely to Succeed on the Merits Because the Gag Order Is Unsupported by Evidence and Violates the First Amendment's Most Basic Precepts.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). The Gag Order violates these principles.

### A.    No Evidence Supports the Gag Order's Animating Concern of Preventing "Threats" and "Harassment" to Prosecutors, Court Staff, or Witnesses.

The Gag Order cites no evidence supporting its findings of risks of harassment and witness intimidation, and the prosecution provided none. *See* Doc. 105, at 1-3. When defense counsel

pointed out at oral argument that "[t]he government had every opportunity to get affidavits from Mr. Barr, General Milley, or Mr. Raffensperger" (supposedly "intimidated" witnesses), the Court responded, "Why should they have to?" Oct. 16, 2023 Tr. ("Tr."), at 57. Then, when the Court asked the prosecution, "What is your response to Mr. Lauro's criticism that you didn't provide any affidavits from either Mr. Barr or General Milley?" the prosecution admitted, "*of course this prejudice is speculative*." Tr. 62.

Not only is the prosecution's argument "speculative," it is poor speculation at that. The witnesses that third parties listening to President Trump have supposedly intimidated—former Vice President Pence, former Attorney General Barr, and former Chairman of the Joint Chiefs of Staff Mark Milley—are extremely high-level public figures who have voluntarily entered the public arena and invited the cut and thrust of public debate by openly criticizing President Trump. Thus, the prosecution's speculation that these witnesses will be "intimidated" by President Trump's criticism is non-credible on its face.

In any event, basing an extraordinary gag order on a Presidential candidate based solely on the prosecution's "speculation," Tr. 62, is insupportable. In *Nebraska Press Association v. Stuart*, the Supreme Court emphasized "that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. . . . A prior restraint . . . has an immediate and irreversible sanction." 427 U.S. 539, 559 (1976).  "The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment." *Id.* "For the same reasons the protection against prior restraint should have particular force as applied to reporting of criminal proceedings." *Id.*

Because of these First Amendment principles, the Court held that proponents of prior restraints on speech regarding pending criminal proceedings bear "the heavy burden of demonstrating, in advance of trial, that without prior restraint a fair trial will be denied." *Id.* at 569. The Supreme Court made clear that this "heavy burden" is typically an *evidentiary* burden. Focusing on "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity," *id.* at 562, the Court held that the prior restraint was unjustifiable due to the lack of evidence to support a finding on that question: "We find little in the record that goes to another aspect of our task, determining whether measures short of an order restraining all publication would have insured the defendant a fair trial." *Id.* at 563. The lack of evidence was fatal to the prior restraint in that case: "There is no finding that alternative measures would not have protected [the defendant's] rights, and the Nebraska Supreme Court did no more than imply that such measures might not be adequate. Moreover, *the record is lacking in evidence to support such a finding*." *Id.* at 565 (emphasis added).

So also here, "the record is lacking in evidence to support" a finding that President Trump's well-known use of rhetoric will intimidate or result in unknown third parties harassing any witness, prosecutor, or court personnel. *Id.* For this reason alone, the unprecedented Gag Order, resting on what the prosecution openly admits are "speculative" concerns, is unlikely to be upheld on appeal. Tr. 62.

### B.    The Gag Order Is a Content-Based Prior Restraint on Core Political Speech.

In addition, the Gag Order violates a long series of First Amendment doctrines. First, it violates three of the First Amendment's most fundamental precepts at once: It is a (1) content-based (2) prior restraint on (3) core political speech.

"Speech on matters of public concern is at the heart of the First Amendment's protection. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up) (citing numerous cases). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 452-53.

Needless to say, the indictment herein is of enormous public concern and a central issue in the upcoming election. Thus, President Trump's opinions of the prosecution, the government officials pursuing him, and the witnesses against him are all core political statements entitled to the highest degree of deference. *See Ford*, 830 F.2d at 599 ("A criminal defendant awaiting trial in a controversial case has the full power of the government arrayed against him and the full spotlight of media attention focused upon him. The defendant's interest in replying to the charges and to the associated adverse publicity, thus, is at a peak.").

Indeed, President Trump's speech in support of his re-election campaign—which is inextricably intertwined with this prosecution and his defense—lies "at the core of our electoral process of the First Amendment freedoms—an area . . . where protection of robust discussion is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (citations and quotations omitted); *see also Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999); *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995) ("[C]ore political speech" encompasses any "advocacy of a politically controversial viewpoint." "No form of speech is entitled to greater constitutional protection than" core political speech.).

Second, as a content-based restriction on President Trump's speech, the Gag Order is uniquely "obnoxious" to the First Amendment. *Hill v. Colorado*, 530 U.S. 703, 723 (2000). The "rationale of the general prohibition" against *content*-based regulation "is that content discrimination raises the specter that the Government may effectively drive certain ideas or *viewpoints* from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (emphasis added and quotation marks omitted).

Here, The Biden Administration seeks to bar President Trump from speaking because it does not want the public to hear what its opponent has to say. That is a quintessential violation of the First Amendment. If our freedom of speech is to mean anything, the Court cannot allow the prosecution to silence the leading Presidential candidate whose speech and message are politically threatening to the incumbent President.

Third, as noted above, prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. A government restriction on speech whose "object . . . is not punishment but suppression" constitutes a *de facto* prior restraint. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 703, 711–12 (1931). The Gag Order is a quintessential prior restraint.

C.   **The Gag Order Interferes with President Trump's Ability to Campaign for Public Office, Inflicting the Highest Levels of First Amendment Injury.**

The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). There can be no greater application of this principle than to a campaign for the Presidency, the highest office in the United States.

Previous cases addressing gag orders on criminal defendants have uniformly deferred to these "most urgent" First Amendment interests to decline to impose virtually *any* restriction on a political candidate's speech during an ongoing political campaign. In *United States v. Ford*, reversing a similar gag order, the Sixth Circuit emphasized the paramount importance of permitting a criminal defendant who was campaigning for public office to speak publicly about the case and criticize the prosecution against him in the most robust terms. 830 F.2d 596, 597 (6th Cir. 1987). The Sixth Circuit emphasized the importance of the "divisive political context of this case" as a compelling reason *not* to muzzle the defendant:

> The protection of political speech which concerned the court in *Near* [*v. Minnesota ex rel. Olson*] is at the core of the First Amendment. Here the defendant, a Democrat, a black congressman who represents a largely black constituency in Memphis, *is entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views and his race*. One may strongly disagree with the political view he expresses but have no doubt that he has the right to express his outrage. *He is entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion, as well as in the courtroom and on the floor of Congress. He will soon be up for reelection. His opponents will attack him as an indicted felon*. He will be unable to respond in kind if the District Court's order remains in place. *He will be unable to inform his constituents of his point of view. And reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance*.

*Id.* at 600–01 (emphases added). The very same reasoning applies here. Even commentators politically opposed to President Trump observe that the issues raised in this criminal case are "central to [Biden's] re-election argument."[2] A court order preventing President Trump from "targeting" (whatever that means, *see infra*) the prosecutors against him or witnesses to his case (some of whom are political opponents campaigning against him and/or writing books opposing him) through core political speech is intolerable. President Trump "will soon be up for reelection"

---

[2] Kevin Liptak, et al., *Trump's Third Indictment Is the Most Personal – and Trickiest – One for Biden*, CNN.COM (Aug. 2, 2023), available at https://www.cnn.com/2023/08/02/politics/joe-biden-donald-trump-indictment/index.html.

and "is entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion." *Ford*, 830 F.2d at 601; *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1043 (1991) ("A defense attorney may pursue lawful strategies to obtain dismissal of an indictment or reduction of charges, including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried.").

The Fifth Circuit in *Brown* applied virtually the same reasoning. 218 F.3d 415. In *Brown*, a gag order was imposed, but "the district court temporarily lifted the gag order in this case to avoid interfering with Brown's re-election campaign for [Louisiana] Insurance Commissioner." *Id.* at 419. Though the Fifth Circuit upheld a speech restriction *post-campaign*, it was essential to *Brown*'s reasoning that the district court had suspended its gag order on the defendant during the course of his political campaign, so that he "was able to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race." *Id.* at 430. The Fifth Circuit reasoned that this suspension was necessary, as the gag order would have otherwise wrongly prevented Brown from being "able to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race." *Id.* In reaching this conclusion, the Fifth Circuit acknowledged that "[t]he urgency of a campaign . . . may well require that a candidate, for the benefit of the electorate as well as himself, have absolute freedom to discuss his qualifications." *Id.*

The Gag Order here violates this guidance. It prevents President Trump from discussing core political themes that are central to his campaign message and prevents him from criticizing speakers who are openly criticizing him in campaign events, media appearances, public statements, and even books—such as former Attorney General Barr, General Milley, and former Vice President Pence. It blocks him from criticizing the Special Prosecutor, whom President Trump views as a key player in the political persecution against him. In fact, the Court repeatedly stated

that it would *not* give any consideration at all to the fact that President Trump is running a political campaign during this prosecution. *See, e.g.,* Tr. 83 ("I cannot imagine any other criminal case in which a defendant is permitted to call the prosecutor 'deranged' or 'a thug,' and I will not permit it here simply because the defendant is running a political campaign."); *see also* Tr. 17 (expressing doubt that "the fact that Mr. Trump is running for president and his corresponding need to speak freely somehow entitles him to make statements that would otherwise be" not permitted). This was error.

### D.    The Gag Order Gives No Weight to the First Amendment Rights of President Trump's Audiences to Receive His Messages.

Under the First Amendment, violating the rights of a speaker inflicts an equal and reciprocal constitutional injury on the *listener*. "Freedom of speech presupposes a willing speaker. But where a speaker exists, . . . the protection afforded is to the communication, *to its source and to its recipients both*." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (emphasis added) (collecting many cases); *see also, e.g., Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) ("It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."); *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (recognizing the right to "speak and listen, and then … speak and listen once more," as a "fundamental principle of the First Amendment"); *Missouri v. Biden*, -- F.4th --, No. 23-30445, 2023 WL 6425697, at *11 (5th Cir. Oct. 3, 2023) (holding that the "right to listen is 'reciprocal' to the … right to speak" and "constitutes an independent basis" for relief). Thus, injuring President Trump's ability to speak injures the First Amendment rights of over 100 million Americans who listen to him, respond to him, and amplify his message.

Like the right to speak, this right of listeners to receive President Trump's message is at its peak in the context of a political campaign, especially for the Presidency. *See Susan B. Anthony*

*List*, 573 U.S. at 162. Both the Sixth Circuit in *Ford* and the Fifth Circuit in *Brown* recognized this paramount interest. In *Ford*, the court emphasized that, if Congressman Ford were silenced, "reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance." 830 F.2d at 601. Likewise, the *Brown* court held that "[t]he urgency of a campaign … may well require that a candidate, *for the benefit of the electorate as well as himself*, have absolute freedom to discuss his qualifications." 218 F.3d at 430 (emphasis added).

The First Amendment interests of a Presidential candidate's audiences are especially pressing in the case of President Trump, who is unique as a former President, a front-running candidate for future Presidency, and the leader of a transformative political movement with an historical impact on American politics. As Justice Robert H. Jackson wrote, the President constitutes "a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear. No other personality in public life can begin to compete with him in access to the public mind through modern methods of communications." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). This is particularly true of President Trump, one of the most dominant and influential communicators in modern American history. Silencing President Trump's core political speech inflicts an incalculable First Amendment injury that directly impacts over 100 million Americans.[3]

---

[3] President Trump unquestionably has third-party standing to defend the rights of his audiences in this context. The Supreme Court is "quite forgiving" of third-party standing requirements "[w]ithin the context of the First Amendment." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). The First Amendment's overbreadth doctrine, for example, relieves the third-party plaintiff of the burden to show the usual "close relationship" and "hindrance" required by the third-party standing doctrine,

This Court gave no significant consideration to the First Amendment rights of President Trump's audiences. The Gag Order does not mention them, and the prosecution ignored them. At oral argument, when counsel for President Trump sought to assert these interests, the Court interrupted counsel and unfairly accused him of making speeches to "an audience other than me." Tr. 44 (Mr. Lauro: "And what the government is proposing here is an order not just directed against President Trump but *against the American electorate that wants to hear from President Trump under these circumstances*." The Court: "Mr. Lauro, no. I'm going to interrupt you. . . . Obviously, you have an audience other than me in mind."); *see also* Tr. 59-60 (Mr. Lauro: "And President Trump in the middle of a campaign is entitled to put the spotlight on it. The American people are entitled to understand that and understand the consequences of that." The Court: "No.").

In fact, both before issuance and in the two days since, the Gag Order has received widespread criticism on this very ground—including from political opponents and critics of President Trump who nevertheless defend his right to disseminate his messages to his audiences.

---

*id.*; instead, Article III injury is all that is required. *See id.*; *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1586 (2020) (Thomas, J., concurring) ("Litigants raising overbreadth challenges rarely satisfy either requirement ['close relationship' and 'hindrance'], but the Court nevertheless allows third-party standing.") (citing *Dombroski v. Pfister*, 380 U.S. 479, 487 (1965)); *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 860 (3d Cir. 2022) (noting that "the requirement that an impediment exist to the third party asserting his . . . own rights" does not apply when the challenged government action "substantially abridges the First Amendment rights of other parties not before the court"). Further, as the Supreme Court held in *Bantam Books Inc. v. Sullivan*, it is particularly important to allow third-party standing to vindicate First Amendment interests because "freedoms of expression … are vulnerable to gravely damaging yet barely visible encroachments" and must be protected by "the most rigorous procedural safeguards." 372 U.S. 58, 66 (1963); *see also id.* at 64 n.6 (upholding the third-party standing of book publishers to assert the rights of distributors because "[t]he distributor … is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights," whereas the seller has a "greater . . . stake" in vindicating those rights). In addition, the doctrine of third-party standing applies "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130. Here, the interference and restriction of President Trump's First Amendment rights "would result indirectly in the violation of third parties' rights," *id.—i.e.*, the rights of his audiences to receive, respond to, and amplify his speech.

*See, e.g.,* The Editors, *The Trump Gag Order Goes Too Far*, NATIONAL REVIEW (Oct. 18, 2023)

("Not only is free speech his right — it is the right of voters in the forthcoming primary and general

elections to hear it before choosing the nation's next president."); Andrew McCarthy, *The Trump*

*Gag Order Is Judicial Overkill*, NATIONAL REVIEW (Oct. 17, 2021) ("He'd have that right even if

he wasn't a political candidate; the fact that he is one heightens the court's duty to minimize the

intrusion of judicial process on the electoral process."); Isaac Arnsdorf et al., *In Trump Cases,*

*Experts Say Defendant's Rhetoric Will Be Hard To Police*, WASHINGTON POST (Aug. 23, 2023)

(quoting Barbara McQuade, a University of Michigan law professor and former U.S. attorney, as

stating, "Any judge would be very reluctant to jail a candidate for president, not only to protect

the candidate's First Amendment rights, but to permit voters access to the defendant's statements

as they decide how to cast their ballots . . .."); Jason Willick, *Go Ahead, Silence Donald Trump*,

WASHINGTON POST (Sept. 19, 2023) ("[A] gag order against Trump would represent 'the first time

that a federal judge imposed meaningful limits on the statements and freedom of a major

presidential candidate.' Not only that, but it also would represent the first time an incumbent

administration has imposed a limit on the freedom of an opposing candidate to *criticize the*

*administration he is trying to replace*.").

The refusal to consider the First Amendment rights of over 100 million Americans entails

that the Gag Order is unlikely to withstand scrutiny on appeal.

### E.   The Gag Order Imposes an Impermissible Heckler's Veto on President Trump Without Any Evidence of a Heckler.

The Gag Order's animating concern is the fear that President Trump's criticisms of the

prosecutors, witnesses, and court staff might inspire unspecified, independent *third parties* to

direct "threats" or "harassment" to those criticized by President Trump. This is the central

justification stated in the Gag Order itself. *See* Doc. 105, at 2. And the Court repeatedly emphasized

this concern during oral argument on the motion. *See, e.g.,* Tr. 41 ("[A] defendant's targeted disparagement of government officials can go from permissible criticism of those officials to encouraging harm against them. 'Will no one rid me of this meddlesome priest' comes to mind."); Tr. 44-45 (Court suggesting that President Trump's use of the word "thug" to describe prosecutors "frankly risks a real possibility of violence"); Tr. 59-60, 62, 68, 79 (similar). Like the prosecution's other concerns, these concerns about acts of "harassment" from third parties are "speculative." Tr. 62 (Government attorney: "of course this prejudice is speculative").

The Court did not hold, and the prosecution does not contend, that any of President Trump's public statements constitute "fighting words" or incitement to imminent lawless action. *See, e.g., Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (noting that "incitement—statements directed at producing imminent lawless action, and likely to do so," is not protected by the First Amendment) (cleaned up) (quoting *Brandenburg*, 395 U.S. at 447). Nor could they. Accordingly, the Gag Order restricts First Amendment-protected speech based on a speculative *reaction* to that speech by independent third parties. *See* Doc. 105, at 2.

This is a quintessential heckler's veto, which is anathema to the First Amendment. "Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence." *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (opinion of Fortas, J.). Where the evidence "showed no more than that the opinions which [the speakers] were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection," the Supreme Court held that the anticipated reaction of the audience—even if unruly or violent—could not justify silencing the speaker: "[T]he compelling answer is that constitutional rights may not be denied simply because

of hostility to their assertion or exercise." *Cox v. Louisiana*, 379 U.S. 536, 551 (1965) (cleaned up) (citing *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963), and *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963)); *see also, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("Speech cannot be . . . punished or banned, simply because it might offend a hostile mob."); *Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972) ("As to the possibility of there being hostile audience members causing violence, the law is quite clear that such considerations are impermissible in determining whether to grant permits" to speak). Even if unidentified third parties might react to President Trump's statements with "disorder and violence," *Brown*, 383 U.S. at 133 n.1—which no evidence supports—that "fact" alone cannot justify a prior restraint.

### F.    The Gag Order Relies on Supreme Court Cases Protecting Criminal Defendants' Civil Rights to Silence the Criminal Defendant Here.

To support the Gag Order, the Court cited two cases: *Sheppard v. Maxwell*, 384 U.S. 333 (1966), and *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984). Doc. 105, at 1. These cases, however, justify restrictions on speech about criminal proceedings for the purpose of protecting the *criminal defendant's* right to a fair trial under the Sixth Amendment and the Due Process Clause. *Sheppard* focused entirely on protecting the rights of the criminal defendant. It addressed how to balance the free-speech rights of *others* to avoid violating the *defendant's* fundamental right to a fair trial. *Sheppard* concerned "the trial judge's failure to protect Sheppard sufficiently from the massive, pervasive and prejudicial publicity that attended his prosecution." 384 U.S. at 335. It decried prejudicial communications from prosecutors to the media and the carnival-like atmosphere of media pervading the trial as invading the defendant's Sixth Amendment and Due Process rights. *Id.* at 338-348. It "insisted that *no one be punished for a crime* without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and

tyrannical power.'" *Id.* at 350 (quoting *Chambers v. State of Florida*, 309 U.S. 227, 236-237 (1940)). It held that "the presence of the press at judicial proceedings must be limited when it is apparent that *the accused* might otherwise be prejudiced or disadvantaged." *Id.* at 358 (emphasis added). It emphasized that the trial court should have protected "the accused," *id.*, by controlling the *government's* communications with the media: "the judge should have further sought to alleviate this problem by imposing control over the statements made to the news media by counsel, witnesses, and *especially the Coroner and police officers*," *id.* at 360 (emphasis added). The dominating concern was to protect *Sheppard*'s right to a fair trial: "*Sheppard's right to a trial free from outside interference* would have been given added protection without corresponding curtailment of the news media." *Id.* at 362 (emphasis added). "Due process requires that *the accused* receive a trial by an impartial jury free from outside influences. . . . [T]he trial courts must take strong measures to ensure that the balance is never weighed against *the accused*." *Id.* (emphasis added).

