In the

# United States Court of Appeals
### for the District of Columbia Circuit

———————————

UNITED STATES OF AMERICA

v.

DONALD J. TRUMP,

Defendant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
District Court No. 23-cr-257 (Chutkan, J.)

———————

## ANSWERING BRIEF FOR THE UNITED STATES

———————

J.P. COONEY
Deputy Special Counsel

RAYMOND N. HULSER
Counselor to the Special Counsel

JAMES I. PEARCE
JOHN M. PELLETTIERI
Assistant Special Counsels

JACK SMITH
Special Counsel

MOLLY G. GASTON
THOMAS P. WINDOM
Senior Assistant Special Counsels

CECIL W. VANDEVENDER
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

## A.    Parties and Amici

The parties that appeared in the district court and that are now before this Court are the United States (plaintiff-appellee) and Donald J. Trump (defendant-appellant).

## B.    Rulings Under Review

The defendant seeks review of the order of the district court (Chutkan, J.) imposing restrictions on certain extrajudicial statements by the parties and their counsel.  JA.229-31 (the "Order").

## C.    Related Cases

Counsel is not aware of any cases that would be deemed related under D.C. Cir. R. 28(a)(1)(C).

/s/ Cecil W. VanDevender
CECIL W. VANDEVENDER
Assistant Special Counsel
U.S. Department of Justice

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .... i

TABLE OF AUTHORITIES ........................................................ iv

GLOSSARY OF ABBREVIATIONS ............................................... x

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF THE ISSUE .................................................... 1

STATEMENT OF THE CASE ...................................................... 1

    I.    Background ................................................................. 1

        A.    The indictment and trial date ............................. 1

        B.    The defendant's extrajudicial statements. ........................... 3

    II.    The District Court's Order Under Local Criminal Rule 57.7(c) ................................................. 8

        A.    Legal background. ........................................... 8

        B.    The Order under review. ................................. 10

SUMMARY OF ARGUMENT .................................................. 18

ARGUMENT ........................................................................ 20

    The District Court Issued an Appropriate Order Under Local Criminal Rule 57.7(c). ....................................... 20

        A.    A district court may issue an order restricting extrajudicial speech by a defendant that poses a substantial likelihood of material prejudice to the proceedings. ................................................. 20

        B.    The Order entered here was necessary and appropriate..... 29

            1.    The Order is necessary to ensure a fair trial. ............ 29

a. The district court's findings had ample evidentiary support ........................................ 30

b. The district court appropriately relied on the clear causal link between the defendant's conduct and acts of harassment and intimidation that threaten the integrity of the trial. .................................. 31

c. The harms identified by the district court are not impermissibly "speculative." .............. 35

2. The Order is narrowly tailored. ............................... 36

a. The Order does not impede the defendant's ability to run for office while defending himself in court. ............................ 36

b. The district court appropriately considered and rejected alternative means. ...................... 45

c. The Order does not subject the defendant to an impermissible double standard. ............. 48

3. The Order is not vague. .......................................... 50

CONCLUSION ........................................................ 55

CERTIFICATE OF COMPLIANCE .......................................... 56

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ............................................................ 20

*Broderick v. Donaldson*,
437 F.3d 1226 (D.C. Cir. 2006) ........................................................... 52

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) .............................................................. 49

*Capital Cities Media, Inc. v. Toole*,
463 U.S. 1303 (1983) ........................................................................... 24

*Carbo v. United States*,
288 F.2d 686 (9th Cir. 1961) .........................................................32, 35

*Carbo v. United States*,
82 S. Ct. 662 (1962) (Douglas, J., in chambers)................................. 33

*Carroll v. Trump*,
--- F. Supp. 3d ---, 2023 WL 2612260 (S.D.N.Y. Mar. 23, 2023)............... 32

*Cox v. Louisiana*,
379 U.S. 536 (1965) ............................................................................. 34

*Estes v. Texas*,
381 U.S. 532 (1965) ............................................................................. 21

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) ............................................................................. 34

*Gentile v. State Bar of Nev.*,
501 U.S. 1030 (1991) .....................................................21-23, 25, 27, 31

*Georgia v. Brailsford*,
3 U.S. (3 Dall.) 1 (1794)....................................................................... 42

*Green v. Haskell Cnty. Bd. of Comm'rs*,
568 F.3d 784 (10th Cir. 2009) ................................................... 20

*Gustafson v. Jones*,
290 F.3d 895 (7th Cir. 2002) ................................................... 20

*In re Dow Jones & Co., Inc.*,
842 F.2d 603 (2d Cir. 1988).................................. 24, 36, 43, 46

*In re Morrissey*,
168 F.3d 134 (4th Cir. 1999) ................................................. 27

*In re Russell*,
726 F.2d 1007 (4th Cir. 1984)...................................... 29, 34, 53

*In re State-Record Co., Inc.*,
917 F.2d 124 (4th Cir. 1990) ................................................. 21

*In re Stone*,
940 F.3d 1332 (D.C. Cir. 2019) ....................................... 1, 36

*Landmark Communications, Inc. v. Virginia*,
435 U.S. 829 (1978) .......................................................... 23-24

*Levine v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
764 F.2d 590 (9th Cir. 1985) ...........................................28, 53

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976) .............................10, 22, 24, 30, 34-35, 46

*New York v. Trump*,
No. 452564/2022, NYSCEF No. 1631
(N.Y. Sup. Ct. Nov. 3, 2023)................................................. 7

*Pell v. Procunier*,
417 U.S. 817 (1974) ............................................................ 27

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ............................................................ 47

v

*Seattle Times Co. v. Rhinehart,*
    467 U.S. 20 (1984) ...............................................................22, 31

*Sheppard v. Maxwell,*
    384 U.S. 333 (1966) ............................................ 8-9, 20-21, 46

*The News-Journal Corp. v. Foxman,*
    939 F.2d 1499 (11th Cir. 1991) ............................................... 24

*Thompson v. Hebdon,*
    7 F.4th 811 (9th Cir. 2021) ...................................................... 20

*United States v. Hill,*
    420 F. App'x 407 (5th Cir. 2011) ............................................ 37

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) ............... 2

*Trump v. United States,*
    54 F.4th 689 (11th Cir. 2022) .................................................. 41

*United States v. Bankman-Fried,*
    No. 22-cr-673, ECF No. 180 (S.D.N.Y. July 26, 2023) ............................ 37

*United States v. Bronstein,*
    849 F.3d 1101 (D.C. Cir. 2017) ......................................... 49-51

*United States v. Brown,*
    218 F.3d 415 (5th Cir. 2000) .................... 1, 22-23, 25-27, 34, 36, 43-47, 53

*United States v. Castillo-Rubio,*
    34 F.4th 404 (5th Cir. 2022) .................................................. 24

*United States v. Concord Mgmt. & Consulting LLC,*
    No. 18-cr-32, 2019 WL 7758635 (D.D.C. July 1, 2019) ........................... 48

*United States v. Cua,*
    No. 21-cr-107, 2021 WL 918255 (D.D.C. Mar. 10, 2021) ......................... 26

*United States v. Cutler,*
    58 F.3d 825 (2d Cir. 1995) .........................................42, 48, 53

*United States v. Fieger*,
    No. 07-cr-20414, 2008 WL 659767 (E.D. Mich. Mar. 11, 2008) .............. 37

*United States v. Ford*,
    830 F.2d 596 (6th Cir. 1987) ....................................................27, 37, 40

*United States v. Hale-Cusanelli*,
    3 F.4th 449 (D.C. Cir. 2021) ................................................................. 20

*United States v. Hanson*,
    No. 23-cr-343, ECF No. 1 (N.D. Ga. Oct. 25, 2023)................................. 7

*United States v. Johnston*,
    No. 17-mj-46, 2017 WL 4277140 (D.D.C. Sep. 22, 2017) ........................ 26

*United States v. Katsman*,
    551 F. App'x 601 (2d Cir. 2014) ............................................................ 33

*United States v. Manafort*,
    897 F.3d 340 (D.C. Cir. 2018)............................................................... 36

*United States v. Maurstad*,
    35 F.4th 1139 (8th Cir. 2022) ............................................................... 33

*United States v. McVeigh*,
    964 F. Supp. 313 (D. Colo. 1997) .......................................................... 49

*United States v. Napout*,
    963 F.3d 163 (2d Cir. 2020).................................................................. 32

*United States v. Salerno*,
    481 U.S. 739 (1987) .............................................................................. 25

*United States v. Scrushy*,
    No. 03-cr-530, 2004 WL 848221 (N.D. Ala. Apr. 13, 2004) ..................... 37

*United States v. Simon*,
    664 F. Supp. 780 (S.D.N.Y. 1987).......................................................... 35

*United States v. Smallwood*,
    365 F. Supp. 2d 689 (E.D. Va. 2005) ..................................................... 11

*United States v. Smith*,
  79 F.3d 1208 (D.C. Cir. 1996) .................................................. 29

*United States v. Shry*,
  No. 4:23-cr-413, ECF No. 1 (S.D. Tex. Aug. 11, 2023) ............................. 5

*United States v. Taranto*,
  No. 1:23-cr-229, ECF No. 27 (D.D.C. Sep. 12, 2023) ............................ 7

*United States v. Tijerina*,
  412 F.2d 661 (10th Cir. 1969) .................................... 22-23, 27, 36

*United States v. Williams*,
  553 U.S. 285 (2008) .............................................................. 51

*United States v. Young*,
  470 U.S. 1 (1985) ................................................................ 21

*Wade v. Hunter*,
  336 U.S. 684 (1949) .............................................................. 22

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .............................................................. 49

