No. 23-3190

In the
# United States Court of Appeals
for the District of Columbia Circuit

———————

UNITED STATES OF AMERICA
v.
DONALD J. TRUMP,
Defendant

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
District Court No. 23-cr-257 (Chutkan, J.)

———————

## SUPPLEMENTAL APPENDIX FOR THE UNITED STATES

———————

J.P. COONEY
Deputy Special Counsel

RAYMOND N. HULSER
Counselor to the Special Counsel

JAMES I. PEARCE
JOHN M. PELLETTIERI
Assistant Special Counsels

JACK SMITH
Special Counsel

MOLLY G. GASTON
THOMAS P. WINDOM
Senior Assistant Special Counsels

CECIL W. VANDEVENDER
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

# TABLE OF CONTENTS

Page

8/3/23   Order Setting Conditions of Release (ECF No. 13) ...................... 1

8/11/23   Transcript of Hearing on Protective Order (ECF No. 29) ............. 7

8/17/23   Response in Opposition to Government's Proposed Trial
          Calendar (ECF No. 30) .............................................. 80

8/28/23   Transcript of Status Hearing (ECF No. 38) ............................... 96

8/28/23   Pretrial Order (ECF No. 39) ..................................... 157

10/6/23   Opinion and Order (ECF No. 82) ........................... 160

11/2/23   Order (ECF No. 130) ............................................. 166

11/6/23   Government's Opposition to Defendant's Motion to Strike
          Inflammatory Allegations from the Indictment (ECF No.
          140) ...................................................... 168

11/7/23   Opinion and Order (ECF No. 146) ........................ 183

AO 199A (Rev. 06/19)  Order Setting Conditions of Release

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.   23-CR-257 |
| Donald J. Trump | ) | |
| _Defendant_ | ) | |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1)  The defendant must not violate federal, state, or local law while on release.

(2)  The defendant must cooperate in the collection of a DNA sample if it is authorized by 34 U.S.C. § 40702.

(3)  The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4)  The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at:   333 Constitution Avenue, N.W. Washington, D.C. 20001

_Place_

before Judge Tanya S. Chutkan in Courtroom 9

on _____

_Date and Time_

If blank, defendant will be notified of next appearance.

(5)  The defendant must sign an Appearance Bond, if ordered.

**SA.1**

AO 199B (Rev. 12/20)  Additional Conditions of Release

## ADDITIONAL CONDITIONS OF RELEASE

Pursuant to 18 U.S.C. § 3142(c)(1)(B), the court may impose the following least restrictive condition(s) only as necessary to reasonably assure the appearance of the person as required and the safety of any other person and the community.

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( [ ] ) (6) The defendant is placed in the custody of:
  Person or organization _____
  Address *(only if above is an organization)* _____
  City and state _____  Tel. No. _____
who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: _____   _____
                                    *Custodian*                                    *Date*

( [✓] ) (7) The defendant must:
  ( [ ] ) (a) submit to supervision by and report for supervision to the _____ ,
         telephone number _____ , no later than _____ .
  ( [ ] ) (b) continue or actively seek employment.
  ( [ ] ) (c) continue or start an education program.
  ( [ ] ) (d) surrender any passport to: _____
  ( [ ] ) (e) not obtain a passport or other international travel document.
  ( [ ] ) (f) abide by the following restrictions on personal association, residence, or travel: _____

  ( [ ] ) (g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: _____

  ( [ ] ) (h) get medical or psychiatric treatment: _____

  ( [ ] ) (i) return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes: _____

  ( [ ] ) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.
  ( [ ] ) (k) not possess a firearm, destructive device, or other weapon.
  ( [ ] ) (l) not use alcohol ( [ ] ) at all ( [ ] ) excessively.
  ( [ ] ) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.
  ( [ ] ) (n) submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.
  ( [ ] ) (o) participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.
  ( [ ] ) (p) participate in one of the following location restriction programs and comply with its requirements as directed.
         ( [ ] ) (i) **Curfew.** You are restricted to your residence every day ( [ ] ) from _____ to _____ , or ( [ ] ) as directed by the pretrial services office or supervising officer; or
         ( [ ] ) (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or
         ( [ ] ) (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court; or
         ( [ ] ) (iv) **Stand Alone Monitoring.** You have no residential curfew, home detention, or home incarceration restrictions. However, you must comply with the location or travel restrictions as imposed by the court.
         **Note:** Stand Alone Monitoring should be used in conjunction with global positioning system (GPS) technology.

**SA.2**

AO 199B (Rev. 12/20)  Additional Conditions of Release

## ADDITIONAL CONDITIONS OF RELEASE

( ☐ ) (q) submit to the following location monitoring technology and comply with its requirements as directed:
    ( ☐ ) (i)   Location monitoring technology as directed by the pretrial services or supervising officer; or
    ( ☐ ) (ii)  Voice Recognition; or
    ( ☐ ) (iii) Radio Frequency; or
    ( ☐ ) (iv) GPS.

( ☐ ) (r) pay all or part of the cost of location monitoring based upon your ability to pay as determined by the pretrial services or supervising officer.

( ☐ ) (s) report as soon as possible, to the pretrial services or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

( ☑ ) (t) The defendant shall not communicate about the facts of the case with any individual known to the defendant to be a witness, except through counsel or in the presence of counsel.

**SA.3**

AO 199C  (Rev. 09/08)  Advice of Penalties                                                 Page ___4___ of ___4___ Pages

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year.  This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court.  The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed.  If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive.  In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release.  I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed.  I am aware of the penalties and sanctions set forth above.

_____
Defendant's Signature

Washington DC
_____
City and State

### Directions to the United States Marshal

(  ) The defendant is ORDERED released after processing.

(  ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release.  If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: 8/3/2023

_____
Judicial Officer's Signature

Moxila A Upadhyay
_____
Printed name and title

DISTRIBUTION:   COURT   DEFENDANT   PRETRIAL SERVICE   U.S. ATTORNEY   U.S. MARSHAL

**SA.4**

AO 98 (Rev. 12/11) Appearance Bond

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| DONALD J. TRUMP | ) | Case No. 23-CR-257-TSC-1 |
| | ) | |
| *Defendant* | ) | |

## APPEARANCE BOND

### Defendant's Agreement

I, _____ DONALD J. TRUMP _____ *(defendant)*, agree to follow every order of this court, or any court that considers this case, and I further agree that this bond may be forfeited if I fail:

( X ) to appear for court proceedings;
( X ) if convicted, to surrender to serve a sentence that the court may impose; or
( X ) to comply with all conditions set forth in the Order Setting Conditions of Release.

### Type of Bond

( X ) (1) This is a personal recognizance bond.

(     ) (2) This is an unsecured bond of $ _____ .

(     ) (3) This is a secured bond of $ _____ , secured by:

(     ) (a) $ _____ , in cash deposited with the court.

(     ) (b) the agreement of the defendant and each surety to forfeit the following cash or other property *(describe the cash or other property, including claims on it — such as a lien, mortgage, or loan — and attach proof of ownership and value):*

If this bond is secured by real property, documents to protect the secured interest may be filed of record.

(     ) (c) a bail bond with a solvent surety *(attach a copy of the bail bond, or describe it and identify the surety):*

### Forfeiture or Release of the Bond

*Forfeiture of the Bond.* This appearance bond may be forfeited if the defendant does not comply with the above agreement. The court may immediately order the amount of the bond surrendered to the United States, including the security for the bond, if the defendant does not comply with the agreement. At the request of the United States, the court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

**SA.5**

AO 98 (Rev. 12/11) Appearance Bond

*Release of the Bond.*  The court may order this appearance bond ended at any time.  This bond will be satisfied and the security will be released when either: (1) the defendant is found not guilty on all charges, or (2) the defendant reports to serve a sentence.

### Declarations

*Ownership of the Property.*  I, the defendant – and each surety – declare under penalty of perjury that:

(1)     all owners of the property securing this appearance bond are included on the bond;
(2)     the property is not subject to claims, except as described above; and
(3)     I will not sell the property, allow further claims to be made against it, or do anything to reduce its value while this appearance bond is in effect.

*Acceptance.*  I, the defendant – and each surety – have read this appearance bond and have either read all the conditions of release set by the court or had them explained to me.  I agree to this Appearance Bond.

I, the defendant – and each surety – declare under penalty of perjury that this information is true.  (See 28 U.S.C. § 1746.)

Date:   08/03/2023
_____                       _____
                                                                                  *Defendant's signature*

_____                       _____
*Surety/property owner – printed name*                 *Surety/property owner – signature and date*

_____                       _____
*Surety/property owner – printed name*                 *Surety/property owner – signature and date*

_____                       _____
*Surety/property owner – printed name*                 *Surety/property owner – signature and date*

*CLERK OF COURT*

Date:   08/03/2023
                                                          Tiffany Lavigne-Rhodes
                                                          _____
                                                          *Signature of Clerk or Deputy Clerk*

Approved.

Date:   08/03/2023
                                                          _____
                                                          *Judge's signature*

**SA.6**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .   CR No. 23-0257 (TSC)
                               .
     v.                        .
                               .
DONALD J. TRUMP                .   Washington, D.C.
                               .   Friday, August 11, 2023
          Defendant.           .   10:00 a.m.
. . . . . . . . . . . . . . .


HEARING ON PROTECTIVE ORDER
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


  APPEARANCES:

For the Government:          THOMAS WINDOM, ESQ.
                             MOLLY G. GASTON, ESQ.
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530


For Defendant:               JOHN F. LAURO, ESQ.
                             GREGORY M. SINGER, ESQ.
                             Lauro & Singer
                             400 North Tampa Street
                             15th Floor
                             Tampa, FL 33602

                             TODD BLANCHE, ESQ.
                             Blanche Law
                             99 Wall Street
                             New York, NY 10005

