ORAL ARGUMENT SCHEDULED NOVEMBER 20, 2023

**No. 23-3190**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

**v.**

**DONALD J. TRUMP,**

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the District of Columbia

_____

**BRIEF OF *AMICUS CURIAE* FOR AMERICA FIRST LEGAL
FOUNDATION IN SUPPORT OF APPELLANT**

_____

GENE P. HAMILTON
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, D.C. 20003
(202) 964-3721
gene.hamilton@aflegal.org

JUDD E. STONE II
  *Counsel of Record*
CHRISTOPHER D. HILTON
STONE | HILTON PLLC
1115 W. Slaughter Lane
Austin, TX 78748
(737) 465-7248
judd@stonehilton.com

November 14, 2023

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

## A.    Parties and *Amici Curiae*

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Defendant-Appellant.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Defendant-Appellant.

## C.    Related Cases

To amicus's knowledge, there are no related cases.

/s/ Judd E. Stone II

November 14, 2023                    Judd E. Stone II

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, *amicus curiae* America First Legal Foundation declares that it has not issued stock to the public, has no parent company, and has no subsidiaries. No publicly held corporation owns 10% or more of its stock, as it has issued none.

/s/ Judd E. Stone II

November 14, 2023                Judd E. Stone II

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................ i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT .......................... ii

TABLE OF AUTHORITIES ........................................................ iv

INTEREST OF *AMICUS CURIAE* ................................................. 1

SUMMARY OF ARGUMENT ...................................................... 2

ARGUMENT ....................................................................... 3

    I. THE GAG ORDER UNDERMINES EXECUTIVE BRANCH POLITICAL ACCOUNTABILITY ......................................... 3

        A. Executive discretion depends on political accountability ................................................. 3

        B. Political accountability is possible only through political speech and political association, which the gag order sharply limits ...................................... 8

    II. THE GAG ORDER EMPOWERS A SINGLE JUDICIAL OFFICER TO SUPERINTEND OVER A CANDIDATE TO HEAD THE EXECUTIVE BRANCH ...................................................... 15

CONCLUSION ................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Baker v. Carr,*
   369 U.S. 186 (1962)...................................................................... 5

*Citizens United v. FEC,*
   558 U.S. 310 (2010)...................................................................... 8

*City of Arlington v. FCC,*
   569 U.S. 290 (2013)...................................................................... 15

*Davis v. FEC,*
   554 U.S. 724 (2008)...................................................................... 11

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323 (1974)...................................................................... 13

*Gill v. Whitford,*
   585 U.S. ----, 138 S. Ct. 1916 (2018)........................................... 5

*Jankovic v. Int'l Crisis Grp.,*
   822 F.3d 576 (D.C. Cir. 2016) ............................................. 12-13

*Marbury v. Madison,*
   5 U.S. 137 (1803) ...............................................................4, 8, 10

*McCutcheon v. FEC,*
   572 U.S. 185 (2014)...................................................................... 11

*McDonnell v. United States,*
   579 U.S. 550 (2016)...................................................................... 9

*Morrison v. Olson,*
   487 U.S. 654 (1988)...............................................................6, 7, 10

*Lohrenz v. Donnelly,*
   350 F.3d 1272 (D.C. Cir. 2003)................................................... 13

*Seila Law v. C.F.P.B.,*
   591 U.S. ----, 140 S. Ct. 2183 (2020)........................................ 5, 6

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ................................................................. 4

*United States v. Fokker Servs. B.V.,*
   818 F.3d 741 (D.C. Cir. 2016) ................................................... 4, 6

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 128 (2015) ..................................................................... 4

**Statutes & Other Authorities:**

U.S. Const., Amend. I ...................................8, 11, 12, 13, 14, 15, 17

1 Annals of Cong. 499 (J. Madison) .............................................. 6

Editorial Board, "Will Trump Be Indicted Into Office?" WSJ
   (Nov. 6, 2023) ........................................................................... 7

Fed. R. App. P. 29(a)(4)(E) ........................................................... 1

Jonathan Swan *et al.*, "Trump Indictments Haven't Sunk His
   Campaign, but a Conviction Might," New York Times
   (Nov. 6, 2023) ........................................................................... 7

Josh Gerstein, "Prosecutor in Trump Documents case has history
   pursuing prominent politicians," Politico (June 13, 2023) ...............9, 13

Statement of Special Counsel Jack Smith, U.S. Dep't of Justice
   (Aug. 1, 2023) ........................................................................... 13

Tal Axelrod, "Nearly two-thirds of Americans think Jan. 6 charges
   against Trump are serious: POLL," ABC News (Aug. 4, 2023) ............. 7

v

## INTEREST OF *AMICUS CURIAE*[1]

America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law in the United States by preventing executive overreach, ensuring due process and equal protection for every American citizen, and encouraging understanding of the law and individual rights guaranteed under the Constitution and laws of the United States.

America First Legal has a strong interest in this case. While America First Legal frequently challenges unlawful executive actions in court, one of the most powerful checks on the Executive Branch is not the judiciary but the court of public opinion. Legal vindication can take years; political backlash can foment in minutes. The district court's order impedes that essential check on the most core executive power—the power to charge private citizens with criminal offenses—by prohibiting the former President of the United States and current candidate for President from "targeting" a specific Executive Branch official for criticism. J.A.231 ("target" in original).

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), America First Legal Foundation certifies that no party's counsel wrote this brief in whole or part, no party or party's counsel contributed money to fund the preparation or submission of this brief, and no person, other than America First Legal, contributed money to fund the preparation or submission of this brief.

As an organization that employs numerous former Department of Justice and Executive Branch personnel, America First Legal is familiar with the political sensitivity of many Executive Branch decisions. Therefore, it submits this brief to highlight the importance of robust political accountability as a check on executive discretion.

## SUMMARY OF ARGUMENT

Through the gag order, a single district judge has prevented the former President of the United States—who is also a leading candidate for President in next year's election—from criticizing a key subordinate of his chief political rival. That order doubly offends the separation of powers.

First, the gag order offends the separation of powers because it deprives the former President of recourse to the most powerful check on Executive Branch actions: political accountability. The Executive Branch enjoys broad discretionary powers, including the power to indict, with few or no checks beyond political accountability to a national electorate. But such accountability can be fostered only through political speech and political association, which the gag order sharply limits. The order singles out a specific Executive Branch official—at minimum, a limited-purpose public figure—for extraordinary protection from criticism, disables the former President from discussing potentially powerful exculpatory testimony, and prohibits the former President

from calling on his friends and supporters to defend him similarly in public. Such restrictions frustrate the effectiveness of political checks on the Executive Branch's exercise of discretion in this case.

Second, the gag order offends the separation of powers because it acts as a delegation to a single judicial officer to supervise political debates between a candidate to lead the Executive Branch and a senior official serving in the Executive Branch. Four factors combine to magnify this delegation: the gag order's acknowledged ambiguity; the district court's reliance on subjective criteria in resolving that ambiguity; the gag order's lack of a germaneness requirement; and the gag order's nationwide application. Whether such an order would be tolerable to the separation of powers when supported by a thorough record and detailed findings is unclear; relying on speculation, it surely cannot stand.

## ARGUMENT

## I. THE GAG ORDER UNDERMINES EXECUTIVE BRANCH POLITICAL ACCOUNTABILITY.

### A.    Executive discretion depends on political accountability.

The Executive Branch employs considerable discretion in its prosecutorial actions. Administrations of both parties have claimed unreviewable—or, at most, deferentially reviewable—discretion over a host of decisions, from

whether and how to enforce the immigration laws to interpreting regulations carrying criminal penalties to recognizing a foreign government as legitimate. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2408, 2421 (2018) (noting that the immigration law at issue "exudes deference to the President in every clause" and noting that the Court "cannot substitute [its] own assessment for the Executive's predictive judgments on [national security] matters"); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015) ("[T]he power to recognize or decline to recognize a foreign state and its territorial bounds resides in the President alone."); *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) ("The Executive's primacy in criminal charging decisions is long settled. . . . Correspondingly, judicial authority is at its most limited when reviewing the Executive's exercise of discretion over charging determinations." (cleaned up)). And claims to expansive Presidential power are not without historical warrant: the Executive power that the Framers were familiar with had few bounds. The Federalist No. 70 (A. Hamilton) ("Energy in the executive is a leading character in the definition of good government.") Then, as now, the cardinal recourse for those who disagreed with the President lay in the President's political accountability for his acts and the acts of his subordinates. *Marbury v. Madison*, 5 U.S. 137, 166–67 (1803) ("[W]hatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to

4

control that discretion. . . . [N]othing can be more perfectly clear than that [discretionary] acts are only politically examinable.").

No less than the separation of powers depends on the Executive Branch remaining politically accountable. The Judicial Branch often explains its limited involvement with the other branches' actions by reference to political accountability. A litigant's standing, as the Supreme Court has explained, "rests not on the default of politically accountable officers," *Gill v. Whitford*, 585 U.S. ----, 138 S. Ct. 1916, 1929 (2018), because federal jurisdiction does not arise merely because the political process has failed to yield a desirable result. Quite the opposite: some matters may be so appropriate for final resolution by "action of the political departments" that they become nonjusticiable political questions—which "is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962).

Likewise, the Legislative Branch may not insulate officers with "significant executive power" from Presidential removal, for the "entire 'executive Power' belongs to the President alone" because the Framers "made the President the most democratic and politically accountable official in Government." *Seila Law v. C.F.P.B.*, 591 U.S. ----, 140 S. Ct. 2183, 2192, 2201, 2203 (2020). In other words, the Executive Branch's singular nature and power depend on political accountability. "The . . . constitutional strategy is

5

straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections." *Id.* at 2203. That accountability runs through *each* rung in the executive ladder: "[t]hrough the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all" remain politically accountable as well. *Id.* (quoting 1 Annals of Cong. 499 (J. Madison)).

The "investigation and prosecution of crimes is a quintessentially executive function"—and the exercise of prosecutorial discretion is perhaps *the* quintessentially executive function. *Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting). An individual who believes he is being wrongly investigated or wrongly prosecuted has only the Executive Branch to turn to, for "the balancing of various legal, practical, and political considerations" in conducting a prosecution, "none of which is absolute, is the very essence of prosecutorial discretion." *Id.* at 708. Neither courts nor Congress may command the use of that discretion in a particular case. *See, e.g.*, *Fokker Servs.*, 818 F.3d at 744 (noting "the Judiciary's lack of competence to review the prosecution's initiation and dismissal of charges"). A defendant who views himself as the victim of an unjust prosecution must turn to political persuasion to remedy his problem or nothing at all.

The backdrop of this case proves the truth of Justice Scalia's statement that prosecutorial discretion carries within it a political dimension. Here, the current President's administration has authorized the appointment of, and an indictment by, a Special Counsel. That indictment charges his principal political rival and likely general-election opponent, a former President, with multiple federal crimes. Before the gag order, supporters and critics of both the current President and former President vigorously debated the propriety of the indictment in the political arena. The "purely executive" decision to indict President Trump, *Morrison*, 487 U.S. at 705 (Scalia, J., dissenting), was made by political actors at the apex of the Executive Branch, and both sides of this political dispute have properly appealed to the public to ratify or reject that decision. That is political accountability for Executive Branch actions at work.

This case is also political in the more commonplace sense: Americans' views of politics shape and are shaped by their views of the charges brought by President Biden against President Trump. Editorial Board, "Will Trump Be Indicted Into Office?" WSJ (Nov. 6, 2023), https://bit.ly/469U78p ; Jonathan Swan et al., "Trump Indictments Haven't Sunk His Campaign, but a Conviction Might," New York Times (Nov. 6, 2023), https://nyti.ms/3QGkwVG; Tal Axelrod, "Nearly two-thirds of Americans think Jan. 6 charges against Trump are serious: POLL," ABC News (Aug. 4, 2023), https://abcn.ws/3FXzNwj.

Like any other private individual, President Trump has recourse only to political accountability measures to attempt to thwart an Executive Branch action—his prosecution—that he disagrees with.

### B.    Political accountability is possible only through political speech and political association, which the gag order sharply limits.

The political accountability that checks Executive Branch power does not arise in a vacuum. It is the product of political speech and political association undertaken to influence one's fellow voters or the Executive Branch directly. The gag order sharply curtails President Trump's ability to engage in core political speech and political association, thereby limiting his ability to keep both the Special Counsel and the President "accountable . . . to his country in his political character." *Marbury*, 5 U.S. at 166. That political accountability—like the First Amendment's protections—"has its fullest and most urgent application . . . during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). This Court should not allow the gag order to interfere with the political-accountability process.

The gag order restrains political speech on its face. As relevant here, it prohibits at least three kinds of political speech: (1) "any public statements . . . that target . . . the Special Counsel in this case or his staff," (2) "any public statements . . . that target . . . any reasonably foreseeable witnesses or the

substance of their testimony," and (3) speech that "direct[s] others to make any public statements" in the former two categories. But these are precisely the kinds of speech designed to foster political accountability for the Executive Branch's prosecutorial decision in the first place.

First, the gag order prohibits President Trump from criticizing his electoral opponent's Special Counsel—in other words, a direct limitation of President Trump's ability to engage in political discourse and challenge his opponent. For example, it ostensibly prohibits the former President from comparing his situation to that of former Governor Bob McDonnell, a then-prominent Republican whom Jack Smith prosecuted for corruption. Josh Gerstein, "Prosecutor in Trump Documents case has history pursuing prominent politicians," Politico (June 13, 2023), https://politi.co/3SNwvTY. McDonnell and his wife ultimately obtained a unanimous Supreme Court decision in their favor. *McDonnell v. United States*, 579 U.S. 550 (2016).

Second, the order likewise prohibits President Trump from remarking on expected favorable or unfavorable witnesses or their testimony—from saying, for example, that he believes a given former staffer's testimony will exonerate him of one charge or from saying that the prosecution is aware of another staffer's exculpatory testimony but is nevertheless prosecuting him out of political spite. This, too, is core political speech: ascribing an undesirable

political motive to one's electoral rival and basing it on concrete allegations. More importantly, this aspect of the order risks the complete evisceration of the former President's ability to offer a substantive defense against the charges to the public. In the context of an election where the former President is a leading candidate against the current Executive, the gag order's limitation on this important political speech impermissibly shields the prosecution from accountability by limiting discussion of the evidence.

Third, the order's restraint on "directing" others to make public statements transparently limits political speech. It prohibits a candidate for office from asking his supporters to express their support for his cause. Indeed, a paradigmatic exhortation to foster political accountability for an undesired executive action—"call your Congressman and demand he stop Biden appointee Jack Smith"—falls squarely within the gag order's prohibition. That is an intolerable intrusion by the judiciary into the political and executive sphere, which is offensive to the separation of powers. *See, e.g.*, *Marbury*, 5 U.S. at 166–67; *Morrison*, 487 U.S. at 705 (Scalia, J., dissenting).

The order's listed exceptions only confirm that it limits core political speech that fosters political accountability. The order affirms that President Trump may still "criticize the government generally, including the current administration or the Department of Justice," and he may still assert both his

innocence and his belief that the prosecution against him is politically motivated. This exception suggests that speech criticizing President Biden or his Department of Justice in *general* terms is acceptable, but that speech criticizing President Biden or his Department of Justice for *specific* actions taken by his subordinate, Special Counsel Jack Smith, is not. But one presupposes that speech encouraging political accountability for actions taken by the Executive Branch is more likely to be effective if it identifies the specific bad acts and bad actors that the speaker wishes changed; a rule that allows only general political speech is one that allows only ineffective political speech. *Cf. McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) ("If the First Amendment protects flag burning, funeral protests, and Nazi parades—despite the profound offense such spectacles cause—it surely protects political campaign speech despite popular opposition."). This is just so regarding the order's preservation of President Trump's right to protest his innocence and the political nature of his prosecution.

If President Trump cannot explain *why* he is innocent by referencing what witnesses and testimony he expects to see (or not) at trial, then the order allows him to make generalized, less-persuasive statements about his innocence but not specific, more persuasive ones. *Cf. Davis v. FEC*, 554 U.S. 724, 743 n.8 (2008) (noting that "it would be generous for the Government to regulate core political speech for the asserted purpose of improving that speech" or addressing its

11

"quality"). Said differently, the gag order restricts President Trump's political speech precisely where it is most likely to produce political accountability.

The gag order's objects strongly suggest its constitutional infirmity. After all, it does not prevent specific statements from being made, as a typical gag order might, such as prohibiting the disclosure of sealed materials, sensitive personal information, or discrete facts that might embarrass or harm a trial participant. Instead, the gag order provides wholesale protections to preferred individuals and topics, regardless of the specific statements' potential effect on the trial court proceedings. Similarly, the gag order does not prohibit contacting specific individuals by interested parties, such as potential jurors. To the contrary, the gag order prevents any covered statements from being made in public to any gathering, at any time, for any purpose, and it singles out an individual wielding executive power for favorable treatment and protection from "targeted" criticism.

That unusual protection is especially difficult to explain given that the Special Counsel no doubt understood that he was making himself a public figure for First Amendment purposes by accepting his appointment. As this Court has recognized, an individual becomes at least a limited-purpose public figure when he "thrust[s] [him]self to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Jankovic v. Int'l Crisis Grp.*, 822

F.3d 576, 584 (D.C. Cir. 2016) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). That public/private dichotomy distinguishes between "those who assumed the risk of publicity and had access to channels of communication to defend themselves, and those who did not." *Jankovic*, 822 F.3d at 584-85 (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003)). Special Counsel Jack Smith is no doubt familiar with the media attention that attends highly political prosecutions, having prosecuted former Governor McDonnell, former vice-presidential nominee John Edwards, Senator Robert Menendez, and Congressman Rick Renzi. *See, e.g.*, Gerstein, *supra*. Likewise, he has access to communication channels to defend himself publicly, having made multiple public statements regarding President Trump's prosecution. *See, e.g.*, Statement of Special Counsel Jack Smith, U.S. Dep't of Justice (Aug. 1, 2023), https://bit.ly/49AU60g. The need for a gag order to insulate a public figure like the Special Counsel from individual criticism is, at best, a First Amendment anomaly.

But the gag order also sharply limits political association. It prohibits President Trump from asking his allies and supporters to speak critically of Jack Smith to generate political accountability for President Trump's electoral rival. J.A.231. It presumably also prohibits those allies and supporters from agreeing to so speak. Yet, these kinds of coordinated efforts are the backbone of political

13

movements. Everything from "meet me at the Jack Smith protest at 3:00" to "call your Congressmen about Jack Smith" to "write letters to the editor of your local paper decrying Jack Smith for a political prosecution" amounts to a statement directing others to make a public statement targeting Jack Smith. Yet these are certainly acts of political association as well as political speech—and these political associations no doubt generate political accountability far more effectively than a single political speaker can.

That the gag order does not further restrain President Trump's First Amendment rights is no consolation. Those rights are his only recourse: if public opinion is to serve as the primary check on the Executive's exercise of quintessentially executive power in our system of separated powers, it is political speech and association or nothing. The district court's order precludes President Trump from publicly criticizing the precise government official responsible for exercising that power, calling on his allies to criticize that official, or discussing the testimony that will substantiate his claims of innocence. That the order does not go further is cold comfort for the separation of powers—and it should be no comfort to this Court.

II.     **THE GAG ORDER EMPOWERS A SINGLE JUDICIAL OFFICER TO SUPERINTEND OVER A CANDIDATE TO HEAD THE EXECUTIVE BRANCH.**

As President Trump has explained in his opening brief (at 48-54), the gag order is both intolerably vague and plainly overbroad. These faults are sufficient to require reversal on First Amendment grounds. But they also inflict distinct separation-of-powers problems: they allow a single judicial officer to referee the bounds of acceptable criticism nationwide between a candidate for President and a senior official in the Executive Branch. That, too, is constitutionally intolerable.

After all, in other contexts, courts understand that the power to interpret ambiguities in legally operative language acts as a delegation of authority. The Supreme Court describes the most famous such power, *Chevron* deference, as exactly that: for that deference to apply, "the agency must have received congressional authority" delegated to it regarding the particular question at hand. *City of Arlington v. FCC*, 569 U.S. 290, 306 (2013); *see also id.* at 300 (referring to such authority as a delegation). The district court has vested itself with an analogous authority. It acknowledged that the gag order's key term, "target," is amenable to several different meanings, J.A.338, but the court asserted that it would decide which meaning applies in any given situation on a case-by-case basis. *Id*. And the district court has no congressional warrant to

exercise such a delegation of power, making it all the more troubling for the separation of powers.

The separation-of-powers problems with the district court's order are further heightened by its doubly open-ended nature. It is open-ended first in that the district court has suggested it will use entirely subjective criteria in determining what definition of "target" to apply and whether the former President's criticism of one of his rival's subordinates meets that definition. And it is open-ended second in that there is no topic on which the former President is apparently safe, save generalized grievances with the current administration or assertions of innocence. J.A.231. The gag order prohibits the former President from targeting the Special Counsel for criticism *on any basis* related to the pending criminal charges or otherwise. *Id*. Presumably, the district court intends to reduce this overbreadth in interpreting the order in the future. If so, however, that too operates analogously to a delegation: the district court has forbidden all unwanted criticism targeting the Special Counsel now, while giving itself the latitude to determine whether challenged statements are sufficiently germane to the former President's criminal trial to justify sanctions.

The district court's gag order is unbounded in yet a third way: it has no geographic limitations. Whatever the merits a prototypical gag order might have in preventing, for example, one side from unduly influencing a potential jury

pool, it is difficult to imagine a legitimate interest that the Special Counsel may have in the gag order *nationwide*. The gag order prohibits speech in Washington State to the same extent as in Washington D.C.; it prevents the former President from exhorting his allies to speak about his complaints against Executive Branch action at a local political rally to the same extent as on the courthouse steps. The district court's interests in the integrity of its proceedings, however compelling, cannot possibly be equally endangered regardless of where or to whom in the United States the former President speaks.

Such a broad gag order might prove impossible to justify even with the most fulsome of records and the most specific of findings. But this gag order was based on neither. In redressing admittedly speculative dangers, J.A.204, the district court empowered itself to adjudicate the propriety of core political speech between two candidates for our Nation's sole true nationwide office in all places, as between all people, and on any subject targeting a specific Executive Branch officer. Such a power is as anathema to the separation of powers as it is to the First Amendment, and this Court should not countenance it.

17

## CONCLUSION

This Court should reverse the district court.

Dated: November 14, 2023                    Respectfully submitted,


                                            /s/ Judd E. Stone II
GENE P. HAMILTON                            JUDD E. STONE II
AMERICA FIRST LEGAL FOUNDATION                  *Counsel of Record*
611 Pennsylvania Ave. SE #231               CHRISTOPHER D. HILTON
Washington, D.C. 20003                      STONE | HILTON PLLC
(202) 964-3721                              1115 W. Slaughter Lane
gene.hamilton@aflegal.org                   Austin, TX 78748
                                            (737) 465-7248
                                            judd@stonehilton.com

18

## CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(a)(7)(C) and Circuit Rule 32(a), this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because the brief contains 3,727 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

November 14, 2023

/s/ Judd E. Stone II
Judd E. Stone II

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

<table>
<tr><td></td><td>/s/ Judd E. Stone II</td></tr>
<tr><td>November 14, 2023</td><td>Judd E. Stone II</td></tr>
</table>