**ORAL ARGUMENT OF THIS APPEAL IS SET FOR NOVEMBER 20, 2023
ON AN EXPEDITED BASIS**

**Case No. 23-3190**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    v.

DONALD J. TRUMP,

                              Defendant-Appellant.

          _____

On Appeal From The United States District Court
For The District Of Columbia

_____

**AMICUS BRIEF OF CHRISTIAN FAMILY COALITION (CFC) FLORIDA,
INC., A NONPROFIT CORPORATION, IN SUPPORT OF APPELLANT
DONALD J. TRUMP AND THE MOOTING OF THIS APPEAL THROUGH
THIS COURT'S USE OF ITS PENDENT APPELLATE JURISDICTION
TO ADDRESS DISPOSITIVE CONSTITUTIONAL ISSUES**

_____


Dated:  November 15, 2023          LAW OFFICE OF DENNIS GROSSMAN
                              by Dennis Grossman
                              Attorney for Amicus Curiae
                                CHRISTIAN FAMILY COALITION
                                (CFC) FLORIDA, INC.
                              6701 Sunset Drive (Suite 104)
                              Miami, Florida 33143
                              (516) 466-6690
                              dagrossmanlaw@aol.com

## CORPORATE DISCLOSURE STATEMENT AND
## STATEMENT IDENTIFYING PARTIES

Amicus Christian Family Coalition (CFC) Florida, Inc., is a nonprofit corporation which has no parent corporation. No publicly held corporation or other public entity owns 10% or more of Amicus's ownership interest.

General Nature and Purpose: Amicus is a human rights and social justice advocacy organization representing over 500,000 fair-minded voters. Amicus actively seeks to protect human rights and social justice in litigation and political forums. The performance of Amicus's function in legislative and executive forums depends upon the responsiveness of the political process and, in turn, upon the ability of public figures including the President to communicate freely with the public without fear of criminal liability for speech which a prosecutor deems "knowingly false." This is indispensable to the integrity and responsiveness of the political processes upon which Amicus depends to protect human rights and social justice.

Parties: The parties in the District Court and in this Court are the United States of American and Donald Trump. The District Court denied leave for amicus filings.

/s/ Dennis Grossman
Dennis Grossman

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES……………………………………………ii

A. STATEMENT IDENTIFYING THE AMICUS
   AND ITS INTEREST…………………………………………………..1

B. STATEMENT REGARDING CONTROL OVER AMICUS BRIEF…2

C. ARGUMENT………………………………………………………..3

    1.   The First Amendment Violations in the Underlying Indictment..3

    2.   The Exercise of this Court's Pendent Appellate Jurisdiction
          To Address the Constitutional Validity of the Underlying
          Indictment is Appropriate Because the Issues Involved in its
          Validity Are Inextricably Intertwined with the Issues on Appeal,7

    3.   The Exercise of this Court's Pendent Appellate Jurisdiction
          To Address the Constitutional Validity of the Underlying
          Indictment is Appropriate in the Interests of Judicial
          Economy and the Avoidance of Potentially Unnecessary
          Political Torture for the Country………………………………14

    4.   The Exercise of this Court's Pendent Appellate Jurisdiction
          To Address the Constitutional Validity of the Underlying
          Indictment Does Not Depend Upon the Existence of a
          District Court Order Addressing the Indictment's
          Validity or Invalidity…………………………………………..16

    5.   The Exercise of this Court's Pendent Appellate Jurisdiction
          To Address the Constitutional Validity of the Underlying
          Indictment is Appropriate to Address Appellant's Claim
          Of Presidential Immunity………………………………...18

D. CONCLUSION……………………………………………………22

CERTIFICATE OF SERVICE………………………………………24

CERTIFICATE OF COMPLIANCE…………………………………25

-i-

# <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

## <u>Cases</u>

*Abney v. U.S.,* 431 U.S. 651 (1977)……………………………………..13,14

*Americans for Prosperity Foundation v. Bonta,* 141 S.Ct. 2373 (2021)…5,20

*Ashcroft v. American Civil Liberties Union,* 542 U.S. 656 (2004)…………..5

*Brown v. Entertainment Merchants Assoc.,* 564 U.S. 786 (2011)…………...6

*Chicago, R.I. & P.R. Co. v. Stude,* 346 U.S. 574 (1954)…………………9,10

*Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940)……………9,10

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974)……………………..9,10

*Gilda Marx, Inc. v. Wildwood Exercise, Inc.,* 85 F.3d 675
(D.C.Cir. 1996)……………………………………………………………..8,15

*Harris v. Medical Transportation Management, Inc.,* 77 F.4th 746
(D.C.Cir. 2023)……………………………………………………………..8,14,15

*Keyishian v. Board of Regents,* 385 U.S. 589 (1967)……………………5,20

*Nixon v. Fitzgerald,* 457 U.S. 731 (1982)………………………………19,21

*Schlagenhauf v. Holder,* 379 U.S. 104 (1964)…………………………..9-11

*Smith v. Vulcan Iron Works,* 165 U.S. 518 (1897)……………………..11,17

*Swint v. Chambers County Commission,* 514 U.S. 35 (1995)…………..8-11

*Thornburgh v. American College of Obstetricians and
Gynecologists,* 476 U.S. 747 (1986)………………………………...9,15-17

# TABLE OF AUTHORITIES
## (continued)

**Page**

**Cases (continued)**

*United States v. Alvarez,* 567 U.S. 709 (2012)……………………………….6

*United States v. Stevens,* 559 U.S. 460 (2010)……………………………6

*Virginia State Board of Education v. Barnette,*
319 U.S. 624 (1943)…………………………………………………………4

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)……..11,17

**U.S. Constitution**

First Amendment…………………………………………1-7, 11-14, 20-21

## AMICUS BRIEF OF CHRISTIAN FAMILY COALITION (CFC) FLORIDA, INC., A NONPROFIT CORPORATION

The Christian Family Coalition (CFC) Florida, Inc. ("Amicus"), hereby submits its Amicus Brief in support of Appellant Donald J. Trump and the exercise of this Court's Pendent Appellate Jurisdiction to address the constitutionality of the underlying indictment.  Amicus respectfully submits that the indictment on its face violates the First Amendment to the U.S. Constitution and the Immunity of a then-sitting President and that the exercise of this Court's Pendent Appellate Jurisdiction to address these dispositive constitutional issues is consistent with the parameters of this jurisdictional doctrine and the constitutional interests at stake. Amicus addresses these issues in this Amicus Brief and respectfully requests that this Court direct the parties to brief the issues of Pendent Appellate Jurisdiction and the constitutionality of the indictment under the First Amendment and the protections of Presidential Immunity.

### A. STATEMENT IDENTIFYING THE AMICUS AND ITS INTEREST

The Amicus, Christian Family Coalition (CFC) Florida, Inc. ("Amicus"), is a nonprofit Florida corporation.  Amicus is a human rights and social justice advocacy organization representing over 500,000 fair-minded voters.  Amicus actively seeks to protect human rights and social justice in litigation and political forums.  The performance of Amicus's function in legislative and executive forums depends upon the responsiveness of the political process and, in turn, upon

-1-

the ability of public figures including the President to communicate freely with the public without fear of criminal liability for speech which a prosecutor deems "knowingly false." This is indispensible to the integrity and responsiveness of the political processes upon which Amicus depends to protect human rights and social justice.

The indictment in the present case seriously impairs the political process by making Presidential speech criminal if a prosecutor deems it to be "knowingly false." The indictment is a violation of the First Amendment and Presidential Immunity which Amicus has an interest in challenging in this appeal through this Court's exercise of its Pendent Appellate Jurisdiction which authorizes this Court to address the indictment directly and to order its dismissal as a violation of the First Amendment and/or Presidential Immunity, as shown in this Amicus Brief.

The source of Amicus's authorization to file this Amicus Brief is its Founder and Executive Director Anthony Verdugo.

## B. <u>STATEMENT REGARDING CONTROL OVER AMICUS BRIEF</u>

No party, counsel for any party, or other representative or agent of any party in this case authored any part of this Amicus Brief or exercised any form of control or approval over this Amicus Brief or any portion of it. No party, counsel for any party, or other person or entity, aside from Amicus or its counsel, made a monetary or other contribution to the preparation or submission of this Amicus Brief.

-2-

## C. **ARGUMENT**

Amicus initially addresses the First Amendment violations in the underlying indictment, followed by the reasons why Pendent Appellate Jurisdiction is appropriate to reach these First Amendment issues and to dismiss the indictment on First Amendment grounds.

Finally, Amicus addresses Presidential Immunity and the reasons why Pendent Appellate Jurisdiction is appropriate  reach the Immunity Issue and to dismiss the indictment on this ground as well.

### 1.     The First Amendment Violations in the Underlying Indictment

The underlying indictment broadly accuses Defendant of several felonies on the ground that his speech and communications in challenging the results of the 2020 Presidential election were "knowingly false."  The indictment enumerates and details numerous instances of Presidential statements to the public and to election officials.  The center piece and pivot point of the indictment are its allegations that Defendant "knew" he lost the election but nevertheless made contrary statements to the public and to election officials that the election was stolen which, according to the indictment, were "knowingly false" (Indictment ¶ 7).

Building on this allegation that the Defendant's statements challenging the election were "knowingly false," the indictment charges Defendant with four

felonies – an alleged conspiracy to "defraud the United States" (Count 1), and to obstruct an official proceeding (Counts 2-3), and to deprive voters against him of their right to vote (Count 4).

The indictment's apparent violations of the First Amendment are several. First, the indictment takes an inflexible position on a hotly contested political issue (the fairness of the 2020 Presidential election) and criminalizes those who "knowingly" disagree. The issue of whether the 2020 Presidential election was fair-vs.-stolen was, and still is, hotly disputed and the focus enormous sustained political controversy. The First Amendment does not permit either side to dictate the "truth" but permits each side to present its arguments in the marketplace of ideas. Neither criminal prosecutors nor anyone else may dictate what is orthodox, established, or "truthful" in the political arena. The Supreme Court 80 years ago, in what is still good law, admonished that under the First Amendment "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642 (1943).

Second, the indictment does not permit the required "breathing space" for expression protected by the First Amendment. It is well established that First Amendment freedoms require "breathing space to survive and may not be

-4-

hampered or restrained by criminal laws that deter free expression.  *Americans for Prosperity Foundation v. Bonta,* 141 S.Ct. 2373, 2384 (2021) ("First Amendment freedoms need breathing space to survive"); *Keyishian v. Board of Regents,* 385 U.S. 589, 604 (1967) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity"). The indictment does not permit the required "breathing space."  It criminalizes speech based on fragile and fickle factual disputes over whether the Defendant's speech was "knowingly false."   The required "breathing space" for First Amendment freedoms may not be so narrow and fragile as to depend upon a case-by-case factual disputes over whether speech was "knowingly false."   The potential for prosecutorial abuse is limitless.

Third, the criminalization of otherwise protected speech if a criminal prosecutor deems it "knowingly false" – which involves a factual dispute and requires a criminal trial – unduly chills free speech and forces speakers into impermissible self-censorship.  *Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 670-671 (2004) ("There is a potential for extraordinary harm and a serious chill upon protected speech" because "speakers may self-censor rather than risk the perils of trial").

Fourth, the indictment improperly seeks to create new categories of exceptions to First Amendment protection.  Instead of tailoring its focus on well-

established and narrow categories of criminality for utterances, the indictment makes broad sweeping allegations that Defendant's "knowingly false" speech was part of a wide-ranging conspiracy to "defraud the United States" (Count 1), and to obstruct an official proceeding (Counts 2-3), and to deprive voters against him of their right to vote (Count 4). These are new categories of alleged criminality for the specific speech attributed to Defendant. The First Amendment does not permit the government to criminalize new categories of speech such as "knowingly false" claims" of election rigging. *United States v. Alvarez,* 567 U.S. 709, 717-718 (2012) ("[C]ontent-based restrictions on speech have been permitted, as a general matter, only when confined to the few 'historic and traditional categories of expression long familiar to the bar.'… Among these categories are advocacy intended, and likely, to incite imminent lawless action … obscenity … defamation … speech integral to criminal conduct … so-called 'fighting words' … child pornography … fraud … true threats … and speech presenting some grave and imminent threat the government has the power to prevent…. These categories have a historical foundation in the Court's free speech tradition."); *Brown v. Entertainment Merchants Assoc.,* 564 U.S. 786, 791 (2011) ("new categories of unprotected speech may not be added"); *United States v. Stevens,* 559 U.S. 460, 468, 467 (2010) ("From 1791 to the present … the First Amendment has permitted restrictions upon the content of speech in a ***few limited areas,*** and has never

-6-

included a freedom to disregard these ***traditional limitations***.  These historic and traditional categories [are] long familiar to the bar … ***including*** obscenity … defamation … fraud … incitement … and speech integral to criminal conduct"; emp.added).

This is not an exhaustive list of the First Amendment violations posed by the underlying indictment.  Within the narrow confines of this Amicus Brief – requesting the use of this Court's Pendent Appellate Jurisdiction to reach the invalidity of the indictment in this appeal – the above discussion shows ample grounds for invoking this jurisdictional prerogative and for directing the parties to brief it and the constitutional violations posed by the underlying indictment.

> 2.     The Exercise of this Court's Pendent Appellate Jurisdiction to Address the Constitutional Validity of the Underlying Indictment  is Appropriate Because the Issues Involved in its Validity are Inextricably Intertwined with the Issues on Appeal

This Court's Pendent Appellate Jurisdiction Permits this Court to address the constitutionality *vel non* of the underlying indictment under the Doctrines of Presidential Immunity and Presidential Rights of Speech and Petition under the First Amendment.

Under this Court's Pendent Appellate Jurisdiction, this Court may review nonappealable orders or the underlying legal merits of a case when reviewing the appealable order now before this Court on interlocutory review.  This is permitted

"when the nonappealable order is inextricably intertwined with the appealable order or when review of the former is necessary to ensure meaningful review of the latter." *Harris v. Medical Transportation Management, Inc.,* 77 F.4th 746, 765 (D.C.Cir. 2023). "[S]ubstantial considerations of fairness or [judicial] efficiency" are factors which militate in its favor. *Gilda Marx, Inc. v. Wildwood Exercise, Inc.,* 85 F.3d 675, 678-679 (D.C.Cir. 1996), quoted in *Harris, supra,* 77 F.4th at 765; *see also Swint v. Chambers County Commission,* 514 U.S. 35, 51 (1995) (when the two issues are "inextricably intertwined … [or when] review of the [nonappealable] decision was necessary to ensure meaningful review of the [appealable decision]").

The Supreme Court in *Swint* made clear that the "inextricably intertwined" requirement does not require an absolute and complete identity of issues in the appealable and nonappealable orders. It merely requires a substantial and essential linkage between the issues to make the appealable and nonappealable orders "inextricably intertwined" and thus appropriate for the exercise of Pendent Appellate Jurisdiction. The Supreme Court in *Swint* cited with approval its own precedent where, in numerous cases, it had approved the exercise of Pendent Appellate Jurisdiction over nonappealable issues on appeal where the nonappealable issues bore a substantial linkage with the primary issues on appeal

-8-

without there being a mirror-image identity of the two sets of issues.  Thus the

Supreme Court in *Swint* recounted with approval:

> "*Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 755–757 (1986) (Court of Appeals reviewing District Court's ruling on preliminary injunction request properly reviewed merits as well); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 172–173 (1974) (Court of Appeals reviewing District Court's order allocating costs of class notification also had jurisdiction to review ruling on methods of notification); *Chicago, R.I. & P.R. Co. v. Stude,* 346 U.S. 574, 578 (1954) (Court of Appeals reviewing order granting motion to dismiss properly reviewed order denying opposing party's motion to remand); *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 287 (1940) (Court of Appeals reviewing order granting preliminary injunction also had jurisdiction to review order denying motions to dismiss). *Cf. Schlagenhauf v. Holder,* 379 U.S. 104, 110–111 (1964) (Court of Appeals exercising mandamus power should have reviewed not only whether District Court had authority to order mental and physical examinations of defendant in personal injury case, but also whether there was good cause for the ordered examinations)."

*Swint v. Chambers County Commission, supra,* 514 U.S. at 50 (reviewing cases

where the Supreme Court had upheld the exercise of Pendent Appellate

Jurisdiction).

The consistent theme in these cases is that the exercise of Pendent Appellate

Jurisdiction does not depend upon an absolute mirror-image identity in the issues

under review but simply depends upon a substantial overlap and essential linkage

between them which makes the appealable and nonappealable issues "inextricably

intertwined."  Thus in *Thornburgh,* as recounted in *Swint,* the Supreme Court

upheld review of the underlying merits of a case in an appeal involving primarily a

preliminary injunction.  The two issues in *Thornburgh* were not identical but were

interrelated and substantially overlapped in their areas of inquiry which made them "inextricably intertwined."  So too in *Eisen,* as recounted in *Swint,* the Supreme Court upheld the review of the underlying class-action notice in an appeal which involved primarily the allocation of costs in serving the class-action notice.  Again, the two issues in *Eisen* were not identical but substantially overlapped in their areas of inquiry which again made them "inextricably intertwined."

The same occurred in *Stude,* also recounted by the Supreme Court in *Swint.* In *Stude,* the Supreme Court upheld review of a remand order in an appeal involving primarily a dismissal order.  Once again, the two issues were not identical but bore a substantial linkage and overlap in their areas of inquiry which made them "inextricably intertwined" and thus appropriate for Pendent Appellate Jurisdiction.  So too in *Decker*, also recounted by the Supreme Court in *Swint.*  In *Decker* the Supreme Court approved review of an order denying a motion to dismiss where the primary issue on appeal involved a preliminary injunction. Once again, the two issues were not identical but clearly involved overlapping areas of inquiry which made them "inextricably intertwined" and appropriate for Pendent Appellate Jurisdiction.

Lastly, in *Schlagenhauf v. Holder,* the final case cited in *Swint* in this sequence, the Supreme Court again approved review of a pendent non-identical issue.  The Supreme Court approved appellate review of the "good cause" for a

discovery order where the primary issue before the Court of Appeals was the underlying authority to issue the discovery order in the first place.  As in the other cases recounted above in *Swint,* the two issues on review in *Schlagenhauf v. Holder* were not identical but bore a substantial relationship and overlapping areas of inquiry which made them "inextricably intertwined."

Other Supreme Court decisions agree.  Above and beyond the many cases it cited in *Swint, supra,* the Supreme Court has consistently permitted the exercise of Pendent Appellate Jurisdiction to review a pendent issue on appeal that was not identical to the appeal's primary issue but was substantially related to it with overlapping areas of inquiry.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (Court reviews constitutional merits underlying official action on an appeal which primarily raised abuse-of-discretion issue concerning a preliminary injunction); *and see Smith v. Vulcan Iron Works,* 165 U.S. 518, 525 (1897) (Court reviews underlying merits of a patent on an appeal which raised primarily issues concerning a preliminary injunction).

The same result obtains here.  Here, the First Amendment issues involved in the order under review are "inextricably intertwined" with the First Amendment issues raised by the underlying indictment.  The issues may not be absolutely identical, but they involve the same First Amendment rights and interests of a sitting President in his efforts to gain re-election, the same or similar effects on

-11-

Presidential election campaigns, the same First Amendment case law, the same overlapping areas of inquiry, and are substantially related in context and effect. Both involve the President's attempts to gain re-election and his First Amendment rights to address his supporters and the decision-makers who control or certify his re-election – *whether* the decision-makers are the popular electorate whom the President seeks to address in his First Amendment challenge against the present order on appeal *or* were the State and federal officials responsible for counting and certifying the 2020 election results whom the same President sought to address giving rise to the underlying indictment and his First Amendment challenge to it. The interrelationship and linkage between the First Amendment issues and interests in both instances – and the similar contexts of Presidential re-election campaigns (in 2020-2021 and 2023-2024) – clearly show that the First Amendment issues raised by the underlying indictment (President's re-election efforts in 2020-2021) are "inextricably intertwined" with the First Amendment issues raised by the order now primarily under review (President's present 2023-2024 re-election campaign). Indeed, it is a virtual guarantee that the same First Amendment arguments and jurisprudence cited in the parties' briefs in the present appeal will also be cited and used in addressing the validity of the underlying indictment.

In short, this Court's jurisdiction to review the present order on appeal and the First Amendment issues it raises gives this Court Pendent Appellate

Jurisdiction to review the "inextricably intertwined" First Amendment issues raised by the underling indictment.

The Supreme Court's decision in *Abney v. U.S.,* 431 U.S. 651 (1977), is not to the contrary. In *Abney* the Supreme Court disallowed Pendent Appellate Jurisdiction over an appeal from the validity of an underlying indictment when considering an appeal which primarily raised a double-jeopardy bar. The Supreme Court in *Abney* made clear that although the jeopardy issue was immediately appealable, the issues involved in the validity of the underlying indictment were separate and distinct from the jeopardy issues. Indeed, the jeopardy argument in *Abney* had nothing to do with the validity of the underlying indictment but rather concerned only an alleged relationship with a prior criminal proceeding. Thus the Supreme Court in *Abney* held that Pendent Appellate Jurisdiction was not appropriate to assess the validity of the underlying indictment when considering the appealable jeopardy issues. *Abney,* 431 U.S. at 661 (the double-jeopardy clause "protects interests wholly unrelated to the propriety of any subsequent conviction").

That is not the situation here. Here, unlike *Abney*, the issues are not separate and distinct but are critically inter-related. As discussed above, the First Amendment issues raised in the present appeal are closely related to and overlap with the First Amendment issues raised by the underlying indictment. As

-13-

discussed above, an absolute identity of issues is not required. The issues here are "inextricably intertwined" and appropriate for Pendent Appellate Jurisdiction because the contexts and First Amendment jurisprudence and issues in both situations overlap and are inter-related. They concern a President's ability to address his supporters and the decision-makers who certify and control his re-election. The First Amendment jurisprudence and case law are the same, as is the primordial context of a Presidential candidate's ability to exercise his First Amendment freedoms in his attempt to gain re-election. Simply stated, Pendent Appellate Jurisdiction is appropriate here which is clearly distinguishable from the situation in *Abney*.

       3.    The Exercise of this Court's Pendent Appellate Jurisdiction to Address the Constitutional Validity of the Underlying Indictment is Appropriate in the Interests of Judicial Economy and the Avoidance of Potentially Unnecessary Political Torture for the Country

Both this Court and the Supreme Court have underscored that the exercise of Pendent Appellate Jurisdiction is appropriate when needed to avoid unnecessary expense and delay by quickly addressing the constitutional validity of an underlying governmental action in important cases. In *Harris, supra,* this Court underscored that "substantial considerations of fairness or [judicial] efficiency" are

-14-

factors which militate in its favor. *Gilda Marx, supra,* 85 F.3d at 678-679 (D.C.Cir. 1996), quoted in *Harris, supra,* 77 F.4th at 765.

The Supreme Court holds the same. In *Thornburgh, supra,* the Supreme Court approved the exercise of Pendent Appellate Jurisdiction to decide the constitutional merits of an underlying governmental action where the issue primarily on appeal concerned not the full merits of the case, but an abuse of discretion in issuing a preliminary injunction. The Supreme Court in *Thornburgh* pointed to its precedent approving the exercise of Pendent Appellate Jurisdiction and quoted with approval its reasoning in its prior decision that "the Court of Appeals had acted properly in deciding the [underlying] merits since review of interlocutory appeals was designed not only to permit the defendant to obtain immediate relief but also in certain cases to save the parties the expense of further litigation." *Thornburgh, supra,* 476 U.S. at 756 (1986), paraphrasing with approval *Smith, supra,* 165 U.S. at 525.

That is the case here, and more. Here, review of the underlying indictment not only will "save the parties the expense of further litigation," *Thornburgh, supra,* 476 U.S. at 756, but more importantly will potentially save the nation the partisan torture and upheaval in a first-ever criminal trial of a past President arising from his re-election efforts. Especially after the events of January 6, 2021, it is difficult to imagine a more disastrous potential for the country's political system

-15-

(and for the Courts) than the brutal criminal trial of an ex-President under an indictment that may turn out to be constitutionally invalid.  There is no more important function for this Court to perform than to address the constitutional validity of the underlying indictment **before** the Appellant is put to trial under it.

> 4.  The Exercise of this Court's Pendent Appellate Jurisdiction to Address the Constitutional Validity of the Underlying Indictment  Does Not Depend Upon the Existence of a District Court Order Addressing the Indictment's Validity or Invalidity

There is no need to await an Order from the District Court concerning the validity or invalidity of the underlying indictment.  The Supreme Court has made clear in several cases that, once an interlocutory appeal is properly before this Court, this Court has the Pendent Appellate Jurisdiction to address in a dispositive ruling the underlying validity of the case which raises an issue closely related to the issue on appeal – even without awaiting a ruling by the District Court on the validity or invalidity of the underlying indictment.  This is appropriate here, and is within this Court's Pendent Appellate Jurisdiction, given the enormous importance of this case and the need for a prompt dispositive appellate ruling on the indictment.

The Supreme Court's cases supporting this approach are numerous.  In *Thornburgh, supra,* the Supreme Court approved the Circuit Court's resolution of the ultimate merits of the case in an appeal which involved only the issue of

-16-

whether there was an abuse-of-discretion concerning the issuance of a preliminary injunction.  The District Court had never rendered an order addressing the ultimate merits upon which the Court of Appeals nevertheless ruled.  The Supreme Court approved.  476 U.S. at 752-753.

In *Youngstown Sheet & Tube, supra*, the Supreme Court resolved the ultimate merits of the dispute and sustained a final injunction on the merits even though the District Court's order, and appeal from it, involved only a preliminary injunction and the question of abuse-of-discretion in its issuance.  343 U.S. at 584 & 660.

In *Smith, supra,* the Supreme Court reached a similar result, which it expressly reaffirmed in *Thornburgh, supra.*  The Supreme Court in *Smith* held that "the Circuit Court of Appeals, upon appeal from the interlocutory decree of the [trial] Court … had authority to consider and decide the case upon its merits, and thereupon to render or direct a final decree dismissing the bill."  165 U.S. at 525, *expressly approved in Thornburgh, supra,* 476 U.S. at 756 (1986).

The clear import of these cases is that an Order by the District Court on the facial merit of the underlying indictment is not a prerequisite to this Court's review of the indictment on this interlocutory appeal.  The inter-related nature of the issue now on appeal and the issues involved in the underlying indictment show they are "inextricably intertwined" and authorize the exercise of this Court's Pendent

-17-

Appellate Jurisdiction to address the indictment head on.  The overriding importance of the pendent issues relating to the indictment and the First Amendment clearly warrants the exercise of this Court's Pendent Appellate Jurisdiction to address the invalidity of the underlying injunction and to order its dismissal.  *Thornburgh, supra; Smith, supra.*

> 5.   The Exercise of this Court's Pendent Appellate Jurisdiction to Address the Constitutional Validity of the Underlying Indictment  is Appropriate to Address Appellant's Claim of <u>Presidential Immunity</u>

In the District Court, Appellant seeks dismissal of the indictment not only on First Amendment grounds, but also on grounds of Presidential Immunity.  At all times relevant to the actions alleged in the indictment, Appellant was still the sitting President and was engaged in his attempts to secure re-election in 2020 and early 2021.  The claim of Presidential Immunity, especially when coupled with Appellant's exercise of his First Amendment rights to challenge the election results, warrants the exercise of this Court's Pendent Appellate Jurisdiction for the same reasons expressed above with regard to the First Amendment – and for an additional reason peculiar to the claim of Presidential Immunity.

Non-frivolous claims of Presidential Immunity are themselves immediately appealable.  Like other claims of litigation immunity, Presidential Immunity is not merely a defense on the merits but is an immunity to litigation itself which forever

would be lost unless enforceable and immediately appealable to prevent the disputed litigation from continuing. *Nixon v. Fitzgerald,* 457 U.S. 731, 742-743 (1982). In *Nixon* the Supreme Court held that Presidents have absolute immunity against civil damage claims arising from Presidential acts but also expressed the need for Presidential Immunity in broad terms which apply to criminal charges as well – that the denial of immunity would impair the President's ability to function as Chief Executive because it "would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Id.,* at 756.

True, the Supreme Court in *Nixon* reaffirmed its prior holding that Presidents have no general immunity from criminal processes. *Id.,* at 753-754. But that does not mean – nor did the Supreme Court hold – that the President has no immunity whatsoever against any and all criminal accusations, regardless of how far-flung they are. The same ability of the President to function – which gives the President absolute immunity against civil damage claims – also requires that Presidential speech within the "outer perimeter" of the Presidential function, including his re-election efforts, not be made "criminal" upon the mere allegation in an indictment that the President's words were "knowingly false" or "improperly motivated." Otherwise, virtually every word uttered by a President, if disputed by "information" from his adversaries, would subject the President to potential

-19-

criminal liability for "knowingly false" utterances, whatever that means and whatever criminal charges may flow from them.

Yet this is precisely what the indictment alleges. While the indictment details numerous communications by the President to set aside what he contends was a fraudulent election – countered by the indictment's citations to contrary communications to him that he was allegedly wrong – the common theme and central point of the indictment are its allegations that the President's communications were "knowingly false" (Indictment ¶ 7) and thereby criminal – as part of an alleged conspiracy to "defraud the United States" (Count 1), or to obstruct an official proceeding (Counts 2-3), or to deprive voters against him of their right to vote (Count 4).  Yet Presidential Immunity and the President's ability to perform ordinary Presidential functions – including communication with the public and seeking re-election to continue his official policies – require a degree of insulation and breathing space from criminal liability that cannot be so narrow and fragile as to depend upon a case-by-case factual dispute over whether his speech was "knowingly false."  *Cf. Americans for Prosperity Foundation v. Bonta, supra,* 141 S.Ct. at 2384 (2021) ("First Amendment freedoms need breathing space to survive"); *Keyishian v. Board of Regents, supra,* 385 U.S. at 604 (1967) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity"). Presidential Immunity, to be

effective, requires the same "breathing space," especially where the disputed Presidential actions are themselves speech arguably deserving of First Amendment protection.

    *Nixon v. Fitzgerald* is instructive here. The concern for the Presidential function which compelled absolute Presidential Immunity against civil damage claims in *Nixon v. Fitzgerald* applies equally to the Presidential function when challenged with the present type of criminal accusations. The Presidential function includes communicating with the public and seeking re-election – and where necessary challenging the election results – in order to implement and continue his official policies. These important Presidential functions cannot be made to depend upon so fickle and fragile a variable as a factual dispute over whether his speech was "knowingly false." Protection of the Presidential function requires more. The need to protect the Presidential function under the umbrella of absolute Presidential Immunity from civil damage claims in *Nixon v. Fitzgerald* applies equally to criminal accusations which depend upon fickle factual disputes over whether Presidential speech was "knowingly false." For these types of criminal claims, the protection of the Presidential function makes "it appropriate to recognize absolute Presidential Immunity … for acts within the outer perimeter of his official responsibility." *Nixon,* 457 U.S. at 756.

This is not a partisan or one-sided issue. At least, it should not be. The danger to the Presidency is obvious and potentially severe. What a left-wing prosecutor today can turn into the criminal liability against a right-wing ex-President for speech that was allegedly "knowingly false" can too easily be turned around after the next Presidential election by a right-wing prosecutor alleging the same against a left-wing ex-President. The political and institutional damage to the Presidency – and to the nation the President is designed to serve – requires the recognition of absolute Presidential Immunity for the acts alleged in the indictment. For the sake of the Presidency and the nation, criminal liability cannot turn on a mere factual dispute over whether an ex-President's communications in challenging an election were "knowingly false."

### D. CONCLUSION

This Court should direct the parties to brief the issues of this Court's Pendent Appellate Jurisdiction and whether the underlying indictment violates the First Amendment and Presidential Immunity. Upon reaching these issues, this Court should exercise its Pendent Appellate Jurisdiction and should dismiss with

prejudice the underlying indictment as a violation of the First Amendment and/or

Presidential Immunity.

Dated:  November 15, 2023

                     Respectfully submitted,

                     LAW OFFICE OF DENNIS GROSSMAN

                     by:  /s/ Dennis Grossman
                          Dennis Grossman
                     Attorney for Amicus Curiae
                      CHRISTIAN FAMILY COALITION
                      (CFC) FLORIDA, INC.
                     6701 Sunset Drive (Suite 104)
                     Miami, Florida 33143
                     (516) 466-6690
                     dagrossmanlaw@aol.com

## CERTIFICATE OF SERVICE

I certify that on November 15, 2023 I caused the foregoing brief to be served on counsel of record for all parties in this appeal by filing the foregoing brief with this Court's ECF system which then transmitted the foregoing brief to all counsel of record in this appeal via this Court's ECF system.

/s/ Dennis Grossman
Dennis Grossman

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,964 words, excluding those portions excluded pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

/s/ Dennis Grossman
Dennis Grossman