ORAL ARGUMENT SET NOVEMBER 20, 2023

No. 23-3190

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA,

*Appellee,*

v.

DONALD J. TRUMP,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Columbia

**REPLY BRIEF OF DEFENDANT-APPELLANT
PRESIDENT DONALD J. TRUMP**

LAURO & SINGER
John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................... ii

GLOSSARY ............................................................................................v

SUMMARY OF ARGUMENT..............................................................1

ARGUMENT ..........................................................................................3

I.  The Prosecution's Statement of Facts Highlights the Evidentiary Gaps..............3

II.  The First Amendment Calls For the Most Exacting Scrutiny Here. ...................9

    A.  The Clear-and-Present-Danger Test Applies....................................9

    B.  First Amendment Principles Call for the Strictest Scrutiny Here. ................14

        1.  The Gag Order restricts campaign speech. ................................15

        2.  The Gag Order violates the rights of 100 million Americans. .................16

        3.  The Gag Order is a heckler's veto. ...........................................18

        4.  The Gag Order restricts criticism of public figures.................................20

    C.  The Gag Order Is Not Narrowly Tailored. ....................................21

        1.  Speech restrictions to avoid tainting the jury pool are inapposite...........22

        2.  The Gag Order fails to consider less restrictive alternatives....................22

III.  The Gag Order Is Unconstitutionally Vague.....................................24

CONCLUSION ...................................................................................28

CERTIFICATE OF SERVICE .............................................................30

CERTIFICATE OF COMPLIANCE ....................................................31

# TABLE OF AUTHORITIES

**Cases**

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969)........................................................................................19

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973)........................................................................................21

*Buckley v. Valeo,*
    424 U.S. 1 (1976)....................................................................................24, 28

*Caudle v. District of Columbia,*
    825 F. Supp. 2d 73 (D.D.C. 2011) ................................................................25

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)..........................................................................................6

*Collin v. Chicago Park Dist.,*
    460 F.2d 746 (7th Cir. 1972) ........................................................................19

*Conservation Force v. Jewell,*
    160 F. Supp. 3d 194 (D.D.C. 2016) ................................................................6

*Estes v. Texas,*
    381 U.S. 532 (1965)........................................................................................13

*Gentile v. State Bar of Nevada,*
    501 U.S. 1030 (1991)..................................................1, 10, 11, 14, 15, 25

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974)........................................................................................20

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)..................................................................................26, 28

*Hynes v. Mayor & Council of Borough of Oradell,*
    425 U.S. 610 (1976)........................................................................................24

*In re Dow Jones & Co.*,
  842 F.2d 603 (2d Cir. 1988) ............................................................12, 17, 23, 24

*In re Sawyer*,
  360 U.S. 622 (1959) ...............................................................................10

*In re Stone*,
  940 F.3d 1332 (D.C. Cir. 2019) .........................................................22

*Landmark Commc'ns, Inc. v. Virginia*,
  435 U.S. 829 (1978)................................................................3, 13, 15

*Matal v. Tam*,
  582 U.S. 218 (2017)................................................................................18

*NAACP v. Button*,
  371 U.S. 415 (1963)...............................................................................24

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)...............................................1, 3, 7, 8, 13, 15, 24

*Pell v. Procunier*,
  417 U.S. 817 (1974)................................................................................14

*Pub. L. Educ. Inst. v. U.S. Dep't of Just.*,
  744 F.2d 181 (D.C. Cir. 1984) .............................................................6

*Republican Party of Minnesota v. White*,
  536 U.S. 765 (2002).........................................................................16, 18

*Rosenblatt v. Baer*,
  383 U.S. 75 (1966)..................................................................................20

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984)......................................................................11, 13, 15

*Sheppard v. Maxwell*,
  384 U.S. 333 (1966)......................................................................13, 15, 23

iii

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ..................................................................................15

*The News-Journal Corp. v. Foxman*,
939 F.2d 1499 (11th Cir. 1991) .................................................12, 13

*United States v. Bronstein*,
849 F.3d 1101 (D.C. Cir. 2017) ................................................26, 27

*United States v. Brown*,
218 F.3d 415 (5th Cir. 2000) ...............................................11, 14, 16

*United States v. Cutler*,
58 F.3d 825 (2d Cir. 1995) ....................................................22

*United States v. Ford*,
830 F.2d 596 (6th Cir. 1987) ................................................14, 16

*United States v. Manafort*,
897 F.3d 340 (D.C. Cir. 2018) .................................................22

*United States v. Tijerina*,
412 F.2d 661 (10th Cir. 1969) ...............................................22

## Other Authorities

*Report of the Committee on the Operation of the Jury System on the*
*"Free Press-Fair Trial" Issue*, 45 F.R.D. 391 (1966) .............................................13

# GLOSSARY

App.Br………………………………..Opening Brief of Defendant-Appellant
President Donald J. Trump

Gag Order……………………………Opinion and Order in *United States v. Trump*, No. 1:23-cr-257-TSC, 2023 WL 6818589, D. Ct. Doc.105 (Oct. 17, 2023), J.A.229

J.A.__.................................................Joint Appendix (page number)

President Trump………………………Defendant-Appellant President Donald J. Trump

the prosecution………………………..Appellee Department of Justice

Resp.Br………………………………Answering Brief for the United States

S.A.__.................................................Supplemental Appendix for the United States (page number)

## SUMMARY OF ARGUMENT

The Gag Order installs a single federal judge as a barrier between the leading candidate for President, President Donald J. Trump, and every American across the country. The district court had no business inserting itself into the Presidential election, just weeks before the Iowa caucuses. The First Amendment does not permit the district court to micromanage President Trump's core political speech, nor to dictate what speech is sufficiently "general" and what speech is too "targeted" for the court's liking. J.A.231. Nor does the Due Process Clause. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1049 (1991). Silencing a Presidential candidate's core political speech at the height of his political campaign is "the essence of censorship." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 557 (1976) (citation omitted).

The prosecution's defense of the Gag Order fails at every step. The Gag Order violates a long list of the First Amendment's most basic doctrines—such as the primacy of campaign speech, the audience's right to listen, the categorical ban against a "heckler's veto," and the heightened protection for criticism of public figures, among others. The prosecution blithely assumes that these venerable doctrines "ha[ve] no bearing on this appeal," Resp.Br. 27, because the case involves a pending criminal prosecution. That is indefensible. Criminal proceedings do not suspend the First Amendment; if anything, they heighten the need for First Amendment protections. Every case to consider speech restrictions about a pending

1

criminal prosecution has taken care to give the First Amendment its maximum possible application. This Court must do the same here.

The prosecution's brief highlights the glaring evidentiary gaps in its case. The case has been pending for over three months, but the only alleged "threat" that the prosecution, wrongfully, identifies in *this* case was made to the district judge on August 5, 2023—before every statement that President Trump made about the judge, and before almost every statement about this case that the prosecution cites of any kind. President Trump did not cause a threat by speaking after the threat occurred. Aside from this, the prosecution does not identify any instance of supposed threats, harassment, or intimidation to any prosecutor, witness, or court staff in this case— despite months of public commentary on the case by President Trump.

The prosecution's defense of the Gag Order suffers from other yawning logical gaps. The prosecution relies heavily on a parallel gag order entered in New York court, which has now been stayed pending appeal. The prosecution contends that silencing a political candidate with over 100 million followers imposes an "equal" injury as silencing a single speaker—an argument that would flunk first-grade math. The prosecution likens President Trump's speech to Henry II's "meddlesome priest" comment—overlooking the difference in continents, countries, and just a few historical developments since 1170, such as the Declaration of Independence and the adoption of the First Amendment to our United States

Constitution. The prosecution relies on hearsay media reports as a substitute for evidence—all but proving the evidence in the record is inadequate.

The Court should reverse the unconstitutional Gag Order.

## ARGUMENT

## I.  The Prosecution's Statement of Facts Highlights the Evidentiary Gaps.

The prosecution's statement of facts, Resp.Br. 4-7, effectively admits that the record is "devoid of … 'actual facts'" showing any imminent risk of threats, harassment, or intimidation. *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978). Instead, "of course this prejudice is speculative." J.A.204. The evidence falls far short of "the degree of certainty" that "cases on prior restraint require." *Nebraska Press Ass'n*, 427 U.S. at 568-69.

The prosecution complains that President Trump "described the presiding district judge as a 'fraud' and a 'hack.'" Resp.Br. 4 & n.13 (citing J.A.79-80). But the Gag Order does not restrict criticism of the district judge, and for good reason. "The operations of the courts and the judicial conduct of judges are matters of utmost public concern," and "the law gives '[j]udges as persons, or courts as institutions ... no greater immunity from criticism than other persons or institutions.'" *Landmark Commc'ns*, 435 U.S. at 839 (citation omitted). Moreover, the challenged statements were posted on August 30, 2023, *see* J.A.80 n.13 (citing https://truthsocial.com/@realDonaldTrump/posts/110980188106641474), so they

could not possibly have caused the only "threat" that the prosecution identifies in *this* case—the alleged threat to the district judge on August 5, 2023. Resp.Br.5. In fact, *none* of President Trump's statements criticizing the district judge cited by the prosecution—and none of President Trump's statements about this case, except a post on August 2 that accused President Biden of directing the prosecution—predates the alleged threat to the judge. *See* J.A.79-85, J.A.129-30.

The prosecution argues that President Trump has "repeatedly called the prosecutors handling the case 'deranged,' 'thugs,' and 'lunatics,'" Resp.Br. 4, but it does not identify any resulting threats or harassment or claim that the prosecutors are even remotely intimidated by such speech. *Id.* at 4-5.

The prosecution complains that President Trump "asserted that one of them … had gone to the White House for an improper purpose," and that this was supposedly "false." Resp.Br. 4. President Trump vigorously disagrees. *See, e.g.,* Jon Levine, *Biden Staffers Met With Special Counsel Jack Smith's Aides Before Trump Indictment*, N.Y. POST (Aug. 26, 2023), at https://nypost.com/2023/08/26/biden-staffers-met-with-special-counsel-jack-smiths-aides-before-trump-indictment/. Whether the White House unduly influenced this prosecution for political reasons lies at the heart of President Trump's

campaign and the First Amendment. The prosecution's objection to this post is a naked attempt to muzzle public criticism of *itself*.[1]

The prosecution complains that President Trump made statements criticizing Vice President Pence, General Milley, and former Congressman and White House Chief of Staff Mark Meadows. Resp.Br. 4-5. The prosecution does not claim that any of these potential witnesses received any threats or harassment, and it does not contend that these individuals—public figures from the highest echelons of government, many of whom publicly attack President Trump—feel in any way threatened or intimidated by President Trump's statements. *See id.* Nor does the prosecution contend that their (often self-invited) public jousting with President Trump is likely to affect these individuals' testimony in any way. *Id.*

The prosecution describes President Trump's statement, "If you go after me, I'm coming after you," as a "public threat," Resp.Br.4 (citing J.A.79). However, this statement made no reference to this case, and his campaign explained that it was made "in response to … special interest groups and Super PACs." App.Br.15 n.7.

---

[1] The prosecution objects to criticism of the Special Counsel's "family members." Resp.Br. 14 n.4, 18, 41. But Special Counsel's wife reportedly produced a documentary with Michelle Obama and donated at least $2,000 to President Biden's campaign. *See, e.g.,* Victor Nava, *Trump Special Counsel's Wife Worked on Obama Film and Donated to Biden*, N.Y. Post (Nov. 11, 2023), https://nypost.com/2022/11/23/trump-special-counsels-wife-worked-on-obama-film-and-donated-to-biden/. In a dispute about prosecutorial motivation and bias, these facts are matters of public concern.

The prosecution ignores this explanation—the only evidence of what the statement was actually referring to—and relies instead on naked speculation.

The prosecution implies that this statement *caused* a random person to threaten the district judge on August 5, 2023. Resp.Br. 5-6. Again, this is pure speculation, and wrong to boot. As noted above, President Trump's statements criticizing the district judge came *after* the August 5 incident. J.A.79-80. The prosecution also cites no evidence that this random individual was inspired to act by President Trump's August 4th social-media post, which did not even reference this case. J.A.79. In the preceding four days, President Trump's indictment was subject to wall-to-wall media coverage, a nationally televised address by the Special Counsel—which included extrajudicial, inappropriate, and incendiary comments— and endless public commentary by others. The threatener might have been inspired to act by any of this speech, or none of it.

To establish causation, "more than *post hoc, ergo propter hoc* must be shown." *Pub. L. Educ. Inst. v. U.S. Dep't of Just.*, 744 F.2d 181, 183 (D.C. Cir. 1984); *Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 205 (D.D.C. 2016) ("[V]ague assertions of *post hoc, ergo propter hoc* are insufficient…"). The Supreme Court rejects causal "theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Such

"speculation," *id.*, cannot bear the "heavy burden of demonstrating" the need for a prior restraint. *Nebraska Press Ass'n*, 427 U.S. at 569.

The prosecution argues that the August 5th threat "was part of a pattern, stretching back years, in which people publicly targeted by the defendant are … subject to harassment, threats, and intimidation." Resp.Br. 5-6. In fact, what allegedly "stretch[es] back years," *id.*, without any concrete link to the *present*, is the prosecution's evidence. The prosecution relies on instances in which a few individuals claimed to experience "threats" and "harassment" after being publicly criticized in December 2020—nearly three years ago. Resp.Br. 6-7; J.A.76-78. And, in many cases, the public criticisms did not even come from President Trump—the prosecution attributes some to unidentified "surrogates," J.A.76, and alleged "co-conspirators," J.A.77.

Finally, the prosecution tries to shore up its evidentiary problems by citing a series of unproven allegations from outside the record. The prosecution cites allegations in the indictment, Resp.Br. 7, but those have not been proven by any evidence, and they refer to alleged events that are three years old. *See id.* The prosecution cites triple-hearsay media accounts about a leaked recording where an individual supposedly speculates about President Trump's intentions when he makes statements unrelated to this case. Resp.Br. 7 (citing J.A.296 n.8). Such out-of-record

materials, exempt from adversarial testing, provide a poor substitute for actual evidence. *Nebraska Press Ass'n*, 427 U.S. at 565.

Another failing tactic is the prosecution's repeated reliance on media reports about President Trump's social-media post about the Principal Law Clerk of the Justice presiding in the pending civil fraud trial in New York. Resp.Br. 6-7, 12, 13, 18. The district court raised this issue *sua sponte*. J.A.192-96. The court presumed, evidently based on hearsay in media reports, that this statement was a gratuitous attack on a nonpartisan, career court staffer. *Id.*

In fact, this Principal Law Clerk sits *beside* the judge on the bench during trial, passes notes to the judge constantly, consults with the judge before virtually every ruling, and even questions counsel on behalf of the court directly—thus effectively "co-judging" the trial. *See* Verified Joint Article 78 Petition in *Trump v. Engoron*, Case No. 2023-05859 (N.Y. App. Div. filed Nov. 15, 2023), at 47. Moreover, this law clerk made illegal political donations, in excess of the amount permitted for court staff by New York law, to partisan Democratic organizations—including to organizations that were actively supporting New York Attorney General James and opposing President Trump, the parties before the New York court—*while the case was pending*. *Id.* at 11-12. The picture of the law clerk with Senator Schumer was posted by the law clerk herself while she was a candidate for public office in New

York in 2022, on a social-media account associated with her political campaign. *Id.* at 12.

President Trump's re-posting of that picture with a comment on how the trial against him was being run represents core political speech criticizing a quintessential public figure and highlighting illegal partisan activities that provide compelling evidence of judicial bias in a pending case of enormous public interest—clearly protected by the First Amendment. *Contra* Resp.Br.6-7. Accordingly, the New York Appellate Division stayed the trial court's gag orders on this issue yesterday. Bart Jansen, *New York Judge Suspends Donald Trump Gag Order in Civil Fraud Trial While Case Is Argued*, USA TODAY (Nov. 16, 2023), https://www.usatoday.com/story/news/politics/2023/11/16/donald-trump-gag-order-suspended-new-york/71610202007/ (linking to the stay order).

## II. The First Amendment Calls For the Most Exacting Scrutiny Here.

### A. The Clear-and-Present-Danger Test Applies.

The prosecution contends (at 21-25) that *Gentile*'s "substantial likelihood of material prejudice" standard applies to all "trial participants," not just attorneys. This claim is central to their case, because they present no argument that the Gag Order satisfies the clear-and-present-danger test. It is also plainly incorrect.

*Gentile*'s adoption of the "substantial likelihood" standard rested entirely on its detailed account of the special role of attorneys as "officers of the court." *Gentile*,

501 U.S. at 1065-76. The Supreme Court framed the issue as whether a standard that differs from *Nebraska Press Association* could be imposed on "speech by a *lawyer*." *Id.* at 1065 (emphasis added). The Court noted cases that distinguished "restraints on lawyers," *id.*, and then expounded "the history of the regulation of the practice of law by the courts," focusing on the courts "exercis[ing] authority to discipline and ultimately disbar lawyers whose conduct departed from prescribed standards." *Id.* at 1066. This discussion of the history of courts' regulation of *lawyers* spans multiple pages. *Id.* at 1066-69. The Court noted that the State Bar distinguished the "clear and present danger" cases by "point[ing] out … that none of these cases involved lawyers…." *Id.* at 1070. The Court framed the issue as whether "a lawyer who represents a criminal defendant involved with the criminal justice system may insist on the same standard" in disciplinary proceedings. *Id.* at 1071.

The Court then reasoned that "in the courtroom itself … whatever right to 'free speech' an attorney has is extremely circumscribed." *Id.* It "observed that lawyers in pending cases [a]re subject to ethical restrictions on speech to which an *ordinary citizen* would not be." *Id.* at 1071 (emphasis added). It noted that "a lawyer actively participating in a trial … is not merely a person and not even merely a lawyer," but "an 'officer of the court'…." *Id.* (quoting *In re Sawyer*, 360 U.S. 622, 666, 668 (1959) (Frankfurter, J., dissenting)). It highlighted "the State's interest in the regulation of a specialized profession." *Id.* at 1073. And it contrasted "the

common rights of citizens" with those of an attorney as "an officer of the court." *Id.* at 1074.

For those reasons, *Gentile* concluded that "the speech of *lawyers* representing clients in pending cases may be regulated under a less demanding standard…." *Id.* (emphasis added). *Gentile* explained that "[l]awyers … are key participants in the criminal justice system," *id.*, clarifying that the "trial participants" were lawyers as *officers of the court*, not "ordinary citizen[s]." *Id.* at 1071; *see also id.* at 1075.

In light of *Gentile*'s overwhelming focus on the special duties of lawyers—spanning many pages of the Court's discussion, *id.* at 1065-75—*Brown*'s statement that *Gentile* "foreclosed the applicability" of the clear-and-present-danger test to criminal *defendants*, Resp.Br. 23 (quoting *United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000)), is unpersuasive. The prosecution contends that *Seattle Times Co. v. Rhinehart* supports a lesser standard here, *id.*, but *Seattle Times* involved a restriction on publication of materials *received through discovery*, and thus it rested on the separate rule that "[a] litigant has no First Amendment right of access to information made available only for purposes of trying his suit." 467 U.S. 20, 32 (1984). It did not address the distinct question whether a court may restrict a criminal defendant's core political speech criticizing the prosecution against him, especially when the defendant is the leading political opponent of the prosecution's boss.

11

The prosecution's other authorities do not assist them. *In re Dow Jones & Co.* involved a gag order against leaks by "state and federal prosecutors' violation of grand jury secrecy," 842 F.2d 603, 605 (2d Cir. 1988), which threatened the ability of the "*defendant* to receive a fair trial by an impartial jury," *id.* at 604. Thus, *Dow Jones* involves attorney speech like *Gentile*, and it provides no plausible support for violating a criminal defendant's First Amendment rights. In fact, the criminal defendant in *Dow Jones* sought the gag order to stop prosecutors from leaking confidential grand-jury materials to the press, and thus *Dow Jones* upheld the gag order as one "directed solely against trial participants and challenged only by the press." *Id.* at 608. Like the press in *Dow Jones*, the prosecution here "ignores the fact that the *defendants* [in *Dow Jones*] requested the order and urge its affirmance." *Id.* at 609. *Dow Jones* held that "there is a fundamental difference between a gag order challenged by the individual gagged and one challenged by a third party." *Id.* at 609. And, like *Gentile*, *Dow Jones* held "[t]t is altogether fitting that the solution should restrict those at the source of the problem: counsel who serve as officers of the court…." *Id.* at 612.

Likewise, in *The News-Journal Corp. v. Foxman*, the criminal defendants "endorsed the proposed restrictive order" on leaks to the media, 939 F.2d 1499, 1503 (11th Cir. 1991). It emphasized both that "the right to speak and publish does not carry with it the unrestrained right to gather information," and that "when First

Amendment claims impinge upon the Sixth Amendment right to a trial by an impartial jury, asserted First Amendment interests must yield to the 'most fundamental of all freedoms,' the right to a fair trial for the *accused*." *Id.* at 1512 (emphasis added).

*Dow Jones* and *Foxman* underline a fatal irony—the prosecution relies heavily on authorities focused on *protecting* the criminal defendant's rights in attempting, and failing, to justify *violating* the criminal defendant's rights here. The Supreme Court "has approved restriction on the communications of trial participants where necessary to ensure a fair trail for a *criminal defendant*." *Seattle Times*, 467 U.S. at 32 (emphasis added); *see also, e.g., Landmark Commc'ns*, 435 U.S. at 839; *Nebraska Press Ass'n*, 427 U.S. at 543, 545, 547, 551-56; *Sheppard v. Maxwell*, 384 U.S. 333, 335, 350, 358, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532, 540 (1965).

Similarly, protecting the *defendant's* rights is the "crux" of the "Free Press-Fair Trial" report. *See Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue*, 45 F.R.D. 391, 393 (1966) (addressing "the right of the individual accused of a crime to a trial by an impartial jury"). The report's recommendations focus on preserving the rights of the "*accused*," *see id.* at 401-15. Gagging the accused is a profoundly different matter: "It is the individual defendant to whom the Sixth Amendment guarantees a fair trial. It is the public to whom the First Amendment guarantees reasonable access to criminal proceedings.

And it is individuals, not the government, to whom First Amendment interests attach." *United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987).

The cases that the prosecution cites, therefore, are inapposite. The most apposite case is *Ford*, which held that criminal defendants enjoy the same First Amendment rights to make public statements as the media itself. 830 F.2d at 598. *Ford* is consistent with the Supreme Court's broader principle that ordinary citizens enjoy the same First Amendment rights as the corporate media. *Pell v. Procunier*, 417 U.S. 817, 834-35 (1974). And though *Brown* purported to adopt a lesser standard, the court granted complete relief to the defendant during his political campaign. *Brown*, 218 F.3d at 430.

Even if the *Gentile* standard applied, the Gag Order does not satisfy it. As Justice Kennedy's opinion in *Gentile* points out, the "substantial likelihood" standard is extremely demanding—it "approximate[s] the clear and present danger test." 501 U.S. at 1037 (plurality op.). "The difference between" the two standards is "mere semantics." *Id.* The prosecution's threadbare evidentiary presentation cannot satisfy either test. *See infra*, Part II.C.

## B. First Amendment Principles Call for the Strictest Scrutiny Here.

Having badly misinterpreted *Gentile*, the prosecution then relies on that misreading to reach its most astonishing conclusion—that all other First Amendment doctrines are simply irrelevant in this case. According to the prosecution, President

Trump's supposedly "scattershot invocation" of the foundational First Amendment principles "*has no bearing on this appeal*." Resp.Br. 27 (emphasis added). In essence, the prosecution incorrectly contends the pendency of criminal proceedings simply suspends the First Amendment. Resp.Br. 27.

*Gentile* provides no support for this conclusion, and overwhelming authority contradicts it. *Gentile* itself held that the First Amendment is fully applicable in criminal proceedings, and it tolerates "only narrow and necessary limitations on lawyers' speech." 501 U.S. at 1075. Every other Supreme Court case on pretrial speech restrictions has granted the First Amendment the maximum possible application to criminal proceedings. *See, e.g., Seattle Times*, 467 U.S. at 32 & n.18 (1984); *Landmark Commc'ns*, 435 U.S. at 839; *Nebraska Press Ass'n*, 427 U.S. at 559; *Sheppard*, 384 U.S. at 350. Thus, just as the First Amendment precept against prior restraints was given full application in *Nebraska Press Association*, the equally foundational First Amendment doctrines cited by President Trump must be given the fullest possible application here. They counsel, both individually and in combination, for the highest level of scrutiny of this extraordinary Gag Order.

### 1. The Gag Order restricts campaign speech.

President Trump's speech about this case is quintessential campaign speech, to which the First Amendment has "its fullest and most urgent application." App.Br. 31-32 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)). The

prosecution never disputes that President Trump's gagged speech is quintessential campaign speech. Instead, the prosecution simply dismisses this fundamental First Amendment doctrine as having "no bearing on this appeal." Resp.Br. 27.

That is wrong. The courts that have considered gag orders on political candidates have treated the presence of campaign speech as *decisive*, not irrelevant, and they have refused to restrict campaign speech at all. *See Ford*, 830 F.2d at 600-01; *Brown*, 218 F.3d at 430. The Supreme Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *Republican Party of Minnesota v. White*, 536 U.S. 765, 781-82 (2002). Campaign speech "'is at the core of our electoral process and of the First Amendment freedoms,' not at the edges." *Id.* (citation omitted).

## 2. The Gag Order violates the rights of 100 million Americans.

President Trump has over 100 million followers on social media, and his audiences include virtually every American voter in the upcoming Presidential election. App.Br. 34-36.[2] Yet the prosecution argues that the size of President

---

[2] The prosecution argues that President Trump "did not squarely raise this issue until his motion to stay the Order." Resp.Br. 43. Not so. President Trump raised this issue repeatedly in his opposition and at oral argument. J.A.98-99 (the gag order would prevent President Trump "from presenting his side of the story to the American people"); J.A.104 (arguing that the district court cannot be "the filter for what the public may hear"); 117 (arguing that "the public has an interest in receiving information about matters that are in litigation"); J.A.189 (arguing that the gag order would be "against the American electorate that wants to hear from President Trump

Trump's audience makes no difference, because "[t]he public's right to receive his speech … is … 'equal' and 'reciprocal' to his own." Resp.Br. 43. Thus, according to the prosecution, a First Amendment violation that afflicts one person somehow imposes no greater injury than one that afflicts over 100 million people. *Id.*

This reasoning is obviously untenable. Because President Trump and his audiences have "equal" and "reciprocal" interests in communicating and receiving his speech, Resp.Br. 43, the fact that his audiences include over 100 million Americans *expands* the significance of President Trump's right to speak and the magnitude of the First Amendment injury from silencing him. App.Br.34-36.

The prosecution's reliance on *Dow Jones*, Resp.Br. 43-44, is misplaced and, at best, obtuse. *Dow Jones* involved an order that prevented state and federal prosecutors from leaking confidential grand-jury materials to members of the press. 842 F.2d at 606. The news agencies' right to receive that information was "entirely derivative of the rights of the trial participants" to release it. *Id.* at 608. Here, the Gag Order does not prevent President Trump from releasing materials to which he has access only because of the court proceedings; it prevents him from commenting on matters that are already in the public domain. J.A.229-31. In such a case, gagging President Trump violates the free-speech rights of tens and tens of millions.

---

under these circumstances"); J.A.201 (arguing that "[t]he American people are entitled to understand" President Trump's message).

The prosecution argues that President Trump's "followers continue to be able to hear his views on a vast range of issues." Resp.Br. 44. This argument is a persistent theme throughout its brief—that President Trump should not complain because the Gag Order graciously allows him to speak on court-approved "general[]" political topics. J.A.231; Resp.Br. 39-42. The Supreme Court has resoundingly rejected such reasoning: "It is simply not the function of government to select which issues are worth discussing or debating in the course of a political campaign." *White*, 536 U.S. at 782 (citation omitted). The First Amendment does not permit the district court or the prosecution to micromanage President Trump's campaign speech or dictate to him what forms of speech are "appropriate" for political debate. *Id.*

### 3. The Gag Order is a heckler's veto.

The Gag Order restricts President Trump's speech solely to prevent an anticipated unruly *reaction* by third parties. App.Br. 36-39. This violates the principle that "[t]he Government may not … t[ie] censorship to the reaction of the speaker's audience." *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment). The prosecution argues that the unruly audience members are not "hostile" to President Trump's message, Resp.Br. 34 n.9, but the First Amendment prohibits silencing speech based on the "reaction of the speaker's audience," *Matal*, 582 U.S. at 250, regardless of whether that

reaction is friendly or hostile.  *See Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972) (holding that "the government may not prohibit speech under a 'secondary effects' rationale").

In fact, the incitement doctrine holds that a speaker cannot be held liable for the unlawful reaction of a *favorable* audience unless the speech rises to the level of incitement to imminent lawless action—which President Trump's does not.  Such a prohibition "impermissibly intrudes upon the freedoms guaranteed by" the First Amendment and "sweeps within its condemnation speech which our Constitution has immunized from government control." *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).  The prosecution's speculation (at 34) about President Trump's supposed intent—supported by no evidence—makes no difference to the First Amendment calculus.  For the same reasons, Henry II's "meddlesome priest" comment, Resp.Br.11; J.A.183, 202, is inapposite.  Such a comment, if made today, would be assessed under the incitement standard of *Brandenburg*, 395 U.S. at 448—which none of President Trump's statements satisfies, as the prosecution concedes.

The prosecution argues that "courts routinely attach consequences or take prophylactic measures in response to a defendant's speech when it poses a potential risk to witnesses, jurors, or officers of the court…" Resp.Br. 32.  But the various cases that the prosecution cites—most of which bear no resemblance to this case—*do not involve gag orders*.  *See id.* at 32-33.  Instead, they involve less speech-

restrictive alternatives like "empaneling [an] anonymous jury," *id.* at 32-33—the very alternatives that the district court failed to consider here. *See infra*, Part II.C.

### 4. The Gag Order restricts criticism of public figures.

The Gag Order restricts public criticism of quintessential public figures like the Special Counsel, other prosecutors, and former officials from the highest echelons of government who routinely attack President Trump's fitness for public office. App.Br. 39-40. The prosecution responds that some of these officials "may … receive increased protection from the Marshals Service or the Secret Service." Resp.Br. 35-36. This misses the point. The First Amendment provides the highest level of protection for speech criticizing public figures, which is "at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). The First Amendment does not turn on the level of "police protection," Resp.Br. 36, for those who have voluntarily "thrust" themselves "into the vortex" of public debate. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974).

The prosecution argues that President Trump's public comments "extend beyond such figures to people like election workers and court personnel," Resp.Br. 36, but it does not cite a single instance of such a statement by President Trump in this case. By invoking statements that President Trump never made, the prosecution underscores its central admission: "of course this prejudice is speculative." J.A.204.

The prosecution's argument that the Gag Order does not impose an "impermissible double-standard" on campaign speech and political debate, Resp.Br. 48-50, cannot survive scrutiny. Attorney General Barr, for example, has written a book criticizing President Trump and launched a full-throated media campaign to argue that he is unfit for office, yet the Gag Order prevents President Trump from responding with statements that "target" him, whatever that means. *See infra*, Part III. The prosecution's extensive discussion of John Gotti's attorney (at 49-50) adds nothing to this analysis. Among other things, that individual was an *attorney*, not a defendant; he "had willfully violated" court orders, *id.*, which President Trump has not; and, in any event, he was not the leading candidate for President.

## C. The Gag Order Is Not Narrowly Tailored.

The Gag Order suppresses a wide range of core political speech that presents no plausible threat to the administration of justice. This includes public criticisms of the prosecutors, who are seasoned public figures who knowingly volunteered for the highest-profile criminal prosecution in modern history; and other senior public figures like Vice President Pence, Attorney General Barr, General Milley, and many others. In fact, almost everything forbidden by the Gag Order falls into this category, leaving the Gag Order with a "plainly legitimate sweep" that is vanishingly small. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

### 1. Speech restrictions to avoid tainting the jury pool are inapposite.

The prosecution argues that other courts have imposed broadly worded orders. Resp.Br. 36-38. But in those cases, the orders were intended to prevent prejudice from tainting the jury pool—a rationale that the district court declined to adopt here. J.A.224-25. *See, e.g., In re Stone*, 940 F.3d 1332, 1335 (D.C. Cir. 2019); *United States v. Manafort*, 897 F.3d 340, 342 (D.C. Cir. 2018); *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969). In fact, the prosecution admits that these broader orders were entered because "such public statements risk biasing the jury pool." Resp.Br. 38. The prosecution's lengthy discussion of the speech restrictions on John Gotti's lawyer, *id.* at 42-43 (quoting *United States v. Cutler*, 58 F.3d 825, 831 (2d Cir. 1995)), suffers from the same error—those restricted speech that was "deliberately couched to poison the well from which the jury would be selected," *id.*, an interest that the Gag Order here does not purport to advance. Moreover, in those cases, the speech restrictions were typically not subject to direct First Amendment challenge, so there is no indication that they could have survived tailoring scrutiny.

### 2. The Gag Order fails to consider less restrictive alternatives.

The district court must consider and reject *every* less restrictive alternative, "individually and in combination," before gagging speech: "[E]ach must be explored and ultimately rejected as inadequate—individually and in combination—as a

remedy for prejudicial pretrial publicity before a restraining order is entered." *Dow Jones*, 842 F.2d at 611. Thus, the district court's categorical refusal to consider the most obvious alternative—postponing the trial until after the Presidential election, J.A.162-65—is itself reversible error. *Id.*

The prosecution argues that the district court considered "alternative measures such as careful *voir dire*, jury sequestration, and cautionary jury instructions." Resp.Br. 45-46 (quoting J.A.229-30). But the prosecution (at 46) all but concedes that the district court gave no meaningful consideration to postponing the trial date until after the Presidential election—the *first* alternative that it should have considered. *Sheppard*, 384 U.S. at 362-63. Instead, the prosecution argues that "there is no reason to think that the targeting prohibited by the Order would cease … with the passage of time." *Id.* at 46. But delaying the trial date would, at very least, alleviate massive First Amendment harms, such as silencing a political candidate's core political speech at the height of his campaign, and placing a gag order between the leading candidate for President and the American electorate.

The prosecution contends that "it is the defendant's own conduct that is the source of prejudice." Resp.Br. 47. On the contrary, the *prosecution* and the district court have created this First Amendment trainwreck by insisting on trying President Trump only seven months after the indictment, on March 4, 2024, at the height of campaign season. Indeed, this trial schedule is so aggressive and unrealistic that it

was previously unheard-of for a complex case with nearly 13 million pages of discovery and hundreds of potential witnesses.

The prosecution argues that "prophylactic measures are preferred over remedial ones." Resp.Br. 47 (quoting *Dow Jones*, 842 F.2d at 609). But the "remedial" measure that case law disfavors is retrying a case after conviction and reversal on appeal, which President Trump is not proposing here. *Dow Jones*, 842 F.2d at 609; *Nebraska Press Ass'n*, 427 U.S. at 555. The alternatives that President Trump proposes—such as postponing trial, careful *voir dire*, cautionary jury instructions, empaneling an anonymous jury, security precautions, among others—are *all* "prophylactic measures." *Dow Jones*, 842 F.2d at 609. The district court made no specific findings and gave them no meaningful consideration. J.A.229-30.

## III. The Gag Order Is Unconstitutionally Vague.

The Supreme Court has repeatedly instructed that prior restraints on speech are subject to "stricter" standards of clarity. *See, e.g., Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976); *Buckley v. Valeo*, 424 U.S. 1, 77 (1976); *NAACP v. Button*, 371 U.S. 415, 432 (1963) (requiring "narrow specificity"); App.Br. 49-50. The prosecution (at 50-55) simply ignores this heightened standard.

Likewise, the prosecution has no answer to the fundamental vagueness created by a Gag Order that authorizes "general[]" criticism, but prohibits "target[ed]" statements. J.A.231; *see* App.Br.54. *Gentile* invalidated as vague a virtually

identical scheme—a rule that authorized "general" statements about a case but prohibited "elaboration." 501 U.S. at 1048-49. Noting that "'general' and 'elaboration' are both classic terms of degree," the Supreme Court held that lawyers governed by the rule must "guess at its contours." *Id.* So also here, the Gag Order gives President Trump "no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the [targeted]." *Id.* at 1049.

The prosecution echoes the district court's "clarification" in denying President Trump's stay motion that the Gag Order prohibits any "statements that could result in significant and immediate risks to the integrity of these proceedings." Resp.Br.51 (quoting J.A.338) (alterations omitted). But, according to the prosecution and the district court, "significant and immediate risk to the integrity of the proceedings" is the *legal standard that authorizes the district court to gag President Trump in the first place*. Resp.Br.15 (quoting J.A.230); *id.* at 17, 34, 36, 51. As interpreted by the district court, therefore, the Gag Order instructs President Trump not to make any statements that the district court believes the Constitution authorizes it to gag. J.A.338. This is "an impermissible 'obey the law' injunction … that is not meaningfully more specific than the law in question." *Caudle v. District of Columbia*, 825 F. Supp. 2d 73, 81 (D.D.C. 2011); App.Br.51-52.

The prosecution suggests that prohibited statements "typically consist of *ad hominem* attacks using inflammatory language likely to arouse angry or violent

25

feelings in the listener, rather than reasoned argument…." Resp.Br. 51. This adds whole new dimensions of vagueness, as it rests on a series of subjective questions about what constitute "inflammatory" and "*ad hominem*" "attacks," as opposed to "reasoned argument." *Id.* Both the district court's and the prosecution's post-Order "clarifications" would require President Trump to attempt to predict the reactions of innumerable, unidentified third parties to his speech. Resp.Br.51; J.A.338. This both chills speech in advance and calls for enforcement by hindsight, *i.e.*, "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

The prosecution cites *United States v. Bronstein* to argue that the Court should not consult the dictionary to understand the Gag Order's meaning. Resp.Br. 51. But *Bronstein* itself consulted a range of dictionaries to arrive at its core holding—that "harangue" and "oration" refer to "public speeches." 849 F.3d 1101, 1108 (D.C. Cir. 2017). When *Bronstein* stated that "we are interpreting a statute, not restating a dictionary," this Court was dismissing the fact that "harangue" and "oration," "as their dictionary definitions show, … can cover different facets of public speeches." *Id.* at 1108. This logic is inapplicable here, where President Trump has cited multiple dictionary definitions showing that "target" has a wide range of meanings to ordinary speakers of English. App.Br.50-51. *Bronstein* emphasizes that "the vagueness doctrine assesses a legal term's meaning to 'ordinary people,'" and "[w]ords receive

their 'plain, obvious and common sense meaning.'" 849 F.3d at 1108 (citation omitted). Here, that meaning of "target" is indeterminate because it has a wide range of meanings to "ordinary people," *id.*, as the dictionary plainly shows. App.Br.50-51.

Moreover, *Bronstein* did not involve a prior restraint, *see* 849 F.3d at 1104-05, and this Court did not cite the exacting standards of clarity that apply to prior restraints. Moreover, the statutory terms in *Bronstein* had clear, discernible, core meanings, *id.* at 1108-09, while the operative term here ("target") has such a range of meanings that it is vague to its core.

The prosecution's reliance on President Trump's two posts—one before and one after the administrative stay—illustrates the very chilling effect created by the Gag Order's vagueness. Resp.Br.17-18; J.A.339-40. The post-stay posting contains core political speech on matters of enormous public concern which President Trump evidently did not feel free to post while the Gag Order was in effect—yet even the district court that entered the Gag Order the week before could not quite determine that this post would have violated it. J.A.340. This illustrates the Gag Order's ability to deter a much wider range of postings expressing core political speech, which appears to be the prosecution's base goal. The Gag Order's vague prohibitions "operate to inhibit protected expression by inducing [President Trump] to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly

marked." *Buckley*, 424 U.S. at 41 n.48 (quoting *Grayned*, 408 U.S. at 108-109) (cleaned up).

Finally, the prosecution's reliance on President Trump's terms of release, Resp.Br.53, undermines its case. Those terms of release include a standard term designed to prevent the very ills that the Gag Order addresses—such as witness interference, threats, or intimidation. S.A.3. The prosecution does not contend that President Trump has violated this term of release, nor explain why it fails to prevent the "speculative" prejudice, J.A.204, that the prosecution supposedly fears.

## CONCLUSION

The Gag Order should be reversed.

Dated: November 17, 2023

LAURO & SINGER

John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW

Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

Respectfully Submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ D. John Sauer*
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald Trump*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 17, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,482 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer