ORAL ARGUMENT HEARD NOVEMBER 20, 2023
No. 23-3190

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA,

*Appellee*,

v.

DONALD J. TRUMP,

*Defendant-Appellant*.

_____

On Appeal from the United States District Court
for the District of Columbia

PRESIDENT TRUMP'S PETITION FOR PANEL REHEARING AND EN
BANC CONSIDERATION AND REQUEST FOR ADMINISTRATIVE STAY
PENDING CONSIDERATION OF THIS PETITION

LAURO & SINGER
John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. iii

GLOSSARY ......................................................................................................v

RULE 35(b) STATEMENT AND INTRODUCTION...............................................1

ARGUMENT .....................................................................................................3

    I.    The Panel Opinion Conflicts With the Supreme Court and Other Circuits on the Governing Standard for Gagging a Criminal Defendant...................................................................................................3

    II.    The Panel Opinion Conflicts With the Supreme Court and Other Circuits on the Importance of Campaign Speech.....................................6

    III.    The Panel Opinion Conflicts With Decisions of the Supreme Court and Other Circuits by Restricting Political Speech Based on a Heckler's Veto. .........................................................................................10

    IV.    The Panel Opinion Conflicts With Supreme Court Precedent Requiring "Solidity of Evidence" To Justify Pretrial Speech Restrictions. ...........................................................................................12

    V.    Panel Rehearing Is Also Warranted Because the Panel Opinion Overlooks or Misapprehends Material Points of Fact and Law..............13

CONCLUSION .................................................................................................17

ADDENDUM

    1.  Panel Opinion ("Slip Op.") (December 8, 2023) .......................................A1

    2.  Judgment (December 8, 2023).................................................................A69

    3.  Certificate of Parties and *Amici Curiae*....................................................A70

    4.  Disclosure Statement ............................................................................A71

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969)....................................................................................2, 11

*Bridges v. California*,
    314 U.S. 252 (1941)....................................................................................4, 12

*Brown v. Louisiana*,
    383 U.S. 131 (1966)........................................................................................10

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)........................................................................................13

*Craig v. Harney*,
    331 U.S. 367 (1947)........................................................................................12

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)..................................................................................10, 11

*Garza v. Hargan*,
    2017 WL 4707112 (D.C. Cir. Oct. 19, 2017)................................................17

*Gentile v. State Bar of Nevada*,
    501 U.S. 1030 (1991)......................................................................................4, 5

*Landmark Communications, Inc. v. Virginia*,
    435 U.S. 829 (1978)........................................................................2, 4, 6, 12

*Matal v. Tam*,
    582 U.S. 218 (2017)........................................................................................10

*Monitor Patriot Co. v. Roy*,
    401 U.S. 265 (1971)..........................................................................................9

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)..................................................................................12, 13

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)...........................................................................4

*Pennekamp v. Florida*,
  328 U.S. 331 (1946)....................................................................3, 4, 12

*Petteway v. Galveston County*,
  2023 WL 8290715 (5th Cir. Nov. 10, 2023).......................................17

*Republican Party of Minnesota v. White*,
  536 U.S. 765 (2002)..........................................................................1

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001).............................................................11

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014).........................................................................9

*United States v. Brown*,
  218 F.3d 415 (5th Cir. 2000).............................................1, 2, 4, 5, 7

*United States v. Ford*,
  830 F.2d 596 (6th Cir. 1987)......................................................1, 4, 7

*United States v. Shry*,
  No. 4:23-cr-413 (S.D. Tex. Aug. 11, 2023) .................................13, 14

**Federal Rules of Appellate Procedure**

Fed. R. App. P. 35...............................................................................1

Fed. R. App. P. 40..........................................................................3, 13

# **GLOSSARY**

J.A.__ ............................................................Joint Appendix (page number)

Add.A__ ........................................................... Addendum (page number)

President Trump ...............................................Appellant President Donald J. Trump

The prosecution....................................................Appellee United States of America

## RULE 35(b) STATEMENT AND INTRODUCTION

This petition presents a question of exceptional importance: Whether a district court may gag the core political speech of the leading candidate for President of the United States—disregarding the First Amendment rights of over 100 million American voters—based on speculation about undefined possible future harms to the judicial process. Fed. R. App. P. 35(b)(1)(B). The Supreme Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *Republican Party of Minnesota v. White*, 536 U.S. 765, 781-82 (2002). Yet the panel opinion does just that. Add.A67-68.

The opinion holds that President Trump must be silenced to protect trial participants from possible threats or "harassment" from unrelated third parties. Add.A28, 33, 35, 43, 46, 52, 53, 61, 62, 64. In doing so, the opinion conflicts with decisions of the Supreme Court and other Circuits, warranting en banc consideration both to secure uniformity of this Court's decisions and because of the question's exceptional importance. Fed. R. App. P. 35(b)(1)(A)-(B).

First, the panel opinion contradicts Supreme Court precedent and deepens a preexisting circuit split on the governing standard for gagging a criminal defendant's pretrial statements. *Compare United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987), *with United States v. Brown*, 218 F.3d 415, 425-28 (5th Cir. 2000). Confronted with a two-way split, the panel opinion adopts a *third* standard, for which

1

it cites no authority. Add.A3, 25, 67. In so holding, the panel reasons that the Supreme Court repudiated the long-established "clear and present danger" test in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 842 (1978), when in fact the Court clarified and applied the test in that case, *id.* at 844-45.

Second, the panel opinion conflicts with the Fifth and Sixth Circuits on the critical importance of *campaign* speech in gagging a criminal defendant. Though they differed on the governing standard, both *Ford* and *Brown* reached the same result—in both cases, the candidate-defendant was given nearly "absolute freedom" to discuss his case during the pendency of the campaign. *Brown*, 218 F.3d at 430. The panel opinion, by contrast, authorizes extensive restrictions on the core political speech of the leading candidate for President of the United States, based on effectively nonexistent evidentiary justifications. Add.A67-68.

Third, the panel opinion conflicts with precedent of the Supreme Court and other Circuits by justifying speech restrictions based on a "heckler's veto" theory— *i.e.*, the anticipated *reaction* of independent audience members to President Trump's speech. Add.A40-43. The panel opinion justifies this reasoning on the basis that the audience is not "hostile" to President Trump, Add.A41, but that justification contradicts the Supreme Court's incitement doctrine. *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (per curiam).

2

Fourth, the panel opinion conflicts with Supreme Court precedent that requires a "solidity of evidence" to justify prior restraints on speech. *Pennekamp v. Florida*, 328 U.S. 331, 347 (1946). Here, the prosecution presented no evidence of any threats or harassment to any prosecutor, potential witness, or court staffer—the only people protected by the gag order—during the case's months-long pendency. Likewise, the prosecution presented no evidence that any prosecutor, potential witness, or court staffer felt intimidated by President Trump's speech, despite the prosecution's unique access to such persons.

Finally, the opinion warrants panel rehearing because it overlooks and misapprehends points of fact by mischaracterizing the context of President Trump's public statements. *See infra*, Part V. It also overlooks and misapprehends numerous points of law, discussed above. *See* Fed. R. App. P. 40(a)(2).[1]

## ARGUMENT

### I.    The Panel Opinion Conflicts With the Supreme Court and Other Circuits on the Governing Standard for Gagging a Criminal Defendant.

The panel opinion conflicts with decisions of the Supreme Court and the Fifth and Sixth Circuits on the standard for gagging a criminal defendant's speech.

---

[1] On December 13, 2023, the district court stayed proceedings pending the outcome of President Trump's appeal relating to Presidential immunity and double jeopardy. D.Ct. Doc. 186. The district court, however, held that it would retain jurisdiction to enforce the gag order challenged in this appeal during the stay. *See id.* at 2-3.

In *Ford*, the Sixth Circuit held that gagging a criminal defendant's speech requires a showing of a "clear and present danger" to the administration of justice. 830 F.2d at 598 (adopting "the exacting 'clear and present danger' test for free speech cases"); *id.* (rejecting the alternative standard of "likelihood that prejudicial news prior to trial will prevent a fair trial"); *id.* at 600 (applying "the clear and present danger standard"). The Supreme Court has often applied the clear-and-present-danger standard to court proceedings. *See, e.g., Landmark*, 435 U.S. at 844-45; *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) (holding that "repression" of speech about court proceedings "can be justified, if at all, only by a clear and present danger of the obstruction of justice"); *Pennekamp*, 328 U.S. at 347 (requiring "a clear and present danger to judicial administration"); *Bridges v. California*, 314 U.S. 252, 262 (1941) ("[T]he 'clear and present danger' language …. has afforded practical guidance in a great variety of cases….").

In *Brown*, considering a gag order on a criminal defendant, the Fifth Circuit came to the opposite conclusion. 218 F.3d at 425-28. It rejected the "clear and present danger" test that *Ford* adopted, and it adopted the "substantial likelihood of material prejudice" test that *Ford* rejected. *See id.* at 428. The Fifth Circuit concluded that the Supreme Court's intervening opinion in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991)—which held that the "substantial likelihood"

standard may apply to *attorneys*, *id.* at 1064-76—requires the same standard to apply to all "trial participants." *Brown*, 218 F.3d at 428.

Confronted with this circuit split, the panel opinion opted for a *third* standard: "a significant and imminent threat to the fair and orderly adjudication of the ongoing criminal proceeding." Add.A3; *see also id.* at A25, 28, 31, 36, 39, 67. The panel opinion cited no authority for this test. *See id.* The panel opinion rejected the "clear and present danger" standard as one that "gets constitutional precedent wrong," *id.* at A28; but it also stated that its "significant and imminent threat" test reflects more "demanding scrutiny" than the prosecution's proposed "substantial likelihood" test, *id.* at A27. Thus, the panel opinion's standard falls somewhere between the "clear and present danger" standard—which it rejects, *id.* at A27-30; and the "substantial likelihood of material prejudice" standard—which it "assume[s] without deciding" is not "demanding" enough, *id.* at A27.

Because the panel opinion plainly envisions that the three standards materially differ, *see id.* at A27-28; *but see Gentile*, 501 U.S. at 1037 (plurality opinion of Kennedy, J.) (suggesting that two of the standards "approximate[]" each other), the decision creates a three-way circuit split on the standard for gagging a criminal defendant during criminal proceedings.

The panel opinion also holds that the "clear-and-present-danger test" has "no legal mooring," because *Landmark* supposedly held that this standard is "not a

5

proper 'formula for adjudicating cases.'" Add.A29 (quoting *Landmark*, 435 U.S. at 842). But *Landmark* merely rejected the "mechanical *application* of the test" and held that "[p]roperly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger…." 435 U.S. at 842-43 (emphases added). Indeed, *Landmark* clarified and applied the clear-and-present-danger test in that case. *Id.* at 845 (holding that "the clear-and-present-danger test … cannot be met here"); *id.* (holding that "the test requires that the danger be 'clear and present'"); *id.* at 844 (addressing whether the statements presented a "clear and present danger to the administration of justice").

## II. The Panel Opinion Conflicts With the Supreme Court and Other Circuits on the Importance of Campaign Speech.

The panel opinion conflicts with *Brown* and *Ford*, not just on the governing legal standard, but in practical outcome. The panel opinion permits significant restrictions on the core political speech of a criminal defendant who is a political candidate at the height of his campaign for office. Add.A67-68. By contrast, in both *Ford* and *Brown*, the defendant-candidate was given virtually unfettered discretion to speak publicly about his case during the campaign.

In *Ford*, the Sixth Circuit gave Congressman Ford unfettered latitude to speak about his prosecution during his campaign, emphasizing that "the defendant, a Democrat … is entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views and

6

his race." *Ford*, 830 F.2d at 600-01.  Congressman Ford, the court reasoned, "will soon be up for reelection.  His opponents will attack him as an indicted felon."  *Id.* at 601.  "He will be unable to respond in kind if the District Court's order remains in place.  He will be unable to inform his constituents of his point of view."  *Id.*

Likewise, in *Brown*, the district court "temporarily lifted the gag order … to avoid interfering with Brown's re-election campaign." 218 F.3d at 419. "The district court … made special allowances for Brown's re-election campaign by lifting most of the order … for the duration of his campaign," so that "Brown was able to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race." *Id.* at 430.  Citing this decision, the Fifth Circuit stated that "[t]he urgency of a campaign … may well require that a candidate, for the benefit of the electorate as well as himself, have *absolute freedom* to discuss his qualifications…." *Id.* (emphasis added).  Thus, though they disagree on the legal standard to apply, the courts in *Brown* and *Ford* are closely aligned in outcome—the political candidate in each case was given virtually "absolute freedom" to discuss the case.  *Id.*

Indeed, the gag order has been criticized across the political spectrum for interfering with the voters' ability to hear from the leading Presidential candidate. *See, e.g.,* Terry Evans, *Democrats' Drive To Impose 'Gag' Orders on Trump Is Blow to Free Speech*, THE MILITANT (Nov. 13, 2023), https://themilitant.com/2023/11/04/democrats-drive-to-impose-gag-orders-on-

trump-is-blow-to-free-speech/ ("Gag orders on the former president … muzzle what he can say during the campaign and … disenfranchise[e] the tens of millions who want to vote for him."); Besty McCaughey, *Why the ACLU Is Going To Bat For Donald Trump*, N.Y. POST (Nov. 1, 2023) (arguing that the Gag Order violates "the public's right to hear Trump's views so it can decide 'whether he deserves to be elected again'"); The Editors, *The Trump Gag Order Goes Too Far*, NATIONAL REVIEW (Oct. 18, 2023) ("Not only is free speech his right—it is the right of voters in the forthcoming primary and general elections to hear it before choosing the nation's next president."); Isaac Arnsdorf et al., *In Trump Cases, Experts Say Defendant's Rhetoric Will Be Hard To Police*, WASHINGTON POST (Aug. 23, 2023) (the court should "permit voters access to the defendant's statements as they decide how to cast their ballots…").

In stark contrast, the panel opinion here treats the fact that President Trump is the leading candidate for President as virtually insignificant. The panel opinion notes the crucial importance of campaign speech, *see* Add.A16, 44—but when it actually analyzes the question, it explicitly *declines* to give the presence of campaign speech any weight, treating it instead as equivalent to "political speech generally." Add.A43 n.14; *id.* at A48.

This analysis contradicts Supreme Court precedent, which instructs that the First Amendment "has its fullest and most urgent application precisely to the conduct

of campaigns for political office." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). The panel opinion cites this principle, Add.A16, but then disregards it in the actual analysis, *id.* at A43-45.

The panel's justification for disregarding the campaign-speech doctrine is puzzling. The panel states in a footnote that "[a]t oral argument, Mr. Trump stated that his position would be the same even if there were no political campaign underway, as he would still be engaged in political speech. Given that position, we focus on the protection of political speech generally." Add.A43 n.14 (citing Oral Arg. Tr. 5:14-6:20). But at oral argument, President Trump's counsel stated that, if there were no campaign, "[o]ur position would be that it's still unconstitutional, but the campaign adds an additional and very powerful reason why it is unconstitutional." Oral Arg. Tr. 7:7-9. Counsel then described the campaign-speech doctrine as the "crown jewel" of the arguments favoring reversal, while also emphasizing several independently sufficient grounds. *Id.* 7:15-8:7. President Trump did not waive reliance on the campaign-speech doctrine by describing it as his "most power[ful] and compelling" argument. *Id.* at 8:6-7. President Trump's assertion of *alternative* grounds for reversal does not negate the Supreme Court's instruction that the First Amendment have its "fullest and most urgent application" to campaign speech. *Susan B. Anthony List*, 573 U.S. at 162.

### III.    The Panel Opinion Conflicts With Decisions of the Supreme Court and Other Circuits by Restricting Political Speech Based on a Heckler's Veto.

The panel opinion relies heavily on the audience's anticipated *reaction* to President Trump's speech—specifically, the concern that President Trump's speech might lead unidentified third parties to "threaten" or "harass" trial participants. *See, e.g.,* Add.A5-9, 28, 31-35, 38-39, 43, 46-47, 52-53, 61-62, 64.

This justification contradicts the case law of the Supreme Court and other Circuits.   Under the First Amendment, public speakers "are not chargeable with the danger" that their audiences "might react with disorder or violence." *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality op.); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("Speech cannot be … punished or banned, simply because it might offend a hostile mob.").

The panel opinion distinguishes these cases on the ground that they involve speech that might "*offend* a hostile mob," Add.A41 (panel's emphasis)—whereas here the panel is concerned that President "Trump's *followers* will act minaciously in response to his words," *id.* (emphasis added).   Under Supreme Court precedent, however, this distinction makes no difference.   Speech cannot be prohibited based solely on the audience's reaction, regardless of whether that reaction is hostile to the speaker, or hostile to those the speaker criticizes: "The Government may not … t[ie] censorship to the *reaction of the speaker's audience*." *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment)

10

(emphasis added); *see also, e.g., Forsyth County*, 505 U.S. at 134 ("Listeners' reaction to speech is not a content-neutral basis for regulation."); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001) (Alito, J.) ("[T]he government may not prohibit speech under a 'secondary effects' rationale based solely on the emotive impact that its offensive content may have on a listener….").

The incitement doctrine forecloses the panel opinion's analysis. Unless speech qualifies as incitement to imminent lawless action—which President Trump's does not—it cannot be prohibited on the ground that it might lead independent third-party actors to misbehave. Such a restriction "impermissibly intrudes upon the freedoms guaranteed by" the First Amendment and "sweeps within its condemnation speech which our Constitution has immunized from governmental control." *Brandenburg*, 395 U.S. at 448; *id.* at 444-45, 448-49 (holding that the First Amendment protects "advocacy" of criminal and other behavior that falls short of "incitement to imminent lawless action"). The Supreme Court treats this rule as categorical, *see id.* at 447 (describing the contrary rule as "thoroughly discredited")—yet the panel opinion disregards it.

In so holding, the panel opinion sets an especially dangerous precedent in the current age. Third-party heckling by random listeners is an all-too-frequent feature of online discourse. *See, e.g.,* Emily A. Vogels, *The State of Online Harassment*, PEW RESEARCH CENTER (Jan. 13, 2021). Speech by any high-profile public figure

11

on a controversial issue is often followed by abusive comments from unrelated third parties—which can speedily be characterized as "harassment" or "threats" by those seeking to silence disfavored viewpoints. The panel's opinion provides a sleeper justification for silencing enormous quantities of core political speech on matters of utmost public importance. Indeed, that is exactly what happened here—the panel opinion silences President Trump because it anticipates that some tiny minority of his over 100 million listeners, over whom he has no control, might heckle others in response to his core political speech. Add.A41.

## IV. The Panel Opinion Conflicts With Supreme Court Precedent Requiring "Solidity of Evidence" To Justify Pretrial Speech Restrictions.

The Supreme Court has emphasized the importance of the *evidentiary* burden required for pretrial speech restrictions, requiring a "solidity of evidence" to justify them. *Pennekamp*, 328 U.S. at 347; *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 565 (1976) (invalidating a prior restraint where "the record is lacking in evidence to support such a finding"). To justify a prior restraint, "the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished, and … a solidity of evidence is necessary to make the requisite showing of imminence. The danger must not be remote or even probable; it must immediately imperil." *Landmark*, 435 U.S. at 845 (quotation marks omitted) (quoting *Bridges*, 314 U.S. at 263; *Pennekamp*, 328 U.S. at 347; and *Craig v. Harney*, 331 U.S. 367, 376 (1947)).

12

The panel opinion's justification falls far short of this "heavy burden of showing justification for the prior restraint." *Nebraska Press Ass'n*, 427 U.S. at 558. The prosecution produced no evidence of any "threats" or "harassment" received by any court staffer, potential witness, or prosecutor in *this* case. Instead, the panel opinion relies heavily on supposed threats and harassment that occurred nearly three years ago. Add.A5-7. In less stringent contexts, the Supreme Court rejects causal "theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). The panel erred by disregarding this guidance here.

## V.  Panel Rehearing Is Also Warranted Because the Panel Opinion Overlooks or Misapprehends Material Points of Fact and Law.

The decision also warrants panel rehearing because it overlooks or misapprehends material points of fact and law. Fed. R. App. P. 40(a)(2).

For example, the panel opinion states that "[t]he day after Mr. Trump's 'IF YOU GO AFTER ME, I'M COMING AFTER YOU!' post, one of his supporters called the district court judge's chambers" and made racist threats. Add.A8 (citing *United States v. Shry*, No. 4:23-cr-413, ECF 1, at 3 (S.D. Tex. Aug. 11, 2023)). The panel concludes that President Trump's post *caused* this threat. Add.A33 (describing this threat as a "real-world consequence[]" of this post). President Trump's post did not refer to the case at all, but to contemporaneous reports that the Koch brothers

13

were funding PACs against him.[2]  Moreover, the panel overlooks evidence from the docket in *Shry* indicating that President Trump's post did *not* cause Shry's threat. The credited testimony at Shry's detention hearing states that the threat was inspired by her watching *the news*, not social media.  Shry's father testified that she is a "non-violent alcoholic" who "sits on the couch daily *watching the news* while drinking too many beers," and "becomes agitated *by the news* and starts calling people and threatening them."  *Shry*, Doc. 8, at 3 (emphasis added).  Social media is not mentioned.  Since the most pervasive subject on "the news" at the time was the Special Counsel's inflammatory press conference announcing the indictment, if anything, this evidence supports the inference that the threat was inspired by the Special Counsel, not President Trump.

The panel also states that President Trump's social-media posts accused Vice President Pence of "going to the 'Dark Side'" and "'making up stories about' the events of January 6, 2020."  Add.A8, 31.  But Pence was then a rival candidate for the Republican nomination for President who had just given a major speech attacking President Trump on these very issues.  James Oliphant, *Pence Urges*

---

[2] See Alexandra Ulmer, *US Conservative Group Led by Billionaire Koch To Spend Big To Beat Trump*, REUTERS (June 29, 2023), at https://www.reuters.com/world/us/us-conservative-group-led-by-billionaire-koch-set-spend-beat-trump-2023-06-29/; Brian Schwarz, *Trump Goes on Offense Against Koch Network*, CNBC (Aug. 7, 2023), at https://www.cnbc.com/2023/08/07/trump-goes-on-offense-against-koch-network.html; Appellant's Br. 15 n.7.

*Republican Voters To Reject Trump-Style Populism*, REUTERS (Sept. 6, 2023).  On August 1, 2023, the indictment alleged that President Trump had told Pence "you're too honest."  J.A.52.  As a result, "the Pence campaign updated its merch[andise] offerings to take advantage" of the allegation to include "a hat and a shirt, both bearing the two-word phrase 'Too Honest.'"  Dave Mendez, *Pence Boosts Fundraising Off Trump's 'Too Honest' Comment Mentioned in Indictment*, SPECTRUM NEWS (Aug. 3, 2023), *at* https://ny1.com/nyc/all-boroughs/politics/2023/08/04/pence-boosts-fundraising-off-of-trump-s--too-honest--quote.  Pence also fundraised off this and raised "more than 7,400 donations" as a result.  *Id.*  Thus, President Trump—in an August 5, 2023, social-media post—stated that he "never" stated that "Mike was 'too honest,'" and accused Pence of having "gone to the Dark Side."  J.A.85.

The panel opinion assumes that President Trump has no valid interest in speaking about prosecutors other than the Special Counsel.  Add.A67-68. This overlooks, for example, that one of those prosecutors raised concerns about undue political influence by meeting at the White House during the investigation— discussion of which constitutes core political speech.  *See* Appellant's Br. 4-5 (citing Jon Levine, *Biden Staffers Met With Special Counsel Jack Smith's Aides Before Trump Indictment*, N.Y. POST (Aug. 26, 2023), *at* https://nypost.com/2023/08/26/biden-staffers-met-with-special-counsel-jack-

15

smiths-aides-before-trump-indictment/).  The panel opinion assumes that President Trump has no valid interest in speaking about the Special Counsel's "family members."  Add.A3.  This overlooks that the Special Counsel's wife has close ties to the Obama family, which raises concerns of political bias that constitute core political speech.  Reply Br. 5 n.1 (citing Victor Nava, *Trump Special Counsel's Wife Worked on Obama Film and Donated to Biden*, N.Y. POST (Nov. 11, 2023), *at* https://nypost.com/2022/11/23/trump-special-counsels-wife-worked-on-obama-film-and-donated-to-biden/).

As these examples—among many others—demonstrate, the First Amendment injuries are not allayed by the panel opinion's attempts to narrow the scope of the district court's gag order.  Add.A67-68.  The order, as modified, suppresses large quantities of core political speech of direct relevance to the Presidential campaign. Among other things, it silences the leading candidate for President of the United States from making specific comments on the "potential participation" of "reasonably foreseeable witnesses" in this case—where the "reasonably foreseeable witnesses" comprise major public figures who publicly attack President Trump amid his campaign, such as Vice President Pence, Attorney General Barr, and similar figures. *Id.*  For its other restrictions, the order imposes a *mens rea* requirement, but the panel opinion then ominously suggests that virtually any statement that results

16

in third-party heckling will satisfy the *mens rea* requirement. *Id.* at A66. Both the gag order and its continued chilling effect are unconstitutional.

## CONCLUSION

This petition for panel rehearing and/or en banc consideration should be granted. Furthermore, the Court should enter an administrative stay of the gag order pending consideration of this petition. *See, e.g.,* Add.A11; *Garza v. Hargan*, 2017 WL 4707112, at *1 (D.C. Cir. Oct. 19, 2017) (per curiam) (unpublished order); *Petteway v. Galveston County*, 2023 WL 8290715, at *1 (5th Cir. Nov. 10, 2023) (per curiam) (unpublished order).

Dated: December 18, 2023

LAURO & SINGER
John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

Respectfully Submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ D. John Sauer*
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

17

# ADDENDUM

## <u>ADDENDUM</u>

## Table of Contents

1. Panel Opinion ("Slip Op.") (December 8, 2023)................................................A1

2. Judgment (December 8, 2023).........................................................A69

3. Certificate of Parties and *Amici Curiae* ...........................................A70

4. Disclosure Statement ...................................................................A71

PUBLIC COPY – SEALED INFORMATION DELETED

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 20, 2023      Decided December 8, 2023

No. 23-3190

UNITED STATES OF AMERICA,
APPELLEE

v.

DONALD J. TRUMP,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cr-00257-1)

———

*D. John Sauer* argued the cause for appellant. With him on the briefs were *John F. Lauro*, *Emil Bove*, *William O. Scharf*, and *Michael E. Talent*.

*Brenna Bird*, Attorney General, Office of the Attorney General for the State of Iowa, and *Eric H. Wessan*, Solicitor General, were on the brief for *amici curiae* Iowa, *et al.* in support of appellant.

A1

2

PUBLIC COPY – SEALED INFORMATION DELETED

*Gene P. Hamilton* and *Judd E. Stone, II* were on the brief for *amicus curiae* America First Legal Foundation in support of appellant.

*Dennis Grossman* was on the brief for *amicus curiae* Christian Family Coalition in support of appellant.

*Cecil W. VanDevender*, Assistant Special Counsel, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *J.P. Cooney*, Deputy Special Counsel, *Raymond N. Hulser*, Counselor to the Special Counsel, *James I. Pearce* and *John M. Pellettieri*, Assistant Special Counsels, and *Molly G. Gaston* and *Thomas P. Windom*, Senior Assistant Special Counsels.

Before: MILLETT, PILLARD, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:[*]  A federal grand jury indicted former President Donald J. Trump for conspiring to overturn the 2020 presidential election through unlawful means and for obstructing the election's certification.  Soon thereafter, Mr. Trump posted multiple statements on his social media account attacking potential witnesses in the case, the judge, and the Special Counsel and his staff prosecuting the case.  The district court subsequently issued an order restraining the parties and their counsel from making public statements that "target" the parties, counsel and their staffs, court personnel, and "any

---

[*] **NOTE**: Portions of this opinion contain **sealed** information, which has been redacted.

A2

3

PUBLIC COPY – SEALED INFORMATION DELETED

reasonably foreseeable witness or the substance of their testimony."

Mr. Trump appeals the district court's order. His appeal involves the confluence of two paramount constitutional interests: the freedom of speech guaranteed by the First Amendment and the federal courts' vital Article III duty to ensure the fair and orderly administration of justice in criminal cases. We agree with the district court that some aspects of Mr. Trump's public statements pose a significant and imminent threat to the fair and orderly adjudication of the ongoing criminal proceeding, warranting a speech-constraining protective order. The district court's order, however, sweeps in more protected speech than is necessary. For that reason, we affirm the district court's order in part and vacate it in part.

Specifically, the Order is affirmed to the extent it prohibits all parties and their counsel from making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding. The Order is also affirmed to the extent it prohibits all parties and their counsel from making or directing others to make public statements about—(1) counsel in the case other than the Special Counsel, (2) members of the court's staff and counsel's staffs, or (3) the family members of any counsel or staff member—if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is highly likely to result. We vacate the Order to the extent it covers speech beyond those specified categories. *See* 28 U.S.C. § 2106.

4

PUBLIC COPY – SEALED INFORMATION DELETED

# I

## A

On August 1, 2023, a federal grand jury in Washington, D.C., indicted former President Donald J. Trump on four felony counts of conspiring to overturn the 2020 presidential election. *See* Indictment ¶¶ 1–4, 127–128. Specifically, the indictment alleges that then-President Trump and his co-conspirators "used knowingly false claims of election fraud to get state legislators and election officials to subvert the legitimate election results[,]" "attempted to use the power and authority of the Justice Department to conduct sham election crime investigations[,]" and "attempted to enlist the Vice President to use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results." Indictment ¶ 10.

The conduct charged in the indictment arises out of then-President Trump's refusal to concede his loss in the 2020 presidential election. Indictment ¶¶ 1–2. He claimed that there had been outcome-determinative fraud and that he had actually won. Indictment ¶ 2; *see also* President Donald J. Trump, Statement on 2020 Election Results at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020) (claiming that the election was "rigged" and characterized by "tremendous voter fraud and irregularities").[1]

According to the indictment, then-President Trump waged a campaign to remain in power by publicly and privately

---

[1] https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results.

5

PUBLIC COPY – SEALED INFORMATION DELETED

pressuring state and local officials to overturn the 2020 election results, even though he lacked any proof of relevant irregularities, voter fraud, or vote rigging.  Indictment ¶ 10; *see, e.g.*, *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F. App'x 377, 381 (3d Cir. 2020) ("[C]alling an election unfair does not make it so.  Charges require specific allegations and then proof.  We have neither here.").

During the alleged efforts to overturn the 2020 election results, the then-President lambasted several state and local officials, often naming and blaming specific individuals on social media for not supporting his claims of election fraud.  Special Counsel Mot. to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings 2–5, ECF 57 (Sept. 15, 2023) ("Special Counsel Mot."); *see* Indictment ¶¶ 28, 32.  Mr. Trump's statements subjected those persons to threats and abuse from his supporters.  Special Counsel Mot. 3–5.  One official explained:  "After the President tweeted at me by name, calling me out the way that he did, the threats became much more specific, much more graphic, and included not just me by name but included members of my family by name, their ages, our address, pictures of our home.  Just every bit of detail that you could imagine.  That was what changed with that tweet."  Special Counsel Mot. 3; Indictment ¶ 42.  Another official explained that he needed additional police protection and avoided ███████████████████████████████████████████████████████████████████████████████ ███████████.  Special Counsel Mot. 3███████████████.  And after then-President Trump criticized a governmental office for certifying the election, a member of that office had to ████████ ████████ when one of the then-President's supporters posted

6

**PUBLIC COPY – SEALED INFORMATION DELETED**

the official's address online.  Special Counsel Mot. 3 ███████
███ .

In addition, then-President Trump is alleged to have publicly criticized and shortly thereafter fired the Director of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency for making statements reassuring the public about the 2020 presidential election's security.  Indictment ¶ 11; Special Counsel Mot. 4.  Two weeks later, a lawyer then working for Mr. Trump publicly stated that the director "should be drawn and quartered.  Taken out at dawn and shot."  Special Counsel Mot. 4; Ben Fox, *Cybersecurity Official Fired by Trump Sues Over Threats*, ASSOCIATED PRESS (Dec. 8, 2020).  That statement prompted a wave of death threats against the former official and his family that forced them to evacuate their home until the danger abated. Special Counsel Mot. 4.

The then-President and his campaign also allegedly singled out private individuals.  Indictment ¶¶ 21, 31; *see id.* ¶¶ 26, 29.  A Georgia election worker, for example, testified before a congressional committee that she and her family were bombarded with violent and racist threats after the then-President, falsely and without any evidentiary basis, accused her of election misconduct.  Select Committee Tr. at 7:22–8:3, 26:24–27:2 (May 31, 2022); Indictment ¶ 31.  She testified:

> Do you know how it feels to have the President of the United States to target you?  The President of the United States is supposed to represent every American, not to target one.  But he targeted me, * * * a small-business owner, a mother, a proud American citizen who stood up to help Fulton County run an election in the middle of the

7

pandemic. * * * [W]hen someone as powerful as the President of the United States eggs on a mob, that mob will come.

Special Counsel Mot. 4–5; *see* Select Committee Tr. at 8:8–20.

## B

At a hearing shortly after the indictment, the district court told the parties that it was "committed to ensuring that this case proceeds in the normal course that our criminal justice system prescribes." Hr'g Tr. 71:3–5, ECF 29 (Aug. 11, 2023). The district court emphasized that it "intend[ed] to ensure that Mr. Trump is afforded all the rights that any citizen would have," but then cautioned the parties that it would "prevent what the Supreme Court called in *Sheppard v. Maxwell*[, 384 U.S. 333 (1966),] a 'carnival atmosphere' of unchecked publicity and trial by media rather than our constitutionally established system of trial by impartial jury." *Id.* 71:11–16. To that end, the district court told both parties "to take special care in [their] public statements about this case[,]" adding that it would "take whatever measures are necessary to safeguard the integrity of these proceedings." *Id.* 72:16–19.

Before and after the district court's warning, Mr. Trump repeatedly used his public platform to denigrate and attack those involved in the criminal case against him. The day after his initial court appearance, Mr. Trump posted on his social media account: "IF YOU GO AFTER ME, I'M COMING AFTER YOU!" Special Counsel Mot. 6. He then shared with his over six million social media followers on Truth Social his view that the district court judge is a "fraud dressed up as a judge[,]" "a radical Obama hack[,]" and a "biased, Trump-

8

hating judge[.]"  Special Counsel Mot. 8–9.  He labeled the prosecutors in the case "[d]eranged[,]" "[t]hugs[,]" and "[l]unatics[.]"  Special Counsel Mot. 8–9; Special Counsel Reply in Support of Special Counsel Mot. 10, ECF 64 (Sept. 29, 2023) ("Special Counsel Mot. Reply").

The day after Mr. Trump's "IF YOU GO AFTER ME, I'M COMING AFTER YOU!" post, one of his supporters called the district court judge's chambers and said:  "Hey you stupid slave n[****]r[.] * * * If Trump doesn't get elected in 2024, we are coming to kill you, so tread lightly b[***]h. * * * You will be targeted personally, publicly, your family, all of it."  Special Counsel Br. 5; *see United States v. Shry*, No. 4:23-cr-413, ECF 1 at 3 (Criminal Complaint) (S.D. Tex. Aug. 11, 2023).

Mr. Trump also took aim at potential witnesses named in the indictment, including former Vice President Michael Pence, whom he accused of going to the "Dark Side[.]"  Special Counsel Mot. Reply 9; *see* Special Counsel Mot. 11 & n.20; Special Counsel Mot. Reply 9 (discussing attacks on former Attorney General Bill Barr).

### C

Arguing that Mr. Trump's statements were "undermin[ing] the integrity of the[] proceedings" by impacting "the impartiality of the jury pool while simultaneously influencing witness testimony[,]" the Special Counsel asked the district court for an order restraining Mr. Trump's public statements about the trial.  Special Counsel Mot. 1, 15.  Specifically, the prosecution sought to prohibit (1) "statements regarding the identity, testimony, or credibility of

9

prospective witnesses"; and (2) "statements about any party, witness, attorney, court personnel, or potential jurors that are disparaging and inflammatory, or intimidating." Special Counsel Mot. 15. After full briefing and a hearing, the district court granted in part and denied in part the Special Counsel's motion. Dist. Ct. Order at 1 ("Order").

The district court first explained that an order restricting Mr. Trump's speech about the District of Columbia or its residents was not necessary at that time to protect against contaminating the jury pool. Hr'g Tr. 82:24–83:4. Instead, the district court held that, on the record before it, any such taint could be addressed through rigorous questioning of potential jurors before empanelment. *Id.*

On the other hand, the court found that the former President's speech posed "a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." Order at 2. Invoking both a local rule of criminal procedure, *see* LCrR 57.7(c), and the court's obligation to "take such steps by rule and regulation that will protect [its] processes from prejudicial outside interferences[,]" Order at 1 (quoting *Sheppard*, 384 U.S. at 363), the district court ordered:

> All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or

10

PUBLIC COPY – SEALED INFORMATION DELETED

(4) any reasonably foreseeable witness or the substance of their testimony.

Order at 3.

The district court then added that the Order did not prohibit "statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that Defendant is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of Defendant's current political rivals[.]"  Order at 3.  The district court's Order does not prohibit statements targeting the court or the judge herself.  *See* Order at 1–3.

## D

The district court administratively stayed the Order while it considered Mr. Trump's motion for a stay pending appeal. Minute Order of Oct. 20, 2023.

Soon thereafter, news broke asserting that Mark Meadows, Mr. Trump's former Chief of Staff, was cooperating with the Special Counsel in exchange for immunity.  *See* Katherine Faulders, Mike Levine & Alexander Mallin, *Ex-Chief of Staff Mark Meadows Granted Immunity, Tells Special Counsel He Warned Trump About 2020 Claims*, ABC NEWS (Oct. 24, 2023, 6:11 PM).[2]  Hours later, Mr. Trump asked on social media whether Meadows was the type of "weakling[] and coward[]" who would "make up some really horrible 'STUFF'" about Mr. Trump in exchange for "IMMUNITY against Prosecution

---

[2] https://perma.cc/VRG2-D6SZ.

A10

11

PUBLIC COPY – SEALED INFORMATION DELETED

(PERSECUTION!) by Deranged Prosecutor, Jack Smith." Special Counsel Resp. in Opp'n to Mot. to Stay 9, ECF 120 (Oct. 25, 2023) ("Special Counsel Stay Opp'n").

Five days later, the district court denied Mr. Trump's request for a stay pending appeal to this court. Order at 9, ECF 124 (Oct. 29, 2023). As part of that denial, the district court further clarified that the Order's reach should be read in light of the court's discussions with counsel during the motion hearing that led to its issuance. *Id.* at 5–6.

**E**

Mr. Trump timely filed an emergency appeal, a motion for a stay of the Order, and a request for an expedited appeal. *See* Emergency Mot. For Stay Pending Appeal at 1–2 (Nov. 2, 2023). The next day, this court administratively stayed the Order and, because of the approaching trial date, set a highly expedited schedule for the merits appeal. *See* Per Curiam Order (Nov. 3, 2023).

**II**

**A**

We begin with our jurisdiction to hear this interlocutory appeal. Congress has generally limited the jurisdiction of federal courts of appeals to "final decisions of the district courts[.]" 28 U.S.C. § 1291. As a result, a party ordinarily may appeal only after the district court has resolved all claims and has entered a final judgment fully disposing of the case. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 521–522 (1988);

12

PUBLIC COPY – SEALED INFORMATION DELETED

*Cincinnati Ins. Co. v. All Plumbing, Inc.*, 812 F.3d 153, 156 (D.C. Cir. 2016).

One exception to this rule is the collateral-order doctrine, under which an interlocutory district court order may be appealed if it "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Ameziane v. Obama*, 620 F.3d 1, 5 (D.C. Cir. 2010) (citing *Will v. Hallock*, 546 U.S. 345, 349 (2006)). In addition, in *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), the Supreme Court underscored that "the class of collaterally appealable orders must remain 'narrow and selective in its membership.'" *Id.* at 113 (quoting *Will*, 546 U.S. at 350). Jurisdiction exists only if the type of order at issue categorically satisfies the doctrine's criteria. *Id*. at 107.

Orders restraining parties' speech during the pendency of a criminal case categorically satisfy those criteria.

First, such orders, by their nature, conclusively determine whether parties may speak on specified matters pertaining to the criminal trial.

Second, such orders determine an important issue separate from the merits. A defendant's ability to speak about his criminal trial is an important issue given the First Amendment's broad protection of free speech and the public interest in the transparency of criminal trials and open discussion of the trial process. *See Sheppard*, 384 U.S. at 349–350. "[T]he criminal justice system exists in a larger context of a government ultimately of the people, who wish to be

13

PUBLIC COPY – SEALED INFORMATION DELETED

informed about happenings in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1070 (1991).

In addition, speech restrictions in criminal trials arise from the need to protect the trial process and its truth-finding function; assessing their validity does not touch on a defendant's guilt or innocence or any merits issues in the underlying case. *See United States v. Brown*, 218 F.3d 415, 420 (5th Cir. 2000); *In re Rafferty*, 864 F.2d 151, 154 (D.C. Cir. 1988) (holding that an order restraining a civil plaintiff's ability to disclose information to third persons "is entirely independent of the underlying wrongful discharge claim").

Third, reviewing such orders after final judgment would not redress or undo any unconstitutional prohibitions of speech that occurred prior to or during trial. The damage to First Amendment interests would be done. And an order regulating speech prior to and during trial almost always will expire by its own terms once final judgment is entered in the criminal case, making any attempted appellate review at the end of the case moot.

In addition, no alternative mechanism for review would suffice. In theory, a party could breach the Order, be held in contempt, and then appeal the contempt ruling. But the Supreme Court has long held that requiring speakers to violate the law before vindicating their right to free speech would excessively chill protected speech. *See, e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) ("Many persons, rather than undertake the considerable burden * * * of vindicating their rights through case-by-case litigation, will choose simply to

14

abstain from protected speech[.]"); *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–159 (2014) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights[.]") (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

For those reasons, we hold that we have jurisdiction under the collateral-order doctrine. *See In re Stone*, 940 F.3d 1332, 1340 (D.C. Cir. 2019) ("[O]ur Circuit has long allowed nonparties subject to a restrictive order to appeal that order under the collateral order doctrine."); *Rafferty*, 864 F.2d at 153–155 (order restraining a civil plaintiff's ability to disclose information to third persons is appealable under the collateral-order doctrine); *see also Brown*, 218 F.3d at 420–422 (speech restraint in criminal trial is appealable under the collateral-order doctrine); *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987) (same).[3]

**B**

Whether the Order violates the Constitution is a question of law subject to *de novo* review. *See United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999); *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017). We review the district court's factual findings for clear error and will overturn them only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Miller*, 35 F.4th 807, 817 (D.C. Cir. 2022) (quoting *United States v. United*

---

[3] Because the Order is appealable under the collateral-order doctrine, we need not address whether the Order is also an appealable injunction under 28 U.S.C. § 1292(a)(1), or whether to treat this appeal as a petition for writ of mandamus. *See* Trump Br. 4–6.

A14

15

PUBLIC COPY – SEALED INFORMATION DELETED

*States Gypsum Co.*, 333 U.S. 364, 395 (1948). On our review, this court can "affirm, modify, vacate, set aside or reverse" the district court's Order. 28 U.S.C. § 2106.

### III

Two foundational constitutional values intersect in this case: an individual's right to free speech and the fair and effective functioning of the criminal trial process and its truth-finding function. Because of the constitutional stakes, orders restricting a defendant's speech must be drawn no more broadly or narrowly than necessary to ensure the fair administration of justice.

### A

### *The Right to Free Speech*

Freedom of speech is a bedrock constitutional right. Americans are free to speak, listen to others, and make up their own minds about their government and the world around them. "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)).

Political speech in particular is the lifeblood of American democracy. It allows the free exchange of ideas among individuals about governance and the political process. *Mills*

16

PUBLIC COPY – SEALED INFORMATION DELETED

*v. Alabama*, 384 U.S. 214, 218–219 (1966). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Id.* It also allows voters to make informed decisions about those who seek to represent them in government, including their character, qualifications, and policy platforms. "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976).

For that reason, "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)). "The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates." *Brown v. Hartlage*, 456 U.S. 45, 53 (1982) (quoting *Buckley*, 424 U.S. at 52–53). That discussion is critical to enabling "the electorate [to] intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Id.*

Free speech also holds government officials accountable. Public criticism and scrutiny of those in power exposes fraud, curbs the abuse of power, and roots out corruption. As relevant here, speech about judicial proceedings, especially criminal prosecutions, promotes transparency in the legal system and

A16

17

PUBLIC COPY – SEALED INFORMATION DELETED

"guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard*, 384 U.S. at 350. "The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations." *Gentile*, 501 U.S. at 1035.

"[T]o provide adequate 'breathing space'" for robust public debate and participation, the First Amendment generally shields "insulting, and even outrageous, speech[.]" *Snyder*, 562 U.S. at 458 (quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988)); *cf. Virginia v. Black*, 538 U.S. 343, 358 (2003). At the same time, certain "historic and traditional categories" of speech receive no First Amendment protection, such as defamation, incitement, "[t]rue threats of violence," and obscenity. *Counterman v. Colorado*, 600 U.S. 66, 73–74 (2023) (quotation marks omitted).

In addition, even protected speech may, and sometimes must, be regulated when necessary to protect a compelling governmental interest, including the fair administration of a criminal trial. *See Sheppard*, 384 U.S. at 362–363; *Cox v. Louisiana*, 379 U.S. 559, 563–565 (1965) (sustaining prohibition on picketing outside a courthouse, even though such activity is "intertwined with expression and association[,]" as necessary to protect trials from outside influence).

18

PUBLIC COPY – SEALED INFORMATION DELETED

## B

### *The Right to a Fair Trial*

The Constitution affords Mr. Trump, like all criminal defendants, the "fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). Foundational to our constitutional system is the requirement that, before the government may deprive a person of liberty, "impartial jurors, who know as little as possible of the case," must decide the defendant's guilt "based on material admitted into evidence before them in a court proceeding." *Gentile*, 501 U.S. at 1070; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). No one should be punished for a crime without "a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power." *Chambers v. Florida*, 309 U.S. 227, 236–237 (1940).

Mr. Trump's right to a *fair* trial does not give him "the right to insist upon the opposite of that right"—that is, a trial prejudiced in his favor. *See Singer v. United States*, 380 U.S. 24, 36 (1965). The public has its own compelling interest "in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949); *see Gentile*, 501 U.S. at 1075; *Brown*, 218 F.3d at 600 n.1 (locating such interest in the common law and Article II's Take Care Clause).

Accordingly, courts must take steps to protect the integrity of the criminal justice process, *Sheppard*, 384 U.S. at 363, giving "[f]reedom of discussion * * * the widest range" that is "compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp v. Florida*, 328 U.S. 331, 347 (1946). That standard requires courts to navigate

19

PUBLIC COPY – SEALED INFORMATION DELETED

a narrow path.  The Constitution gives them very limited authority to restrict the speech of the press and other outsiders to the litigation.  Their speech generally may be abridged only if it presents a "clear and present danger to the administration of justice." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 844 (1978); *see Bridges v. California*, 314 U.S. 252, 260–263 (1941).

In fact, court orders restraining speech about an ongoing criminal proceeding are presumptively unconstitutional. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976).  In this context, prior restraints can be imposed only if narrowly tailored to redress sufficiently serious threats to the criminal justice process and if no less restrictive alternatives are available.  Even then, "there is nothing that proscribes the press from reporting events that transpire in the courtroom." *Sheppard*, 384 U.S. at 362–363; *see Craig v. Harney*, 331 U.S. 367, 374 (1947) ("What transpires in the court room is public property.").

At the same time, when a case involves extensive media coverage and public interest, or when the parties are trying the case in the media rather than the courtroom, a court cannot sit back and wait for a "carnival atmosphere" to descend before acting.  *Sheppard*, 384 U.S. at 356–363.  Quite the opposite. "[T]he primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions[.]"  *United States v. Nixon*, 418 U.S. 683, 707 (1974).  As part of that duty, courts must "prevent the prejudice" to the trial process "at its inception."  *Sheppard*, 384 U.S. at 363; *see Nebraska Press*, 427 U.S. at 553 (The cure for prejudice to the trial "lies in those remedial measures that will prevent the prejudice at its inception.") (quoting *Sheppard*, 384 U.S. at 363).  That is

20

PUBLIC COPY – SEALED INFORMATION DELETED

because waiting until the trial is over and reversing the conviction would be an ineffective, costly, and wasteful "palliative," inflicting the additional burdens on a defendant and extra expenses on the taxpayers of a retrial in an already contaminated public atmosphere, with witness recall and evidence growing staler all the while. *Sheppard*, 384 U.S. at 363; *see Nebraska Press*, 427 U.S. at 553.

As a result, courts have an ongoing obligation to ensure that speech about a criminal case does not "divert the trial from the 'very purpose of a court system[,]'" which is "'to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.'" *Sheppard*, 384 U.S. at 350–351 (quoting *Cox*, 379 U.S. at 583 (Black, J., dissenting)). Due process demands that "the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Id*. at 351 (quoting *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907)); *see Geders v. United States*, 425 U.S. 80, 86–87 (1976) ("If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings."). The courts' duty to protect trials from outside influence includes protecting court personnel from both the reality and the appearance of undue outside pressure. The Supreme Court "has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." *Cox*, 379 U.S. at 562 (citing *Wood v. Georgia*, 370 U.S. 375, 383 (1962)) (sustaining the constitutionality of a state ban on picketing outside a courthouse "with the intent of influencing any judge, juror, witness, or court officer").

21

PUBLIC COPY – SEALED INFORMATION DELETED

While courts have quite limited authority to quiet the speech of the press and public, the Constitution affords judges broader authority to regulate the speech of trial participants. *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) (noting that "court[s] *often* find[] it necessary to restrict the free expression of participants" to a trial) (emphasis added) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104 n.21 (1981)).  The Supreme Court has pointedly said that "[n]either prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate [the court's] function." *Sheppard*, 384 U.S. at 363.  Courts "must" be proactive, *id.*, and, when warranted, "proscribe[] extrajudicial statements by any lawyer, party, witness, or court official" engaging in "prejudicial" communications, *id.* at 361.  *See id.* at 359 ("[T]he court should have made some effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides."); *see also Seattle Times*, 467 U.S. at 36–37 (holding that a court may prohibit a newspaper that is party to a case from publishing information obtained through the discovery process).

In *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), the Supreme Court discussed a state's authority to regulate the speech of participants in a criminal case.  There, a lawyer representing a criminal defendant in an ongoing criminal proceeding held a press conference claiming that the prosecutors were not "honest enough to indict the people who did it," and that the police were "crooked cops." *Id.* at 1059.  The state bar initiated disciplinary proceedings against the lawyer for violating a state bar rule prohibiting an attorney from publicly making certain extrajudicial statements. *Id.* at 1033.

22

PUBLIC COPY – SEALED INFORMATION DELETED

The Supreme Court held that the First Amendment allows a court to prohibit the speech of a trial participant when the speech poses a "substantial likelihood of material prejudice" to an adjudicative proceeding. *Gentile*, 501 U.S. at 1075. In so ruling, the Court was explicit that the "stringent standard applied in *Nebraska Press*" does not apply "to speech by a lawyer whose client is a defendant in a criminal proceeding." *Id.* at 1065; *see id.* at 1072–1076. One aspect of the Court's reasoning focused on lawyers' roles as "officers of the court," *id.* at 1074 (quoting *Nebraska Press*, 427 U.S. at 601 n.27), a special status that "subjects them to fiduciary obligations to the court and the parties[,]" *id.* at 1057.

But the Court also drew on the "distinction between participants in the litigation and strangers to it[.]" *Gentile*, 501 U.S. at 1072–1073. The Court emphasized that it had, in prior cases, "expressly contemplated that the speech of *those participating before the courts* could be limited." *Id.* at 1071–1073 (citing *Seattle Times*, 467 U.S. at 32–33, 32 & n.18; *Sheppard*, 384 U.S. at 363; *Sacher v. United States*, 343 U.S. 1, 8 (1952)). With this distinction in mind, the Court emphasized that participation in a case gives lawyers a distinctive public status and "special access to information through discovery and client communications[.]" *Id*. at 1074. Parties, too, have special access to information and accordingly may be subject to speech restrictions not appropriate for outsiders to the case.[4]

---

[4] *Gentile* had two majority opinions. Four justices found that the state bar rule was unconstitutionally vague and would have found that the rule violated the First Amendment. *Gentile*, 501 U.S. at 1051–1058 (Kennedy, J.). Four other justices found that the bar rule was not unconstitutionally vague and did not violate the First

23

PUBLIC COPY – SEALED INFORMATION DELETED

While *Gentile* involved regulating the speech of counsel for a criminal defendant, the law has long recognized the district court's authority to control the speech and conduct even of defendants in criminal trials when necessary to protect the criminal justice process. *See Nebraska Press*, 427 U.S. at 553–554 (exhorting courts to take "remedial measures that will prevent * * * prejudice * * * [by] * * * the accused" and other persons "coming under the jurisdiction of the court"); *Sheppard*, 384 U.S. at 363 (similar).

In addition, after indictment, criminal defendants are frequently subjected to "substantial liberty restrictions as a result of the operation of our criminal justice system." *United States v. Salerno*, 481 U.S. 739, 749 (1987). More specifically, as a less restrictive alternative to pre-trial detention, Congress granted courts the authority to release indicted defendants under the "least restrictive * * * condition, or combination of conditions [of release], that * * * will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(c)(1)(B). Such conditions commonly include measures that burden criminal defendants' ability to act, associate, and speak. *See id.* § 3142(c)(1)(B)(i)–(xiv); *see also* GEORGE E. BROWNE & SUZANNE M. STRONG, U.S. DEP'T OF JUST. BUREAU OF JUST. STAT., PRETRIAL RELEASE AND MISCONDUCT IN FEDERAL DISTRICT COURTS, FISCAL YEARS 2011–2018, at 7 table 5

---

Amendment. *Id.* at 1076, 1078 (Rehnquist, C.J.). Justice O'Connor joined Chief Justice Rehnquist's opinion holding that the rule comported with the First Amendment, while agreeing with Justice Kennedy that it was impermissibly vague. *Id.* at 1082–1083 (O'Connor, J., concurring).

24

PUBLIC COPY – SEALED INFORMATION DELETED

(2022);[5] AMBER WIDGERY, NAT'L ASS'N OF STATE LEGISLATURES, THE STATUTORY FRAMEWORK OF PRETRIAL RELEASE 5 (2020) (describing "limitations on contact with certain people, groups or places" and "adherence to or creation of protection or no-contact orders" as common statutory options for pretrial release conditions among States).[6]

As relevant here, Congress expressly authorized federal courts to order a criminal defendant to "avoid all contact with * * * a potential witness who may testify concerning the offense." 18 U.S.C. § 3142(c)(1)(B)(v); *cf. United States v. Perazza-Mercado*, 553 F.3d 65, 70–71 (1st Cir. 2009) (canvassing different circuits' approach to internet restrictions as a condition of supervised release and concluding such restrictions may be imposed upon a showing of particular need).

In this case, the district court prohibited Mr. Trump from speaking to any witnesses to the case, except through or in the presence of counsel. Order Setting Conditions of Release 3, ECF 13 (Aug 3, 2023). Mr. Trump agrees that straightforward prior restraint on his speech is "completely consistent with" the First Amendment because of his status as an indicted defendant. *See* Oral Arg. Tr. 31:13–32:1.

* * * * *

To sum up, the Constitution requires robust protection of speech about criminal trials and the government's effort to

---

[5] https://perma.cc/V6VH-Q3TV.

[6] https://perma.cc/XHQ3-4UP7.

25

PUBLIC COPY – SEALED INFORMATION DELETED

deprive a defendant of liberty.  At the same time, the Constitution requires courts to ensure that outside speech and influences do not derail or corrupt the criminal trial process. On this record, the constitutional path for the presiding judge to protect both free speech and the fair and orderly administration of justice was not to limit what outsiders can say about the trial or trial participants, but to appropriately delimit what trial participants, including the accused, can say publicly to other participants, witnesses, or outsiders.

## IV

Given that constitutional backdrop, the Supreme Court's decisions in *Nebraska Press* and *Gentile* provide the starting point for analyzing the district court's authority to restrict a criminal defendant's communications about the pending case. *Nebraska Press* and *Gentile* both require us to consider: (1) whether the Order is justified by a sufficiently serious risk of prejudice to an ongoing judicial proceeding; (2) whether less restrictive alternatives would adequately address that risk; and (3) whether the Order is narrowly tailored, including whether the Order effectively addresses the potential prejudice.  *See Nebraska Press*, 427 U.S. at 562; *Gentile*, 501 U.S. at 1075–1076.

We hold that the district court had the authority to restrain those aspects of Mr. Trump's speech that present a significant and imminent risk to the fair and orderly administration of justice, and that no less restrictive alternatives would adequately address that risk.  We also hold that the district court's Order was not narrowly tailored and modify its scope to bring it within constitutional bounds.

26

PUBLIC COPY – SEALED INFORMATION DELETED

## A

While the Supreme Court has repeatedly said that district courts have the power, where necessary, to restrict the speech of the accused, it has never directly reviewed an order limiting the out-of-courtroom speech of a criminal defendant.

Like any other criminal defendant, Mr. Trump has a constitutional right to speak. And his millions of supporters, as well as his millions of detractors, have a right to hear what he has to say. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–757 (1976).

Also like any other criminal defendant, Mr. Trump does not have an unlimited right to speak. "Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in [the trial] setting." *Seattle Times*, 467 U.S. at 32 n.18 (formatting modified). In particular, the public has a compelling interest in ensuring that the criminal proceeding against Mr. Trump is not obstructed, hindered, or tainted, but is fairly conducted and resolved according to the judgment of an impartial jury based on only the evidence introduced in the courtroom. *See Gentile*, 501 U.S. at 1075; *Wade*, 336 U.S. at 689.

The Supreme Court has instructed courts that when they are imposing orders restricting speech about judicial proceedings, they must in all cases consider both "the imminence and magnitude of the danger" to the judicial process that flows from the speech and "the need for free and unfettered expression." *Landmark Commc'ns*, 435 U.S. at 843;

A26

27

*see id.* at 842–843.    Here, the relevant danger is the "substantive evil of unfair administration of justice[,]" *Landmark Commc'ns*, 435 U.S. at 844 (quoting *Bridges*, 314 U.S. at 271), and impairment of "the unhindered and untrammeled functioning of our courts [that] is part of the very foundation of our constitutional democracy[,]" *Cox*, 379 U.S. at 562.

The parties vigorously contest what degree of danger to the judicial process must exist for a district court to restrain a criminal defendant's speech.    Trump Br. 26–29; Special Counsel Br. 20–29.

In *Gentile*, the Supreme Court held that speech by a trial participant—there, a defense attorney—could be restricted if it posed a "substantial likelihood of material prejudice" to the integrity of the proceedings.    501 U.S. at 1075.    That bears some resemblance to this case in that Mr. Trump is a participant in the trial, not an outsider to it.    But, as Mr. Trump fairly notes, in adopting the "substantial likelihood of material prejudice" standard in *Gentile*, the Supreme Court relied in part on lawyers' roles as officers of the court and the special duties that lawyers owe to the court.    *See* 501 U.S. at 1066–1068.

Criminal defendants, of course, have no similar obligations.    In addition, under our system of justice, a criminal defendant—who is presumed to be innocent—may very well have a greater constitutional claim than other trial participants to criticize and speak out against the prosecution and the criminal trial process that seek to take away his liberty.

Given those concerns, we assume without deciding that the most demanding scrutiny applies to the district court's speech-

28

PUBLIC COPY – SEALED INFORMATION DELETED

restricting Order, *see* Trump Op. Br. 31–34, 43–45, and that only a significant and imminent threat to the administration of criminal justice will support restricting Mr. Trump's speech.

Mr. Trump disagrees and argues that the court may proscribe his speech only if it poses a "clear and present danger" to the trial process, Trump Br. 26–29, as laid out in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 842–846 (1978), and *Nebraska Press Association v. Stuart*, 427 U.S. 539, 559–564 (1976).  He offers no alternative test.  Oral Arg. Tr. 18:24–20:2.  But his proposed rule gets constitutional precedent wrong.

First, Mr. Trump's approach gives no inch to the need to protect the criminal justice process.  He miscasts Supreme Court precedent discussing "clear and present danger" as preventing the district court from doing anything at all to curb speech other than duplicate existing criminal prohibitions against influencing witnesses, 18 U.S.C. § 1512(b), harassing those assisting in a prosecution, *id.* § 1512(d)(4), and unlawful threats, *see, e.g.*, *id.* § 875; *id.* § 1503(a); D.C. Code § 22-407 (misdemeanor threats); *id.* § 22-1810 (felony threats); *see also Counterman*, 600 U.S. at 74; *Elonis v. United States*, 575 U.S. 723, 726 (2015).  Tellingly, Mr. Trump was unable to identify any example of speech that could be protectively proscribed by the district court that was not already a violation of the criminal law, and so also of his release condition to comply with applicable federal, state, and District laws.  *See* Oral Arg. Tr. 21:3–19; Order Setting Conditions of Release 1.

The Supreme Court has been clear that the First Amendment permits, and Article III and due process principles require, courts to do more to protect the integrity of the criminal

29

justice process than to shake their finger at a defendant and tell him not to do what the law already forbids.  *See Sheppard*, 384 U.S. at 362–363.

Second, Mr. Trump's version of the clear-and-present-danger test has no legal mooring.  While the Supreme Court's "clear and present danger" language reflects the Constitution's great solicitude for free speech, the Supreme Court has said explicitly that "clear and present danger" is not a proper "formula for adjudicating cases."  *Landmark Commc'ns*, 435 U.S. at 842 (quoting *Pennekamp*, 328 U.S. at 353 (Frankfurter, J., concurring)); *see Gentile*, 501 U.S. at 1036 (citing *Landmark Commc'ns*, 435 U.S. at 842–843).  Instead, the Supreme Court has instructed that what "clear and present danger" translates to in practice is that courts must analyze whether any compelling interest justifies an appropriately limited speech restriction.  *See Landmark Commc'ns*, 435 U.S. at 842–843.  Yet Mr. Trump has refused to argue for any such weighing, insisting that "clear and present danger" is the only test that the court can apply and that it categorically prohibits any speech-limiting order in this case.   Oral Arg. Tr. 18:24–20:2.

Finally, Mr. Trump's proposed test fails to account for the difference between trial participants and nonparticipants.  Neither *Landmark Communications* nor *Nebraska Press* involved restrictions on trial participants' speech.  In fact, the Supreme Court was at pains to point out in *Landmark Communications* that the case did not involve "any constitutional challenge to a State's power * * * to punish *participants* for breach of [the confidentiality] mandate[,]" 435 U.S. at 837 (emphasis added), and the Court explicitly noted that limiting the statute at issue to trial participants "might well

A29

30

PUBLIC COPY – SEALED INFORMATION DELETED

save the statute[,]" *id.* at 837 n.9.  Instead, the "narrow and limited question presented" in *Landmark Communications* was "whether the First Amendment permits the criminal punishment of *third persons who are strangers to the inquiry* * * * for divulging or publishing truthful information regarding" certain judicial proceedings.  *Id.* at 837 (emphasis added); *see id.* at 841 ("The question, however, is whether [the State's] interests are sufficient to justify the encroachment on First Amendment guarantees * * * with respect to *nonparticipants* such as Landmark.") (emphasis added); *see also id.* at 841 n.12.

Notably, every single Supreme Court case applying the clear-and-present-danger standard to restrictions on speech about judicial proceedings (1) was decided before the Supreme Court ruled out "clear and present danger" as a "formula" for courts to apply, *Landmark Commc'ns*, 435 U.S. at 842 (quoting *Pennekamp*, 328 U.S. at 353 (Frankfurter, J., concurring)), and (2) involved speech by outsiders to the litigation, *see Nebraska Press*, 427 U.S. at 568–570 (publications and broadcasting by the press and media); *Wood*, 370 U.S. at 376–379, 382, 389–394 (press release by county sheriff speaking in his personal capacity); *Craig*, 331 U.S. at 369, 376–377 (newspaper editorial and news stories); *Pennekamp*, 328 U.S. at 336–339, 348–350 (newspaper editorials and cartoon); *Bridges*, 314 U.S. at 271–273 (newspaper editorials); *cf. Landmark Commc'ns*, 435 U.S. at 837, 842–846.[7]

---

[7] While the Sixth Circuit applied the clear-and-present-danger standard to an order restraining a criminal defendant's speech in *United States v. Ford*, 830 F.2d 596, 598–602 (6th Cir. 1987), it did so before *Gentile* and did not acknowledge *Landmark Communications*' direction against using the clear-and-present-danger standard as a formula for resolving cases.

31

PUBLIC COPY – SEALED INFORMATION DELETED

**B**

The record before the district court and its factual findings demonstrate that some of Mr. Trump's speech poses a significant and imminent threat to the fair and orderly adjudication of the criminal proceeding against him.

**1**

The record shows that Mr. Trump has repeatedly attacked those involved in this case through threatening public statements, as well as messaging daggered at likely witnesses and their testimony. For example, the day after his initial appearance in court, Mr. Trump issued a warning: "IF YOU GO AFTER ME, I'M COMING AFTER YOU!" Special Counsel Mot. 6.

The former President has gone after known and potential witnesses, and others closely involved in the 2020 election events around which the indictment and criminal trial center. In the days and weeks following the indictment, Mr. Trump publicly accused former Vice President Pence of "go[ing] to the Dark Side" and of "mak[ing] up stories about" the events of January 6, 2020 (including in a post that also referred to "these Fake Indictments").[8]

Two weeks after his indictment and after "reading reports" that the former Georgia Lieutenant Governor Jeff Duncan would be testifying before a grand jury in Fulton County, Georgia, Mr. Trump posted that Duncan "shouldn't [testify]"

---

[8] https://perma.cc/PMD6-BUDX;    https://perma.cc/9VR2-HZGK; Hr'g Tr. 55:16–22.

32

PUBLIC COPY – SEALED INFORMATION DELETED

and called Duncan a "fail[ure]" and a "loser" who "fought the TRUTH all the way."[9]

In addition, apparently in response to news reports that former White House Chief of Staff Mark Meadows might be cooperating with prosecutors, Mr. Trump posted:

> I don't think Mark Meadows would lie about the Rigged and Stollen 2020 Presidential Election merely for getting IMMUNITY against Prosecution (PERSECUTION!) by Deranged Prosecutor, Jack Smith. BUT, when you really think about it, after being hounded like a dog for three years, told you'll be going to jail for the rest of your life, your money and your family will be forever gone, and we're not at all interested in exposing those that did the RIGGING — If you say BAD THINGS about that terrible "MONSTER," DONALD J. TRUMP, we won't put you in prison, you can keep your family and your wealth, and, perhaps, if you can make up some really horrible "STUFF" about him, we may very well erect a statue of you in the middle of our decaying and now very violent Capital, Washington, D.C. Some people would make that deal, but they are weaklings and cowards, and so bad for the future [of] our Failing Nation. I don't think that Mark Meadows is one of them, but who really knows? MAKE AMERICA GREAT AGAIN!!![10]

The former President has also lashed out at government officials closely involved in the criminal proceeding. He has

---

[9] https://perma.cc/ZK9H-8SKS.

[10] https://perma.cc/9DFD-A7QP.

A32

33

PUBLIC COPY – SEALED INFORMATION DELETED

repeatedly labeled the trial judge as "biased," a "fraud[,]" and a "hack[,]" Special Counsel Mot. 6–7, and has called the prosecutors "[d]eranged[,]" "thugs[,]" and "[l]unatics[,]" Special Counsel Mot. 8–9; Special Counsel Reply 10. He likewise has posted about the Special Counsel's wife and spoke publicly about her at a rally following our administrative stay of the Order.[11] *See* Special Counsel Br. 14 n.4.

The record also shows that former President Trump's words have real-world consequences. Many of those on the receiving end of his attacks pertaining to the 2020 election have been subjected to a torrent of threats and intimidation from his supporters. A day after Mr. Trump's "IF YOU GO AFTER ME, I'M COMING AFTER YOU!" post, someone called the district court and said: "Hey you stupid slave n[****]r[.] * * * If Trump doesn't get elected in 2024, we are coming to kill you, so tread lightly b[***]h. * * * You will be targeted personally, publicly, your family, all of it." Special Counsel Br. 5; *see United States v. Shry*, No. 4:23-cr-413, ECF 1 at 3 (Criminal Complaint) (S.D. Tex. Aug. 11, 2023). The Special Counsel also has advised that he has received threats, and that a prosecutor in the Special Counsel's office whom Mr. Trump has singled out for criticism has been "subject to intimidating communications." Special Counsel Mot. 12.

The former President has repeatedly attacked both the presiding judge and his law clerk in a New York state-law lawsuit. Since those attacks, the judge's chambers have been "inundated with hundreds of harassing and threatening phone calls, voicemails, emails, letters, and packages." *New York v. Trump*, No. 452564/2022, NYSCEF No. 1631 at 2 (N.Y. Sup.

---

[11] https://perma.cc/F769-Z49A.

34

PUBLIC COPY – SEALED INFORMATION DELETED

Ct. Nov. 3, 2023).  In addition to threatening death or serious
harm, callers have labeled the judge and clerk "Nazi[s]," "dirty
Jews," and child molesters.  *See Trump v. Engoron*, No. 2023-
05859, NYSCEF No. 9, Ex. E at 3–5 (N.Y. App. Div. Nov. 22,
2023).

Election officials involved in the 2020 election were
subjected to similar attacks.  One election official explained:
"After the [then-]President tweeted at me by name, calling me
out the way that he did, the threats became much more specific,
much more graphic, and included not just me by name but
included members of my family by name, their ages, our
address, pictures of our home.  Just every bit of detail that you
could imagine.  That was what changed with that tweet."
Special Counsel Mot. 3.  Another state official explained that
he avoided ███████████████████████████████████
███████████.  Special Counsel Mot. 3████████████.  And a local
election official had to ████████████ after then-President
Trump criticized his office and a supporter posted his address
online.  Special Counsel Mot. 3████████████.

Likewise, after former President Trump publicly
condemned and then fired a federal official for making
statements reassuring the public about the 2020 election's
security, one of Mr. Trump's campaign's lawyers publicly
stated that the official "should be drawn and quartered.  Taken
out at dawn and shot."  Special Counsel Mot. 4.  After receiving
death threats, the official and his family had to evacuate their
home.  *Id.*

Others too have had their lives turned upside down after
coming within Mr. Trump's verbal sights.  For example, a

A34

35

temporary Georgia election worker testified before Congress that she and her daughter endured "horrible, racist threats" after then-President Trump falsely accused them of election misconduct.  Special Counsel Mot. 4–5; Select Committee Tr. 7:22–8:3, 26:24–27:2 (May 31, 2022).  She testified that she "had to move out of [her] house because the FBI said it wasn't safe."  Select Committee Tr. 8:1.  People would send messages "say[ing] things like, 'We know where you live, and we're coming to get you, n[****]r.'"  Select Committee Tr. 27:4–12.  Some would show up at her home to confront her, and one person even tried to force her way into the election worker's mother's home to effectuate a citizen's arrest of the election worker.    Select Committee Tr. 28:2–29:12.    The election worker explained:  "Do you know how it feels to have the President of the United States to target you? * * * [W]hen someone as powerful as the President of the United States eggs on a mob, that mob will come."  Special Counsel Mot. 4.

Mr. Trump himself recognizes the power of his words and their effect on his audience, agreeing that his supporters "listen to [him] like no one else."  Transcript of CNN's Town Hall with Former President Donald Trump, CNN (May 11, 2023).[12]

Based on that record, the district court made a factual finding that, "when Defendant has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed."  Order at 2.  Mr. Trump has not shown that factual finding to be clearly erroneous, and we hold that the record amply supports it.

---

[12] https://perma.cc/HC5Y-3XLT.

A35

36

PUBLIC COPY – SEALED INFORMATION DELETED

**2**

Mr. Trump's documented pattern of speech and its demonstrated real-time, real-world consequences pose a significant and imminent threat to the functioning of the criminal trial process in this case in two respects.

First, Mr. Trump's messages about known or reasonably foreseeable witnesses that concern their potential participation in the criminal proceeding pose a significant and imminent threat to individuals' willingness to participate fully and candidly in the process, to the content of their testimony and evidence, and to the trial's essential truth-finding function.

The law has long recognized the importance of shielding witnesses from external influences that undermine the integrity of the trial process. In *Sheppard*, the Supreme Court underscored the trial court's obligation to "insulate[] the witnesses" from external communications that could affect their testimony. 384 U.S. at 359. Similarly, in *Estes v. Texas*, 381 U.S. 532 (1965), the Supreme Court overturned a criminal conviction because broadcasting of the trial proceedings had created a risk that "[t]he quality of the testimony" would "be impaired" or that "witnesses [would be] reluctant to appear." *Id.* at 547. Courts also have authority to exclude witnesses from the courtroom, instruct them not to discuss their testimony with others, and even sequester them pending their testimony—all to protect them and the evidence they offer from external influences. *See Geders*, 425 U.S. at 87 (approving courts' power to sequester witnesses so as to "prevent[] improper attempts to influence the testimony in light of the testimony already given"); *Perry v. Leeke*, 488 U.S. 272, 281 (1989) (discussing the "common practice" of "instruct[ing]

A36

37

PUBLIC COPY – SEALED INFORMATION DELETED

a witness not to discuss his or her testimony with third parties until the trial is completed" in order to "lessen the danger that their testimony will be influenced" by others); FED. R. EVID. 615(a) ("At a party's request, the court *must* order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony.  Or the court may do so on its own.") (emphasis added).

The concern with defendants' influences on witnesses is so significant that Congress has expressly authorized courts to prevent defendants from communicating with witnesses.  *See* 18 U.S.C. § 3142(c)(1)(B)(v); *see generally Nixon*, 418 U.S. at 709 ("[T]he public * * * has a right to every man's evidence[.]") (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1949)).  That restraint is so commonplace that Mr. Trump does not dispute the court's authority to have ordered him, as a condition of pretrial release, not to communicate with witnesses except in the presence of counsel.  *See* Oral Arg. Tr. 31:13–32:11.

There is no question that Mr. Trump could not have said directly to Mark Meadows, former Vice President Pence, or former Georgia Lieutenant Governor Duncan any of the statements he posted on social media about their potential discussions with the Special Counsel or grand-jury testimony, and the consequences that would follow.  Yet the district court's prohibition on Mr. Trump's direct communications with known witnesses would mean little if he can evade it by making the same statements to a crowd, knowing or expecting that a witness will get the message.  *Cf. Sheppard*, 384 U.S. at 359 (restrictions on witnesses observing other witnesses' testimony mean nothing if "the full verbatim testimony [is] available to them in the press"); *Estes*, 381 U.S. at 547.

38

PUBLIC COPY – SEALED INFORMATION DELETED

Mr. Trump's counsel conceded at oral argument that the former President speaking about the case "with a megaphone, knowing that [a] witness is in the audience" would likely present the "same scenario" as Mr. Trump's calling that witness directly, in violation of his conditions of release.  Oral Arg. Tr. 33:12–17.  So too if the defendant posts a message on "social media knowing that [witness] is a social media follower of his," *id.* 33:20–23, or that the message will otherwise likely reach the witness.  In each of these scenarios, the defendant's speech about witness testimony or cooperation imperils the availability, content, and integrity of witness testimony.

Accordingly, the district court had the authority to prevent Mr. Trump from laundering communications concerning witnesses and addressing their potential trial participation through social media postings or other public comments.

In addition, common sense and "common human experience," *Nebraska Press*, 427 U.S. at 563, teach that hostile messages regarding evidentiary cooperation that are publicly relayed to high-profile witnesses have a significant likelihood of deterring, chilling, or altering the involvement of other witnesses in the case as well.  The undertow generated by such statements does not stop with the named individual.  It is also highly likely to influence other witnesses.  Even witnesses not yet publicly identified, who lack the special capacity or resources to protect themselves or their families against the risk of ensuing threats or harm, will be put in fear that, if they come forward, they may well be the next target.

It is the court's duty and authority to prevent speech by trial participants, including the defendant, when the record shows that their words have an "extraordinary power to

39

PUBLIC COPY – SEALED INFORMATION DELETED

undermine or destroy the efficacy of the criminal justice system." *Gentile*, 501 U.S. at 1075 (quotation marks omitted); *see Sheppard*, 384 U.S. at 363.  This is such a case.

Second, certain speech about counsel and staff working on the case poses a significant and imminent risk of impeding the adjudication of this case.  Courts have a "legitimate interest in protecting [the] judicial system from [outside] pressures," including protecting court officers from "conscious[] or unconscious[ outside] influence[.]"  *See Cox*, 379 U.S. at 562, 565.  Messages designed to generate alarm and dread, and to trigger extraordinary safety precautions, will necessarily hinder the trial process and slow the administration of justice.  For example, trial personnel and participants will be distracted or delayed by objectively reasonable concerns about their safety and that of their family members, as well as by having to devote time and resources to adopting safety measures or working with investigators.

Given the record in this case, the court had a duty to act proactively to prevent the creation of an atmosphere of fear or intimidation aimed at preventing trial participants and staff from performing their functions within the trial process.  Just as a court is duty-bound to prevent a trial from devolving into a carnival, *see Sheppard*, 384 U.S. at 357–358, so too can it prevent trial participants and staff from having to operate under siege.

**3**

Mr. Trump raises three objections to any regulation of his speech at all.  None holds up.

40

PUBLIC COPY – SEALED INFORMATION DELETED

First, Mr. Trump argues that actual harm or obstruction to witnesses or the judicial process and its participants must already have occurred before his speech can be regulated. Trump Br. 22; Trump Reply Br. 3. The Supreme Court has said otherwise. Both *Nebraska Press* (which Mr. Trump embraces) and *Sheppard* commanded trial courts that they "must" prevent such harms at their "inception," before they are realized and dysfunction envelops the trial. *Nebraska Press*, 427 U.S. at 553–554; *Sheppard*, 384 U.S. at 362–363.

That makes sense. No one is entitled to one free bite at derailing witness testimony or impeding the trial court's ability to function. A rule that courts are helpless to act until witnesses have been intimidated, violence has been attempted, or a trial participant has been materially hindered from doing her job would "gravely impair the basic function of the courts" in the "fair administration of criminal justice." *Nixon*, 418 U.S. at 712–713.

Nor are the court's hands tied until evidence of direct causation materializes. Such proof would be hard to come by, and requiring a court to conduct a mini-trial on that inquiry while readying a high-profile case for trial would itself divert and delay the criminal justice process. That presumably is why the Supreme Court recognized in *Nebraska Press* that the trial court's assessment of the threat to the court's functioning must be "of necessity speculative, dealing * * * with factors unknown and unknowable[,]" and may appropriately be grounded both in record facts and "common human experience." 427 U.S. at 563.

Second, Mr. Trump objects that holding him responsible for his listeners' responses to his speech unconstitutionally

A40

41

PUBLIC COPY – SEALED INFORMATION DELETED

imposes a "classic heckler's veto," "regardless of how predictable * * * [Mr. Trump's supporters'] unruly reactions might be." Trump Br. 37–38; *see* Trump Br. 36–39. Not so.

To start, that argument ignores the significant risk of harm caused by Mr. Trump's own messaging to known or potential witnesses about their participation in the criminal justice process and his menacing comments about trial participants and staff.

The claim also misunderstands the heckler's veto doctrine. That doctrine prohibits restraining speech on the grounds that it "might *offend* a hostile mob" hearing the message, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–135 (1992) (emphasis added), or because its audience might express "hostility to" the message, *Cox*, 379 U.S. at 551. The harm the district court identified here was not that some members of the public who oppose Mr. Trump's message might react violently and try to shut down his speech. *Cf. National Socialist Party of America v. Village of Skokie*, 432 U.S. 43, 43–44 (1977). The concern was instead "how predictable" it has become, Trump Br. 38, that some (but certainly not all, or even many) of Mr. Trump's followers will act minaciously in response to his words.

Of course, the First Amendment generally does not allow speech to be restricted because of some enthusiastic audience members' reactions. Outside of a judicial proceeding, ordinarily only speech that rises to the level of incitement of the audience can be banned. *See Brandenburg v. Ohio*, 395 U.S. 444, 448–449 (1969) (striking down law that failed to distinguish "mere advocacy" from "incitement to imminent lawless action").

42

PUBLIC COPY – SEALED INFORMATION DELETED

But within a judicial proceeding, a trial court's duty to protect the functioning of the criminal trial process is not cabined by the incitement doctrine. *Sheppard* holds that courts may, and sometimes must, limit the speech of trial participants to prevent the prejudice to the trial process caused by third parties. *Sheppard* involved a criminal trial beset by suffocating press coverage and publicity. 384 U.S. at 358. The press regularly reported on evidence leaked to them by both sides, even though such evidence was never offered into evidence in court. *Id.* at 360–361. The Supreme Court held that, as a means of addressing and averting harm to the criminal justice process, the trial court should have "proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters[.]" *Id.* at 361. Had the trial court done so, "the news media would have soon learned to be content with the task of reporting the case as it unfolded in the courtroom— not pieced together from extrajudicial statements." *Id.* at 362.

In other words, the Supreme Court explained that a protective order restricting trial participants' speech should have been entered in *Sheppard* not only because the parties' expression was itself obstructive, but even more so because outsiders' reactions and responses to that speech also threatened the integrity of the trial process. At no point in *Sheppard* did the Supreme Court even hint that evidence demonstrating that the parties were already inciting interfering press coverage would have been needed before the court could act.

So too here. Many of former President Trump's public statements attacking witnesses, trial participants, and court staff pose a danger to the integrity of these criminal proceedings. That danger is magnified by the predictable

43

torrent of threats of retribution and violence that the district court found follows when Mr. Trump speaks out forcefully against individuals in connection with this case and the 2020 election aftermath on which the indictment focuses. The district court appropriately found that those threats and harassment undermine the integrity of this criminal proceeding by communicating directly or indirectly with witnesses and potential witnesses about their testimony, evidence, and cooperation in the justice process. They also impede the administration of justice by exposing counsel and members of the court's and counsel's staffs to fear and intimidating pressure. The First Amendment does not afford trial participants, including defendants, free rein to use their knowledge or position within the trial as a tool for encumbering the judicial process.[13]

Third, Mr. Trump asserts that, because he is running for office, the trial is at issue in the campaign, meaning his comments about the trial are political speech that cannot be regulated without the strictest showing of necessity. Proactive concerns about harm to the trial process, in his view, do not suffice. *See* Trump Br. 31–34.[14]

---

[13] Should Mr. Trump have reasonable concerns about the impartiality or actions of court or prosecutorial staff, and their effect on the integrity of the trial process, the better course is for his counsel to voice those concerns in a motion filed with the court, where that filing will be a matter of public record.

[14] At oral argument, Mr. Trump stated that his position would be the same even if there were no political campaign underway, as he would still be engaged in political speech. Oral Arg. Tr. 5:14–6:20. Given that position, we focus on the protection of political speech generally.

44

PUBLIC COPY – SEALED INFORMATION DELETED

The First Amendment unquestionably affords political speech robust protection, and courts undoubtedly must tread carefully when regulating such communications. *See McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995) ("No form of speech is entitled to greater constitutional protection" than "[c]ore political speech.").

But there is another fundamental constitutional interest at stake here. The existence of a political campaign or political speech does not alter the court's historical commitment or obligation to ensure the fair administration of justice in criminal cases. A trial participant's engagement in political speech cannot degrade or diminish that essential judicial function. Mr. Trump acknowledges as much by accepting his pretrial release condition that he cannot speak to witnesses in the case about political matters or otherwise. He cannot evade that legitimate limitation by dressing up messages to witnesses in political-speech garb.

For the reasons outlined above, this record establishes the imminence and magnitude, as well as the high likelihood, of harm to the court's core duty to ensure the fair and orderly conduct of a criminal trial and its truth-finding function. That significant and imminent threat to the core functioning of the judicial branch reflected in this record constitutes a compelling interest. *See Nixon*, 418 U.S. at 712–713; *In re Murphy-Brown*, 907 F.3d 788, 797 (4th Cir. 2018) ("Ensuring fair trial rights is a compelling interest * * * when there is a 'reasonable likelihood' that a party would be denied a fair trial without the order under challenge.") (quoting *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984)); *see also Williams-Yulee v. Florida Bar*, 575 U.S. 433, 446 (2015) ("[P]ublic perception of judicial integrity is 'a state interest of the highest order.'") (quoting

45

PUBLIC COPY – SEALED INFORMATION DELETED

*Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 889 (2009)). On the record before us, that compelling interest establishes a sufficient predicate for the district court to have imposed some limitation on trial participants' speech. The constitutional solicitude for political speech remains, though, and requires that less restrictive alternatives not be viable and that the scope of the order be narrowly tailored.

## C

No less-speech-restrictive alternative could viably protect against the imminent threat to the participation of witnesses, trial participants, and staff in this criminal matter, or the full, fair, and unobstructed receipt of relevant evidence. *See Nebraska Press*, 427 U.S. at 563–565 (discussing "measures short of an order restraining" speech); *Gentile*, 501 U.S. at 1075 (same).

We note that the district court tried a less restrictive approach first. Shortly after the indictment, she cautioned the parties and counsel against speech that would prejudice the trial process and sought their voluntary compliance. Hr'g Tr. 72:7–17, ECF 29 (Aug. 11, 2023) "[E]ven arguably ambiguous statements from parties or their counsel, if they could reasonably be interpreted to intimidate witnesses or to prejudice potential jurors, can threaten the process. * * * I caution all of you and your client, therefore, to take special care in your public statements about this case." *Id.* That warning was not heeded, necessitating a more direct measure.

Self-regulation is just one possible alternative for a court to consider before restraining speech. *Nebraska Press* identified four others: questioning prospective jurors,

A45

46

PUBLIC COPY – SEALED INFORMATION DELETED

instructing seated jurors to ignore extrajudicial statements, moving the trial to a different location, and postponing the trial. 427 U.S. at 563–564.  We agree with the district court that none was a viable option to respond to the nature and character of the harm posed in this case.

The district court carefully considered whether questioning prospective jurors during *voir dire* or instructing seated jurors to disregard information would suffice.  The court found that those measures would redress any taint from Mr. Trump's repeated criticisms of the District of Columbia and its residents.  *See, e.g.*, Special Counsel Mot. 8 (Mr. Trump calling the District of Columbia a "FILTHY AND CRIME RIDDEN EMBARRASSMENT TO OUR NATION").  For that reason, the court rejected the Special Counsel's request that the district court restrict speech "regarding the District of Columbia or its jury pool."  Hr'g Tr. 83:2; *see* Hr'g Tr. 82:25–83:4 ("I am confident that the voir dire process and cautionary jury instructions can filter out those statements' influence on the jury.").

Those measures, however, would do nothing to prevent or redress the harm to witnesses' participation or to staff beleaguered by threats or harassment.  If a witness's testimony were to change, or if a reluctant potential witness were to decide not to come forward because of the former President's public statements, no amount of questioning or instructing jurors could undo that harm.  Likewise, if court and prosecution staff are diverted from their work by the need to take extra safety precautions to protect themselves and their families, or are distracted by the burdens of constant vigilance, none of the proposed measures regarding the jury would mitigate that interference.

47

PUBLIC COPY – SEALED INFORMATION DELETED

Moving the trial to a different location would also be ineffective.  Mr. Trump's rhetoric has national reach.  *See* Special Counsel Mot. Reply 9 (noting that Mr. Trump has more than 6 million followers on the platform Truth Social).[15]  A change of scene would not ameliorate the reasons for a witness's reluctance.  And the staffs of court and the respective litigation teams would be equally subject to interference, regardless of locale.

Delaying the trial date until after the election, as Mr. Trump proposes, would be counterproductive, create perverse incentives, and unreasonably burden the judicial process.  Allowing prejudicial statements to go unchecked for an even longer pre-trial period would simply compound the problem.  Delay would not bring back witnesses who have been stifled by Mr. Trump's commentary and the reactions of those whom he says "listen to [him] like no one else."  *See* Transcript of CNN's Town Hall with Former President Donald Trump, CNN (May 11, 2023).[16]  In addition, postponing trial would incentivize criminal defendants to engage in harmful speech as a means of delaying their prosecution.  Mr. Trump has repeatedly asked to push back the trial date in this case for two additional years, and the district court has considered and denied those requests.  *See, e.g.*, Def. Resp. Opp. Special Counsel's Proposed Trial Calendar 1–3, ECF 30 (Aug. 17, 2023) (proposing April 2026 trial date); Pretrial Order ¶ 1, ECF 39 (Aug. 28, 2023) (setting March 4, 2024 trial date); *see also* Order at 3–4, ECF 82 (Oct. 6, 2023) (denying in part Mr. Trump's request for a 60-day deadline extension); Order at 1–

---

[15] https://perma.cc/K3UM-SS92 (displaying 6.51 million followers).

[16] https://perma.cc/HC5Y-3XLT.

48

PUBLIC COPY – SEALED INFORMATION DELETED

3, ECF 146 (Nov. 7, 2023) (denying in part Mr. Trump's request for a three-month deadline extension). A criminal defendant cannot use significantly and imminently harmful speech to override the district court's control and management of the trial schedule. Delays also "entail serious costs to the [judicial] system," *Gentile*, 501 U.S. at 1075, and frustrate the public's interest in the swift resolution of criminal charges.

Mr. Trump suggests that, as an alternative, the court should follow the district court's lead in *United States v. Brown*, 218 F.3d 415 (5th Cir. 2000), and suspend the Order in the months leading up to the election. *See* Trump Br. 32; Trump Reply Br. 1, 16; Oral Arg. Tr. 23:25–24:3; 26:9–19. That proposal is not remotely viable.

In *Brown*, the court of appeals held that a criminal defendant's speech could be restrained pending trial even though the defendant was simultaneously running for Louisiana Insurance Commissioner. 218 F.3d at 418–419, 428–432. The district court later chose to suspend its order for the roughly seven weeks leading up to the general election to facilitate Brown's campaigning. *Id.* at 419. But no good deed goes unpunished. Soon after the order was lifted, some of the defendants released to the media telephone recordings relevant to the case and conducted interviews about the recordings. *Id.* That forced the district court to partially reimpose the gag order. *Id.* At no point did the court of appeals address the necessity of the district court's decision to temporarily lift its speech order.

In this case, the general election is almost a year away, and will long postdate the trial in this case. *See* Pretrial Order ¶ 1 (Aug. 28, 2023), ECF 39. The district court also cannot

49

PUBLIC COPY – SEALED INFORMATION DELETED

feasibly suspend the Order for the weeks leading up to each of the upcoming primary elections because contests for the Republican nomination continue every month in 2024 from January through June.  *See* FED. ELECTIONS COMM'N, 2024 PRELIMINARY PRESIDENTIAL AND CONGRESSIONAL PRIMARY DATES (2023).[17]  Suspending the Order for the leadup to each of those primary elections would be the equivalent of no Order at all.  And no Order at all is not a less restrictive alternative.

## V

### A

While the district court had the authority to issue an order restraining trial participants' speech, and no less restrictive alternative would suffice, the Order is not narrowly tailored to maximize the amount of protected speech allowed while still averting the "substantive evil of unfair administration of justice[.]"  *Landmark Commc'ns*, 435 U.S. at 844 (quoting *Bridges*, 314 U.S. at 271); *see Gentile*, 501 U.S. at 1076.

In so holding, we fully credit the district court's care and efforts while handling this complex case to bring the Order within First Amendment bounds.  *See, e.g.*, Hr'g Tr. 84:18–22 (stating that "Mr. Trump may still vigorously seek public support as a presidential candidate, debate policies and people related to that candidacy, criticize the current administration, and assert his belief that this prosecution is politically motivated"); Dist. Ct. Stay Order at 5 (explaining that the Order covers only those "kinds of 'targeting' statements that could result in 'significant and immediate' risks' to 'the integrity of

---

[17] https://perma.cc/P5HK-7LAG.

A49

50

PUBLIC COPY – SEALED INFORMATION DELETED

these proceedings'") (quoting Order at 2).  But in our view, the Constitution requires some narrowing of the Order's reach.

By way of reminder, the Order provides:

All interested parties in this matter, including the parties and their counsel, are prohibited from making any public statements, or directing others to make any public statements, that target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony.

Order at 3.  The Order then adds that it "shall not be construed" to prohibit Mr. Trump from making statements that (1) "criticiz[e] the government generally, including the current administration or the Department of Justice"; (2) "assert[] that Defendant is innocent of the charges against him, or that his prosecution is politically motivated"; or (3) "criticiz[e] the campaign platforms or policies of Defendant's * * * political rivals, such as former Vice President Pence."  Order at 3.

**1**

The district court's ban on speech that "targets" witnesses and trial personnel reaches too far.  The ordinary meaning of statements that "target" a person is statements aimed at or directed toward a person or entity.  *See, e.g.*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) (def. 5) ("[t]o aim * * * at a target"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2341 (1993) (defs. 1a, 4) ("to make a target of" or "to direct toward a target").

A50

51

PUBLIC COPY – SEALED INFORMATION DELETED

By broadly proscribing any statements about or directed to the Special Counsel and the court's and counsel's staffs, as well as reasonably foreseeable witnesses or their testimony, the Order sweeps too broadly.  It captures some constitutionally protected speech that lacks the features or content that would trench upon the court's proper functioning or ability to administer justice.  Under the Order, Mr. Trump could not, for example, say that a former government official and potential witness is a "liar," or that the Special Counsel is a "Trump hater."  *See* Oral Arg. Tr. 114:25–116:22 (Special Counsel arguing that the Order as drafted permits Mr. Trump to call another's statements untrue, but not to call the speaker a "liar").  Nor could Mr. Trump express his opinion that the staff, in general, at the courthouse has been "terrific" and "helpful," or, conversely, "hard to work with."

Mr. Trump, it bears noting, is simultaneously a criminal defendant and a political candidate for the Republican presidential nomination.    Under the court's Order, his opponents could without restriction wield the indictment and evidence in the case to demonstrate his unfitness for office.  Yet the Order would allow Mr. Trump to respond only by "asserting that [he] is innocent of the charges," and then changing the subject to his rival's "campaign platform[] or policies[.]"  Order at 3.  Permitting Mr. Trump to answer such political attacks with only an anodyne "I beg to differ" would unfairly skew the political debate while not materially enhancing the court's fundamental ability to conduct the trial.

In addition, the indictment against Mr. Trump refers to statements or actions by the former Vice President, the former Chairman of the Joint Chiefs of Staff, "other senior national security advisors," the former White House Chief of Staff,

A51

52

PUBLIC COPY – SEALED INFORMATION DELETED

other senior White House officials, and multiple United States Senators and Representatives.    Indictment ¶¶ 83–120. Certainly, some of those figures are known or reasonably foreseeable witnesses in the case.  As Mr. Trump points out, some of those same individuals also have written books about their work in his administration and have given interviews that Mr. Trump views as unfavorable.    Trump Resp. Opp. Prosecution's Mot. for Prior Restraints 10 n.7, ECF 60 (Sept. 25, 2023).  Mr. Trump has a First Amendment interest in publicly debating those individuals' commentaries in a way that is independent of and disassociated from any role they might have in the trial.  *See Brown*, 456 U.S. at 53.  Yet the Order would proscribe such speech because it would speak about someone who is a reasonably foreseeable witness, even if Mr. Trump's speech would have nothing to do with their witness role or the possible content of any testimony.

The interest in protecting witnesses from intimidation and harassment is doubtless compelling, but a broad prohibition on speech that is disconnected from an individual's witness role is not necessary to protect that interest, at least on the current record.  Indeed, public exchanges of views with a reasonably foreseeable witness about the contents of his forthcoming book are unlikely to intimidate that witness or other potential witnesses weighing whether to come forward or to testify truthfully.

In so holding, we underscore a critical consideration:  The only rationale invoked by the district court for its Order as to witnesses is their willingness to come forward and to provide evidence truthfully.  Order at 2.  Yet commonly, one of the most powerful interests supporting broad prohibitions on trial participants' speech is to avoid contamination of the jury pool,

A52

53

PUBLIC COPY – SEALED INFORMATION DELETED

to protect the impartiality of the jury once selected, to confine the evidentiary record before the jury to the courtroom, and to prevent intrusion on the jury's deliberations. *See Russell*, 726 F.2d at 1009–1010; *United States v. Tijerina*, 412 F.2d 661, 666–667 (10th Cir. 1969); *see also Sheppard*, 384 U.S. at 358–361 (emphasizing a trial court's responsibility "to protect the jury from outside influence[,]" including through regulating the speech of parties). Since unrestricted speech by those involved in a trial may prejudice actual or potential jurors in ways that are difficult to remedy, courts have reasonable leeway to regulate those participants' speech. *Gentile*, 501 U.S. at 1075–1076; *Sheppard*, 384 U.S. at 362–363.

Here, however, the district court based the Order exclusively on the risks of influencing witnesses and intimidating or harassing other trial participants, and not on the need to ensure jury impartiality or to protect the jury from outside influence. Order at 2–3. So our holding addresses only the first two interests as a basis for the Order.[18]

**2**

Following Mr. Trump's motion to stay the Order, the district court clarified that it meant its Order to cover only those "kinds of 'targeting' statements that could result in 'significant and immediate risk[s]' to 'the integrity of these

---

[18] Since the district court did not rely on the interest in protecting jury impartiality and independence, we do not consider whether that interest might support different restrictions from those we hold are justified to protect witnesses, counsel, and court and attorney staff. As a result, nothing in this opinion speaks to the district court's authority to consider additional measures to protect the jury pool and jury should such protection prove necessary going forward.

54

PUBLIC COPY – SEALED INFORMATION DELETED

proceedings[,]'" Dist. Ct. Stay Order at 5 (quoting Order at 2), specifying that "[t]he motion hearing and corresponding Order provide substantial context for and examples of" prohibited statements, *id*. at 5–6.

The problem is that the discussions and debates within the hearing transcript do not meaningfully narrow the Order's overbreadth.  In its order denying a stay pending appeal, the district court highlighted hypothetical examples offered during the hearing of "'targeting' statements that *could* result in 'significant and immediate risk[s]' to 'the integrity of these proceedings.'"  Dist. Ct. Stay Order at 5 (emphasis added) (quoting Order at 2); *see* Dist. Ct. Stay Order at 5–6.  The court then offered two examples of former President Trump's prior statements to illustrate the meaning of the word "target."  Dist. Ct. Stay Order at 6–7.  But the only example given of a prior statement that would not violate the Order was:

> Does anyone notice that the Election Rigging Biden Administration never goes after the Riggers, but only after those that want to catch and expose the Rigging dogs.  Massive information and 100% evidence will be made available during the Corrupt Trials started by our Political Opponent.  We will never let 2020 happen again.  Look at the result, OUR COUNTRY IS BEING DESTROYED.  MAGA!!!

Dist. Ct. Stay Order at 6.

But that post does not even arguably fall within the bounds of the Order in the first place because it does not identify, concern, or otherwise discuss any covered person.  Without an example of speech about a person covered by the Order that

55

PUBLIC COPY – SEALED INFORMATION DELETED

would not constitute forbidden targeting, the transcript does not meaningfully narrow the Order's operative language in a way that accommodates both the weighty free speech interests and the compelling judicial interests at stake.

For those reasons, we hold that the Order is not sufficiently narrowly tailored and so can be upheld only in part, as explained below.

**B**

Rather than prohibiting speech that "target[s]" known or reasonably foreseeable witnesses, the Order must focus more directly and narrowly on comments that speak to or are about those persons' potential participation in the investigation or in this criminal proceeding. That allows the former President to continue to speak out about those same persons' books, articles, editorials, interviews, or political campaigns as long as he does so in a manner that does not concern their roles as witnesses or the content of any expected testimony. For those witnesses who previously served or are currently serving in high-level government positions, narrowing language would also allow the former President to voice his opinions about how they performed their public duties, wholly separate from their roles as potential witnesses. Such speech about the roles of high-ranking public officials in the conduct of "governmental affairs" constitutes core political speech entitled to the strongest form of First Amendment protection. *Mills*, 384 U.S. at 218–219. And because such statements would not concern the persons' potential participation in the investigation or in this criminal proceeding, the "magnitude" and "likelihood" of the danger posed to the proceeding is lower. *See Landmark Commc'ns*, 435 U.S. at 843.

A55

56

By contrast, Mr. Trump's interest in commenting publicly on a potential witness's decision to participate in the criminal investigation, choice to cooperate with either party, or expected testimony encroaches on the weighty public interest in the fair administration of criminal justice.  "Trial by newspaper"—or, nowadays, social media—can pose a significant and imminent danger to the fair and proper functioning of the judicial process and its truth-finding function.  *Pennekamp*, 328 U.S. at 359 (Frankfurter,   J.,   concurring).     The   unique   megaphone   a defendant wields, amplified by social media, ramps up the risk of public and press reactions and attention capable of altering or swaying witnesses' participation in the trial or the content of their testimony.  The risk is particularly significant that public statements about certain witnesses' involvement in the case may   intimidate   other   potential   witnesses   from   providing testimony, encourage them to alter their testimony, or dissuade them from cooperating with investigators.   In addition, a prohibition on speech concerning witnesses' participation in this   case   reinforces   Mr.   Trump's   condition   of   release forbidding him to "communicate about the facts of this case with   any   individual   known   to   [Mr.   Trump]   to   be   a   witness, except through counsel or in the presence of counsel."  Order Setting Conditions of Release 3.

Importantly,   an   order   restricting   communications concerning   individuals'   roles   as   witnesses   in   a   criminal proceeding does not close the door to such speech.  It instead relocates such commentary to the courtroom, where the content and   credibility   of   witnesses   can   be   challenged   through   the time-tested crucible of examination and cross-examination "in the calmness and solemnity of the courtroom according to legal procedures."   *Sheppard*, 384 U.S. at 350–351 (quoting *Cox*, 379 U.S. at 583 (Black, J., dissenting)).  After all, "[l]egal trials

57

PUBLIC COPY – SEALED INFORMATION DELETED

are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Id.* at 350 (quoting *Bridges*, 314 U.S. at 271).

In short, requiring a nexus between Mr. Trump's speech and a witness's potential participation in the criminal proceeding affords "freedom of discussion * * * the widest range" that is "compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp*, 328 U.S. at 347. Given the trial court's latitude to "adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence," an order that prohibits participants from engaging in speech concerning reasonably foreseeable witnesses' potential participation in the investigation or in this criminal proceeding would be "narrowly drawn" toward protecting "the integrity of the criminal process." *Cox*, 379 U.S. at 562.[19]

When the Supreme Court has spoken of courts' authority to restrict trial participants' speech, it has framed those

---

[19] Other courts have upheld speech-limiting orders that similarly require linkage between the communication and the person's participation as a witness. *See, e.g.*, *Russell*, 726 F.2d at 1008 (sustaining order prohibiting potential witnesses from making statements to media "that relate[] to, concern[], or discuss[] the testimony such potential witnesses may give in this case, or any of the parties or issues such potential witness expects or reasonably should expect to be involved in this case") (emphasis omitted); *Tijerina*, 412 F.2d at 663 & n.1 (upholding order prohibiting parties, counsel, and witnesses from publicly speaking about "the merits of the case, the evidence, actual or anticipated, the witnesses or the rulings of the Court").

58

PUBLIC COPY – SEALED INFORMATION DELETED

restrictions in the context of speech *about* the case in which the restrictions are imposed. *See Sheppard*, 384 U.S. at 361 (discussing a court's authority to "proscribe[] extrajudicial statements by any lawyer, party, witness, or court official *which divulged prejudicial matters*, such as the * * * *the identity of prospective witnesses or their probable testimony*; any belief in guilt or innocence; or like *statements concerning the merits of the case*") (emphases added); *Gentile*, 501 U.S. at 1076 (acknowledging the State's legitimate interest in prohibiting attorney "speech having a substantial likelihood of materially prejudicing that proceeding"); *id.* at 1074 (reasoning that lawyers' "extrajudicial statements" about the case "pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative" in light of lawyers' "special access to information [about the case] through discovery and client communications").

To be clear, narrowing the Order's reach to statements concerning reasonably foreseeable witnesses' potential participation in the investigation or in this criminal proceeding does not require that the statements facially refer to the person's potential status as a witness or to expected testimony. Context matters. The statement that a potential witness "is a liar" might well concern that person's testimony if made on the eve of trial or immediately following news reports that the person is cooperating with investigators. The same words might not concern that person's status as a witness if uttered immediately after and in response to the release of that person's book or media interview unrelated to this court proceeding.

Similarly, when Mr. Trump makes comments about a high-profile figure, context will shed critical light on whether that speech concerned other aspects of that person's public life

59

PUBLIC COPY – SEALED INFORMATION DELETED

or her testimonial intentions.  By the same token, were Mr. Trump to make public statements about a poll worker whose name he would not know but for that worker's anticipated participation in this case, determining that the statements concerned that person in their capacity as a potential witness will be more straightforward.  This would be true whether or not the statements on their face mention the witness's anticipated testimony.

Two posts help illustrate the requisite nexus between Mr. Trump's statements and a foreseeable witness's potential participation in the criminal proceeding.  Shortly after former Attorney General William Barr gave a televised interview, Mr. Trump posted a video on his social media account in which he said:  "Why does Fox News constantly put on slow-thinking and lethargic Bill Barr, who didn't have the courage or stamina to fight the radical left lunatics while he was the Attorney General of the United States, and who even more importantly refused to fight election fraud, of which there was much?"  Special Counsel Mot. 11 n.20.  That statement's criticisms of Barr's actions in the aftermath of the 2020 election do not concern any role he may have as a witness in this criminal proceeding.

On the other hand, hours after news broke asserting that former Chief of Staff Mark Meadows was cooperating with the Special Counsel, Mr. Trump asked on social media whether Meadows was the type of "weakling[] and coward[]" who would "make up some really horrible 'STUFF'" about Mr. Trump in exchange for "IMMUNITY against Prosecution (PERSECUTION!) by Deranged Prosecutor, Jack Smith."  Special Counsel Mot. Reply 9.  That statement, considering both its timing and its content, concerns Meadows's potential

60

cooperation with the prosecution and his potential testimony against Mr. Trump and so is properly proscribed.

There no doubt will be some close cases in which it will be difficult to determine whether a statement concerns a foreseeable witness's potential participation in the investigation or in this criminal proceeding.  But resolving such factual disputes falls well within the district court's wheelhouse.

Mr. Trump argues that the Order's reference to "reasonably foreseeable witnesses" and to the substance of their potential testimony is unconstitutionally vague.  Trump Br. 53–54.  That is incorrect.

A legal rule is not unconstitutionally vague so long as it gives "sufficient warning" that persons can conform their conduct to the law and "avoid that which is forbidden." *United States v. Bronstein*, 849 F.3d 1101, 1106–1107 (D.C. Cir. 2017) (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975)).  The indictment paints a reasonably clear picture of the primary participants in this case, Indictment ¶¶ 83–120, and ongoing discovery will provide further clarity, *see United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) (holding that a witness was "foreseeable" to the defendant because the defendant had prior dealings with the witness related to the case); *cf. Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."); *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").

61

PUBLIC COPY – SEALED INFORMATION DELETED

In short, the Order's effort to protect witnesses is permissible as modified to prohibit only those statements that concern reasonably foreseeable witnesses' potential participation in the investigation or in this criminal proceeding. Whether a statement about a reasonably foreseeable witness concerns her potential participation in the investigation or in this criminal proceeding must be determined by reference to the statement's full context.

## C

As for the protection of counsel and staff working on the case, the Order requires some recalibration to sufficiently accommodate free speech.

We start by noting the obvious. This criminal proceeding places significant demands on all counsel, the defendant, and court and counsel staff. The case, which is the object of enormous public and press attention, is just a few months from trial and involves 47,000 pages of key documents and hundreds of potentially relevant witnesses. Pretrial briefing alone has been voluminous, with four separate motions to dismiss the indictment on various grounds, in addition to ten other substantive motions.

Some statements concerning counsel or staff working on this case, or their family members, are highly likely to trigger a barrage of threats, intimidation, or harassment that pose an imminent risk of materially interfering with the work of counsel and court personnel as they labor to fairly and orderly adjudicate this complex criminal proceeding. In view of the demands on counsel and court personnel, and the "significant and immediate risk that * * * attorneys, public servants, and

62

PUBLIC COPY – SEALED INFORMATION DELETED

other court staff will themselves become targets for threats and harassment[,]" Order at 2, the district court had the authority to take some steps to prevent obstruction of the court's capacity to manage and conduct this case in an effective, efficient, and timely manner, *see Sheppard*, 384 U.S. at 363.

At the same time, speech about the criminal justice system is vital. The courts are the people's Third Branch of government and, especially in criminal cases, "play a vital part in a democratic state[.]" *Gentile*, 501 U.S. at 1035. As a result, the public has a strong and "legitimate interest in their operations." *Id.* That interest is magnified in criminal cases, where public scrutiny promotes transparency, accountability, and integrity. "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980). Allowing robust speech can "guard[] against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard*, 384 U.S. at 350.

As written, the Order prohibits interested parties from making or directing others to make *any* public statements that target—that are directed to or aimed at—prosecutors or court staff. Order at 3. That goes too far. Prosecutors are vested with immense authority and discretion, including the power to take steps that can result in persons' loss of liberty. The public has a weighty interest in ensuring that such power is exercised responsibly. And criminal defendants facing potential curtailments of liberty have especially strong interests in commenting, within reasonable bounds, on prosecutors' use of their power.

63

PUBLIC COPY – SEALED INFORMATION DELETED

Likewise, the courts and the judges who sit on them enjoy "no greater immunity from criticism than other persons or institutions." *Landmark Commc'ns*, 435 U.S. at 839 (quoting *Bridges*, 314 U.S. at 289 (Frankfurter, J., dissenting)). The district judge in this case plays a centrally important role in adjudicating this case and guiding it through trial. Those reasons, presumably, are why the district court commendably did not include in the Order speech directed at the judge herself or the court as an institution.

For similar reasons, the Order should not have restricted speech about the Special Counsel himself. The Order already exempts speech about the Department of Justice as an institution. *See* Order at 3. As conceded at oral argument, "the Special Counsel himself is * * * both an individual trial participant and a representative of the institution"—that is, the Department of Justice's Office of Special Counsel. Oral Arg. Tr. 99:6–8; *see* Special Counsel Jack Smith Announces a New Trump Indictment, C-SPAN (Aug. 1, 2023) (Special Counsel's public announcement of the indictment in this case).[20] As a high-ranking government official who exercises ultimate control over the conduct of this prosecution, the Special Counsel is no more entitled to protection from lawful public criticism than is the institution he represents. *See Landmark Commc'ns*, 435 U.S. at 839 (quoting *Bridges*, 314 U.S. at 289 (Frankfurter, J., dissenting)).

As for other counsel in this case and the court's and counsel's staffs, we hold that adding a *mens rea* requirement

---

[20] https://www.c-span.org/video/?529681-1/special-counsel-jack-smith-announces-trump-indictment; https://www.c-span.org/video/?528657-1/special-counsel-jack-smith-statement-indictment-donald-trump.

64

PUBLIC COPY – SEALED INFORMATION DELETED

will appropriately balance the court's institutional interests and the free speech values at stake. As a general rule, state-of-mind requirements "lessen[] the hazard of self-censorship" and "provide[] breathing room" for speech. *Counterman*, 600 U.S. at 75 (formatting modified). In this case, the requirement affords "strategic protection" to Mr. Trump's speech by guarding against the prospect of chilling speech that poses an immaterial risk to the criminal proceedings. *Id.* (quotation marks omitted).[21]

At the same time, state-of-mind requirements allow vindication of the compelling judicial interest in ensuring that speech by trial participants does not obstruct or delay the criminal proceeding. Here, the district court found, and the record demonstrates, that there is a "significant and immediate risk that * * * attorneys, public servants, and other court staff will themselves become targets for threats and harassment" because of Mr. Trump's speech. Order at 2. Threats of physical harm, stalking, or doxing almost inevitably will slow or temporarily halt work on the criminal proceeding as

---

[21] No *mens rea* is needed with respect to the portion of the Order dealing with speech about witnesses. As explained above, any speech by trial participants concerning witnesses' participation in the case, regardless of motive or mindset, threatens to discourage or influence witness testimony—testimony that the court has an obligation to keep free of outside influence. *See Sheppard*, 384 U.S. at 359. Against that threat, defendants have little legitimate interest in publicly commenting on the fact or expected substance of witness testimony before it occurs. *See* Section V.B, *supra*. Further, unlike witnesses, the court's and counsel's staffs have elected to serve in government or on this case. For their part, witnesses have civic and legal duties to truthfully provide relevant information, but may find any participation in the trial process unwelcome and difficult.

65

PUBLIC COPY – SEALED INFORMATION DELETED

personnel are distracted addressing threats to their or their families' safety, or to the security of courthouse and office premises.

We hold that the district court appropriately restricted speech concerning counsel and staff members, or their family members, to the extent it is made with either the intent to materially interfere with their work or the knowledge that such interference is highly likely to result. By requiring at least knowledge of a high likelihood of interference, we make clear that it is not enough that Mr. Trump has "done more than make a bad mistake." *See Counterman*, 600 U.S. at 80. He must fairly bear responsibility for the known consequences of his actions. *See id.*; *see also id.* at 78–79 (describing *mens rea* standards). That restriction also best accounts for the competing interests in effective functioning of the judicial, prosecutorial, and defense processes and the substantial First Amendment interests in speech about how governmental authority and positions of prominent responsibility in the criminal case are used.

Furthermore, by requiring that the interference be material, we make clear that statements including or leading to intemperate and rude remarks—without more—are not proscribed. Working in the criminal justice sphere fairly requires some thick skin. At the same time, the requirement of materiality ensures, for example, that words objectively threatening imminent physical harm—whether the covered person utters such words directly or speaks with the requisite knowledge or intent that such threats are highly likely to occur—are proscribed. Words inducing mass robocalling, doxing, or true threats being called into offices or the courthouse would also be proscribed. These are the types of

66

PUBLIC COPY – SEALED INFORMATION DELETED

material interference that would obstruct a reasonable person's performance of their duties, and the type of threats that have resulted from some of Mr. Trump's prior statements, as demonstrated by the record. *See* Section IV.B.1, *supra*. The First Amendment does not empower a criminal defendant or other trial participants to engage in speech intended to delay or obstruct the justice process or with the knowledge that such interference is highly likely to result.

Adding proof of state of mind "no doubt[] has a cost: Even as it lessens chill of protected speech," it makes enforcing the Order harder. *Counterman*, 600 U.S. at 78. But that tradeoff is necessary here to protect against the "substantive evil of unfair administration of justice[,]" while allowing as much speech as is consistent with that protective barrier. *Landmark Commc'ns*, 435 U.S. at 844. Furthermore, the relevant mental states can commonly be proved with objective evidence. *See Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds."); *United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir. 2010) (A fact finder may infer that "a person intends the natural and probable consequences of acts knowingly done[.]").

As with its assessment of statements concerning witnesses, the district court's consideration of speech about other trial participants should account for context, including such factors as the statement's phrasing, timing, setting, and meaning. And we leave it open to the district court, with her broad authority to manage and conduct this complex and high-profile trial, to

67

PUBLIC COPY – SEALED INFORMATION DELETED

decide whether additional restrictions are needed on speech about counsel or about staff as the trial date draws nearer or circumstances change.

Finally, Mr. Trump argues that the Order's application to "[a]ll interested parties in this matter," Order at 3, is unconstitutionally vague, *see* Trump Br. 52–53.  The district court clarified that "interested party" means only "the parties and their counsel."  Dist. Ct. Stay Order at 5.  In affirming the Order in part, we read it with that clarification, which moots the vagueness challenge.

## VI

For the foregoing reasons, we hold that some aspects of the defendant's speech pose a significant and imminent risk to the fair and orderly adjudication of this criminal proceeding, which justified protective action by the district court.  We affirm in part and vacate in part the district court's Order to best accommodate the competing constitutional interests at stake, as required by *Landmark Communications*.

Specifically, we affirm the Order to the extent it prohibits all parties and their counsel from making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding.  The Order is also affirmed to the extent it prohibits all parties and their counsel from making or directing others to make public statements about—(1) counsel in the case other than the Special Counsel, (2) members of the court's staff and counsel's staffs, or (3) the family members of any counsel or staff member—if those statements are made with the intent to materially interfere with,

68

PUBLIC COPY – SEALED INFORMATION DELETED

or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is highly likely to result.  We vacate the Order to the extent it covers speech beyond those specified categories. *See* 28 U.S.C. § 2106.  The administrative stay issued by this court on November 3, 2023, is hereby dissolved.

As should be clear, but to avoid any potential doubt, as affirmed in part and vacated in part, the Order also leaves open the categories of speech the district court explicitly stated were permissible under its initial ruling.  *See* Order at 3.  Mr. Trump is free to make statements criticizing the current administration, the Department of Justice, and the Special Counsel, as well as statements that this prosecution is politically motivated or that he is innocent of the charges against him.  *See id.*

We do not allow such an order lightly.  Mr. Trump is a former President and current candidate for the presidency, and there is a strong public interest in what he has to say.  But Mr. Trump is also an indicted criminal defendant, and he must stand trial in a courtroom under the same procedures that govern all other criminal defendants.  That is what the rule of law means.

*So ordered.*

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 23-3190**                     **September Term, 2023**

FILED ON: DECEMBER 8, 2023

UNITED STATES OF AMERICA,

APPELLEE

v.

DONALD J. TRUMP,

APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cr-00257-1)

———

Before: MILLETT, PILLARD and GARCIA, *Circuit Judges*

### J U D G M E N T

This cause came on to be heard on the record on appeal from the United States District Court for the District of Columbia and was argued by counsel. On consideration thereof, it is

**ORDERED** and **ADJUDGED** that the District Court's Order be affirmed in part and vacated in part, in accordance with the opinion of the court filed herein this date. It is

**FURTHER ORDERED** that this court's administrative stay entered on November 3, 2023, be dissolved.

The Clerk is directed to issue the mandate forthwith.

### Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY:    /s/

Daniel J. Reidy
Deputy Clerk

Date: December 8, 2023

Opinion for the court filed by Circuit Judge Millett.

## <u>CERTIFICATE OF PARTIES AND *AMICI CURIAE*</u>

The parties in the district court include the United States of America and Donald J. Trump. The district court denied leave to file to proposed *amici curiae*. The parties before this Court include the United States of America and Donald J. Trump. *Amici curiae* before this Court include the following:

**In Support of Appellant Donald J. Trump:**

State of Iowa, State of West Virginia, State of Alabama, State of Alaska, State of Idaho, State of Indiana, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Nebraska, State of North Dakota, State of Oklahoma, State of South Carolina, State of South Dakota, State of Texas, State of Utah

America First Legal Foundation

Christian Family Coalition Florida, Inc.

*/s/ D. John Sauer*

## **DISCLOSURE STATEMENT**

No Disclosure Statement under Federal Rule of Appellate Procedure 26.1 or under Circuit Rule 26.1 is indicated, as Defendant is not a corporation or similar entity.

*/s/ D. John Sauer*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on December 18, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3,840 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer
Dated: December 18, 2023