*Seattle Times*, though it concerned a restriction on civil discovery, emphasized the same point—that restrictions on free speech relating to criminal cases are designed to protect the rights of the *accused*. There, the Court stated: "For instance, on several occasions this Court has approved restriction on the communications of trial participants where necessary *to ensure a fair trial for a criminal defendant*." 467 U.S. at 32 n.18 (citing *Nebraska Press Ass'n*, 427 U.S. at 563). And *Nebraska Press Association*, which *Seattle Times* cited for this point, is even more emphatic; it repeatedly emphasizes that the only thing warranting restrictions on free-speech rights in the criminal process are the Sixth Amendment and Due Process rights of the *criminal defendant*. *See Nebraska Press Ass'n*, 427 U.S. at 551 ("In essence, the right to jury trial guarantees to the *criminally accused* a fair trial by a panel of impartial, 'indifferent' jurors.") (citation omitted); *id.*

("[W]hen the case is a 'sensational' one tensions develop between *the right of the accused* to trial by an impartial jury and the rights guaranteed others by the First Amendment."); *id.* at 552 ("In *Sheppard v. Maxwell*, the Court focused sharply on the impact of pretrial publicity and a trial court's duty to protect *the defendant's* constitutional right to a fair trial."); *id.* at 553 ("Due process requires that *the accused* receive a trial by an impartial jury free from outside influences."); *id.* at 555 (a trial judge's actions "may well determine whether *the defendant* receives a trial consistent with the requirements of due process"); *id.* at 556 (addressing "restrictive orders entered to protect *a defendant's* right to a fair and impartial jury") (all emphases added). *Nebraska Press Association* properly framed the question as the conflict between the *accused*'s Sixth Amendment rights and the First Amendment rights of others, especially news media: "The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other. In this case, the petitioners would have us declare the right of *an accused* subordinate to their right to publish in all circumstances." *Id.* at 561.

For these reasons, in *Ford*, the Sixth Circuit categorically rejected attempts to muzzle the *defendant* based on cases protecting the *defendant's* civil rights:

> It is true that permitting an indicted defendant like Ford to defend himself publicly may result in overall publicity that is somewhat more favorable to the defendant than would occur when all participants are silenced. This does not result in an "unfair" trial for the government, however. *It is the individual defendant to whom the Sixth Amendment guarantees a fair trial.* It is the public to whom the First Amendment guarantees reasonable access to criminal proceedings. *And it is individuals, not the government, to whom First Amendment interests attach.* To the extent that publicity is a disadvantage for the government, the government must tolerate it. The government is our servant, not our master.

830 F.2d at 600 (emphasis added). This logic applies with special force here, where President Trump faces trial in a venue that is already heavily tilted against him. In the most recent election,

District of Columbia residents voted against President Trump in overwhelming margins.[4] The District of Columbia has been subject to pervasive media coverage of the events of January 6, 2021, which the Special Counsel has outrageously linked with this indictment, even though President Trump is not charged with any legal responsibility for those events. President Trump's indictment and the progress of this case have been subject to wall-to-wall media coverage in the District of Columbia, which has been overwhelmingly negative for President Trump, and driven, in substantial part, by apparent leaks from the prosecution. Not surprisingly, polls indicate that almost *two thirds* of D.C. residents have pre-judged President Trump's guilt—a number that is "well above the national average."[5]  In these circumstances, the notion—rejected by the Court— that extraordinary restrictions on *President Trump*'s speech are necessary to ensure that *the prosecution* can get a fair trial in the District of Columbia is meritless to say the least.

### G.   The Gag Order Restricts Statements About Public Figures, Who Are Entitled to Minimal Protection from Public Criticism Under the First Amendment.

The Gag Order shields from *any* criticism high-level public officials and public figures. Doc. 105, at 3. These include the Special Prosecutor and his team, senior government officials who have volunteered to prosecute one of the highest-profile criminal cases in American history, and thus have "thrust" themselves "into the vortex of this public issue." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 352 (1974). These also include possible witnesses against President Trump, such as Vice President Pence, Attorney General Barr, and General Milley, who are avowed political opponents of President Trump from the very highest echelons of government—all of whom have

---

[4]   *See, e.g.,* Washington, D.C. Presidential Results, POLITICO (Jan. 6, 2021), *at* https://www.politico.com/2020-election/results/washington-dc/ (reporting that 93 percent of voters in the District of Columbia voted against President Trump).

[5] Ankush Khardori, *Some Free Legal Advice for Donald Trump, From the Jury Experts*, POLITICO (Oct. 13, 2023), *at* https://www.politico.com/news/magazine/2023/10/13/trump-jurors-dc-trial-00121184 (noting that "[a] recent poll found that 64 percent of D.C. residents believe Trump is guilty — well above the national average").

publicly criticized President Trump for years, including writing whole books about him to profit from their public criticism. *Id.*

Criticism of such public officials lies "at the very center of the constitutionally protected area of free discussion" and so such criticisms "must be free, lest criticism of government itself be penalized." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). Likewise, the Special Prosecutor and his team are public officials, subject to criticism in a free society. The Ninth Circuit, for example, has said that the discussion of an individual's "activities as a prosecutor" renders him a public official. *Crane v. Ariz. Republic*, 972 F.2d 1511, 1525 (9th Cir. 1991). Likewise, the head of a federal task force is a public official. *See id.* at 1524. The Minnesota Supreme Court has held that a county attorney is a public official. *Diesen v. Hessburg*, 455 N.W.2d 446, 450 (Minn. 1990). And the Georgia Supreme Court held that a county's public defender for misdemeanor crimes is a public official. *ACLU, Inc. v. Zeh*, 864 S.E.2d 422, 437-38 (Ga. 2021). Even an assistant state's attorney is likely a public official that courts may not shield from criticism. *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 206 (1st Cir. 2006) (noting the dearth of authority but concluding that "[w]hat little case law there is suggests that such a person might be a public official").

### H.    Prior Restraints Must Be Clear and Specific, and the Gag Order Is Unconstitutionally Vague.

The Gag Order suffers from another fatal defect—unconstitutional vagueness. The Supreme Court imposes exacting standards of clarity on prior restraints, because they are "the most serious and the least tolerable infringement on First Amendment rights," and "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Ass'n*, 427 U.S. at 559, 562. In holding that the gag order at issue in *Nebraska Press Association* was "too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights," *id.* at 568, the Supreme Court cited a series of cases applying the strictest possible scrutiny to questions of

vagueness in speech restrictions. *See, e.g., Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976) ("The general test of vagueness applies with particular force in review of laws dealing with speech. Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech.") (modifications omitted); *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) ("Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal. . . . Where First Amendment rights are involved, an even 'greater degree of specificity' is required."); *NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.") (all cited in *Nebraska Press Ass'n*, 427 U.S. at 568).

Under these heightened standards, the Gag Order is unconstitutionally vague in multiple respects. First, the central operative verb in the prohibition, "target," is vague. *See* Doc. 105, at 3 (prohibiting "the parties and their counsel . . . from making any public statements . . . that *target*" a series of persons). The verb "target" has a wide range of possible meanings in this context. To "target" means "to make a target of," whereas the noun "target" may mean "a mark to shoot at," "something or someone marked for attack," "a goal to be achieved," "an object of ridicule or criticism," or "something or someone to be affected by an action or development," among several other meanings. *Target*, Merriam-Webster Online, at https://www.merriam-webster.com/dictionary/target. Thus, public statements that "target" the listed persons could include (1) *any* statement that refers to them in any way (*i.e.*, any "mark to shoot at"), *id.*; (2) any statements that "attack" them in any way—where the question whether a statement "attacks" someone raises its own vagueness problems, *id.*; (3) any statement that subjects any person to "ridicule or criticism" of any kind, *id.*—where again, the question whether a statement constitutes "ridicule" or "criticism" raises its own host of vagueness problems; and/or (4) any statement that

might "affect" a person in any way (*i.e.*, "someone to be affected by an action"), *id.*; among many other possible meanings. This is textbook vagueness. *Compare, e.g., Nebraska Press Ass'n*, 427 U.S. at 568 (holding that the word "implicative" in a pretrial gag order was unconstitutionally vague). Moreover, under the Supreme Court's exacting vagueness scrutiny, the Court must *not* presume that a narrower meaning was intended—which entails that the Gag Order is also unconstitutionally overbroad, as it must be construed to prevent *any* statement of *any* kind referring to any of these people in any way. *See Button*, 371 U.S. at 432 ("If the line drawn by the decree between the permitted and prohibited activities of the NAACP, its members and lawyers is an ambiguous one, *we will not presume that the statute curtails constitutionally protected activity as little as possible*. For standards of permissible statutory vagueness are strict in the area of free expression.") (emphasis added).

The Gag Order suffers from other vagueness problems as well. It applies to all "interested parties," which (it clearly implies) include parties *in addition to* "the parties and their counsel." Doc. 105, at 3 ("All interested parties in this matter, including the parties and their counsel, are prohibited. . . ."). An "interested" party is one "affected or involved" by the proceedings. *Interested*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/interested (defining "interested" as "being affected or involved: *interested* parties"). Thus, the Gag Order might apply to everyone "affected" by or "involved" in the case—which could possibly include the media covering it, the potential witnesses, the prosecutors, the Department of Justice, President Trump's attorneys in other cases, the Trump campaign, the Biden campaign, and virtually every American voter.

Likewise, the Gag Order's reference to "any reasonably foreseeable witness" and "the substance of their testimony" is incurably vague. The discovery in this case comprises over 10

million pages, and the prosecution has not disclosed a witness list. It is anyone's guess which witnesses may be "reasonably foreseeable" at this stage. Unless and until the witnesses are called, President Trump will have to guess what the "substance of their testimony" may involve—but the Gag Order binds him *now*. The vagueness doctrine prevents the Court from enforcing these standards *ex post*, with the benefit of hindsight, or imposing the Court's standardless judgment as to which witnesses are "reasonably foreseeable" after the fact. Instead, when it comes to the Gag Order's scope, "men of common intelligence must necessarily guess at its meaning," rendering it fatally vague. *Hynes*, 425 U.S. at 620 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)).

The Gag Order's carve-outs exacerbate the vagueness problems by imposing new layers of confusion upon the Order. Doc. 105, at 3. The carve-outs seem to authorize "criticizing the government generally, including the current administration or the Department of Justice," but that does not seem to include criticizing the most relevant figure of the Department of Justice, *i.e.*, Jack Smith. *Id.* The carve-outs supposedly allow President Trump to state "that his prosecution is politically motivated," but the Gag Order prevents him from "targeting" the specific actors *involved* in his prosecution, so it prevents him from giving any specific or detailed *justification* for this claim. *Id.* Where claiming that the prosecution is politically motivated ends, and "targeting" the prosecutors against President Trump begins, is anyone's guess. The carve-outs apparently authorize "statements criticizing the platforms or policies of . . . former Vice President Pence," *id.*, but the "platforms or policies" of candidates like Pence (and Biden) are deeply intertwined with their views on *election integrity*, with specific reference to the 2020 election. When does criticism of Mike Pence's "platforms or policies" become a statement "that target[s] . . . the substance of [his] testimony," *id.*, when questions about the integrity of the 2020 election are "central" to the

2024 Presidential campaign? Liptak, *supra*. Persons of ordinary intelligence must guess at the answers to these questions.

Again, attempting to adopt a narrowing construction of the Gag Order's staggeringly broad, vague language cannot cure it. *Button*, 371 U.S. at 432. Therefore, the Court should stay its application pending appeal.

**I.    The Gag Order Gives No Meaningful Consideration to the Availability of Less Restrictive Means to Protect the Judicial Process.**

Finally, the Gag Order gives no meaningful consideration to alternative, less restrictive measures, including a narrower order. Doc. 105, at 1-3. The prosecution submitted no evidence on the efficacy of such alternative measures, and the Court made no specific findings on them. *See id.* Indeed, the Court failed to provide any explanation for why the specific, extraordinarily broad, scope of the Gag Order was required to serve the asserted interest, and why no narrower formulation would suffice.

This was error. "It is axiomatic that the limitation on First Amendment freedoms must be 'no greater than is essential to the protection of the particular governmental interest involved.'" *Brown*, 218 F.3d at 429 (quoting *Procunier v. Martinez*, 416 U.S. 396 (1974)); *see also Seattle Times Co. v. Rinehart*, 467 U.S. 20, 32 (1984) (considering "whether the limitation of First Amendment freedoms is no greater than is necessary or essential to the protection of the particular governmental interest involved").

Thus, the Supreme Court cases addressing such restraints repeatedly emphasize the necessity of considering alternative means, including non-speech-restrictive means. For example, to the extent a restriction is intended to protect the defendant's right to a fair trial (which, again, is a right belonging to the defendant), numerous options are available. The Supreme Court in *Sheppard* emphasized that a lower court's failure to consider these other options is error:

"Sheppard was not granted a change of venue to a locale away from where the publicity originated; nor was his jury sequestered. . . . On the contrary, the Sheppard jurors . . . were allowed to go their separate ways outside of the courtroom, without adequate directions not to read or listen to anything concerning the case." 384 U.S. at 352–53. The trial judge in *Sheppard* erred in failing to adopt (or even consider) such alternatives: "Since he viewed the news media as his target, the judge never considered other means that are often utilized to reduce the appearance of prejudicial material and to protect the jury from outside influence. We conclude that these procedures would have been sufficient to guarantee Sheppard a fair trial." *Id.* at 358. Thus, "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered." *Id.* at 363.

*Nebraska Press Association*, likewise, placed heavy emphasis on the necessity of considering such less speech-restrictive measures. 427 U.S. at 562 (considering "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity"). As noted above, *Nebraska Press Association* emphasized the importance of evidence and specific findings of fact to support the trial court's conclusions on this very point: "We find little in the record that goes to another aspect of our task, determining whether measures short of an order retraining all publication would have insured the defendant a fair trial. . . . [T]he trial court made no express findings to that effect; the Nebraska Supreme Court referred to the issue only by implication." *Id.* at 563. Citing *Sheppard*, the Supreme Court emphasized the wide range of alternative measures:

> Most of the alternatives to prior restraint of publication in these circumstances were discussed with obvious approval in *Sheppard v. Maxwell*: (a) change of trial venue to a

place less exposed to the intense publicity. . .; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors . . . to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths.

*Id.* at 563–64. The failure to consider, receive evidence on, and make findings relating to such alternative measures was fatal to the trial court's gag order: "There is no finding that alternative measures would not have protected [defendant's] rights. . . . Moreover, the record is lacking in evidence to support such a finding." *Id.* at 565; *see also Ford*, 830 F.2d at 600.

Here, the Gag Order gave no specific consideration of such alternative measures such as (1) change of venue, (2) postponement of trial, (3) searching voir dire, (4) clear jury instructions, and (5) jury sequestration, among other possibilities. Doc. 105, at 1-3. No evidence was cited, none was presented, and no findings were made. *Id.* In fact, at oral argument, the Court expressed its unwillingness to consider such alternative measures in this context. *Sheppard* held that the *principal* method of addressing pretrial publicity, and by far the least restrictive, is granting a continuance of the trial: "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should *continue the case until the threat abates*." 384 U.S. at 362–63 (emphasis added); *see also Nebraska Press Ass'n*, 427 U.S. at 564 (raising "postponement of the trial to allow public attention to subside" as an alternative means).

Yet when President Trump's counsel proposed this very alternative, the Court categorically refused to consider it: "This trial will not yield to the election cycle and we're not revisiting the trial date." Tr. 20-21. Nor did the Court meaningfully consider any other means that would be less restrictive of President Trump's core political speech. This was error.

**II.      The Remaining Equitable Factors Overwhelmingly Favor a Stay Pending Appeal.**

Given President Trump's likelihood of success under the First Amendment, *see supra* Part

I, the other equitable factors—concerning irreparable injury to President Trump, the balancing of

harms, and the public interest—overwhelmingly favor a stay pending appeal.

First, President Trump's irreparable injury is established beyond doubt. "The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, a showing of likelihood of success

on a First Amendment claim necessarily establishes irreparable injury. *Phelps–Roper v. Nixon*,

545 F.3d 685, 690 (8th Cir. 2008) (concluding that if the movant "can establish a sufficient

likelihood of success on the merits of her First Amendment claim, she will also have established

irreparable harm as the result of the deprivation").

As for the balancing of harms and the public interest, "[i]njunctions protecting First

Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics

Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Furthermore, the balance of hardships and public

interest "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435

(2009), and "it is always in the public interest to prevent violation of a party's constitutional

rights," *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377,

400 (6th Cir. 2001). As a result, the demonstration of an ongoing violation of First Amendment

rights dictates that a stay should be entered. *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022)

("[I]n First Amendment cases, only one question generally matters to the outcome: Have the

plaintiffs shown a likelihood of success on the merits of their First Amendment claim?") (citing

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020)).

Here, President Trump is likely to prevail on appeal in his claim that the Gag Order violates

his First Amendment rights. This showing necessitates that (1) President Trump will suffer

irreparable injury absent a stay, (2) the prosecution will suffer no cognizable injury from a stay because it has no valid interest in violating President Trump's First Amendment rights, and (3) the public interest overwhelmingly favors a stay vindicating President Trump's First Amendment rights—*especially* where the First Amendment right to *listen* of over 100 million Americans is also at stake. The Court should grant a stay pending appeal.

## **CONCLUSION**

For the reasons stated, the Court should stay the Gag Order, Doc. 105, pending the conclusion of all appellate proceedings challenging it. The Court should also immediately enter a temporary administrative stay to remain in effect pending ruling by this Court and (if necessary) the Court of Appeals and/or the Supreme Court on President Trump's motion(s) for stay pending appeal. *See, e.g., In re Sealed Case No. 99-3091*, 192 F.3d 995, 998-99 (D.C. Cir. 1999) (per curiam); *In re Sealed Case*, 148 F.3d 1079, 1080 (D.C. Cir. 1998) (per curiam); *United States v. Ford Motor Co.*, 574 F.2d 534, 538 (D.C. Cir. 1978) (all granting such administrative stays); *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020) ("Entering temporary administrative stays so that a panel may consider expedited briefing in emergency cases is a routine practice in our court.").

If the Court does not enter a temporary administrative stay to permit orderly consideration of this and any subsequent stay motion(s), President Trump respectfully requests that this Court issue its ruling on this stay motion by Tuesday, October 24, 2023, after which President Trump intends to seek an emergency stay from the U.S. Court of Appeals for the D.C. Circuit. Such expedited consideration is highly warranted in a case raising First Amendment questions of enormous consequence. *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## **CERTIFICATE OF CONFERRAL**

Counsel for President Trump conferred with counsel for the prosecution, who advise the

government opposes the relief requested herein.


Dated: October 20, 2023                    Respectfully submitted,


Todd Blanche, Esq. (PHV)                   */s/John F. Lauro*
toddblanche@blanchelaw.com                 John F. Lauro, Esq.
Emil Bove, Esq. (PHV)                      D.C. Bar No. 392830
Emil.Bove@blanchelaw.com                   jlauro@laurosinger.com
BLANCHE LAW                                Gregory M. Singer, Esq. (PHV)
99 Wall St., Suite 4460                    gsinger@laurosinger.com
New York, NY 10005                         Filzah I. Pavalon, Esq. (PHV)
(212) 716-1250                             fpavalon@laurosinger.com
                                           LAURO & SINGER
                                           400 N. Tampa St., 15th Floor
                                           Tampa, FL 33602
                                           (813) 222-8990
                                           *Counsel for President Trump*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

## PRESIDENT TRUMP'S MOTION TO DISMISS FOR
## SELECTIVE AND VINDICTIVE PROSECUTION

President Donald J. Trump respectfully submits this motion to dismiss the charges on the basis of selective and vindictive prosecution.

The core conduct alleged in the indictment relating to the presentation of alternate electors has a historical basis that dates back to 1800 and spans at least seven other elections. There are no other prosecutions in American history relating to these types of activities. The allegations in the indictment involve constitutionally authorized activities by President Trump as Commander In Chief, as well as speech and expressive conduct protected by the First Amendment.

Given this context, it is no surprise that in the months following the 2020 election, senior government officials rejected an investigation of President Trump as unfounded and potentially unconstitutional. However, biased prosecutors pursued charges despite the evidence, rather than based on it, with one prosecutor violating DOJ rules and ethical norms by forecasting the investigation in a television interview on *60 Minutes*. Even the Attorney General felt "boxed in" by the onslaught. Unable to address criticism from President Trump through lawful means—while facing public pressure from a House committee investigation not confined by a burden of proof or the same due process standards, *i.e.*, the same congressional investigation that failed to preserve a

huge amount of exculpatory evidence—Joe Biden pressured DOJ to pursue the nakedly political indictment in this case months before the FBI had even opened an investigation.

Less than a week before President Trump announced his candidacy for the Presidency in the 2024 election, Biden used the White House itself to tell anyone listening that he was "making sure" that President Trump "does not become the next President again."  Three days after President Trump formally announced his candidacy, the Special Counsel was put in place as part of a flawed effort to insulate Biden and his supporters from scrutiny of their obvious and illegal bias.

These actions, which are demonstrated by, *inter alia*, Biden's public statements and reports from the *New York Times* and *Washington Post* based on leaks from participants in the investigation, require further inquiry and dismissal of the indictment.

## **RELEVANT FACTS**

In February and March 2021, according to the *Washington Post*, the DOJ and FBI rejected aggressive proposals by line prosecutors to target President Trump, including a "wide-ranging effort . . . to trace who had financed the [allegedly] false claims of a stolen election and paid for the travel of rallygoers-turned rioters," targeting "the finances of Trump backers," examining "slates of electors for Trump that his Republican allies had submitted to Congress and the Archives," and investigating "documents that Trump used to pressure Pence not to certify the election for Biden."  Ex. 1.  The officials who rejected these proposals expressed concerns about, *inter alia*, "First Amendment-protected activities," "uncomfortable analog[ies]" to other protest activities, and the fact that "investigating public figures demanded a high degree of confidence, because even a probe that finds no crime can unfairly impugn them."  *Id.*  Nevertheless, following a March 2021 *60 Minutes* interview in which a then-acting United States Attorney expressed his "personal[] belie[f]" that the "evidence . . . probably meets" the elements of a seditious conspiracy

charge, the prosecutor "heard from a close Justice Department ally that [the Attorney General] and his deputies now felt boxed into the seditious conspiracy charges—or to tough questions if they didn't bring them." *Id.*

In November 2021, another prosecutor—who is now one of the Senior Assistant Special Counsels assigned to this case—asked the FBI to issue grand jury subpoenas targeting associates of President Trump. *See id.* "[A]ccording to people familiar with the meeting," the proposal was met with "flat rejection." *Id.* Undeterred by the FBI's determination that the subpoenas were inappropriate, the prosecutor pitched the same idea to the U.S. Postal Inspection Service. Around this time, "according to a person familiar with the exchange," an investigator working for the House committee investigating events related to January 6, 2021 "alerted" the U.S. Attorney's Office for the District of Columbia to "a few details" regarding President Trump in connection with the House committee's investigation. *Id.* Following this early coordination, the committee failed to preserve critical information regarding its activities, such as interview materials, records identifying witnesses, and intelligence and other law enforcement information. *See* Doc. 99 at 2-3.

In April 2022, the *New York Times* reported that, "as recently as late last year, Mr. Biden confided to his inner circle that he believed former President Donald J. Trump was a threat to democracy and should be prosecuted, according to two people familiar with his comments." Ex. 2. The article also attributed the following to Biden: "he has said privately that he wanted [the Attorney General] to act less like a ponderous judge and more like a prosecutor who is willing to take decisive action . . . ." *Id.* That same month, the FBI reportedly "open[ed] an investigation of the electors scheme . . . , about 15 months after" the January 6, 2021 protests at the Capitol. Ex. 1.

On November 9, 2022, Biden was much less private.  At a press conference, Biden stated: "we just have to demonstrate that he will not take power—if we—if he does run.  I'm making sure he, under legitimate efforts of our Constitution, does not become the next President again."[1]  On November 15, 2022, President Trump announced that he would run for a second term as President.  Three days later, Biden's Justice Department appointed Jack Smith to oversee this case.  In the press release appointing Mr. Smith, the Attorney General stated that the appointment was necessary because of "recent developments, including the former President's announcement that he is a candidate for President in the next election, and the sitting President's stated intention to be a candidate as well."[2]

On June 8, 2023, the Special Counsel's Office filed an indictment in the Southern District of Florida.  President Trump pleaded not guilty to those charges on June 13, 2023.  On July 5, 2023, President Trump argued on his Truth account that "MASSIVE PROSECUTORIAL MISCONDUCT IS CURRENTLY TAKING PLACE IN AMERICA.  THE WEAPONIZATION OF LAW ENFORCEMENT CANNOT BE ALLOWED TO HAPPEN."  Ex. 3.  On July 12, President Trump publicly criticized "Crooked Joe Biden's Targeted, Weaponized DOJ & FBI." Ex. 4.

Following President Trump's not-guilty plea in Florida and his public criticisms, the Special Counsel's Office filed the indictment in this case on August 1, 2023.  As we have explained in other filings, the allegations in the indictment focus—to an unprecedented extent—on acts by

---

[1] *Remarks by President Biden in Press Conference*, The White House (Nov. 9, 2022, 4:15 pm), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/11/09/remarks-by-president-biden-in-press-conference-8/.

[2] *Appointment of Special Counsel*, U.S. Dep't of Justice (Nov. 18, 2022), https://www.justice.gov/opa/pr/appointment-special-counsel-0.

President Trump in connection with his "official responsibility" as the leader of this Nation, Doc.

74 at 8, as well as protected speech and expressive conduct protected by the First Amendment,

which is discussed in our motion to dismiss on constitutional grounds

## LEGAL STANDARDS

### I.      Selective Prosecution

"For almost one hundred years, the federal courts have recognized that it is unconstitutional

to administer the law 'with an evil eye and an unequal hand so as practically to make unjust and

illegal discrimination between persons in similar circumstances. . . .'" *United States v. Napper*,

574 F. Supp. 1521, 1523 (D.D.C. 1983) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)).

"If the Executive selectively prosecutes someone based on impermissible considerations, the equal

protection remedy is to dismiss the prosecution . . . ." *In re Aiken County*, 725 F.3d 255, 264 n.7

(D.C. Cir. 2013).  There are two elements to a selective prosecution claim.  The defendant must

show that the challenged prosecution decision had a "discriminatory effect" and a "discriminatory

purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

### II.     Vindictive Prosecution

The Due Process Clause prohibits prosecutors from 'upping the ante' by filing increased

charges in order to retaliate against a defendant for exercising a legal right. *United States v. Slatten*,

865 F.3d 767, 798-99 (D.C. Cir. 2017) (quoting *Blackledge v. Perry*, 417 U.S. 21, 27-28 (1974)).

"[I]n the pre-trial context, a defendant must provide additional facts sufficient to show that 'all of

the circumstances, when taken together, support a realistic likelihood of vindictiveness.'" *Slatten*,

865 F.3d at 799 (quoting *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987)).  "[A]

prosecutorial decision to increase charges after a defendant has exercised a legal right does not

alone give rise to a presumption in the pretrial context, but it is surely a fact relevant to the analysis." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (cleaned up).

## ARGUMENT

Public statements by Biden and news reports sourced to government personnel with direct knowledge of the relevant events make out *prima facie* cases of selective prosecution and vindictive prosecution.

### I.    The Prosecutors Have Behaved in a Discriminatory and Unconstitutionally Selective Fashion

With respect to selective prosecution, the relevant theory of this case is that it is illegal to dispute the outcome of an election and work with others to propose alternate electors.  As we made clear in our motion to dismiss based on fair-notice principles, which we incorporate herein, the track record of similar, unprosecuted, efforts dates back to 1800 and includes at least seven other elections.  In light of the extensive history, it is not surprising that at least three Supreme Court Justices have suggested that the Electoral Count Act contemplates Congress having to "select[] among conflicting slates of electors."  *Bush v. Gore*, 531 U.S. 98, 127 (2000) (Stevens, J., dissenting).  What is surprising—and is likely to have an impermissibly "discriminatory effect" in this case and the 2024 election—is the efforts by the Special Counsel's Office to prosecute President Trump based on protected speech relating to the very same strategy.

This prosecution is also driven by an unconstitutional discriminatory purpose: Biden's publicly stated objective is to use the criminal justice system to incapacitate President Trump, his main political rival and the leading candidate in the upcoming election.  *See Napper*, 574 F. Supp. at 1523 ("[A] defendant may not be selectively prosecuted on the basis of such considerations as religion, race or the desire to deter the proper exercise of constitutional rights.").  No amount of "follow the evidence" course correction by the Attorney General or the Special Counsel can mask

6

the driving force behind this case, especially where there remain unresolved questions about responsibility for missing evidence collected by a House committee that was "[p]rivately" coordinating with prosecutors beginning in at least late 2021.  *See* Ex. 1; Doc. 99 at 2-3.

"[T]he Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's political beliefs."  *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021). In *United States v. Diggs*, the D.C. Circuit reasoned that "a concern for the integrity of the legislative process prompts careful inquiry into a congressman's claim of discriminatory prosecution," but found the defendant's evidence to be lacking.  613 F.2d 988, 1004 (D.C. Cir. 1979).  The evidence in *Diggs* was limited to the "broad assertion" of a conflict with the "then-incumbent administration."  *Id.* at 1004 n.92.  Here, in contrast, after prosecutors who are now part of the prosecution team were rebuffed while shopping the inappropriate investigation around to the FBI and the Postal Service, Biden told his advisors that President Trump "should be prosecuted," Ex. 2, urged the Attorney General to "take decisive action," *id.*, and declared from the State Dining Room of the White House that he was "making sure" that President Trump "does not become the next President again."[3]

"What the government has done here is to undertake to suppress a viewpoint it does not wish to hear under the guise of enforcing a general regulation prohibiting disturbances on government property."  *United States v. Crowthers*, 456 F.2d 1074, 1079 (4th Cir. 1972); *see also United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) ("[J]ust as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a

---

[3] *Remarks by President Biden in Press Conference, supra* note 1.

member of a group unpopular with the government.").  As a result, there is, at the very minimum, a *prima facie* case of selective prosecution.

## II.    The Sequence of Events Demonstrates Vindictiveness

Parallel facts support President Trump's vindictive prosecution argument.  This case, urged by Biden when many prosecutors and agents appropriately saw no basis for it, is a straightforward retaliatory response to President Trump's decisions as Commander In Chief in 2020, his exercising his constitutional rights to free speech and to petition for the redress of grievances, and his decision to run for political office.

Without question, this is a "high-profile prosecution with international ramifications no less," which has a "far greater potential to give rise to a vindictive motive."  *United States v. Slatten*, 865 F.3d 767, 799-800 (D.C. Cir. 2017).  That motive is manifest.  President Trump criticized the process and results of the 2020 election.  He criticized Biden and his family before, during, and after that election, including with respect to misconduct and malfeasance in connection with the Ukrainian oil and gas company known as Burisma,[4] China's State Energy HK Limited,[5] and Russian oligarchs such as Yelena Baturina.[6]  President Trump is now the leading candidate in

---

[4] *See Hunter Biden, Burisma, and Corruption: The Impact on U.S. Government Policy and Related Concerns*, U.S. Senate Comm. on Homeland Security and Government Affairs and U.S. Senate Comm. on Finance (Sept. 22, 2020), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/HSGAC_Finance_Report_FINAL.pdf, at 3.

[5] *See Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes*, House of Rep. Comm. on Oversight and Accountability (May 10, 2023), https://oversight.house.gov/wp-content/uploads/2023/05/Bank-Memorandum-5.10.23.pdf, at 5, 9.

[6] *See Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes*,  House of Rep. Comm. on Oversight and Accountability (Aug. 9, 2023), https://oversight.house.gov/wp-content/uploads/2023/08/Third-Bank-Records-Memorandum_Redacted.pdf, at 2.

the 2024 election, and raises all these concerns in that context as well.  Likewise, President Trump also criticized the Special Counsel's Office after charges were filed against him in Florida.  *See* Exs. 3 and 4.  Following those criticisms, and after President Trump exercised his constitutional right to plead not guilty in Florida, the prosecutors added additional charges in this District.  The record is more than sufficient to support a presumption of vindictiveness.

### III.    A Hearing Is Necessary

At the very least, even if the Special Counsel's Office makes self-serving arguments in an effort to articulate a defense of the prosecutors' charging decision, where there is none, a hearing is necessary to give President Trump an opportunity to demonstrate that their proffered evidence is pretextual.  "[T]he defenses of selective prosecution and vindictive prosecution both require the defendant to probe the mental state of the prosecutors.  Requiring the defendant to prove more than a colorable claim before compelling discovery might prematurely stifle a legitimate defense of vindictive prosecution for lack of evidence."  *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990) (cleaned up).  The standard "necessarily is lower than the 'clear evidence' standard required for dismissal of the indictment."  *United States v. Hsia*, 24 F. Supp. 2d 33, 49 (D.D.C. 1998).  Here, at minimum, Biden's statements from the White House and leaked accounts of flaws in the underlying investigation require additional fact finding before these arguments can be resolved.

9

## **CONCLUSION**

For the foregoing reasons, President Trump respectfully submits that the indictment should be dismissed on the basis of selective and vindictive prosecution or, in the alternative, the Court should hold a hearing to develop the record regarding due process violations by the Special Counsel's Office.

Dated: October 23, 2023                          Respectfully submitted,

                                                 */s/ Todd Blanche*
John F. Lauro, Esq.                              Todd Blanche, Esq. (PHV)
D.C. Bar No. 392830                              ToddBlanche@blanchelaw.com
jlauro@laurosinger.com                           Emil Bove, Esq. (PHV)
Gregory M. Singer, Esq. (PHV)                    Emil.Bove@blanchelaw.com
gsinger@laurosinger.com                          BLANCHE LAW PLLC
LAURO & SINGER                                   99 Wall St., Suite 4460
400 N. Tampa St., 15th Floor                     New York, NY 10005
Tampa, FL 33602                                  (212) 716-1250
(813) 222-8990

*Counsel for President Donald J. Trump*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 23, 2023, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via

transmission of Notices of Electronic Filing.


*/s/ Todd Blanche*
Todd Blanche

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

<u>**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO STAY**</u>

The Court has issued a narrow order (ECF No. 105, "Order") under Local Criminal Rule 57.7(c) that strikes a careful balance between the First Amendment rights of the defendant and the need to safeguard the integrity of the proceedings, including by protecting certain trial participants from intimidation, harassment, and threats. These narrow restrictions were needed, the Court found (*id.* at 2), because the defendant has a demonstrated history of using inflammatory language to target certain individuals in a way that "pose[s] a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." The Order leaves the defendant entirely free (*id.* at 3) to assert his innocence, claim that his prosecution is politically motivated, criticize the platforms and policies of his political opponents, and level all manner of criticism at various institutions and individuals, including the incumbent president and the Department of Justice. But, like every other criminal defendant, what the defendant may not do is publicly target certain trial participants in order to "vilify and implicitly encourage violence against public servants" or to "launch a pretrial smear campaign against . . . foreseeable witnesses." ECF No. 103 at 83-84. Because such targeted "statements pose sufficiently grave threats to the integrity of the

proceedings that cannot be addressed by alternative means," ECF No. 105 at 2-3, the Court found

the Order both necessary to advance a compelling interest and narrowly tailored, ECF No. 103 at

82.

 The defendant has moved to stay that Order pending appeal, insisting that he is entitled to

target trial participants.  ECF No. 110.  But because he has failed to show either a substantial

likelihood of success on the merits, or that the public interest weighs in favor of a stay, the

defendant's motion should be denied.  Moreover, based on the defendant's recent social media

posts targeting a known witness in this case in an attempt to influence and intimidate him, the

Court should lift the administrative stay and modify the defendant's conditions of release to

prevent such harmful and prejudicial conduct.

## I. Background

 Local Criminal Rule 57.7(c) authorizes each judge in this district to issue a "special order"

in "a widely publicized or sensational criminal case" that "govern[s] such matters as extrajudicial

statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a

fair trial by an impartial jury."  LCrR 57.7(c).  After indictment, the Government filed a motion

(ECF No. 57) requesting such an order in light of the defendant's repeated efforts to target

witnesses and trial participants with disparaging and inflammatory personal attacks.   The

defendant opposed the Government's motion.  ECF No. 60.

 At the hearing that followed, the Court reviewed numerous social media posts by the

defendant, which fell "into roughly five categories": (1) "statements about the District of Columbia

and its jury pool"; (2) "statements about the Biden administration or the Justice Department"; (3)

"statements about Special Prosecutor Smith and his staff"; (4) "statements about judges and their

staff"; and (5) "statements about political witnesses." ECF No. 103 at 27.  In discussing these

examples and other hypotheticals, the Court emphasized (*id.* at 37) that "speech critical of the exercise of the state's power lies at the very center of the First Amendment," and should therefore be given the widest possible berth.  The Court noted (*id.* at 41), however, that "at some point a defendant's targeted disparagement of government officials can go from permissible criticism of those officials to encouraging harm against them."  As the Court explained (*id.* at 41, 60), targeted disparagement of this sort can pose a real danger even when it does not explicitly call for harassment or violence, as repeated attacks on a perceived adversary are often understood as a signal to act against that person—much like King Henry II's famous remark, in reference to Archbishop Thomas à Becket, "Will no one rid me of this meddlesome priest?" which resulted in Becket's murder.  *See, e.g.*, *United States v. Smallwood*, 365 F. Supp. 2d 689, 696 n.14 (E.D. Va. 2005) (explaining the idiom).  Such risks are far from speculative here, the Court found, given uncontradicted facts submitted by the Government showing that when the defendant "has singled out certain people in public statements in the past," it has "led to them being threatened and harassed."  ECF No. 103 at 66-67.[1]

To that end, the Court asked defense counsel why, in advancing the claim that his "prosecution is politically motivated," it was necessary for the defendant to use "derogatory labels" and "highly charged language" such as "thug" and "deranged," that "frankly risk[] a real possibility of violence."  *Id.* at 41-42, 44-45.  Likewise, the Court inquired why it was necessary for the defendant to advance his claim of judicial bias by attacking the Court as "a fraud dressed up as a

---

[1] Shortly after being assigned to the case, the Court itself received a racist death threat explicitly tied to the Court's role in presiding over the defendant's case.  *See United States v. Shry*, No. 4:23-cr-413, ECF No. 1 at 3 (Criminal Complaint) (S.D. Tex. Aug. 11, 2023) (caller stating, among other things, "'If Trump doesn't get elected in 2024, we are coming to kill you, so tread lightly, b***h. . . .  You will be targeted personally, publicly, your family, all of it.'").  This incident, like many of the others the Government cited, was widely publicized and surely well known to the defendant.

judge" and "a radical Obama hack," or to assert judicial bias in his ongoing civil trial in New York by posting to social media a photograph of a court staffer, accompanied by the false allegation that the staffer was Senator Schumer's "girlfriend." *Id.* at 50-51. The Court also asked why it would be acceptable for the defendant to say (hypothetically), in the course of criticizing his former Attorney General, that "Bill Barr should be executed for his many treasonous acts." *Id.*

In response, defense counsel acknowledged that, if he were asked by his client, he would advise against actions like these, since targeted disparagement does not "necessarily need to be made in the context of a court proceeding," *id.* at 70, and posting a court staffer's photograph to social media is "not something that should be done in the course of a . . . court proceeding," *id.* at 52.[2] Counsel illustrated the point by noting that he had raised the issue of judicial bias "very professionally and very appropriately . . . and very respectfully" through the recusal motion, without any targeted disparagement, thereby "represent[ing] [the] client zealously" while also adhering to counsel's duties as an officer of the court. *Id.* at 52-53. But counsel maintained that the Court could not constrain the defendant himself from saying these concededly unnecessary things. Instead, counsel proposed that the Court should merely ask defense counsel to "convey" to the defendant the Court's "instructions and admonition[s]" about what the Court "find[s]

---

[2] Defense counsel also assured the Court that the defendant's post targeting the court staffer had been "dealt with" with by the court in New York. That assurance turned out to be mistaken. On October 20, 2023, the presiding judge in New York fined the defendant $5,000 for "blatant[ly] violat[ing]" the order in that case by leaving the photograph and false accusation on his campaign website. *See* Jonah Bromwich & Kate Christobek, *Trump Ordered to Pay $10,000 in New Punishment for Breaking Gag Order*, N.Y. Times (Oct. 25, 2023). Today, the defendant again violated the New York court's order when he stated that the judge had "a person who's very partisan alongside him, perhaps much more partisan than he is." After the defendant claimed unconvincingly under oath that he had not been commenting on the court's clerk, the judge found the defendant not to be credible and fined him $10,000. *See* New York Post, Trump fraud trial: Live updates from NYC courtroom, www.nypost.com/2023/10/24/news/trump-fraud-trial-live-updates-from-nyc-courtroom/.

acceptable," with "the expectation" that the defendant would then choose to "abide by [the Court's] instructions in that regard." *Id.* at 53-54.   Counsel maintained, however, that so long as the defendant's comments could be characterized as addressing a topic of legitimate concern or public interest, the Court was powerless to place any limits whatsoever on the defendant's extrajudicial speech, beyond what is already prohibited by the criminal law, even for the purpose of protecting trial participants or ensuring the fairness and integrity of the trial. *See id.* at 24-25 (counsel stating, "I can't conceive of an order that would be lawful").

In the defendant's view, for example, because he is entitled to say that "this prosecution is politically motivated," it must also be acceptable for him to refer to the prosecutors as "deranged" "thugs," and to use his social media account to identify members of the prosecutor's family. *Id.* at 45-48.   Because the defendant is entitled to raise "the issue of potential judicial bias," he must also be free to post a photograph of a court staffer and falsely allege that she is the "girlfriend" of a political adversary. *Id.* at 51-53.   Because the defendant is entitled to say that "misconduct by a joint chief of staff is intolerable in a democratic society," he must also be free to post on social media that "in times gone by" the appropriate "punishment" for the Chairman of the Joint Chiefs of Staff "would have been DEATH!" *Id.* at 56, 59-60.   Because the defendant is entitled to "comment on Bill Barr's activity as attorney general," or discuss whether he "might have a position in a future administration," he must also be free to call Barr "a slimy liar," and to suggest that he, too, should be "executed." *Id.* at 69-73.   Defense counsel did not dispute that, when the defendant uses social media to target a perceived adversary in this manner, harassment, intimidation, and threats from third parties often follow.   But he maintained (*id.* at 26, 60-61, 67-68) that, unless the defendant himself is delivering or inciting the threat, the Court was powerless to take prophylactic measures to prevent such harassment—and, in any event, some of the defendant's targets were

"tough-edged political people," *id.* at 74, who would not be deterred from testifying despite such intimidation and threats.

After hearing from the parties, the Court orally granted the Government's motion in part and denied it in part. *Id.* at 81-82.[3]  The Court explained that "[t]here is a compelling interest in the administration of justice and in protecting witnesses in this case, and it is possible to craft a narrowly tailored order to serve that interest." *Id.* at 82.[4]  Based on the Court's "review of past statements made by [the defendant] in particular, as well as the evidence that they have led to harassment and threats for the people he has targeted," the Court found that, in the absence of an order, "there is a real risk that witnesses may be intimidated or unduly influenced and that other potential witnesses may be reluctant to come forward lest they be subjected to the same harassment and intimidation." *Id.* at 84.  The Court further explained that because these narrow restrictions on extrajudicial statements were aimed at "language that presents a danger to the administration of justice," it would not impose any restrictions on two of the five categories of statements described above. *Id.* at 82-83.  Specifically, the Court declined to impose any additional restrictions on "statements regarding the District of Columbia or its jury pool," since "the *voir dire* process and cautionary jury instructions can filter out those statements' influence on the jury." *Id.* The Court likewise declined to impose any additional restrictions "on statements criticizing the government generally, including the Biden administration or the Justice Department, or statements

_____

[3] The Court also denied the Government's separate request to impose "additional jury pool survey requirements." ECF No. 103 at 82.  That decision is not at issue in this motion to stay.

[4] At the beginning of the hearing, the Court noted that the parties disputed the applicable legal standard, with the Government advocating for the substantial-likelihood-of-material-prejudice standard from *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), and the defendant advocating for a form of strict scrutiny that could only be satisfied by finding a clear and present danger to the administration of justice. ECF No. 103 at 6-7.  The Court declined to resolve this dispute because it intended for any order "to satisfy either test." *Id.* at 7-8.

communicating that [the defendant] believes this prosecution to be politically motivated." *Id.* at
83.   Thus, the defendant "can certainly claim he's being unfairly prosecuted" and "may still
vigorously seek public support as a presidential candidate, debate policies and people related to
that candidacy, criticize the current administration, and assert his belief that this prosecution is
politically motivated." *Id.* at 83-84.   But, like every other criminal defendant, he does not have
"carte blanche to vilify and implicitly encourage violence against public servants" and he may not
"launch a pretrial smear campaign against participating government staff, their families, and
foreseeable witnesses." *Id.* at 84-85.   These narrow restrictions, the Court found, "are consistent
with the rights secured by the First, Fifth, and Sixth Amendments, and . . . are both necessary and
narrowly tailored to safeguard the integrity of these proceedings as well as to protect the safety of
the people assisting with them." *Id.* at 85.

The Court issued its written Order (ECF No. 105) the following day.   In it, the Court
acknowledged its duty to "'take such steps by rule and regulation that will protect [its] processes
from prejudicial outside interferences,'" explaining that, while "'[f]reedom of discussion should
be given the widest range compatible with the essential requirement of the fair and orderly
administration of justice,'" it "'must not be allowed to divert the trial from the very purpose of a
court system to adjudicate controversies, both criminal and civil, in the calmness and solemnity of
the courtroom according to legal procedures.'"   *Id.* at 1 (quoting *Sheppard v. Maxwell*, 384 U.S.
333, 350-51, 363 (1966)).   The Court then found that "[i]n order to safeguard the integrity of these
proceedings, it is necessary to impose certain restrictions on public statements by interested
parties." *Id.* at 2.   "Undisputed" evidence demonstrated that when the defendant "has publicly
attacked individuals, including on matters related to this case, those individuals are consequently
threatened and harassed," with such targeted attacks on trial participants continuing post-

indictment.  *Id.*  The defendant has made these targeted attacks, moreover, "to national audiences using language communicating not merely that he believes the process to be illegitimate, but also that particular individuals involved in it are liars, or 'thugs,' or deserve death."  *Id.*  The Court therefore found "that such statements pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment."  *Id.*  The Court further found there were no "alternative means" that could adequately address these "grave threats to the integrity of the proceedings."  *Id.* at 3.  In particular, alternative means "such as careful *voir dire*, jury sequestration, and cautionary jury instructions" could "remedy only some of the potential prejudices."  *Id.* at 1-2.  And "in the age of the Internet," the risk to an individual is "largely irreversible" once he or she "is publicly targeted" on social media, even if the "offending statement" is later removed.  *Id.*

The Court was cognizant (*id.* at 2-3) of the defendant's status as a presidential candidate, and therefore found it appropriate to leave him room to criticize his prosecution as politically motivated and to attack institutions (such as the Department of Justice) as well individuals who are not trial participants (such as the incumbent president).  The Court found, however, that, in keeping with basic principles of "equal justice under law," his "candidacy cannot excuse statements that would otherwise intolerably jeopardize these proceedings."  *Id.* at 3.

The Court therefore ordered that:

> All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

*Id.*  The Court added, however, that "[t]his Order shall not be construed to prohibit Defendant from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence." *Id.*

On October 20, 2023, the defendant moved (ECF No. 110) to stay the Order, and the Court granted an administrative stay pending resolution of that motion (Minute Order).  In the few days since the administrative stay has been in place, the defendant has returned to the very sort of targeting that the Order prohibits, including attempting to intimidate and influence foreseeable witnesses, and commenting on the substance of their testimony.  For example, on October 24, 2023, the defendant took to social media to respond to a news report claiming that his former Chief of Staff, identified in the indictment, had testified in exchange for a grant of immunity:



Today, in a courthouse press conference in New York, the defendant again commented on the

Chief of Staff's credibility and anticipated testimony.[5]

## II.    Applicable Law

A stay pending appeal is "an intrusion into the ordinary processes of administration and

judicial review and accordingly is not a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009)

(citation and quotation marks omitted).  A stay pending appeal is "extraordinary relief." *Citizens*

*for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir.

2018) (per curiam) (*"CREW"*).  A movant seeking a stay pending appeal bears the burden of

demonstrating that a stay would be appropriate.  *Nken*, 556 U.S. at 433-34.  A court considering

whether to grant a stay pending appeal considers: "(1) whether the stay applicant has made a strong

showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties

interested in the proceeding; and (4) where the public interest lies." *Id.* at 434.  The last two factors

"merge when the Government is the opposing party." *Id.* at 435.

The first factor—likelihood of success on the merits—is the "most important," *Aamer v.*

*Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014), and will often be "determinative" in cases alleging

a First Amendment violation, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d

314, 334 (D.C. Cir. 2018).  With respect to that paramount factor, "[i]t is not enough that the

chance of success on the merits [is] better than negligible." *Nken*, 556 U.S. at 434 (citation and

quotation marks omitted). Rather, the likelihood of success on appeal must be "substantial." *Wash.*

*Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).  The

---

[5]    *See*   CSPAN,   https://www.c-span.org/video/?531393-1/president-trump-comments-
speaker-election-mark-meadows-immunity-report.

failure to make this requisite showing is "arguably [a] fatal flaw for a stay application." *CREW*, 904 F.3d at 1019. Moreover, "even if irreparable injury might otherwise result to the appellant," a stay "is not a matter of right" and remains an exceptional remedy. *Nken*, 556 U.S. at 427 (quotations omitted).

## III.  Argument

The defendant's motion to stay the Court's narrowly tailored order under Local Criminal Rule 57.7(c) should be denied. There has never been a criminal case in which a court has granted a defendant an unfettered right to try his case in the media, malign the presiding judge as a "fraud" and a "hack," attack the prosecutor as "deranged" and a "thug," and, after promising witnesses and others, "IF YOU GO AFTER ME, I'M COMING AFTER YOU," target specific witnesses with attacks on their character and credibility, even suggesting that one witness's actions warrant the "punishment" of "DEATH!" The defendant nevertheless claims that the First Amendment, combined with his status as a presidential candidate, grants him an unfettered right to do these things, and more. Indeed, he insists that the Court is powerless even to prevent him from posting photographs of court personnel, ECF No. 103 at 51-52, or publicly telling known witnesses that they should learn to keep their mouths shut, *id.* at 72. The most the Court can do, he maintains, is either wait for harassment or violence to occur and then take remedial steps (*id.* at 79)—such as ordering the removal of a particular post (*id.* at 52) or, better yet from the defendant's perspective, delaying the trial date (*id.* at 20)—or ask defense counsel (*id.* at 54) to "convey" the Court's "instructions and admonition[s]" to the defendant, with "the expectation" that the defendant will choose to "abide by [the Court's] instructions in that regard."

The First Amendment does not require such an ineffectual approach to protecting the integrity and fairness of the trial. To the contrary, the Court has both the authority and the duty to

prevent trial participants, including the defendant, from engaging in extrajudicial speech that poses a substantial likelihood of material prejudice.  The Court correctly entered such an order here.

The Order was based on appropriate factual findings grounded in the defendant's long and well-documented history of using his public platform to target disparaging and inflammatory comments at perceived adversaries, regardless of whether they are military generals, judges, election workers, or court staffers.  When the defendant does so, harassment, threats, and intimidation foreseeably and predictably follow.  These actions, particularly when directed against witnesses and trial participants, pose a grave threat to the very notion of a fair trial based on the facts and the law.  The Order is therefore aimed at serving the most compelling of governmental and societal interests.

The Court's Order is also narrowly tailored.  The Order placed no limitations whatsoever on the defendant's ability to proclaim his innocence, to allege that the prosecution is politically motivated, to attack institutions like the Department of Justice and the government generally, to criticize individuals who are not participants in the case, including the incumbent president, and to criticize the platforms and policies of political rivals, even when they are expected to be witnesses at this trial.  The Order is far narrower than the orders issued in similar cases, which often preclude any discussion of the case or any extrajudicial allegations of political motivation.  It does not limit the defendant's ability to present a full defense in court or hinder his ability to run for office.  As the Court explained, the defendant's status as a political candidate does not give him "carte blanche to vilify and implicitly encourage violence against public servants" or "launch a pretrial smear campaign against . . . foreseeable witnesses."  ECF No. 103 at 83-84.  And, contrary to the defendant's assertions, the Court considered alternative means but rejected them as unworkable, at least with respect to certain categories.  Indeed, the Court rejected restrictions on

some statements because it found that alternative means were sufficient to mitigate the resulting harms.

Finally, the Order is sufficiently clear and does not suffer from vagueness problems. The Order limits the defendant's ability to "target" certain trial participants—that is, to single them out as "the object of general abuse, scorn, derision or the like." *Oxford English Dictionary* 640 (target, n., sense 3.b); *see id.* at 642 (target, v., sense 2) ("To use (a person) as a target"). It does not limit the speech of non-parties, such as members of the public or the media. And, through discovery, the defendant has ample information about who the foreseeable witnesses are, which is presumably why he has not raised any vagueness objection to his conditions of release, even though those conditions likewise restrict his ability to speak to any individual known to be a witness.

Taken together, the Court's Order was appropriate, and the defendant's appeal is unlikely to succeed on the merits. And because the defendant cannot show that his constitutional rights have been violated, he cannot establish any of the other stay factors. The motion should be denied.

**A. The Defendant Has Not Demonstrated a Substantial Likelihood of Success on the Merits.**

> **1. The Court has the power to issue an order restricting extrajudicial speech of the defendant.**

The "very purpose of a court system" is "to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures," with the jury's verdict "based on evidence received in open court, not from outside sources." *Sheppard v. Maxwell*, 384 U.S. 333, 350-51 (1966) (quotations omitted). When a party threatens to flout this "undeviating rule" by trying to influence the case "through the use of the meeting-hall, the radio, and the newspaper," *id.* (quotations omitted), rather than through evidence and legal argument, a court has the power to act. Indeed, courts have an affirmative duty to "take such steps by rule and

regulation that will protect their processes from prejudicial outside interferences," and "[n]either prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." *Id.* at 363.

A court's power includes the ability to impose narrowly tailored restrictions on extrajudicial speech. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991). In doing so, however, a court must strike a "constitutionally permissible balance" between the speaker's First Amendment rights and the public's "interest in fair trials." *Id.* "Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in this setting," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984), and "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors," *Gentile*, 501 U.S. at 1075 (quotations omitted).

The applicable standard for striking the constitutionally permissible balance depends on whether the speaker is a "participant[] in the litigation," such as a defense attorney, or a "stranger[] to it," such as a newspaper covering the case. *Gentile*, 501 U.S. at 1072-73. In cases involving a trial participant, a court must find that the extrajudicial speech poses a "substantial likelihood of material prejudice" to the trial. *Id.* at 1075. In cases involving restrictions on a third party, like the news media, a court must find that there is "a clear and present danger of some serious substantive evil which [the restrictions] are designed to avert." *Id.* at 1069; *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976).

The defendant asserts (ECF No. 110 at 2, 7) that the clear-and-present-danger test should apply here, relying on cases that preceded *Gentile*. But the Supreme Court's decision in *Gentile* "foreclosed the applicability of [the clear-and-present-danger] test[] to the regulation of speech by trial participants." *United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000); *see Gentile*, 501

U.S. at 1072-73 (explaining that the "distinction between participants in the litigation and strangers to it is brought into sharp relief by" *Seattle Times*, which "unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access through court-ordered discovery"); ECF No. 64 at 2-7 (collecting cases).  Notably, the defendant never engages with the majority opinion in *Gentile*, citing the case only once (ECF No. 110 at 14); and even then, he cites a portion of the opinion, 501 U.S. at 1043, joined by only four justices, while failing to disclose that he is relying on a non-controlling section of the decision.  *See Gentile*, 501 U.S. at 1032 (explaining that Part II of Justice Kennedy's opinion is "an opinion" rather than "the opinion of the Court").

The defendant's attempt to equate his right to extrajudicial speech to that of the press also fails on its own terms.  Criminal defendants, unlike the press, are subject to the jurisdiction and supervision of the court presiding over their case.  They are routinely subject to reasonable restraints on their liberty—including the standard release condition, entered here without objection (ECF No. 13), barring them from communicating with witnesses about the case without attorneys present—that generally could not be permissibly imposed on the public or the media.  *See United States v. Salerno*, 481 U.S. 739, 749 (1987) ("Even competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system.").  The contrary conclusion reached in the pre-*Gentile* case of *United States v. Ford*, rests on a single sentence stating, "We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the press."  830 F.2d 596, 598 (6th Cir. 1987).  For that proposition, *Ford* cited *Pell v. Procunier*, 417 U.S. 817, 834-35 (1974), which explains that the First Amendment does not "impose[] upon government the affirmative duty to make available to journalists sources of information not available to members of the public

generally." *Id.*  But the fact that the press and the public are treated equivalently for purposes of access to information does not suggest that a trial participant's right to make extrajudicial statements is equivalent to the press and public's right to comment on pending charges or a trial. To the contrary, a criminal defendant, like his attorney, is "privy to a wealth of information" provided in discovery that is unavailable to the general public or the media but particularly capable of jeopardizing a fair trial if disseminated. *Brown*, 218 F.3d at 428.  And a criminal defendant has ample opportunity to comment on the trial through the judicial process itself—by filing motions, presenting evidence, making arguments—which is not afforded to the public or the media. Moreover, when the court's animating concern is "protect[ing] [its] processes from prejudicial outside interferences," *Sheppard*, 384 U.S. at 363, "there appears to be no reason, at least where lawyers and parties have each demonstrated a 'substantial likelihood' of making prejudicial comments outside the courtroom, to distinguish between the two groups for the purpose of evaluating a gag order directed at them both," *Brown*, 218 F.3d at 428.

The defendant resists this conclusion by arguing (ECF No. 110 at 20-23) that the right to a fair trial belongs only to him, and so he should be free to try use external influences to distort the trial in his favor.  That claim should be rejected.  The defendant again relies (*id.* at 22) largely on *Ford*, 830 F.2d at 600, but that portion of the opinion was not embraced by the other two members of the panel.  *See Ford*, 830 F.2d at 603 (Krupansky, J., concurring) ("[E]xisting legal precedent defines the Sixth Amendment right to a fair and impartial trial as a right that inures not only to the sole benefit of a defendant, but rather one that inures equally to the state as the representative of the people."); *id.* at 606 (Nelson, J., concurring) ("The public's interests do not extend to allowing the official to engage in tortious conduct toward his accusors, of course . . . .").  The Supreme Court's decision in *Gentile*, which involved restrictions imposed on a defense attorney, forecloses

such a narrow conception of the right to a fair trial.  *See Gentile*, 501 U.S. at 1075 (emphasizing the need to strike "a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials").  The defendant is therefore incorrect to suggest that he retains a constitutionally protected right to prejudice the trial in his favor.  *See United States v. Lindh*, 198 F. Supp. 2d 739, 743 (E.D. Va. 2002) ("Defendant has no constitutional right to use the media to influence public opinion concerning his case so as to gain an advantage at trial.  No such right inheres in either the Sixth Amendment right to a public trial, or the public's First Amendment right to a free press."); *United States v. Tijerina*, 412 F.2d 661, 667 (10th Cir. 1969) ("The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect fair trials designed to end in just judgments.  This objective may be thwarted unless an order against extrajudicial statements applies to all parties to a controversy.  The concept of a fair trial applies both to the prosecution and the defense.").

It is therefore clear that the Court had the authority to issue an order restricting the defendant's extrajudicial speech.  And while the Constitution requires only a finding of a substantial likelihood of material prejudice, the Court found that the Order satisfies even the defendant's proffered standard (ECF No. 103 at 7-8), because it is narrowly tailored to advance a compelling interest (*id.* at 82-83).

### 2.  The Order entered here was necessary and appropriate.

#### *a.  The Court correctly found that an order under Local Criminal Rule 57.7(c) was necessary to advance compelling interests.*

The Court correctly found that an order under Local Criminal Rule 57.7(c) was necessary to advance the compelling interests of ensuring a fair trial free from outside influence and untainted by harassment, intimidation, and threats directed towards witnesses and other trial participants.

The Court's Order was premised on three well-supported factual findings.[6]  First, the defendant has a long history of using his social media account and public statements to target perceived adversaries by singling them out and using inflammatory and disparaging language that "vilif[ies] and implicitly encourage[s] violence against" them.  ECF No. 103 at 84.  Second, when the defendant does so, harassment, threats, and intimidation reliably follow.  ECF No. 105 at 2.  Third, such harassment, threats, and intimidation "pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment."  *Id.*

The defendant does not meaningfully dispute the accuracy of any of these findings.  Instead, he first argues (ECF No. 110 at 8-10) that they lacked adequate evidentiary support.  But the Government's uncontradicted filings (ECF No. 57 at 2-13; ECF No. 64 at 9-12) documented a long history of targeted tweets as well as a litany of individuals who have described (sometimes in sworn testimony) the repeated and foreseeable effects of his targeting.  *E.g.*, ECF No. 57 at 3 (quoting congressional testimony stating, "After the President tweeted at me by name, calling me out the way he did, the threats became much more specific, much more graphic, and included not just me by name but included members of my family by name, their ages, our address, pictures of our home.  Just every bit of detail you could imagine.  That was what changed with that tweet."); *id.* at 5 (quoting congressional testimony stating, "[W]hen someone as powerful as the President

---

[6] Although the Court of Appeals will review the propriety and scope of the Order *de novo*, it will review questions of "historical fact" such as these for clear error.  *See Thompson v. Hebdon*, 7 F.4th 811, 819 (9th Cir. 2021); *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018); *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 796 (10th Cir. 2009); *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

of the United States eggs on a mob, that mob will come.").[7]  As the Court explained, these citations to public statements and testimony were "[u]ndisputed," ECF No. 105 at 2, and there was no need to submit the same material as part of an affidavit, ECF No. 103 at 57.  *Cf. United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam) (holding that the parties may proceed by proffer at a detention hearing).  The factual findings here were adequately supported and readily distinguish this case from *Ford*.  *Cf. Ford*, 830 F.2d at 597 (noting that the order was issued *sua sponte*); *id.* at 603 (Krupansky, J., concurring) (noting the absence of factual findings).  And the defendant will not be able to demonstrate that they are clearly erroneous on appeal.

The defendant further maintains that, despite being a party to this case, his extrajudicial speech cannot be restricted unless the speech itself is independently criminal, either because it constitutes a direct threat or harassment, or because it incites criminal conduct by others.  In his view, the likelihood that a "third party" might choose to engage in harassment, threats, or violence as a result of the defendant's words can never authorize an order under Rule 57.7(c).  *See* ECF No. 103 at 67 (dismissing these concerns as "totally irrelevant").  This argument is of a piece with the pattern that lies at the heart of the Court's Order.  As the Court explained (*id.* at 41, 60, 84), the defendant does not need to *explicitly* incite harassment or violence in his public statements,

---

[7] The Government's submissions, while extensive, did not purport to be a comprehensive account of every occasion when the defendant's public targeting of perceived adversaries has resulted in threats, harassment, or intimidation.  The public record is replete with other examples. *See, e.g.*, *United States v. Taranto*, No. 1:23-cr-229, ECF No. 27 at 4-6 (D.D.C. Sep. 12, 2023) (affirming detention order for Taranto and explaining that, after "'former President Trump posted what he claimed was the address of Former President Barack Obama' on Truth Social," Taranto—who had previously entered the Capitol on January 6, 2021—reposted the address, along with a separate post stating, "'See you in hell, Podesta's and Obama's'" [sic], and then proceeded, heavily armed, to the area the defendant had identified as President Obama's address, while livestreaming himself talking about "getting a 'shot' and an 'angle,'" adding, "'See, First Amendment, just say First Amendment, free speech'") (quoting *Taranto*, ECF No. 20).

because he well knows that, by publicly targeting perceived adversaries with inflammatory language, he can maintain a plausible deniability while ensuring the desired results.   The indictment notes, for example, that "[w]hen the Vice President refused to agree to the Defendant's request that he obstruct the certification, the Defendant grew frustrated and told the Vice President that the Defendant would have to publicly criticize him," which caused the Vice President's Chief of Staff sufficient concern that he "alerted the head of the Vice President's Secret Service detail." ECF No. 1 at ¶ 97.   The defendant knows the effect of his targeting and seeks to use it to his strategic advantage while simultaneously disclaiming any responsibility for the very acts he causes.[8]   And while the precise timing and manner of the resulting harassment, intimidation, or violence is, by the defendant's own design, inherently "speculative" (ECF No. 103 at 62), what matters for present purposes is that everyone—the defendant, his "over 100 million followers" (ECF No. 110 at 4), and the people targeted—knows of the dynamic, which creates a "significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." ECF No. 105 at 2.   Contrary to the defendant's suggestions (ECF No. 110 at 18-20), this dynamic is the opposite

---

[8] In a recently published recording, one of the defendant's supporters described this well-known dynamic, stating, "'Trump says, "Would you go and tell that guy over there to steal for me?"  And so he can say, "I never told the guy to steal."  And things like that is how Trump gets away with it.'"  *See* Ben Protess, et al., *A President, a Billionaire and Questions About Access to National Security*, N.Y. Times (Oct. 22, 2023); *see also Donald Trump Spills Secrets*, 60 Minutes Australia (playing audio recording in which the same supporter says that the defendant "knows exactly what to say and what not to say so that he avoids jail, but gets so close to it that it looks to everyone like he's breaking the law.  Like, he won't go up to someone and say, 'I want you to kill someone.'  He'll say, he'll send someone, to tell someone, to kill someone."), *available at* https://www.youtube.com/watch?v=AVFT-2k8eWQ at 7:03.

of a "heckler's veto," as the Court's concern was not the violent *disagreement* of the audience, but rather the clear pattern of a portion of the audience *agreeing* with the defendant's implicit wishes.

It is true, as the defendant insists, that some of the individuals he has targeted and plans to continue targeting are current or former high-ranking public officials who, after becoming the defendant's targets, may be granted increased protection from the Marshals Service or the Secret Service, thereby mitigating the likelihood that any threats will be carried out. But the defendant's threats have never been *limited* to such figures and have always included people like election workers and court personnel who have little ability to avail themselves of similar protections. There are numerous witnesses in this category, and without the Court's Order there is an immediate risk that their testimony could be influenced or deterred by the defendant's documented pattern of targeting. The Court was therefore correct to find that an order under Rule 57.7(c) was necessary.

### b. The Order is narrowly tailored.

The Court's Order is also narrowly tailored. In most cases involving restrictions on extrajudicial speech, the order at issue has imposed a blanket prohibition on extrajudicial statements, subject only to narrow carve-outs. *See Ford*, 830 F.2d at 598 (citing "the broad 'no discussion-of-the-case' order"); *id.* at 605 (Nelson, J., concurring) (noting that the order "would prevent Mr. Ford from calling a press conference in Memphis and announcing, to take a purely hypothetical example, that he has decided to oppose any increase in the minimum wage because of the adverse effect such an increase would have on the employment opportunities of black teenagers in his district"); *Brown*, 218 F.3d at 418-19 (noting that "[t]he order provides that '[s]tatements or information intended to influence public opinion regarding the merits of this case are specifically designated as information which could prejudice a party'"); *United States v. Manafort*, 897 F.3d 340, 342 (D.C. Cir. 2018) (describing district court finding that the defendant

had arguably violated the 57.7(c) order by contributing to an op-ed in a foreign newspaper discussing the facts of the case).  In other cases, courts have expressly precluded defendants from making any extrajudicial statement "that imparts the message that Defendants have been subject to an improper, selective or vindictive prosecution," since "the issue of selective prosecution is one of law not fact," and such public statements risk biasing the jury pool.  *United States v. Fieger*, No. 07-cr-20414, 2008 WL 659767, at *3, *6 (E.D. Mich. Mar. 11, 2008); *see United States v. Scrushy*, No. 03-cr-530, 2004 WL 848221, at *6 (N.D. Ala. Apr. 13, 2004) (directing trial participants to "remove from their existing webpages within seven days of this order extrajudicial comments, allegations of prosecutorial misconduct, and information concerning matters disclosed during the course of criminal discovery in this case").

The Order here is far different and reflects the Court's narrow tailoring.  Rather than placing all discussion of the case presumptively off-limits, the Order prohibits only "public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony."  ECF No. 105 at 3.  By contrast, the Order explicitly does not prohibit the defendant "from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence."  *Id.*

It is instructive to examine the scope of the Order in light of the things the defendant claims he needs to be able to say to defend himself and run for office.  For example, on the day before the hearing, the defendant posted to social media that the government was seeking "to silence me,

through the use of a powerful GAG ORDER, making it impossible for me to criticize those who are doing the silencing, namely Crooked Joe Biden, and his corrupt and weaponized DOJ & FBI."[9] The Order, however, leaves him entirely free to do those things.  He can criticize the incumbent president and the Department of Justice.  Indeed, he freely did so while the Order was in effect.[10]

During the hearing, defense counsel identified a number things that the defendant must be allowed to say, including that "this is a politically motivated prosecution" (ECF No. 103 at 18); that "he's being treated unfairly" (*id.*); that "the Department of Justice is acting unlawfully" (*id.*); that "there are deep problems in this city that need to be addressed that haven't been addressed by the Biden administration" (*id.* at 29-30); that "this is a politically biased prosecution by a politically biased prosecutor" (*id.* at 47); that there may be an "issue of potential judicial bias" (*id.* at 52-53); and that "misconduct by a joint chief of staff is intolerable in a democratic society" (*id.* at 59).  He must also be allowed to "describe what he would like in an attorney general, and in particular compare how Attorney General Barr conducted himself with what kind of attorney general he would like" (*id.* at 64); and comment on "what a vice president should be, what an attorney general should be, what a secretary of state in a state should be and what a member of the joint chiefs of staff should be" (*id.* at 74-75).  Again, the Order leaves him entirely free to say all of these things.

In his motion to stay, the defendant quotes (ECF No. 110 at 13) a lengthy passage from *Ford* emphasizing that the defendant must be entitled to "attack the alleged political motives of the . . . administration which he claims is persecuting him"; "fight the obvious damage to his

---

[9] https://truthsocial.com/@realDonaldTrump/111242571403804808.

[10] *See, e.g.*, https://truthsocial.com/@realDonaldTrump/111250043067355175 (Oct. 17, 2023) ("Crooked Joe Biden told the DOJ to Indict TRUMP hoping that it would help him in his campaign against me and the Republicans.  In other words, he indicted his Political Opponent. They are now called the Biden Indictments, and nothing like this has ever happened in the USA before!").

political reputation in the press and in the court of public opinion"; and "inform his constituents of his point of view." *Ford*, 830 F.2d at 600-01. The defendant can do all of these things and more. As such, the defendant has not remotely been "silenced." *Id.* at 600.

The only thing he cannot do is target certain individuals connected to the case. And as defense counsel conceded (ECF No. 103 at 70) during the hearing, targeting of the sort prohibited by the Order does not "necessarily need to be made in the context of a court proceeding." Indeed, the litigation of the recusal motion illustrates the point. The defendant was certainly entitled to move for the Court's recusal and marshal any facts and law necessary to explain why he believed the Court could not give him a fair trial. Defense counsel did so, as he noted, "very professionally and very appropriately," while also representing his client "zealously." *Id.* at 52-53. The Government responded with its own facts and arguments, and the Court resolved the motion in a reasoned opinion, which the defendant may appeal after a final judgment, if warranted. In the meantime, the defendant himself is free to describe those proceedings to his followers. That is how the system is supposed to work, and how it has worked in the case of every other defendant, including those who are running for office.

What the defendant is fighting for here, however, is the right to go far beyond these sorts of measures so that he can continue using disparaging and inflammatory language that would never be put in a court filing, like "fraud," "hack," and "thug." His failure to explain why such language is necessary only supports the inference that his objections to the Order do not stem from a legitimate concern with informing the public about his positions (which he is free to do), but rather with retaining his ability to target his perceived adversaries in a way that will foreseeably subject them to harassment, intimidation, and threat. The First Amendment—particularly when balanced

against the bedrock values of a fair trial unaffected by external influence—does not grant him free

rein to do so.

The defendant relatedly seeks (ECF No. 110 at 15-18) to invoke the rights of his followers

to receive his message.[11]  But again, his followers can hear his views on a vast range of issues,

including criticisms of this prosecution.  As illustrated by the defendant's social media posts in the

days following the issuance of the Court's Order, the defendant was in no way hampered from

disseminating his views to his followers.[12]

The defendant also contends (ECF No 110 at 28-30) that the Order is not narrowly tailored

because the Court purportedly failed to consider alternative measures.  But the Court explained

(ECF No. 105 at 2-3) that "alternative measures such as careful *voir dire*, jury sequestration, and

cautionary jury instructions" could "remedy only some of the potential prejudices" that the Order

---

[11] The defendant did not invoke these interests in his response to the Government's motion for an order under Local Criminal Rule 57.7(c).  And while the defendant claims to have invoked these interests at the hearing, only to have been unfairly interrupted by the Court (ECF No. 110 at 17), his citations mischaracterize the record.  For example, he asserts (*id.*) that the Court interrupted him in response to his statement, "And what the government is proposing here is an order not just directed against President Trump but against the American electorate that wants to hear from President Trump under these circumstances."  The Court did not, in fact, interject in response to that point.  *See* ECF No. 103 at 44.  Rather, it was only several sentences later, after defense counsel returned to his oft-repeated talking point that "[t]his is the first time we've had a sitting administration prosecute a political opponent" that the Court responded, "I'm going to interrupt you. . . .  You have said that.  You have said it repeatedly.  I have heard it."  *Id.*  Likewise, the defendant asserts (ECF No. 110 at 17) that, when counsel said, "The American people are entitled to understand that and understand the consequences of that," the Court simply responded, "No."  The Court did no such thing.  After defense counsel's comment, the Court asked why the defendant "is entitled to suggest that an appropriate punishment would be death."  ECF No. 103 at 59-60.  When defense counsel invoked the First Amendment in response, the Court said, "No.  As part of that.  But again, the First Amendment protections must yield to the administration of justice and the protection of witnesses."  *Id.*

[12] Between the time the Order was orally imposed and the time it was administratively stayed, the defendant posted roughly 182 times to Truth Social.

was designed to avoid.  Indeed, the Court declined to impose any restrictions on "statements regarding the District of Columbia or its jury pool" because it was "confident that the voir dire process and cautionary jury instructions can filter out those statements' influence on the jury." ECF No. 103 at 83.  The Court likewise considered and rejected the possibility of using after-the-fact removal orders, explaining that, "in the age of the Internet[,] once an individual is publicly targeted, even revoking the offending statement may not abate the subsequent threats, harassment, or other intimidating effects."  ECF No. 105 at 2.  Additional alternative measures, such as a continuance or change of venue, would be inadequate, and would only create a perverse incentive for the defendant to ramp up his targeting in order to gain the very relief that he otherwise requests.

### c.   The Order is not vague.

The Order also provides ample clarity to give the defendant "fair notice" and "sufficient warning" to "conduct [himself] so as to avoid that which is forbidden."  *United States v. Bronstein*, 849 F.3d 1101, 1104, 1106-07 (D.C. Cir. 2017) (quotations omitted) (rejecting vagueness challenge to a statute making it unlawful to "make a harangue or oration . . . in the Supreme Court Building or grounds"); *see ACLU v. Wash. Metro. Area Transit Auth.*, 303 F. Supp. 3d 11, 27 (D.D.C. 2018) ("A speech regulation is unconstitutionally vague when it is not 'clear enough to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" (quoting *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008)).

The vagueness doctrine is not offended by a term that "requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask."  *Bronstein*, 849 F.3d at 1107 (quotations omitted).  Indeed, "the vagueness doctrine does not doubt the constitutionality of laws that call for the application of a qualitative standard to real-world conduct; the law is full of instances where a man's fate depends

on his estimating rightly some matter of degree." *Id.* at 1108 (cleaned up); *see Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."). "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all." *Bronstein*, 849 F.3d at 1107 (cleaned up). "Accordingly, when the vagueness doctrine assesses a legal term's meaning to ordinary people, it is assessing meaning with the elementary rule of statutory interpretation: Words receive their plain, obvious and common sense meaning, unless context furnishes some ground to control, qualify, or enlarge it." *Id.* at 1108 (quotations omitted). The operative terms in the Court's Order easily satisfy that standard.

The defendant first challenges (ECF No. 110 at 25-26) the term "target," cataloging various dictionary definitions of the term. "But we are interpreting [an Order], not restating a dictionary," and "[o]ur search here is not for every facet of [the applicable terms], but their meaning within the [Order] at issue." *Bronstein*, 849 F.3d at 1108. And in context, it is clear that the Order uses the word "target" to mean singling out a trial participant as "the object of general abuse, scorn, derision or the like." *Oxford English Dictionary* at 640 (target, n., sense 3.b); *see id.* at 642 (target, v., sense 2) ("To use (a person) as a target"). As the Court's discussion throughout the hearing and in the Order confirms, the prohibition on "targeting" is directed at attacking individuals with "language that presents a danger to the administration of justice." ECF No. 103 at 82; *see* ECF No. 105 at 2 ("Defendant has made those statements to national audiences using language communicating not merely that he believes the process to be illegitimate, but also that particular individuals involved in it are liars, or 'thugs,' or deserve death."). The defendant avers (ECF No. 110 at 27) that he needs to be able to lay out a "specific or detailed *justification* for" his claim that

- 27 -

the prosecution is politically motivated, and that he needs to be able to discuss his political opponents' "platforms or policies" to the extent that they are "deeply intertwined with their views on *election integrity*."  But the Court's prohibition on targeting does not place any limits on offering specific and detailed justifications, discussing platforms or policies, or advancing any of the forms of rational argumentation that he claims it is necessary to make.  To the contrary, it limits only the sort of fact-free, disparaging, inflammatory, *ad hominem* attacks that, as the defendant knows, tend to provoke harassment, threats, and intimidation from his followers.  The mere fact that this standard may, in some circumstances, present close cases does not render the Order unconstitutionally vague.  *Bronstein*, 849 F.3d at 1107-08; *see United States v. Williams*, 553 U.S. 285, 305-06 (2008) (rejecting as a "basic mistake" the belief that "the mere fact that close cases can be envisioned renders a statute vague," since "[c]lose cases can be imagined under virtually any statute").

The defendant next challenges (ECF No. 110 at 26) the phrase "all interested parties," contending that it could encompass "the media covering [the case]" and "virtually every American voter."  No plausible interpretation encompasses this broad reading.  An "interested party" is "anyone who both is directly interested in a lawsuit and has a right to control the proceedings, make a defense, or appeal from an adverse judgment."  *Black's Law Dictionary* (party, sense 2; interested party).  The Order thus restricts the defendant, his attorneys and their staff, and members of the Special Counsel's Office.

The defendant further complains (ECF No. 110 at 26-27) that he cannot know who the "reasonably foreseeable" witnesses are, or what the "substance of their testimony" might be.  But the defendant's release conditions (ECF No. 13) likewise preclude him from communicating with witnesses about the facts of the case outside the presence of counsel, and he has not raised any

vagueness objections to that condition.  Rightly so, since the discovery includes a list of potential witnesses along with any testimony or statements they have given.  A reasonable person in the defendant's position has fair notice of who the foreseeable witnesses are and what the substance of their testimony will be.

* * *

In sum, the Court had an ample factual basis to issue the Order, and the Order is both narrowly tailored and sufficiently clear to provide the defendant with fair notice.  He has therefore failed to show that his challenge to the Order is likely to succeed on the merits.

### B.  The Other Factors Weigh Against a Stay.

The other factors likewise counsel against a stay.  *See Archdiocese of Wash.*, 897 F.3d at 334 (considering remaining factors in tandem).  While it is true that "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," the "deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely."  *Id.* (quotations omitted).  Where, as here "there is no showing of a likelihood of success on the merits," there can be no showing of irreparable injury.  *Id.* Likewise, "the strength of the [defendant's] showing on public interest rises and falls with the strength of [his] showing on likelihood of success on the merits."  *Id.* at 335.  Although "[t]he public interest favors the protection of constitutional rights," the defendant "would need to show a likelihood of violation of [his] constitutional rights, and [he] has not done so."  *Id.*

The public interest also weighs against a stay for other reasons.  As noted, "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors, and an outcome affected by extrajudicial statements would violate that fundamental right."  *Gentile*, 501 U.S. at 1075.  The very purpose of the Order is to safeguard that fundamental right,

which not only protects the interests of the defendant but also the interests of the government and society in general.   *See id.*; *Tijerina*, 412 F.2d at 667.   In addition, the Court found that the Order was necessary to mitigate the "grave" and "largely irreversible" risk that the defendant's acts of public targeting would result in intimidation, harassment, or threats towards members of the public.   ECF No. 105 at 2-3.   Staying the Order would allow those risks to continue unabated, contrary to the public interest.

### C.   The Court Should Immediately Lift the Administrative Stay and Modify the Defendant's Conditions of Release.

The defendant's continued targeting of witnesses and repeated violations of a similar order in New York during the brief interval while the Order has been administratively stayed, *see supra* at 9 (describing Oct. 20, 2023 post), not only illustrate the risks of suspending the Court's appropriate order; they demonstrate why the Court should lift the administrative stay and modify the defendant's conditions of release to protect witnesses from his attacks.   Yesterday, within hours of a news report about the purported testimony in this case of the defendant's former Chief of Staff, the defendant issued multiple prejudicial and threatening Truth Social posts to influence and intimidate the Chief of Staff and comment publicly on the subject of his testimony.[13]   The defendant's targeting included insinuating that if the reporting were true, the Chief of Staff had lied and had been coerced, and the defendant sent a clear public message to the Chief of Staff, intended to intimidate him:   "Some people would make that deal [to testify upon immunity], but they are weaklings and cowards, and so bad for the future [of] our Failing Nation.   I don't think that [Chief of Staff] is one of them, but who really knows?"[14]

---

[13] See https://truthsocial.com/@realDonaldTrump/posts/111293136072462799; https://truthsocial.com/@realDonaldTrump/posts/111293117150329703.

[14] *See* https://truthsocial.com/@realDonaldTrump/posts/111293117150329703.

Just as the defendants in *Brown* took advantage of that court's suspension of its order prohibiting certain extrajudicial statements to publicly release evidence and prejudice the jury pool, *see* ECF No. 64 at 8, here the defendant has capitalized on the Court's administrative stay to, among other prejudicial conduct, send an unmistakable and threatening message to a foreseeable witness in this case. Unless the Court lifts the administrative stay, the defendant will not stop his harmful and prejudicial attacks. In addition, to the extent that the defendant's public message—directed to the Chief of Staff, with knowledge that it would reach him—is not already covered by his release conditions, it is an intentional end-run around them. *See* ECF No. 13 ¶ 7(t) ("The defendant shall not communicate about the facts of the case with any individual known to the defendant to be a witness, except through counsel or in the presence of counsel."). Accordingly, the Court should modify the defendant's conditions of release by making compliance with the Order a condition or by clarifying that the existing condition barring communication with witnesses about the facts of the case includes indirect messages to witnesses made publicly on social media or in speeches.[15] *See United States v. Stone*, No. 1:19-cr-18, ECF No. 43 (D.D.C. Feb. 22, 2019) (incorporating compliance with 57.7(c) order as a condition of release). By doing so, the Court will have at its disposal the compliance measures available under 18 U.S.C. § 3148 in addition to those available as a contempt penalty for violating the Order. Otherwise, without

---

[15] Section 3142 provides that the Court "may at any time amend the order to impose additional or different conditions of release," *id.* § 3142(c)(3), and that release orders must "include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct." *Id.* § 3142(h)(1). Here, the Court has sufficient evidence before it to make a finding that the modified condition "is reasonably necessary to . . . assure the safety of any other person and the community," *id.* § 3142(c)(1)(B)(xiv), and that the resulting "combination of conditions" is the "least restrictive" combination that "will reasonably assure . . . the safety of any other person and the community," *id.* § 3142(c)(1)(B). *See Manafort*, 897 F.3d at 344-45; *United States v. Pickel*, 500 F. App'x 771, 772 (10th Cir. 2012).

the Court's intervention, the defendant will continue to threaten the integrity of these proceedings and put trial participants at risk.

**IV.     Conclusion**

The defendant's motion to stay should be denied.   The Court should also lift the administrative stay and modify the conditions of release.

Respectfully submitted,

JACK SMITH
Special Counsel

By:     /s/Molly Gaston
Molly Gaston
Thomas P. Windom
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

   v.

DONALD J. TRUMP,

    *Defendant*.

Case No. 1:23-cr-00257-TSC

## PRESIDENT TRUMP'S REPLY IN SUPPORT OF MOTION
## FOR STAY OF GAG ORDER PENDING APPEAL

## INTRODUCTION

The Court's Order, Doc. 105 (the "Gag Order"), imposes sweeping prior restraints on President Trump, the leading candidate in the 2024 presidential campaign. If reinstated, the Gag Order would prohibit President Trump from discussing nearly anything about this case—a key campaign issue—with the American public, including "reasonably foreseeable" witnesses and testimony, as well as valid criticisms of the prosecutors (whom he believes, with good reason, are politically biased, as laid out in Doc. 116 (Motion to Dismiss Based on Selective Prosecution)).

Never in American history has any Court censored the speech of a political candidate, least of all in the extraordinarily broad and vague terms of the Gag Order. In reaching this unprecedented decision, the Court rejected and did not rely on any of the prosecution's false, unsupported, and unconstitutional claims that prior restraints are necessary to avoid "undermin[g] confidence in the criminal justice system," Doc. 57 at 2, or otherwise "influenc[ing] the actual outcome of trial," or "prejudic[ing] the venire," Doc. 64 at 7.

Rather, the Court's sole justification is its unsupported conclusion that President Trump's protected speech about this case may lead to third parties threatening or harassing prosecutors, witnesses, or court staff. Doc. 105 at 2. The prosecution echoes this theoretical and conclusory argument. *See, e.g.,* Doc. 120, Response in Opposition to Stay ("Response"), at 1, 3, 5-8, 11-12, 17-30. As discussed below, however, this purported reason for the prior restraint is entirely unconstitutional. Moreover, neither the Court nor the prosecution suggest that President Trump himself has threatened or harassed anyone, or directed anyone to do so. The only cited concern is that unidentified "followers" of President Trump (numbering over a hundred million U.S. Citizens) may do so unprompted at some future date. Response at 28.

1

Thus, the relevant questions on appeal are: (1) whether the Court may prohibit a leading candidate for president from commenting on critical public issues relating to his defense of this case out of a concern for what unsolicited third parties might do; (2) whether the evidence presented is sufficient to justify such a content-based prior restriction, as measured by the appropriate standard of proof (i.e., a clear and present danger of harm); and (3) whether the Gag Order is narrowly tailored, accounting for invariable Constitutional prohibitions on vague or overbroad prior restraints.

President Trump is nearly certain to succeed on each of these arguments. The Supreme Court has held, time and time again, that a person may not be prohibited from speaking because of the unsolicited actions of others. Rather, only speech "directed to inciting or producing imminent lawless action and [which] is likely to incite or produce such action" may be censored. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Moreover, where, as here, the speech at issue is inextricably political, the Constitution holds no tolerance for censorship. President Trump has a right to speak his mind and the public has a right to hear what he has to say. The prosecution and the Court may not like the content of these statements, but President Trump has an inarguable and inalienable right to make them.

Nor is conceded prosecutorial speculation that some individuals might feel harassed or threatened is hardly a constitutional justification for limiting free speech. Doc. 103 at 62 (October 16, 2023, H'rg. Tr., hereafter "Tr.") ("of course this prejudice is speculative."). Without a demonstrable "clear and present danger," *Landmark Comm's, Inc. v. Virginia*, 435 U.S. 829, 844-45 (1978), or even a "substantial likelihood of material" harm, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1066 (1991), the Gag Order will not be upheld on appeal. Tr. at 7–8 ([The Court]: "I intend for any order I issue to meet -- to satisfy either test.").

Finally, the Gag Order is not tailored at all, let alone narrowly. It uses undefined, ambiguous terms such as "target" that arguably (and unconstitutionally) encompass essentially all statements regarding this case, no matter how innocuous, unless they fall within three narrow (and equally vague) safe harbors. "[T]he seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as precisely tailored as possible." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (emphasis in original). The Gag Order is anything but narrowly tailored and precise; and it is therefore unconstitutional.

As the Gag Order is highly unlikely to survive appeal, the Court should stay its application pending a decision from the D.C. Circuit. Doing so will prevent irreparable harm to President Trump and the public's First Amendment rights, cause no cognizable harm to any party, and serve the interests of the public.

## ARGUMENT

## I.     Unsolicited Third-Party Actions Do Not Justify Censorship of a Political Candidate

### A.     The Gag Order Imposes a Quintessential Heckler's Veto.

The prosecution repeatedly insists that President Trump's speech must be gagged because, in the prosecution's estimation, it might—despite not requesting or encouraging such conduct—cause independent third parties to "threaten" or "harass" others. Response, at 1, 3, 5-8, 11-12, 17-30. This concern, which our case law describes as a "heckler's veto," cannot justify censorship. Just the opposite, even where an audience "might react with disorder or violence" to a speaker's statements, the Supreme Court repeatedly rejects government attempts at censorship. *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality op.); *see also Cox v. Louisiana*, 379 U.S. 536, 551 (1965) ("[T]he 'compelling answer … is that constitutional rights may not be denied simply because of hostility to their assertion or exercise.'") (quoting *Watson v. City of Memphis*, 373 U.S.

3

526, 535 (1963)); *Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972) ("As to the possibility of there being hostile audience members causing violence, the law is quite clear that such considerations are impermissible….").[1]

The prosecution devotes only a single sentence of its brief to this fatal problem, arguing for the first time that the Court must silence President Trump's speech not because of "violent *disagreement* of the audience," but rather "the clear pattern of a portion of the audience *agreeing* with the defendant's implicit wishes." Response, at 21. The prosecution cites no authority to support this supposed distinction between the risk of unruly "disagreement" and unruly "agreement," and none exists. In fact, the prosecution's argument directly contradicts the Supreme Court's incitement cases, which plainly instruct that speech falling short of incitement may *not* be silenced solely because it might inspire crimes or violence by those "agreeing," *id.*, with the speaker. "These … decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447.

Thus, under settled law, a speech restriction that seeks to silence speech because it might provoke "the use of force or of law violation" from the audience "impermissibly intrudes upon the

---

[1] Here, the prosecution's position is even worse, because the prosecution's dominant concern is not preventing actual "violence" or "disorder," *Brown*, 383 U.S. 133 n.1, but preventing "harassment"—a word that appears 30 times in their brief—and ill-defined "threats." Response, at 1, 3, 5-8, 11-12, 17-30. Further, much of the alleged "harassment" concerns public statements disparaging other prominent public officials, such as the former Vice President and Attorney General—conduct that is itself core First Amendment-protected speech. Thus, the prosecution urges the Court to silence President Trump's First Amendment-protected speech to prevent others from engaging in First Amendment-protected speech. Needless to say, if potential violence cannot justify censorship, it is without question that non-violent criticism of public figures cannot either.

4

freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Id.* (citing eight cases).

Here, these cases are controlling, because President Trump's speech does not constitute incitement, and the prosecution never contends that it does. Indeed, the prosecution ignores this point by entirely failing to: (1) identify any alleged violence; (2) demonstrate that President Trump's speech caused or was otherwise "directed to inciting or producing imminent" violence; or (3) explain how the Gag Order is narrowly tailored to prohibit only those statements.

In short, "[t]he Government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience," *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment)—regardless of whether the audience is supportive or hostile to the speaker. "Indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise." *Id.* To justify the Gag Order based on the actions of others, the prosecution must meet the *Brandenburg* test by demonstrating the Gag order is needed to, and does, prevent the actual incitement of violence. 395 U.S. at 447. It has failed to do so. Therefore, the Gag Order is unconstitutional.

## B.  The Gag Order Violates President Trump's Right to Campaign and the Rights of Hundreds of Millions of President Trump's Listeners to Receive His Message.

The Gag Order violates two more fundamental principles of the First Amendment: (1) the protection of President Trump's campaign speech meriting the highest level of protection, and (2) the right of President Trump's supporters and adversaries to have an equal and reciprocal right to receive his speech and make informed judgments about the presidential election. Doc. 110, at 12-18. On the former point, the Supreme Court has emphasized that the freedom of speech "has its fullest and most urgent application precisely to the conduct of campaigns for political office."

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

The Fifth Circuit in *Brown* and the Sixth Circuit in *Ford* fully accommodated this interest. *See United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987) ("[T]he defendant, a Democrat, … is entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views and his race."); *United States v. Brown*, 218 F.3d 415, 419 (5th Cir. 2000) ("[T]he district court … lifted the gag order in this case to avoid interfering with Brown's re-election campaign…."). The Gag Order gives no weight to these compelling interests, and the Court declined to consider them. Tr. 17, 83. In its Response, the prosecution says nothing to address this fatal deficiency.

Likewise, in silencing President Trump, the Gag Order violates the reciprocal First Amendment rights of the electorate to receive his messages. The First Amendment's "protection afforded is to the communication, to its source and its recipients both." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). "It is now well established that the Constitution protects the right to receive information and ideas. This freedom (of speech and press) … necessarily protects the right to receive…." *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (alterations omitted) (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)).

*Ford* and *Brown* both emphasized this paramount interest. *Ford*, 830 F.2d at 601 ("[R]eciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance."); *Brown*, 218 F.3d at 430 ("The urgency of a campaign … may well require that a candidate, for the benefit of the electorate as well as himself, have absolute freedom to discuss his qualifications."). As *Brown* suggests, when the audiences are listeners to political campaign speech, they should have "absolute freedom" to receive the candidate's messages. *Id.* Here, where the gagged speaker is the leading candidate for President of the United States with

6

audiences in the hundreds of millions, and the gagged speech is core political speech that lies at the heart of his campaign, the magnitude of the First Amendment violation to his audiences is truly staggering. Yet the Gag Order gives the issue no consideration at all aside from a cursory exclusion of "statements criticizing the government generally . . . [and] the campaign platforms or policies of Defendant's current political rivals." Doc. 105, at 1-3.

The Court has repeatedly stated that it will ignore the obvious fact that President Trump is a candidate for the presidency. In following this flawed approach, the Gag Order fails to consider that the allegations in the case are themselves central political questions, discussed at length by media, President Trump's political opponents (some of whom are witnesses), the Biden Administration, and the citizenry writ large in connection with the 2024 campaign. This is precisely where the Gag Order runs headlong into unconstitutional shoals. President Trump is absolutely entitled to defend himself publicly and explain with specificity why the charges against him are false and meritless. That is not "try[ing] his case in the media," Response at 11, it is political campaigning—our most sacred and inviolable category of protected speech.

The prosecution, likewise, gives short shrift to the American electorate itself, including President Trump's supporters. Response, at 25 & n.11. First, the prosecution contends that President Trump did not raise his audiences' interests in opposing the Gag Order. *Id.* n.11. Not so. President Trump raised this very issue multiple times, both in his opposition brief and at oral argument. *See, e.g.*, Doc. 60, at 3-4 (arguing that the proposed gag order would "prevent President Trump from presenting his side of the story to the American people during a political campaign"); *id.* at 9 (arguing that neither the prosecution nor the Court "are the filter for what the public may hear"); *id.* at 22 (arguing that "the public has an interest in receiving information about matters that are in litigation" as part of the "interests … of free expression") (quoting D.C. Bar Rule 3.6,

Cmt. 1); Tr. 44 ("[W]hat the government is proposing here is on order not just directed against President Trump but against the American electorate that wants to hear from President Trump under these circumstances"); Tr. 59-60 ("President Trump in the middle of a campaign is entitled to put the spotlight on it. The American people are entitled to understand that and understand the consequences of that.").

Substantively, the prosecution's only response to this problem is to point out that the Gag Order does not silence *all* of President Trump's campaign-related core political speech, so his listeners will be able to receive *some* of his speech. Response, at 25. Again, the prosecution cites no cases to support this argument, and for good reason—it directly contravenes Supreme Court precedent. In *White*, 536 U.S. 765, the Supreme Court rejected a restriction on campaign speech that prohibited candidates for judicial office from discussing their "views on disputed legal or political issues." *Id.* at 768. Like the prosecution here, Minnesota defended the restriction on the ground that the law "still leaves plenty of topics for discussion on the campaign trail . . . Indeed, the Judicial Board has printed a list of preapproved questions which judicial candidates are allowed to answer." *Id.* at 774. The Supreme Court rejected the argument that the First Amendment was satisfied by permitting some, but not all, core political speech:

> [T]he notion that the special context of electioneering justifies an abridgment of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. Debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance. It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign. *We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election*.

*Id*. at 781–82 (emphasis added) (citations and quotation marks omitted). So also here, President Trump's audiences are entitled to receive *all* his messages, not just the topics that the prosecution

picks and chooses. The Gag Order violates this core American freedom and is therefore unconstitutional.

## II.  The Prosecution's Speculation Cannot Justify the Gag Order Under Either Constitutional Test.

As described above, preventing unsolicited, third-party "harassment" or "threats" against other third parties is not a compelling government interest under any circumstances and is wholly incapable of overcoming both the First Amendment right of a Presidential candidate to speak on matters of public concern and the public's right to hear what he has to say. Yet even assuming, *arguendo*, that a compelling interest could exist, the prosecution has utterly failed to establish it.

The prosecution contends that its "uncontradicted filings" in Doc. 57, at 2-13, and Doc. 64, at 9-12, provide the basis it needs to establish the existence of "harassment" or "threats." Response, at 18. The prosecution is wrong.

First, screenshots of social-media posts from "between the Presidential election on November 3, 2020, and the congressional certification proceeding on January 6, 2021," *i.e.*, almost three years ago, Doc. 62, at 2; *id.* at 3-5, do not prove that anyone has been harassed or threatened due to President Trump's statements. Although the prosecution provided public statements from three individuals claiming that they allegedly received harassment and threats in the same time frame (2020 and 2021), the prosecution did not draw any causal connection between these claims and President Trump's statements. Nor could the prosecution do so. Countless others made statements regarding the same individuals during the same timeframe. Moreover, President Trump's statements, again, did not direct or request that any harassment or threats occur. *Id.* Thus, the prosecution cannot say with any degree of certainty why such alleged events happened (if they

9

even did), or that they would not have occurred but for President Trump's statements. (This, of

course, is part of why the *Brandenburg* test is so stringent—to avoid just such speculation.)[2]

Next, the prosecution provided screenshots of posts by President Trump from August 2,

4, 6, 7, 8, 21, 23, 25, and 28, 2023. *Id.* at 3-12. Likewise, in its reply brief supporting the proposed

gag order, the prosecution then provided quotes from social-media posts by President Trump from

September 5, 6, 22, 23, and 26, 2023, and cited a nationally publicized media interview on

September 17, 2023. Doc. 64, at 9-10. Finally, in its response to the stay motion, the prosecution

refers to two more social media posts by President Trump—a post regarding Mark Meadows on

October 24, 2023, and a post and public statement supposedly about a court clerk in New York in

another case, dated October 20 and 25, 2023. Response, at 4 n.4, 9.[3]

---

[2] The prosecution repeatedly presupposes, without evidence, that any supposed "threats" or "harassment" that might occur *after* President Trump's speech must have been *caused* by President Trump's speech. *See* Response, at 3; *id.* at 5 (arguing that threats and harassment "often follow" President Trump's speech); *id.* at 12 (these results "predictably follow"); *id.* at 18 ("reliably follow"). To be sure, the absence of evidence of any threats or harassment in the last three months of continuous public statements by President Trump refutes the prosecution's inferences that such results "predictably," "reliably," or even "often" follow. *See id.* More importantly, President Trump is not the only speaker in the country addressing this case and the issues it raises—it is subject to wall-to-wall media coverage and endless commentary and debate on social media and elsewhere, much of it elevated and heated. To infer that President Trump's speech must be the *cause* of any "threats" or "harassment" that might ensue, as opposed to the influence of any number of unidentified, independent speakers and actors, is pure fallacy. Especially when it comes to prior restraints, "more than *post hoc, ergo propter hoc* must be shown." *Pub. L. Educ. Inst. v. U.S. Dep't of Just.*, 744 F.2d 181, 183 (D.C. Cir. 1984); *see also Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 205 (D.D.C. 2016) ("[V]ague assertions of *post hoc, ergo propter hoc* are insufficient...") (citing Black's Law Dictionary 1355 (10th ed. 2014) (defining *post hoc ergo propter hoc* as the "logical fallacy of assuming that a causal relationship exists when acts or events are merely sequential")).

[3] Recent leaks regarding Meadows' alleged testimony, which received wide media attention, demonstrate why the Gag Order is unworkable. If the Gag order had been in effect, President Trump would have been unable to respond to, or rebut, the false claims about his interactions with his former chief of staff—an issue that is important to many Americans in connection with the 2024 election. The key question is, for what legitimate constitutional purpose? It is not as though President Trump started the recent national discussion on Meadows. The media did that itself, presumably prompted by a source other than President Trump. The Gag Order would not have

For these more recent posts, the prosecution's argument is even weaker. The prosecution presents no evidence (or even argument) that any prosecutor, court staffer, or potential witness has actually received any threats or harassment after public criticism by President Trump, or even *felt* threatened or harassed. *Id*. To the contrary, the prosecution stated that "[t]he defendant's baseless attacks on the Court and two individual prosecutors … *could* subject them to threats…." *Id.* at 10 (emphasis added).

Thus, the prosecution has presented at least seventeen examples of President Trump's posts and public statements about this case, dating from the day after the indictment was filed until the present—a period of 88 days—for which the prosecution presents no evidence of any ensuing threats or harassment. Moreover, the prosecution presented no evidence that any potential witness even *feels* threatened or harassed, however subjectively. Indeed, when the Court asked prosecutors why it had not submitted evidence of threats, harassment, or witness intimidation, the prosecution admitted that its prediction of "prejudice is speculative." Tr. 62.

\*\*\*

As the Court indicated at oral argument, there are two possible standards for assessing the prosecution's proffer—either the "clear and present danger" test of *Landmark Comm's*, 435 U.S. at 844-45, or the ambiguously lower (but still very high) "substantial likelihood of material prejudice" of *Gentile*, 501 U.S. at 1066.

The Sixth, Seventh, and Ninth Circuits each agree the "clear and present danger" test is the correct standard, particularly, as the Sixth Circuit holds, in the political context. *See Ford*, 830

---

done anything to prevent a national discussion of this issue during a campaign. Thus, the only thing the Gag Order would accomplish is ensuring that President Trump could not respond to inappropriate prosecutorial or witness leaks, an obviously impermissible and wholly unconstitutional goal.

F.2d at 600 ("[T]he clear and present danger' standard should apply to the District Court's 'no discussion' order is reinforced by the divisive political context of this case."). The prosecution disagrees, spilling much ink arguing the Court should apply the *Gentile* standard. Specifically, relying on *Gentile*, the prosecution argues that criminal defendants have diminished First Amendment rights to criticize the prosecutors, judges, and court proceedings against them. Response, at 14-15. But the prosecution misreads *Gentile*. That case held that a lower level of protection applies to the First Amendment rights of *attorneys*, not of all "trial participants," because attorneys are officers of the court. 501 U.S. at 1066.[4]

Regardless, as the Court has stated, it intends for the Gag Order "to satisfy either test." Tr. at 7–8. It does not. Even allowing for the possibility that the "substantial likelihood" test applied (and it does not), the prosecution is still subject to the Supreme Court's instruction that the party seeking the gag order bears a "heavy burden of demonstrating" the need for a prior restraint through an evidentiary "record." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, at 569 (1976). For the reasons stated above, the prosecution met absolutely *no* burden of showing a risk of prejudice because it presented no competent evidence to that effect, admitting instead, "of course this prejudice is speculative." Tr. 62.

---

[4] This lower standard for attorneys, in the Supreme Court's view, was appropriate because "[l]awyers representing clients in pending cases are key participants *in the criminal justice system*, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct." *Id.* (emphasis added).

Conversely, *Gentile* strongly implies that a citizen like President Trump is entitled to the same level of protection as the media. *Gentile* repeatedly contrasted the rights of an "attorney" with the rights of an "ordinary citizen" or "private citizen." *Id.* at 1071, 1072 n.5, 1074. Here, as the criminal defendant, President Trump is participating as a citizen, not an attorney. Moreover, as a Presidential candidate, President Trump has a constitutional right to discuss this case with the hundreds of millions of "people, who wish to be informed" not by the prosecution or the media, but by President Trump himself. *Id.*

12

For the same reason, the prosecution cannot hope to satisfy the "clear and present danger" test. The prosecution presents no facts proving *any* danger, to say nothing of a "clear and present" one. Speculation is not evidence, and the Constitution does not allow prior restraints on that basis. Accordingly, even if the prosecution had articulated a compelling interest (and it has not), its meager factual showing cannot justify the Gag Order.

## III.   The Gag Order Is Incurably Vague and Overbroad.

All prior restraints—even those intended to prevent a clear and present danger to a compelling government interest—must be precisely targeted to resolve that harm. *White*, 416 F.3d at 751. Vagueness or overbreadth are fatal deficiencies. *Id*. Here, the Gag Order presents both issues.

### A.      Vagueness

The prosecution, for its part, argues that the Gag Order is not vague, Response, at 26-28. In support, the prosecution writes page upon page of supposed clarifications that are found nowhere in the Order itself. But, even accepting the untenable position that the prosecution could unilaterally clarify a court order through self-serving arguments in response to a stay motion, its attempts to do so would only compound the Order's vagueness. As President Trump's stay motion discussed, the Gag Order's key operative word, "target," has at least five competing definitions in Merriam-Webster Online, reflecting a wide range of possible meanings. Doc. 110, at 25 ("target" can mean "a mark to shoot at," "something or someone marked for attack," "a goal to be achieved," "an object of ridicule or criticism," or "something or someone to be affected by an action or development").

The prosecution responds that *none* of these definitions applies, but that it is somehow "clear" (the prosecution doesn't explain why) that a *sixth* definition is what the Court meant:

"singling out a trial participant as 'the object of general abuse, scorn, derision, or the like.'" Response, at 27 (quoting *Oxford English Dictionary* at 640, "sense 3.b").

The prosecution's preferred definition, which it selectively plucks from the United Kingdom-based Oxford English Dictionary, is seldom used by ordinary Americans, contradicting the prosecution's claim that the Gag Order should be given a "plain, obvious and common sense meaning." *Id.* at 27 (quoting *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017)). Moreover, O.E.D. includes *fifteen* definitions of "target," *see* Oxford English Dictionary Online, *at* https://www.oed.com/dictionary/target_n1?tab=factsheet#18985107 ("There are 15 meanings listed in OED's entry for the noun *target*…."). The prosecution does not explain why its chosen definition ("sense 3.b") is better than the other fourteen. A reasonable reader will remain at a loss to know which of a range of perfectly ordinary statements might constitute "targeting" the prosecutors, court staff, or potential witnesses. This problem gets even worse when the prosecution "clarifies" that the Gag Order applies to any "language that presents a danger to the administration of justice," Response, at 27—a standard that is hopelessly vague.

Unsurprisingly, the Supreme Court has rejected such *ex-post* attempts to provide narrowing constructions to prior restraints to save them on appeal—which is exactly what the prosecution attempts here. "If the line drawn" by a prior restraint "is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963).

Moreover, even if one were to adopt the prosecution's preferred definition of "target" as to "singl[e] out" as "the object of general abuse, scorn, derision, or *the like*," Response, at 27, that definition renders the Gag Order both staggeringly broad and inherently subjective. The

prosecution would interpret the Gag Order to cover virtually any *negative* speech, provided that the Court would later deem it to be a bit *too* negative. "Abuse" means "language that condemns or vilifies *usually unjustly*, intemperately, and angrily." *Abuse*, Merriam-Webster Online Dictionary, *at* https://www.merriam-webster.com/dictionary/abuse. "Intemperate" means not "marked by moderation: such as keeping or held within limits: not extreme or excessive." *Temperate*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/temperate. "Like" (as in "and the like") means "similar to." *Like*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/like.

Thus, in the prosecution's interpretation, the Gag Order prevents President Trump from criticizing the listed parties "unjustly," or doing so in a way that is not "marked by moderation," or saying anything "similar to" such forbidden speech. Enforcing such terms requires the exercise of inherently subjective judgment.[5] The elimination of such subjective enforcement is one of the most fundamental precepts of the vagueness doctrine. *See, e.g. Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("A vague law impermissibly delegates basic policy matters … on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

In a third attempt to resolve the Gag Order's irresolvable vagueness, the prosecution contends, without textual support, that the Gag Order restricts only "fact-free, disparaging,

---

[5] And this is just the beginning of the vagueness. Words like "scorn," "derision," "ridicule," and "the like" are similarly vague and require inherently subjective enforcement. "Scorn" means "open dislike and disrespect or mockery often mixed with indignation" or "an expression of contempt or derision." *Scorn*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/scorn. "Derision" means "the use of ridicule or scorn to show contempt" or "an object of ridicule or scorn." Derision, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/derision. "Ridicule" means "derision, mockery." Ridicule, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/ridicule. Even setting aside the circularity of these definitions, prior restraint cannot be based on subjective judgments about whether speech expresses "dislike," "disrespect," "ridicule," or "indignation."

15

inflammatory, *ad hominem* attacks." Response, at 28. This "clarification" simply piles vagueness upon vagueness. Will enforcement of the Gag Order require a judicial determination that President Trump's political rhetoric is "fact-free" or "*ad hominem*"? *See id.* Likewise, the prosecution's most-preferred term for the speech it seeks to prohibit, the word "disparaging," *see also* Response, at 2, 12, 18, 24, 28, is nowhere in the order itself (despite the prosecution's request) and is in any event vague itself. In *Matal v. Tam*, addressing a law that prohibited the registration of trademarks that "disparage" anyone, the Supreme Court noted that "[t]he admitted vagueness of the disparagement test" resulted in "a haphazard record of enforcement," 582 U.S. at 233 (plurality op.); and even the Government admitted that the "disparagement" analysis was "somewhat vague" and subject to "necessarily … highly subjective" enforcement, *id.* at 233 n.5. This prosecution's standard is not one that "may, in some circumstances, present close cases," Response, at 28; it is vague down to its core.

The prosecution's legally prohibited and misplaced attempts to clarify the Gag Order's remaining terms fare no better. Again, contradicting its own instruction that the Gag Order's terms should "receive their plain, obvious and common sense meaning," Response, at 27, the prosecution ignores Webster's definition of "interested" party and opts for a technical definition from Black's Law Dictionary, without explaining why one should be favored over the other. *Id.* at 28. This violates the Supreme Court's instruction in *Button* that an appellate Court should not "presume that" the Gag Order "curtails constitutionally protected activity as little as possible." 371 U.S. at 432. And even if the Court were to adopt the prosecution's narrowing construction (which it cannot do at this point as President Trump's appeal divested the Court of jurisdiction to amend the Order), the scope of the persons covered by the Gag Order would remain unclear.

16

The prosecution also contends that the phrase "reasonably foreseeable witnesses" is not vague because "the discovery includes a list of potential witnesses." Response, at 29. But the prosecution pointedly does *not* contend that its "list of potential witnesses" includes *all* the "reasonably foreseeable" witnesses in the case, so this claim does nothing to eliminate the phrase's vagueness. In fact, by claiming that it has disclosed "a list of potential witnesses," but leaving open the option enforcing the Gag Order against President Trump's statements about *other* "witnesses," the Government vividly illustrates that the Gag Order is subject to "arbitrary and discriminatory enforcement"—the hallmark of vagueness. *Grayned*, 408 U.S. at 109.

As for the Gag Order's prohibition regarding the "substance of their testimony," Doc. 105, at 3, the prosecution makes no argument that this phrase is not vague, other than to assert it is not. Response, at 29. In fact, this phrase is inherently vague and renders enforcement-by-hindsight virtually inevitable. Months before trial, President Trump and others have no way of predicting what "the substance of their testimony" will be for any number of witnesses, whether foreseeable or unforeseeable.

In its vagueness argument, the prosecution relies heavily on *United States v. Bronstein*, which upheld a statute prohibiting "mak[ing] a harangue or oration … in the Supreme Court building or grounds," as enforced against protestors who shouted protest slogans during a Supreme Court oral argument session. 849 F.3d at 1102. *Bronstein* is distinguishable because, unlike the Gag Order, it involved a restriction on speech that was already extremely circumscribed—it applied only to speech on "the Supreme Court building or grounds." *Id.* And the D.C. Circuit held that the words "harangue" and "oration" had a simple, commonsense meaning—"public speeches." *Id.* at 1108. This straightforward meaning was rendered even more narrow and specific by the statute's immediate context, which clarified that the words meant "public speeches that tend

17

to disrupt the Court's operations, and no others." *Id.* at 1109. The Gag Order differs from the statute in *Bronstein* because its key terms (e.g., "target") are vague from the outset, and they draw no clarification from the Gag Order's immediate context. *See id.*

Moreover, the statute at issue in *Bronstein* was not a prior restraint, since it sought to impose penalties after the fact, not to silence speech in advance. The D.C. Circuit did not analyze it as a prior restraint. *See id.* at 1102. The Gag Order, by contrast, is a quintessential prior restraint, "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559. Thus, *Bronstein* consciously sought to employ every possible interpretative tool to narrow the statute and eliminate its vagueness. *Id.* at 1106 ("'Only if no construction can save the Act from this claim of unconstitutionality are we willing to' strike the statute.") (citation omitted).

For a prior restraint, by contrast, the reviewing court "will not presume that the [restraint] curtails constitutionally protected activity as little as possible." *Button*, 371 U.S. at 432. The Supreme Court has repeatedly instructed that such restrictions on First Amendment rights are subject to the strictest standards of clarity. *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976) ("Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech.") (modifications omitted); *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) ("Where First Amendment rights are involved, an even 'greater degree of specificity' is required."); *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope … is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."); *Button*, 371 U.S. at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression."). *Bronstein* did not rely on such standards because of its narrow application, but they are applicable here.

18

## B.  Overbreadth

The prosecution also cannot show narrow tailoring because the Gag Order is sweepingly overbroad.  Not all statements "targeting" the prosecution, potential witnesses, or the substance of those witnesses' testimony, however defined, can possibly present a "clear and present danger" to a compelling government interest. Rather the Court must, but did not, delineate the specific statements where the prosecution has met its factual burden (which in this case is none) and impose restrictions only in those narrow areas. *White*, 416 F.3d at 751.

Seeking to justify the Gag Order's overbroad scope, the prosecution repeatedly claims that President Trump's speech is supposedly "disparaging" and "inflammatory" toward those he criticizes.  Doc. 120, at 2, 3, 12, 18, 24, 28.  In doing so, the prosecution echoes the Court's repeated scrutiny of "why … it was necessary for the defendant to use 'derogatory labels' and 'highly charged language'" in his political speech, such as calling people "thugs" or "deranged," *Id.* at 3-4 (quoting Doc. 103, at 41-42, 44-45, 50-51).  Indeed, the prosecution seeks to silence President Trump precisely *because* his speech is supposedly "disparaging" and "inflammatory."  *Id.* at 2, 3, 12, 18, 24, 28.  The Gag Order adopts this rationale.  Doc. 105, at 2.

The First Amendment does not permit censorship because the prosecution or the Court thinks that President Trump used "mean" or "intemperate" language. Just the opposite, suppressing speech only because it is supposedly "disparaging" and "inflammatory" is forbidden viewpoint discrimination, violating bedrock First Amendment principles:

> [A] function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.  Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.  That is why freedom of speech is protected against censorship or punishment.  There is no room under our Constitution for a more restrictive view. For the alternative

19

> would lead to standardization of ideas either by legislatures, courts, or dominant
> political or community groups.

*Cox*, 379 U.S. at 551–52 (cleaned up) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4–5 (1949)).

Recently, the Supreme Court applied these principles to unanimously invalidate a statutory restriction on speech that "disparage[s]" any person. *Matal*, 582 U.S. at 223 ("Speech may not be banned on the ground that it expresses ideas that offend."). In *Matal*, the four-Justice plurality opinion emphasized that a prohibition against "disparaging" speech constitutes forbidden viewpoint discrimination. *Id.* at 243. "We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Id.* at 244 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969) and citing ten other cases); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). The idea that "[t]he Government has an interest in preventing speech expressing ideas that offend … strikes at the heart of the First Amendment." *Matal*, 582 U.S. at 246.

*Matal*'s four-Justice concurrence was, if anything, more emphatic on this point, holding that the "disparagement" clause "constitutes viewpoint discrimination—a form of speech suppression so potent that it must be subject to rigorous constitutional scrutiny." *Id.* at 247 (Kennedy, J., concurring in part and concurring in the judgment). To prohibit "disparaging" speech "reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination." *Id.* at 249.

Here, the viewpoint discrimination is particularly pernicious because it selectively disadvantages President Trump in the forum of public debate without imposing any similar

disadvantage on his political opponents.   President Biden, his Administration, his campaign, former Vice President Pence, former Attorney General Barr, General Milley, and many others who routinely attack President Trump in public statements, books, and national news media remain free to use whatever rhetoric or methods of communication they prefer.   Even the Special Prosecutor's team remains free to continue to regularly leak confidential details of its investigation to the media to drive endless negative media coverage about President Trump.[6]   The First Amendment does not permit a one-sided, government-induced disadvantage on President Trump.   The government "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."   *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92 (1992).

Similarly, the Gag Order's prohibition of public criticism of the Special Prosecutor and other prosecutors is indefensible under the First Amendment. Those attorneys knowingly volunteered to participate in the most high-profile, politically charged prosecution in modern American history, and thus each "thrust himself into the vortex of this public issue." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). The same applies to the numerous potential witnesses who are high-level government officials and quintessential public figures.   Restricting criticism of the Special Counsel and his staff as well as other public officials, including any number of potential witnesses, is clearly inconsistent with the First Amendment.   Criticisms of judges—

---

[6] A long series of negative news stories about the Special Counsel's prosecution of President Trump have reported on inside information obtained from "sources close to the prosecution," often in circumstances where it is clear that only source(s) within the Special Prosecutor's team could have provided the information—such as reporting on grand jury matters or the timing of the indictment. *See, e.g.,* Katherine Faulders, *Ex-Chief of Staff Mark Meadows Granted Immunity, Tells Special Counsel He Warned Trump About 2020 Claims: Sources*, ABC News (Oct. 24, 2023), https://abcnews.go.com/US/chief-staff-mark-meadows-granted-immunity-tells-special/story?id=104231281 ("Former President Donald Trump's final chief of staff in the White House, Mark Meadows, has spoken with special counsel Jack Smith's team at least three times this year, including once before a federal grand jury, which came only after Smith granted Meadows immunity to testify under oath, according to sources familiar with the matter.").

21

even criticism that uses "strong language, intemperate language" and is "unfair"—cannot

constitutionally be the subject of contempt. *Craig v. Harney*, 331 U.S. 367, 376 (1947). The same

is true of other government officials, like the Special Counsel and his staff, former Vice President,

former Attorney General, former Chief of Staff and others. Restrictions on criticisms of those

officials thus cannot rest on mere "electricity in the atmosphere . . . generated by the facts" of the

case. *Bridges v. California*, 314 U.S. 252, 278 (1941).

## IV.     The Other Equitable Factors Favor a Stay Pending Appeal.

The prosecution admits that "the loss of [First Amendment] freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury." Response, at 29. And it admits that

"the strength of [President Trump's] showing on public interest rises and falls with the strength of

his showing of likelihood of success on the merits." *Id.* (cleaned up). Because President Trump has

shown a likelihood of success on the merits, a stay should follow.[7]

## V.      The Prosecution's Request to Modify the Conditions of Release is Meritless.

Finally, the prosecution (while not proceeding by notice and motion) for the first time asks

the Court to "modify the defendant's conditions of release by making compliance with the Order

a condition" of release or by incorporating the terms of the Gag Order. Response, at 31. This relief

is unconstitutional for the reasons discussed above. The Court cannot cure the infirmities of the

---

[7] The prosecution argues that the public interest favors "a right to a fair trial by impartial jurors." Response, at 29 (quoting *Gentile*, 501 U.S. at 1075). But, as explained above, the Court did not grant the prosecution's request for a gag order regarding statements that the prosecution thinks might affect the jury pool, *see* Doc. 105, at 2, so the prosecution's invocation of "impartial jurors" is inapt. In any event, the prosecution has presented no evidence that any potential witness has received threats or harassment, or even subjectively feels threatened by President Trump's statements, so the prosecution's fear of prejudice to its right to a "fair trial," Response, at 29, is "of course … speculative." Tr. 62.

Gag Order simply by reincorporating the same directives into President Trump's terms of release. Moreover, the issue of amending conditions of release has not been briefed by the parties.

The prosecution's request is also jurisdictionally improper. The Court entered the Gag Order, and President Trump promptly filed a notice of appeal. The prosecution does not dispute that the Gag Order is an appealable order. *See* Doc. 110, at 8. Thus, when President Trump filed his notice of appeal, it divested the Court of jurisdiction to amend or modify the Gag Order: "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). The prosecution's latest proposal seeks to end-run around the Court of Appeals' jurisdiction by modifying and reasserting the Gag Order as a condition of release while it is being challenged on appeal, which the Court lacks jurisdiction to do. *See id.*

Moreover, by seeking to, effectively, impose sanctions on President Trump for speech occurring while the Gag Order is stayed, the prosecution not only violates the Court's administrative stay, but highlights the prosecution's unconstitutional and deeply troubling goal of silencing President Trump's core political speech. The prosecution does not seek modification of the terms of release because it believes President Trump has violated his existing terms. Instead, it hopes the threat of bond revocation and imprisonment will force President Trump into silence. This exponentially compounds the Constitutional burdens imposed by the Gag Order, as "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone than if the

boundaries of the forbidden areas were clearly marked.'" *Grayned*, 408 U.S. at 109 (cleaned up)

(quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).[8]

## CONCLUSION

The prosecution's undeniable goal is to silence its primary political opponent, President

Trump, during his campaign against the Biden Administration. The Court should not countenance

such a blatant and unjustifiable attack on the First Amendment. Accordingly, the Court should deny

the prosecution's bond modification request and stay the Gag Order pending appeal.

Dated: October 28, 2023                          Respectfully submitted,


Todd Blanche, Esq. (PHV)                         */s/John F. Lauro*
toddblanche@blanchelaw.com                       John F. Lauro, Esq.
Emil Bove, Esq. (PHV)                            D.C. Bar No. 392830
Emil.Bove@blanchelaw.com                         jlauro@laurosinger.com
BLANCHE LAW                                      Gregory M. Singer, Esq. (PHV)
99 Wall St., Suite 4460                          gsinger@laurosinger.com
New York, NY 10005                               Filzah I. Pavalon, Esq. (PHV)
(212) 716-1250                                   fpavalon@laurosinger.com
                                                 LAURO & SINGER
                                                 400 N. Tampa St., 15th Floor
                                                 Tampa, FL 33602
                                                 (813) 222-8990
                                                 *Counsel for President Trump*

---

[8] The prosecution's justification for this request is baseless. Response, at 30-31. The prosecution contends that "within hours of a news report about the purported testimony in this case of the defendant's former Chief of Staff," Mark Meadows, "the defendant issued multiple prejudicial and threatening Truth Social posts to influence and intimidate the Chief of Staff…." *Id.* at 30; *see also id.* at 9 (screen shot of Truth Social post). Setting aside the fact that a likely source for this leak about Meadows' supposedly confidential grand jury testimony—calculated to generate news coverage negative for President Trump—is the Special Prosecutor and/or his team. The prosecution offers no evidence that Meadows—a former U.S. Congressman and White House Chief of Staff—is somehow threatened or intimidated by President Trump's public statements, or has received any "threats" or "harassment," or that there is any reasonable prospect that President Trump's posts might affect him in any way.

24

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**UNITED STATES OF AMERICA**,

v.

**DONALD J. TRUMP**,

　　　　Defendant.

Criminal Action No. 23-257 (TSC)

---

## OPINION AND ORDER

On September 15, 2023, the government filed a Motion to Ensure that Extrajudicial

Statements Do Not Prejudice These Proceedings.  ECF No. 57.  Following a motion hearing on

October 16, 2023, *see* Tr. of Mot. Hr'g, ECF No. 103 ("Hr'g Tr."), the court prohibited the

parties and counsel in this matter from making certain public statements, Opinion and Order,

ECF No. 105 ("Order").  Defendant has appealed that Order, *see* ECF No. 106, and now moves

for the court to stay the Order during the pendency of that appeal, ECF No. 110 ("Motion to

Stay").  The court entered a temporary administrative stay of its Order while the parties briefed

the Motion, *see* October 20, 2023 Minute Order, but will now DENY Defendant's Motion and

lift the stay.[1]

## I.　　DISCUSSION

Four factors guide the decision whether to stay an order pending appeal:

(1) whether the stay applicant has made a strong showing that he is likely to succeed
on the merits; (2) whether the applicant will be irreparably injured absent a stay;

---

[1] The government also asks the court to incorporate the Order into Defendant's conditions of
release.  Resp. in Opp'n to Mot. to Stay, ECF No. 120, at 30–32.  The court hereby DENIES
that request without prejudice.  Even assuming that request is procedurally proper, the court
concludes that granting it is not necessary to effectively enforce the Order at this time.

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).  The third and fourth factors "merge when the Government is the opposing party."  *Id.* at 435.  Here, all the factors weigh against granting a stay.

## A.  <u>Likelihood of success on the merits</u>

Defendant has not made a strong showing that he is likely to succeed on the merits.  As the court has explained, the First Amendment rights of participants in criminal proceedings must yield, when necessary, to the orderly administration of justice—a principle reflected in Supreme Court precedent, the Federal Rules of Criminal Procedure, and the Local Criminal Rules.  Order at 1–3; *see, e.g.*, Hr'g Tr. at 6–8, 16–18, 31, 34, 60, 64, 82–85.  And contrary to Defendant's argument, the right to a fair trial is not his alone, but belongs also to the government and the public.  *See, e.g.*, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991) (emphasizing "the State's interest in fair trials"); *United States v. Tijerina*, 412 F.2d 661, 667 (10th Cir. 1969) ("The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect 'fair trials designed to end in just judgments.'  This objective may be thwarted unless an order against extrajudicial statements applies to all parties to a controversy.  The concept of a fair trial applies both to the prosecution and the defense." (internal citations omitted)).  Defendant's repeated appeals to broad First Amendment values therefore ignore that the court—pursuant to its obligation to protect the integrity of these proceedings—recognized those values but, in balancing them against the

potential prejudice resulting from certain kinds of statements, found them outweighed.  *See*

Motion to Stay at 2–3, 10–24.[2]

    Defendant's other claims also disregard the record.  To begin, he asserts that the court

"cite[d] no evidence supporting its findings of risks of harassment and witness intimidation, and

the prosecution provided none."  *Id.* at 8.  But several times the court and the government

pointed to evidence causally linking certain kinds of statements with those risks, and Defendant

never disputed it.  *See* Hr'g Tr. at 67 (The Court: "[W]hen Mr. Trump has singled out certain

people in public statements in the past, hasn't that led to them being threatened and harassed, as

demonstrated in the statements attached by the government?"  Mr. Lauro: "Your Honor, that's

totally irrelevant."  The Court: "And the government's motion cites several of them who averred

in the kinds of statements that you've asked for under oath that threats and harassment toward

them had increased significantly as a result of Mr. Trump's statements about them.");  Order at 2

("Undisputed testimony cited by the government demonstrates that when Defendant has publicly

attacked individuals, including on matters related to this case, those individuals are consequently

threatened and harassed.  *See* ECF No. 57 at 3–5.");  *see also* ECF No. 60 (failing to dispute or

even discuss the testimonies cited by the government).  The evidence is in the record; Defendant

simply fails to acknowledge it.

---

[2] Defendant's Motion argues that his speech restrictions are inconsistent with the "right of
listeners to receive President Trump's message."  Motion to Stay at 15.  Defendant did not
squarely raise that argument in his opposition brief to the government's original motion; the
closest he came to identifying any authority for it was an unrelated "*see also*" citation to
*United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987), a case that he now quotes to support
his right-of-listeners argument.  *Compare* ECF No. 60 at 5, *with* Motion to Stay at 16.  But the
court expressly addressed and distinguished that case.  Order at 2–3.  In any event, the
argument does not alter the fundamental principle that First Amendment rights, whether those
of the speaker or the listener, may be curtailed to preclude statements that pose sufficiently
grave threats to the integrity of judicial proceedings.

Likewise, Defendant claims that the court "g[ave] no meaningful consideration to alternative, less restrictive measures, including a narrower order."  Motion to Stay at 28.  Again, the record flatly contradicts that claim.  During the motion hearing, the court questioned whether Defendant's existing speech restrictions, such as his conditions of release, would adequately prevent the potential dangers to these proceedings.  Hr'g Tr. at 10–11, 34–35, 70.  The court also considered whether alternative measures could prevent those harms—and in fact concluded that they could—with respect to certain kinds of statements, such as those disparaging the District of Columbia.  *Id.* at 28, 35–36.  Accordingly, the court denied the government's motion in those respects.  *Id.* at 82–83; Order at 1.  But the court explained that alternative measures would not sufficiently mitigate the risks flowing from other kinds of statements, such as those targeting reasonably foreseeable witnesses.  *See* Order at 1–2 ("Here, alternative measures such as careful *voir dire*, jury sequestration, and cautionary jury instructions are sufficient to remedy only some of the potential prejudices that the government's motion seeks to address."); *id.* at 2 (noting that the risks created by certain statements would be irreversible); *id.* at 2–3 ("[T]his court has found that even amidst his political campaign, Defendant's statements pose sufficiently grave threats to the integrity of these proceedings that cannot be addressed by alternative means, and it has tailored its order to meet the force of those threats.").  The court thus tailored its Order to prohibit statements only where less restrictive measures would be inadequate.

Defendant's final claim is that the Order is unconstitutionally vague for various reasons, none of which withstand scrutiny.  First, Defendant quotes Merriam-Webster Online's definition of "interested" to conclude that the term "interested parties" includes could include "everyone 'affected' by or 'involved' in the case."  Motion to Stay at 26.  But "interested party" is a well-established legal term of art meaning "anyone who both is directly interested in a lawsuit and has

a right to control the proceedings, make a defense, or appeal from an adverse judgment."
*Interested Party*, *Black's Law Dictionary* (11th ed. 2019) (referencing *Party* (2), *Black's Law Dictionary* (11th ed. 2019)).  The Order confirmed that scope, defining the term as "including the parties and their counsel."  Order at 3; *see also* Hr'g Tr. at 83–84 (stating that the written order would apply to the parties and their counsel).  There is no meaningful basis to interpret "interested parties" as covering anyone else.

Second, Defendant focuses on the prohibition of "targeting" certain individuals, again quoting various dictionary definitions to assert that targeting could include not only identifying those individuals, but also attacking them, subjecting them to ridicule or criticism, or otherwise attempting to affect them.  Motion to Stay at 25.  But "restating a dictionary" to "search . . . for every facet" of relevant terms is not a proper vagueness inquiry.  *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017).  "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'"  *Id.* at 1107 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).  And a cardinal rule of interpretation is that context matters; "a word is known by the company it keeps."  *Id.* at 1108 (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

The motion hearing and corresponding Order provide substantial context for and examples of the kinds of "targeting" statements that could result in "significant and immediate risk[s]" to "the integrity of these proceedings."  Order at 2.  Indeed, the court identified that, depending on their context, statements matching each of the definitions Defendant proffers for the term "target" could pose such risks.  *See, e.g.*, Hr'g Tr. at 50–54 (risks associated with publicly identifying court staff); *id.* at 41–43 (risks associated with attacking prosecutors); *id.* at 59–60 (risks associated with criticizing potential witnesses); *id.* at 13–14 (risks associated with

attempting to affect potential witnesses' testimony, even using praise rather than criticism).

Defense counsel also repeatedly relied on context to distinguish permissible from impermissible statements. *See, e.g.*, *id.* at 72 (The court: "Next hypothetical. 'Bill Barr is a smart guy, but he better learn to keep his mouth shut.' Permissible? Or an attempt to obstruct justice or intimidate a witness?" Mr. Lauro: "[It] depends on the context . . . . [I]f it happened the day before Bill Barr testified at trial, that might be [impermissible]."); *id.* at 71 (similar). A "term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). The court's Order and the motion hearing's record sufficiently clarify the meaning of "targeting" to provide fair notice of the kinds of statements—understood in context—that it prohibits.

Two of Defendant's social media posts since the Order's entry illustrate the comprehensible difference between the statements it permits and those it proscribes. First, on October 20, 2023—after the Order was entered, but before it was administratively stayed—Defendant stated:

> Does anyone notice that the Election Rigging Biden Administration never goes after the Riggers, but only after those that want to catch and expose the Rigging dogs. Massive information and 100% evidence will be made available during the Corrupt Trials started by our Political Opponent. We will never let 2020 happen again. Look at the result, OUR COUNTRY IS BEING DESTROYED. MAGA!!![3]

This statement asserts that Defendant is innocent, that his prosecution is politically motivated, and that the Biden administration is corrupt. It does not violate the Order's prohibition of "targeting" certain individuals; in fact, the Order expressly permits such assertions. Order at 3.

---

[3] https://truthsocial.com/@realDonaldTrump/posts/111267550982205234.

By contrast, on October 24, 2023—after the Order was administratively stayed—

Defendant stated:

> I don't think Mark Meadows would lie about the Rigged and Stollen 2020
> Presidential Election merely for getting IMMUNITY against Prosecution
> (PERSECUTION!) by Deranged Prosecutor, Jack Smith.  BUT, when you really
> think about it, after being hounded like a dog for three years, told you'll be going
> to jail for the rest of your life, your money and your family will be forever gone,
> and we're not at all interested in exposing those that did the RIGGING — If you
> say BAD THINGS about that terrible "MONSTER," DONALD J. TRUMP, we
> won't put you in prison, you can keep your family and your wealth, and, perhaps,
> if you can make up some really horrible "STUFF" a out him, we may very well
> erect a statue of you in the middle of our decaying and now very violent Capital,
> Washington, D.C.  Some people would make that deal, but they are weaklings and
> cowards, and so bad for the future our Failing Nation.  I don't think that Mark
> Meadows is one of them, but who really knows?  MAKE AMERICA GREAT
> AGAIN!!![4]

This statement would almost certainly violate the Order under any reasonable definition of

"targeting."[5]  Indeed, Defendant appears to concede as much, Reply in Support of Motion to

Stay, ECF No. 123, at 10 n.3 ("If the Gag order had been in effect, President Trump would have

been unable to [make the statement].")—and for good reason.  The statement singles out a

foreseeable witness for purposes of characterizing his potentially unfavorable testimony as a

"lie" "mad[e] up" to secure immunity, and it attacks him as a "weakling[] and coward[]" if he

provides that unfavorable testimony—an attack that could readily be interpreted as an attempt to

influence or prevent the witness's participation in this case.  The plain distinctions between this

statement and the prior one—apparent to the court and both parties—demonstrate that far from

---

[4] https://truthsocial.com/@realDonaldTrump/posts/111293117150329703.

[5] Because of the administrative stay on the Order, this statement is not before the court.  Before
concluding that any statement violated the Order, the court would afford the parties an
opportunity to provide their positions on the statement's meaning and permissibility.

being arbitrary or standardless, the Order's prohibition on "targeting" statements can be straightforwardly understood and applied.

Defendant's other assertions of vagueness boil down to similar objections that deciding whether a statement violates the Order will necessarily be a fact-bound inquiry. He contends that it may at times be difficult to tell whether an individual is a reasonably foreseeable witness, or to distinguish proclamations of innocence from attacks on prosecutors or witnesses. Motion to Stay at 26–28. But even assuming that is true, it does not follow that "men of common intelligence must necessarily guess at [the] meaning" of the Order's prohibitions. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976) (citation omitted). It is a "basic mistake" to derive vagueness from "the mere fact that close cases can be envisioned. . . . Close cases can be imagined under virtually any [prohibition]." *United States v. Williams*, 553 U.S. 285, 305–06 (2008). If a party or their counsel makes a statement that may have violated the Order, the court will assess its substance and context. The fact that it needs to do so with special care in close cases does not render the underlying Order unconstitutionally vague.

Consequently, Defendant has failed to make a strong showing that he is likely to succeed on the merits of his appeal.

## B.  Remaining factors

The remaining factors also counsel against a stay. Defendant's brief arguments on each rely entirely on the premise that the court's Order violated his First Amendment rights. *See* Motion to Stay at 31 ("[A] showing of likelihood of success on a First Amendment claim necessarily establishes irreparable injury."); *id.* ("As for the balancing of harms and the public interest . . . the demonstration of an ongoing violation of the First Amendment rights dictates that a stay should be entered."). Having rejected that premise, the court reaches the opposite conclusions. Where "there is no showing of a likelihood of success on the merits" of a First

Amendment claim, there is no irreparable injury or public interest favoring a stay. *Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334–35 (D.C. Cir. 2018). To the contrary, "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile*, 501 U.S. at 1075 (internal quotations omitted). As discussed above, in the Order, and during the motion hearing, the court finds that the public interest in the orderly administration of this case requires the Order's limitations on such statements.

## II.     CONCLUSION

For these reasons, Defendant's Motion to Stay, ECF No. 110, is hereby DENIED, and the administrative stay imposed by the court's October 20, 2023 Minute Order is hereby LIFTED.


Date: October 29, 2023


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

Dated: November 8, 2023                Respectfully Submitted,


LAURO & SINGER                         JAMES OTIS LAW GROUP, LLC

John F. Lauro, Esq.                    */s/ D. John Sauer*
D.C. Circuit Bar No. 64896             D. John Sauer
jlauro@laurosinger.com                 William O. Scharf
400 N. Tampa St., 15th Floor           Michael E. Talent
Tampa, FL 33602                        13321 N. Outer Forty Road, Suite 300
(813) 222-8990                         St. Louis, Missouri 63017
                                       (314) 562-0031
                                       John.Sauer@james-otis.com

                                       *Attorneys for President Donald Trump*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 8, 2023, I caused a true and correct copy

of the foregoing to be filed via hand delivery with the Clerk of Court at:

Clerk of Court
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue NW
Room 5205
Washington, DC 20001

and by hand delivery to:

Mr. Cecil W. VanDevender
United States Department of Justice
950 Pennsylvania Avenue NW
Room B-206
Washington, DC 20530

*/s/ D. John Sauer*