**Statutes and Rules**

18 U.S.C. § 241 ..................................................................... 2

18 U.S.C. § 371 ..................................................................... 2

18 U.S.C. § 1512 .................................................................... 2

18 U.S.C. § 2383 .................................................................... 2

18 U.S.C. § 3142 ................................................................... 26

28 U.S.C. § 1291 .................................................................... 1

D. Mass. LR 83.2.2 ................................................................ 10

D. Md. LR 603...................................................................... 10

D.C. Cir. R. 28.................................................................................................i

D.C. LCrR 57.7 ...................................................................1, 8, 10, 20, 36

E.D. Va. LCrR 57.1 ..................................................................... 10

S.D.N.Y./E.D.N.Y. LCrR 23.1.................................................. 10

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ............................................. 52

*Former President Trump Campaigns in Claremont, New Hampshire,*
 C-SPAN (Nov. 11, 2023) ........................................................ 14

Maggie Haberman, et al., *Trump, Escalating Attacks, Raises Specter of*
 *Violence if He Is Charged*, N.Y. Times (Mar. 24, 2023) .................................. 8

Perry Stein et al., *Trump Says He Received a Target Letter in Federal Jan.*
 *6 Investigation*, Washington Post (July 18, 2023)....................................... 48

*Report of the Committee on the Operation of the Jury System on the "Free*
 *Press-Fair Trial" Issue*, 45 F.R.D. 391 (1968) ............................................ 8-9

*Revised Report of the Judicial Conference Committee on the Operation of the*
 *Jury System on the "Free Press-Fair Trial" Issue,*
 87 F.R.D. 518 (1980) ............................................................... 9-10, 25, 27

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Br. | Opening brief filed by Defendant |
| JA | Joint Appendix |
| Mot. | Defendant's November 2, 2023 Emergency Motion for Stay Pending Appeal |
| SA | Government's Supplemental Appendix |
| SJA | Supplemental Joint Appendix (under seal) |

## JURISDICTIONAL STATEMENT

The district court entered its order on October 17, 2023, and the defendant filed a timely notice of appeal the same day. JA.16, 232. This Court has jurisdiction under 28 U.S.C. § 1291, because the order is immediately appealable under the collateral order doctrine. *See In re Stone*, 940 F.3d 1332, 1340 (D.C. Cir. 2019); *United States v. Brown*, 218 F.3d 415, 420 (5th Cir. 2000).

## STATEMENT OF THE ISSUE

Whether the district court permissibly issued an order under Local Criminal Rule 57.7(c) prohibiting the parties and their counsel from making extrajudicial statements targeting certain trial participants, while expressly leaving the defendant free to make "statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals."

## STATEMENT OF THE CASE

### I.    Background

#### A.    The indictment and trial date

This case stems from the defendant's criminal efforts to overturn the results of the 2020 presidential election and prevent the lawful transfer of power to his successor. On August 1, 2023, a grand jury charged the defendant in a

four-count indictment.  JA.20-64.  Count One charges a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; Counts Two and Three charge conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2) for corruptly obstructing the certification of the presidential election results on January 6, 2021; and Count Four charges a conspiracy to violate one or more person's constitutional right to vote and have one's vote counted, in violation of 18 U.S.C. § 241.  *Id.*

Although the indictment does not charge the defendant with incitement to insurrection, *see* 18 U.S.C. § 2383, it squarely alleges that he is responsible for the events of January 6, 2021, where "[l]ives were lost; blood was shed; portions of the Capitol building were badly damaged; and the lives of members of the House and Senate, as well as aides, staffers, and others who were working in the building, were endangered." *Trump v. Thompson*, 20 F.4th 10, 35-36 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022).  JA.136; *see* SA.168-82 (addressing the defendant's role in the events of Jan. 6, 2021, in response to a motion to strike surplusage).

The district court has scheduled the trial to begin on March 4, 2024, SA.157, with prospective jurors set to complete questionnaires on February 9, 2024, SA.166-67.  In so doing, the court denied the defendant's request (SA.80-94) for a trial date in April 2026, in light of "the public's interest in seeing this

case resolved in a timely manner," SA.150, and has likewise denied his repeated requests to delay the trial and the pretrial deadlines, *see* SA.162-64 (denying defense request to extend pretrial motions deadline by sixty days and noting that "[b]ackloading the pretrial schedule to that degree will not serve the interests of justice"); SA.183-85 (denying defense request to extend deadline for trial subpoenas by three months in light of "the problems inherent in additional delay"); JA.162-63 (stating that "[t]his trial will not yield to the election cycle and we're not revisiting the trial date").

### B. The defendant's extrajudicial statements.

At a hearing shortly after the defendant's indictment, the district court noted that it was "committed to ensuring that this case proceeds in the normal course that our criminal justice system prescribes." SA.77. To that end, the court explained that although the defendant would be "afforded all the rights that any citizen would have," the court was also cognizant of its "obligation to prevent . . . a carnival atmosphere of unchecked publicity and trial by media rather than our constitutionally established system of trial by impartial jury." *Id.* (quotations omitted). The court observed that while the parties' briefing had "referred to certain public statements that [the defendant] has made in recent days," those statements were not yet the subject of any pending motion. SA.77-78. Nevertheless, the court "issue[d] a general word of caution" grounded in its

commitment "to ensure the orderly administration of justice in this case" as with "any other case." SA.78. The court warned that "even arguably ambiguous statements from parties or their counsel, if they could reasonably be interpreted to intimidate witnesses or to prejudice potential jurors, can threaten the process." *Id.* The court therefore "caution[ed]" the attorneys and the defendant "to take special care in your public statements about this case," because the court would "take whatever measures are necessary to safeguard the integrity of these proceedings." *Id.*

Before and after these admonitions, the defendant has persistently used social media to make prejudicial comments about the case and its participants. Three days after the indictment, he issued the public threat, "IF YOU GO AFTER ME, I'M COMING AFTER YOU!", JA.79, and then followed through on that threat by using disparaging and inflammatory language to target the district court, the Special Counsel, and trial witnesses who, as he knew from discovery, were expected to offer inculpatory testimony against him, JA.84-85, 129-30, 285. He described the presiding district judge as a "fraud" and a "hack." JA.79-80. He repeatedly called the prosecutors handling the case "deranged," "thugs," and "lunatics," and asserted that one of them, whom he identified by name, had gone to the White House for an improper purpose—a claim that he knew to be false from the materials he had received in discovery. JA.81-83. He

described his former Vice President, a foreseeable trial witness, as "delusional" and "not a very good person" who "wants to show he's a tough guy," JA.85, later saying that the former Vice President had "ma[d]e up stories" about the defendant, JA.129. He said that the person he had appointed Chairman of the Joint Chiefs of Staff, another foreseeable trial witness, had done something "so egregious that, in times gone by, the punishment would have been DEATH!" JA.130. He said that potentially unfavorable testimony from his former chief of staff was a "lie" "mad[e] up" to secure immunity, adding that only a "weakling[] and coward[]" would provide such testimony. JA.306, 340. After the defendant made these public statements, they were "amplified by social media users, including his followers"—who, he has boasted, listen to him "like no one else," JA.78—and then "widely reported on in national media." Br. 6.

Four days after the indictment, and one day after his post stating, "IF YOU GO AFTER ME, I'M COMING AFTER YOU!", one his followers called the district court's chambers, saying, "Hey you stupid slave n****r . . . . If Trump doesn't get elected in 2024, we are coming to kill you, so tread lightly, b***h. . . . You will be targeted personally, publicly, your family, all of it." *See United States v. Shry*, No. 4:23-cr-413, ECF No. 1 at 3 (Criminal Complaint) (S.D. Tex. Aug. 11, 2023); JA.85. That episode was part of a pattern, stretching back years, in which people publicly targeted by the defendant are, as a result of

the targeting, subject to harassment, threats, and intimidation. An election commissioner who was targeted by the defendant in the wake of the 2020 election described the results in congressional testimony, stating, "After the President tweeted at me by name, calling me out the way that he did, the threats became much more specific, much more graphic, and included not just me by name but included members of my family by name, their ages, our address, pictures of our home. Just every bit of detail that you could imagine. That was what changed with that tweet." JA.76; SJA.3. An election worker likewise testified, "Do you know how it feels to have the President of the United States to target you? . . . [W]hen someone as powerful as the President of the United States eggs on a mob, that mob will come." JA.78; SJA.5. A state judge likewise described needing additional police protection after the defendant targeted him on social media. JA.76; SJA.3; *see* SJA.3-5 (describing additional incidents). More recently, the defendant posted to social media a photograph of a state judge's law clerk, along with a caption falsely alleging that she was the "girlfriend" of a political adversary. JA.192-93. The presiding judge there ordered the removal of the post, but has stated, "Since the commencement of this bench trial, my chambers have been inundated with hundreds of harassing and threatening phone calls, voicemails, emails, letters, and packages." *New*

*York v. Trump*, No. 452564/2022, NYSCEF No. 1631 at 2 (N.Y. Sup. Ct. Nov. 3, 2023).

As alleged in the indictment, the defendant seeks to use this well-known dynamic to his advantage, as he did when he responded to the Vice President's "refus[al] to agree to the Defendant's request that he obstruct the certification" by threatening to publicly criticize him; that threat caused the Vice President's chief of staff sufficient concern that he "alerted the head of the Vice President's Secret Service detail." JA.55. When the defendant did, in fact, repeatedly target the Vice President on January 6, 2021, members of the violent crowd at the Capitol responded by chanting, "Hang Mike Pence!"; "Where is Pence? Bring him out!"; and "Traitor Pence!" JA.59. One of the defendant's supporters recently described this dynamic. JA.296 (the defendant "knows exactly what to say and what not to say" and "won't go up to someone and say, 'I want you to kill someone,'" but will instead "send someone, to tell someone, to kill someone"). And it has continued unabated as this case and other unrelated cases involving the defendant have progressed.[1]

---

[1] *See United States v. Taranto*, No. 1:23-cr-229, ECF No. 27 (D.D.C. Sep. 12, 2023) (affirming detention for January 6 rioter, and explaining that, after the defendant "posted what he claimed was the address of Former President Barack Obama on Truth Social," the rioter proceeded, heavily armed, to the area that the defendant had identified as President Obama's address)*; United States v. Hanson*, No. 23-cr-343, ECF No. 1 (N.D. Ga. Oct. 25, 2023) (charging threats made by one of the defendant's supporters to the sheriff and the district attorney

## II. The District Court's Order Under Local Criminal Rule 57.7(c)

### A. Legal background.

In 1966, the Judicial Conference of the United States authorized the Committee on the Operation of the Jury System to "study the necessity of promulgating guidelines or taking other corrective action to shield federal juries from prejudicial publicity in light of the Supreme Court's recent decision" in *Sheppard v. Maxwell*, 384 U.S. 333 (1966). *Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue*, 45 F.R.D. 391, 391-92 (1968) ("*Free Press-Fair Trial Report*"). In *Sheppard*, the Supreme Court had reversed a criminal conviction due to "pervasive and prejudicial publicity" and faulted the trial court for believing "that it lacked power to control the publicity about the trial." 384 U.S. at 335, 357. The Supreme Court explained that, far from lacking such power, trial courts "must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences," and "[n]either prosecutors, counsel for defense, the accused, witnesses, court staff nor

_____

of Fulton County, Georgia); Maggie Haberman, et al., *Trump, Escalating Attacks, Raises Specter of Violence if He Is Charged*, N.Y. Times (Mar. 24, 2023) (noting that, shortly after the defendant "predicted 'potential death and destruction' may result if . . . he was charged by the Manhattan district attorney, Alvin L. Bragg," whom he had described as an "animal" and "a degenerate psychopath," the district attorney's office discovered a threatening letter addressed to Bragg, containing white powder, and stating, "'ALVIN: I AM GOING TO KILL YOU' followed by 13 exclamation points").

enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." *Id.* at 363.

After "approximately two years of deliberation and research," the Committee made several recommendations designed to implement *Sheppard* and achieve "a satisfactory accommodation" between, on the one hand, the First Amendment's freedoms of speech and of the press, and, on the other, the right of the accused to "trial by an impartial jury" and the right of the public "to demand and expect fair trials designed to end in just judgments." *Free Press-Fair Trial Report*, 45 F.R.D. at 391-93 (quotations omitted). Among the Committee's recommendations was that "each United States District Court adopt a rule of court" providing that "[i]n a widely publicized or sensational case, the Court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury." *Id.* at 409.

In 1980, the Committee issued a revised report. *See Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue*, 87 F.R.D. 518 (1980) ("*Revised Free Press-Fair Trial Report*"). The revised report adhered to the recommendation that each district court adopt a local rule governing "extrajudicial statements by parties and witnesses," *id.* at

9

529, while adding, in light of *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976), that "[n]o rule of court or judicial order should be promulgated by a United States District Court which would prohibit representatives of the news media from broadcasting or publishing any information in their possession relating to a criminal case." *Revised Free Press-Fair Trial Report*, 87 F.R.D. at 533-34.

The U.S. District Court for the District of Columbia, like many other districts,[2] has adopted a local rule that largely mirrors the language proposed by the Committee. Specifically, Local Criminal Rule 57.7(c) states that "[i]n a widely publicized or sensational criminal case," a court may, among other things, "issue a special order governing such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury." LCrR 57.7(c).

## B.     The Order under review.

On September 15, 2023, the Government filed on the public docket a motion seeking a special order under Local Criminal Rule 57.7(c). JA.74-92.[3] The defendant opposed the motion, arguing that it violated his First Amendment rights. JA.96-120.

---

[2] *See, e.g.*, E.D. Va. LCrR 57.1(G); D. Md. LR 603; S.D.N.Y./E.D.N.Y. LCrR 23.1(h); D. Mass. LR 83.2.2.

[3] The Government had previously filed an unredacted version of the motion under seal, along with a sealed exhibit. SJA.1-65.

At the hearing that followed, the district court reviewed several of the defendant's social media posts, which fell "into roughly five categories": (1) "statements about the District of Columbia and its jury pool"; (2) "statements about the Biden administration or the Justice Department"; (3) "statements about Special Prosecutor Smith and his staff"; (4) "statements about judges and their staff"; and (5) "statements about political witnesses." JA.169. In discussing these examples and other hypotheticals, the court emphasized that while "speech critical of the exercise of the state's power lies at the very center of the First Amendment," "at some point a defendant's targeted disparagement of government officials can go from permissible criticism of those officials to encouraging harm against them." JA.179, 183. As the court explained, targeted disparagement of this sort poses a danger even when it does not explicitly call for harassment or violence, as repeated attacks are often understood as a signal to act—just as King Henry II's remark, "Will no one rid me of this meddlesome priest?" resulted in Thomas à Becket's murder. JA.183, 202; *see, e.g.*, *United States v. Smallwood*, 365 F. Supp. 2d 689, 696 n.14 (E.D. Va. 2005) (discussing idiom). Such risks are far from speculative here, the court found, given uncontradicted evidence showing that when the defendant "has singled out certain people in public statements in the past," it has "led to them being threatened and harassed." JA.209.

The district court asked defense counsel about the purpose behind the defendant's repeated use of "derogatory labels" and "highly charged language" that "frankly risks a real possibility of violence." JA.183-84, 187; *see, e.g.,* JA.183-87 (discussing attacks on the prosecutor as a "thug" and "deranged"); JA.192-93 (discussing attacks on the judge as a "fraud" and a "hack"). Defense counsel acknowledged that targeted disparagement like this does not "necessarily need to be made in the context of a court proceeding." JA.212; *see* JA.194 (similar concession regarding posting a photograph of a court staffer). Counsel maintained, however, that if the defendant's comments generally touch on a topic of legitimate public interest, the court was powerless to limit the defendant's extrajudicial speech concerning witnesses or participants in this case. *See* JA.166-67 (counsel stating, "I can't conceive of an order that would be lawful"). At most, the district court could ask defense counsel to "convey" the court's "instructions and admonition[s]" to the defendant, with "the expectation" that the defendant will choose to "abide by" them. JA.196.

In his view, for example, because the defendant is entitled to claim that "misconduct by a joint chief of staff is intolerable in a democratic society," he must also be free to post on social media that "in times gone by" the appropriate "punishment" for the Chairman of the Joint Chiefs of Staff "would have been DEATH!" JA.198-202. Likewise, because the defendant is entitled to

"comment on Bill Barr's activity as attorney general," or discuss whether he "might have a position in a future administration," he must also be free to call Barr "a slimy liar" who "should be executed." JA.211-15. And because the defendant is entitled to raise "the issue of potential judicial bias," he must also be free to post a photograph of a court staffer and falsely allege that she is the "girlfriend" of a political adversary. JA.192-94. In the defendant's view, the likelihood that harassment, threats, and intimidation would foreseeably result from his targeting was "totally irrelevant." JA.209.

The court orally granted the Government's motion in part, finding that "[t]here is a compelling interest in the administration of justice and in protecting potential witnesses in this case, and it is possible to craft a narrowly tailored order to serve that interest." JA.224. Based on "past statements made by [the defendant] in particular, as well as the evidence that they have led to harassment and threats for the people he has targeted," the court found "a real risk that witnesses may be intimidated or unduly influenced and that other potential witnesses may be reluctant to come forward lest they be subjected to the same harassment and intimidation." JA.226. The court did not impose any restrictions on certain categories of statements, JA.224-25, adding that the defendant "can certainly claim he's being unfairly prosecuted" and "may still vigorously seek public support as a presidential candidate, debate policies and

people related to that candidacy, criticize the current administration, and assert his belief that this prosecution is politically motivated." JA.225-26. But, like every other criminal defendant, he does not have "carte blanche to vilify and implicitly encourage violence against public servants" and he may not "launch a pretrial smear campaign against participating government staff, their families, and foreseeable witnesses." *Id.*[4] These narrow restrictions, the court found, "are both necessary and narrowly tailored to safeguard the integrity of these proceedings as well as to protect the safety of the people assisting with them." JA.227.

In its written order, JA.229-31 (the "Order"), the court reiterated that "to safeguard the integrity of these proceedings, it is necessary to impose certain restrictions on public statements by interested parties." JA.230. "Undisputed" evidence demonstrated that when the defendant "has publicly attacked individuals, including on matters related to this case, those individuals are

---

[4] The extension of the order to trial participants' families, *see* JA.225 ("It should go without saying that statements targeting the families of any of these people are absolutely prohibited as well."), stemmed from the district court's concern that the defendant "has publicly targeted Special Counsel Smith's family in general and his wife in particular," asking, "In what world, in what case would it be allowable for a criminal defendant to attack a prosecutor's family?" JA.189. The defendant has recently resumed targeting the Special Counsel's family while the order has been administratively stayed. *See Former President Trump Campaigns in Claremont, New Hampshire*, C-SPAN, at 1:29-1:32 (Nov. 11, 2023), *available at* https://www.c-span.org/video/?531752-1/president-trump-campaigns-claremont-hampshire.

consequently threatened and harassed," with such targeted attacks on trial participants continuing post-indictment. *Id.* The defendant has made these targeted attacks, moreover, "to national audiences using language communicating not merely that he believes the process to be illegitimate, but also that particular individuals involved in it are liars, or 'thugs,' or deserve death." *Id.* The court therefore found "that such statements pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." *Id.* The court further found that no "alternative means"—including "careful *voir dire*, jury sequestration, and cautionary jury instructions"—could adequately address these "grave threats to the integrity of these proceedings." JA.229-31. The court therefore ordered that:

> All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

JA.231.

The district court made clear, however, that its Order was intended to narrowly address threats to the judicial process and did not restrict the

defendant's ability to speak on matters of public concern more generally. Accordingly, the court explained, the Order does not "prohibit Defendant from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence." JA.231.

The district court later declined the defendant's request to stay the Order, JA.334-42, finding that "all the factors weigh against" a stay, JA.335. Addressing likelihood of success on the merits, the court noted that the defendant's stay motion repeatedly "disregard[ed] the record," including by "fail[ing] to acknowledge" the undisputed evidence "causally linking certain kinds of statements" with the "risks of harassment and witness intimidation." JA.336. And "the record flatly contradict[ed]" the defendant's claim that the court "g[ave] no meaningful consideration to alternative, less restrictive measures." JA.337 (quotations omitted).

The court also rejected the defendant's vagueness claim, explaining that "[t]he motion hearing and corresponding Order provide substantial context for and examples of the kinds of 'targeting' statements that could result in

'significant and immediate risk[s]' to 'the integrity of these proceedings.'" JA.338 (quoting JA.230). Those materials "sufficiently clarify the meaning of 'targeting' to provide fair notice of the kinds of statements—understood in context—that [the Order] prohibits." JA.339.

Indeed, the district court noted that two of the defendant's recent social media posts—the first issued when the Order was in place, the second while it was administratively stayed—"illustrate the comprehensible difference between the statements [the Order] permits and those it proscribes." JA.339-40. The defendant's first statement "assert[ed] that Defendant is innocent, that his prosecution is politically motivated, and that the Biden administration is corrupt." JA.339. That statement "d[id] not violate the Order's prohibition of 'targeting' certain individuals; in fact, the Order expressly permits such assertions." *Id.* By contrast, the defendant's second statement—which targeted the defendant's former chief of staff, as described above—"single[d] out a foreseeable witness for purposes of characterizing his potentially unfavorable testimony as a 'lie' 'mad[e] up' to secure immunity, and it attack[ed] him as a 'weakling[] and coward[]' if he provides that unfavorable testimony—an attack that could readily be interpreted as an attempt to influence or prevent the witness's participation in this case." *Id.* As such, it "would almost certainly violate the Order under any reasonable definition of 'targeting,'" as the

defendant effectively conceded by acknowledging that he "'would have been unable'" to make the statement had the Order not been administratively stayed. JA.340 (citing JA.319). The "plain distinctions" between the two posts, the court explained, "demonstrate that far from being arbitrary or standardless, the Order's prohibition on 'targeting' statements can be straightforwardly understood and applied." JA.340-41.

## SUMMARY OF ARGUMENT

The district court's Order should be affirmed. There has never been a criminal case in which a court has granted a defendant an unfettered right to try his case in the media, malign the prosecutor and his family, and—after threatening witnesses and others, "IF YOU GO AFTER ME, I'M COMING AFTER YOU!"—target specific witnesses with attacks on their character and credibility, calling one a "weakling[]" and a "coward[]" and suggesting that another's actions warrant the "punishment" of "DEATH!" The defendant nevertheless claims that the First Amendment grants him an unfettered right to do these things, and more. Indeed, he insists that the district court is powerless to prevent him from posting photographs of court personnel, JA.195-96, or publicly telling known witnesses that they should learn to keep their mouths shut, JA.214. The demonstrable likelihood that such targeted attacks will result in threats, harassment, and intimidation is, in the defendant's view, "totally

irrelevant." JA.209. The most the district court can do, he maintains, is accede to his repeated request to delay the trial, JA.162; ask defense counsel to "convey" the court's "instructions and admonition[s]" to the defendant, with "the expectation" that the defendant will choose to "abide by" them, JA.196; or wait for harassment or violence to occur and then take remedial measures such as removing a particular post, JA.194.

The First Amendment does not require a court to adopt such an ineffectual approach to protecting the integrity and fairness of criminal proceedings. To the contrary, district courts have an affirmative duty to prevent trial participants, including attorneys and defendants, from engaging in extrajudicial speech that poses a substantial likelihood of material prejudice to the proceedings. The district court correctly entered such an order here.

The Order was based on well-supported factual findings, narrowly tailored to advance a compelling interest, and more than sufficiently clear to provide the defendant with fair notice of how to conduct himself. In particular, the Order leaves the defendant free to do virtually everything that he has claimed, throughout the litigation, that he must be able to do to run for office while defending himself in court. And the distinctions it draws between criticizing the policies of a political rival or describing the prosecution as politically motivated,

on the one hand, and targeting trial participants or their expected trial testimony, on the other, is readily comprehensible. The Order should be affirmed.

## ARGUMENT

### The District Court Issued an Appropriate Order Under Local Criminal Rule 57.7(c).

This Court reviews the propriety and scope of the Order, and other questions of "constitutional fact," *de novo*, but reviews questions of "historical fact"—"the who, what, where, when, and how of the controversy," *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1206 (11th Cir. 2009)— only for clear error. *See Thompson v. Hebdon*, 7 F.4th 811, 819 (9th Cir. 2021); *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018); *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 796 (10th Cir. 2009); *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). Under the "highly deferential" clear-error standard, a factual finding is clearly erroneous only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Hale-Cusanelli*, 3 F.4th 449, 455 (D.C. Cir. 2021) (quotations omitted).

### A. A district court may issue an order restricting extrajudicial speech by a defendant that poses a substantial likelihood of material prejudice to the proceedings.

The "very purpose of a court system" is "to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to

legal procedures," with the jury's verdict "based on evidence received in open court, not from outside sources." *Sheppard v. Maxwell*, 384 U.S. 333, 350-51 (1966) (quotations omitted). When a party threatens to flout this "undeviating rule" by trying to influence the case "through the use of the meeting-hall, the radio, and the newspaper," *id.* (quotations omitted), rather than through evidence and legal argument, a court has the power to act. *See United States v. Young*, 470 U.S. 1, 10 (1985) (emphasizing that a district judge is "not a mere moderator," but rather "the governor of the trial for the purpose of assuring its proper conduct" (quotations omitted)). Indeed, courts have an affirmative duty to "take such steps by rule and regulation that will protect their processes from prejudicial outside interferences," and "[n]either prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." *Sheppard*, 384 U.S. at 363; *see Estes v. Texas*, 381 U.S. 532, 540 (1965) ("We have always held that the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs.").

A court's power includes the ability to impose narrowly tailored restrictions on extrajudicial speech. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991); *see In re State-Record Co., Inc.*, 917 F.2d 124, 128 (4th Cir. 1990) (per curiam) ("Orders restricting parties, witnesses and attorneys from discussing a

pending case with the press are not unusual."). "Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in this setting," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (quotations omitted), and "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors," *Gentile*, 501 U.S. at 1075 (quotations omitted).[5]

The applicable test for such restrictions depends on whether the speaker is a "participant[] in the litigation" or a "stranger[] to it." *Gentile*, 501 U.S. at 1072-73. For a trial participant, the extrajudicial speech must pose a "substantial likelihood of material prejudice" to the trial. *Id.* at 1075. For a nonparticipant, such as the media, there must be "a clear and present danger of some serious substantive evil which [the restrictions] are designed to avert." *Id.* at 1069 (quotations omitted); *see Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563 (1976).

---

[5] In the district court, the defendant contended that the right to a fair trial rested only with a defendant. JA.252-55. He appears to have correctly abandoned that argument here. *See Gentile*, 501 U.S. at 1075 (emphasizing "the State's interest in fair trials"); *Wade v. Hunter*, 336 U.S. 684, 689 (1949) (emphasizing "the public's interest in fair trials designed to end in just judgments"); *United States v. Brown*, 218 F.3d 415, 424 n.9 (5th Cir. 2000) ("[A] criminal defendant is entitled to a fair and impartial jury, not a jury whose views have been deliberately manipulated by outside influences to be biased in his or her favor." (quotations omitted)); *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969) ("The concept of a fair trial applies both to the prosecution and the defense.").

Despite being a trial participant, the defendant asserts (Br. 26-29) that the clear-and-present-danger test applies, relying on cases that preceded *Gentile*. But *Gentile* "foreclosed the applicability of [the clear-and-present-danger] test[] to the regulation of speech by trial participants." *United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000).[6] As *Gentile* explained, the "distinction between participants in the litigation and strangers to it is brought into sharp relief by" *Seattle Times*, which "unanimously held that a newspaper, which was itself a defendant in a libel action, could be restrained from publishing material about the plaintiffs and their supporters to which it had gained access through court-ordered discovery," 501 U.S. at 1072-73, merely upon a showing of "good cause," *Seattle Times*, 467 U.S. at 37.

The cases on which the defendant principally relies reflect this very distinction. In *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978) (*see* Br. 20, 26, 27, 28, 29, 44, 45), the Supreme Court addressed "whether the First Amendment permits the criminal punishment *of third persons who are strangers to the inquiry*, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry

---

[6] Even before *Gentile*, "[t]he Supreme Court ha[d] never said that a clear and present danger to the right of a fair trial must exist before a trial court can forbid extrajudicial statements about the trial" made by trial participants. *Tijerina*, 412 F.2d at 666.

and Review Commission." *Id.* at 837 (emphasis added).  The Court invalidated a state statute that imposed such punishments, but noted that a construction of the statute applying only to "those who actually participated in the proceedings" "might well" have "save[d] the statute from constitutional invalidity." *Id.* at 837 n.9.  Likewise, in *Nebraska Press* (*see* Br. 21, 22, 29, 30, 43, 44, 46, 47, 49, 51), the Supreme Court specifically identified the ability of trial courts to "limit what the contending lawyers, the police, and witnesses may say to anyone" as an alternative measure that could permissibly safeguard the fairness of the trial without precluding the media from reporting on what had happened in open court.  427 U.S. at 564.[7]

Other authorities reflect this "critical" distinction "between a restraining order directed against the press . . . and the order here directed solely against

---

[7] In the same vein, the defendant relies (Br. 30, 31, 45) on Justice Brennan's order in *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303 (1983), which stayed an order barring the media from publishing information about jurors that had been revealed in open court. *Id.* at 1307.  But courts routinely empanel semi-anonymous juries and prohibit trial participants from disclosing juror names outside of court—as indeed will be done in this case, without objection from the defendant.  *See* SA.167 ("No party may disclose, either in open court or outside of court, prospective jurors' names or any identifying information."); *United States v. Castillo-Rubio*, 34 F.4th 404, 408 (5th Cir. 2022) (similarly limiting disclosure by trial participants).  These different frameworks further illustrate that disclosure restrictions on trial participants are simply not equivalent to injunctions barring the media from publishing information about judicial proceedings.

trial participants." *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 608 (2d Cir. 1988);

*see The News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1512-13 (11th Cir. 1991)

(noting that "the Supreme Court has suggested a restrictive order limiting

extrajudicial commentary of trial participants as an alternative to a prior

restraint on the media"); *Revised Free Press-Fair Trial Report*, 87 F.R.D. at 529-33

(recommending adoption of a local rule authorizing orders governing

"extrajudicial statements by parties and witnesses" while recommending against

any order that applies to the media).

The defendant resists this conclusion by observing (Br. 27-28) that *Gentile*

emphasized the special role of lawyers as officers of the court. *See Gentile*, 501

U.S. at 1066-67. That emphasis was necessary to explain why lawyers are "key

participants in the criminal justice system," given "special access to information

through discovery and client communications," thus permitting "the State [to]

demand some adherence to the precepts of that system in regulating their speech

as well as their conduct." *Id.* at 1074. It hardly follows, however, that criminal

defendants are any less "key participants" than their attorneys, or that courts

have any lesser ability to demand their adherence to the precepts of the criminal

justice system. Defendants, like their attorneys, have "special access to

information through discovery." *Id.* And because "the problem the district

court sought to avoid depended in no way on the identity of the speaker as either

a lawyer or a party, . . . there appears to be no reason . . . to distinguish between the two groups for the purpose of evaluating a gag order directed at them both." *Brown*, 218 F.3d at 428.

Moreover, defendants are regularly subject to "substantial liberty restrictions as a result of the operation of our criminal justice system." *United States v. Salerno*, 481 U.S. 739, 749 (1987). Such restrictions often affect their rights of speech and association, such as the requirement that they "abide by specified restrictions on personal associations," "avoid all contact . . . with a potential witness who may testify concerning the offense," *see* 18 U.S.C. § 3142(c)(1)(B), or refrain from "accessing the internet or using any electronic device that is capable of accessing the internet," *United States v. Johnston*, No. 17-mj-46, 2017 WL 4277140, at *8 (D.D.C. Sep. 22, 2017); *see United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *7 (D.D.C. Mar. 10, 2021). These restrictions are routinely imposed prophylactically, upon a finding that they will "reasonably assure" either "the appearance of the person as required" or "the safety of any other person [or] the community." 18 U.S.C. § 3142(c)(1)(B). No one supposes that a court could, on an equivalent record, impose similar speech-and-association restrictions on a non-participant, by, for example, prohibiting a newspaper or other third party from contacting a witness or accessing the internet. A court may impose these restrictions on a defendant precisely because

he is a party to the case due to the grand jury's indictment, bringing him under the court's jurisdiction and supervision.

It follows that the defendant's scattershot invocation (Br. 25-43) of various First Amendment doctrines governing speech in unrelated contexts—i.e., speech posing no risk of prejudice to a pending trial and uttered by someone who is not a trial participant—has no bearing on this appeal. It is the conjunction of a court's duty to protect the integrity of the proceedings and its unique authority to control trial participants—and particularly criminal defendants—that dictates the appropriate constitutional standard: whether the extrajudicial speech "is substantially likely to have a materially prejudicial effect" on the integrity and fairness of the trial. *Gentile*, 501 U.S. at 1076; *see Brown*, 218 F.3d at 428.[8]

The contrary conclusion in *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987), is unpersuasive. Its analysis consists of a single sentence stating, "We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the

---

[8] Some courts have suggested that a slightly lower standard—requiring only a *reasonable* likelihood, rather than a substantial likelihood, of material prejudice—is constitutionally permissible. *See In re Morrissey*, 168 F.3d 134, 139-40 (4th Cir. 1999); *Tijerina*, 412 F.2d at 666; *see also Revised Free Press-Fair Trial Report*, 87 F.R.D. at 523-24. The Court need not resolve that issue here, as the Order satisfies the substantial-likelihood standard approved by *Gentile*.

press." *Id.* For that proposition, *Ford* cited the Supreme Court's decision in *Pell v. Procunier*, 417 U.S. 817 (1974), which held that the First Amendment does not "impose[] upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally." *Id.* at 834-35. But the fact that the press and public have equal access-to-information rights does not imply an equivalence between the right of the press to report on a trial and the right of a trial participant—and particularly a criminal defendant—to make extrajudicial statements about his own case.

The district court therefore had the authority to issue an order restricting the defendant's extrajudicial speech based on a finding of a substantial likelihood of material prejudice. The district court found that the Order satisfies that standard, as well as the higher standard proffered by the defendant. JA.149-50. This Court should affirm under either standard. *See Levine v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 764 F.2d 590, 598 (9th Cir. 1985) ("[W]e conclude that the record supports the district court's conclusion that the activity restrained"—making statements to the media shortly before trial—"poses a serious and imminent threat to the administration of justice.").

**B. The Order entered here was necessary and appropriate.**

*1. The Order is necessary to ensure a fair trial.*

The Order was premised on three well-supported findings of historical fact. First, the defendant has a long history of using his social media accounts and public statements to target perceived adversaries by singling them out and using inflammatory and disparaging language that "vilif[ies] and implicitly encourage[s] violence against" them. JA.225-26. Second, when the defendant does so, harassment, threats, and intimidation reliably follow. JA.230. Third, such harassment, threats, and intimidation "pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." *Id.*

The defendant does not meaningfully dispute the accuracy of these findings, *see* JA.336, which were not erroneous, let alone clearly so. Instead, he contends that the findings lacked appropriate evidentiary support (Br. 17-18, 43-45); that they were legally deficient because they were tied to the foreseeable actions of "third parties" (Br. 36-39); and that the harms are too "speculative" to justify the Order (Br. 2, 18, 22, 26, 29, 44). Each argument fails.

*The district court's findings had ample evidentiary support.*

The defendant contends (Br. 17-18, 43-45) that the court's findings were inadequate because they were not based on affidavits or live testimony. But the Government's uncontradicted filings documented the defendant's long history of targeting his perceived adversaries with inflammatory language that has repeatedly led to harassment, intimidation, threats, and violence, as well as a litany of individuals who have described (sometimes in sworn testimony) its foreseeable effects. JA.75-86, 129-31; SJA.2-13. These citations to public statements and testimony were "[u]ndisputed," JA.230, and there was no need to submit the same material as part of an affidavit or through live witnesses, JA.199. *See In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984) (rejecting similar argument); *cf. United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam) (approving proceeding by proffer at a detention hearing). Indeed, judges may rely on "common [hu]man experience" in assessing whether pretrial publicity "might impair" the fairness of the trial. *Nebraska Press*, 427 U.S. at 563.

The defendant likewise contends that the district court erred by relying on examples of threats resulting from the defendant's targeting that occurred in 2020 and 2021, asserting that there was "no evidence" of "any such threats . . . since the case was filed" (Br. 19), and arguing (Br. 43-45) that only examples from the weeks following the indictment could suffice. Notably, the defendant

entirely fails to acknowledge the death threat made to the district court one day after his post stating, "IF YOU GO AFTER ME, I'M COMING AFTER YOU!" And, as noted above, *supra* at 7-8 n.1, 14 n.4, similar incidents continue unabated. The district court correctly identified a well-established and ongoing pattern, and the defendant cannot credibly claim that the evidence it relied on was somehow stale or otherwise clearly erroneous.

> b.    *The district court appropriately relied on the clear causal link between the defendant's conduct and acts of harassment and intimidation that threaten the integrity of the trial.*

The defendant argues (Br. 36-39) that the likelihood that a "third party" might choose to engage in harassment, threats, or violence in response to the defendant's words is "totally irrelevant." JA.209. In his view, the causal link between his conduct and the harassment and intimidation that follows cannot justify an order under Local Criminal Rule 57.7(c), "regardless of how predictable . . . those unruly reactions might be." Br. 38. His speech cannot be restricted, he insists, unless his conduct independently amounts to incitement, a true threat, or another form of fully unprotected speech. That claim fails.

Because the district court's Order was directed at preventing material prejudice to the trial, the court properly focused on the effect of the defendant's conduct, rather than on whether his speech fell within an exception to the First Amendment. Indeed, the *Gentile* standard presupposes that the restricted

extrajudicial speech is protected by the First Amendment, *see Gentile*, 501 U.S. at 1034 (op. of Kennedy, J.) (describing the speech at issue as "classic political speech . . . critical of the government and its officials"); it is nevertheless proscribable if it meets the substantial-likelihood-of-material-prejudice standard, because that "standard constitutes a constitutionally permissible balance" between the trial participant's First Amendment rights and the interest of the government and the public in "fair trials." *Id.* at 1075 (majority op.). That approach is also consistent with *Seattle Times*, which held that a trial participant can be prohibited from disseminating material obtained through pretrial discovery upon a showing of "good cause," even though such information "would rarely, if ever, fall within the classes of unprotected speech identified by decisions of [the Supreme] Court." 467 U.S. at 31. Under both approaches, the applicable standard exists to balance two competing rights; it does not depend on the speech rights being non-existent in the first place.

In analogous contexts, courts routinely attach consequences or take prophylactic measures in response to a defendant's speech when it poses a potential risk to witnesses, jurors, or officers of the court, regardless of whether the speech fits within a First Amendment exception or provides a freestanding basis for criminal liability. *See Carroll v. Trump*, --- F. Supp. 3d ---, 2023 WL 2612260, at *2 & n.6 (S.D.N.Y. Mar. 23, 2023) (empaneling anonymous jury

and noting that the defendant "repeatedly has attacked courts, judges, various law enforcement officials and other public officials, and even individual jurors in other matters," such that even if he has not "incited violence in either a legal or factual sense, . . . jurors will perceive themselves to be at risk"); *United States v. Napout*, 963 F.3d 163, 189-90 (2d Cir. 2020) ("Our caselaw does not . . . require a court to find that a defendant personally intimidated or attempted to intimidate witnesses or others associated with the trial in order to empanel an anonymous jury."); *Carbo v. United States*, 288 F.2d 686, 689-90 (9th Cir. 1961) (affirming detention based on threats to, and an assault on, a witness, even though "there was no showing that [the defendants] were personally responsible"), *stay denied by Carbo v. United States*, 82 S. Ct. 662, 669 (1962) (Douglas, J., in chambers) (noting that "[t]he totality of the threats and past injuries . . . indicates something more than just a coincidence"); *United States v. Maurstad*, 35 F.4th 1139, 1146 (8th Cir. 2022) (affirming obstruction enhancement based on the defendant's "attempt to publicize witness names," and explaining that "a direct threat" is not required); *United States v. Katsman*, 551 F. App'x 601, 604 (2d Cir. 2014) (affirming order permitting the government to withdraw from a plea agreement in response to the defendant's "creation of a Facebook page to denounce a cooperating witness," and explaining that "[r]egardless of truth, publicizing the cooperation of another person in the criminal process can have serious

consequences," even if it does not constitute "a criminal offense or the factual predicate of a sentencing enhancement").

The same principle applies here. As the district court explained, JA.183, 202, 226, the defendant does not need to explicitly incite threats or violence in his public statements, because he well knows that, by publicly targeting perceived adversaries with inflammatory language, he can maintain a patina of plausible deniability while ensuring the desired results. *See* JA.296 (discussing similar allegation in the indictment); JA.296 n.8 (noting description of this dynamic by one of the defendant's supporters). What matters for present purposes is that everyone—the defendant, his followers, and the people targeted—are aware of the dynamic, which creates a "significant and immediate risk" of intimidation, threats, and harassment of those involved in the defendant's trial and thus poses and intolerable risk of material prejudice to the proceedings. JA.230.[9]

---

[9] Contrary to the defendant's suggestions (Br. 21, 36-39), this dynamic is the opposite of a "heckler's veto." A key danger of the heckler's veto is that an individual can silence a disfavored speaker by meeting his speech with violence rather than counter-speech, thus allowing him to silence, or veto, his adversary. Here, the defendant is not being greeted by "a hostile mob," *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992), or by listeners expressing "hostility to" his message, *Cox v. Louisiana*, 379 U.S. 536, 551 (1965). Instead, he is implicitly but unmistakably encouraging his supporters—who are plainly not his hecklers—to act against the very people he targets. Regardless, his invocation of the heckler's-veto doctrine is legally inapposite in this context,

c. *The harms identified by the district court are not impermissibly "speculative."*

As the Government noted below, JA.204, the precise timing and manner of the harassment, intimidation, or violence that results from the defendant's targeting is inherently "speculative." But, contrary to the defendant's claims (Br. 2, 18, 22, 26, 29, 44), that is neither surprising nor problematic, "[g]iven the difficult and 'necessarily speculative' task of trying to prevent prejudice that has not yet occurred—a task that involves the weighing of 'factors unknown and unknowable.'" *Brown*, 218 F.3d at 431 (quoting *Nebraska Press*, 427 U.S. at 563); *see In re Russell*, 726 F.2d at 1011 ("[T]he findings made by [the district court] are adequate to support the gag order, recognizing, as we must, the 'necessity' of some 'speculation' and the weighing of 'factors unknown and unknowable' confronting a trial judge in such a situation." (quoting *Nebraska Press*, 427 U.S. at 563)); *United States v. Simon*, 664 F. Supp. 780, 791-92 (S.D.N.Y. 1987) ("It is specious to suggest that, in light of the standards announced in *Sheppard* and *Nebraska Press Ass'n*, the Court must make 'specific factual findings' as to how defendants are being or will be prejudiced.").

It is also true that some of the defendant's targets are current or former high-ranking public officials (Br. 39, 48), who may, as a result of the targeting,

_____

involving a restriction imposed on a criminal defendant to prevent material prejudice to the proceedings.

receive increased protection from the Marshals Service or the Secret Service. But no principle of law or logic suggests that law enforcement's ability to take extraordinary measures to ensure the safety of witnesses or court personnel after they have been threatened leaves a court powerless to prevent a criminal defendant from igniting such threats in the first place. And even if the availability of "around-the-clock protection . . . were an appropriate consideration, which we doubt, the availability of police protection is never a certain safeguard." *Carbo*, 288 F.2d at 690. Moreover, the defendant's threats extend beyond such figures to people like election workers and court personnel who have little ability to avail themselves of similar protections. There are numerous witnesses in this category and there is an immediate risk that their testimony could be influenced or deterred by the defendant's documented pattern of targeting.

      2.     *The Order is narrowly tailored.*

          a.     <u>*The Order does not impede the defendant's ability to run for office while defending himself in court.*</u>

The Order in this case is narrow—indeed, far narrower than orders that have been adopted in other cases restricting extrajudicial speech to protect the integrity of the proceedings. Such orders typically involve blanket prohibitions on discussing the case, subject only to narrow carve-outs. *See, e.g.*, *Brown*, 218 F.3d at 418-19 (noting that statements "regarding the merits of this case" were

presumptively prohibited (quotations omitted)); *In re Stone*, 940 F.3d 1332, 1336,

1338 (D.C. Cir. 2019) (describing orders requiring the defendant "not to discuss

the case in any way," and later imposing "a blanket ban" on his use of

"Instagram, Twitter or Facebook"); *United States v. Manafort*, 897 F.3d 340, 348

(D.C. Cir. 2018) (affirming detention based, in part, on the fact that the

defendant "skat[ed] close to the line" by "contributing to an op-ed in a foreign

newspaper while under" a Rule 57.7(c) order); *In re Dow Jones & Co.*, 842 F.2d

at 605-06 (discussing order directed at all trial participants, including a U.S.

Congressman, that, with the exception of two narrow carve-outs, "prohibits

virtually all other extrajudicial speech relating to the" pending case); *United*

*States v. Tijerina*, 412 F.2d 661, 663 (10th Cir. 1969) (affirming contempt

convictions for defendants who violated an order prohibiting all trial participants

from making public statements regarding "the merits of the case, the evidence,

actual or anticipated, the witnesses or rulings of the Court"); *United States v.*

*Bankman-Fried*, No. 22-cr-673, ECF No. 180 (S.D.N.Y. July 26, 2023)

(precluding public discussion of "anything about the case").[10]  Courts have also

---

[10] The Order here is also far narrower than the order that the court invalidated in *Ford*.  *See* 830 F.2d at 598 (citing "the broad 'no discussion-of-the-case' order"); *id.* at 605 (Nelson, J., concurring) (noting that the order "would prevent Mr. Ford from calling a press conference in Memphis and announcing . . . that he has decided to oppose any increase in the minimum wage because of

precluded defendants from making extrajudicial statements "that impart[] the message that Defendants have been subject to an improper, selective or vindictive prosecution," since "the issue of selective prosecution is one of law not fact," and such public statements risk biasing the jury pool. *United States v. Fieger*, No. 07-cr-20414, 2008 WL 659767, at *3, *6 (E.D. Mich. Mar. 11, 2008); *see United States v. Scrushy*, No. 03-cr-530, 2004 WL 848221, at *6 (N.D. Ala. Apr. 13, 2004) (directing trial participants to "remove from their existing webpages . . . allegations of prosecutorial misconduct"); *United States v. Hill*, 420 F. App'x 407, 412-13 (5th Cir. 2011) (affirming contempt conviction for attorney whose public claim that "the prosecution was politically motivated" went beyond what was contained in the "publicly-filed selective prosecution motion").

The Order here is far narrower. Rather than placing all discussion of the case presumptively off-limits, the Order prohibits only certain types of targeting, and does not prohibit the defendant "from making statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the

---

the adverse effect such an increase would have on the employment opportunities of black teenagers in his district").

campaign platforms or policies of Defendant's current political rivals, such as former Vice President Pence." JA.231.

It is instructive to consider the Order against the backdrop of what the defendant has claimed, throughout the litigation, that he must say to run for office while defending himself in court. The day before the hearing, for example, the defendant posted to social media that the Government was seeking "to silence me, through the use of a powerful GAG ORDER, making it impossible for me to criticize those who are doing the silencing, namely Crooked Joe Biden, and his corrupt and weaponized DOJ & FBI." JA.298-99. The Order leaves him free to do those things, and he has in fact done so while it has been in effect.[11]

Defense counsel later emphasized that the defendant must be allowed to say that "this is a politically motivated prosecution" (JA.160); that "he's being treated unfairly" (*id.*); that "the Department of Justice is acting unlawfully" (*id.*); that "there are deep problems in this city that need to be addressed that haven't been addressed by the Biden administration" (JA.172); that there may be an "issue of potential judicial bias" (JA.194); and that "misconduct by a joint chief

---

[11] *See, e.g.*, https://truthsocial.com/@realDonaldTrump/1112500 43067355175 (Oct. 17, 2023) ("Crooked Joe Biden told the DOJ to Indict TRUMP hoping that it would help him in his campaign against me and the Republicans. In other words, he indicted his Political Opponent. They are now called the Biden Indictments, and nothing like this has ever happened in the USA before!"); JA.339 (describing similar post from Oct. 20, 2023).

of staff is intolerable in a democratic society" (JA.201). He must also be allowed to "describe what he would like in an attorney general, and in particular compare how Attorney General Barr conducted himself with what kind of attorney general he would like" (JA.206); and comment on "what a vice president should be, what an attorney general should be, what a secretary of state in a state should be and what a member of the joint chiefs of staff should be" (JA.216-17). In his stay motion before this Court, the defendant added that he must be able to deliver "[h]is central campaign messages," including "that this case is a politically motivated persecution designed to derail his candidacy" (Mot. 3); "rebut" the "issues underlying the indictment" (Mot. 11); and "'have absolute freedom to discuss his qualifications'" (Mot. 12). His merits brief likewise emphasizes (Br. 20) his need "to spread his core political speech and message," and to say (Br. 32-33) "that the criminal cases against him are part of a politically motivated, unconstitutional campaign to silence him and derail his candidacy." He also quotes (Br. 32) a passage from *Ford* emphasizing that the defendant must be entitled to "attack the alleged political motives of the . . . administration which he claims is persecuting him"; "fight the obvious damage to his political reputation in the press and in the court of public opinion"; and "inform his constituents of his point of view." *Ford*, 830 F.2d at 600-01.

Under the Order, the defendant can say and do all those things.  The only thing he cannot do is make extrajudicial statements targeting certain individuals connected to the case.  And the defendant has acknowledged that targeting of this sort is unnecessary "in the context of a court proceeding."  JA.212.

The defendant's litigation of the motions seeking judicial recusal, JA.65-73, and dismissal on the basis of vindictive and selective prosecution, JA.266-76, further illustrates the point.  The defendant moved for the district court's recusal by presenting facts and law to support his claim, arguing "zealously," but also "very professionally and very appropriately," JA.194, that the judge should not preside over his trial, JA.65-73.  He did this without resorting to calling the judge a "fraud" or a "hack," posting a photograph of a court staffer, or making other statements likely to result in harassment, intimidation, or threats.  *Id.*  The Government responded, and the court resolved the motion in a reasoned opinion.  The defendant has likewise moved to dismiss the indictment for vindictive and selective prosecution without resorting to any sort of inflammatory targeting of individuals as "thugs" or "deranged," or otherwise exposing court officers or their family members to threats or violence.  *See* JA.266-76.  That is how the system should work, and how it routinely works in criminal cases throughout the country, including those involving defendants who are running for office.  The defendant's ability to defend himself zealously

without engaging in anything approaching the type of conduct that would be prohibited by the Order further demonstrates its narrow scope.

The defendant maintains, however, that it is not enough for him to be able to defend himself in court, publicly profess his innocence, criticize the presiding judge, characterize the prosecution as politically motivated, and criticize the platforms and policies of his political opponents. He must also be allowed to engage in a concerted campaign of targeting witnesses and public servants like court staff and career prosecutors, and even their families, with inflammatory language likely to result in harassment, intimidation, and threats. No other criminal defendant or defense attorney could credibly make such a claim, and the Court should decline the defendant's request to fashion a special rule solely for him. *See Trump v. United States*, 54 F.4th 689, 701 (11th Cir. 2022) (per curiam) ("To create a special exception here would defy our Nation's foundational principle that our law applies 'to all, without regard to numbers, wealth, or rank.'" (quoting *Georgia v. Brailsford*, 3 U.S. (3 Dall.) 1, 4 (1794)).

In *United States v. Cutler*, 58 F.3d 825 (2d Cir. 1995), for example, the court affirmed a contempt sanction against John Gotti's lawyer, based on the lawyer's repeated public statements asserting: "the prosecutors 'are doing everything they can to destroy John Gotti' and are 'dealing in vendettas,' 'on a witch hunt,' and 'framing people'; the Government 'threw the Constitution out the window' and

is on a 'vendetta' against Gotti; . . . the prosecutors want to 'destroy' Gotti 'because of his popularity' . . . ; the 'evidence is phony'; . . . the Government is 'creating cases against individuals they target'"; and "the prosecutors were a 'sick and demented lot.'" *Id.* at 831 (cleaned up). As the court explained, these "statements were dipped in venom and were deliberately couched to poison the well from which the jury would be selected," which "goes beyond the pale, by any reasonable standard." *Id.* at 840. The strong resemblance between the statements considered "beyond the pale" in *Cutler*, *id.*, and the comments the defendant is *allowed* to make under the Order indicates that his demand to go even further should be rejected.

The defendant's effort (Br. 34-36) to invoke the rights of his followers to receive his message is likewise unavailing. As the district court found, the defendant did not squarely raise this issue until his motion to stay the Order. JA.336 n.2. But in any event, the public's "right to receive speech does not enlarge the rights of those directly subject to the restraining order," so his invocation of their rights does not change the analysis. *In re Dow Jones & Co.*, 842 F.2d at 608 ("Success on the merits for the news agencies is entirely derivative of the rights of the trial participants to speak."). The public's right to receive his speech—while certainly legitimate—is, as the defendant notes (Br. 21, 31, 34, 35), "equal" and "reciprocal" to his own. And because his rights

have not been violated, their "entirely derivative" right, *In re Dow Jones & Co.*, 842 F.2d at 608, has not either.  Moreover, his followers continue to be able to hear his views on a vast range of issues, including criticisms of this prosecution.  As illustrated by the defendant's posts while the Order has been in effect, he may still disseminate his views to his followers while complying with the narrow restrictions in the Order.[12]

The defendant also emphasizes (Br. 32) the *sua sponte* decision by the district court in *Brown* to "temporarily lift[] the gag order . . . to avoid interfering with Brown's re-election campaign for Insurance Commissioner."  218 F.3d at 419.  That decision does not change the analysis here, for two reasons.  First, the propriety of suspending an order that limits extrajudicial statements is inextricably intertwined with the order's scope.  Where, as in *Brown*, the order is so broad that it prohibits any discussion "intended to influence public opinion regarding the merits of the case," *id.*, it may be appropriate to suspend the order during the final weeks before an election.  But where, as here, the Order permits a wide array of case-related speech, and only narrowly prohibits certain forms

---

[12] In the four-and-a-half days between the time the Order was orally imposed and the time it was administratively stayed by the district court, the defendant posted roughly 182 times to Truth Social.  And in the four-and-a-half days between the time that the stay was lifted and the time that this Court issued an administrative stay, the defendant posted another roughly 128 times to Truth Social.  *See* https://truthsocial.com/@realDonaldTrump.

of targeting, there is no equivalent basis for a temporary stay, since under the Order the defendant remains free to "answer, without hindrance, the charges of his opponents regarding his indictment throughout the race." *Id.* at 430. Second, the temporary stay in *Brown* was imposed during the final seven-and-a-half weeks before election day. The trial here is scheduled to be completed more than six months before election day. If the trial schedule changes, the district court will be free to "consider modifications, suspensions, or reinstatements of the order as changing circumstances may warrant." JA.128. There is no need to "temporarily lift[]," *Brown*, 218 F.3d at 419, the Order for a full year.[13]

> b. *The district court appropriately considered and rejected alternative means.*

The defendant contends (Br. 45-48) that the Order is not narrowly tailored because the district court purportedly failed to consider alternative measures. But "the record flatly contradicts that claim." JA.337. The district court explained that "alternative measures such as careful *voir dire*, jury sequestration,

---

[13] The district court's decision in *Brown* also demonstrates the risks inherent in even temporary stays. There, shortly after the order was lifted, "various defendants released to the media recordings (as well as transcripts of recordings) of telephone conversations relevant to the case, and also conducted interviews while playing the recordings," which "attracted further interest from the press." *Brown*, 218 F.3d at 419 (footnote omitted). Likewise, the defendant here has taken advantage of administrative stays to engage in targeting of witnesses, *see* JA.340, as well as prosecutors and their families, *see supra* at 14 n.4.

and cautionary jury instructions" could "remedy only some of the potential prejudices" that the Order was designed to avoid. JA.229-30. Indeed, the court specifically declined to impose further restrictions on the defendant's extrajudicial speech because it was "confident that the voir dire process and cautionary jury instructions can filter out those statements' influence on the jury." JA.225. The court likewise rejected the possibility of using after-the-fact orders to remove inflammatory statements from social media, explaining that, "in the age of the Internet[,] once an individual is publicly targeted, even revoking the offending statement may not abate the subsequent threats, harassment, or other intimidating effects." JA.230.

Although the defendant faults the court's treatment of his request to continue the trial date (Br. 19, 23, 47, 48), there was no need for the court to say more. *See Brown*, 218 F.3d at 431 (rejecting similar challenge to the adequacy of a court's explanation regarding alternative means). While a continuance may be appropriate when there is a flurry of media interest that is likely to abate, *see Nebraska Press*, 427 U.S. at 553-54, there is no reason to think that the targeting prohibited by the Order would cease, or become any less dangerous, with the passage of time. Delaying the trial would therefore carry "significant costs without addressing the root cause of the district court's concern." *Brown*, 218 F.3d at 431. A continuance would also be a particularly unsuitable remedy here,

given that it is the defendant's own conduct that is the source of the prejudice sought to be avoided. Throughout the proceedings, the defendant has made clear that he wants to delay the trial until 2025 (or later) at all costs. It would create a perverse incentive for the district court to signal to the defendant that, if his extrajudicial statements are sufficiently egregious, he will be rewarded with the very continuance that, the court has found, would otherwise contravene the public's strong interest in a speedy trial.

The defendant's challenge to the district court's narrow tailoring analysis also overlooks the fact that, in this context, "prophylactic measures are preferred over remedial ones." *In re Dow Jones & Co.*, 842 F.2d at 609. "The *Sheppard* Court observed that when considering how to 'cure' the effects of pretrial publicity, a trial court's overriding object must be to institute 'those remedial measures that will prevent the prejudice at its inception.'" *Brown*, 218 F.3d at 431 (quoting *Sheppard*, 384 U.S. at 363). In light of the defendant's "demonstrated enthusiasm" for using public statements to target trial participants in advance of trial, "the district court made a reasoned and reasonable decision to focus its prophylactic" efforts on a narrow component of the defendant's extrajudicial speech. *Id.*

*The Order does not subject the defendant to an impermissible double standard.*

The defendant suggests that the Order imposes an impermissible double-standard by "'licens[ing] one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.'"  Br. 23, 49 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992)).  As noted above, the narrow limitation on targeting hardly requires the defendant to "follow Marquis of Queensberry rules," as a review of his social media account while the Order was in effect amply confirms.  Regardless, his double-standard claim fails both factually and legally.

The defendant asserts, for example, that the Special Counsel "egregiously mischaracterized the indictment" in his press conference announcing the charges.  Br. 8-9.  But the indictment plainly and clearly alleges that the defendant is responsible for the events of January 6, 2021, and that those events represented the culmination of the defendant's months-long campaign of knowing deceit.  *See supra* at 2; JA.135-36; SA.168-82.  The defendant also baselessly asserts that certain leaks "could have come only from the prosecution."  Br. 10.  But there is no evidence to support that claim, and it is false.  In fact, it is the defendant himself who has revealed information about "the timing of the charges" (Br. 10) by posting on social media about the target

letters he received.  *See* Perry Stein et al., *Trump Says He Received a Target Letter in Federal Jan. 6 Investigation*, Washington Post (July 18, 2023).

Moreover, the Order on its face applies equally to both parties, and prohibits them from targeting various individuals, including "defense counsel or their staff." JA.231.  The defendant has not suggested that the Government has violated the Order, but it plainly binds both parties equally, as Local Criminal Rule 57.7(c) contemplates.  *Cf. United States v. Concord Mgmt. & Consulting LLC*, No. 18-cr-32, 2019 WL 7758635 (D.D.C. July 1, 2019).

The defendant's claim (Br. 11-12) that he must be allowed to make targeted, inflammatory statements because non-parties have generated prejudicial coverage of his trial is likewise unavailing.  In *Cutler*, for example, the court recognized that John Gotti's trial "received more press coverage and publicity than any other in New York history." 58 F.3d at 836.  It nevertheless rejected the sanctioned attorney's argument that "in the midst of a veritable firestorm of anti-Gotti publicity, the few cinders he added could not possibly have tainted the proceedings." *Id.*  What mattered was that he had willfully violated the local rule, and it was no defense that he "did not singlehandedly generate the media circus that threatened the fairness" of the trial. *Id.* at 840; *see also United States v. McVeigh*, 964 F. Supp. 313, 316 (D. Colo. 1997) (denying

defense request "to recognize a limited right for them to reply publicly about extrajudicial statements or comments to which they cannot respond in court").

### 3. The Order is not vague.

The Order provides more than enough clarity to give the defendant "fair notice" and "sufficient warning" to "conduct [himself] so as to avoid that which is forbidden." *United States v. Bronstein*, 849 F.3d 1101, 1104, 1106-07 (D.C. Cir. 2017) (quotations omitted) (rejecting vagueness challenge to a statute making it unlawful to "make a harangue or oration . . . in the Supreme Court Building or grounds"); *see Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008).

The vagueness doctrine is not offended by "requir[ing] a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask." *Bronstein*, 849 F.3d at 1107 (quotations omitted).  Indeed, "the vagueness doctrine does not doubt the constitutionality of laws that call for the application of a qualitative standard to real-world conduct; the law is full of instances where a man's fate depends on his estimating rightly some matter of degree." *Id.* at 1108 (cleaned up); *see Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").  Rather, a prohibition "is unconstitutionally vague if,

applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all." *Bronstein*, 849 F.3d at 1107 (cleaned up).

The defendant primarily challenges (Br. 50-52) the term "target," cataloging various dictionary definitions of the term. "But we are interpreting [an Order], not restating a dictionary," and "[o]ur search here is not for every facet of [the applicable terms], but their meaning within the [Order] at issue." *Bronstein*, 849 F.3d at 1108. As the district court explained, "[t]he motion hearing and corresponding Order provide substantial context for and examples of the kinds of 'targeting' statements that could result in 'significant and immediate risk[s]' to 'the integrity of these proceedings.'" JA.338. Although such statements are necessarily context-dependent, JA.338-39, they typically consist of *ad hominem* attacks using inflammatory language likely to arouse angry or violent feelings in the listener, rather than reasoned argument, since these are precisely the sorts of statements that pose a substantial likelihood of material prejudice to the proceedings.

As the district court noted, the defendant's own "social media posts since the Order's entry illustrate the comprehensible difference between the statements it permits and those it proscribes." JA.339. While the Order was in effect, the defendant issued a strongly worded post that "assert[ed] that Defendant is innocent, that his prosecution is politically motivated, and that the

Biden administration is corrupt," while also steering clear of "the Order's prohibition of 'targeting' certain individuals." *Id.* Then, when the Order was administratively stayed, the defendant resumed targeting the Special Counsel's family, *supra* at 14 n.4, and separately issued a post "singl[ing] out a foreseeable witness for purposes of characterizing his potentially unfavorable testimony as a 'lie' 'ma[d]e up' to secure immunity," and "attack[ing] him as a 'weakling[] and coward[]' if he provides that unfavorable testimony." JA.340. The defendant has conceded that, had the Order been in effect, he "would have been unable" to make the latter post, further demonstrating that "far from being arbitrary or standardless, the Order's prohibition on 'targeting' statements can be straightforwardly understood and applied." JA.340-41.

The fact that this standard may occasionally present close cases that turn on relevant context does not render the Order unconstitutionally vague. *Bronstein*, 849 F.3d at 1107-08; *see United States v. Williams*, 553 U.S. 285, 305-06 (2008) (rejecting as a "basic mistake" the belief that "the mere fact that close cases can be envisioned renders a statute vague," since "[c]lose cases can be imagined under virtually any statute"). Moreover, as the district court noted, "[b]efore concluding that any statement violated the Order, the court would afford the parties an opportunity to provide their positions on the statement's meaning and permissibility." JA.340 n.5. If the defendant can credibly argue

that a particular statement does not rise to the level of prohibited targeting, he cannot be held in contempt for violating the Order. *See, e.g.*, *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (discussing contempt standards).

The defendant also challenges the Order's reference to all "interested parties," suggesting that, as a result, the Order "might apply" to a range of non-parties, including "the media covering" the case. Br. 52-53. But as the district court explained, "'interested party' is a well-established legal term of art meaning 'anyone who both is directly interested in a lawsuit and has a right to control the proceedings, make a defense, or appeal from an adverse judgment.'" JA.337-38 (quoting *Interested Party*, *Black's Law Dictionary* (11th ed. 2019) (referencing *Party* (2), *Black's Law Dictionary* (11th ed. 2019))). The term covers "'the parties and their counsel,'" and "[t]here is no meaningful basis to interpret [it] as covering anyone else." JA.338.

Finally, the defendant takes issue (Br. 53-54) with the Order's prohibition on targeting "any foreseeable witness or the substance of their testimony." But the defendant's release conditions (SA.3) likewise preclude him from communicating with witnesses about the facts of the case outside the presence of counsel, and he has not raised any vagueness objection to that condition. Rightly so, since the allegations in the indictment combined with transcripts and

reports of the witnesses' statements—provided as part of "assembled, organized and summarized discovery," SA.148—provides him with ample notice on this topic. It is a far cry from "unknowable." Br. 24.

Courts have rejected vagueness challenges to orders less clear than the Order here. In *Brown*, for example, the order in question designated "'[s]tatements or information intended to influence public opinion regarding the merits of this case' as matters the parties may not share with the public media." *Brown*, 218 F.3d at 430. The court rejected a vagueness challenge, seeing "no reason to believe that the parties in this case would not understand the meaning of these words." *Id.* Likewise, in *Levine*, the court rejected a vagueness challenge to an order that "bar[red] trial participants from making 'any statements to members of the news media concerning any aspect of this case that bears upon the merits to be resolved by the jury.'" *Levine*, 764 F.2d at 598-99. And in *In re Russell*, the court rejected a vagueness challenge to an order prohibiting potential witnesses from making "any extrajudicial statement that relates to, concerns, or discusses the testimony such potential witnesses may give in this case, or any of the parties or issues such potential witness expects or reasonably should expect to be involved in this case, or the events leading up to" the charged offense. *In re Russell*, 726 F.2d at 1008, 1011 (emphasis omitted); *see also Cutler*, 58 F.3d at 833-34 (finding the local rule sufficiently "definite and specific" to justify a

contempt sanction).  The Court should likewise reject the defendant's vagueness challenge here.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's Order.

Respectfully submitted,

J.P. COONEY
Deputy Special Counsel

JACK SMITH
Special Counsel

RAYMOND N. HULSER
Counselor to the Special Counsel

MOLLY G. GASTON
THOMAS P. WINDOM
Senior Assistant Special Counsels

JAMES I. PEARCE
JOHN M. PELLETTIERI
Assistant Special Counsels

CECIL W. VANDEVENDER
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

November 14, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.      This brief contains 12,944 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced, 14-point serif typeface using Microsoft Word for Microsoft 365.

<u>/S/ CECIL W. VANDEVENDER</u>
Assistant Special Counsel
U.S. Department of Justice