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
1                    P R O C E E D I N G S
2            THE DEPUTY CLERK:  Good morning, Your Honor.  This is
3     Criminal Case No. 23-257, United States of America versus
4     Donald J. Trump.
5         Counsel, please approach the lectern and state your
6     appearances for the record.
7            MR. WINDOM:  Good morning, Your Honor.
8            THE COURT:  Good morning.
9            MR. WINDOM:  Thomas Windom and Molly Gaston for the
10    United States.  With us at counsel table is FBI Special Agent
11    Jamie Garman.
12           THE COURT:  Good morning.
13        Who will be speaking for the government this morning?
14           MR. WINDOM:  I will, Your Honor.
15           THE COURT:  All right.  Thank you.
16           MR. LAURO:  Good morning, Your Honor.  Nice to meet
17    you.
18           THE COURT:  Good morning.
19           MR. LAURO:  John Lauro on behalf of President Trump.
20    With me is Todd Blanche, my co-counsel, and also my partner,
21    Greg Singer.
22           THE COURT:  Good morning.
23        And who will be speaking for counsel this morning?
24           MR. LAURO:  I will.
25           THE COURT:  All right.  Just so you know, because we're
```

1    going to be working through this, you all are free to remain

2    at counsel table and seated if you want, just as long as you

3    speak into the microphone so my court reporter can hear you.

4    Even if I can hear you, if you're not on the microphone, he

5    cannot, and he's got to keep the record.  So you're welcome

6    to stay at counsel table rather than hop up and down.  It's

7    totally up to you.

8        All right.  We are here for a hearing regarding the

9    parties' proposed protective orders in this case.  The

10   government has moved for imposition of a protective order in

11   ECF No. 10, which is frequently used in criminal cases to

12   ensure that certain information that the government shares

13   with the defense is not disclosed to the public.

14       The defense has objected to the government's initial

15   proposed order, and the government then proposed a second

16   order to which the defense also has objections.  The parties

17   have been unable to so far resolve those objections and reach

18   agreement on their own, and so I decided to schedule this

19   hearing to work through those objections one by one.

20       And I want to thank the parties for making themselves

21   available on such short notice.  I know initially I said

22   I wasn't available on Friday, and then I became available.

23   So I really appreciate that because, as you all know, the

24   government can't turn over discovery until there's a protective

25   order in place, and so it's imperative that this be resolved

1    promptly so that discovery can be disclosed and the case can

2    move forward in the regular order.

3    So a brief word about briefing schedules.  Under Local

4    Criminal Rule 47(b), a party may oppose a motion within 14 days

5    of the date of service or at such other time as the Court may

6    direct.

7    Likewise, under rule 47(d), the default deadline for replies

8    in support of a motion is seven days after service of the

9    memorandum in opposition; however, I routinely depart from the

10   default 14- and 7-day time limits, as do many of my colleagues,

11   when it serves the interest of justice and efficiency.

12   With respect to the government's pending motion, for

13   instance, I determined that a shorter briefing schedule deadline

14   was appropriate given the relative brevity of the proposed

15   protective order and the need to proceed with discovery in this

16   case.  There may well be other instances and times in this case

17   where my briefing schedule is shorter or longer than the one

18   prescribed in our local rule.

19   And so now I intend to resolve the parties' objections by

20   going through defendant's redline to the government's proposed

21   order one by one as they're set forth in ECF No. 14, which is

22   Exhibit A.  There's a few minor differences between A and B, but

23   I thought A best...

24   So I am prepared to rule immediately on some of the

25   revisions.  For others, I will have some questions.  I will have

1    some questions of counsel before I make my decision, and after

2    this hearing it's my intention to issue a protective order

3    consistent with today's rulings as quickly as possible.

4        So Federal Rule of Criminal Procedure 16(d) provides that at

5    any time the court may, for good cause, deny, restrict, or defer

6    discovery or inspection or grant other appropriate relief.

7        Under binding D.C. Circuit precedent in *United States v.*

8    *Cordova*, 806 F.3d 1085, 1090, the burden of showing good cause

9    is on the party seeking the order, and among the considerations

10   to be taken into account by the court will be the safety of

11   witnesses and others, a particular danger of perjury or witness

12   intimidation, and the protection of information vital to

13   national security.

14       Relatedly, I must also comply with what the Supreme Court

15   has said is my affirmative constitutional duty to minimize the

16   effects of prejudicial pretrial publicity, and that's from

17   *Gannett Co. v. DePasquale*, 443 U.S. 368.  The Supreme Court

18   noted that after the commencement of the trial itself,

19   inadmissible prejudicial information about a defendant can be

20   kept from a jury by a variety of means.  When such information

21   is publicized before the trial, however, it may never be

22   altogether kept from potential jurors.

23       As a result, the Supreme Court stated in *Alderman v. United*

24   *States*, 394 U.S. 165, 185, that the trial court can and should,

25   where appropriate, place a defendant and his counsel under

**SA.11**

1    enforceable orders against unwarranted disclosure of materials

2    which they may be entitled to inspect.

3        Mr. Trump, like every American, has the First Amendment right

4    to free speech, but that right is not absolute.  In a criminal

5    case such as this one, a defendant's free speech is subject to

6    the release conditions imposed at arraignment and must also

7    yield to the orderly administration of justice, especially with

8    respect to disclosure of materials obtained in discovery.

9        Without a protective order, a party could reveal information

10   that would taint the potential jury pool, result in the

11   harassment or intimidation of witnesses or parties in the case,

12   or otherwise prevent a fair trial.

13       Accordingly, I'm going to review each disputed portion of the

14   proposed orders today to ensure that they are consistent with

15   the defendant's rights and the integrity of the judicial process

16   — in other words, that there is good cause for the order that

17   I'll issue.

18       So I want to begin with what is perhaps the parties' biggest

19   disagreement:  the scope of the protective order.  The

20   government proposes that the order govern all discovery material

21   that it turns over to the defense.  The defense proposes that

22   the order govern only the materials that the government

23   designates as sensitive.  This disagreement is reflected

24   throughout Defendant's Exhibit A, but the most relevant

25   paragraphs are paragraphs 1 and 2.

1    So here I have some questions for you, Mr. Windom.  In your

2    motion, you stated that there was good cause shown -- excuse

3    me -- that there was good cause for your proposal, and I quote,

4    "because issuance of the government's proposed order would

5    expedite the flow of discovery in this case, give the defendant

6    prompt access to a large portion of the discovery he ultimately

7    will receive, and protect the highly sensitive categories of

8    material."

9    But I don't see why those same goals wouldn't be served by

10   the defense proposal.  So can you explain why you think there

11   is good cause to cover all discovery materials rather than just

12   sensitive materials?  And I have a couple of follow-up.

13        MR. WINDOM:  Yes, Your Honor.  Thank you.

14    So that is the kind of larger philosophical difference

15   between the government's proposed order and the defendant's

16   proposed order.  The government wants the protective order

17   to cover all discovery.  The defense only wants it to cover

18   sensitive discovery.

19        THE COURT:  Right.

20        MR. WINDOM:  On this issue, in addition to the line

21   from our motion that you read, in the paragraph underneath

22   that it also talks about preventing the improper dissemination

23   or use of discovery materials including to the public.

24    So the larger basis here is that, under the government's

25   proposed order, it really follows three overlapping bases for

1    good cause.  The first one is to ensure that the purpose of

2    discovery is for the fair and efficient adjudication of the

3    court in the courtroom as opposed to in the public.

4        The second is that, consistent with the Advisory Committee

5    explanation for the purpose of the rule, it is to safeguard

6    witness security, to prevent intimidation of the witnesses, to

7    prevent harm to reputation or dignity of the witnesses, and to

8    prevent personal information from being released, in addition

9    to the third overlapping piece, which, as Your Honor noted, is

10   the Court's affirmative duty to prevent prejudicial pretrial

11   publicity.

12       Those are the overlapping three core objectives at which

13   our protective order is aimed and which is, in some respects,

14   different than what the defense has proposed.

15       The defendant's proposal specifically is tailored to permit

16   them to try this case in the media.  This is something that

17   Your Honor, in the Rule 57.7 hearing in the *Butina* case, noted

18   was an improper purpose, to try the case in the media.

19       Here, the defendant is asking for the Court's blessing to

20   be able to use criminal discovery for political purposes.

21   That is not a proper use of discovery.  And what is, I think,

22   telling is that the defendant's proposed order and the

23   defendant's arguments do not actually indicate any way in

24   which the government's proposed order hinders the defense's

25   use of discovery material in defense of this case in the

1    courtroom.

2         THE COURT:  I hate to interrupt you, Mr. Windom, but

3    all that may be so, but how is that explaining why all of this

4    material is both sensitive and nonsensitive?  So my question

5    really goes to what is the good cause shown for subjecting the

6    nonsensitive material to the order.

7         MR. WINDOM:  There is some sensitive material, a great

8    amount of sensitive material that we would designate, and

9    there's some nonsensitive as well.

10        THE COURT:  Right.  It's the nonsensitive I'm

11   interested in.

12        MR. WINDOM:  Yes, ma'am.

13     The nonsensitive falls within the exact same rubric that

14   I just laid out.  Even if it's nonsensitive, it still may be

15   inadmissible, it may still be irrelevant, but it may be

16   sensational.  It may be something that is used by the defense

17   or the defendant to pollute the jury pool, whether purposely

18   or not.

19     The information the defense has set forth, both in the

20   defendant's own posts and the defense counsel's statements on

21   the Sunday shows last weekend, the defendant has set forth an

22   intention to publicly disseminate any information that they

23   deem, quote, "informative" is what the defense counsel said.

24        THE COURT:  Well, defense has a First Amendment right

25   to -- within limits, to speak about the case.  What I'm

**SA.15**

1    interested in is the Circuit says I have to enunciate good

2    cause for protecting information, and certainly there's no --

3    I don't see any problem with the sensitive information.

4       Well, let me ask you this:  What percentage of the

5    discovery, if you can just give me a rough estimate, is

6    nonsensitive?

7            MR. WINDOM:  Giving you an estimate, Your Honor?

8            THE COURT:  Yes.  You said a "small amount."

9            MR. WINDOM:  Yes, ma'am.  I would say that the vast

10   majority would be designated as sensitive within the

11   government's definition of "sensitivity."  Obviously, that's

12   an issue of dispute between the parties, but I would say the

13   vast majority.  It's hard to give a percentage, because some

14   of the discovery material may already be in the defendant's --

15   he may have the right to access that material otherwise.

16           THE COURT:  But that's the sensitive material.

17   Nonsensitive is what I'm focused on.

18           MR. WINDOM:  Yes, ma'am.

19      For the nonsensitive material that the government intends

20   to produce, there is some, obviously, nonsensitive material,

21   which is a fairly small amount.  Then there is another bucket

22   of material which may be up to a quarter of the government's

23   first production which we need to consult with defense counsel

24   on because the defendant may have the ability to actually

25   access that information other than us giving it to him.

1      THE COURT:  And would that be sensitive or nonsensitive

2      information under the definition as set forth in the protective

3      order?

4      MR. WINDOM:  Sure.  Under the definition, assuming that

5      the defense can affirm in writing that they otherwise are able

6      to access that information, we would not consider it

7      sensitive.  We're talking about information specifically from

8      the defendant's campaign entities or PAC entities.

9      THE COURT:  All right.  So if I understand what you're

10     saying, your position is it's even the nonsensitive information

11     could be used for witness intimidation or reputational damage

12     or -- I mean, if so, why wouldn't it be sensitive, I guess?

13     MR. WINDOM:  It would not be sensitive within the

14     definitions we have laid out, but it still could be produced

15     in discovery.  And then Your Honor mentioned the First

16     Amendment right.

17     As you know, and as you quoted from *Seattle Times*, there is

18     simply a different calculus when it is discovery that is used

19     in a judicial proceeding.  There is much less of a First

20     Amendment issue, and the only thing the court needs to look

21     for, as you've said, is the good cause standard.

22     So I would just go back to the three animating principles

23     they provide for protection for all of the discovery material

24     for the government, both sensitive and nonsensitive.  The main

25     thing is -- well, it's all important, but as Your Honor said,

1    there is the potential of damaging reputations of witnesses,

2    depending on what the nonsensitive information is.  It doesn't

3    simply need to include PII in or a witness's statement in

4    order to potentially damage the witness's reputation.

5        But secondly, the larger issue here is the defense has

6    broadcast their strategy; and that is not to try this case in

7    this courtroom, and the Court should address that with this

8    protective order.

9        THE COURT:  I intend to, but my task here is somewhat

10   narrower.

11       MR. WINDOM:  Sure.

12       THE COURT:  And it really focuses on how much -- you

13   know, I don't want this order to be overinclusive.

14       MR. WINDOM:  Yes, ma'am.

15       THE COURT:  In other words, I don't want to just

16   issue a blanket protective order over information that is

17   not sensitive.  But if you're talking about a small amount

18   relative to what's being turned over, or if you can enunciate

19   good cause, because that is what I have to find.

20       And, certainly, if I decide to have two categories and not

21   have the nonsensitive information subject to the protective

22   order, you can always go over the nonsensitive and consider if

23   you need to designate it as sensitive.  Isn't that right?

24       MR. WINDOM:  That is right.  I will put out an

25   additional implication for the fair and efficient

1    administration of this case and getting this case to trial,

2    which I think is an important consideration.

3         THE COURT:  Oh, I agree.

4         MR. WINDOM:  Should the Court -- the government has a

5    blanket approach.  The defense has the sensitivity designation

6    or not, or simply outside the protective order.  Should the

7    Court go with the defense's approach, I anticipate that there

8    will be never-ending battles over sensitivity designations,

9    and perhaps every week we might be before the Court in order

10   for the defense to raise an objection as to the government's

11   sensitivity designation.

12        THE COURT:  But if the amount of material you're

13   describing as nonsensitive is relatively small -- I mean,

14   I suspect we're going to be having disagreements about a lot

15   of things in this protective order, but if the nonsensitive

16   material you're describing is relatively small, that is a

17   limited amount of disagreement we could have, isn't it?

18        MR. WINDOM:  I think it's the flip, Your Honor.

19   Since the sensitive amount is so large, under the government's

20   order, if the government produces it in discovery, the defense

21   simply cannot use it on the weekend shows.  If the government --

22   if the Court goes to the defense's proposed order, then there

23   will be the squabbles over what is sensitive --

24        THE COURT:  Isn't that going to happen in any event?

25   If I go with your request and designate it all as sensitive,

1    can't the defense come to me through motion and say, we

2    believe this document is not sensitive?  Isn't that going to

3    be the case anyway?

4          MR. WINDOM:  The defense could do that, Your Honor, but

5    it would still be covered under the protective order and would

6    not be permitted to be publicly disseminated.

7          THE COURT:  Until I ruled otherwise.

8          MR. WINDOM:  Unless you ruled otherwise under paragraph

9    16 of our proposed protective order.

10          THE COURT:  Okay.

11          MR. WINDOM:  The other thing to consider here that the

12   government will attempt to lay out, this is a decision today

13   to address what the Court sees as good cause and the best

14   interest of this case and the fair administration of justice.

15   Should it prove unworkable for some reason, paragraph 13

16   permits a modification; paragraph 16 permits document-specific

17   adjudication by the Court.

18     So, for those reasons, the ones that we've set forth as our

19   animating principles for all discovery, sensitive or not, and

20   the potential for what the government believes to be endless

21   litigation over sensitivity designation — so it's whether it's

22   in or outside of a protective order — the government believes

23   that the Court should enter our proposed protective order.

24          THE COURT:  Thank you, Mr. Windom.

25     Mr. Lauro?

1          MR. LAURO:  Yes, Your Honor.

2       I think you hit the nail on the head.

3          THE COURT:  That may be the last time you say this

4    for a while.

5       (Laughter)

6          MR. LAURO:  I doubt it, Your Honor.

7       But truly, this kind of blanket order is extraordinary.

8    The government has the ability to separate out sensitive and

9    nonsensitive information.  We have to face the fact that we

10    are in uncharted waters here, where we have a presidential

11    candidate running for office, and his opponent has the Justice

12    Department bringing criminal charges against him.  And in this

13    situation, certainly President Trump has the right to respond

14    and speak about these issues.

15       What we're asking for is for the government to show good

16    cause as Your Honor has designated those items under Rule 16

17    as well as the case law.  Extrajudicial speech, or public

18    speech, is not one of the good-cause factors Your Honor

19    described.

20          THE COURT:  It is a good-cause factor if that

21    extrajudicial speech causes witness intimidation or harassment

22    or interferes with -- I mean, it must always yield.  And so

23    what the defendant is currently doing -- you know, the fact

24    that he's running a political campaign currently has to yield

25    to the orderly administration of justice.  And if that means

1  that he can't say exactly what he wants to say about people

2  who may be witnesses in this case, that's how it's going to

3  have to be.

4      MR. LAURO:  And that's a different issue, though, than

5  a Rule 16 protective order, I believe, because --

6      THE COURT:  But isn't a protective order under Rule 16

7  designed to protect the harassment or intimidation of witnesses

8  or the dissemination of information that is sensitive?

9      MR. LAURO:  Sure.  It's directed if there is some

10 cognizable harm or identifiable harm to a particular witness

11 or an issue of perjury.  Here we don't have that.

12     THE COURT:  Well, Mr. Lauro, what about talking about

13 a potential witness to a nationwide, or potential worldwide,

14 audience and denigrating that witness?  Isn't that the kind

15 of -- isn't that the kind of situation that the protective

16 order is designed and Rule 16 is designed to prevent?

17     MR. LAURO:  Your Honor, you may have Mr. Pence in mind?

18 Is that your concern?

19     THE COURT:  Any witness.

20     MR. LAURO:  All right.  Well, obviously, on the

21 campaign trail, since the prosecutors decided to bring this

22 case in the middle of the campaign, President Trump has the

23 ability to respond fairly to political opponents, and that's

24 the problem with the way this order is structured.

25     THE COURT:  The defendant's desire to conduct a

1    campaign, to respond to political opponents has to yield.  Do

2    you disagree with that, that there are limits regardless of

3    what is going on in -- you know, I hate to say -- his day job?

4       I mean, this is a criminal case.  The need for this

5    criminal case to proceed in the normal order and protect

6    witnesses and the integrity of the process means that there

7    are going to be limits on the defendant's speech.

8       MR. LAURO:  I can assure you that my client will abide

9    by the integrity of the process, but he also can't be subject

10   to some kind of a contempt trap, which this really is.

11      THE COURT:  I think you're going -- I mean, nobody's

12   talked about contempt.  What we're talking about now are the

13   parameters of this order, and the parameters of the order that

14   we're all considering means that there are certain things, if

15   they have an impact on the administration of justice or on

16   witnesses, can't be said regardless of what endeavors the

17   defendant is currently engaged in.

18      MR. LAURO:  No one disagrees that any speech that

19   intimidates a witness would be covered by this order and

20   prohibited.  What we're talking about, though, is the fair use

21   of information.  For example, if my client has a memory of a

22   certain event that occurred and wants to speak publicly about

23   it in the course of a campaign, he's certainly entitled to do

24   that.

25      THE COURT:  Not if that memory ends up containing

1   information that would intimidate a witness.  It always has to

2   yield to the fact that there are pretrial release conditions

3   and a protective order will be in place.

4         MR. LAURO:  And he'll abide by that, obviously, and

5   has abided by it.  But my concern here is that the first

6   obligation is on the government, under Rule 16, to establish

7   what's sensitive and what's not sensitive.

8         THE COURT:  So let's go back to that, because we're

9   kind of painting with a very broad brush here.  Let's go back

10   to the designation.

11      Is it your position that with regard to the nonsensitive

12   information, that your client can say whatever he wants to say

13   about the nonsensitive information?

14         MR. LAURO:  No.  Subject to the limitations that

15   you've described, he has to abide by the rules of this court.

16   Certainly, he has First Amendment rights, but in no way am I

17   suggesting that any client could ever intimidate a witness or

18   use that information.  But we are in the middle of a campaign,

19   and the way this order is structured, it would provide an

20   enormous advantage to President Biden in the middle of a

21   campaign, and that's my concern.  It really --

22         THE COURT:  What the effects of my order are on a

23   political campaign are not before me and are not going to

24   influence my decision here.  This is a criminal trial.  This

25   is going to be a criminal trial brought at the time that the

1    government decided to bring the charges and they decided they

2    were ready to bring charges.  I don't have any control over

3    that.  But I cannot, and I will not, factor into my decisions

4    the effect it's going to have on a political campaign for

5    either side.

6         MR. LAURO:  Although, Your Honor, one of the good-cause

7    factors requires you to do the balancing that you described.

8         THE COURT:  Of course.

9         MR. LAURO:  And one of those is the impact on the

10   defendant when you enter this order, and I think, as a result

11   of that, the Court has to balance the factor and the impact on

12   a defendant --

13        THE COURT:  Mr. Lauro, your client has not seemed to

14   have had any trouble talking about the prosecution of this

15   case for some time and the investigation that he's been under

16   for some time, and the protective order, in many ways, would

17   not infringe on his right to talk about that.

18        MR. LAURO:  And then we have no problem, if he can

19   speak the way he's been speaking.

20        THE COURT:  So let's go back to the sensitive versus

21   nonsensitive designation.  What would be the burden on the

22   defense if I designated all materials, sensitive and

23   nonsensitive, as subject to the protective order, to the

24   defense simply moving to exempt certain documents?  I mean,

25   I suspect we're going to be dealing with discovery disputes

1    occasionally.

2            MR. LAURO:  It would be a massive burden, Your Honor.

3            THE COURT:  Tell me how.

4            MR. LAURO:  Especially when they can designate

5    sensitive versus nonsensitive information.  We looked at all

6    the Rule 16 orders that have been added on J6 cases.  We

7    haven't seen a single one that resembles this type of order

8    in terms of breadth.  I'll give you a practical example.

9        They designate all examples of testimony or interviews or

10   videos as being sensitive, and they require us, as counsel, to

11   sit with our client in the same room while our client reviews

12   that material.

13           THE COURT:  I'm going to get to that.

14           MR. LAURO:  Okay.

15           THE COURT:  I'm going to get to that.

16           MR. LAURO:  But that's just one example of how

17   over-burdensome that is.  And the other issue is --

18           THE COURT:  But that material is already designated

19   as sensitive.  I'm not inclined -- I'm not hearing a request

20   to say that that material is not included in the sensitive

21   designation.  What I'm talking about is the nonsensitive.

22   In other words, are you saying that those witness interviews

23   should not be designated as sensitive?

24           MR. LAURO:  Absolutely they should not be designated --

25           THE COURT:  Okay.  I'm going to get to that.

1          MR. LAURO:  -- unless the government can come up with

2     good cause as to why.  But I think, as you've seen under Rule

3     16 in your experience and the orders that you've entered, the

4     burden should be on the government --

5          THE COURT:  It is.

6          MR. LAURO:  -- first to designate what's sensitive and

7     what's not sensitive.  The nonsensitive material is subject to

8     the regular rules of the Court that we all have to abide by in

9     terms of what we can say and what we can't say about it.

10        But that nonsensitive information should not restrict,

11    under the Sixth Amendment, our ability to represent our client

12    and our ability to have an opportunity to discuss these issues

13    with our client, but also not be required to sit in the same

14    room as we go over a massive amount of documents in this case.

15         THE COURT:  Well, again, I'll get to that.

16         MR. LAURO:  I know we'll get to that.  But, really,

17    the burden is on the government under Rule 16, and here

18    they're trying to switch it.  They're trying to say the burden

19    is on President Trump's team when it's not.  It really has to

20    be something that the government has to go through and provide

21    good cause.  These kinds of blanket orders really present an

22    enormous problem here as well because of the ambiguity in this

23    order.

24        The risk is that someone can say something in the course of

25    a heated debate or heated campaign, and they're going to throw

1    a flag and say, No, wait a minute, somewhere in the bowels

2    of discovery there was something that mentioned what you

3    just said, and therefore you're in violation of this order.

4    And then we're off to the political spectacle of President

5    Trump in violation of the order.  All of this, Your Honor,

6    unfortunately, has to be understood in context under the

7    microscope of how the government decided to proceed.

8        And I will say one other thing.  Everything that we do

9    here now is under a microscope -- a political microscope,

10   unfortunately -- because of the result of what the government

11   has done.  And I understand our requirement, and we will obey

12   Your Honor's direction 100 percent --

13            THE COURT:  I'm glad to hear that.

14            MR. LAURO:  -- and not ever deviate from what Your

15   Honor directs us to do.  But there has to be fair play here.

16   All we're asking for is fairness in terms of how we handle

17   this discovery.  We don't even know the magnitude of the

18   discovery yet.  They haven't even described it for us.  Is it

19   one terabyte?  Is it three terabytes?

20       But the bottom line is we need something that's workable,

21   that isn't ambiguous, that doesn't intrude on the attorney-

22   client privilege, that affords my client the due process

23   rights that he's entitled to in the context of a campaign.

24   We can't ignore the fact that it's a campaign.

25            THE COURT:  I intend to ensure your client is afforded

1    all the rights he's entitled to.  I reiterate that the
2    existence of a political campaign is not going to have any
3    bearing on my decision other than, you know, any other lawyer
4    coming before me saying that my client needs to be able to do
5    his job.  I will always, obviously, factor it in, but I intend
6    to keep politics out of this.
7        And, Mr. Windom, since you have the burden, I'm going to
8    let you to respond to Mr. Lauro.
9        Did I cut you off?
10            MR. LAURO:  No.  Absolutely not.
11        Your Honor, just in sum, the factors that are at issue
12   here is whether or not the government can show good cause
13   with respect to witness intimidation or perjury.  We'll put
14   national security aside because there's no question, no issue
15   there.  But they haven't done that yet.  They haven't done
16   that in terms of any cognizable or nonspeculative harm that
17   exists.
18            THE COURT:  As to the nonsensitive.
19            MR. LAURO:  Exactly.
20            THE COURT:  I keep trying to come back to the paragraph.
21            MR. LAURO:  I understand your difference.  And, Your
22   Honor, that's our difference.  That's why we wanted the order
23   to separate out sensitive from nonsensitive and put the burden
24   on the prosecutor to come up with what's sensitive at an
25   initial blush.

**SA.29**

1    Now, if they put something in the sensitive bucket, we can

2    argue that it shouldn't be.  But in fairness, they should have

3    the first obligation to do that and not have this blanket

4    assertion.

5    And one other point that I need to make on paragraph 1

6    before I forget, if I may, Your Honor, it says, "The order

7    does not apply to records," and we should add "or information."

8    "Records or information."  Because that covers the *Seattle*

9    *Times* issue where a client who is subject to a protective

10   order may have some information from prior that's not

11   connected to the discovery process.

12        THE COURT:  Well, isn't that covered by another

13   paragraph?

14        MR. LAURO:  It's not, really, and we just wanted to

15   make that clear in paragraph 1.

16        THE COURT:  Okay.

17        MR. LAURO:  But I think Your Honor knows our concerns

18   in terms of a blanket order.  We think it's much more

19   practical and much more in accordance with the way that this

20   Court has handled these orders, is to have the burden on the

21   government at first issue.

22        THE COURT:  Well, they always bear the burden when they

23   move for the order.  So I'll hear from Mr. Windom in response,

24   and then I'll rule.

25        MR. LAURO:  Yes.

1          MR. WINDOM:  Thank you, Your Honor.

2      The government is happy to accept its mandates to bear

3      the burden for good cause here.  The defense counsel's made a

4      bunch of comments that are obviously political in nature here

5      in this courtroom.  I'm not going to address those.

6      What I will say is that it is emblematic of what the

7      defendant has done even more recently, since we filed a week

8      ago, in posting things about potential witnesses in the case.

9      Counsel also has made no secret about what his intention is.

10     The good cause here is in order to, among what I already have

11     said, to prevent pollution of the jury.

12         THE COURT:  I really want you to focus -- I mean, we're

13     just -- this is the first thing.  We have a number of things

14     to discuss, and I really want you to focus on the sensitive

15     versus nonsensitive difference and whether it should all be

16     subject to the order.

17         MR. WINDOM:  Yes, ma'am.  And the government's aim here

18     is to prevent the use of any material produced in discovery

19     for purposes of harming the jury pool, whether it's sensitive,

20     whether it's nonsensitive.  The aims control, the objectives

21     control, regardless of the designation.

22         THE COURT:  I agree.  But you still have to show good

23     cause for the nonsensitive.  That's really what I'm trying to

24     home in on.

25         MR. WINDOM:  Yes, ma'am.  And I cannot be more specific

1    than they have identified what they intend to do with it.

2    Even if it is nonsensitive material, it still has the

3    potential to pollute the jury pool.  It still has the

4    potential to intimidate witnesses, to damage witness

5    reputation.

6        And I would say that this is not -- the defense has said

7    this is some sort of extreme thing that the government's

8    reaching for here.  The defense agreed to these same

9    protections in the Southern District of Florida not two months

10   ago.  The Court has entered an order with the same broad brush

11   of covering all discovery in the *Butina* case in addition to

12   the handful of cases that the government mentioned here in its

13   brief.

14       THE COURT:  I think the differences with the *Butina*

15   case, which now seems so small and quiet, is that there was

16   no argument from the defense there that the defendant in that

17   case needed to speak, and we have a different situation.  As I

18   said to Mr. Lauro, the fact that there's a political campaign

19   going on is not going to influence my decision one way or the

20   other.  But I do have to weigh the defendant's -- all

21   limitations on a defendant's First Amendment rights.

22       And I would point out that even without the protective

23   order, the defendant is -- Mr. Trump is subject to pretrial

24   release conditions, which also prevent him from interfering

25   with the orderly administration of justice and engaging in

1    behavior that could harass or intimidate a witness, because

2    the release conditions are also there.

3         MR. WINDOM:  That's also correct.  What the protective

4    order does is to prevent -- is to limit the amount of

5    information and data that the defendant would be able to use

6    in the event he wants to go after a potential witness.

7         THE COURT:  And so the statement that you used where

8    the defendant posted something about the former vice

9    president, for example, that's not really -- that really

10   wouldn't be covered, right, because that's not really

11   information.  That's covered under his conditions of release.

12      Isn't that right?  I mean that's not from information that

13   would be turned over in discovery.  That's behavior that may

14   be affecting his conditions of release but not really

15   implicated on the protective order.

16        MR. WINDOM:  That's correct.  However, once the

17   defendant receives discovery, if he says something that

18   clearly he got from a transcript or from another document --

19        THE COURT:  Well, we'll get to it, but a transcript

20   may be designated as sensitive, so it's subject to the order.

21   I'm really trying to determine if I need to subject the

22   nonsensitive information to the order, and that's where I keep

23   getting a lot of broad arguments.  But I'm not --

24        MR. WINDOM:  Sure.  And it's a little hard to speak in

25   the abstract, which is why --

1          THE COURT:  I know.

2          MR. WINDOM:  In addition to the overriding principles

3     that the government has laid out, I guess I would say two

4     other things.

5          First, in paragraph 1 of the proposed protective order, the

6     government's order is appropriately limited.  It does exempt

7     information that is public.  It does exempt information that

8     the defendant or defense counsel come into possession of by

9     independent means unrelated to the discovery process.

10         So we are talking about -- in terms of the nonsensitive

11    versus sensitive, we're talking about a relatively small

12    percentage of discovery.  But nonetheless, the concern is that

13    the defendant will still use that in order to affect the fair

14    administration of justice to the extent that there is -- once

15    we get the ability to be more granular, once discovery is

16    produced, to the extent that there is an issue where there is

17    a strong defense reason to rebut the government's good cause

18    that we have set forth, the defense can come back to the Court.

19         THE COURT:  All right.  Thank you.

20         MR. WINDOM:  Thank you, Your Honor.

21         THE COURT:  It is close.  But as I said, there are

22    release conditions, and the government has an opportunity to,

23    before turning over discovery once the protective order is

24    issued, to go over its materials and add sensitive

25    designations.

1    So, at this point, I am not persuaded that the government

2    has shown good cause to subject to the protective order all

3    the information in this case, and therefore I will adopt the

4    defense'S revised scope.  The protective order will govern

5    only materials that the government designates as sensitive.

6    At this stage, as I said, I haven't -- I'm not persuaded.

7    I will tell you, Mr. Lauro, that as I just said to

8    Mr. Windom, the defendant is also covered by conditions of

9    release, and all his behavior and statements are governed by

10   those conditions of release.

11   So, regardless of whether statements are made that are

12   derived from the discovery or not, if they are made and they

13   have an effect on the administration of justice or have the

14   effect of intimidating or causing harassment to a witness, I

15   will be scrutinizing them very carefully.

16   All right.  The remainder of the disputes about the

17   protective order are largely confined to the defense's

18   discrete edits in the particular paragraphs.  So, as I said,

19   I'm going to go through them in sequence as they appear in

20   Exhibit A to defendant's opposition brief in ECF No. 14,

21   beginning with paragraph 1.

22   I cannot accept the defense's edit that would exempt from

23   the protective order any records that -- and I guess you

24   would -- that would exempt from the protective order any

25   records that, in quotes, "become publicly available."

1      Discovery materials could become publicly available through

2      any number of ways, some improper.  I am not willing to

3      automatically allow the parties to disclose or confirm any

4      materials just because, for instance, someone else manages to

5      access and disseminate that information.  So I'm not going to

6      go for that edit, and the government language will stay.

7      Instead, I will retain the government's proposed language

8      which exempts only records that are publicly available

9      independent of the government's production.  If certain

10     records that are not publicly available now become so during

11     the course of these proceedings, the defense may move to

12     modify the protective order to exempt them.

13     Next we move to paragraph -- we're still in paragraph 1.

14     I also cannot agree to the defense's other proposed edit to

15     paragraph 1 which would exempt records which the defense came

16     into possession by means other than government production.

17     As the government points out in its reply, that would allow

18     the defense to subpoena sensitive information learned through

19     discovery and then disseminate those materials, and I don't

20     want that to happen.  So I will therefore retain the

21     government's proposed language which exempts only records that

22     the defense obtains by independent means unrelated to the

23     discovery process.  I move now to paragraph 3.

24          MR. LAURO:  Your Honor, if I may?

25          THE COURT:  Yes.

1          MR. LAURO:  I don't mean to interrupt.

2      Will the Court adopt our request that it should be "records

3   or information" to cover the *Seattle Times* issue?

4          THE COURT:  In paragraph 1?

5          MR. LAURO:  In paragraph 1, yes.

6          THE COURT:  Mr. Windom?

7          MR. WINDOM:  The government has no objection to that,

8   Your Honor.

9          THE COURT:  I will.

10          MR. LAURO:  Thank you, Your Honor.

11          THE COURT:  Okay.  Paragraph 3.  The defense proposes

12   broadening the definition of authorized persons who can view

13   the protected materials to include not only persons employed

14   to assist the defense, but also to any persons assisting the

15   defense in any capacity, and I quote, "including any attorneys,

16   investigators, paralegals, support staff, consultants, or expert

17   witnesses who are advising or assisting defense counsel."

18      I am not comfortable with that broad a definition which

19   could include just about anyone and would significantly

20   heighten the risk of unauthorized disclosure.  So I'm not

21   going to alter that definition.  I do note, however, that the

22   parties' briefing suggested that the defense might be amenable

23   to drafting a narrower definition to which the parties could

24   agree.

25      Did you have a proposed alternative, Mr. Lauro?

1          MR. LAURO:  We could submit one, Your Honor.  Yes.

2          THE COURT:  And, obviously, submit it to the government

3     first because, to the extent that there's anything that is

4     unopposed, I'm going to treat it much more quickly than I

5     would if it's opposed.  So I would appreciate it if you would

6     do that.

7          MR. LAURO:  Your Honor, may I speak to that issue,

8     though?

9          THE COURT:  Yes.

10         MR. LAURO:  I'm assuming and want to represent to the

11    Court that anyone on our team who has access to any discovery

12    will be given a copy of this order, and we will require them

13    to abide.

14         THE COURT:  Actually, I'm going to get to it, but I'm

15    going to add a provision that neither party had mentioned,

16    that they sign a document.

17         MR. LAURO:  Yes.  And we understand that.

18       But one thing we want to be able to do, obviously, is as we

19    build our team with this incredibly large case, to be able to

20    have, you know, consultants and others who are working under

21    our direction or with us, including in some instances people

22    who volunteered to be volunteer lawyers and volunteer

23    paralegals to assist us.  They'll all be subject to this rule

24    and subject to Your Honor's order.

25       This is a massive case, and it's impossible to get ready

1    under the terms that the government is seeking, which is

2    in early January, without the kind of staff -- the special

3    counsel, as I understand it, has over 60 lawyers and

4    investigators working on this.  We have a relatively small

5    group here.

6         THE COURT:  I understand.

7         MR. LAURO:  And it's an impossible task unless we're

8    able to enlist the help of people who are willing to abide by

9    Your Honor's ruling, abide by this order, abide by the rules

10   of the court, but who want to provide assistance.  In order

11   for us to defend this case, we have to have more help and more

12   manpower beyond just the lawyers working on it.

13        THE COURT:  I understand that.  And no one is more

14   aware than I that you and your team are defending Mr. Trump

15   in more than one jurisdiction at the same time.  I'm aware

16   of that.  Notwithstanding that fact, and the need for you

17   to obtain assistance, there's a process.  I cannot accept a

18   definition that would basically let anyone, including, I might

19   note, individuals who may be unindicted co-conspirators, to

20   assist and to have access to this material without leave of

21   court.

22        If there is a lawyer or legal personnel, you know, a

23   paralegal or lawyer or consultant that you want to have assist

24   you, then that person needs to fit the definition and be

25   subject to the protective order, and the definition you have

1    currently is simply too broad.  It allows just about anybody --

2    you know.  I live in Washington.  Everyone is a consultant.

3        (Laughter)

4        MR. LAURO:  That may be, Your Honor, but not anyone

5    would be operating under the direction of counsel and subject

6    to the order.  And if the government would like, they can give

7    us a list of co-conspirators.  Obviously, we would --

8        THE COURT:  I'm sure you would like that, but I don't

9    think they're ready for that yet.

10       MR. LAURO:  Yeah, we can exclude those.  But to

11   basically disable us from having consultants or volunteer

12   lawyers working on the case would hamstring us in an

13   incredible way.  In every large case I've had, and I'm sure

14   Your Honor has had, there have been consultants, trial

15   consultants, third parties that assist in the accumulation

16   and processing of documents --

17       THE COURT:  But those people are usually employed by

18   the defense.  They are people who are subject to, you know,

19   all -- they're officers of the court.  They are people who are

20   subject not only to your supervision, but they must abide by

21   the rules of this case.

22     But volunteers?  I mean, you're asking for such a broad

23   definition that it makes me very concerned, and I just cannot

24   have it this open-ended and this broad a definition.

25       MR. LAURO:  These outside consultants are often

**SA.40**

1    employed by the client, or paid by the client.  They're under

2    my supervision, but I don't pay all the consultants.

3         THE COURT:  The payment is less troubling to me than

4    the broadness of the definition.  I mean, I hear you and I

5    understand your need to have assistance, but that -- I think

6    allowing your definition would basically allow almost anyone

7    to just sort of come in, and it would increase the chance and

8    the possibility that information subject to the protective

9    order would be improperly disseminated.  But I'll hear

10   Mr. Windom on this.

11        MR. LAURO:  And, Your Honor, if we could submit,

12   perhaps, alternative language.  But I just want to make clear

13   that anybody who sees any discovery in this case, it will be

14   at my direction and co-counsel's direction.  It will not be

15   done in a haphazard --

16        THE COURT:  Anybody who sees any discovery in this case

17   has to sign a document indicating that they understand and are

18   bound by the protective order.

19        MR. LAURO:  We're fine with that, Your Honor.

20        THE COURT:  Okay.  Well, I'm not going to accept the

21   language as you proposed.  As with this order, it is subject

22   to modification.  If there's alternative language that you

23   want to meet and confer with the government about, I'll hear

24   you further down.  But as it stands right now, I am not going

25   to -- I'm going to leave the government language in.  I'm not

**SA.41**

1    going to change it to the language that you propose, at least
2    in your motion.  Mr. Windom?
3              MR. WINDOM:  I don't need to be heard, Your Honor.
4              THE COURT:  Sometimes it's good to just -- yeah, move
5    on.  All right.
6         Paragraph 4, which is the exception for generalized mental
7    impressions.  The government does not object to the defense's
8    proposed exception to paragraph 4 for generalized mental
9    impression, so I will accept it.
10        With regard to paragraph 5, agreement in writing, I will
11   make one minor edit, as I said, that has not been requested by
12   either side, which paragraph 5 provides, that all authorized
13   persons must be provided with a copy of the protective order
14   and agree to abide by it.  And I am going to add that such
15   agreement must be in writing.
16        Paragraph 6, exception for work products, etc.  The
17   government does not object to the defense-proposed exception
18   to paragraph 6 for work product, notes, or other documents
19   reflecting the content of protected materials.  And I agree
20   that that edit is appropriate, so I will accept it.
21        In paragraph 7, the defense proposes a similar exemption
22   from the protective order for any records that become publicly
23   available.  For the reasons I discussed earlier, I will not
24   add that language here.  So that I will not add that edit, and
25   that is for the reasons that I discussed in the information

1      that may become publicly available.

2        So next paragraph, 8(e).  The defense proposes two changes

3      to the definition of sensitive materials in paragraph 8.

4      In paragraph 8(e), they replace "recordings, transcripts,

5      interview reports, and related exhibits of witness interviews"

6      with "information regarding the government's confidential

7      sources or which may jeopardize witness security."

8        The government states that the defense definition would allow

9      disclosure of discovery transcripts and audio recordings of

10     witness interviews conducted outside of the grand jury process.

11       Let me ask you, Mr. Windom, the transcripts and audio

12     recordings that you're concerned about that are not from

13     confidential sources -- well, are the transcripts and audio

14     recordings that you're concerned about not from confidential

15     sources?  Because if they are, wouldn't they be covered by

16     the defense's proposed language?

17         MR. WINDOM:  They would be covered by the defendant's

18     proposed language, but let me give you a sense as to what

19     we're talking about.

20         THE COURT:  Okay.

21         MR. WINDOM:  During the course of this investigation,

22     it was the government's general practice to audio record

23     witness interviews conducted outside of the grand jury.  Those

24     fall into interviews that occurred in preparation for grand

25     jury.  They fall into separate interviews conducted outside of

1    the local area.  They fall into interviews that occurred at

2    our office.  There are hundreds of recordings of witness

3    interviews.

4        What is or is not a confidential source, it's hard to say

5    when you're simply talking about a percipient fact witness,

6    for example, to the defendant's criminal conduct.  Our

7    approach is much cleaner.

8        It will prevent -- it is the functional equivalent of a

9    grand jury transcript taken outside of a grand jury setting,

10   and what it will prevent is what defense has forecast it's

11   going to do.  It will prevent the defendant from putting a

12   post out and attaching a three-second snippet of an audio

13   recording.  It will prevent the defendant from putting out a

14   Metro billboard with a quote or sending out a mass mailer

15   targeted to the D.C. jury pool.  It will prevent the defense

16   from systematically and scientifically generating the grounds

17   for a Rule 26 motion for change of venue.  It will prevent the

18   pollution of the jury pool.

19       That is the import of the government's proposed order with

20   respect to that subparagraph.

21           THE COURT:  Are there other materials you're concerned

22   that the defense's proposed language would exclude?

23           MR. WINDOM:  So the government's proposed language

24   covers all of the transcripts and recordings.  The defendant's

25   proposed language, we would construe it broadly.  We would

1    have to designate all of those transcripts should the Court

2    decide to go with the defense here.  But I anticipate that

3    it would result in protracted weekly litigation over which

4    sentence of which transcript that the defendant finds

5    favorable that it wants to put out, you know, on the Sunday

6    shows or put through a surrogate.  Ours is much cleaner and

7    straightforward and more efficient for this court.

8             THE COURT:  Okay.  Mr. Lauro?

9             MR. LAURO:  Yes, Your Honor.  Once again, it's too

10   broad of a brush.  For example, let's assume the government

11   has obtained information, a transcript that came about during

12   the J6 committee -- assuming that they haven't destroyed it --

13   and in the course of that, the government has that discovery.

14   It's a transcript.  It was never intended to be confidential.

15   For whatever reason, the J6 committee did not decide to

16   release it, but there never was any degree of confidentiality

17   attached to it.

18      That clearly should not be designated as sensitive

19   information, particularly if it contains *Brady* or *Giglio*

20   material that would be very important to President Trump in

21   terms of his defense and in terms of the -- you know, the

22   wider scope of what he has to do to defend himself publicly.

23            THE COURT:  But, again, you're sort of conflating what

24   your client needs to do to defend himself and what your client

25   wants to do politically, and your client's defense is supposed

**SA.45**

1   to happen in this courtroom, not, you know, on the internet.

2          MR. LAURO:  Well, and here's --

3          THE COURT:  And to the extent your client wants to,

4   you know, make statements on the internet, they have to always

5   yield to witness security, witness safety.  And that's what

6   I'm concerned about.  The subcommittee may not have designated

7   those transcripts as confidential, but you start releasing

8   snippets of witness interview transcripts, what do you think

9   is going to happen to those witnesses?

10         MR. LAURO:  The problem is, Your Honor, the way that

11   this is drafted, if President Trump talks about something

12   relating to that witness and it happens to be in a transcript,

13   then they throw the red flag and they say there's been a

14   violation.

15         THE COURT:  Well, I'm finding it very difficult to

16   envision the former president of the United States engaged in

17   a political campaign talking about potential witnesses who may

18   not have, you know, the kinds of protection that he has.  I

19   mean, I could see the possibility for a lot of problems here.

20          I'm not sure what right -- I mean, your client retains, as

21   I said in the beginning, a First Amendment right.  But I can

22   see how, in advance of trial, making public statements about

23   potential witnesses is going to, in and of itself, affect the

24   orderly administration of justice and, Mr. Lauro, could run

25   afoul of his release conditions.  So the example you're giving

1    me is not helping.  It's actually causing me some concern.

2        MR. LAURO:  And I understand your concern, Your Honor.

3    And President Trump will scrupulously abide by his conditions

4    of release, and we will do everything to ensure that that

5    happens, and it will happen.  But let's take one example.

6       Vice President Pence is a political opponent now in a

7    campaign, and there's going to be an exchange between the

8    two of them.  There's going to be arguments back and forth.

9    And if, in one of President Trump's statements, it happens to

10   overlap with something that's in discovery that's included in

11   this definition, we suddenly have a problem.

12      And the other thing, Your Honor, respectfully, is President

13   Trump, in the middle of a campaign, should not have that chill

14   over him in terms of the way that he campaigns and advocates

15   for his position.

16       THE COURT:  He is a criminal defendant.  He's going to

17   have restrictions like every single other defendant.  This

18   case is proceeding in the normal order.  I know there are

19   obviously security concerns, and there are many, many concerns

20   that we all have because of the unusual nature of this case,

21   but the fact that the defendant is engaged in a political

22   campaign is not going to allow him any greater or lesser

23   latitude than any defendant in a criminal case.

24       MR. LAURO:  We understand that, absolutely.  But the

25   problem is, the way that this order is written by the

1      government, it paints too broadly.  All we're asking for

2      is more specificity, particularly with respect to sensitive

3      information that the government can designate with some

4      particularity and have a reason for.

5          Simply saying a transcript is sensitive, that's not enough

6      under Your Honor's original determination, because there's no

7      good cause to identify that particular transcript as

8      sensitive.  Once again, we have to go back to the government

9      showing good cause why it's sensitive and why it should be

10     protected.  That's all we're asking for.

11         THE COURT:  Well, what I did in the beginning was

12     agree with you that the government has to show good cause here

13     for why certain materials should be covered by the protective

14     order and shouldn't, and I agreed with you that, as to the

15     nonsensitive information, it would not be covered.

16         But now we're talking about what can be designated as

17     sensitive, and I have to tell you, so far I'm not being

18     persuaded by your argument that witness transcripts or

19     recordings of witness interviews shouldn't be sensitive for

20     the reasons I have concern, and the examples you're giving me

21     are not comforting.  But I'll hear from Mr. Windom on this.

22         MR. LAURO:  If I may say one last thing, Your Honor,

23     respectfully.

24         THE COURT:  Yes.

25         MR. LAURO:  I think the government can easily identify

**SA.48**

1    what they believe are sensitive transcripts, videos and so

2    forth, and have some basis for making that argument based on

3    Your Honor's order here.  That's something that they're

4    capable of doing.  Rather than having this broad category, all

5    we're asking is that the government have to be put to its

6    burden to identify what's sensitive.

7              THE COURT:  All right.  Mr. Windom?

8              MR. WINDOM:  Thank you, Your Honor.

9         The government's proposed order is much more specific

10   than the defendant's proposed order.  The defendant's proposed

11   order is subjective and nebulous as to what is a confidential

12   source or what could jeopardize safety.  Ours is demarcated by

13   the type of document it is.

14        The defense just said that the government should have to

15   identify which transcripts or audio recordings are sensitive

16   and which are not.  Every single one of those people we

17   interviewed is a potential trial witness.  All of them are

18   sensitive.

19        I guess the next argument from the defense would be,

20   well, the government has to go through each one and designate

21   specific paragraphs, designate specific pages.  That is

22   antithetical to the smooth and orderly discovery process

23   that this court should impose here for the fair and efficient

24   administration of justice.

25             THE COURT:  All right.  I am going to retain the

1    government's proposed language.  The definition of "sensitive

2    materials" will include all recordings, transcripts, interview

3    reports, and related exhibits of witness interviews.  Disclosure

4    of any of those materials creates too great a risk that witnesses

5    may be intimidated or that prejudicial information reaches the

6    jury pool.

7        Mr. Trump is already bound by his conditions of release to,

8    and I quote, "not communicate about the facts of the case with

9    any individual known to him to be a witness, except through

10    counsel or in the presence of counsel."  That's ECF No. 13 at 3.

11        But I am concerned that members of the public -- I mean, in

12    addition to the concerns I've already talked about with regard

13    to witness security, I'm concerned that members of the public

14    who are not bound by the release conditions and by these terms

15    might use sensitive witness information in ways that intimidate

16    witnesses or otherwise threaten the integrity of the proceedings,

17    so I am going to go with the government's definition of

18    sensitive materials.

19        Again, the order provides that either side may seek

20    modification.

21        Moving on to paragraph 8(f), which concerns materials

22    obtained from other governmental entities, the defense also

23    proposes to change the definition of sensitive materials in

24    paragraph 8(f).  Specifically, they seek to exclude the

25    category of materials obtained from other governmental

1    entities.  Mr. Windom, I'm not sure I understand exactly what

2    would fall into this category.  Can you give me an example?

3            MR. WINDOM:  Yes, ma'am.  So paragraph 8(e) really

4    was targeted at the SCO, the Special Counsel's interviews.

5    Paragraph 8(f) is mainly dealing with a few things.  The first

6    bucket is the material that we've obtained -- or that we did

7    obtain from the House Select Committee.  There are nonpublic

8    items that the House Select Committee provided to the

9    government including transcripts of witness interviews that we

10   do not believe are public.

11           THE COURT:  But those will be covered by the previous

12   paragraph, right?

13           MR. WINDOM:  And perhaps this is poor wording on our

14   part.  The intention was for 8(e) really to be focused on what

15   the -- the government's own interviews and for 8(f) to

16   encompass the Select Committee's interviews.  I see that it

17   could be covered by both.  So that is one category.

18       The second category is there's a large volume of material

19   obtained from the Secret Service including internal emails

20   which have, you know, the names of individuals, various things

21   that the defendant may or may not have known in his time as

22   president that deal with any number of issues that should be

23   nonpublic.

24       Again, the blanket designation, the government believes,

25   is appropriate for the reasons of not polluting the jury pool,

1    not intimidating witnesses, not naming people who are within

2    the Service or within other governmental agencies.  Should

3    there be a specific document, we're happy to discuss that with

4    the defendant under the paragraph 16 of the proposed order

5    after discovery is released.

6             THE COURT:  All right.

7             MR. LAURO:  And, Your Honor, that clearly can be

8    something they designate as sensitive.

9             THE COURT:  I'm sorry?

10             MR. LAURO:  I'm sorry.  It clearly could be something

11    they designate as sensitive if it's a Secret Service or other

12    matter.  But to just have it as this broad category,

13    automatically sensitive, kind of --

14             THE COURT:  Well, it fits the definition -- and

15    wouldn't you agree, or do you agree, that some of this

16    material under 8(f) would already be covered under 8(e),

17    such as the transcripts of witness interviews?

18             MR. LAURO:  Yeah, it could.

19             THE COURT:  What about the material that Mr. Windom

20    just referenced, for example, Secret Service emails?  That

21    would fit the definition of 8(f), materials from other

22    governmental entities, and that is very sensitive.

23             MR. LAURO:  Right.  And it should be designated as

24    sensitive, and they can do that.  But what I'm concerned about

25    is nonsensitive information that is swallowed in this broad

1    language of "anything that's obtained."  You know, it just --

2    it makes it impossible to comply.  That's our problem.

3         THE COURT:  Well, I may one day regret saying this, but

4    the parties are always free to seek modifications under the

5    terms of the agreement.  But I think, given the examples and

6    given the good-cause argument that I've heard from the

7    government, I am going to retain the government's proposed

8    language.  The definition of "sensitive materials" will

9    include "materials obtained from other governmental entities."

10        I am persuaded that disclosure could compromise --

11   especially given the example that Mr. Windom has given me, and

12   I can think of others, could compromise the confidentiality of

13   those entities' own proceedings.  And so I'm going to leave

14   the language in as the government has stated.  I'm not going

15   to adopt the defense edit.

16        Now, if you want to propose language that narrows this,

17   you're free to meet and confer with Mr. Windom about it.

18        MR. LAURO:  I may have to, Your Honor, because it

19   literally would include -- all of the J6 materials that the

20   government obtained would be subsumed in this provision,

21   again, assuming that J6 didn't destroy any documents.

22        THE COURT:  Wouldn't some of that material already be

23   publicly available?

24        MR. LAURO:  Not necessarily, because --

25        THE COURT:  But some of it would.  So you said "all,"

1    and that's not actually correct.  Right?  So some of that

2    material has been broadcast.

3         MR. LAURO:  You know, talk about pretrial publicity,

4    they had big TV screens going on.  But the problem is that we

5    don't know what's there and what's not there.  For example, if

6    there's something that was not publicly disclosed that came

7    within J6, then it's all going to be considered sensitive even

8    though there's not a good-cause showing.  That's my concern.

9         THE COURT:  I think the government has established good

10   cause for materials that are defined in that paragraph, and,

11   as I said, this order has to be read as a whole.  And so there

12   may be some of those materials that are just not sensitive

13   because they are publicly available.  And with regard to the

14   subcommittee materials, there may be quite a bit of that that

15   is publicly available given the public proceedings.  So, at

16   this point, I'm not going to adopt the defense language.

17        Now, paragraph 8, the final edit the defense proposes --

18   not the final.  The final edit to paragraph 8 would require

19   the government to conspicuously mark all sensitive materials.

20        Now, Mr. Windom, my understanding is -- well, tell me if

21   I'm wrong.  Do you intend to, when you produce the materials,

22   segregate all sensitive materials from nonsensitive materials?

23   Correct?  And your reply brief suggests that it would be --

24   you said "logistically unworkable to mark all sensitive

25   materials."

1       Can you explain why?  Obviously, if you have to go through

2   and stamp every single page "sensitive," that's really quite

3   burdensome.  But what about an interim measure, like stamp on

4   the first page or -- I don't know.  Aren't there some ways

5   that could make sure that the defense doesn't inadvertently

6   produce something that's sensitive that they could argue to

7   me, well, we just didn't know; it wasn't clear that that was

8   sensitive?

9       MR. WINDOM:  So this is actually a -- it may not seem

10  on its face, it's a very important point for the speed of

11  getting discovery out.

12      THE COURT:  And I'm -- you know, I'm all for that.

13      MR. WINDOM:  Yes, ma'am.  So what the government wants

14  to do is in the -- whether it's in the cover letter or in the

15  source logs -- and I have an example where the source logs

16  have the exact production, by very organized title and

17  description, the Bates number, and whether it is sensitive or

18  nonsensitive.

19      THE COURT:  Okay.

20      MR. WINDOM:  That is the fastest and most efficient way

21  to accomplish this.  The defense has asked for a page-by-page

22  stamping of them.  If the Court went with that --

23      THE COURT:  I'm not going with that.

24      MR. WINDOM:  Thank you, Your Honor.

25      I will say that this approach also was adopted in a

**SA.55**

1    protective order in a case in which Mr. Lauro was counsel

2    in Florida about two years ago, with this language being

3    permissible to include it not just on the face of the

4    document, but also in cover letter or in transmittal

5    information.

6        THE COURT:  And the organization and designation that

7    you describe in cover letter and transmittal would include a

8    Bates range.  Is that correct?

9        MR. WINDOM:  Yes, ma'am.  It is the source, the

10   beginning Bates, the end Bates, the designation.

11       THE COURT:  All right.

12     Mr. Lauro, I'll hear you if you want.

13       MR. LAURO:  They're going to do what they're going to do.

14       THE COURT:  Well, no.  I mean, you enunciate a

15   reasonable concern, which is you don't want to be in front of

16   me saying, we released sensitive information, but we didn't

17   know.  And I want to make sure that you're not in a position

18   where you may do that and that the production is designed so

19   to ensure that there's no confusion.

20     The procedure that Mr. Windom has described sounds like it

21   would make clear by Bates range and source and in every other

22   way that, you know, what is sensitive and what is not.  I do

23   think that stamping every page would be not only unworkable

24   but would delay this considerably for a reason that's not

25   really a problem.  I don't mind taking the time to ensure that

**SA.56**

1     things are done right, but it seems like a solution in search

2     of a problem.

3             MR. LAURO:  Your Honor, based on the explanation

4     that counsel gave, we're fine with it as long as we have

5     identifiable sensitive information that we know exists.

6             THE COURT:  Okay.

7             MR. LAURO:  I just resent the fact that counsel has

8     been searching for prior orders in cases that I had no idea

9     about.  So I just need to put that on the record.

10            THE COURT:  Well -- you know.  I hear you.  I feel

11    your pain.  All right.  Based on the parties' submissions and

12    the arguments, I will retain the government's proposed

13    language.  I will not require the government to mark every

14    record it designates as sensitive, and I'm willing to accept

15    their representation that individually marking the documents

16    would be too burdensome and unnecessary, frankly, in light of

17    the government's representations as to how they will produce

18    and segregate and designate the documents.

19        Now paragraph 9, which goes to assisting the defense, and

20    that goes back to our discussion that I had, Mr. Lauro, with

21    persons who are subject to the order.

22        In paragraph 9, the defense edits reiterate the expanded

23    definition of "authorized persons" that I discussed earlier in

24    relation to paragraph 3, and for the same reasons as my ruling

25    on paragraph 3, I will not accept those edits and am going to

1    leave in place the government's definition of "authorized

2    persons."

3        Also in paragraph 9, the defense's other edit extends

4    permission to share sensitive materials to the counsel of

5    persons to whom the materials solely and directly pertain.

6    That edit and revision is unopposed, and I will enter it.

7        Paragraph 10, counsel review of defendant's notes.  The

8    defense edit to paragraph 10 would remove defense counsel's

9    obligation to review Mr. Trump's notes regarding sensitive

10   materials and ensure that they do not include any personal

11   identifying information under Federal Rule of Criminal

12   Procedure 49.1.

13       I am inclined to reject that edit.  That obligation

14   is imperative, as I mentioned earlier, to prevent witness

15   intimidation and other potentially prejudicial consequences.

16   With regard to paragraph 11 --

17           MR. LAURO:  Your Honor, I have one question about

18   paragraph 10, and this really does raise an important issue.

19   If there are transcripts or documents of prior witness

20   testimony, for example, I want to be able to allow my client

21   to read those in private and have the ability to examine them

22   without counsel present or without counsel being in the same

23   room.  And I think we have to have some degree of assurance

24   that we don't have to literally sit next to our client while

25   he reviews transcripts and otherwise sensitive information.

1          THE COURT:  Well -- and I'll hear from Mr. Windom in a

2     minute, but -- hold on.

3          (Court reviewing document.)

4        Wouldn't your client be able to review -- and Mr. Windom

5     can correct me if my reading is incorrect.  But he would be

6     able to review those materials in private, but afterwards

7     you would have to check his notes to make sure that personal

8     identifying information wasn't included in those notes.  It's

9     not how he reviews the notes.

10       Am I wrong, Mr. Windom?  I mean, Mr. Lauro's concern is

11    that his client be allowed to review the notes in private.

12         MR. WINDOM:  Just to make sure we're talking about the

13    same thing, the notes or the sensitive discovery materials?

14         THE COURT:  Mr. Lauro, as I understand it, wants his

15    client to be able to review the sensitive material without him

16    having to be there.  Is that -- let's break it down.  Is that

17    agreeable to the government?

18         MR. WINDOM:  So the -- I guess I would first note that

19    Mr. Lauro did not object to that language in paragraph 10 in

20    this proposal here.  What it sounds like he's asking for is

21    that he need not sit next to his client the entire time.

22         THE COURT:  Right.

23         MR. WINDOM:  I think as long as it is a person employed

24    to assist with the defense to be with him when the sensitive

25    materials are present and then to collect the material after

**SA.59**

1   the defendant is done reviewing the sensitive material.

2          THE COURT:  Hold on a second.

3       (Court reviewing document.)

4       So your objection, Mr. Lauro, is to the language that says

5   "but defense counsel may not provide a copy of sensitive

6   material to the defendant"?

7          MR. LAURO:  Exactly, Your Honor.  And we're not --

8   in terms of personal identifying information or that nature,

9   we're fine with it.  I mean, we can sit with the client.

10  But in terms of -- and other orders, by the way, have done

11  sensitive and highly sensitive differentiations.

12      What I'm saying is, if there's a transcript of a witness or

13  if there's a video, I want to be able to share it with my client

14  without having to sit in the room or having somebody from the

15  defense team sitting in the room with him.  That becomes

16  impractical under the circumstances, and it really does impinge

17  on Sixth Amendment rights.

18      We have a lot to do in this case, with a relatively small

19  staff, and for us to have our folks sitting with a client as

20  he reads through a transcript, maybe hours, really is an

21  intolerable burden on us.  At least allow us to have the client

22  read transcripts, read information that could be relevant to

23  the case, and then coordinate with us and communicate with us.

24      We can put in procedures to get that information back

25  immediately, but we have to have a situation where the client

1    is allowed to review materials on his own, outside the presence

2    of counsel.

3         THE COURT:  You didn't object to that part.  In your

4    motion, you addressed the notes issue.  You didn't address the

5    reviewing on your own issue.

6         MR. LAURO:  Well, that's correct, Your Honor.  But in

7    light of the fact of how sensitive information is now defined

8    under this order, which will include these transcripts and

9    interviews and so forth, the issue does come to the forefront,

10   unfortunately, in terms of dealing with that issue.

11        THE COURT:  Okay.  Mr. Windom, Mr. Lauro has a point,

12   which is -- tell me what it is you're worried about.  So I'm

13   already inclined to have the order require that the defense

14   inspect any notes.  So that would apply whether or not

15   Mr. Trump is accompanied by counsel or other legal staff while

16   he's reviewing the material or not.  They're still going to

17   have to check all notes that he makes.

18      So tell me the harm or the prejudice that you see arising

19   from him being able to read the materials, which he's allowed

20   to see, by himself, in another room, as opposed to having one

21   of his lawyers or paralegals or legal staff be there with him.

22        MR. WINDOM:  Yes, Your Honor.  Three things on that.

23      First, defense counsel has a certain level of trust in the

24   defendant that the government does not.

25      Second, the defense counsel agreed to an extraordinarily

1        similar position in Florida.  It is defendant shall only have

2        access to discovery materials under the direct supervision of

3        defense counsel or member of defense counsel's team.

4                THE COURT:  But that involves some very -- some

5        classified and national security-implicated information,

6        doesn't it?

7                MR. WINDOM:  No, ma'am.  This particular order that

8        I'm reading from is the nonclassified protective order.

9        There's a separate CIPA Section 3 classified protective order.

10           Third, publicly, the defense counsel and the defendant have

11       had a divergence of views on the protective order, whether

12       there should be one at all or not.  The defendant says there

13       should not be.

14           Second, the defendant has made claims in the press that his

15       counsel has not adopted with respect to motions that should

16       have already been filed or will soon will be filed.  There's a

17       delta that I'm concerned about.

18               THE COURT:  But how would -- and I hate to interrupt

19       you, but I'm going to.  Because how -- and I share your -- but

20       sometimes -- you know.  I was a defense attorney.  Sometimes

21       there is a divergence.

22           But how would the procedure that you're talking about

23       address that?  In other words, whether Mr. Lauro or one of

24       his legal staff is in the room or out of the room isn't

25       necessarily going to solve that problem.  Can you tell me how

1     it would?

2          MR. WINDOM:  It would ensure that the defendant doesn't

3     have unfettered access to sensitive materials to do with it as

4     he wants.

5          THE COURT:  But even if Mr. Lauro -- okay.  Say I

6     go with your provision and I require Mr. Lauro, one of his

7     co-counsel or legal staff to be present.  If the defendant is

8     going to do something, he can still do it whether they were

9     there or not there.  I mean, the safety is the notes, right?

10    Making sure that any notes that he takes are reviewed by

11    defense counsel to make sure they don't include identifying

12    information.

13         MR. WINDOM:  Two things, Your Honor.  First of all, the

14    point of the protective order is to limit risk.  It will limit

15    risk in order to have a defense counsel or an employee --

16         THE COURT:  How, though?

17         MR. WINDOM:  Because of this:  The defendant, when he

18    only has the materials to himself, could elect to photocopy

19    or otherwise reproduce, take a picture of, the sensitive

20    materials.  That risk is much lower when in the presence of a

21    member --

22         THE COURT:  You mean like live tweeting something?

23         MR. WINDOM:  I mean literally just photocopying or

24    taking a picture of something, having it in order to do

25    whatever he wants with it.  He has shown a tendency to desire

1    to hold onto material to which he should not have.

2         THE COURT:  Well, you know --

3       I'll hear you, Mr. Lauro.

4       I'm still having a hard time figuring out how having

5    somebody right there with him is going to -- and I hear you

6    about the photocopy or photograph.  I guess that's a

7    possibility.  But I'll hear your response on that, Mr. Lauro.

8         MR. LAURO:  Yes, Your Honor.  I'm quite surprised that

9    counsel would say that, because it suggests that really what

10   they want to do is just bog us down and bog President Trump

11   down in the middle of a campaign, and maybe that's what they

12   want to do.  But the reality is, to have a lawyer physically

13   with a client all the time --

14        THE COURT:  Let me stop you.

15      Actually, Mr. Windom, would the government be willing to

16   allow the defendant to review the material, provided that the

17   defendant didn't review the material with a phone or -- I

18   mean, just without access to those -- to the extent that

19   that's a possibility, without access to those?  Because

20   Mr. Lauro does have a point.  It's a lot of material, and they

21   are stretched.  And absent some real danger of what you're

22   saying happens, I think it would be burdensome for the defense

23   to require legal staff there all the time.

24        MR. WINDOM:  The issue really is a custody or control

25   one.  I think Your Honor has identified some mitigating

1    measures.  Should the defendant not be permitted to have

2    electronic devices, not be permitted to have a replicating

3    machine --

4            THE COURT:  While he is reviewing the material.

5            MR. WINDOM:  Yes, ma'am.  And then also the other

6    catch to that is, even though a defense counsel or member of

7    the team wouldn't be sitting there, they would have to be

8    immediately available to collect the material if the defendant

9    goes to lunch, if the defendant --

10           THE COURT:  Absolutely.  That's sensitive material.

11    That can't be left lying around.

12           MR. WINDOM:  So if somebody is going to be there

13    anyway outside the room, I'm not sure why they couldn't be in

14    the room.  That said, I understand Your Honor's mitigation

15    measures.

16     I have yet to hear -- there has not yet been a motion to

17    amend the specific language already employed in Florida, so

18    I'm not sure what the actual aspect of the hypothetical harm

19    here is.

20           THE COURT:  That I forgot to ask you about, Mr. Lauro.

21    You did agree to it in Florida.  What's the problem now?  And

22    that case involves, as far as I know -- I don't know any

23    details -- a lot of materials as well.

24           MR. LAURO:  It does, Your Honor.  And I'm not involved

25    in the case in Florida.  I'm not counsel.

1            THE COURT:  Oh.

2            MR. LAURO:  But the bottom line here is that we have to

3       have a workable system that allows President Trump to review

4       these materials without counsel either sitting in the room or

5       outside the room.  We are stretched incredibly thin in this

6       case.

7            THE COURT:  Well, what about Mr. Windom's point, which

8       is -- I intend to retain the provision that says the notes

9       have to be reviewed, so --

10           MR. LAURO:  We can direct the client not to make any

11      notes, obviously.  I mean, this kind of intrusion --

12           THE COURT:  But Mr. Windom's point, which is even

13      if the defendant is reviewing notes alone, in a room where he

14      doesn't have access to electronic devices that could reproduce

15      those materials, somebody still has to be present to collect

16      it, safeguard it.  I mean, it's still going to require time.

17      What about that?

18           MR. LAURO:  The problem is, Your Honor -- respectfully,

19      is the government has not shown good cause for that kind of

20      intrusion into the attorney-client relationship.

21           THE COURT:  But I'm saying, even if he's allowed to

22      review it by himself, it's still going to require staffing to

23      make sure that the conditions of the order are complied with.

24      The materials can't be -- you know, they have to be

25      safeguarded, and they have to be collected.  Right?

**SA.66**

1          MR. LAURO:  That's the problem with the order as

2     it stands now.

3          THE COURT:  Oh, that's not going to change.

4          MR. LAURO:  No, no.  But I'm just saying the

5     practicality of a case like this, of this magnitude, with the

6     number of documents involved, based on what the folks here are

7     requesting, would put President Trump and his defense team at

8     an incredible disadvantage at a time when not only is he

9     facing other prosecutions brought by this administration, but

10    also other litigation.

11      He's in the middle of a campaign against this

12    administration, and to have this kind of burden on us is

13    enormous.  And in 40 years of practice, I've never seen a

14    situation in a white-collar case where counsel has to sit next

15    to a client and literally sort of babysit what goes on in

16    terms of what they review and what notes they take.

17      What Your Honor has in this order already are protections

18    that if President Trump made any statements in violation of

19    the order, then that's a problem.  But having all of these

20    oppressive kinds of conditions which they know will interfere

21    with the campaign, that's the goal.  They know that --

22         THE COURT:  I'm not going to accept that premise, and

23    again, I -- I'm not going into that.

24         MR. LAURO:  But the practicality of it --

25         THE COURT:  And I will tell you, I think the more

1    reasonable and what I see is -- I see a desire to move this

2    case along.  I haven't seen any evidence that this is

3    politically motivated.  I understand you have a different

4    view, but it might be -- it might be more persuasive to me if

5    the former president had not entered into this agreement in

6    the Florida case.  It certainly undercuts some of the strength

7    of your arguments, that they're already agreeing to do it in

8    Florida.

9         And I'm willing to consider a modification to that, but I

10    am not willing to consider anything that's going to result in

11    information that's sensitive being disseminated to the public.

12    And I have concerns about that.

13         MR. LAURO:  And, obviously, we will abide by your

14    order, and we understand Your Honor's position.  But there

15    has to be some practical way of carrying this out so that it

16    doesn't burden the defense.  And as a defense lawyer, it's not

17    easy to sit with a client for hours and hours while they read

18    a document.  It just doesn't work, Your Honor.

19         THE COURT:  Okay.  I agree with you, and therefore I

20    am going to compromise here.  I will allow the defendant to

21    review the sensitive material without being accompanied,

22    without having a member of the legal team sit next to him,

23    but I am going to retain the provision that requires counsel,

24    members of the legal team, to review any notes.  And if you're

25    saying you're going to instruct him not to take notes, so much

1      the better, but to ensure that there's no notes taken and no

2      personal identifying information that is kept.  And if the

3      defendant's going to review those materials alone, the

4      defendant cannot have access, during that review, to an

5      electronic device, photocopier machine, or anything that could

6      reproduce or copy those materials.

7          Mr. Windom?

8          MR. WINDOM:  Your Honor, the issue remains about

9      keeping custody or control on breaks or lunches and things

10     like that.

11         THE COURT:  Oh, yes.  Those materials must be

12     safeguarded.  They cannot be left alone.  Should the defendant

13     need to leave the room for any reason, someone has to

14     safeguard those materials, and certainly he can't carry them

15     around with him.

16         Okay.  Paragraph 11.  The defense-proposed edits would

17     permit the parties to include sensitive materials in any

18     public filing without leave of court if all sensitive

19     information is redacted.  This doesn't materially alter the

20     government's proposed approach, which likewise contemplates

21     filing without leave redacted sensitive materials.

22         I will allow the parties to include in their public filings

23     redacted sensitive materials without leave of court only if

24     they have conferred and both sides agree to the redactions.

25     I realize that exception may swallow up my ruling, but if the

1    parties disagree about the redactions, leave of court must be

2    sought before the filing.

3        Again, with paragraph 11, filing sensitive materials under

4    seal without leave, the defense similarly proposes an edit

5    that would permit the parties to file unredacted copies of

6    sensitive materials under seal without leave of court, I'm not

7    going to accept.  This edit is in violation of our local

8    rules.  Local Criminal Rule 49(f)(6)(I)(1) provides that no

9    document may be sealed without an order from the Court.

10       In accordance with that rule, I will require the parties to

11   follow the regular procedure for seeking leave to file a

12   document under seal each time they wish to do so for sensitive

13   materials.

14       I will also require that any motion for leave to file

15   sensitive materials under seal shall attach a redacted copy of

16   those sensitive materials so that the Clerk of the Court can

17   file the redacted copy on the public record if I grant the

18   motion.  And I've consulted, and the Clerk of the Court is

19   prepared and able to do that.

20       Paragraph 12, introducing sensitive materials under seal

21   without leave.  So the defense's edits propose, essentially,

22   the same approach for handling sensitive materials at

23   hearings as they do for filings; that is, the parties may

24   (1) introduce redacted sensitive materials without leave, and

25   (2) go under seal to introduce or discuss unredacted sensitive

1    materials.

2        My approach to those procedures and hearings will be the

3    same as it is for filings.  The parties may introduce redacted

4    sensitive materials during hearings without leave of court so

5    long as both sides agree to the redactions.  However, they may

6    not go under seal or introduce unredacted sensitive materials

7    during hearings without first seeking leave of court.  And

8    that's unredacted.

9        Paragraph 12, handling sensitive materials at trial.  The

10   defense proposes an edit stating that the Court will determine

11   the appropriate handling of sensitive materials at trial in a

12   future order.  And I'm not going to add this language at this

13   juncture, but as we get closer to trial, the parties can move

14   for modifications to the protective order that will change or

15   specify different provisions for trial.

16       So are there any proposed or disputed edits from the

17   defense, Mr. Lauro, that I haven't covered?

18            MR. LAURO:  I don't believe so, Your Honor.

19            THE COURT:  All right.

20       Mr. Windom, is there anything else?

21            MR. WINDOM:  No, ma'am.  Thank you.

22            THE COURT:  All right.  I will issue a protective

23   order consistent with my decisions in short order, but for now

24   I just have a couple more items of business.

25       First, as reflected on the docket, last night I denied a

**SA.71**

1     motion from the government for leave to file a document under

2     seal and ex parte.  I intend for this case to proceed in the

3     public record as much as possible, and the motion did not

4     persuade me that there was a need to file the document ex

5     parte.  Accordingly, neither that motion nor its attached

6     document had any bearing on my decision today, and that's why

7     I denied it without prejudice.

8        Going forward, I want to underscore that any motions to

9     file under seal, especially ex parte motions, must articulate

10    the need for those designations, and I will carefully weigh

11    the relevant factors to ensure that there's sufficient reason

12    for keeping any material off the public record.

13       Second, yesterday the government moved to schedule a

14    conference under the Classified Information Procedures Act,

15    CIPA, to discuss what they said was a small amount of

16    classified information that may be subject to discovery in

17    this case.  That's ECF No. 25.  The government proposes that

18    we hold that conference on August 28, which is the same day we

19    have our next status conference in the case.

20       Mr. Lauro, are you available to do that?  It makes sense to

21    me.  We could do it in the afternoon or, you know, right after

22    the status.

23          MR. LAURO:  I think, since we'll see you on the 28th,

24    it might be a good time to discuss that as well, Your Honor.

25          THE COURT:  Excellent.  Then we'll do it then.

**SA.72**

1      Okay.  So I will schedule that conference.  Actually, it'll

2    just be part of our status conference on the 28th.  I don't

3    think I need to schedule another conference.

4      This is a good time to mention that, in the interest of

5    efficiency and in keeping with my standard practice, I expect

6    the parties to confer before filing any nondispositive motions

7    and indicate in the caption whether it is opposed or not, and

8    that way I can move speedily with regard to unopposed motions.

9      So just say, you know, defense opposed, defense unopposed

10    motion, or say in a paragraph that the government opposes it,

11    and then I'll know to give time and have a briefing schedule.

12      All right.  Any other matters related to discovery or

13    pretrial motions that we need to address, Mr. Lauro?

14          MR. LAURO:  Yes, Your Honor.  If I may approach?

15          THE COURT:  Yes.

16          MR. LAURO:  Your Honor, we've asked the government

17    not to hide the ball and tell us how much discovery there is.

18    They won't do that.  We don't know if it's terabytes, you

19    know, multiple terabytes, how many boxes, how they're

20    organized.  It's a humongous task, and Your Honor has been

21    there, as defense counsel, and knows what it's like dealing

22    with something like this.

23      We would like a Rule 16 conference with the government as

24    soon as possible, no later than Monday at five o'clock, where

25    we can discuss these issues because we have to respond to Your

1    Honor in terms of trial schedules, and we need to know how

2    much discovery there is.

3              THE COURT:  Well, so here's the thing.  It seems to

4    me -- and Mr. Windom can correct me if I'm wrong -- that the

5    government is prepared to give you that information as soon as

6    I enter a protective order.  Is that correct?

7              MR. WINDOM:  With respect to the --

8              THE COURT:  The amount and -- well, tell me.

9    You tell me.

10             MR. WINDOM:  Thank you.  If I may?

11             MR. LAURO:  And if I may ask, how much is it?

12             THE COURT:  Well, you may find out, as I said,

13   immediately after I issue the order.

14             MR. WINDOM:  The government has actively been trying

15   to get the defendant discovery for some time now.  We are

16   producing, presumably today, if the Court enters the protective

17   order soon, the first production.  There's an extraordinarily

18   detailed, extensive source log in the same manner the defense

19   is familiar with from the Southern District of Florida case,

20   lays out exact Bates numbers, the exact organization of the

21   discovery.  So that information will be provided in that

22   source log.

23      There is, in addition to that, a hard drive that we'll go

24   over when the defense lets us know which address to send it

25   to.  That is the first discovery production.

SA.74

1    THE COURT:  And let me stop you.

2        Is there any reason why you can't tell Mr. Lauro how many

3    documents?  What are we talking about?

4        MR. WINDOM:  Sure.  And he'll have it in a letter, you

5    know, by the end of the day --

6        THE COURT:  Okay.

7        MR. WINDOM:  -- in the first production.  If Your Honor

8    would like to hear it on record, I'm happy to provide the

9    information.  He's going to have it in a letter within 24 hours.

10       THE COURT:  I'm just saying, is there any reason why we

11   can't go on the record now?

12       MR. WINDOM:  No, ma'am.

13       THE COURT:  Well, go ahead.

14       MR. WINDOM:  So, for the first discovery production,

15   the volume of it is roughly 11.6 million pages, or files,

16   which are load ready, available at length.  There's also a

17   hard drive with 2703(d) returns and extractions from other

18   certain electronic facilities.  Those are impossible to

19   paginate or to identify by that.

20       I cannot go into the details because of various Rule 6

21   or sealing concerns.  In general, I will say the material is

22   extraordinarily well organized.  Roughly a quarter of it comes

23   from entities associated with the defendant already, and it

24   may be that the defendant has access to that material already.

25       Some of the material is open-source.  Some of it is also

1    necessarily duplicative just from an organizational

2    standpoint, just to make sure that the defense knows precisely

3    which documents came from where.  As I, said this is the same

4    format and the same process that is used in the Southern

5    District of Florida.  We anticipate additional productions

6    in the coming weeks, and our goal is to have discovery

7    substantially complete by August 28.

8            THE COURT:  You heard Mr. Windom, Mr. Lauro.  I can

9    just imagine your motion for a trial date now.

10           MR. LAURO:  I'm waiting for the deluge, Your Honor.

11   It's going to come.

12       One small point, though.  I think Your Honor mentioned

13   that, with respect to filing under seal, we would have to

14   justify under the normal rules.  I assume that the government

15   will also have to establish a reason for filing anything under

16   seal in terms of...

17           THE COURT:  Rules apply to both sides.

18           MR. LAURO:  Thank you.

19           THE COURT:  I mean, I assume, if it's sensitive

20   material, they have to file it under seal.  They don't have to

21   give additional reasons if it's sensitive material as defined

22   under the order.

23           MR. LAURO:  All right.

24           THE COURT:  Okay.

25       All right.  Thank you, all of you, for your preparation and

**SA.76**

attention today.  Before we conclude, I just want to make two
points about this case going forward.

First, as I have said before, I am committed to ensuring
that this case proceeds in the normal course that our criminal
justice system prescribes.  The protective order that I will
issue is just one example of that.  Courts across the country
and in this district routinely issue similar orders in criminal
cases for many of the same reasons that I've discussed today.

The defense has reiterated at length Mr. Trump's First
Amendment right to speak about this case and the evidence in
it.  While I intend to ensure that Mr. Trump is afforded all
the rights that any citizen would have, I also take seriously
my obligation to prevent what the Supreme Court called in
*Sheppard v. Maxwell* a "carnival atmosphere" of unchecked
publicity and trial by media rather than our constitutionally
established system of trial by impartial jury.

It is a bedrock principle of judicial process in this
country, as the Supreme Court said in *Bridges v. California,*
that "legal trials are not like elections, to be won through
the use of the meeting-hall, the radio, and the newspaper."
Obviously, in *Bridges*, the internet hadn't been invented yet.
This case is no exception.

Second, and relatedly, both parties' briefing on the
protective order referred to certain public statements that
Mr. Trump has made in recent days.  There are no motions based

1   on these statements, nor does the government claim they

2   violated the defendant's conditions of release.  So I will not

3   address them specifically, but I do want to issue a general

4   word of caution.

5        As I have stressed at several points during this hearing,

6   I intend to ensure the orderly administration of justice in

7   this case as I would with any other case; and even arguably

8   ambiguous statements from parties or their counsel, if they

9   could reasonably be interpreted to intimidate witnesses or to

10  prejudice potential jurors, can threaten the process.

11       In addition, the more a party makes inflammatory statements

12  about this case which could taint the jury pool or intimidate

13  potential witnesses, the greater the urgency will be that we

14  proceed to trial quickly to ensure a jury pool from which we

15  can select an impartial jury.

16       I caution all of you and your client, therefore, to

17  take special care in your public statements about this case.

18  I will take whatever measures are necessary to safeguard the

19  integrity of these proceedings.

20       I'll see you all on August 28.  We are adjourned.

21        (Proceedings adjourned at 11:39 a.m.)

22

23

24

25

**SA.78**

\* \* \* \* \* \*

CERTIFICATE

     I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|                                   |   |                    |
|:----------------------------------|:-:|:-------------------|
| UNITED STATES OF AMERICA          | : | No. 23-cr-257-TSC  |
|                                   | : |                    |
| v.                                | : |                    |
|                                   | : |                    |
| DONALD J. TRUMP,                  | : |                    |
|                                   | : |                    |
| Defendant.                        | : |                    |

_____

**RESPONSE IN OPPOSITION TO
GOVERNMENT'S PROPOSED TRIAL CALENDAR**

President Donald J. Trump, through counsel, submits this response in opposition to the government's proposed trial calendar, Doc. 23, and respectfully requests the Court place this case on the April 2026 trial calendar. In support, President Trump states as follows:

**INTRODUCTION**

"The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob." *Powell v. State of Ala.*, 287 U.S. 45, 59 (1932).

This is an unprecedented case in American history. The incumbent administration has targeted its primary political opponent—and leading candidate in the upcoming presidential election—with criminal prosecution. The administration has devoted tens of millions of dollars to this effort, creating a special counsel's office with dozens of employees, many of whom are apparently assigned full-time to this case and this case alone.

1

**SA.80**

Taking full advantage of the administration's blank check,[1] the government spent over two-and-a-half years investigating this matter. It, among other things, interviewed and subpoenaed hundreds of witnesses, executed over 40 search warrants, and compiled information from countless individual sources. The government included some, but not all, of these materials in a massive, 8.5-terabyte initial production, totaling over 11.5 million pages, together with native files, recordings, and other electronic data not amenable to pagination.

In this District, ordinary order when faced with such overwhelming discovery is to set a reasonable trial schedule, commensurate with the size and scope of discovery and complexity of the legal issues. The government rejects this sensible approach. Instead, it seeks a trial calendar more rapid than most no-document misdemeanors, requesting just four months from the beginning of discovery to jury selection. The government's objective is clear: to deny President Trump and his counsel a fair ability to prepare for trial. The Court should deny the government's request.

The public interest lies in justice and fair trial, not a rush to judgment. Moreover, if the rights to due process and counsel are to mean anything, a defendant must have adequate time to defend himself. The Speedy Trial Act embraces these considerations and so, too, should the Court.

Accordingly, President Trump respectfully requests the Court schedule this case to begin on the April 2026 trial calendar, with the following interim control dates:

- Week of December 4, 2023: Discovery Status Conference and Motions Hearing
- Week of April 15, 2024: Discovery Status Conference and Motions Hearing
- Week of August 5, 2024: Discovery Status Conference and Motions Hearing
- August 1, 2024: Rule 12 and Other Dispositive Motions Due
- August 22, 2024: Oppositions to Rule 12 and Other Dispositive Motions Due

---

[1] *See* U.S. Department of Justice, *Special Counsel's Office – Smith Statement of Expenditures November 18, 2022 through March 31, 2023*, (reporting approximately $5.4 million in direct expenditures and an additional $3.8 million "DOJ component expenses," through March 31, 2023 only, the majority of which relate to salaries and benefits).

- September 5, 2024: Replies in Support of Rule 12 and Other Dispositive Motions Due
- Week of December 2, 2024: Discovery Status Conference and Motions Hearing
- Week of April 7, 2025: Discovery Status Conference and Motions Hearing
- Week of August 4, 2025: Discovery Status Conference and Motions Hearing
- Week of December 1, 2025: Discovery Status Conference and Motions Hearing
- January 29, 2026: Motions *in Limine* Due
- February 12, 2026: Oppositions to Motions *in Limine* Due
- February 19, 2026: Replies in Support of Motions *in Limine* Due
- Week of March 2, 2026: Motions Hearing
- Week of March 23, 2026: Final Pretrial Conference
- April 2026: Jury Selection and Trial[2]

This more reasonable schedule—equal to the government's time spent investigating—will allow this case to proceed in an orderly fashion, with both parties having a fair opportunity to review all material information, advance appropriate motions, and apprise the Court of relevant legal issues. Additionally, President Trump's proposed schedule (the "Proposed Schedule") will: (1) avoid scheduling conflicts with other pending matters; (2) provide sufficient time to address the production of discovery under the Classified Information Procedures Act (CIPA); and (3) preserve President Trump's right to seek discovery from third parties, while also addressing significant gaps in the government's productions.

## **APPLICABLE LAW**

In setting a trial date, the Court must allow the defendant and defense counsel "reasonable time to prepare," as "stripping away the opportunity to prepare for trial is tantamount to denying

---

[2] At this early stage, without having reviewed discovery, President Trump cannot estimate the time he will require to present his case at trial; however, for the present, and without any waiver of rights or arguments, President Trump will adopt the same calculation as the government—4 to 6 weeks for the defense case.

**SA.82**

altogether the assistance of counsel for the defense." *United States v. Young-Bey*, No. CR 21-661 (CKK), 2023 WL 4706122, at *2 (D.D.C. July 24, 2023) (citation omitted).[3]

For that reason, the Speedy Trial Act directs the Court to consider the unusual or complex nature of a case, 18 U.S.C. § 3161(h)(7)(B)(ii), and the need to provide "counsel for the defendant . . . the reasonable time necessary for effective preparation, taking into account the exercise of due diligence," 18 U.S.C. § 3161(h)(7)(B)(iv).

Thus, "whether a delay is reasonable depends on all the surrounding facts and circumstances," including:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; [and] the complexity of the case.

*Young-Bey*, 2023 WL 4706122, at *2.

---

[3] *See also United States v. Verderame*, 51 F.3d 249, 252 (11th Cir. 1995) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963)):

> While we appreciate the heavy case loads under which the district courts are presently operating and understand their interest in expediting trials, we feel compelled to caution against the potential dangers of haste, and to reiterate that an insistence upon expeditiousness in some cases renders the right to defend with counsel an empty formality. In our system of justice, the Sixth Amendment's guarantee to assistance of counsel is paramount, insuring the fundamental human rights of life and liberty. "The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done."

**ARGUMENT**

<u>A.</u>     <u>The Enormity of Discovery Warrants the Proposed Schedule</u>

11.5 million pages is a difficult number to comprehend. Ordinarily, a complex, document-intensive criminal case might have a million pages at issue. *See, e.g.*, *United States v. Scarfo*, 41 F.4th 136, 176 (3d Cir. 2022) (open-ended continuance and complex case designation under 18 U.S.C. § 3161(h)(7)(B)(ii) appropriate where discovery included "approximately 1,000,000 pages of information."). To have over ten times that many pages at issue, against a single defendant, is largely unheard of. Such cases are, instead, almost always sprawling civil battles between large companies, which regularly take years to litigate. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (seven years to litigate a case involving approximately 5 million pages of discovery).

To put 11.5 million pages in some perspective, we began downloading the government's initial production on August 13, 2023. Two days later, it was still downloading. We then requested the government send hard drives containing its initial production, which we received on August 16, 2023. Our technology vendor is now preparing to ingest the files into a document review database, but estimates such a large dataset will take several days to process.

Nonetheless, even assuming we could begin reviewing the documents today, we would need to proceed at a pace of 99,762 pages per day to finish the government's initial production by its proposed date for jury selection. That is the entirety of Tolstoy's *War and Peace*, cover to cover, 78 times a day, every day, from now until jury selection.[4] (Keeping in mind this is just to read the government's initial production a single time, to say nothing of trial counsel's need to analyze, organize, and integrate those materials into a cohesive defense presentation.)

---

[4] Leo Tolstoy, War and Peace (Vintage Classics Ed., Dec. 2008).

Stated differently, if we were to print and stack 11.5 million pages of documents, with no gap between pages, at 200 pages per inch, the result would be a tower of paper stretching nearly 5,000 feet into the sky. That is taller than the Washington Monument, stacked on top of itself eight times, with nearly a million pages to spare:



**SA.85**

Yet even this analogy belies the true scope of discovery: it includes only printed text, without considering native files, audio recordings, phone and electronic device image files, and other materials that will require substantial, labor-intensive review. *See, e.g.,* Ex. A at 38:1–3 (August 11, 2023, Hr'g Tr.) (government counsel describing "hundreds of recordings of witness interviews"); *id.* at 69:16–19 (describing "a hard drive with 2703(d) returns and extractions from other certain electronic facilities [that are] impossible to paginate or to identify by that").

Likewise, it does not consider the large number of additional documents that:

- the government has not, but still intends to produce. *See, e.g.,* Ex. A at 70:5–7 ([Government Counsel]: "We anticipate additional productions in the coming weeks and our goal is to have discovery substantially complete by August 28.");

- the government will obtain going forward. Doc. 23 at 5 (Government Response) ("The Government would then continue to produce to the defense on a prompt rolling basis any additional materials that are obtained going forward.");[5]

- President Trump may request from the government in discovery. *See* Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring production of materials "within the government's possession, custody, or control" that are "material to preparing the defense"); *United States v. Libby*, 429 F. Supp. 2d 1, 7–8 (D.D.C. 2006) (defendant may make requests for 16(a)(1)(E)(i) material and that "the materiality standard is not a heavy burden." (citation and quotation marks omitted)); and

---

[5] The government's grand jury investigation appears to continue, suggesting the volume of additional materials will only grow. *See* Dan Mangan, CNBC, *D.C. grand jury that indicted Trump meets Tuesday as election probe continues*, (Aug. 8, 2023), https://www.cnbc.com/2023/08/08/trump-grand-jury-meets-again-as-election-probe-continues.html

**SA.86**

- President Trump may request from third parties. Fed. R. Crim. P. 17(c) (permitting pretrial subpoenas with leave of court).[6]

For its part, the government suggests that it has "prepare[d] and organize[d] discovery in a manner that will assist the defendant in his review of produced materials." Doc. 23 at 2. Setting aside the dubious accuracy of this statement, prosecutorial organization of information cannot solve the defense's largest burden—reviewing the documents and preparing to use them at trial. That takes time—a lot of time in this instance—regardless of how the documents are labeled.

Similarly, the government claims it will "provide a compilation of certain key" documents and "identif[y] certain material within the discovery that is arguably favorable to the defendant." Doc. 23 at 5. This, again, is no answer. The government's view of importance surely differs substantially from the defense, and it goes without saying that a criminal defendant should not build his case on the word of his accusers.

Rather, President Trump has a right to review all material information, regardless of the government's view of the significance of such information to the defense. This is a critically important process, as identifying and presenting *Brady* material will be central to demonstrating President Trump's innocence. *Cf. Newman v. Hopkins*, 247 F.3d 848, 852 (8th Cir. 2001) ("[T]he right to present favorable evidence to a jury is clearly established by the [Supreme] Court's precedent."). [7]

---

[6] We anticipate seeking leave to issue multiple Rule 17(c) subpoenas. By way of just one example, we would request a subpoena directed to the House of Representatives for documents related to the investigation by the January 6th Select Committee. We will also need to address the reported destruction of documents by that committee, which could be potentially exonerative to President Trump.

[7] Even by its own terms, the government states only that it will identify "certain," but not all, documents it views as significant to its case or favorable to the defense. Doc. 23 at 5. Thus, whatever limited usefulness the government's key document folder might provide, it will not alter President Trump's need to fully review all discovery. Additionally, in cases such as this with

Simply put, the discovery in this case is enormous and growing. Although defense counsel will, of course, work diligently to review this material, the process will take time. For example, even under our Proposed Schedule, we would need to review approximately 12,000 pages per day to complete a first pass of the initial production by our proposed trial date. This is an exceedingly rapid pace, by any measure, and one that will only be manageable with intense diligence. The government's proposal, by contrast, is flatly impossible. No defendant can reasonably review nearly 100,000 pages of discovery per day.

Thus, "even exercising 'due diligence,'" the government's proposal would deny President Trump "reasonable time necessary for effective preparation," and, in so doing, violate his rights to due process and counsel.[8] *United States v. Taylor*, No. CR 18-198 (JEB), 2020 WL 7264070, at *7 (D.D.C. Dec. 10, 2020) (quoting 18 U.S.C. § 3161(h)(7)(B)(iv)); *see also United States v. Rice*, 746 F.3d 1074, 1079–80 (D.C. Cir. 2014) (affirming continuance based, in part, on complexity of the case and volume of discovery, and District Court's finding that "the defense itself is not going to be in a position to adequately provide the quality of representation the defendants are entitled to" without time to review pertinent discovery).[9]

---

substantial discovery, the Court may require the government to go beyond identifying "certain key" documents, and instead identify all "those items it intends to offer in its case-in-chief at trial." *United States v. Anderson*, 416 F. Supp. 2d 110, 116 (D.D.C. 2006).

[8] It stands as no small irony that the government seeks to deny President Trump his constitutional rights in a prosecution where the government wrongly alleges President Trump violated the rights of others.

[9] The government contends that President Trump has been "aware of . . . certain relevant information made public through hearings and the report written by the House Select Committee to Investigate the January 6th Attack on the United States Capitol" and therefore should not need to thoroughly review discovery. Doc. 23 at 6. However, the government simultaneously advises only "a relatively small percentage of discovery" is non-sensitive. Ex. A at 28:11–12. As only non-public material may be marked sensitive, Doc. 28 at 1, that means President Trump had no meaningful ability to review the government's discovery prior to production. (Nor would he have

Without doubt, the public has an interest in the prompt resolution of this case; however, as the Speedy Trial Act recognizes, that interest must yield to the public and the defendant's overriding interest in a just proceeding. The Proposed Schedule allows President Trump to defend himself fairly. The government's proposal does not. Accordingly, the Court should adopt the Proposed Schedule.[10]

B.      The Complexity of this Case Warrants the Proposed Schedule

The large volume of discovery in this matter is not happenstance, but reflects the reality that this is a complicated, unusual case. 18 U.S.C. § 3161(h)(7)(B)(ii) (permitting continuances for complex or unusual cases, or where the Court must address "novel questions of fact or law"). There are hundreds of potentially relevant witnesses spread across the country. Many are current or former government officials, including within the Department of Justice itself. Events alleged in the Indictment, and which are otherwise pertinent, likewise occurred throughout the country. Classified documents are at issue, as well as large quantities of search warrant materials that may be subject to suppression. As noted above, President Trump will seek Fed. R. Crim. P.

---

known what materials to review, as the government did give any pre-indictment explanation of its theory of the case, let alone identify any information it purports supports those charges.)

At the same time, the government has identified no good reason why it waited 31 months to seek an indictment. The notion that the government may, with all its vast resources, spend years investigating this case, only to turn and demand the defense be prepared for jury selection in just four months defies all notions of fairness.

[10] The government invokes the violence on January 6, 2021, as a reason to expedite the trial calendar, arguing it is "clearly a matter of public importance." Doc. 23 at 4. First, the Indictment does not charge President Trump with causing or participating in any violence. The fact that others have allegedly done so cannot factor into President Trump's trial date. Moreover, the widespread interest in these proceedings counsels a deliberate approach, protective of individual rights. The public's interest is in truth, fairness, and justice, not a rush to judgment.

SA.89

16(a)(1)(E)(i) discovery from government departments and witnesses, as well as pretrial 17(c) subpoenas, which may raise a host of difficult issues for the Court to resolve.[11]

These factors alone suggest this case is complex under the meaning of the Speedy Trial Act and weigh in favor of a lengthier trial calendar. *See United States v. Raymond*, No. CR 21-380 (CKK), 2023 WL 2043147, at \*4 (D.D.C. Feb. 16, 2023) (holding case as complex and granting government motion for continuance, over defendant's objection, based on, *inter alia*, dispersion of witnesses and classified information); *see also Barker v. Wingo*, 407 U.S. 514, 531 (1972) ("To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.").

However, this case is not just complex or unusual. It is *terra incognita*. The protests at Capitol Hill aside, no person in the history of our country has ever been charged with conspiracies related to the Electoral Count Act. No president has ever been charged with a crime for conduct committed while in office. No major party presidential candidate has ever been charged while in the middle of a campaign—and certainly not by a Justice Department serving his opponent. These and numerous other issues will be questions of first impression, requiring significant time for the parties to consider and brief, and for the Court to resolve. The Proposed Schedule provides that time. The government's timeline does not. Consequently, the complexity and unusual nature of this case favors the Proposed Schedule.

---

[11] The government acknowledges that it considers materials obtained from a congressional committee and the United States Secret Service are material to this case. Doc. 23 at 5. Many other governmental agencies may have information favorable to the defense as well. The government cannot pick and choose what sources of information are important to the determination of this matter; justice requires that the defense be accorded the time to consider, request, and review all information material to the charges.

C.      The Proposed Schedule is Consistent with Ordinary Order

As the Court stated at our August 11 hearing, and as the government then agreed, this case should "proceed[] in the normal course that our criminal justice system prescribes." Ex. A at 71:3–5; Doc. 15 at 8 (Gov't Reply in Support of Motion for Protective Order) ("Normal order should prevail."). As explained above, the normal course for complex, document-intensive cases is not a rush to trial, but a measured schedule that preserves the defendant's rights to review discovery and raise appropriate motions with the Court.

Indeed, the median time from commencement to termination for a jury-tried § 371 charge is 29.4 months—many times longer than the government's proposal schedule.[12] (And this reflects only the median, meaning half of all such cases take more time based on individualized assessments of discovery volume, complexity, and similar concerns.)

Likewise, this Court regularly allows far more time than the government proposes, even in cases involving protests at the Capitol on January 6, 2021. *See, e.g.*, *United States v. Foy*, No. 21-cr-0108 (28 months from indictment to stipulated bench trial on 4-page indictment); *United States v. Nordean, et al*, No. 21-cr-0175 (TJK) (21 months); *United States v. Crowl, et al*, No. 21-cr-0028 (APM) (23 months); *United States v. Kuehne, et al*, Case No. 21-cr-160 (29 months); *United States v. Hostetter, et al*, Case No. 21-cr-0392 (RCL) (24 months).

---

[12] Administrative Office of the United States Courts, *Table D-10: U.S. District Courts–Median Time Intervals From Commencement to Termination for Criminal Defendants Disposed of, by Offense, During the 12-Month Period Ending September 30, 2022*, at 2, jb_d10_0930.2022.pdf (uscourts.gov).

SA.91

Ordinary order, in other words, is adherence to the Constitution and the Speedy Trial Act, together with their assurances of fair and just criminal trials, regardless of the government's ill-placed desire to hurry this case to a conclusion.[13]

D.      The Government's Proposal is Unworkable Under CIPA

CIPA controls the disclosure of classified information in this matter. Doc. 23. As the government is aware, proceedings under CIPA are complicated, and "often lengthen the ordinary trajectory from indictment to trial." Ex. B at ¶ 7 (Decl. of Jay Bratt, June 23, 2023).

These delays can be extensive. As the Special Counsel's foremost expert on CIPA, Jay Bratt,[14] recently explained: the government is unaware of any case with classified discovery that went to trial in less than six months. Ex. C at 16:17–22 ([THE COURT]: "Can you point the Court to any other similar cases involving classified information that have gone to trial following production of discovery in less than six months?" [Mr. Bratt]: "So going to trial in less than six months, no.").

This case will be no different. The government acknowledges even uncomplicated CIPA cases involving "a very small number of documents with no substantive pretrial motions" take a minimum of eight months. *Id*. at 17:5–17. It is, therefore, puzzling that the government would propose a trial calendar the CIPA process cannot accommodate. Our Proposed Schedule, conversely, accounts for CIPA and will ensure any issues under that law are fully resolved by the time of trial.

---

[13] Another key factor in setting any trial date is the detention status of the defendant. That is not a factor here, and there is no reason that this Court should place the government's desire for a headline ahead of the interests of any detained defendant in this District who is awaiting trial.

[14] Mr. Bratt previously led the Department of Justice's Counterintelligence and Export Control Section and testified that he has "extensive experience with [CIPA]." Ex. B at ¶ 7.

SA.92

E.     The Government's Proposal Conflicts with Other Cases

Finally, the government's proposal presents numerous conflicts with other pending matters, including:

- A civil case in New York state court, scheduled for a six-week trial beginning October 2, 2023. Ex. D (Scheduling Order);

- A civil case in the Southern District of New York, scheduled for a two-week trial beginning January 15, 2024. Ex. E (Scheduling Order);

- A criminal case in New York state court, scheduled for a 5-week trial beginning March 25, 2024 (trial date set by oral order);

- A criminal case in Georgia state court, for which the state has requested a March 4, 2024, trial. Ex. F (Proposed Pretrial Scheduling Order); and

- A criminal case in the Southern District of Florida, also prosecuted by the Special Counsel and scheduled for a 5-week trial beginning May 20, 2024. Ex. G (Order Resetting Deadlines).

President Trump must prepare for each of these trials in the coming months. All are independently complex and will require substantial work to defend. Several will likely require President Trump's presence at some or all trial proceedings. Moreover, beyond trial, these cases will include numerous pre-and-post trial hearings that will invariably conflict with the government's proposed trial calendar here. As one example, a pretrial hearing in the Special Counsel's Southern District of Florida prosecution of President Trump is scheduled for December 11, 2023—the same day the Special Counsel proposes jury selection begin in this matter. Ex. G.[15]

---

[15] Co-counsel in this matter, Todd Blanche, also represents President Trump in the Southern District of Florida and New York state court criminal matters.

14

Without question, President Trump's obligation to diligently prepare for this case does not end because of other pending matters. However, the Court may, and should, consider the practical effects these parallel prosecutions will have on President Trump's ability to meet the extraordinarily brief deadlines the government proposes. *See, e.g.*, *United States v. Schardar*, 850 F.2d 1457, 1459 (11th Cir. 1988) (noting "several continuances were granted because defense counsel was involved in other trials"); *United States v. Randall Everette Tennyson*, No. 2:21-CR-364-ECM, 2022 WL 686619, at *1 (M.D. Ala. Mar. 8, 2022) (granting continuance to provide additional preparation time in light of counsel's simultaneous preparation for state court trials).

Once again, the government's proposed schedule does nothing to address these significant concerns; our Proposed Schedule resolves them. Accordingly, the Court should adopt the Proposed Schedule.

## <u>CONCLUSION</u>

The Proposed Schedule appropriately balances President Trump's constitutional and statutory rights to counsel and a fair trial with the public's need for promptness. The Proposed Schedule is further consistent with ordinary order and resolves significant conflicts presented by CIPA and other pending prosecutions. Accordingly, the Court should determine that the ends of justice outweigh the interest of the public and the defendant in a speedy trial, adopt the Proposed Schedule, and exclude time through April 1, 2026.

**SA.94**

Dated: August 17, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

/s/Gregory M. Singer
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

*Counsel for President Donald J. Trump*

SA.95

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
            Plaintiff,             .    CR No. 23-0257 (TSC)
                                   .
       v.                          .
                                   .
DONALD J. TRUMP                    .    Washington, D.C.
                                   .    Monday, August 28, 2023
            Defendant.             .    10:00 a.m.
. . . . . . . . . . . . . . . ..


               TRANSCRIPT OF STATUS HEARING
        BEFORE THE HONORABLE TANYA S. CHUTKAN
              UNITED STATES DISTRICT JUDGE


   APPEARANCES:

For the Government:           THOMAS WINDOM, ESQ.
                              MOLLY G. GASTON, ESQ.
                              U.S. Attorney's Office
                              601 D Street NW
                              Washington, DC 20530


For Defendant:                JOHN F. LAURO, ESQ.
                              GREGORY M. SINGER, ESQ.
                              Lauro & Singer
                              400 North Tampa Street
                              15th Floor
                              Tampa, FL 33602

                              TODD BLANCHE, ESQ.
                              Blanche Law
                              99 Wall Street
                              New York, NY 10005

Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Good morning, Your Honor.  This is Criminal Case No. 23-257, United States of America versus Donald J. Trump.  Counsel, please approach the lectern and state your appearances for the record.

MS. GASTON:  Good morning, Your Honor.  Molly Gaston for the United States along with Thomas Windom, and with us at counsel table is Special Agent Jamie Garman.

THE COURT:  Good morning.

MR. LAURO:  Good morning, Your Honor.  John Lauro on behalf of President Trump.  With me is my partner, Greg Singer, and Todd Blanche, who has noticed an appearance as well, as co-counsel for President Trump.

THE COURT:  And is Filzah Pavalon here?  Is that person appearing or they're not appearing in this case?

MR. LAURO:  She's with my firm but not here presently.

THE COURT:  All right.  So pro hac entered.  Good morning, everyone.

We are here for a hearing regarding the parties' proposed trial dates.  But before we discuss the proposed schedules, I want to address the defense's motion to exclude time under the Speedy Trial Act, which is ECF No. 18.

The defense has moved to exclude the 25 days between Mr. Trump's initial appearance on August 3, 2023, and today's status conference from the Speedy Trial Act calculation.  The

government has opposed that motion but acknowledged in their filing that the exclusion of time between the August 3rd initial appearance and August 28th scheduled hearing already will occur under the operation of other provisions of the act such as those provisions that automatically exclude time delays resulting from the filing of motions.

As the Supreme Court noted in *Bloate v. United States*, 559 U.S. 196 at 203, the Speedy Trial Act requires that a criminal defendant's trial commence within 70 days of a defendant's initial appearance or indictment, but excludes from the 70-day period days lost to certain types of delay.  Section 3161(h)(7) of the Speedy Trial Act permits the Court to exclude time from the calculation based on findings that the ends of justice served by taking such action outweigh the best interests of the public and the defendant in a speedy trial.

Taking into account the reasonable time necessary for effective preparation, the numerous motions filed between defendant's arraignment and this hearing, as well as the fact that the motion has been filed by the defense, I do find that the ends of justice outweigh the defendant and the public's interest in a speedy trial, and therefore I will grant the motion.  Accordingly, the 25 days between Mr. Trump's initial appearance on August 3, 2023, and today's status conference will be excluded.

Now let's move on to the proposed schedule.  In my August

3, 2023, minute order I asked the government to submit a proposed trial date with an estimate of the time that would be needed to set forth the prosecution's case-in-chief during trial. I also asked the defense to respond with their proposed trial date and estimate to the extent possible of the time that they believe they would need to put on a defense case.

So the government in its proposed pretrial schedule, which is ECF No. 23, proposes that trial begin on January 2, 2024, and estimates that its case-in-chief will take no longer than four to six weeks, and actually the government also proposed that voir dire jury selection begin before that date.

The defense in their proposed trial schedule, which is ECF No. 30, proposes that trial begin in April 2026, and states that it cannot yet estimate how long the defense will take but for now adopts, and I quote, the same calculation as the government, four to six weeks.

These proposals are obviously very far apart. And for reasons I will discuss shortly, neither of them is acceptable. So with regard to the Speedy Trial Act, the right to a speedy trial is guaranteed by the Sixth Amendment and the Speedy Trial Act comprehensively regulates the time within which a criminal trial must begin. And that's from *Zedner v. United States*, 547 U.S. 489 at 500.

The act, which is codified at 18 U.S.C. § 3161(a), provides

that the appropriate judicial officer at the earliest
practicable time shall, after consultation with the counsel
for the defendant and the attorney for the government, set the
case for trial on a day certain so as to assure a speedy
trial.

The earliest practicable time depends in part on factors
which can exclude time from the act's calculation; that is, to
stop the speedy trial clock. These factors include whether
the case is so unusual or so complex due to the number of
defendants, the nature of the prosecution, or the existence of
novel questions of fact or law, that it is unreasonable to
expect adequate preparation for pretrial proceedings or for
the trial itself before the trial date. That's from section
(h)(7)(B)(ii).

Another factor is whether the trial date would deny the
defendant reasonable time to obtain counsel, would
unreasonably deny the defendant or the government continuity
of counsel, or would deny counsel for the defendant or the
attorney for the government the reasonable time necessary for
effective preparation, taking into account the exercise of due
diligence. And that's from (h)(7)(B)(iv).

Now, I want to note here that setting a trial date does
not depend and should not depend on a defendant's personal and
professional obligations. Mr. Trump, like any defendant, will
have to make the trial date work regardless of his schedule.

1    If this case, for example, involved a professional athlete, it

2    would be inappropriate for me to schedule a trial date to

3    accommodate her schedule.  The same is true here.

4        Moreover, although the Speedy Trial Act primarily

5    safeguards the defendant's rights, as the Supreme Court noted

6    in *Barker v. Wingo*, 407 U.S. 514 at 519, there is a societal

7    interest in providing a speedy trial which exists separate

8    from and at times in opposition to the interests of the

9    accused.  The Supreme Court in *Zedner* observed that if the act

10   were designed solely to protect a defendant's right to a

11   speedy trial, it would make sense to allow a defendant to

12   waive the application of the act.  But the act was designed

13   with the public interest firmly in mind.

14       Among other things, the public has an interest in the fair

15   and timely administration of justice, as well as reducing

16   defendant's opportunity -- reducing a defendant's opportunity

17   to commit crimes while on pretrial release, and preventing

18   extended pretrial delay from impairing the deterrent effort --

19   deterrent effect of punishment.  And I'm quoting from *Zedner*

20   at 501.

21       The Supreme Court's decision in *Barker* further highlights

22   that delay may prejudice the prosecution and public interest.

23   It noted:  Delay is not an uncommon defense tactic.  As the

24   time between the commission of the crime and the trial

25   lengthens, witnesses may become unavailable or their memories

may fade.  If the witnesses support the prosecution, its case will be weakened, sometimes seriously so, and it is the prosecution which carries the burden of proof in this case, as in every case.  And that's from *Barker* at 521.

Relatedly, the Sixth Amendment also guarantees a defendant's right to effective assistance of counsel, which in turn depends on counsel having adequate time to prepare for trial.  But as the D.C. Circuit noted in *United States v. Burton*, 584 F.2d 485 at 489, note 10, counsel is not entitled to unlimited preparation time.  Instead, counsel is entitled to reasonable preparation time.

And in *United States v. Cronic*, 466 U.S. 648 at 663, the Supreme Court held that neither the period of time that the government spent investigating the case nor the number of documents that its agents reviewed during that investigation is necessarily relevant to the question of whether a competent lawyer could prepare to defend the case.

I am aware that Mr. Trump faces charges in other state and federal criminal cases.  Given that Federal Rule of Criminal Procedure 43 requires his presence at trial unless waived, the Court has considered the currently set trial schedules in those cases, as well as the competing demands of his counsel in this and other cases.  Although I believe Mr. Lauro, who is lead counsel in this case, does not represent the defendant in any of the other matters -- is that right, Mr. Lauro?

1    MR. LAURO:  That's correct, Your Honor, although my

2  co-counsel, Mr. Blanche, does represent President Trump in the

3  New York proceeding as well as in the Florida proceeding, and

4  we will be trying this case together.  Given the magnitude of

5  the documents, over 250 witnesses, the complexity of the

6  issues, it really is a team effort.  So both of us are co-lead

7  counsel in this matter.

8    THE COURT:  All right.  Thank you.

9    All right.  I'm going to have some questions for each side,

10  but I'm going to start by addressing the defense argument

11  regarding the timing of other cases.  So the defense contends

12  that the median time from commencement to termination for a

13  jury demandable case involving 18 U.S.C. § 371, which is

14  conspiracy to defraud the United States, is 29.4 months, and

15  that the court regularly allows far more time than the

16  government proposes in other January 6 cases.

17    As an initial matter, and as the government correctly

18  points out, that 29.4 months cited by the defense was the

19  time from commencement to sentencing, not to trial.  And

20  sentencing, in this court at any rate, in the last few years

21  usually takes place about 90 days or more from verdict.  So

22  that statistic is a bit misleading.  And one of the cases that

23  the defense cites, *United States v. Foy*, 21-CR-108, is my

24  case.

25    In that case, there have been multiple continuances due to

the COVID-19 pandemic, litigation over -- considerable
litigation over pretrial detention, a superseding indictment,
and plea negotiations.  So, given that all the other cases the
defense cites were brought in 2021, I expect and suspect that
the pandemic had an impact on the time it took to resolve
those as well.

In addition, as the government notes, the other January 6
cases cited by the defense all involve between six and 17
codefendants.  There are no codefendants in this case.  And
from my review, the defense has not identified any case in
this district where the defendant was given over two years
between indictment and trial in which there were no
codefendants and no ongoing pandemic.

And the government hasn't identified any cases in this
district where the length of time between indictment and trial
was roughly five months, although they did point to the
*Manafort* case in the Eastern District of Virginia, which went
to trial roughly five months after the superseding indictment.

The other factor I wanted to focus on is the preparation
that's needed for trial.  And I think I will have some
questions in that area.  The defense advocates for a trial
schedule equal to the government's time spent investigating.
But as I've already noted, the Supreme Court found in *Cronic*
that there is no necessary correlation between the period of
time that the government spent investigating the case and the

defendant's task in preparing to deny or rebut a criminal charge.

*Cronic* was a mail fraud case in which the government took over four and a half years to investigate and included extensive document review. The Court found that the time devoted by the government to the assembly, organization, and summarization of the thousands of written records unquestionably simplified the work of the defense counsel in identifying and understanding the basic character of the defendant's scheme. That's at 664 of *Cronic*.

The defense here argues that they need years to review the over 11.5 million pages of discovery, declaring they would need to review nearly a hundred thousand pages per day to finish the government's initial production by its proposed date for jury selection. The government responds that characterization of the discovery review burden is misleading. It contends that 65 percent of its initial production consists of materials to which the defendant has functionally had access, are duplicative, or do not constitute Rule 16 discovery. 25 percent come from entities associated with Mr. Trump. And hundreds of thousands of pages come from the National Archives and House Select Committee to investigate the January 6 attack.

The government further states that it has made a small second discovery production consisting of 615,000 pages or

1    files, 20 percent of which were generated by records from an

2    entity associated with Mr. Trump.  The government also

3    represents that in the first production it provided defense

4    counsel with a set of key documents that it views as some of

5    the most pertinent to its case-in-chief.  Now, I realize the

6    defense may have a different view of that, but nonetheless

7    it's been provided.

8       So who will be arguing at this point?  Will it be you,

9    Ms. Gaston?

10       MS. GASTON:  Yes, Your Honor.

11       THE COURT:  So regarding the discovery that's been

12    turned over to the defense so far, you said in your motion

13    that about 65 percent of the first production is either

14    duplicative, is material that Mr. Trump has already had access

15    to, or is not Rule 16 discovery.

16       How much of the discovery did Mr. Trump already have access

17    to such as documents from the archives that his counsel would

18    have reviewed for privilege?

19       MS. GASTON:  Yes, Your Honor.  And let me begin by

20    saying that at this point discovery is now substantially

21    complete.

22       THE COURT:  Okay.

23       MS. GASTON:  We made a fifth production last night.

24       THE COURT:  Oh, a fifth.

25       MS. GASTON:  A fifth.

1      THE COURT:  Okay.  So I had two in the last -- so

2   there's been three more.  Okay.

3      MS. GASTON:  Correct, Your Honor.  So at this point

4   the discovery is at approximately 12.8 million pages.  That

5   is generally the number of pages that we are at.  But as we

6   described in our reply, number of pages is not the best metric

7   for measuring such things.

8      So of those 12.8 million pages, approximately 25 percent,

9   or more than 3 million, are pages associated with the

10  defendant's campaign or political action committees.  More

11  than 3 million, as we stated in our reply, came from the

12  United States Secret Service.  That's approximately 24

13  percent.  There are hundreds of thousands of pages from

14  publicly available litigation, 172,000 pages from the National

15  Archives.  And so --

16     THE COURT:  And those are documents that were -- would

17  have been reviewed for privilege by Mr. Trump's counsel before

18  they were turned over.

19     MS. GASTON:  Yes, Your Honor.  So approximately 61

20  percent of what we have provided so far, or 7.8 million pages,

21  are pages that came from entities associated with the

22  defendant, either in political action committees or the

23  campaign, from the National Archives, from publicly available

24  litigation documents, open-source materials like tweets,

25  materials from the House Select Committee, the vast majority

of which were already publicly available, and then some data
associated with a consultant to the defendant in some of the
election litigation.

So what is in the other 5 million pages, which is what
we're really talking about, is things like every grand jury
transcript in this case up to indictment and the accompanying
exhibits.  The defendant has all of those already.

THE COURT:  And those exhibits -- excuse me.  If an
exhibit was produced but shown to a witness during the grand
jury testimony, then it's been duplicated.  Is that correct?

MS. GASTON:  Yes, Your Honor.

THE COURT:  It's listed twice.

MS. GASTON:  Exactly.  So for instance, if a witness
in this case received a grand jury subpoena and produced
documents to the government, and the government went though
the documents, and then that person testified in the grand
jury and the government used documents from the document
production, those documents would be reproduced to the
defendant both in terms of the grand jury production and as --
the subpoena production, and the testimony and the documents
shown to the witness in the grand jury.

The same thing is true of all of our witness interviews in
the course of the investigation.

THE COURT:  That's what I was going to ask you next.
How much of the discovery could be categorized as witness

1    statements and notes?

2          MS. GASTON:  One moment, Your Honor.

3       Your Honor, approximately 58,000 pages are from witness

4    interview folders.  That includes the transcripts of those

5    interviews.  Most of them were audio recorded.  So the defense

6    has been provided audio recordings as well as transcripts

7    created for convenience of review.  And then all of the

8    exhibits that were used in the course of those interviews, and

9    those were provided in an organized fashion.

10       So, basically, there's a folder or a Bates range associated

11    with each witness.  It includes the transcript of either the

12    grand jury testimony or of the interview, the agent notes if

13    it was an interview, and then the exhibits associated or any

14    interview report of the interview.

15          THE COURT:  Do you have an idea of how much of the

16    discovery is material that Mr. Trump actually created, such as

17    tweets or other...

18          MS. GASTON:  The open-source material, Your Honor,

19    would include things like the publicly available litigation.

20    So I'm not sure I have a breakdown exactly of his tweets, but

21    I could get that for you.

22          THE COURT:  All right.  That's fine.

23       Now, you also said, at least in your response, that more

24    than 3 million pages, or 25 percent of the first production,

25    and 20 percent of the second production, came from, in quotes,

1    entities associated with Mr. Trump.  And you mentioned a PAC,

2    a political action committee.  Are there other -- what do you

3    mean by that?

4         MS. GASTON:  There's the defendant's campaign,

5    Your Honor, and then a few different political action

6    committees.

7         THE COURT:  Okay.

8         MS. GASTON:  And let me correct myself, Your Honor.  In

9    terms of the open-source material that includes campaign

10   statements, tweets, Truth Social posts, that's about 27,000

11   pages.

12        THE COURT:  Okay.  Now, in your key documents list, do

13   you have an approximation of how many documents are included

14   in that list?

15        MS. GASTON:  Yes, Your Honor.  One moment, please.

16      The key documents are approximately 47,000 pages.  And let

17   me take a moment just to describe what the key documents are.

18        THE COURT:  Yes.

19        MS. GASTON:  So it includes all of our case agent's

20   summary testimony as well as any exhibits introduced through

21   her to the grand jury.  And so that includes things like

22   transcripts of witness testimony or testimony before the House

23   Select Committee.  It also includes a file that is essentially

24   an annotation of the indictment.  It is almost 3 00 different

25   documents that are labeled and named according to the

paragraph of the indictment that they support.  So it is
essentially a road map to our case, Your Honor.  And it
includes other key documents that the government believes that
it may use at trial as well.

The other thing that we did through case agent testimony,
and have pointed the defense to in our cover letter and
through that case agent testimony, is we identified material
that we believe is arguably favorable to the defendant.  Of
course, that is simply the government's guess at what the
defense might find favorable, and it is of course a duty for
the defense to also identify potentially exculpatory material
in materials --

THE COURT:  But your *Brady* obligations are
constitutional and ongoing and that's what -- that's the
material you're talking about.

MS. GASTON:  Yes, Your Honor.

THE COURT:  And as you know, I think we take a --
if there's a doubt, the government's encouraged to take an
overinclusive position on that.

MS. GASTON:  Yes, Your Honor.  And, in addition,
the defense has spoken in interviews and such about various
defenses that they may raise in this case.  And all of the
materials that we have provided, the grand jury subpoena
returns, the search warrant returns, it is all searchable in
their electronic database for purposes of identifying that

1   material as well.

2          THE COURT:  Okay.  Thank you for answering a couple

3   of my questions, including how the information is organized.

4   And so -- and it's substantially complete.

5      All right.  And that key documents list, was that just for

6   the first production or has that been supplemented for the

7   entire production?

8          MS. GASTON:  The key documents list was an entirely

9   duplicative collection of material in the very first

10  production so that we could say to the defense in our very

11  first production, here's what we view as the most important

12  evidence in this case.  Here it is, it's all in one place for

13  you in a very organized fashion.

14         THE COURT:  Okay.  Thank you.

15     Well -- thanks.

16         MS. GASTON:  Thank you, Your Honor.

17         THE COURT:  I'll note that many years ago when I was

18  trying murder and conspiracy cases across the street in

19  Superior Court, we got witness names on the day of trial and

20  witness statements and grand jury testimony before the witness

21  testified and sometimes after the witness testified.  And

22  while the discovery rules here in federal court provide for

23  far more disclosure in advance, the manner in which the

24  discovery in this case has been organized indicates that the

25  government has made a considerable effort to expedite review,

1  certainly beyond their normal discovery obligations.

2  In cases involving large amounts of document discovery,

3  initial review is usually done by electronic searches.  The

4  government represents that it has produced the discovery in

5  load ready files so that the defense can review them quickly,

6  in the same manner as the government did, through targeted

7  keyword searches and electronic sorting.

8  So, Mr. Lauro, why won't that significantly speed up the

9  review process?

10  MR. LAURO:  Because Mr. Trump, President Trump, is

11  entitled to a fair trial.

12  THE COURT:  Absolutely.

13  MR. LAURO:  He is entitled to an opportunity to have a

14  defense lawyer who is reasonably prepared.  This is a request

15  for a show trial, not a speedy trial.

16  Your Honor, I respectfully and strongly disagree with the

17  prosecution's presentation here.  The concept that we would

18  have access to materials in the archives, in Secret Service,

19  in other government agencies, that that would somehow enable

20  us to prepare for trial because we should have already been

21  reading that material for the last two and a half years, is

22  absurd and ridiculous.

23  We have to do our job as defense lawyers to represent a

24  client.  This is a solemn obligation of every defense lawyer,

25  no matter if you're representing someone who's in a street buy

1   on a corner or a former president of the United States.

2   I have a special obligation to make sure that my client is

3   adequately represented.  And I'm sorry, Your Honor, to

4   suggest -- for a federal prosecutor to suggest that we could

5   go to trial in four months is not only absurd but it's a

6   violation of the oath to do justice.  And let me just go

7   through this organized material --

8         THE COURT:  Okay.  Let's take the temperature down for

9   a moment here.

10        MR. LAURO:  I take my obligation seriously as a defense

11  lawyer.  I've been doing this for 40 years.  I know Your Honor

12  has done it as well.  It's a sacred obligation to represent a

13  defendant.  And it's not easy when you have the entire

14  government amassed against you.  But we need adequate time to

15  prepare.  President Trump stands before Your Honor as an

16  innocent man right now.  He's entitled to his Sixth Amendment

17  protection.  He's entitled not only to counsel, but under

18  *Gideon*, the promise of *Gideon*, he's entitled to counsel that

19  can prepare adequately.

20      What this case means, we're talking about 9 terabytes of

21  information.  I have to go through that information.  I have

22  to sort it by witnesses, over 250 witnesses.  I have to

23  organize it in a way that's reasonable.  I have to look at all

24  the information in terms of these key witnesses.  I have to

25  cross-reference against other witnesses that may have said

something about a particular witness.  I need to think about
impeachment material.  I need to think about corroborative
material.  I need to think about my own Rule 17 subpoenas as
well.

For the government to suggest that I can do that in four
months is an outrage to justice, that not once have they
talked about justice in this case, not once.  So this is what
I have to do.

Now, they can give me key documents.  That's very nice of
them.  That's very kind of them.  I'd like to know one defense
lawyer in the United States that's going to rely on a
government's proposal of key documents.

THE COURT:  Mr. Lauro, as I said, let's take the
temperature down.  I understand you have a sacred obligation.
I understand Mr. Trump is presumed innocent, as is every
defendant.  But let's not overlook the fact that Mr. Trump has
considerable resources that every defendant -- criminal
defendant does not usually have.

And what I want -- my question to you is, given how the
discovery in this case has been produced, in an electronic
searchable form, and given the fact that a substantial portion
of the discovery has already been reviewed by Mr. Trump's
counsel as part of documents produced by archives -- hold
on -- why won't that speed it up?

I mean, we're not talking -- discovery in 2023 is not

sitting in a warehouse with boxes of paper looking at every
page at the first cut.  You and I both know that that is not
how the first cut of discovery in a complex case is reviewed;
it's reviewed by electronic searches.  So why won't the manner
in which this discovery has been turned over speed up your
review process?

MR. LAURO:  For a number of reasons.  First of all,
we've not had access as criminal defense counsel to what's in
the archives, what's in the Secret Service, what's in DOJ,
what's in political action committees.  We have not had that
access.  We as criminal defense lawyers now, for the first
time looking at these charges, have to assess these charges in
terms of what the actual relevance is.

They have given us what they represent is Rule 16 material
that's relevant to the defense.  We are now the defense and
we're looking at all the material they've given us.

THE COURT:  All right.  But some of that material is
not new to you --

MR. LAURO:  It is new to me, Your Honor.

THE COURT:  Whether or not you're looking at it through
the eyes of a criminal defense lawyer, certainly it was
reviewed by Mr. Trump's counsel before, before this case came
in.

MR. LAURO:  Who were not criminal defense lawyers.  How
is that new to me, Your Honor?  I just have to work through --

1          THE COURT:  In other words, this is not brand-new

2     information.  Some of it are statements, some of it are

3     materials of your client's own creation.  In other words, none

4     of this -- you're not seeing this for the -- you personally

5     may be, this may be new to you, but this is material that has

6     been reviewed, at least for privilege -- some of this material

7     are statements of your client and materials created by your

8     client or entities associated with him.  Why -- that's not

9     brand-new information, is it?

10          MR. LAURO:  Of course it is.  Of course.  To a criminal

11     defense lawyer, it's brand-new information.  That's like

12     saying if a CEO of a public company was before Your Honor and

13     had responsibility for running a company, oh, they've seen all

14     the information that the company has, why do they need time to

15     prepare?  They've already had it for years.

16          THE COURT:  No, that's a different point.  Because it's

17     information from the company doesn't mean that the defendant

18     had seen it.  But a lot of this material is material your

19     client created or material that your client's lawyers, maybe

20     not you specifically, saw and reviewed and had possession of

21     before this case.

22          MR. LAURO:  Your Honor, the statements of my client are

23     minuscule compared to the avalanche of information here.

24     Minuscule.  And by the way, I need to look at all the

25     statements, Mr. Blanche needs to look at all the statements

as a criminal defense lawyer, not from a client's perspective.
That's the teaching of *Gideon*. It would be a miscarriage of
justice if a lawyer were expected to absorb all the
information that a client already knew and not look at it anew
and not look at it from the perspective of a criminal defense?

THE COURT: Absolutely. And certainly you have to look
at your client's statements, you have to look at -- there's a
lot that you may personally have to eyeball. But you don't
need to look at -- you personally, at least at the first cut,
are not going to review all 12 million pages, right? Some of
those documents are going to be reviewed electronically. Am I
correct?

MR. LAURO: No documents get reviewed electronically.
They get assembled electronically, and we can do searches for
documents, but, Your Honor, all I can tell you is I've worked
these large cases. Maybe -- I don't know what the prosecution
has done in a former life, but these cases are enormously
complex and they go something like this. As you know,
Your Honor, I'm not telling you anything; you've been through
it. You have to do searches, maybe with key terms.

THE COURT: Right.

MR. LAURO: You have to organize those documents
typically by witnesses and issues. You have to cross-
reference them with respect to what other people say and
what other people have mentioned. Then you have to organize

a narrative.  I like to do witness outlines.  Some lawyers are
different.  I like to be prepared for trial.  I have an
obligation to a client.

     Then, in addition, you have to look for evidence that
corroborates witnesses that are favorable to you.  You have
to look for impeachment evidence with respect to witnesses
that say something bad about you.

     In this case we have not only documents we're searching
for, we have videos and recordings that can't be searched
electronically.

          THE COURT:  But you have --

          MR. LAURO:  This is a massive undertaking.

          THE COURT:  But you have the transcripts of those
recordings.

          MR. LAURO:  I don't think in all respects we do, and
not certainly with respect to every single video I don't think
we do.  This is over 12 million pages, 9 terabytes of
information.  This is an overwhelming task.  Never in the
history of the United States have we seen a case of this
magnitude go to trial in four months, let alone a year, let
alone less than two years.

     If we were big corporations in America, where the only
thing was money at stake, no one would blink an eye at a
two-and-a-half or three-year trial schedule.  But this man's
liberty and life is at stake and he deserves an adequate

representation, as every American does.  He's no different

than any American.

            THE COURT:  Mr. Lauro.

            MR. LAURO:  I'm sorry, Your Honor.  For a defense

lawyer to hear these arguments from a prosecutor who took an

oath to do justice, I'm sorry, it has to be spoken.  Every

single person in this courtroom, every single person in the

United States deserves a fair and adequate defense.

      And I'm telling you, as an experienced trial lawyer, an

experienced defense lawyer, we cannot do this in the time

frame that the government has outlined, and we cannot do this

in the time frame that would be suggested by anything less

than what we have.  We need this time to prepare.

            THE COURT:  I understand, Mr. Lauro, but I can tell

you, you are not going to get two more years.  This case is

not going to trial in 2026.  It's not going to trial in --

            MR. LAURO:  Your Honor, I can only give you my best

estimate based on the fact that, you know, we're looking at

this discovery right now.  We just got a discovery at three

o'clock in the morning today.

            THE COURT:  I understand.  But Mr. Lauro, for one

thing -- okay.  You suggest that the defense needs a

substantial amount of time to investigate, for example.

The existence of the grand jury investigating in this case has

been known for -- since September 2022, almost a year, has been

public knowledge.  The identity of many of the witnesses who have testified in the grand jury, and potential trial witnesses, have been a matter of public record.  And given that Mr. Trump likely knows most of the witnesses the government -- or many of the witnesses the government would call, several of whom, according to at least page 7 of the indictment, may be staff and associates.  So why would the defense need two years to investigate?

MR. LAURO:  Because there's no obligation for any American citizen to start conducting their own defense during a grand jury investigation and prepare for a trial when we don't even know what the issues are, what the charges are.

THE COURT:  There may not be an obligation, but certainly a defense attorney, a good defense attorney, knowing that their client was under investigation by a grand jury, knowing who the witnesses -- some of the witnesses were in the grand jury, would already start.  Right?  Isn't that what a good defense attorney would do?

MR. LAURO:  Your Honor, I was not hired during that period of time.  The government never communicated, as far as I know, to President Trump's counsel regarding the theories of investigation, the matters under investigation, the statutes at issue, the witnesses.  None of that was ever provided. They could have done that.  They could have said, yes, here's what we're doing --

1    THE COURT:  I'm not sure if they could commensurate

2  with --

3    MR. LAURO:  -- the fact that they didn't puts us at a

4  disadvantage because how can we go into a dark room and figure

5  out what they are investigating?  That would be absurd.  We

6  can't be charged and hindered because we didn't do an

7  investigation during the grand jury period when they wouldn't

8  tell us what that investigation was about.

9    I mean, this case, Your Honor, looking at it from a defense

10  lawyer's perspective, is an enormous, an enormous factual

11  issue.  We haven't even talked about the novel issues of law

12  we're going --

13    THE COURT:  I'm coming to those.

14    MR. LAURO:  -- to have to address.  And I know you're

15  going to get to that.  But this is an enormous, overwhelming

16  task.  We have two law firms, two small law firms here working

17  around the clock, and you see how diligent we are in

18  responding to Your Honor.  Whenever anything is asked, we

19  respond right away.  Even if the rules are shortened for

20  President Trump, we're making sure we're responding

21  immediately, we're doing everything that a diligent defense

22  lawyer can do.

23    But Mr. Trump is entitled, entitled to a defense that's

24  reasonably prepared.  It would be a miscarriage of justice if

25  that truth is not sustained in this court, and every single

court.  Whether it's Mr. Trump or anyone else deserves that
kind of defense.

THE COURT:  And they're going to get it.  The point I'm
asking you is about the review necessary for this case.  And
Mr. Lauro, I'm well acquainted with *Gideon*.  I'm well
acquainted with the defendant's Sixth Amendment rights, his
right to a fair trial, and I intend to ensure he gets it.  But
I'm not going to give -- as I said, this trial is not -- this
case isn't going to trial in 2026.

And I want to know, despite the rhetoric in your response
to the government's proposed trial date, realistically, why
you think that you need this time when, although there are 12
million pages of discovery, you and I both know and the
government knows that that's not -- again, nobody's sitting
there going through page by page.  A significant amount of
this discovery is duplicative.  A significant amount of it you
already have in your possession or know about.  And whether or
not you, the defense lawyer, are seeing it for the first time,
Mr. Trump has been ably represented by experienced counsel
during the whole pendency of this investigation.

This is not -- you know, it's not an unveiling -- a
surprise he's been indicted.  You've known this was coming.
Mr. Trump's counsel has known this was coming for some time.
And I'm sure any able, diligent, zealous defense counsel would
not have been sitting on their hands waiting for an

indictment.  Certainly -- yes, an indictment signifies the
beginning of a case, and you're looking at the indictment and
you're looking at what you need to prepare.  But a lot of this
material was in the hands of Mr. Trump and his counsel for a
significant period of time before the grand jury was convened.
And that's what I'm asking you about.

You can keep talking about 12 million pages and his right
to a fair trial.  He has a right to a fair trial, but what is
a fair amount of time to prepare?  And the 12 million pages we
talk about here are not truly indicative of how much time he
needs to prepare because a lot of that is simply a belt and
suspenders approach by the government, for example, in
releasing duplicative documents, exhibits that were referred
to in witness testimony and grand jury testimony that are also
disclosed to you in production.

So a lot of this is duplicative, a lot of this may not even
be relevant, and I realize there has to be some searches to
categorize that, but that does not, in this court's estimation,
need to take two years.

All right.  Let me ask you this --

MR. LAURO:  Your Honor, may I respond to that?

THE COURT:  Yes.

MR. LAURO:  And respectfully, what I'm saying is not
rhetoric, it's in defense of the Constitution and my client
and with respect to trying to explain to Your Honor what's

1    necessary to defend somebody under these circumstances.

2        I doubt, I doubt that -- you can't push a button these days

3    and get documents sorted.  You have to go through those

4    documents.  No person who is charged with a crime should be in

5    some way disadvantaged because they didn't do or anticipated

6    what that crime would be in connection with a grand jury

7    proceeding, and they didn't do or whether or not they did do

8    any kind of research or examination or defense prior to the

9    charge.

10        We start at the time of the charge.  It would be highly

11    prejudicial if Your Honor took into account any time before

12    the charge was entered and suggest that the defense had some

13    obligation to conduct investigation prior to the time the

14    charges were brought.

15        THE COURT:  I'm not suggesting you had an obligation.

16    I'm simply suggesting you had an opportunity.

17        MR. LAURO:  I didn't.  I was hired, you know, a month

18    and a half ago, Your Honor, and I'm going to be trial counsel

19    along with Mr. Blanche.  Not only do we have to review this

20    material, we have to absorb it.  You know what it's like as a

21    trial lawyer.  Sure, you know, a firm can help, paralegals can

22    help, they can read documents, they can look at documents.

23    But at the end of the day, Your Honor, we stand before the

24    jury and we have to make our case before a jury.  We have to

25    know the facts.  Mr. Blanche and I have to absorb a gargantuan

amount of facts in this case in order to adequately represent a client.

Cross-examining a witness is not an easy task.  You have to make sure that you understand all the documents that might be related.  This is a question of whether or not -- and I'm pleading with Your Honor as an experienced defense lawyer, having done this over 40 years -- this is a question of whether or not one man, one United States citizen, gets a fair trial or not.  And I am telling you, Your Honor, based on what I've seen so far, it is a gargantuan task.

I understand we have modern search tools.  Years ago maybe there would be 50 boxes, right, in a room, and we'd look through the boxes one by one.  Now there's 12 million pages.  Sure, we sort them in some way by computerized searches, but at the end of the day I have to read the grand jury transcripts, I have to read the FBI 302s, I have to go through all of the text messages.

THE COURT:  That's a much smaller universe of documents, Mr. Lauro.

MR. LAURO:  I don't think so, Your Honor.

THE COURT:  You and I both know that.

MR. LAURO:  250 witnesses in this case, and counting, that might be witnesses in this case so far is the estimate we have.  And that's to say nothing of our opportunity to file and seek Rule 17 subpoenas, to do our own witness interviews,

to conduct our own investigation.  All of that will be
eviscerated.  All of that will be eviscerated.

And if the goal here is to truly do justice, truly do
justice, then every American citizen is entitled to counsel
with a reasonable time to prepare.  No one, no one, is
suggesting that we're not being diligent.  No one is
suggesting that we're not taking these obligations seriously,
because we are, Your Honor.  We have an enormous
responsibility here, not just to one client but to the system,
and to ensure that the system works for every American.

Mr. Trump is not above the law but he's not below the law.
He should not be treated any differently than any other person
who appears before Your Honor and asks and pleads for justice.
And I am saying, without question, that we cannot be ready
under the circumstances of this case until we have a
reasonable amount of time, consistent with justice, so we can
prepare and we can also present.

Your Honor, candidly, the jury is entitled to an organized
defense.  The jury is entitled to a presentation that makes
sense, a defense narrative that shows that counsel is
prepared.  The worst thing for a jury to see is a lawyer that
gets up there are starts asking questions, they don't even
know what they're talking about because they haven't been
prepared.  And we've been there, we've seen that, and none of
us here in this courtroom would do that, and I'm certainly

1    not.

2         THE COURT:  Thank you, Mr. Lauro.  And I will say that

3    I don't doubt for a minute that you're working diligently, but

4    I will say that you and I have a very, very different estimate

5    of the time that's needed to prepare for this case.  But as

6    you have mentioned several times, Mr. Trump will be treated

7    exactly, with no more or less deference, than any other

8    defendant would be treated.

9        All right.  With regard to the complexity of the case, the

10   defense says this is a complicated, unusual case that might

11   require the Court to address novel questions of fact or law,

12   but you don't explicitly state what those novel questions are.

13   I mean, some of the January 6 cases, all of which have been

14   brought in this court, have involved conspiracies related to

15   the Electoral Count Act.

16       Now, a former president being charged for crimes while in

17   office, or the prosecution of a presidential candidate may be

18   points of historic note about this case, but they aren't legal

19   issues.  This case involves one defendant and four counts.

20   The charges are not multijurisdictional.  The alleged conduct

21   occurred over the period of a few months.  Why is this case

22   complex, other than the historic aspect of it?

23        MR. LAURO:  We've outlined the factual complexity to

24   some extent.  The legal complexity, number one, is we have a

25   very initial issue of executive immunity which we're going to

raise with the Court likely this week or early next week,

which is a very complex and sophisticated motion regarding

whether or not this court would even have jurisdiction over

this case in light of the fact that, as the indictment

essentially indicts President Trump for being President Trump

and faithfully executing the laws and executing on his take

care obligations, so we're going to have a very, very unique

and extensive motion that deals with executive immunity.

We also anticipate a selective prosecution motion, given

the fact that this prosecution provides an advantage to these

prosecutors' boss, who is running a political campaign against

President Trump, which everybody knows about, and this

selective prosecution motion will go directly to the core of

criticisms that Mr. Trump made historically against President

Biden and his son and whether or not this is a retaliatory

action as a result of that.  So we expect that there's going

to be a selective prosecution motion as well.

We also have core First Amendment issues that are going to

be litigated in this case.  We also have a number of Rule 17

subpoenas that we anticipate serving.  There might be some

litigation about that.

So there's going to be an enormity of unique legal issues.

None of these have been decided yet.  To say nothing of the

core question of whether or not 18 U.S.C. 371 should be used

in a political context.  That's going to be a novel issue

because historically it's not been used against a political

opponent.  This is the first time where the Biden

administration has used that statute against a political

opponent.  We're going to be dealing with whether or not the

obstruction statute should be applied under the circumstances

of this case.

So all of those are novel issues, Your Honor, and I will

say that this court -- I know Your Honor is going to look at

all those issues seriously, but they're going to be briefed

completely and fully by the defense.  And not only are we

going to be dealing with a host of very significant factual

issues, but I'm afraid, Your Honor, we're going to be back

many, many times arguing some of these complex motions.  And

I --

THE COURT:  Can't wait.

MR. LAURO:  I see you smiling, Your Honor, that you're

looking to enjoy these novel issues, but they've never been

decided.  And certainly the question of executive immunity is

a very important one.  It's not been decided in the criminal

context by the Supreme Court.  It has with respect to civil

litigation, but everything in the indictment, it's a speaking

indictment, 45 pages of essentially a prosecutorial theory.

All of that really embraces executive action or items

within the penumbra of executive action, within the outer

perimeter, as the legal definition is, of what President Trump

was required to do as president. That's going to present an
incredibly important *ab initio* legal issue for Your Honor to
decide.

So we're going to be busy with very, very complex, novel
issues without question in this case. This is one of the most
unique cases from a legal perspective ever brought in the
history of the United States. Ever. And we're going to have
to deal with those issues. And we will.

But we're already starting that at the same time that we
have this massive factual investigation under way. So it's a
dual issue. And that's why I'm so adamant about the time to
prepare. It's not just looking through 18 million pages of
documents, it's also looking through legal theories and legal
issues that will be presented, and some of these have never
touched a court before, and Your Honor's time and effort are
going to have to be devoted to that as well.

So all of this presents a clear reason to handle this as if
President Trump were any other person coming before Your Honor
and needing the time necessary to prepare adequately both on
the legal side and on the factual side.

THE COURT: All right.

Ms. Gaston. Could you respond to Mr. Lauro's discussion
of the time needed to review the documents in this case.

MS. GASTON: Yes, Your Honor. I think there is a
reason why Mr. Lauro resisted answering your specific question

1    about what the exact time would be needed to review the

2    materials in this case, and it's because he doesn't want to

3    admit that through electronic searches and through the

4    reasonable due diligence used in modern criminal trials, it

5    is possible to be ready much sooner than April of 2026.

6        Let me first address a few of Mr. Lauro's points that

7    suggest that the defense is starting fresh at indictment.

8    So, first, in advance of indictment in this case, the Select

9    Committee made public a large amount of the evidence in this

10   case, and the defendant himself published video and written

11   defenses in response, which demonstrate that the defendant was

12   observing the Select Committee's investigation and work, and

13   defending himself against it.

14       In fact, in an interview the night the indictment was

15   unsealed in this case, Mr. Lauro called the indictment "a

16   regurgitation of the J6 committee report."

17       In terms of pre-indictment litigation, the government and the

18   defendant engaged in extensive pre-indictment litigation

19   regarding executive privilege.  It took place in five sealed

20   proceedings starting in August 2022 and lasting through March of

21   2023.  And it concerned the scope of grand jury testimony for 14

22   witnesses.  And I'll just note that we asked for and received

23   permission from the chief judge to provide that information to

24   you today.

25       In terms of witnesses, a number of people on our potential

witness list are not a surprise to the defense either.  The
defendant's political action committee paid attorneys' fees for
more than a dozen witnesses during the course of our
investigation.  And since indictment, Mr. Lauro has a team of
experienced attorneys working for him.  There are four counsel
of record, two additional attorneys who attended the
arraignment, one of whom was intimately involved in the
pre-indictment litigation that I just mentioned, another at the
last hearing.

And when Mr. Lauro appeared on multiple news programs and
podcasts following the indictment, he described a number of the
defenses he plans to raise, motions he plans to file, and he
stated that he had read Vice President Pence's book twice and
was already planning his cross-examination.

Just a week or so ago, the defendant claimed publicly to have
created a robust report on the stolen presidential election of
2020 that contained irrefutable and overwhelming evidence of
election fraud that his attorneys would use in service of a
motion to dismiss.  We are not starting fresh at indictment in
this case.

Other things that Mr. Lauro mentioned are not a reason not to
proceed promptly to trial.  With respect to Rule 17 subpoenas,
as the Court knows, those are not intended as a discovery tool,
and the defense has to meet exacting standards of relevancy,
admissibility, and specificity.  And the best way to find out if

the defense can meet those standards is to set a schedule based off of a trial date and move forward with them.

The same goes, Your Honor, with respect to the complexity that Mr. Lauro just mentioned. So, first of all, Mr. Lauro mentioned that they are prepared to file a motion regarding executive immunity this week. Let's have that motion. The government will respond to that motion and the Court can consider it. But let's set a trial date and set a schedule.

Other things that Mr. Lauro mentioned are not novel questions. Selective prosecution motions are common in this district. I'm sure that Your Honor receives them all the time. Similarly, Rule 17 subpoenas, there's a lot of case law on those. And First Amendment issues in the context of fraud is not a new legal issue and that won't be complex either. And §371 has been challenged in a number of ways in the course of more than a decade, and that is not a complex legal issue either.

But I think the thing that all of this shows is the importance of setting a trial date and working backwards with a schedule. I think all of us, Your Honor, Mr. Lauro, we know that a trial date really sort of focuses the mind and enables everybody to work towards a common date.

And so the question before the Court today is, under the Speedy Trial Act, what is the balance of the defendant's right and need to prepare for a fair trial and, on the other hand,

1  the public's exceedingly and unprecedentedly strong interest in
2  a speedy trial here.  The defendant, formerly the senior-most
3  official in our federal government, is accused of historic
4  crimes: attempting to overturn the presidential election,
5  disenfranchise millions of Americans, and obstruct the peaceful
6  transfer of power.

7  There is an incredibly strong public interest in a jury's
8  prompt and full consideration of those claims in open court.
9  And there's also a strong public interest in a fair trial, which
10 means that we need to proceed to trial as soon as the defense
11 can be ready, reasonably, because on a near daily basis the
12 defendant posts on social media about this case.  He has
13 publicly disparaged witnesses, he has attacked the integrity of
14 the courts and of the citizens of the District of Columbia who
15 make up our jury pool, and this potentially prejudices the jury
16 pool.

17 So under the Speedy Trial Act, Your Honor, we need to find a
18 time for trial when -- as soon as the defense can reasonably be
19 ready.  The government's trial date estimate was an estimate of
20 when, based on our knowledge of the discovery, the public nature
21 of the evidence in this case, the pre-indictment litigation,
22 Mr. Lauro's experience and ability to prepare, and the
23 organization of the discovery, that was our estimate.  But the
24 government urges the Court to set the soonest possible trial
25 date when the Court believes that the defense can reasonably

1  be ready.

2          THE COURT:  Okay.  Thank you.

3      So I'm going to digress for a moment and talk about CIPA.

4  The parties agreed to hold a conference today on the

5  Classified Information Procedures Act, CIPA, to discuss the

6  small amount of classified information that may be subject to

7  discovery in this case.  Because such procedures might affect

8  the trial date and the parties' readiness, I think it might

9  make sense to discuss CIPA now, or we can wait till the end of

10  the hearing.  What's your preference?  Mr. Windom?

11          MR. WINDOM:  I think now makes sense, Your Honor.

12          THE COURT:  Mr. Lauro?

13          MR. LAURO:  Yes, Your Honor.  Mr. Blanche will take

14  care of that.

15          THE COURT:  All right.

16      So, as I understand it, CIPA does not create any additional

17  rights to discovery or disclosure but rather establishes

18  procedures for how and when certain procedures relating to

19  classified information will be handled during the discovery

20  process and the lead-up to trial.

21      The government filed a consent motion in what may be our

22  last joint unopposed filing -- such a nice beginning to the

23  case.  The government filed a consent motion to appoint a

24  classified information security officer pursuant to CIPA

25  Section 2, which was ECF No. 33, and an unopposed motion for a

protective order regarding classified materials pursuant to
CIPA Section 3, which was ECF No. 35.  I granted both motions
on August 22 and entered a sealed order designating the
classified information security officer, and that was ECF Nos.
36 and 37.

Now, CIPA Section 4 provides that the Court upon a
sufficient showing may authorize the United States to delete
specified items of classified information from documents to
be made available to the defendant through discovery under the
Federal Rules of Criminal Procedure, to substitute a summary
of the information for such classified documents, or to
substitute a statement admitting the relevant facts that
classified information would tend to prove.

Pursuant to the discovery process under Section 4, there
are three steps governing the handling of classified
information under Sections 5 and 6 of CIPA.

First, under Section 5, the defense must file a pretrial
notice precisely identifying the classified information they
want to use at trial; second, upon motion of the government,
the Court shall hold a hearing pursuant to Section 6(a) to
determine the use, relevance, and admissibility of the
proposed evidence; and third, following the Section 6(a)
hearing and formal findings of admissibility by the Court, the
government may move to substitute redacted versions of
classified documents for the originals or to prepare an

1    admission of certain relevant facts or summaries for

2    classified information that the Court has ruled admissible.

3         So, Mr. Windom, are you handling this?

4              MR. WINDOM:  Yes, Your Honor.

5              THE COURT:  The government has noted that it does not

6    anticipate introducing classified documents in its

7    case-in-chief.  Is this still the case?

8              MR. WINDOM:  Yes, ma'am.

9              THE COURT:  I realize this is dependent on the trial

10   date, but does the government have an estimated schedule for

11   producing classified information to the defense and/or moving

12   for deletion or substitution under Section 4?

13             MR. WINDOM:  Yes, ma'am.

14             THE COURT:  How much material are we talking about

15   here?

16             MR. WINDOM:  Sure.  So top line, whatever happens with

17   CIPA we don't anticipate will affect any trial date Your Honor

18   sets, whatever the date may be.

19        There are two things to talk about here.  First, there

20   is the limited amount of classified information that the

21   government is going to make available to the defense.  And

22   second is the CIPA Section 4 process.

23        With respect to the information that is going to be made

24   available to the defense, the universe of what we're talking

25   about is five to ten nonduplicative classified documents

totaling less than a hundred pages of material.  Those are the

documents.

    There's also a transcript.  The transcript will be about

125 pages long.  It's a transcript of a witness interview.  We

have already provided the relevant part of the transcript in a

nonclassified form.  In fairness, we are going to provide the

rest of the transcript as well.  That is in classification

review.  That will be provided to the defense as well.

    So in total, between the documents and the transcript,

we're talking about 225, 250 pages total.

            THE COURT:  Okay.

            MR. WINDOM:  This is information that the defense can

review as soon as it gets its final security clearance.

Mr. Blanche currently has an interim top secret clearance.  He

is allowed to review only a small part of the material at this

point.  We anticipate Mr. Blanche may have a better

understanding of when he'll get his final security clearance,

but we anticipate that will be fairly soon.  Within the next

few weeks is our best estimate.  That's not something we

control.

    As I said at the beginning, we do not anticipate introducing

classified information in our case-in-chief.  To the extent

that the defense reviews the material and wants to give notice

under CIPA Section 5 that they intend to use the material,

first of all, based on my knowledge and information, I don't

1    think they will do that.  If they do do that, we would

2    recommend a date for that CIPA 5 notice, a deadline for the

3    CIPA 5 notice of 30 days after Mr. Blanche gets his final

4    security clearance.  That would give him time to review the

5    material.

6        Mr. Lauro, my understanding, he does not have a security

7    clearance at this point, but there are ways -- to the extent

8    that Mr. Blanche needs to discuss the material with Mr. Lauro,

9    the government believes that there are ways to do that either

10   in a unclassified form or in a classified form available to

11   Mr. Lauro should he get an interim security clearance, which

12   is a much faster process than a final security clearance.

13       If the defense does move under Section 5 of CIPA, which

14   again we recommend 30 days after Mr. Blanche gets his final

15   clearance, the government would then be in a position to move

16   very quickly for a CIPA 6 hearing.

17            THE COURT:  I was going to ask you, how long do you

18   estimate you'd need for the Section 6(a) hearing?

19            MR. WINDOM:  I'll say top line two weeks to make the

20   motion.  It's somewhat dependent on which documents, if any,

21   which would then implicate which equity holders would be

22   involved that the defense wants notice.  That said, there's a

23   universe in which the government doesn't move for a CIPA 6

24   hearing.

25            THE COURT:  You said does not?

1    MR. WINDOM:  Correct.  There's a universe in which that

2    happens, in which the government does not move for a CIPA 6

3    hearing.

4         THE COURT:  Okay.

5         MR. WINDOM:  But I think, in fairness, you can set a

6    date two weeks after the CIPA 5 notice deadline for the

7    government to move under CIPA 6.

8         THE COURT:  And I assume that after the 6(a) hearing,

9    if there is one, the government will not need much time -- or

10   how much time will the government need to prepare redacted

11   versions?  Substitute redacted versions.

12        MR. WINDOM:  Sure.  Again, with the variable that it's

13   highly dependent on what the document is, we believe that that

14   can be accomplished very quickly, in a matter of weeks, and I

15   think it's fine if you want to put a two-week deadline on that

16   given the nature of the documents.

17        THE COURT:  All right.

18        MR. WINDOM:  That's with respect -- so that's the first

19   bucket of the information that the defense will be getting in

20   classified discovery.  CIPA 4 is separate.  The government

21   anticipates filing a motion under CIPA Section 4 which we will

22   request that the Court hear on an ex parte basis.  It involves

23   a limited amount of information for the Court to review on a

24   discrete issue.  And we anticipate, if Your Honor would like

25   to set a deadline for that, September 25, which is four weeks

away, is more than enough time.  If you want it to be sooner,
that will be --

THE COURT:  September 25 is fine.

MR. WINDOM:  Thank you, Your Honor.  And thereafter,
once we file that, then Your Honor can consider that in
whatever due course Your Honor believes appropriate.

THE COURT:  All right.  Mr. Blanche.  Good morning.

MR. BLANCHE:  Good morning, Your Honor.

THE COURT:  All right.  I realize, again, this is
dependent on the trial date.  But does the defense have an
estimated time -- obviously, you don't have your final
clearance yet, so it would depend on that -- by which it plans
to file its notice identifying the classified information it
plans to use?

MR. BLANCHE:  So, Your Honor, just as far as my
security clearance is concerned and also my counsel who is
here today, the process is ongoing, and I do not believe that
there's a lot of time left in the process, but it's completely
out of my control.

   In the case in the Southern District of Florida, there's
a tremendous amount of key events in September and October
around the CIPA discovery in that case.  So I anticipate
spending a fair amount of time between whenever I get a
security clearance and into October with the CIPA discovery in
that case.  My understanding from the government is that the

1    number of documents in this case is small.

2              THE COURT:  It's relatively small.

3              MR. BLANCHE:  The issue I have is -- about when we will

4    make Section 5 motions, if we make Section 5 motions at all,

5    is I would certainly have to speak about that with my counsel

6    who I don't believe has even interim clearance yet.

7              THE COURT:  Well, remember, at least according to

8    Mr. Windom, the government isn't even planning on using any

9    classified documents in its case-in-chief.  So this would sort

10   of be dependent on whether you wanted to introduce that

11   information.

12             MR. BLANCHE:  And even beyond that, there's other

13   potential litigation -- beyond just whether the government

14   chooses to use anything in their case-in-chief, there's

15   litigation that the defense can initiate under CIPA depending

16   on what the documents show, whether it's requests for

17   additional documents or for the government to do additional

18   searches for additional documents.  I don't know.  There may

19   not be any of that litigation, but I won't know that until I

20   review the documents.

21        So the only contention or issue I have with the schedule

22   proposed by the government is I think the triggering date for

23   a Section 5 filing should be 30 days after co-counsel gets

24   security clearance, not me.

25             THE COURT:  But why does that have anything to do with

1  you?  It's an ex parte filing they're proposing giving to me

2  by September 25.  Are we talking about the same thing?

3          MR. BLANCHE:  No, that's Section 4.

4          THE COURT:  Okay.

5          MR. BLANCHE:  That's the government, and that's fine.

6  The proposed date by the government for our motions was 30

7  days after --

8          THE COURT:  That's based on their proposed trial date,

9  though.  Right?

10          MR. BLANCHE:  I don't know what it's based on.  It's

11  just what they suggested.  My request would be that any

12  motions we need to file under CIPA, to the extent it's

13  triggered, it's triggered off of the date that Mr. Lauro and

14  his team receive security clearances.  It's not supposed to

15  take that long.  For example, I believe I started the process

16  in the Southern District of Florida about 45 days ago, and so

17  it's nearly complete.  My understanding, not from anybody

18  sitting at this table --

19          THE COURT:  Excuse me.  When did you get your interim

20  clearance?

21          MR. BLANCHE:  Oh, that's within a day or two.  It's

22  very quick.  However, Your Honor, my understanding is there's

23  not -- well, I don't want to speak to the documents.  But my

24  understanding is that the special counsel's office was able to

25  accelerate the process in the Florida case, and I'm assuming

1    they can do the same here.

2              THE COURT:  Oh, I'm sure they will try.

3              MR. BLANCHE:  They apparently have the ability.  So I

4    would just respectfully request, Your Honor -- I can certainly

5    look at the documents as soon as I have clearance, and I

6    appreciate the government making them available as soon as I

7    do have clearance, but that doesn't help my strategy and

8    whether we need to file Section 5 motions without counsel

9    being able to look at them.

10       So that would be my only adjustment.  The other proposed

11   dates for the Section 4 filing, I don't have an objection to

12   that.

13             THE COURT:  Okay.  Thank you.

14       All right.  Mr. Lauro, you've already touched on -- do

15   you want to respond, Mr. Windom?

16             MR. WINDOM:  Just briefly, Your Honor.

17             THE COURT:  Yes.

18             MR. WINDOM:  What I would propose is that the Court

19   keep that deadline for the CIPA 5 notice of 30 days after

20   Mr. Blanche gets his final clearance.  Based on what I believe

21   to be able to happen, if Mr. Blanche is able to review that

22   material, he may be able to make determinations on his own

23   with respect to notice, or he may be able to actually speak to

24   Mr. Lauro with an interim clearance regarding the nature of

25   the documents such that they can make a determination soon.

1    What I don't want to happen is for us to key things off of

2    a date which we cannot know as to when Mr. Lauro will get a

3    final clearance.  Maybe we're lucky, maybe that's only two

4    months, but then we're talking about three months from now is

5    when a CIPA 5 notice would be filed.

6        THE COURT:  I'm inclined to keep the schedule, and if

7    there's a delay in the clearance process, I'll adjust it on

8    motion of the parties.

9        MR. WINDOM:  Thank you, Your Honor.

10       THE COURT:  Now, motions schedule.  Mr. Lauro, you've

11   already talked about some of the motions you might file.  And

12   again, I won't hold you to this, but can you give me a sense

13   of what if any dispositive motions or motions requiring

14   significant briefing you intend to file?  You've mentioned the

15   executive immunity, you've mentioned selective prosecution.

16   What else are we talking about here?

17       MR. LAURO:  Thank you, Your Honor.  We'll have motions

18   addressed to each conspiracy that's alleged in the indictment

19   as well.

20       THE COURT:  What kind of motions are you talking about?

21       MR. LAURO:  Motions to dismiss based on the flawed

22   legal theory, and the fact that in our view this is a

23   political prosecution.  And as a result we're going to have to

24   raise that issue squarely with Your Honor and do it justice.

25   So we anticipate those motions to be filed.

1   My understanding is that the selective prosecution motion

2   may involve a request for an evidentiary hearing as well, and

3   I anticipate that the executive immunity argument will also

4   come with a motion to stay as well which we may be entitled to

5   under existing law.

6       So all of those are motions that we anticipate filing as

7   quickly as possible.  Needless to say, it's a significant

8   task.  We want to make sure we get all the issues before Your

9   Honor in a way that does justice to these important motions.

10          THE COURT:  All right.  Thank you.

11      Ms. Gaston, I'm assuming there may be in limine motions

12  from both sides, but does the government plan on filing any

13  other motions that will require a significant briefing

14  schedule?

15          MS. GASTON:  No, Your Honor.  We're thinking in limine

16  motions and then depending on Rule 17 subpoenas and such,

17  responding.

18          THE COURT:  All right.  I am going to take a very brief

19  recess, a few minutes, five or 10 minutes, and we'll reconvene

20  for the trial date.

21      (Recess from 11:14 a.m. to 11:20 a.m.)

22          THE COURT:  All right.  I understand all too well

23  the need for counsel to have enough time to investigate and

24  prepare for trial.  That need is even more compelling in a

25  case such as this where the defendant faces serious charges

carrying significant penalties, and where the government has
had ample time and resources to investigate and bring these
charges.

I take seriously the defense's request that Mr. Trump be
treated like any other defendant appearing before this court,
and I intend to do so. But I also want to point out that most
defendants do not receive this level of assembled, organized
and summarized discovery, as well as other concessions made
because of the historic nature of the case.

Nonetheless, the government's requested date of January 2,
2024, does not in my opinion give the defense enough time to
get ready for trial. Even with the considerable resources at
his disposal, Mr. Trump, who faces trial in several other
matters, needs more than five months to prepare.

On the other hand, the defense's proposed date of April
2026 is far beyond what is necessary. The offense giving rise
to this case occurred at the end of 2020 and the beginning of
2021. To propose trying this case over five years later risks
the real danger that witnesses may become unavailable or their
memories may fade. And while Mr. Trump has a right to time to
prepare, the public has a right to a prompt and efficient
resolution of this matter.

The defense cites to *Powell v. State of Alabama*, 287 U.S.
45 at 49, for the proposition that while prompt disposition of
criminal cases is to be commended and encouraged, a defendant

charged with a serious crime must not be stripped of his right
to have sufficient time to advise with counsel and prepare his
defense.

Quoting the case, the defense argues that scheduling a too
speedy trial is not to proceed promptly in the calm spirit of
regulated justice but to go forward with the haste of the mob.
In that landmark decision in *Powell*, which is also known as
the Scottsboro Boys case, the Supreme Court reversed the
convictions of several young black men for allegedly raping
two white women.

The court noted that after their arrest the defendants
were met at Scottsboro by a large crowd and that the attitude
of the community was one of great hostility. That's at 51.
The defendants' trials began six days after indictment. The
Supreme Court found that there was a clear denial of due
process because the trial court failed to give the defendants
reasonable time and opportunity to secure counsel and the
defendants were incapable of adequately making their own
defense. That's at 71.

This case, for any number of reasons, is profoundly
different from *Powell*. Mr. Trump is represented by a team of
zealous, experienced attorneys and has the resources necessary
to efficiently review the discovery and investigate, and, as
the government points out, a great deal of the discovery
provided has already been available to the defense or is

1   duplicative.

2       The grand jury investigating the events in this case was

3   convened in September of 2022, meaning that Mr. Trump has

4   known about the government's investigation for nearly a year.

5       I have seen many cases unduly delayed because a defendant

6   lacks adequate representation or cannot properly review

7   discovery because they are detained.  That is not the case

8   here.

9       Consequently, after considering the parties' briefs and

10  arguments, I find that a trial beginning on March 4, 2024,

11  would give the defense adequate time to prepare for trial

12  and ensure the public's interest in seeing this case resolved

13  in a timely manner.

14      I realize that Mr. Trump's criminal case in New York is

15  scheduled for trial on March 25.  I did speak briefly with

16  Judge Merchan to let him know that I was considering a date

17  that might overlap with his trial.

18      A trial start date of March 4, 2024, gives Mr. Trump

19  seven months between indictment and trial, which I believe

20  is sufficient time to advise with counsel and prepare his

21  defense.  Indeed, I have considered all of the relevant

22  factors under the Speedy Trial Act, many of which I've already

23  discussed.  This timeline does not move the case forward with

24  the haste of the mob.  The trial will start three years, one

25  month, and 27 days after the events of January 6, 2021.

The trial involving the Boston Marathon bombing began less than two years after the events. The trial involving Zacarias Moussaoui for his role in the September 11 attacks was set to begin one year after the attacks; but due to continuances, appeals, and voluminous discovery, it began roughly four years later.

My primary concern here, as it is in every case, is the interest of justice, and that I balance the defendant's right to adequately prepare with my responsibility to move this case along in the normal order. Accordingly, trial will commence on March 4, 2024, meaning jury selection will begin then. I will issue an order with a schedule for pretrial matters, including motions deadlines, status hearing, a pretrial conference, and other interim deadlines.

If the parties have conflicts or other issues with the schedule other than the trial date, you may file a motion to alter those dates after consulting with opposing counsel regarding alternative dates.

Do the parties have a proposed date for our next status hearing? Ms. Gaston, Mr. Lauro?

MR. LAURO: I don't, Your Honor.

THE COURT: Ms. Gaston?

MS. GASTON: No, Your Honor.

MR. LAURO: Your Honor, I do need to put on the record.

THE COURT: Yes. Go ahead.

1    MR. LAURO:  On behalf of President Trump, we will

2    certainly abide by Your Honor's ruling as we must, but we will

3    not be able to provide adequate representation to a client who

4    has been charged with serious offenses as a result of that

5    trial date.  The trial date will deny President Trump the

6    opportunity to have effective assistance of counsel in light

7    of the enormity of this case.

8        I feel I need to put that on the record so there's no doubt

9    that in our judgment that trial date is inconsistent with

10   President Trump's right to due process and his right to

11   effective assistance of counsel under the Sixth Amendment.

12       THE COURT:  I understand, and your objection is noted

13   for the record.

14       Does it make sense for us to have a status hearing -- to

15   set a date for a status hearing now, or why don't I issue a

16   minute order with a proposed pretrial schedule and then maybe

17   the parties can meet and confer and propose a status date.  Is

18   that agreeable to you, Mr. Lauro?

19       MR. LAURO:  I don't see any need for a status hearing.

20       THE COURT:  All right.  I'm sure we'll be back.  Okay.

21   I'll issue a minute order with the pretrial schedule.

22   Ms. Gaston?

23       MS. GASTON:  Your Honor, very briefly, one last matter.

24   In -- the government knows that in some cases in this district

25   attorneys have sent out polls to the general public in advance

1    of trial to gather material for change of venue motions.  I

2    believe Mr. Lauro has suggested in interviews both that the

3    defense might file such a motion and that they might conduct

4    some polling.

5         THE COURT:  By file such a motion, you mean a change of

6    venue motion?

7         MS. GASTON:  Yes, Your Honor.  Based on the wording of

8    the questions, the government has some concern about whether a

9    polling could affect the jury pool in the District, and so we

10   would just request that before either party does any such

11   polling, that the parties be allowed to brief the issue.

12        THE COURT:  Mr. Lauro?

13        MR. LAURO:  I'm not quite sure why that's necessary,

14   Your Honor, in light of fact that that is a core defense

15   function.

16        THE COURT:  Well, here's the problem I see.  The

17   District of Columbia is the site of the events at issue.

18   The citizens of the District of Columbia have a right -- an

19   interest in seeing that this matter is -- moves forward in a

20   fair manner.

21     I don't know whether you intend to file a motion to transfer

22   or what the grounds for such a motion to transfer would be, but

23   certainly based on statements that have been made outside of

24   this courtroom regarding the defense's view of the ability of

25   the citizens of the District of Columbia to provide a fair jury

1    pool, I'm watching carefully for any -- anything that might

2    affect that jury pool or poison that jury pool or in any way

3    affect the ability of the parties to select a fair jury in this

4    case.

5       So I guess I am concerned about what -- you know, if you file

6    a motion to transfer -- and you haven't, on one hand -- but are

7    doing polling on the other, that might affect the same jury pool

8    you're claiming is not fair, there's a problem.  And so I can't

9    tell you what pretrial -- you know -- what investigation you can

10   do or what information you can gather, but I am concerned that,

11   in terms of gauging the views of the venire, of the jury pool,

12   you may actually affect their ability to render a fair verdict

13   by virtue of the kinds of questions you're asking, because

14   questions can be phrased in all kinds of ways.

15      That's what I'm concerned about.  So I would ask -- well, are

16   you intending to conduct that kind of polling, first of all?

17         MR. LAURO:  We intended to address this issue as we get

18   closer to trial, and now in terms of the expedited trial

19   schedule, we'll likely need to do it sooner rather than later.

20   Those motions are typically done with the assistance of some

21   sort of public assessment of views and positions among a jury

22   pool generally.  I've never seen a court deny the opportunity

23   for defense counsel to do that in order to obtain a fair

24   trial.

25         THE COURT:  I'm not planning to restrict your ability

1    to do that.  But I do think it's fair to find out, for you to

2    let the Court know whether you're going to do that.

3         MR. LAURO:  Well, perhaps we could submit something *in*

4    *camera* to Your Honor if that issue does come up.  But I'm

5    certainly not going to share it with the United States

6    government in terms of what we're doing or the questions we're

7    asking.  I don't think that would be appropriate.

8         THE COURT:  I'm going to ask that if you intend to do

9    that kind of polling, that you notify the Court ex parte,

10   should you decide to do that, and then I'll consider it.

11   Ms. Gaston?

12        MS. GASTON:  Yes, Your Honor.  Our request was simply

13   that that polling not begin before we have an opportunity to

14   brief the issue.

15        THE COURT:  Well, there may not be an issue to brief.

16   It's going to be -- if there's a motion to change venue and

17   polling, those two things may be interconnected.  So let's not

18   get ahead of ourselves and find more motions and more briefing

19   that we need to do.  But I'll ask Mr. Lauro to notify the

20   Court, and it can be done ex parte, if and when the defense

21   decides to undertake such activities.

22        MS. GASTON:  Thank you, Your Honor.

23        THE COURT:  All right.  Thank you all.

24        (Proceedings adjourned at 11:32 a.m.)

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA**,


v.                                                          Criminal Action No. 23-cr-257 (TSC)

**DONALD J. TRUMP**,

            Defendant.

---

**PRETRIAL ORDER**

1.  **TRIAL.**  Trial in this matter will begin on **March 4, 2024**, at **9:30 a.m.** in Courtroom 9 unless otherwise specified.

2.  **PRE-TRIAL MOTIONS.**  All other pre-trial motions, excluding motions *in limine*, shall be filed on or before **October 9, 2023**.  Oppositions shall be due **October 23, 2023**.  Replies shall be due **November 6, 2023**.

3.  **FED. R. EVID. 404(b) NOTICE.**  No later than **December 4, 2023**, the government shall provide notice of evidence it intends to offer pursuant to Fed. R. Evid. 404(b).

4.  **MOTIONS *IN LIMINE*/SUPPRESSION MOTIONS.**  All motions *in limine* and motions to suppress statements or tangible things shall be filed shall be filed on, or before, **December 27, 2023**.  Oppositions shall be filed no later than **January 9, 2024**.  Replies shall be due **January 22, 2024**.  The court will schedule a hearing on the motion(s) as necessary.

5.  **VOIR DIRE/ PROPOSED JURY INSTRUCTIONS.**  Counsel shall jointly submit both a short narrative description of the case, to be read to the prospective jurors, and proposed voir dire questions on or before **January 15, 2024**.  By the same date, Counsel shall file proposed jury instructions and a proposed verdict form, jointly to the extent possible.  To the extent that the parties seek to use pattern jury instructions from the current version of the DC Redbook, it is sufficient simply to list the numbers of those instructions.  Special instructions

Page **1** of 3

**SA.157**

shall be submitted verbatim with citations to cases and other authorities to support each instruction.  Proposed instructions shall be filed on ECF.  The parties shall indicate (a) the instructions on which the parties agree; and (b) the instructions on which the parties disagree.

6. ***BRADY*** **AND** ***GIGLIO*** **OBLIGATIONS.**  The Government is under an ongoing obligation to promptly provide defense counsel any favorable or exculpatory information (*Brady*) as it becomes available, whether or not admissible in evidence.  *Brady* information must be disclosed on a rolling basis; "the duty to disclose is ongoing." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).  To the extent it has not already done so, the Government must disclose information that may be useful for impeachment or may otherwise affect the credibility of any Government witness (*Giglio*)—including *Lewis* material—on or before **February 12, 2024**.  *See United States v. Celis*, 608 F.3d 818, 835–36 (D.C. Cir. 2010).  The Government's *Giglio* obligations are also ongoing.

7. **EXPERT WITNESSES.**  The parties shall disclose any expert witnesses and file a brief description of each witness' area of expertise and expected testimony by **December 11, 2023**.

8. **EXHIBIT LISTS.**  The parties shall exchange lists of exhibits they intend to use in their cases in chief by **December 18, 2023**.  The parties shall file objections to exhibits by **January 3, 2024**.  Replies shall be due **January 9, 2024**.  All exhibits are to be marked in advance of trial and listed in order on the exhibit form obtained from the Courtroom Deputy Clerk.  The written list of exhibits must contain a brief description of each exhibit.

9. **WITNESS LISTS.**  The parties shall exchange lists of witnesses in their cases in chief by **February 19, 2024**.  On that same date, the Government shall also provide to the defense all *Giglio* material not previously provided pertaining to each witness on the list.  Counsel will not be absolutely bound by the witness lists or the sequence of witnesses on the list.

10. **JURY SELECTION.**  The court will discuss its jury selection procedures at a later status hearing.

Date: August 28, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**,

v.

**DONALD J. TRUMP**,

Defendant.

Civil Action No. 23-cv-257 (TSC)

**OPINION & ORDER**

Before the court are Defendant's Motion for Access to CIPA § 4 Filing and An

Adjournment of the CIPA § 5 Deadline, ECF No. 62 ("CIPA Motion"), and Motion for

Extension of Time to File Pretrial Motions, ECF No. 63 ("Extension Motion").  For the reasons

set forth below, the court will GRANT in part and DENY in part both Motions.

**A.  CIPA Motion**

The court turns first to the issues related to the Classified Information Procedures Act

(CIPA), which governs the access to and use of classified information in criminal proceedings.

In its CIPA Motion, the defense asks the court to:

> (1) order the Special Counsel's Office to file a redacted version of its CIPA § 4
> motion and a public brief justifying its redactions; (2) refrain from addressing the
> CIPA § 4 motion until President Trump has an opportunity to file procedural
> objections on October 11, 2023 and make any appropriate *ex parte* submission
> regarding his defense theories; and (3) adjourn the deadline for CIPA § 5 notice
> until three weeks after the Office complies with its disclosure obligations as to the
> entire defense team.

CIPA Motion at 9.  The court will grant the second request, but deny the first and third.

SA.160

First, the court will not require the government to file a redacted brief of its CIPA § 4 submission.  That submission is classified in its entirety, which justifies its sealing in full.[1]  And the defense cites no authority for the proposition that the court should—or even could—order the government to declassify any portion of it.  *Contra Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (The "authority to classify and control access to information bearing on national security . . . flows primarily from [the] constitutional investment of power in the President" in Article II, Section 2.); *New York Times v. Cent. Intel. Agency*, 965 F.3d 109, 123 (2d Cir. 2020) ("[T]he suggestion that courts can declassify information raises separation of powers concerns."); *United States v. Libby*, 429 F. Supp. 2d 46, 48 (D.D.C. 2006) ("Accordingly, the Court cannot preemptively constrain the government in any manner from making filings it deems appropriate, necessary, and permissible under Section 4.").  The government's entire CIPA § 4 submission will therefore remain under seal.

Second, the court will nonetheless permit the defense to file objections to the *ex parte* nature of the government's CIPA § 4 motion.  CIPA Motion at 2–3.  The D.C. Circuit has emphasized that in this context, "since the government is seeking to withhold classified information from the defendant," adversarial litigation over that information "would defeat the

---

[1] Whether evaluated under the First Amendment's limited right of access to documents in criminal cases, *see Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1 (1986), or the presumption of public access discussed in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), classified documents by and large qualify for sealing.  There is no historical tradition of access to them, and for good reason:  The well-established risks to national security created by the disclosure of classified materials generally outweigh any interest in making them public.  *See Dhiab v. Trump*, 852 F.3d 1087, 1096 (D.C. Cir. 2017) (concluding there is no "right under the First Amendment to receive properly classified security information filed in court" in a habeas proceeding); *id.* at 1098 ("The law of this circuit is that the need to 'guard against risks to national security interests' overcomes a common-law claim for access.") (quoting *Hubbard*, 650 F.2d at 315–16).  That is the case here.

very purpose of the discovery rules." *United States v. Mejia*, 448 F.3d 436, 457 & n.21 (D.C. Cir. 2006). Still, the court will allow the defense an opportunity to explain why it believes that CIPA's statutory text and Circuit precedent do not govern this case. The court will require any brief articulating such objections to be filed by October 11, 2023. The government may file any response to those objections by October 18, 2023.

Third, the court will not adjourn the initial CIPA § 5 notice deadline. During the August 28, 2023 hearing in this case, the court set that deadline for thirty days after defense counsel Mr. Blanche received finalized clearance to review the classified discovery shared by the government. Protective Order Hr'g Tr., ECF No. 38 at 42–51. Mr. Blanche, along with two additional attorneys and a paralegal, received final clearance and access to those materials on September 26, 2023. *See* ECF No. 65 at 4–5. That results in a CIPA § 5 notice deadline of October 26, 2023. The court is not persuaded that an indefinite extension of that deadline, as the defense requests, is warranted. Thirty days is sufficient time for Mr. Blanche and his team to review the relatively limited classified discovery at issue here, which totals fewer than one thousand pages. *See id.* at 5. If, as the defense posits, the government is later required to produce additional classified discovery, *see* CIPA Motion at 8–9, the defense may file a supplemental CIPA § 5 notice with respect to any of those additional materials within twenty days of receiving access to them.

### B.  Extension Motion

In its Extension Motion, the defense asks for the pretrial motions deadline of October 9, 2023 to be extended sixty days to December 8, 2023. "At any time before trial, the court may extend or reset the deadline for pretrial motions." Fed. R. Crim. P. 12(c)(2). The court's discretion to do so is broad. *See* Fed. R. Crim. P. 12 advisory committee's note to 2014 amendment; *Morris v. Slappy*, 461 U.S. 1, 11 (1983). The defense contends that it needs

additional time "to finalize several of its expected motions, including, for example, motions to dismiss relating to executive immunity, failure to state a claim, and improper conduct by the Special Counsel during the grand jury process and in charging decisions, motions for 17(c) subpoenas, potential motions to compel discovery, *etc*." Extension Motion at 3. The court will not grant the full sixty-day extension sought but will adjust the pretrial schedule to grant the defense some additional time to file certain motions.

Lengthy deadline extensions for the defense's anticipated dispositive motions—like motions to dismiss—are not warranted. If the court were to extend the briefing schedule for these motions by the requested sixty days, they would not be fully briefed until January 2024. In other words, what the defense anticipates will be "numerous novel and complex legal issues . . . of first impression," *id.* at 1, would not be fully presented to the court until fewer than three months before the scheduled trial date of March 4, 2023—the same three months in which the parties may dispute motions in limine, voir dire questions, jury instructions, and other pretrial matters. *See* Pretrial Order, ECF No. 39. Backloading the pretrial schedule to that degree will not serve the interests of justice. Moreover, such dispositive motions will by their nature turn on legal issues—such as the sufficiency of the government's pleadings—that the defense has had months to anticipate, research, and brief. *See United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015) (quoting Moore's Federal Practice § 612.02). The defense confirmed at the August 28, 2023 hearing that it had already begun work on those motions. Protective Order Hr'g Tr., ECF No. 38 at 33–36, 51–52. In fact, the defense filed its Motion to Dismiss Indictment Based on Presidential Immunity on October 5, 2023, well ahead of the October 9 deadline. ECF No. 74. Consequently, the court will grant a two-week extension of the dispositive motions deadline.

The court will grant additional time for the filing of Rule 17(c) motions and motions to compel.  Unlike the dispositive motions discussed above, these motions will deal primarily with evidentiary rather than legal issues.  As such, some of these motions—and the defense's arguments in support of them—may arise from the defense's ongoing review of the discovery materials.  The court has recognized that the discovery materials in this case are well-organized but significant, and additional time to review them may be useful to the defense as it considers motions related to the acquisition of evidence.  Protective Order Hr'g Tr., ECF No. 38 at 17–18, 53.  But, in the interests of justice, the court must weigh that utility against the disadvantages of backloading the pretrial schedule.  Accordingly, the court will grant a one-month extension of the deadline to file Rule 17(c) motions and motions to compel.

## C.  <u>Conclusion</u>

For the reasons stated above, Defendant's Motion for Access to CIPA § 4 Filing and An Adjournment of the CIPA § 5 Deadline, ECF No. 62, is hereby GRANTED in part and DENIED in part.  The court will not require the government to publicly docket a partially redacted version of its CIPA § 4 submission.  The defense may file a brief objecting to the *ex parte* nature of the government's CIPA § 4 submission by October 11, 2023, and the government may file a response to that brief by October 18, 2023.  The deadline for the defense's CIPA § 5 notice remains October 26, 2023, but the defense may file supplemental notices with respect to any additional classified discovery it receives within twenty days of receiving access to it.

Likewise, Defendant's Motion for Extension of Time to File Pretrial Motions, ECF No. 63, is hereby GRANTED in part and DENIED in part.  The court's Pretrial Order, ECF No. 39, is AMENDED as follows with respect to the pre-trial motions deadlines set forth in its second paragraph.  Rule 17(c) motions and motions to compel shall be filed by November 9, 2023; any oppositions to those motions shall be filed by November 24, 2023; and any replies in support of

those motions shall be filed by December 1, 2023.  If there are multiple such motions, then to the extent possible, the motions, oppositions, and replies shall be filed in omnibus.  All other pretrial motions, including motions to dismiss and other dispositive motions (but excluding motions *in limine* and suppression motions as set forth in paragraph five of the Pretrial Order), shall be filed by October 23, 2023; any opposition shall be filed within fourteen days of the motion's filing; and any reply shall be filed within ten days of the opposition's filing.

Date: October 6, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**<u>ORDER</u>**

Having considered the parties' briefs identifying certain jury procedures that both parties have agreed upon, and for good cause shown, the Court orders as follows:

1.      The Court will use a written questionnaire in advance of in-person jury selection. The Government will prepare a written questionnaire for distribution to prospective jurors and meet and confer with defense counsel regarding the questionnaire before submitting it for Court approval on _____January 9, 2024_____ .  To the extent the parties do not agree on any question, the Government, at the time it submits the proposed questionnaire, shall also submit a joint filing identifying the disputed language and succinctly stating the parties' respective positions.  After review and approval by the Court, the questionnaire will be distributed to prospective jurors summoned to complete it at the courthouse on _____February 9, 2024_____ .

2.      Although the parties may conduct open-source research regarding prospective jurors, they may not do so in any way that involves direct contact or communication with a prospective juror, nor may the parties use non-public databases for juror research.  The parties must ensure that anyone permitted access to sensitive juror information understands that he cannot publicly disclose the information, and no party may provide jurors' identifying information to any

other entity (e.g., the defendant's campaign) that is not part of the defense team or Government team assisting with jury selection.

3.    No party may disclose, either in open court or outside of court, prospective jurors' names or any identifying information.

Accordingly, the government's Motion for Fair and Protective Jury Procedures, ECF No. 97, is hereby **GRANTED**.

Date: November 2, 2023

*Tanya S. Chutkan*
_____
HON. TANYA S. CHUTKAN
DISTRICT COURT JUDGE

**SA.167**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO STRIKE INFLAMMATORY ALLEGATIONS FROM THE INDICTMENT**

On January 6, 2021, "[l]ives were lost; blood was shed; portions of the Capitol building were badly damaged; and the lives of members of the House and Senate, as well as aides, staffers, and others who were working in the building, were endangered." *Trump v. Thompson*, 20 F.4th 10, 35-36 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022). Yet publicly, the defendant has promoted and extolled the events of that day. While the violent attack was ongoing, the defendant told rioters that they were "very special" and that "we love you." In the years since, he has championed rioters as "great patriots" and proclaimed January 6 "a beautiful day." In this case, though, the defendant seeks to distance himself, moving to strike allegations in the indictment related to "the actions at the Capitol on January 6, 2021." ECF No. 115 at 1. The Court should recognize the defendant's motion for what it is: a meritless effort to evade the indictment's clear allegations that the defendant is responsible for the events at the Capitol on January 6. Indeed, that day was the culmination of the defendant's criminal conspiracies to overturn the legitimate results of the presidential election, when the defendant directed a large and angry crowd—one that he had summoned to Washington, D.C., and fueled with knowingly false claims of election fraud—to the Capitol to obstruct the congressional certification proceeding. When his supporters did so, including through violence, the defendant did not try to stop them; instead, he encouraged

them and attempted to leverage their actions by further obstructing the certification.  Contrary to the defendant's claims, then, the indictment's allegations related to the actions at the Capitol are relevant and probative evidence of the defendant's conduct and intent, and they are neither prejudicial nor inflammatory.  His motion to strike them from the indictment must be denied.

## I.     Background

On August 1, 2023, the grand jury returned an indictment charging the defendant with perpetrating three criminal conspiracies that targeted the collection, counting, and certification of the 2020 presidential election results, and with obstructing, and attempting to obstruct, the congressional certification of those results, which took place at the United States Capitol on January 6, 2021.  ECF No. 1.  The congressional certification on January 6 was central to the defendant's criminal conspiracies and his obstruction effort, and the indictment makes clear that he bears responsibility for the actions at the Capitol on that day.

First, in the months after the 2020 presidential election, the defendant cultivated widespread anger, resentment, and mistrust of the election results by spreading knowingly false claims of election fraud.  *Id.* at ¶¶ 4, 87.  In the weeks leading up to January 6, the defendant repeatedly urged his supporters to travel to Washington, D.C., on the day of the congressional certification, telling them, "Be there, will be wild!"  *Id.* at ¶¶ 87, 90, 96.

Then, on January 6, the defendant used multiple means to attempt to obstruct the congressional certification, including by directing an angry and violent crowd to the Capitol.  *Id.* at ¶¶ 10d, 10e.  In particular, the indictment alleges that, on the morning of the certification, the defendant reiterated knowingly false claims of election fraud and gave his supporters false hope that the Vice President could and might still change the election outcome to favor the defendant.  *Id.* at ¶ 104.  The defendant then exhorted his supporters to "fight like hell" and go to the Capitol.

*Id.* Following this instruction, thousands of people marched to the Capitol both during and after the defendant's speech. *Id.* at ¶ 105.

As the crowd at the Capitol—which included supporters the defendant had called to the city and directed to the Capitol—broke through barriers, violently attacked law enforcement officers attempting to secure the building, and broke into the building, the defendant refused to take action to calm the violence. *Id.* at ¶¶ 107, 110.  Instead, he sought to further stoke anger, which he had initially cultivated, against the Vice President.  After the defendant issued a tweet that the Vice President "didn't have the courage to do what should have been done," members of the crowd responded,  chanting phrases such as "Hang Mike Pence!"; "Where is Pence? Bring him out!"; and "Traitor Pence!"  *Id.* at ¶¶ 106, 111, 113.

Finally, as the attack on the Capitol halted the congressional certification for several hours, the defendant and his co-conspirators sought to exploit the delay to further obstruct the proceeding. *Id.* at ¶¶ 119-121.

## II.    Applicable Law

Although Federal Rule of Criminal Procedure 7(d) allows that a court may, upon a defendant's motion, "strike surplusage from the indictment or information," such motions "are highly disfavored in this Circuit." *United States v. Watt*, 911 F. Supp. 538, 554 (D.D.C. 1995). *See also United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998) (the standard under Rule 7(d) "has been strictly construed against striking surplusage") (quoting *United States v. Jordan*, 626 F.2d 928, 930 n.1 (D.C. Cir. 1980)).  A court's discretion whether to strike allegations as surplusage is thus "narrow" in scope. *United States v. Oaker*, 111 F.3d 146, 157 (D.C. Cir. 1997).

The defendant "must overcome a most severe burden to move this court to order language from the indictment stricken." *Watt*, 911 F. Supp. at 554.  He must satisfy a trio of requirements,

**SA.170**

showing "that the allegations are [1] not relevant to the charge and are [2] inflammatory and [3] prejudicial." *Rezaq*, 134 F.3d at 1134 (quoting 1 Charles Alan Wright, *Federal Practice and Procedure* § 127, at 426 (1982)).  This test is conjunctive: a shortcoming on any prong fails to meet the standard.  *See United States v. Trie*, 21 F. Supp. 2d 7, 20 (D.D.C. 1998) ("On the other hand, *relevant* language generally 'should not be stricken even if it may be prejudicial.'" (emphasis in original) (quoting *United States v. Weinberger*, No. 92-cr-235, 1992 WL 294877, at *7 (D.D.C. Sept. 29, 1992)); *United States v. Hedgepeth*, 434 F.3d 609, 612-13 (3d Cir. 2006) ("Logic demands the conjunctive standard: information that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand and information that is irrelevant need not be struck if there is no evidence that the defendant was prejudiced by its inclusion." (citing cases)).  For instance, "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989) (internal citations omitted).  As a result, "only rarely has surplusage been ordered stricken." *Watt*, 911 F. Supp. at 554 (quoting Wright, § 127).

## III.   Argument

In his motion, the defendant seeks to strike language from the indictment—including one of the charged manner and means by which the grand jury found the defendant furthered his criminal conspiracies—related to actions at the Capitol on January 6, 2021.  ECF No. 115 at 1.  But the defendant's argument to strike "surplusage" from the indictment fails because what he seeks to strike is not surplusage at all; rather, it is relevant evidence of his criminal attempts to overturn the results of the election through, among other means, directing an angry crowd to the Capitol to disrupt the certification proceeding.  Evidence of the actions at the Capitol is also

**SA.171**

relevant and probative of the defendant's motive and intent before, on, and after January 6—the day that each of the defendant's criminal conspiracies came to a head—and provides necessary context for the criminal conduct with which he is charged.  Finally, the indictment's recitation of the events at the Capitol on January 6 is neither inflammatory nor prejudicial.  Because the defendant's motion fails to meet each prong of the test for striking language from an indictment, his motion should be denied.

### A.     No Prejudice Can Result from the Indictment Language

This Court, consistent with others in this District, does not provide the jury a copy of the indictment.  As a result, no prejudice can possibly result from any charging language.  *See Hedgepeth*, 434 F.3d at 613 (defendant's prejudice claim fails where jury was not shown the indictment, "as information never revealed to the jury could not have prejudiced its deliberations"); *cf. Trie*, 21 F. Supp. 2d at 19 (recognizing possibility of prejudice from indictment allegations stemming from the court's practice of providing the jury with the indictment).  The Court should deny the defendant's motion on this basis alone.

### B.     The Defendant Fails to Establish Any Basis to Strike Language from the Indictment about the January 6 Attack on the Capitol

The defendant's motion is premised on the disingenuous claim that he is not charged with "responsibility for the actions at the Capitol on January 6, 2021."  ECF No. 115 at 1.  But the indictment clearly alleges, and the Government will prove at trial, that the defendant bears such responsibility, and the evidence supporting these allegations in the indictment is relevant and probative of his conduct and intent.

#### 1.     Information about the January 6 attack on the Capitol is relevant to all of the charges against the defendant

The defendant makes only a cursory and conclusory attempt to claim that the indictment's allegations regarding actions at the Capitol on January 6 are not relevant, ECF No. 115 at 2-4,

**SA.172**

because he knows that they are.  Indeed, when it suits his purposes, the defendant concedes in other filings that the events at the Capitol on January 6 are central to this case.  In his motion to dismiss the indictment on grounds of presidential immunity, for instance, the defendant claimed immunity from prosecution because "[i]n January 2021, he was impeached on charges arising from the same course of conduct at issue in the indictment," ECF No. 74 at 19—including inciting followers to take "lawless action at the Capitol"[1]—and was acquitted.  When seeking leave to issue Rule 17(c) subpoenas for material from the House Select Committee to Investigate the January 6th Attack on the United States Capitol, the defendant acknowledged that the indictment "directly alleges that [the defendant] 'directed [supporters] to the Capitol to obstruct the certification proceeding,'" and argued that any Select Committee records of his and others' knowledge and intent related to actions at the Capitol on January 6 "is plainly relevant."  ECF No. 99 at 11 (quoting ECF No. 1 at ¶ 10(d)).  The defendant claimed that without the requested documents (which, as the Government explained in its response, he already has, *see* ECF No. 119), he could not "possibly have a fair trial."  *Id.* at 10.

Thus, as the defendant has acknowledged in his other filings, the charged allegations that the defendant seeks to strike are plainly relevant to all the counts in the indictment, which alleges that the defendant engaged in a multipronged endeavor to overturn the 2020 presidential election, disenfranchise voters, and obstruct the transfer of presidential power.  As various earlier efforts in furtherance of his conspiracies failed, the defendant and his co-conspirators turned their focus to the congressional certification on January 6.  Ultimately, the defendant's three conspiracies culminated and converged when, on January 6, the defendant attempted to obstruct and prevent

---

[1] H. RES. 24 (117th Cong. 1st Sess.) at 3, *available at* https://www.congress.gov/bill/117th-congress/house-resolution/24/text.

**SA.173**

the congressional certification at the Capitol.  One of the ways that the defendant did so, as alleged in the indictment, was to direct an angry crowd of his supporters to the Capitol and to continue to stoke their anger while they were rioting and obstructing the certification.

At trial, the Government will prove these allegations with evidence that the defendant's supporters took obstructive actions at the Capitol at the defendant's direction and on his behalf. This evidence will include video evidence demonstrating that on the morning of January 6, the defendant encouraged the crowd to go to the Capitol throughout his speech, giving the earliest such instruction roughly 15 minutes into his remarks; testimony, video, photographic, and geolocation evidence establishing that many of the defendant's supporters responded to his direction and moved from his speech at the Ellipse to the Capitol; and testimony, video, and photographic evidence that specific individuals who were at the Ellipse when the defendant exhorted them to "fight" at the Capitol then violently attacked law enforcement and breached the Capitol.

The indictment also alleges, and the Government will prove at trial, that the defendant used the angry crowd at the Capitol as a tool in his pressure campaign on the Vice President and to obstruct the congressional certification.  Through testimony and video evidence, the Government will establish that rioters were singularly focused on entering the Capitol building, and once inside sought out where lawmakers were conducting the certification proceeding and where the electoral votes were being counted.  And in particular, the Government will establish through testimony and video evidence that after the defendant repeatedly and publicly pressured and attacked the Vice President, the rioting crowd at the Capitol turned their anger toward the Vice President when they learned he would not halt the certification, asking where the Vice President was and chanting that they would hang him.

**SA.174**

Relevancy is a low bar. *See United States v. Latney*, 108 F.3d 1446, 1449 (D.C. Cir. 1997) ("So long as the evidence makes a fact of consequence more or less likely, it is relevant."). Thus, courts in this District have rejected challenges, like the defendant's, to the relevance of evidence of the attack on the Capitol on January 6. *See United States v. Stedman*, No. 21-cr-383, 2023 WL 3303818, at *2 (D.D.C. May 8, 2023) (citing cases). In multiple cases involving January 6 offenders charged with obstructing the certification proceeding in violation of Section 1512(c), courts have determined that relevant evidence to prove the obstruction includes evidence of others' conduct at the Capitol. The court in *Stedman*, for instance, considered a defendant's motion to exclude, as irrelevant and unduly prejudicial, evidence of events and conduct on January 6 for which he was not present and not personally aware. *Id.* at *1. Finding the defendant's motion "untenable" under evidentiary relevance standards, *id.*, the court noted that "[p]lainly, others' actions on January 6 at the Capitol, in combination with defendant's own actions, are relevant" to whether the certification proceeding was obstructed, *id.* at 2. The court ruled similarly in *United States v. Carpenter*, No. 21-cr-305, 2023 WL 1860978 (D.D.C. Feb. 9, 2023). Considering a defendant's request to exclude "general" evidence about events of January 6 in which she did not take part, the *Carpenter* court denied the request on the grounds that such evidence "would be highly relevant" to prove, as necessary for a violation of Section 1512(c), "that there was an official proceeding, and that such proceeding was in fact disrupted." *Id.* at *3; *see also United States v. Bennett*, No. 21-cr-312, 2023 WL 6460026, at *5 (D.D.C. Oct. 4, 2023) (finding that "general evidence of the events of January 6 is probative of multiple elements of the crimes with which" that defendant was charged, including Section 1512, and "[b]ackground video evidence is plainly probative of whether there was an official proceeding and whether such proceeding was in fact disrupted").

Likewise, the defendant here is charged with four related criminal counts, including conspiring to obstruct and obstructing the official certification proceeding on January 6. Essential to those charges are factual allegations and evidence that the proceeding was in fact impeded—namely, by a large crowd, including individuals whom the defendant had directed at the Capitol, that violently advanced on the Capitol building to create "a catastrophic security risk requiring the evacuation" of lawmakers (including the Vice President) and delaying the certification by several hours. *Stedman*, 2023 WL 3303818, at *1.

### 2. Information about the events of the January 6 attack on the Capitol helps show the defendant's motive and intent

The events at the Capitol on January 6 are additionally relevant to proving the defendant's intent and motive. *United States v. Espy*, 23 F. Supp. 2d 1, 7 (D.D.C. 1998) (finding allegations that "provide the jury information on issues of intent and motivation" were relevant and would not be struck); *Trie*, 21 F. Supp. 2d at 19 ("The government is not precluded from including information in the indictment used to . . . establish the defendant's state of mind, intent and motives." (cleaned up)). The four charges against the defendant variously require proof that he acted knowingly and corruptly in his efforts to overturn the election results, and the defendant's actions before, during, and after the riot at the Capitol are powerful and probative evidence of his motive and intent for each conspiracy and for the obstruction charge.

As set forth in the indictment, on the morning of January 6, the defendant knew that the crowd that he had gathered in Washington for the certification "was going to be 'angry.'" ECF No. 1 at ¶ 98. Despite this knowledge—or perhaps because of it—in his remarks to supporters, the defendant told knowing lies about the Vice President's role in the congressional certification, stoked the crowd's anger, and directed them to march to the Capitol and "fight." *Id*. at ¶ 104.

**SA.176**

Next, the Government will prove that the defendant's knowing and corrupt intent is clear from his actions, and purposeful inaction, during the attack on the Capitol. *Cf. United States v. Griffith*, No. 21-cr-244-2, 2023 WL 2043223, at *3 (D.D.C. Feb. 16, 2023) (in prosecution of January 6 offender, conduct by others and events at the Capitol other than defendant's location were relevant to defendant's mental state); *United States v. MacAndrew*, No. 21-cr-730, 2022 WL 17961247, at *3 (D.D.C. Dec. 27, 2022) ("Statements by political leaders and the conduct and statements made by the mob surrounding Defendant both bear on Defendant's mental state at the time of the charged offenses.").  Through testimony and video evidence, the Government will show that following his public remarks, the defendant returned to the White House and watched hours of television—including footage of crowds marching from his Ellipse event to the Capitol and swarming Capitol grounds, and news reporting of law enforcement injuries, threats inside the building, and lawmakers in hiding.  Testimony will establish that the defendant was informed of, though indifferent to, the fact that the Vice President had to be evacuated from the Senate to a secure location.  Although the defendant knew that the certification proceedings had been interrupted and suspended, he rejected multiple entreaties to calm the rioters and instead provoked them by publicly attacking the Vice President.  ECF No. 1 at ¶111.  And instead of decrying the rioters' violence, he embraced them, issuing a video message telling them that they were "very special" and that "we love you."  *Id*. at ¶ 116.  Finally, while the violent riot effectively suspended the proceedings over which the Vice President had been presiding, the defendant and his co-conspirators sought to shore up efforts to overturn the election by securing further delay through knowing lies.  *Id.* at ¶¶ 119, 120.

The Government will further establish the defendant's criminal intent by showing that, in the years since January 6, despite his knowledge of the violent actions at the Capitol, the defendant

- 10 -

**SA.177**

has publicly praised and defended rioters and their conduct. There is a robust public record of how rioters' actions at the Capitol on January 6 were extraordinarily violent and destructive, including attacks on law enforcement officers with flag poles, tasers, bear spray, and stolen riot shields and batons. One officer who was dragged into the crowd endured a brutal beating while members of the crowd reportedly yelled, "Kill him with his own gun!" Terrified lawmakers and staff hid in various places inside the building, and many were evacuated. Despite this, the defendant has never wavered in his support of January 6 offenders. For instance, the Government will introduce at trial the defendant's own statements in the years since January 6 proclaiming it "a beautiful day" and calling rioters "patriots," many of whom he "plan[s] to pardon."[2] The Government will also introduce evidence of the defendant's public support for and association with the "January 6 Choir," a group of particularly violent January 6 defendants detained at the District of Columbia jail.[3] The defendant's decision to repeatedly stand behind January 6 rioters and their cause is relevant to the jury's determination of whether he intended the actions at the Capitol that day.

The defendant's actions in advance of, during, and following the riot at the Capitol demonstrate that he did not act unwittingly or in good faith. Information about the actions at the

---

[2] *See, e.g.*, Fox News, Sunday Morning Futures (July 12, 2021), https://www.foxnews.com/ transcript/sunday-morning-futures-on-trumps-big-tech-lawsuit-us-and-china-relations; Trump Remarks at Faith & Freedom Conference (June 17, 2022), https://www.c-span.org/video/?521049-1/pres-trump-speaks-investigation-faith-freedom-conference; CNN Town Hall (May 11, 2023), https://www.cnn.com/2023/05/11/politics/transcript-cnn-town-hall-trump/index.html.

[3] The defendant began a campaign rally in Waco, Texas, on March 25, 2023, by playing a recording of the Star-Spangled Banner by the January 6 Choir. Of the January 6 Choir, the defendant told the crowd, "[O]ur people love those people, they love those people." *See* C-SPAN at 2:44, https://www.c-span.org/video/?526860-1/president-trump-holds-rally-waco-texas. The January 6 Choir includes defendants who assaulted law enforcement officers on January 6 and one who used chemical spray on a Capitol Police officer who died the next day. S*ee* Washington Post, Behind Trump's Musical Tribute to Some of the Most Violent Jan. 6 Rioters (May 7, 2023), https://www.washingtonpost.com/investigations/interactive/2023/trump-j6-prison-choir/.

Capitol—of which the defendant was well aware—are therefore relevant to proving the defendant's motive and intent through his statements, actions, and inaction on and regarding January 6.

**3.      Information about the events of the January 6 attack on the Capitol provides necessary context for all the charged conduct**

The information that the defendant asks to strike also places his charged conduct in context. *See Watt*, 911 F. Supp. at 554 (denying motion to strike indictment's introductory language that "provides the background necessary for a jury to understand the full scope of defendant's activities, and to place defendant's conduct in the appropriate context"); *United States v. Poindexter*, 725 F. Supp. 13, 37 (D.D.C. 1989) (denying request to strike background paragraphs that were relevant to jury's understanding of charged conduct).  Details about the actions of the crowd at the Capitol explain events that the defendant set in motion.  The defendant sowed election mistrust, beckoned supporters to his rally on January 6, hung the hopes of those "angry" supporters on the Vice President, and directed them to the Capitol where the Vice President was presiding over the certification.  Those supporters, in turn, followed the defendant's instruction to march to the Capitol, turned against the Vice President when he did not halt the electoral vote count, and contributed to the immense and violent crowd that breached the Capitol building, requiring suspension of the certification proceedings.  *See Stedman*, 2023 WL 3303818, at *1 (describing crowd's effect on delaying certification proceedings).  Such information is essential to understand how the certification proceeding on January 6 was interrupted and suspended, consistent with the object of the defendant's criminal conspiracies and with his efforts to obstruct those very proceedings.  *Id.* ("General evidence about the events on January 6—even if defendant did not personally observe all of the conduct engaged in by others in multiple parts of the Capitol Building

- 12 -

**SA.179**

and restricted grounds—assists the jury in better understanding the parties' actions that day and thus the alleged criminal conduct of defendant.").

C.     **Information about the January 6 Attack on the Capitol is Not Inflammatory or Unduly Prejudicial**

The defendant further characterizes the language he seeks to strike as "highly prejudicial and inflammatory."  ECF No. 115 at 5.  To the contrary, the indictment's discussion of the actions at the Capitol on January 6, far from being "designed to inflame the passions or prejudices of the jury," *id.* at 4 (citation omitted), is accurate.

The indictment states that members of the crowd "broke through barriers" and "advanced on the building, including by violently attacking law enforcement officers," ECF No. 1 at ¶ 107, and that after this "violent advancement" the crowd "broke into" or "breached" the Capitol building, *id.* at ¶¶ 109, 110.  It quotes various members of the crowd whose statements echoed the defendant's earlier criticisms of his Vice President.  *Id.* at ¶ 113.  Unlike the cases cited by the defendant, ECF No. 115 at 4-5, the indictment does not name uncharged crimes, suggest the defendant committed uncharged crimes, or imply that others have found the defendant culpable for the charged conduct.  *See United States v. Singhal*, 876 F. Supp. 2d 82, 103 (D.D.C. 2012) (striking indictment reference to company "insider trading" policies, where defendants were not charged with insider trading and obligations under the policy could not give rise to criminal culpability); *United States v. Hubbard*, 474 F. Supp. 64, 83 (D.D.C. 1979) (striking, without further analysis, language about an unrelated offense not substantively charged that "may be prejudicial"); *Poindexter*, 725 F. Supp. 13, 36 (declining to strike properly descriptive and neutral terms, but striking information suggesting that the defendant had already been found at fault for the charged conduct).

That the indictment's factual recitation includes probative evidence that demonstrates the

**SA.180**

defendant's responsibility for the violence of January 6 is no cause to strike.  Because the defendant is alleged to have committed conspiracies and obstruction that included encouraging and capitalizing upon violence to further his crimes, the indictment's accurate factual recitation of that obstruction and violence is not unfairly prejudicial.  *See United States v. Roberson*, 581 F. Supp. 3d 65, 75-76 (D.D.C. 2022) ("To be sure, evidence that depicts a defendant as a pedophile could indeed stigmatize him in the eyes of the jury.  But in a prosecution for distribution of child pornography, such 'prejudice' can hardly be characterized as 'unfair.'").  There is no basis to exclude highly probative evidence that does not lead the jury to improper considerations.  *See United States v. Looking Cloud*, 419 F.3d 781, 785 (8th Cir. 2005) ("Evidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning."); *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998) ("[D]amage to a defendant's case is not a basis for excluding probative evidence.  And for good reason.  Evidence that is highly probative invariably will be prejudicial to the defense."); *United States v. Wilkins*, 538 F. Supp. 3d 49, 73 (D.D.C. 2021) (prejudice inherent in evidence is not unfair when it "stems from the legitimate probative force of the evidence and is directly related to the central question in this case").  The Court should not strike language from the indictment simply because its accurate description of the defendant's crimes tends to show guilt.

The defendant also complains that information about events at the Capitol should be struck from the indictment because those events are a "hot topic" about which the public has "high awareness" and "strong views[.]"  ECF No. 115 at 4-5.  Absent a showing—which the defendant has not made—that the information is irrelevant, inflammatory, and prejudicial, public knowledge of the attack on the Capitol is insufficient reason to strike language from the indictment.  *Cf. United States v. Brock*, 628 F. Supp. 3d 85, 94 (D.D.C. 2022) ("To show prejudice, a defendant must show

**SA.181**

more than juror familiarity with the case, or even a preliminary opinion of its merits."), *aff'd*, 2023 WL 3671002 (D.C. Cir. May 25, 2023).   At any rate, and as with any trial, "high awareness" or "strong views" that might render potential jurors unable to fairly hear evidence and decide the case can be determined and assessed using juror questionnaires, which the Court will use (ECF No. 130), and thorough voir dire.   *Brock*, 628 F. Supp. 3d at 98 ("[A] vigorous voir dire should suffice to root out any bias in individual jurors.").   Indeed, "multiple other January 6th cases have proceeded to jury trials . . . in which voir dire has been successful in identifying unbiased jurors." *United States v. Rhodes*, 610 F. Supp. 3d 29, 59 (D.D.C. 2022).

## IV.   Conclusion

The allegations in the indictment are not unduly prejudicial or inflammatory.   In fact, evidence of the attack at the Capitol on January 6 is powerful and probative evidence of the defendant's conduct, motive, and intent.   The Court should deny the defendant's motion.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    /s/Molly Gaston_____
       Molly Gaston
       Thomas P. Windom
       Senior Assistant Special Counsels
       950 Pennsylvania Avenue NW
       Room B-206
       Washington, D.C. 20530

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA**,

v.

**DONALD J. TRUMP**,

Defendant.

Criminal Action No. 23-257 (TSC)

---

<u>**OPINION AND ORDER**</u>

The court previously ordered that motions to compel and motions for Rule 17(c) subpoenas would be due on November 9, 2023.  *See* Opinion and Order, ECF No. 82.  Defendant now seeks to extend those deadlines.  Motion for Extension of Time to File Pretrial Motions Related to Discovery and Subpoenas, ECF No. 129 ("Motion").  Specifically, Defendant requests (1) that motions for Rule 17(c) subpoenas be due February 9, 2024; and (2) that motions to compel be due on a rolling basis, within ten days of the parties meeting and conferring with respect to discovery requests as they arise, based on "discovery the prosecution has not yet produced, or which President Trump has not currently reviewed."  Motion at 1.  "At any time before trial, the court may extend or reset the deadline for pretrial motions."  Fed. R. Crim. P. 12(c)(2).  The court's discretion to do so is broad.  *See* Fed. R. Crim. P. 12 advisory committee's note to 2014 amendment; *cf. Morris v. Slappy*, 461 U.S. 1, 11 (1983).  The court will GRANT in part and DENY in part the Motion.

Defendant offers several arguments in support of his Motion.  First, he argues that the government's discovery production is not well organized, citing the fact that the emails therein are not compiled with their attachments and replies.  Motion at 3–4.  Second, he argues that the discovery is voluminous and continues to be provided on a rolling basis, making it difficult if not

SA.183

impossible to raise motions before the current deadline.  *Id.* at 4–5.  And third, he asserts that allowing later Rule 17(c) subpoenas will be more efficient than seeking the same documents during trial.  *Id.* at 5–6.  Defendant also repeats his view that additional time is needed to preserve his rights to due process and effective assistance of counsel.  *Id.* at 6–7.

Most of those arguments are unpersuasive.  First, the government points out that the sole organizational defect cited by the defense was actually a best practice—rather than compiling the email materials themselves, the government provided those materials in a format that would easily allow the defense to compile them in their preferred manner, *see* Opp'n to Motion, ECF No. 137, at 4—a point to which the defense does not respond, *see* Reply in Support of Motion, ECF No. 144.  Second, the court has already considered the volume of discovery materials multiple times in this case and concluded that the schedule it set would be appropriate given, for example, the early production of organized discovery, the quantity of materials that were duplicative or to which the defense already had access, and Defendant's resources in reviewing those materials.  *See, e.g.*, Tr. of Aug. 28, 2023, Status H'rg, ECF No. 38, at 9–24, 28–31.  And in the interests of justice, the court must weigh—as it has—any requests for additional time to review those materials "against the disadvantages of backloading the pretrial schedule."  Op. and Order, ECF No. 82, at 5.

Defendant's requested deadline of February 9, 2024 for motions for Rule 17(c) subpoenas illustrates the problems inherent in additional delay.  On that schedule, those motions would not be ripe until March 1, 2024, three days before the trial is scheduled to begin—after which the court would have to rule, the subpoenas (if any) would have to issue, the materials would have to be produced, and Defendant would have to review them, all of which could take considerable time, which would frustrate Rule 17(c)'s purpose "to expedite the trial by providing

a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co.
v. United States*, 341 U.S. 214, 220 (1951) (citation omitted).  That said, the court will permit
one more partial extension of the deadline for motions for Rule 17(c) subpoenas of about a
month.  That will still allow those motions to be briefed and decided, and any subpoenaed
materials to be produced and reviewed before the scheduled trial.

With respect to motions to compel, the court will permit a deadline extension of about
two weeks.  As Defendant requests, this will permit the parties to further confer regarding any
outstanding discovery requests, and will allow him time to file motions with respect to any
unresolved disputes.  *See* Motion at 1–3.  After that deadline, Defendant may seek leave to file
any additional motions for good cause—for instance, if the motions are related to discovery
produced by the government following that deadline.  That will preserve Defendant's right to
raise motions with respect to all government discovery.  *See id.* at 5.

Accordingly, Defendant's Motion for Extension of Time to File Pretrial Motions Related
to Discovery and Subpoenas, ECF No. 129, is hereby GRANTED in part and DENIED in part.
It is hereby ORDERED that the deadlines set forth in the court's Pretrial Order, ECF No. 39, and
the court's Opinion and Order, ECF No. 82, are AMENDED as follows:

Motions to compel shall be filed by November 27, 2023; any oppositions to those
motions shall be filed by December 11, 2023; and any replies in support of those
motions shall be filed by December 18, 2023.

Motions for Rule 17(c) subpoenas shall be filed by December 13, 2023; any
oppositions to those motions shall be filed by December 27, 2023; and any replies
in support of those motions shall be filed by January 3, 2024.

Following these deadlines, Defendant may request leave to late-file a motion for good cause, and the court will consider that request.

Date: November 7, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge