No. 23-3190

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA,

*Appellee (Complainant)*

v.

DONALD J. TRUMP

*Appellant (Defendant)*

---

On Appeal from the U.S. District Court for the District of
Columbia, Case No. 1:23-cr-00257,  Hon. Tanya Chutkan
Presiding

---

**AMICUS CURIAE BRIEF IN SUPPORT OF APPELLANT**
*By Treniss Jewell Evans III*

---

Treniss Jewell Evans, III
Contact c/o CONDEMNED USA, LLC
Post Office Box 3238
Forney, Texas 75126.
Telephone:  (210) 485-1889.
Email:   treniss@condemnedusa.com
*Proposed Amici Pro Se*

## TABLE OF CONTENTS

TABLE OF CONTENTS                                              *ii*

FRAP RULE 26.1 AND FRAP 29(a)(4)(E)
DISCLOSURE STATEMENT                                           *iii*

STATEMENT OF INTEREST OF AMICUS CURIAE                         *v*

TABLE OF AUTHORITIES                                           *viii*

I.    SUMMARY OF ARGUMENT                                       1

II.   ARGUMENT                                                  9

      **A. GOVERNING LAW**                                      9

      **B. GOVERNING PRECEDENTS**                               11

      **C. JUDGE CHUTKAN AND GOVERNMENT
         ARE THE ACTUAL SOURCE OF
         PREJUDICIAL OUTSIDE INTERFERENCE**                     17

      **D. DEFECTS OF GAG ORDER**                               19

      **E. WITNESSES WHO DON'T WANT TO BE
         PROTECTED OR NEED TO BE**                              23

      **F. SUPPRESSION OF INFORMATION
         NEEDED TO CAST AN INFORMED VOTE
         AND ORGANIZE FOR CANDIDATE
         OF ONE'S CHOICE**                                      27

IV.   CONCLUSION                                                27

V.    APPENDIX *All relevant statutes sufficiently set forth in Argument*

## FRAP RULE 26.1 AND FRAP 29(a)(4)(E))
## DISCLOSURE STATEMENT

In compliance with Federal Rules of Appellate Procedure ("FRAP") Rule 29(a)(4)(E), proposed *Amicus* is not aware – and he would be – of any possibility that any of the Court's Judges or staff or their families have any economic relationship with any business interest of his.

*Amicus* Treniss Evans is the creator and leader of an organization Condemned USA which advocates for due process and heightened attention and adherence to fairness and impartiality in criminal prosecutions and the political rights of accused defendants. It fights for those who are deemed guilty merely for being accused. However, the organization has issued no shares of stock nor could it and Evans is not aware of – and he would be – any donation or relationship between any of the Court's Judges or staff or their families or any other way that there could be any conflicting relationship.

None of the proposed *Amici* are a majority stockholder or owner of any for-profit corporation or holder of a controlling interest of any other type of business entity of a for-profit business which trades publicly or could in any way create any interest by any of the Judges of this Court or their staff, because such involvement would not be possible.

*Amicus* will be seeking donations to defray the costs of this brief, through Condemned USA. However, none of the funding or concepts or decisions concerning this brief have been or will be supplied by any party to this case, attorney, or staff.

No donor is allowed to determine the content of the professional judgment in this brief. No party in any legal proceeding or their counsel or advisors requested or suggested this brief nor had any input into its contents.

Dated: December 7, 2023

/s/ Treniss Jewell Evans III
Treniss Jewell Evans, III
Contact c/o CONDEMNED USA, LLC
Post Office Box 3238
Forney, Texas 75126.
Telephone: (210) 485-1889.
Email:    treniss@condemnedusa.com
*Proposed Amici Pro Se*

iv

## STATEMENT OF INTEREST OF AMICUS CURIAE

Treniss Evans is a natural person who has been a resident and domiciliary of Texas, for many years and who has a business mailing address at Condemned USA LLC, Post Office Box 3238, Forney, Texas 75126. Telephone: (210) 485-1889. Email: treniss@condemnedusa.com

Proposed Amicus Evans is legally qualified to vote in Texas and Federal elections.    Evans intends to vote in the Republican primary election for the nominee of the Republican Party for the 2024 Presidential election and in the November 2024 general election for President. Therefore, Proposed Amicus Evans wants to hear more (all) from candidate Donald Trump Trump's side of the story on the suspicious indictments brought years after January 6, 2021, only when Trump as a candidate began to look politically unbeatable.

Prosecutors politically aligned against Trump in heavily-Democrat-dominated jurisdictions waited around two years since January 6, 2021, before bringing indictments.   While professing the seriousness of these events, they suspiciously waited until the election cycle for 2024 had started and before appeals likely to over-turn adventurous and creative re-interpretations of statutes are likely to be

v

resolved by election day.

Each time information emerged suggesting Joseph Robinette Biden, Jr. is guilty of money laundering, soliciting, and receiving bribes, conspiracy, violations of the Foreign Agents Registration Act, and of the Foreign Corrupt Practices Act, the U.S. Department of Justice the same day or around the following day unseals new indictments against Donald J. Trump, files superseding indictments of new charges against Trump, or "leaks" incendiary accusations against Trump. Whenever damning legal news breaks about Biden, Trump gets indicted or accused. This would seem to explain why many of the indictments are very long, cumbersome, and sloppily written as if thrown together in a hurry.

Therefore, 80 million voters in the U.S.A. have strong reasons to dismiss and disrespect these legal attacks upon Donald Trump as being partisan campaign commercials for the Democrat Party and really conspiracy of obstruction of justice to bury Joe Biden's activities.

Proposed Amicus Evans needs to know what is real and true and what is not in order to be sure of his decision of whom to vote for for President. The gag order in this case and others – vastly broader and

vi

ambiguous and chilling of legitimate speech than any valid purpose –
prevents Evans and others from hearing all sides of these issues to
decide whether in organizing for a candidate and casting his vote in the
Texas March 5, 2024, primary

Treniss Evans works through Condemned USA. *Condemned USA*
is a Legal Advocacy Group, which does not provide attorney services but
public advocacy about legal issues in need, provide funding solutions for
legal counsel and which fights to restore the freedom and unity of
under-represented American families. It has often worked to help
defendants find attorneys. It is a united front of Americans dedicated
to sharing the truth that leads to change. We are citizen journalists,
investigators, community leaders, speakers, and contributors in effort to
preserve the sanctity of American institutions for those who have
forgotten. We seek to ensure that our brothers, sisters, mothers,
fathers, daughters, sons and friends are never victimized again by the
deception, misinformation and outright lies by politicians for political
gain at the expense of our freedoms. We are a safeguard for the human
rights of our fellow man.

# TABLE OF AUTHORITIES

**Statutes**

First Amendment to the U.S. Constitution ............................... 1, 4, 5, 10, 11,

.................................................................... 12, 13, 20, 24, 25, 26, 29

**Cases**

*Brandenburg v. Ohio,* 395 U.S. 444 (1969) ..................................... 7

*Gentile v. State Bar of Nevada,* 501 U.S. 1030 (1991)............. 13, 14, 15, 17

*Hustler Magazine v. Falwell,* 485 U.S. 46 (1988) ......................... 7

*In Ashcroft v. American Civil Liberties Union,* 535 U.S. 564 (2002) ...... 10

*In re Dow Jones & Co., Inc.,* 842 F.2d 603, 606-08 (2d Cir.), cert. denied,
--- U.S. ----, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988).......................... 11

*In re Murphy-Brown, LLC,* 907 F.3d 788 (4th Cir. 2018)......................... 11

*In re: New York Times Co.,* 878 F.2d 67 (2nd Cir. 1989) ........................ 11

*United States v. Douglass Mackey,* Case No. 21-CR-80-AMD.................... 6

Winter v. Natural Resources Defense Council, Inc, 555 U.S. 7 (2008) .... 9

**Statutes**

First Amendment to the U.S. Constitution .................................... 1

**Other Authorities**

Alan Dershowitz,........................................................... 25

Attorney General's Memorandum on "Election Year Sensitivities"
March 5, 2008................................................................ 8

FRAP 29(a)(4)(E)............................................................ iii

FRAP RULE 26.1 ............................................................ iii

Sidney Powell, <u>Licensed to Lie</u>, 2nd Edition (November 1, 2018)............. 15

Warning, by District Court Judge, Eastern District of Virginia Judge
T.S. Ellis III ............................................................. 24

## I.   SUMMARY OF ARGUMENT

1.   Proposed *Amicus,* Texas voter Treniss Evans, challenges the jurisdictional reach of the District Court and alleges that voters have been denied their rights to vote for President with full information because of the U.S. District Court for the District of Columbia exceeding its authority vis-à-vis the First Amendment to the U.S. Constitution.

2.   A type of temporary injunction, casually called a "gag order," has been used from time to time in court cases for a long time.

3.   However, Proposed *Amicus* contends that that is because, traditionally, judges respecting the First Amendment to the U.S. Constitution have been more careful to define limited and precise "gag order" injunctions and to use them only for legitimate purposes and only when strictly necessary.

4.   The gag order in the lower court here is defective because there is no way to know what witnesses – who have not yet been identified – Trump may not comment upon.

5.   The gag order in the lower court is defective because it fails to distinguish between witnesses who have literally written books on the topic and gone on speaking tours dining out on their stories on the

1

same topics as the prosecution in this case, and those who have booked the news show circuit and talk show circuit and have pushed through crowds to seek out every news microphone in the land versus private witnesses who have not enthusiastically sought out public attention.

6.     The gag order as written – not how some better gag order could be written – fails to distinguish between political heavy-weights like former Attorney General Bill Barr, former Vice President Mike Pence, Mark Meadows, and any number of law professors and professional talking heads who attack Trump in public as opposed to private persons generally unknown to the public who have not sought out a public stage, who may lack political and social power, and may be unaccustomed to the rigors of public debate.

7.     Protecting witnesses who do not want to be protected or need to be is a factor this Court should explicitly address in its legal tests.

8.     We should recognize that there are different kinds of witnesses.  A car accident trial might major on primary participants, yet also include minor witnesses who are not personally interested in the case, such as a local weather man noting what the weather was during the accident, the defendant's mechanic testifying that the brakes

2

were working and had just been serviced, or a custodian of phone records introducing text message usage just before the accident.

9.    So there are witnesses... and then there are witnesses.

10.    The gag order fails strict scrutiny by lumping them all in the same pot.   There are witnesses who knock people over to find a television news camera.  But there are witnesses who really don't want to be in the trial at all.

11.    The gag order in the lower court is defective because Donald Trump has already been attacked and his credibility repeatedly criticized and attacked for almost 3 years.

12.    The gag order cannot serve any purported purpose – earning public disrespect – of insulating a jury when the entire country has already been saturated by massive waves of accusations and nasty attacks upon Donald Trump and over 1,100 other Defendants claiming the same conduct.   What has happened here is like warning someone to buy an umbrella ***after*** a five day long Category 5 hurricane has already soaked the entire State.

13.    The prosecution seems sensitive to the difference between saying very nicely that accusations are false, the procedure is flawed,

3

witnesses against him could not have the capacity to know what they testify to, witnesses against him are lying, including because of pressure of being prosecuted themselves, as opposed to saying the same things in impolite wording.

14.    However, the nearly 3 years of attacks on Trump and all of his supporters from the Government have not met the Government's own test of politeness or etiquette.  Nothing the Government complains about approaches the Government's own odious vitriol against Trump.

15.    Would the Government here now object to a criminal defendant publicly calling a prosecution witness a fascist, a racist, a white supremacist, a cult figure, a fraud, a liar, a threat to democracy?

16.    The gag order fails the injunction test and the strict scrutiny test under the First Amendment  because it is too late – 3 years too late – to purportedly protect the integrity of a trial.  That integrity is gone.

17.    Candidate for President Donald Trump has literally been put on trial in public for approaching 3 years – including before a Faux Court in the U.S. House of Representatives Select Committee to Investigate the January 6 Attack on the Capitol.

18.    Both in substance and pageantry the Select Committee put

4

Trump on trial on television, even holding unprecedented evening sessions to maximize public viewing of the show trial.

19.    In a February to March 2021 impeachment trial in the U.S. Senate, Trump was literally put on trial before the public on the same topics.

20.    This Court should address as a case of first impression how to protect a trial that has already been damaged, by those asking now to protect what they themselves already damaged.

21.    Remember that Joe Biden is not only Trump's opponent in the Presidential election but the boss of everyone involved in the chain of command. The attacks on candidate Trump have been publicly and officially brought by (among others) the U.S. Attorney for the District of Columbia Matthew Graves, Special Counsel Jack Smith, Attorney General Merrick Garland, and the President of the United States Joe Biden. All of them work for the President.

22.    It is an error to think of a gag order as a question of courtroom administration. A gag order is clearly a regulation of First Amendment protected free speech and political association rights.

23.    It is impossible to justify a compelling state interest in the

5

Government attacking Trump yet not allowing him to reply.

24.    Furthermore, a gag order is inescapably an injunction and the four tests for an injunction must be satisfied.

25.    Now, voters are being denied their rights to hear and understand the candidates for President of the United States in order to exercise their votes in the 2024 Presidential Republican primary and general election.

26.    Voters are being doused in misinformation about candidate Trump that he is not being allowed to correct, creating the same deprivation of voter rights as just decided in the Eastern District of New York in *United States v. Douglass Mackey*, Case No. 21-CR-80.

27.    *Amicus* suggests that Judge Chutkan's gag order is incompatible and irreconcilable with the Government's conviction of Douglass Mackey. The Government would need to retreat from its *Mackey* conviction to deny that voters are similarly affected here.

28.    On October 18, 2023, social media activist Douglass Mackey was sentenced to seven months in prison for posting memes concerning the 2016 presidential election.

29.    In the Eastern District of New York, Docket No. 21-CR-80-

6

AMD, *United States v. Douglass Mackey*, United States District Judge Ann M. Donnelly entered a guilty verdict for "attempt to suppress votes" through a social media disinformation campaign "for his role in a conspiracy to interfere with potential voters' right to vote in the 2016 election for the Office of the President of the United States."[1]

30.    The United States' Attorney's Office prosecuted Mackey for his exercise of free speech, outside the limitations of *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (incitement to imminent violence required to abridge free speech) and *Hustler Magazine v. Falwell, 485 U.S. 46 (1988) (*"The fact that society may find speech offensive is not a sufficient reason for suppressing it" – Chief Justice William Rehnquist"), under 18 U.S.C. 241.

31.    U.S. Attorney Peace proclaimed on the DoJ's website:

> "One of the foundational rights we hold as Americans, a right that many fought so hard to obtain, is the right to vote. The defendant weaponized disinformation in a dangerous scheme to stop targeted groups, including black

---

[1]    Of course, as always, Mackey's conviction depends crucially on the Government deciding for us what the Government thinks a Defendant meant. The Government is kind enough to tell us what we are thinking.

and brown people and women, from participating in our democracy." And: "This groundbreaking prosecution demonstrates our commitment to prosecuting those who commit crimes that threaten our democracy and seek to deprive people of their constitutional right to vote."

32.    Multiple Attorney Generals have ordered prosecutors as with the Memorandum on "Election Year Sensitivities" entered on March 5, 2008, and similar Memoranda repeatedly issued by various Attorneys General, attached as Exhibit C.

As Department employees, however, we must be particularly sensitive to safeguarding the Department's reputation for fairness, neutrality, and nonpartisanship.

And:

Simply put, politics must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges. Law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving and advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission.

8

## II.   ARGUMENT

### A. GOVERNING LAW

33.   The formula for an injunction – which a gag order functionally is – requires:

> A. A significant prejudice or burden to the party or parties requesting the gag order if it is not granted.
>
> B. A comparatively insignificant prejudice or burden upon the party or parties affected by the requested gag order if it is granted.
>
> C. The balance of the equities argues in favor of issuing the injunction / gag order.  This in some contexts includes projecting the likelihood of success.
>
> D. The injunction or gag order is in the public interest.

*See, e.g., Winter v. Natural Resources Defense Council, Inc,* 555 U.S. 7 (2008).

34.   Again, there are possible gag orders that could meet these tests.  But the gag order here does not.

35.   The main reason the gag order fails is that it is overwhelmingly vague, ambiguous, amorphous and meaningless.

9

36.   Under strict scrutiny infringing upon First Amendment rights, the Court must find and also articulate clearly and substantiate, that the order vindicates a "compelling state interest." *See, e.g., In Ashcroft v. American Civil Liberties Union,* 535 U.S. 564 (2002).

37.   But to vindicate a "compelling state interest" the Court must clearly identify what that interest is, not invoke a vague phrase.

38.   Does The Government have a "compelling state interest" in Special Counsel Jack Smith's feelings not being hurt?

39.   Does The Government have a "compelling state interest" in immunizing prosecutors from criticism of public, official actions?

40.   To satisfy strict scrutiny, The Government would also find that infringement of a fundamental constitutional right is the "least restrictive" means of achieving the compelling state interest.

41.   For example, the gag order prohibits "target[ing]" – whatever that means – unidentified, unknown, unnamed witnesses. Trump and his legal staff must *guess* who that involves.

42.   Furthermore, allowing one side to publicly smear Trump for over two and a half years, but gagging only Trump from responding, is not the least restrictive means.  It also fails the injunction test.

10

## B. GOVERNING PRECEDENTS

43.    An important precedent is *In re Murphy-Brown, LLC*, 907

F.3d 788 (4th Cir. 2018) (citing summary / syllabus for convenience)

*(emphasis added):*

> Applying strict scrutiny, the court held that ***the gag order breached basic First Amendment principles in both meaningful and material ways***. In this case, the gag order harmed petitioner, farmers, and Proposed Amici. Accordingly, the court vacated the gag order and allowed the parties to begin anew under the guidelines the court set forth.

44.    A seminal case for pre-trial gag orders is *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976), in which a gag order was struck down as prior restraint against the First Amendment's rights, as excessive, but identifying criteria when a gag order might be acceptable.

45.    Another important precedent is *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 606-08 (2d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988).

46.    An important precedent examining *Dow Jones* is *In re: New York Times Co.*, 878 F.2d 67 (2nd Cir. 1989) *(emphases added):*

> In *Dow Jones*, we held that a "gag" order such as

11

the one at issue could only be justified if, at a minimum, the district court found that "pretrial publicity ... posed such a threat to The Government' Sixth Amendment rights as to justify the ... restraining order," 842 F.2d at 610, *and that no "other available remedies would effectively mitigate [any] prejudicial publicity*," id. at 611; see also id. at 611 n. 1 ("an analysis of the effectiveness of the order in question is a necessary consideration").

While, as in the case before us, the Court in *Dow Jones* was not presented with a party to the proceedings below arguing that the order was unconstitutional, the Court did know that the government had opposed the order in the district court. Id. at 605, 607-08. Thus, the Court was able to state that "there is no indication that [the] government prosecutors are not willing speakers." Id. at 608.

\* \* \*

Judge Carter himself acknowledged that he was not relying on any actions of counsel in the case before him, but was "looking to the past, to some experience, ... and looking prospectively to avoid some of the problems that I have faced in other cases, not in this case."

***This is not sufficient justification for imposing restrictions on counsel beyond those already contained in local court rules,*** see S.D.N.Y.Crim.R. 7(a) (counsel may not release information "if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice"). **The First**

12

> **Amendment and _Dow Jones_ require more**.
> _Dow Jones_, 842 F.2d at 609.

> For the foregoing reasons, we vacate the
> order of the district court. The mandate shall
> issue forthwith. No costs.

47.     Another important precedent is _Gentile v. State Bar of Nevada_, 501 U.S. 1030 (1991).  In _Gentile_, an attorney gave a public press conference, yet the U.S. Supreme Court ruled that his comments to the public were free speech protected under the U.S. Constitution's First Amendment, because attorney Gentile merely stated the facts in response to the prosecution's announcement of the charges.

48.     The U.S. Supreme Court found the restrictions on attorney Gentile's speech unconstitutional, although the analysis grew into a void-for-vagueness / over-breadth holding.

49.     The U.S. Constitution does not permit regulation or discipline of an attorney's speech without first establishing that the speech posed "_a substantial likelihood of materially prejudicing [the] proceeding._"

> The restraint on speech is narrowly tailored to
> achieve those objectives. _**The regulation of
> attorneys' speech is limited -- it applies only to
> speech that is substantially likely to have a
> materially prejudicial effect   [on the pending**_

13

> ***trial]*** ; it is neutral as to points of view, applying
> equally to all attorneys' participating in a pending
> case; ***and it merely <u>postpones</u> the attorney's
> comments <u>until after the trial</u>.*** While supported
> by the substantial state interest in preventing
> prejudice to an adjudicative proceeding by those
> who have a duty to protect its integrity, ***the rule is
> limited on its face to preventing only speech
> having a substantial likelihood of materially
> prejudicing that proceeding.***

*Gentile*, 501 U.S. at 1076   *(emphases and clarifying phrase added).*

50.    However, what is it that would be materially prejudiced?

51.    There cannot be "***a substantial likelihood of materially prejudicing
[the] proceeding***" from a Defendant accurately and truthfully responding to
massive pre-trial publicity from the Government itself against him with the other
side of the story.

52.    "Prejudicing the proceeding" does not mean that the
prosecutors have a right to win at any cost, no matter what, even if the
facts and the law are against them.

53.    The Government's freedom to lie about a criminal defendant
or spread disinformation or distortions – a much more serious and

14

widespread concern among defendants not in the public eye, who may

be without resources or power – is not a compelling state interest.[2]

54.   "Materially prejudicing the trial" cannot mean forcing the

prosecution to actually prove their case, a now forgotten concept.

> The "substantial likelihood" test embodied in
> Rule 177 is constitutional under this analysis, for
> it is designed to protect the integrity and fairness
> of a state's judicial system, ***and it imposes only
> narrow and necessary limitations on
> lawyers' speech. The limitations are aimed
> at two principal evils: (1) comments that are
> likely to influence the actual outcome of the
> trial, and (2) comments that are likely to
> prejudice the jury venire, even if an
> untainted panel can ultimately be found. ...***

*Gentile*, 501 U.S. at 1075. *(emphases added)*.

55.   The Supreme Court further recited before striking down the

Bar rule:

> *The Press Conference.*
>                   * * *
>
> *Petitioner's Motivation.* As petitioner explained to
> the disciplinary board, his primary motivation
> was ***the concern that, unless some of the***

---

[2]   Sidney Powell, Licensed to Lie, 2nd Edition (November 1, 2018), ISBN-13 :
978-1732767614, https://www.amazon.com/Licensed-Lie-Sidney-
Powell/dp/1732767610/ref=tmm_hrd_swatch_0?_encoding=UTF8&qid=&sr=

15

***weaknesses in the State's case were made
public, a potential jury venire would be
poisoned by repetition in the press of
information being released by the police and
prosecutors, in particular the repeated press
reports about polygraph tests*** and the fact that
the two police officers were no longer suspects.
App. 40-42. Respondent distorts Rule 177 when it
suggests this explanation admits a purpose to
prejudice the venire, and so proves a violation of
the Rule. Rule 177 only prohibits the
dissemination of information that one knows or
reasonably should know has a "substantial
likelihood of materially prejudicing an
adjudicative proceeding."

Petitioner did not indicate he thought he could
sway the pool of potential jurors to form an
opinion in advance of the trial, nor did he seek to
discuss evidence that would be inadmissible at
trial. ***He sought only to counter publicity
already deemed prejudicial.*** The Southern
Nevada Disciplinary Board so found. It said
petitioner attempted "(i) to counter public opinion
which he perceived as adverse to Mr. Sanders, (ii)
. . . to refute certain matters regarding his client
which had appeared in the media, (iii) to fight
back against the perceived efforts of the
prosecution to poison the prospective juror pool,
and (iv) to publicly present Sanders' side of the
case." App. 3-4. Far from an admission that he
sought to "materially prejudic[e] an adjudicative
proceeding," petitioner sought ***only to stop a
wave of publicity he perceived as prejudicing
potential jurors against his client and
injuring his client's reputation in the
community.***

16

501 U. S. at 1041-1043 *(emphases added)*.

## C. **JUDGE CHUTKAN AND GOVERNMENT ARE THE ACTUAL SOURCE OF PREJUDICIAL OUTSIDE INTERFERENCE**

56.    Judge Chutkan begins the gag order at issue, Exhibit A attached, by observing that:

> **Under binding Supreme Court precedent, this court "must take such steps by rule and regulation that will protect [its] processes from prejudicial outside interferences."** ***Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).**

57.    However, Judge Chutkan herself violated that principle in many cases over the last two years related to events on or about January 6, 2021, all other Judges of that District, and Judge Chutkan in reference to candidate Donald Trump.

58.    Yet Trump is blocked from responding or explaining.

59.    When only one side has been massively prejudiced by a concerted, intentional, planned, deliberate, exceedingly repetitious, offensive, official and governmental campaign to convict Candidate Trump in the news media for almost 3 years, it is nonsensical to pine for excluding public discussion.  Too late.

17

60.   Not only the Attorney General, U.S. Attorney for the District of Columbia, their boss the President, and the Special Counsel Jack Smith massively prejudiced the pending trial for nearly 3 years, but so has Judge Chutkan as well as a dozen other District Court Judges.

61.   Judge Chutkan's gag order cannot **"take such steps by rule and regulation that will protect [its] processes from prejudicial outside interferences"** when Judge Chutkan is unwilling to "take such steps" by stopping talking.

62.   One of the challenges, to be fair, is that the District Court and the U.S. Attorney have been confused about whether the cases related to events on or surrounding January 6, 2021, is   single prosecution of over 1,100 Defendants or hundreds of different cases with inexplicable groupings of 1,100 randomly distributed.

63.   At times, when convenient to the prosecution, there is one single case, and any decision by any judge becomes the "law of the case" for all of the January 6 cases and individual consideration is highly discouraged.

64.   But when convenient to the prosecution, the cases are all independent and entirely separate.

18

65. As a result, District Court judges have engaged in highly political, nasty, and harsh rants as pronouncements of public condemnation under the fiction that they are only explaining sentencing decisions.

66. However, there were as many as 10,000 demonstrators around Capitol Hill on January 6, 2021, and the public declarations by District Court Judges proclaim all of them equally guilty even though no jury has been seated, no evidence has been presented.

67. District Court judges know that they are telegraphing the guilt of January 6 related Defendants who are still awaiting trial, including Donald Trump.

68. The gag order attempted by Judge Chutkan, even if fixed in other respects, cannot satisfy strict scrutiny or the tests for an injunction where Judge Chutkan herself has been the source of **"prejudicial outside interferences"** (e.g., prior cases affecting the current new case seating a new jury).

### D. DEFECTS OF GAG ORDER

69. Judge Chutkan ordered, in Exhibit A,

"**All interested parties in this matter,**

19

including ..."

70.    Thus, from the start, it is vague and ambiguous as to whom the gag order applies to.    Certainly, your Proposed Amicus is an "interested party" but probably not as Chutkan intended.    While such language may be tolerable for general purposes, for a temporary injunction it is not.

71.    Judge Chutkan further ordered:

> ... are prohibited from making any public statements, or directing others to make any public statements, that target ...   or (4) any reasonably foreseeable witness or the substance of their testimony."

72.    Second, the order is vague and ambiguous as to what "**any public statements**" means.

73.    Third, the order is vague and ambiguous as to what "**target**" means.    Again, a temporary injunction forbidding a person under penalty of contempt must be more precise.    For example, if a witness claims that he witnessed a conversation at the bar in Mar-a-Lago on a certain day, and in response Trump proves he was in Scotland that day, the First Amendment would not allow the court to silence this explanation as "targeting" a witness.

20

74. Contrast this with exposing some embarrassing but irrelevant personal secret. Saying "Witness 1 cheated on his SAT college entrance exam or "Witness 2 posted nude photographs" would be targeting the witness personally not targeting the evidence of significance to the Defendant's guilt or innocence. So what does "target" mean? Could Trump "target" a potential witness positively?

75. Fourth, the order is vague and ambiguous as to who are **"reasonably foreseeable witness[es]**." No witness lists have been exchanged. Until discovery is exchanged and analyzed, neither side could finalize their witness list. There are any number of reasons why potential witnesses are not actually called in a trial including litigation strategy. Witnesses of what? Under the standards of a temporary injunction, it has not even been determined what claims and counter-claims will be made in any trial. So how can one discern by speculation of what a person might be a witness, when the attorneys have yet to decide what points they will present for and against in an actual trial? Until it is decided what points should be made, not even the attorneys can guess who is a **"reasonably foreseeable witness"** without knowing *of what* they might be a witness.

21

76. If the attorneys have not yet decided, then how reasonably foreseeable is a witness?[3]

77. Therefore, the gag order has the appearance at first glance of being defensible, but on deeper inquiry it presents an impossible standard that no one could comply with.

78. Fifth, unfortunately, given the massive misinformation, propaganda, spin, and proven false statements by critics of Candidate Trump, it becomes vague and ambiguous what "**the substance of their testimony**" means. This phrase fails to identify what topic their testimony might be. It fails to limit the gag order to testimony that is actually relevant and material. It fails to identify to what the testimony might be relevant. It doesn't even identify whether the testimony would be for or against Candidate Trump if the testimony

---

[3] For example, "Mr. Coffee" is seen on CCTV video helping set up a flimsy, fake gallows on Capitol grounds at around 5 AM, then walking to a major FBI building at 601 4th St NW, Washington, DC and having coffee before 6 AM across 3rd Street from the FBI. Why would someone who apparently just committed part of a crime immediately go get coffee at the FBI? Whom did he meet? A witness that "Mr. Coffee" could have gone to Union Station or the Hyatt Hotel for coffee available 24/7 instead could be an unanticipated, last-minute witness who is not seeking publicity and has no political power. https://sharylattkisson.com/2023/11/builders-of-j6-gallows-remain-unidentified-fbi-and-doj-continue-to-pursue-other-defendants/ And https://rumble.com/v3p6zc4-who-brought-the-gallows-on-jan-6-fbi-doj-mr.-coffee-.html

were allowed.

79.    Sixth, Judge Chutkan fails to analyze any of this in terms of "reasonably foreseeable witnesses" ___who have volunteered to speak in public on the subject___, such that a person would be in danger standing between a speculatively possible witness and a television news crew.

80.    Again, Proposed Amici do not deny that gag orders exist, but contrast witnesses who have literally written books and gone on speaking tours "dining out" on their stories from January 6.   A witness for whom there is some reason to protect their identity cannot be compared to politicians voluntarily speaking about the topic, witnesses who have published books on the topic, and those who have made a cottage industry of talking about January 6.

## E. __WITNESSES WHO DON'T WANT TO BE PROTECTED OR NEED TO BE__

81.    One potential witness is former Attorney General Bill Barr, despite Barr having leaped with extreme enthusiasm and abandon into the public discussion of these matters.

82.    While Barr was low-key as Attorney General, since January 6, 2021, standing between Barr and a television camera has been a dangerous place to be.

23

83.    There is no compelling state interest consistent with the First Amendment nor action narrowly tailored under strict scrutiny to justify prohibiting comment about the messages of a possible "witness" such as Barr who just can't stop talking in public about the topic.

84.    Similarly, Jack Smith sought to increase the gag order because Trump merely ***hinted*** "on social media that a potential witness, former chief of staff Mark Meadows, would be a weakling and coward if he agreed to testify in exchange for immunity, as had been reported."    https://news.yahoo.com/weaklings-donald-trump-targets-mark-143101688.html

85.    Note that this is not a commentary on the substance of Mark Meadows' possible testimony, but an echo of an honored warning, recently repeated by the Honorable District Court Judge in the Eastern District of Virginia Judge T.S. Ellis III:

> "The vernacular is to 'sing,' is what prosecutors use. What you got to be careful of is, they may not only sing, they may compose."

86.    Trump is entitled to warn exactly as Judge Ellis did the danger that pressured witnesses may "cooperate" by saying things that were never true.

24

87.  Alan Dershowitz explained in <u>The Hill</u>: [4]

> Civil libertarians have long criticized this tactic, since the time it was used by Joseph McCarthy and his minions to pressure witnesses to testify against suspected communists in the 1950s. In recent decades it has been deployed against mobsters, terrorists and corporate predators. But [Judge] Ellis has accused Mueller of using this questionable approach to develop a political case against the duly elected president of the United States.

> For those who argue that everything is fair, if the goal is to prevent a president from being above the law, Ellis provided a compelling response: "What we don't want in this country, we don't want anyone with unfettered power ... It's unlikely you're going to persuade me the special counsel has unlimited powers to do anything he or she wants."

88.  Proposed Amici contend that under the First Amendment and the balancing tests of an injunction, no Court has the power to issue a gag order against public discussion of a possible witness who will simply not stop talking in public and doesn't want to be protected.

89.  Mike Pence has spent the last two and a half years praising

---

[4]     https://thehill.com/opinion/judiciary/386508-federal-judge-rightly-rebukes-mueller-for-questionable-tactics/

himself and glorifying his moral superiority over Donald Trump to everyone who will listen concerning the Constitutionally-required process for hearing disputes about Electoral College votes.

90.    Thus a gag order against responding to Pence's high-profile public accusations is not constitutionally sound.   Pence was actually running for President against Trump by taking a different interpretation of the Vice President's duties under Articles XII and XX of the U.S. Constitution.

91.    To allow a witness to hurl accusations at a Defendant, here Trump, but then the Defendant be prohibited from responding, fails all the legal tests for prior restraint under the First Amendment as a gag order, which is in essence an injunction governed by the four tests.

92.    Proposed Amicus further requests that any factual disputes – of which there are many that are material and serious – be resolved by a jury.   In particular, the modern "fundamental transformation" of America and the U.S. legal system has led to the Government telling us what we meant and telling us what our intent was.

93.    The Government merely asserting what it thinks people intended or meant to say is a fraud on the court and a violation of due

26

process. Any disputes about what someone meant or intended have to be resolved as disputed questions of facts. The Government should bring its experts at psychic mind-reading with credentials of their abilities to use psychic powers.

94.   No gag order now can command " all parties involved in the case 'to refrain from making further statements to the media or in public settings that are 'substantially likely to have a materially prejudicial effect on this case,'" after the case has already been massively tried in the public.

## F. SUPPRESSION OF INFORMATION NEEDED TO CAST AN INFORMED VOTE AND ORGANIZE FOR CANDIDATE OF ONE'S CHOICE

95.   In *Mackey*, misinformation on social media was held to interfere with voters right to vote. Here, Government officials have massively flooded the nation with falsehoods and misinformation about Donald Trump, while now trying to silence Trump from correcting the misinformation. Thus, voters are being misled by election interference.

96.   As in *United States v. Douglass Mackey*, Proposed Amici and voters need to receive accurate information – primarily and most especially (logically and of necessity) the responses and explanation of

27

the target of these indictments, Donald Trump – in order to evaluate the seriousness or lack thereof of the charges when casting their votes for President.

97.    Given that the front-runner for the Republican nomination for President for the 2024 general election, Donald Trump, has already served as President, Proposed Amici and voters are generally aware of his record as President.  Current accusations in indictments procured by The Government against Trump become the largest and most significant remaining issues about which the Proposed Amici and class will need to decide whether to vote for Donald Trump in the 2024 primary, for another candidate for the nomination, and/or in the general election to vote for Trump, an independent candidate, or not vote at all (which is a choice more significant than simply inaction because it clearly affects the ultimate outcome but without the voter endorsing any nominee).

98.    Is Trump likely to be on the ballot?    Should activists organize for another candidate like Ron DeSantis?

99.    Voters and election activists need both sides of the story to be able to evaluate whether their first choice is likely to be acquitted.

28

100. The Proposed Amici and class have a right to free association under the First Amendment especially for acting together in advance of their agendas for government policy, political policies, or philosophies of governance for the greater welfare of their communities and the nation.

## III.  **CONCLUSION**

The proposed *Amici* ask that the U.S. Court of Appeals for the District of Columbia Circuit consider these matters in reaching its decisions concerning the collision between the First Amendment and the over-use of gag orders.

Dated: December 7, 2023                    Respectfully Submitted,

Treniss Jewell Evans, III
Contact c/o CONDEMNED USA, LLC
Post Office Box 3238
Forney, Texas 75126.
Telephone:  (210) 485-1889.
Email:   treniss@condemnedusa.com
*Proposed Amici Pro Se*

29

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
**Record No. No. 23-3190**
UNITED STATES
v.
DONALD J. TRUMP

U.S. Court of Appeals for D.C. Circuit
333 Constitution Avenue, N.W.
Washington, DC 20001-2866

## CERTIFICATE OF COMPLIANCE
### WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This motion complies with the word limit requirements of *Fed. R. App. P. 27(d)(2)(a)* because the document contains 6,013 words, out of a permissible 6,500 words (half of 13,000 words allowed for Appellant's brief) as determined by the word-count function of Microsoft Word, excluding the parts of the motion exempted by *Fed. R. App. P. 32(f)*; and

2. This motion complies with the typeface requirements of *Fed. R. App. P. 32(a)(5)* and *32(a)(6)* because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font type and footnotes in Century Schoolbook font 12-point type.

Treniss Jewell Evans, III

30

Contact c/o CONDEMNED USA, LLC
Post Office Box 3238
Forney, Texas 75126.
Telephone: (210) 485-1889.
Email:  treniss@condemnedusa.com
*Proposed Amici Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify from my review of the Court's PACER system, that the foregoing will be delivered automatically this December 7, 2023, through the Court's computerized ECF system to the following attorneys of record listed with the Court's ECF system:

Mr. John F. Lauro, Esq.
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, Florida 33602
Telephone: (813) 222-8990
E-mail: jlauro@laurosinger.com
*Attorneys for President Donald Trump*

Mr. Todd Blanche, Esq.
Emil Bove, Esq.
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
Telephone: (212) 716-1250
E-mail: toddblanche@blanchelaw.com
*Attorneys for President Donald Trump*

D. John Sauer
William O. Scharf
Michael E. Talent
JAMES OTIS LAW GROUP, LLC
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017

31

Telephone  (314) 562-0031
E-mail:  John.Sauer@james-otis.com
*Attorneys for President Donald Trump*

Mr. JACK SMITH, Esq.
Special Counsel, Prosecutor
of the U.S. Department of Justice

CECIL W. VANDEVENDER
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W. Rm. B-206
Washington, DC 20530

Treniss Jewell Evans, III

32

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    v.

**DONALD J. TRUMP,**

    Defendant.

Criminal Action No. 23-257 (TSC)

### OPINION AND ORDER

For the reasons set forth below and during the hearing in this case on October 16, 2023, the government's Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings, ECF No. 57, is **GRANTED** in part and **DENIED** in part.

Under binding Supreme Court precedent, this court "must take such steps by rule and regulation that will protect [its] processes from prejudicial outside interferences." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). The First Amendment does not override that obligation. "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice. But it must not be allowed to divert the trial from the very purpose of a court system to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." *Id.* at 350–51 (cleaned up); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984) ("Although litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise in this setting. For instance, on several occasions this Court has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant.") (quotation omitted). Here, alternative measures

such as careful *voir dire*, jury sequestration, and cautionary jury instructions are sufficient to remedy only some of the potential prejudices that the government's motion seeks to address.

In order to safeguard the integrity of these proceedings, it is necessary to impose certain restrictions on public statements by interested parties. Undisputed testimony cited by the government demonstrates that when Defendant has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed. *See* ECF No. 57 at 3–5. Since his indictment, and even after the government filed the instant motion, Defendant has continued to make similar statements attacking individuals involved in the judicial process, including potential witnesses, prosecutors, and court staff. *See id.* at 6–12. Defendant has made those statements to national audiences using language communicating not merely that he believes the process to be illegitimate, but also that particular individuals involved in it are liars, or "thugs," or deserve death. *Id.*; ECF No. 64 at 9–10. The court finds that such statements pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment. And that risk is largely irreversible in the age of the Internet; once an individual is publicly targeted, even revoking the offending statement may not abate the subsequent threats, harassment, or other intimidating effects during the pretrial as well as trial stages of this case.

The defense's position that no limits may be placed on Defendant's speech because he is engaged in a political campaign is untenable, and the cases it cites do not so hold. The Circuit Courts in both *United States v. Brown* and *United States v. Ford* recognized that First Amendment rights must yield to the imperative of a fair trial. 218 F.3d 415, 424 (2000); 830 F.2d 596, 599 (1987). Unlike the district courts in those cases, however, this court has found that

even amidst his political campaign, Defendant's statements pose sufficiently grave threats to the

integrity of these proceedings that cannot be addressed by alternative means, and it has tailored

its order to meet the force of those threats. *Brown*, 218 F.3d at 428–30; *Ford*, 830 F.2d at 600.

Thus, limited restrictions on extrajudicial statements are justified here. The bottom line is that

equal justice under law requires the equal treatment of criminal defendants; Defendant's

presidential candidacy cannot excuse statements that would otherwise intolerably jeopardize

these proceedings.

Accordingly, and pursuant to Local Criminal Rule 57.7(c), it is hereby **ORDERED** that:

> All interested parties in this matter, including the parties and their counsel, are
> prohibited from making any public statements, or directing others to make any
> public statements, that target (1) the Special Counsel prosecuting this case or his
> staff; (2) defense counsel or their staff; (3) any of this court's staff or other
> supporting personnel; or (4) any reasonably foreseeable witness or the substance of
> their testimony.

This Order shall not be construed to prohibit Defendant from making statements criticizing the

government generally, including the current administration or the Department of Justice;

statements asserting that Defendant is innocent of the charges against him, or that his prosecution

is politically motivated; or statements criticizing the campaign platforms or policies of

Defendant's current political rivals, such as former Vice President Pence.

In addition, the sealed version of the government's Motion to Ensure that Extrajudicial

Statements Do Not Prejudice These Proceedings, ECF No. 56, is **DENIED** as moot.

Date: October 17, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| v. | Criminal Action No. 23-257 (TSC) |
| **DONALD J. TRUMP,** | |
| Defendant. | |

### OPINION AND ORDER

On September 15, 2023, the government filed a Motion to Ensure that Extrajudicial

Statements Do Not Prejudice These Proceedings. ECF No. 57. Following a motion hearing on

October 16, 2023, *see* Tr. of Mot. Hr'g, ECF No. 103 ("Hr'g Tr."), the court prohibited the

parties and counsel in this matter from making certain public statements, Opinion and Order,

ECF No. 105 ("Order"). Defendant has appealed that Order, *see* ECF No. 106, and now moves

for the court to stay the Order during the pendency of that appeal, ECF No. 110 ("Motion to

Stay"). The court entered a temporary administrative stay of its Order while the parties briefed

the Motion, *see* October 20, 2023 Minute Order, but will now DENY Defendant's Motion and

lift the stay.[1]

### I.    DISCUSSION

Four factors guide the decision whether to stay an order pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed
> on the merits; (2) whether the applicant will be irreparably injured absent a stay;

---

[1] The government also asks the court to incorporate the Order into Defendant's conditions of
release. Resp. in Opp'n to Mot. to Stay, ECF No. 120, at 30–32. The court hereby DENIES
that request without prejudice. Even assuming that request is procedurally proper, the court
concludes that granting it is not necessary to effectively enforce the Order at this time.

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). The third and fourth factors "merge when the Government is the opposing party." *Id.* at 435. Here, all the factors weigh against granting a stay.

## A. Likelihood of success on the merits

Defendant has not made a strong showing that he is likely to succeed on the merits. As the court has explained, the First Amendment rights of participants in criminal proceedings must yield, when necessary, to the orderly administration of justice—a principle reflected in Supreme Court precedent, the Federal Rules of Criminal Procedure, and the Local Criminal Rules. Order at 1–3; *see, e.g.*, Hr'g Tr. at 6–8, 16–18, 31, 34, 60, 64, 82–85. And contrary to Defendant's argument, the right to a fair trial is not his alone, but belongs also to the government and the public. *See, e.g.*, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991) (emphasizing "the State's interest in fair trials"); *United States v. Tijerina*, 412 F.2d 661, 667 (10th Cir. 1969) ("The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect 'fair trials designed to end in just judgments.' This objective may be thwarted unless an order against extrajudicial statements applies to all parties to a controversy. The concept of a fair trial applies both to the prosecution and the defense." (internal citations omitted)). Defendant's repeated appeals to broad First Amendment values therefore ignore that the court—pursuant to its obligation to protect the integrity of these proceedings—recognized those values but, in balancing them against the

potential prejudice resulting from certain kinds of statements, found them outweighed. *See* Motion to Stay at 2–3, 10–24.[2]

Defendant's other claims also disregard the record. To begin, he asserts that the court "cite[d] no evidence supporting its findings of risks of harassment and witness intimidation, and the prosecution provided none." *Id.* at 8. But several times the court and the government pointed to evidence causally linking certain kinds of statements with those risks, and Defendant never disputed it. *See* Hr'g Tr. at 67 (The Court: "[W]hen Mr. Trump has singled out certain people in public statements in the past, hasn't that led to them being threatened and harassed, as demonstrated in the statements attached by the government?" Mr. Lauro: "Your Honor, that's totally irrelevant." The Court: "And the government's motion cites several of them who averred in the kinds of statements that you've asked for under oath that threats and harassment toward them had increased significantly as a result of Mr. Trump's statements about them."); Order at 2 ("Undisputed testimony cited by the government demonstrates that when Defendant has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed. *See* ECF No. 57 at 3–5."); *see also* ECF No. 60 (failing to dispute or even discuss the testimonies cited by the government). The evidence is in the record; Defendant simply fails to acknowledge it.

---

[2] Defendant's Motion argues that his speech restrictions are inconsistent with the "right of listeners to receive President Trump's message." Motion to Stay at 15. Defendant did not squarely raise that argument in his opposition brief to the government's original motion; the closest he came to identifying any authority for it was an unrelated "*see also*" citation to *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987), a case that he now quotes to support his right-of-listeners argument. *Compare* ECF No. 60 at 5, *with* Motion to Stay at 16. But the court expressly addressed and distinguished that case. Order at 2–3. In any event, the argument does not alter the fundamental principle that First Amendment rights, whether those of the speaker or the listener, may be curtailed to preclude statements that pose sufficiently grave threats to the integrity of judicial proceedings.

Likewise, Defendant claims that the court "g[ave] no meaningful consideration to alternative, less restrictive measures, including a narrower order." Motion to Stay at 28. Again, the record flatly contradicts that claim. During the motion hearing, the court questioned whether Defendant's existing speech restrictions, such as his conditions of release, would adequately prevent the potential dangers to these proceedings. Hr'g Tr. at 10–11, 34–35, 70. The court also considered whether alternative measures could prevent those harms—and in fact concluded that they could—with respect to certain kinds of statements, such as those disparaging the District of Columbia. *Id.* at 28, 35–36. Accordingly, the court denied the government's motion in those respects. *Id.* at 82–83; Order at 1. But the court explained that alternative measures would not sufficiently mitigate the risks flowing from other kinds of statements, such as those targeting reasonably foreseeable witnesses. *See* Order at 1–2 ("Here, alternative measures such as careful *voir dire*, jury sequestration, and cautionary jury instructions are sufficient to remedy only some of the potential prejudices that the government's motion seeks to address."); *id.* at 2 (noting that the risks created by certain statements would be irreversible); *id.* at 2–3 ("[T]his court has found that even amidst his political campaign, Defendant's statements pose sufficiently grave threats to the integrity of these proceedings that cannot be addressed by alternative means, and it has tailored its order to meet the force of those threats."). The court thus tailored its Order to prohibit statements only where less restrictive measures would be inadequate.

Defendant's final claim is that the Order is unconstitutionally vague for various reasons, none of which withstand scrutiny. First, Defendant quotes Merriam-Webster Online's definition of "interested" to conclude that the term "interested parties" includes could include "everyone 'affected' by or 'involved' in the case." Motion to Stay at 26. But "interested party" is a well-established legal term of art meaning "anyone who both is directly interested in a lawsuit and has

a right to control the proceedings, make a defense, or appeal from an adverse judgment."
*Interested Party, Black's Law Dictionary* (11th ed. 2019) (referencing *Party* (2), *Black's Law Dictionary* (11th ed. 2019)). The Order confirmed that scope, defining the term as "including the parties and their counsel." Order at 3; *see also* Hr'g Tr. at 83–84 (stating that the written order would apply to the parties and their counsel). There is no meaningful basis to interpret "interested parties" as covering anyone else.

Second, Defendant focuses on the prohibition of "targeting" certain individuals, again quoting various dictionary definitions to assert that targeting could include not only identifying those individuals, but also attacking them, subjecting them to ridicule or criticism, or otherwise attempting to affect them. Motion to Stay at 25. But "restating a dictionary" to "search . . . for every facet" of relevant terms is not a proper vagueness inquiry. *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017). "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" *Id.* at 1107 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). And a cardinal rule of interpretation is that context matters; "a word is known by the company it keeps." *Id.* at 1108 (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

The motion hearing and corresponding Order provide substantial context for and examples of the kinds of "targeting" statements that could result in "significant and immediate risk[s]" to "the integrity of these proceedings." Order at 2. Indeed, the court identified that, depending on their context, statements matching each of the definitions Defendant proffers for the term "target" could pose such risks. *See, e.g.*, Hr'g Tr. at 50–54 (risks associated with publicly identifying court staff); *id.* at 41–43 (risks associated with attacking prosecutors); *id.* at 59–60 (risks associated with criticizing potential witnesses); *id.* at 13–14 (risks associated with

attempting to affect potential witnesses' testimony, even using praise rather than criticism).

Defense counsel also repeatedly relied on context to distinguish permissible from impermissible

statements. *See, e.g.*, *id.* at 72 (The court: "Next hypothetical. 'Bill Barr is a smart guy, but he

better learn to keep his mouth shut.' Permissible? Or an attempt to obstruct justice or intimidate

a witness?" Mr. Lauro: "[It] depends on the context . . . . [I]f it happened the day before Bill

Barr testified at trial, that might be [impermissible]."); *id.* at 71 (similar). A "term is not

rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all

the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S.

476, 491 (1957)). The court's Order and the motion hearing's record sufficiently clarify the

meaning of "targeting" to provide fair notice of the kinds of statements—understood in

context—that it prohibits.

Two of Defendant's social media posts since the Order's entry illustrate the

comprehensible difference between the statements it permits and those it proscribes. First, on

October 20, 2023—after the Order was entered, but before it was administratively stayed—

Defendant stated:

> Does anyone notice that the Election Rigging Biden Administration never goes
> after the Riggers, but only after those that want to catch and expose the Rigging
> dogs. Massive information and 100% evidence will be made available during the
> Corrupt Trials started by our Political Opponent. We will never let 2020 happen
> again. Look at the result, OUR COUNTRY IS BEING DESTROYED. MAGA!!![3]

This statement asserts that Defendant is innocent, that his prosecution is politically motivated,

and that the Biden administration is corrupt. It does not violate the Order's prohibition of

"targeting" certain individuals; in fact, the Order expressly permits such assertions. Order at 3.

---

[3] https://truthsocial.com/@realDonaldTrump/posts/111267550982205234.

By contrast, on October 24, 2023—after the Order was administratively stayed—

Defendant stated:

> I don't think Mark Meadows would lie about the Rigged and Stollen 2020
> Presidential Election merely for getting IMMUNITY against Prosecution
> (PERSECUTION!) by Deranged Prosecutor, Jack Smith. BUT, when you really
> think about it, after being hounded like a dog for three years, told you'll be going
> to jail for the rest of your life, your money and your family will be forever gone,
> and we're not at all interested in exposing those that did the RIGGING — If you
> say BAD THINGS about that terrible "MONSTER," DONALD J. TRUMP, we
> won't put you in prison, you can keep your family and your wealth, and, perhaps,
> if you can make up some really horrible "STUFF" a out him, we may very well
> erect a statue of you in the middle of our decaying and now very violent Capital,
> Washington, D.C. Some people would make that deal, but they are weaklings and
> cowards, and so bad for the future our Failing Nation. I don't think that Mark
> Meadows is one of them, but who really knows? MAKE AMERICA GREAT
> AGAIN!!![4]

This statement would almost certainly violate the Order under any reasonable definition of

"targeting."[5]  Indeed, Defendant appears to concede as much, Reply in Support of Motion to

Stay, ECF No. 123, at 10 n.3 ("If the Gag order had been in effect, President Trump would have

been unable to [make the statement].")—and for good reason.  The statement singles out a

foreseeable witness for purposes of characterizing his potentially unfavorable testimony as a

"lie" "mad[e] up" to secure immunity, and it attacks him as a "weakling[] and coward[]" if he

provides that unfavorable testimony—an attack that could readily be interpreted as an attempt to

influence or prevent the witness's participation in this case.  The plain distinctions between this

statement and the prior one—apparent to the court and both parties—demonstrate that far from

---

[4] https://truthsocial.com/@realDonaldTrump/posts/111293117150329703.

[5] Because of the administrative stay on the Order, this statement is not before the court.  Before
concluding that any statement violated the Order, the court would afford the parties an
opportunity to provide their positions on the statement's meaning and permissibility.

being arbitrary or standardless, the Order's prohibition on "targeting" statements can be straightforwardly understood and applied.

Defendant's other assertions of vagueness boil down to similar objections that deciding whether a statement violates the Order will necessarily be a fact-bound inquiry. He contends that it may at times be difficult to tell whether an individual is a reasonably foreseeable witness, or to distinguish proclamations of innocence from attacks on prosecutors or witnesses. Motion to Stay at 26–28. But even assuming that is true, it does not follow that "men of common intelligence must necessarily guess at [the] meaning" of the Order's prohibitions. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976) (citation omitted). It is a "basic mistake" to derive vagueness from "the mere fact that close cases can be envisioned. . . . Close cases can be imagined under virtually any [prohibition]." *United States v. Williams*, 553 U.S. 285, 305–06 (2008). If a party or their counsel makes a statement that may have violated the Order, the court will assess its substance and context. The fact that it needs to do so with special care in close cases does not render the underlying Order unconstitutionally vague.

Consequently, Defendant has failed to make a strong showing that he is likely to succeed on the merits of his appeal.

**B. Remaining factors**

The remaining factors also counsel against a stay. Defendant's brief arguments on each rely entirely on the premise that the court's Order violated his First Amendment rights. *See* Motion to Stay at 31 ("[A] showing of likelihood of success on a First Amendment claim necessarily establishes irreparable injury."); *id.* ("As for the balancing of harms and the public interest . . . the demonstration of an ongoing violation of the First Amendment rights dictates that a stay should be entered."). Having rejected that premise, the court reaches the opposite conclusions. Where "there is no showing of a likelihood of success on the merits" of a First

Amendment claim, there is no irreparable injury or public interest favoring a stay. *Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334–35 (D.C. Cir. 2018). To the contrary, "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile*, 501 U.S. at 1075 (internal quotations omitted). As discussed above, in the Order, and during the motion hearing, the court finds that the public interest in the orderly administration of this case requires the Order's limitations on such statements.

## II.    CONCLUSION

For these reasons, Defendant's Motion to Stay, ECF No. 110, is hereby DENIED, and the administrative stay imposed by the court's October 20, 2023 Minute Order is hereby LIFTED.

Date: October 29, 2023

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge

Page **9** of 9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

DONALD J. TRUMP,

*Defendant*.

Case No. 23-cr-257-TSC

**BRIEF AMICI CURIAE OF THE AMERICAN CIVIL LIBERTIES UNION &
THE AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA
IN AID OF THE COURT'S RE-EVALUATION OF ITS GAG ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................................... ii

INTEREST OF AMICI CURIAE ...................................................................................................... 1

ARGUMENT....................................................................................................................................... 1

I.       The Order's use of the word "target" is unconstitutionally vague....................................... 2

II.      Any restraint on Defendant's speech must be narrowly tailored to prohibit imminent
         threats against individuals or conduct that would interfere with the administration of
         justice. ..................................................................................................................................... 4

         A.       The First Amendment standard is strict. ................................................................. 4

         B.       The October 17 order is overbroad and underexplained...................................... 10

CONCLUSION................................................................................................................................... 12

i

## TABLE OF AUTHORITIES

**Cases**

*Baggett v. Bullitt,*
   377 U.S. 360 (1964)............................................................................................... 3

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963)................................................................................................ 4

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969)........................................................................................ 6, 11

*Bridges v. California,*
   314 U.S. 252 (1941)............................................................................................. 5

*Chicago Council of Lawyers v. Bauer,*
   522 F.2d 242 (7th Cir. 1975)............................................................................... 5

*Connally v. General Construction Co.,*
   269 U.S. 385 (1926)............................................................................................. 2

*English v. Cunningham,*
   269 F.2d 517 (D.C. Cir. 1959) ............................................................................ 2

*Gentile v. State Bar of Nev.,*
   501 U.S. 1030 (1991)........................................................................................ 6, 7

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972)......................................................................................... 2, 3

*In re Levine,*
   27 F.3d 594 (D.C. Cir. 1994) .............................................................................. 3

*In re Russell,*
   726 F.2d 1007 (4th Cir. 1984).............................................................................. 6

*Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n,*
   389 U.S. 64 (1967)............................................................................................... 2

*Levine v. U.S. Dist. Ct. for C.D. Cal.,*
   764 F.2d 590 (9th Cir. 1985) ............................................................................... 6

* *Nebraska Press Ass'n v. Stuart,*
   427 U.S. 539 (1976)........................................................................................ 4, 12

*Nelle ex rel. B.N. v. Huntsville Sch. Dist.,*
   No. 5:21-CV-05158, 2021 WL 6135690 (W.D. Ark. Dec. 29, 2021) ................. 8

*Pennekamp v. Florida,*
   328 U.S. 331 (1946)............................................................................................. 5

*Schmidt v. Lessard,*
   414 U.S. 473 (1974)............................................................................................. 2

*Seattle Times Co. v. Rhinehart,*
   467 U.S. 20 (1984)............................................................................................... 7

ii

*Sheppard v. Maxwell,*
   384 U.S. 333 (1966)...................................................................................... 5

*Smith v. Goguen,*
   415 U.S. 566 (1974)...................................................................................... 2

*Snyder v. Phelps,*
   562 U.S. 443 (2011)...................................................................................... 8

*Turney v. Pugh,*
   400 F.3d 1197 (9th Cir. 2005) ..................................................................... 6

*United States v. Brown,*
   218 F.3d 415 (5th Cir. 2000)............................................................ 6, 7, 8, 9

*United States v. Carmichael,*
   326 F. Supp. 2d 1267 (M.D. Ala. 2004)....................................................... 8

*United States v. Fieger,*
   No. 07-20414, 2008 WL 474084 (E.D. Mich. Feb. 19, 2008)..................... 8

*United States v. Ford,*
   830 F.2d 596 (6th Cir. 1987)............................................................... 6, 9, 10

*United States v. Hansen,*
   599 U.S. 762 (2023).................................................................................... 12

*United States v. Koubriti,*
   307 F. Supp. 2d 891 (E.D. Mich. 2004)....................................................... 8

*United States v. Locascio,*
   6 F.3d 924 (2d Cir. 1993) ............................................................................ 9

*United States v. McGregor,*
   838 F. Supp. 2d 1256 (M.D. Ala. 2012)....................................................... 8

*United States v. Schock,* No. 16-cr-30061,
   2016 WL 7176578 (C.D. Ill. Dec. 9, 2016) ................................................ 8

*United States v. Tijerina,*
   412 F.2d 661 (10th Cir. 1969)................................................................... 6, 9

*Wade v. Hunter,*
   336 U.S. 684 (1949)...................................................................................... 9

**Other Authorities**

Brief for ACLU & Ohio Civil Liberties Union as Amici Curiae, *Sheppard v. Maxwell,*
   No. 490 (U.S. Jan. 24, 1966), 1966 WL 100499...................................... 1, 5

*Target*, Merriam-Webster Dictionary (Online ed.), https://www.merriam-
   webster.com/dictionary/target...................................................................... 3

## INTEREST OF AMICI CURIAE[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties of all Americans. The ACLU of the District of Columbia is the ACLU's Washington, D.C. affiliate. Amici have frequently appeared in this Court, as counsel and amici, in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of rights it grants. Amici have also participated in many of the most consequential First Amendment cases in American history, including the 1966 Supreme Court case upon which the Court based its authority to issue its October 17 gag order. *See* Brief for ACLU & Ohio Civil Liberties Union as Amici Curiae at 2, *Sheppard v. Maxwell*, No. 490 (U.S. Jan. 24, 1966), 1966 WL 100499. Amici seek leave to file the instant brief pursuant to D.D.C. LCvR 7(o)(1).

## ARGUMENT

Former President, and now Defendant, Donald Trump has said many things. Much that he has said has been patently false and has caused great harm to countless individuals, as well as to the Republic itself. Some of his words and actions have led him to this criminal indictment, which alleges grave wrongdoing in contempt of the peaceful transition of power. But Trump retains a First Amendment right to speak, and the rest of us retain a right to hear what he has to say. Thus, any restraint this Court imposes on Defendant's future speech must be precisely defined and narrowly tailored to protect the impartial administration of justice. Respectfully, the Court's October 17 gag order fails that test, and Amici urge the Court to re-evaluate it.

---

[1] Pursuant to Local Civil Rule 7(o)(5), counsel for Amici Curiae certifies that no counsel for a party authored this brief in whole or in part, and no person other than Amici Curiae, their members, or their counsel made a monetary contribution to the brief's preparation or submission.

## I.    The Order's use of the word "target" is unconstitutionally vague.

In its order, the Court barred Defendant from "making any public statements, or directing

others to make any public statements, that target (1) the Special Counsel prosecuting this case or

his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting

personnel; or (4) any reasonably foreseeable witness or the substance of their testimony." Order at

3 (ECF 105). The entire order hinges on the meaning of the word "target." But that meaning is

ambiguous, and fails to provide the fair warning that the Constitution demands, especially when,

as here, it concerns a prior restraint on speech.[2]

The vagueness doctrine, rooted in due process, ordinarily applies to legislatures, requiring

that statutes provide "fair notice or warning" of what is prohibited by penal laws. *Smith v. Goguen*,

415 U.S. 566, 572 (1974). But it also applies to court orders that carry with them the threat of

punishment. *See, e.g.*, *Int'l Longshoremen's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389

U.S. 64, 76 (1967); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *English v. Cunningham*, 269

F.2d 517, 524–25 (D.C. Cir. 1959). Fairness demands that the law, and judicial edicts, avoid laying

"trap[s]" for "the innocent," and instead "give the person of ordinary intelligence a reasonable

opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of*

*Rockford*, 408 U.S. 104, 108 (1972); *see also Connally v. General Construction Co.*, 269 U.S. 385,

391 (1926).

The vagueness doctrine has special force where, as here, government action restricts

speech, because "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful

---

[2] The gag order restrains both the Defendant and his counsel. Amici focus on the rights of the Defendant here, in part because he is running for President, and because attorneys can be restrained as officers of the court in ways that non-lawyers cannot. *See infra* Part II.A. But Amici's concerns about vagueness extend to all who are required to comply with the order.

zone than if the boundaries of the forbidden areas were clearly marked.'" *Grayned*, 408 U.S. at 109 (cleaned up) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)). The First Amendment rights of the accused require any court order restraining their speech to be both clearly defined and narrowly framed. The order's prohibition on speech that "targets" certain named and unnamed individuals is neither.

Reading the order, Defendant cannot possibly know what he is permitted to say, and what he is not. "Target" is an inherently vague term. It can mean "to make an object of ridicule or criticism," or even to "affect[]" someone "by an action." *Target*, Merriam-Webster Dictionary (Online ed.), https://www.merriam-webster.com/dictionary/target. In the context of the order, it could mean something as innocuous as "name" or "identify," or something much more violent. One could target another with respectful but vigorous political advocacy, or target them for physical violence or death. Context can sometimes provide clarity, *see In re Levine*, 27 F.3d 594, 596 (D.C. Cir. 1994), but the October 17 order gives none. It does not define "target" to be narrowly limited to its most menacing implications, perhaps prohibiting true threats or incitement of violence against witnesses or court staff. Nor does it give examples to guide Defendant's behavior and the public's expectations.

One of the categories that cannot be "target[ed]" is "the substance of" the "testimony" of "any reasonably foreseeable witness," an unknown and perhaps unknowable range of possible topics. Order at 3. The meaning of "target" is even less clear in this application. While it might mean "affect or influence" the substance of such testimony, it might simply encompass merely "addressing" the testimony in general. Defendant cannot know which of these meanings applies, and as a result the order risks restricting too much speech.

3

Should the Court continue to believe that a gag order is necessary in this case, the Court should rephrase its order or clarify its meaning.

## II. Any restraint on Defendant's speech must be narrowly tailored to prohibit imminent threats against individuals or conduct that would interfere with the administration of justice.

The October 17 order suffers from a second flaw: In addition to being impermissibly vague, it is impermissibly broad. Commendably, this Court applied a high First Amendment standard in assessing the need for the order. Order at 2 (finding the potential for extrajudicial statements by both the parties and their counsel "pose a significant and immediate risk" of prejudice). Unfortunately, the order fails to adhere to that standard with sufficient rigor, and consequently bans too much speech—without a sufficient explanation of how the First Amendment standard has been met in this case.

### A. The First Amendment standard is strict.

The heavy presumption of unconstitutionality that attaches to prior restraints "form[s] the backdrop against which" courts must measure their own restrictions on speech in connection with the judicial process. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 561–62 (1976); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). *Nebraska Press* involved a judicial order restricting the media from publishing accounts about certain evidence that was yet to be used in a prominent murder trial taking place in a small, rural community. 427 U.S. at 567–68. The Court articulated three considerations relevant to whether a restraint on speech in connection with a judicial proceeding can survive First Amendment scrutiny: (1) whether the expected publicity about the case would harm the defendant's right to a fair trial; (2) whether the gag order is the least restrictive means possible to ensure that fairness; and (3) whether the gag order will be effective in preventing the potential unfairness. *See id.* at 562–63.

4

At the same time, courts not only have the power, but the duty, to "protect their processes from prejudicial outside interferences" and to ensure a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). Long before *Sheppard*, Justice Frankfurter warned of the potential for "trial by newspaper" to "t[ear]" participants "from their moorings of impartiality by the undertow of extraneous influence." *Pennekamp v. Florida*, 328 U.S. 331, 359, 366 (1946) (Frankfurter, J., concurring). At bottom, "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California*, 314 U.S. 252, 271 (1941).

"The point at which free speech and fair trials intersect in the administration of criminal justice presents serious and complex problems to those," like Amici, "who would defend the principles of both freedom and justice."[3] *Nebraska Press* involved a gag on the media, rather than a criminal defendant, and over the past half century, courts have disagreed about whether its most demanding requirements apply in the same way to participants in proceedings before the court. Neither the Supreme Court nor the D.C. Circuit has resolved that question.

Some courts have concluded that the First Amendment applies with full force to restrictions on the speech of participants in the judicial process. Even a year before *Nebraska Press*, the Seventh Circuit struck down local court and American Bar Association "no comment" rules proscribing extrajudicial comments by attorneys on pending litigation because they did not narrowly prohibit only "comments that pose a 'serious and imminent threat' of interference with the fair administration of justice." *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th Cir. 1975). Similarly, the Ninth Circuit has endorsed "a general rule" that "speech concerning judicial proceedings may be restricted only if it 'is directed to inciting or producing' a threat to the

---

[3] Brief for ACLU & Ohio Civil Liberties Union as Amici Curiae at 2, *Sheppard v. Maxwell*, No. 490 (U.S. Jan. 24, 1966), 1966 WL 100499.

administration of justice that is both 'imminent' and 'likely' to materialize." *Turney v. Pugh*, 400 F.3d 1197, 1202 (9th Cir. 2005) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)); s*ee also Levine v. U.S. Dist. Ct. for C.D. Cal.*, 764 F.2d 590, 596–97 (9th Cir. 1985). And—in a case with unique resonance to this one—the Sixth Circuit held that the "clear and present danger" test applied to a gag order restricting the speech of Congressman Harold Ford, a criminal defendant charged with mail and bank fraud. *United States v. Ford*, 830 F.2d 596, 599 (6th Cir. 1987).

Other courts have applied less demanding standards when evaluating gag orders of courtroom participants. Some have required banned speech to have a "reasonable likelihood" of impairing the administration of justice. *See, e.g.*, *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984); *United States v. Tijerina*, 412 F.2d 661, 666–67 (10th Cir. 1969). Using slightly different terms, the Fifth Circuit allows a court to restrict the speech of parties and their lawyers "if it determines that extrajudicial commentary by those individuals would present a 'substantial likelihood' of prejudicing the court's ability to conduct a fair trial." *United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000). That is essentially the standard the government urged the Court to adopt here, pointing to a handful of similar orders it has obtained on that basis from other courts in this District. *See* Gov't Reply at 5 (ECF 64). The government also suggested, without elaboration, that a lower standard was appropriate in criminal cases than in civil ones. *See id.* at 6–7.

The stricter view from the Sixth, Seventh, and Ninth Circuits is the correct one when it comes to issuing a gag order against criminal defendants. In adopting the lower "substantial likelihood" standard, the Fifth Circuit relied heavily on—but misinterpreted—the Supreme Court's opinion in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991). In *Gentile*, in an opinion by Justice Kennedy, the Court voided on vagueness grounds a state bar disciplinary rule restricting

6

attorneys' out-of-court speech on pending matters. *See id.* at 1048 (opinion of Kennedy, J.). Justice O'Connor signed onto that opinion, providing the fifth vote. But she also gave a fifth vote to an opinion by Chief Justice Rehnquist that explicitly approved, as consistent with the First Amendment, the state bar rule's standard, which permitted punishment where extrajudicial speech posed a "substantial likelihood of material prejudice" to the administration of justice. *Id.* at 1075 (opinion of Rehnquist, C.J.).

Justice Kennedy protested that the "substantial likelihood" standard, though endorsed by a Court majority, was both unnecessary and unwise. *See id.* at 1051 (Kennedy, J., concurring). Even so, in *Brown*, the Fifth Circuit adopted the lower standard, and applied it not only to gag orders affecting *attorneys* before a court, but *all other participants*, too. 218 F.3d at 423. That was unjustified. While Chief Justice Rehnquist's opinion used some stray language that appeared to suggest his views might reach beyond attorneys, *Gentile* involved restrictions on the speech only of attorneys, who are officers of the court.[4] His opinion relied heavily on "the history of the regulation of the practice of law by the courts." 501 U.S. at 1066, 1066–68. And the question before the Court did not have anything to do with non-lawyers. *See id.* at 1072 n.5. Moreover, Justice O'Connor, who provided the fifth vote, wrote a concurrence explaining that her view was merely that "a State may regulate speech by lawyers representing clients in pending cases more readily than it may regulate the press." *Id.* at 1082 (O'Connor, J., concurring). So in applying

---

[4] Like Chief Justice Rehnquist in *Gentile*, the government cites a footnote in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984), that suggests the rights of litigants "may be subordinated to other interests that arise in" the courtroom. *See* Gov't Reply at 5; *Gentile*, 501 U.S. at 1073. But that case involved a very different order, restricting the dissemination by a defendant (which happened to be a newspaper) of documents produced in discovery, *Seattle Times*, 467 U.S. at 36, that was "not the kind of classic prior restraint that requires exacting First Amendment scrutiny," *id.* at 33.

7

*Gentile* to parties, rather than just attorneys, *Brown* overreached—as does the government in urging that relaxed standard for restricting Defendant's speech rights here.[5]

The obvious and unprecedented public interest in this prosecution, as well as the widespread political speech that it has generated and will continue to generate, only underscores the need to apply the most stringent First Amendment standard to a restraint on Defendant's speech rights. Speech on matters of public concern "is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (cleaned up). There has been extensive public commentary by parties and non-parties alike about Defendant, this case, and the events that underlie it. And Defendant's ability to speak publicly about the substance of the prosecution, even including potential witnesses and testimony, is in many ways inextricable from the 2024 presidential campaign in which he is a declared candidate. Defendant's role in the events related

---

[5] The government is just wrong when it represents that *Gentile* "forecloses the applicability of the clear-and-present-danger standard" adopted in *Ford* "to the regulation of speech by trial participants." Gov't Reply at 6 (quoting *Brown*, 218 F.3d at 427) (cleaned up). It may have foreclosed that standard as applied to attorneys, but not to *all* trial participants. *See Nelle ex rel. B.N. v. Huntsville Sch. Dist.*, No. 5:21-CV-05158, 2021 WL 6135690, at *3 n.2 (W.D. Ark. Dec. 29, 2021) (rejecting *Brown*'s extension of *Gentile* to non-attorneys); *United States v. Schock*, No. 16-cr-30061, 2016 WL 7176578, at *1–2 (C.D. Ill. Dec. 9, 2016) (rejecting, notwithstanding *Gentile*, government's motion for a gag order of parties, and applying the "serious and imminent threat to the administration of justice" standard); *see also, e.g., United States v. Carmichael*, 326 F. Supp. 2d 1267, 1294 (M.D. Ala. 2004) (Thompson, J.) (concluding that the "clear and present danger" standard should apply to a criminal defendant); *United States v. McGregor*, 838 F. Supp. 2d 1256, 1260-62 (M.D. Ala. 2012) (Thompson, J.) (reaffirming *Carmichael* after *Gentile* and distinguishing gag orders that affect defendants from those that affect attorneys).

The government also pointed to two post-*Ford* cases in district courts within the Sixth Circuit that "have recognized that *Gentile*, rather than *Ford*, supplies the applicable standard." Gov't Reply at 6. To the extent they repeat *Brown*'s error, those cases were wrong, but the government vastly overstates their significance even on their own terms. One of them concerned a "gag" on sealed and classified information, a context far removed from this one. *United States v. Koubriti*, 307 F. Supp. 2d 891, 901–02 (E.D. Mich. 2004). In the other, the defendant conceded the lower standard applied. *United States v. Fieger*, No. 07-20414, 2008 WL 474084, at *4 (E.D. Mich. Feb. 19, 2008), *report and recommendation adopted as modified*, No. 07-CR-20414, 2008 WL 659767 (E.D. Mich. Mar. 11, 2008).

to his obstruction of the peaceful transition of power are relevant not only to the proceedings in this Court, but to the country's decision about whether he deserves to be elected again.

Similar issues were present in *Ford*, where the Sixth Circuit overturned a gag order that prohibited speech by the defendant, a sitting congressman, about the evidence and facts in the case, the prosecuting attorney, the government's motive in prosecuting him, and the ultimate merits of the prosecution. 830 F.2d at 597. In striking down the gag order under the "clear and present danger" test, the court explained that the defendant was "entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views . . . ." *Id.* at 600–01. It also underscored the defendant's "right to express his outrage," and "to fight the obvious damage to his political reputation in the press and in the court of public opinion." *Id.* at 601. The court noted specifically that the gag order would leave him "unable to respond" to political "opponents" who "attack him as an indicted felon," or to "inform his constituents of his point of view." *Id.*[6]

To be sure, the government and the public have a strong "interest that justice be done in a controversy between the government and individuals," and in ensuring a fair trial. *Tijerina*, 412 F.2d at 666 (citing *Wade v. Hunter*, 336 U.S. 684, 689 (1949)); *see also United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993) (discussing the government's interests in ensuring a just verdict and a fair trial). But as the court explained in *Ford*, "permitting an indicted defendant . . . to defend himself publicly may result in overall publicity that is somewhat more favorable to the defendant than would occur when all participants are silenced," but would "not result in an 'unfair' trial for

---

[6] While *Ford* involved a sitting congressman who was not actively running for anything, the court found it important to note that he would "soon be up for reelection." 830 F.3d at 601. And even in *Brown*, the district court temporarily lifted its own gag order for two months "to avoid interfering with [the defendant's] re-election campaign for Insurance Commissioner." 218 F.3d at 419 (upholding the reinstated gag order on the lower standard discussed above).

9

the government." 830 F.2d at 600. A trial is not unfair simply because the defendant has been able

to speak about it in public. Additionally, as *Ford* emphasized, the Supreme Court's conclusion that

widespread public broadcasts of a defendant's confession created an unfair trial in *Sheppard* was

premised on the *defendant*'s right to a fair trial under the Sixth Amendment, a right the government

does not have. *Id.* As a result, "[t]o the extent that publicity is a disadvantage for the government,

the government must tolerate it." *Id.*

> **B.     The October 17 order is overbroad and underexplained.**

The court in *Ford* struck down an extraordinarily far-ranging gag order, much broader than

the October 17 order at issue here. But the order in this case nonetheless fails to justify the speech

restrictions it has imposition on Defendant, or to narrow that restriction as much as possible. The

Court could fix that in several ways.

First, the order's prohibition of "target[ing] . . . any reasonably foreseeable witness or the

substance of their testimony" effectively bars the Defendant from addressing whole subjects of

discussion. Order at 3. But witness testimony in this case will concern the events of January 6,

2021, the results of the 2020 presidential election, and Defendant's own conduct in relation to both.

These topics are key points in the ongoing 2024 presidential campaign. Barring any discussion of

these entire topics by Defendant is unconstitutionally overbroad. And to justify even a much

narrower restriction along these lines, the Court must find that such discussion would actually

harm the fairness of the trial. Where so many are already saying so much about the topic, it seems

unlikely that silencing the Defendant is justified. In any event, the order does not support that

conclusion.

Second, the order applies to speech that "targets" the Special Counsel and its staff. Order

at 3. But like the Court itself, which is excluded from the order's terms, the Special Counsel is a

public official. Attempts to gag speech that addresses how the Special Counsel is conducting his work, on the grounds of ensuring the proper and impartial administration of justice, unduly undermine public discussion on matters of public concern that is at the heart of what the First Amendment protects. Respectfully, the Court should exempt public officials from the coverage of its order, except to the extent that it bars speech that threatens or instigates violence against such persons.

Third, a key step in the Court's brief analysis supporting its order was its reliance on "[u]ndisputed testimony" that Trump's public statements about "individuals, including on matters related to this case," has led to other people "threaten[ing] and harass[ing]" "potential witnesses, prosecutors, and court staff." Order at 2. The government's motion asked the Court to go even further, urging the adoption of a broad gag order—one that would even have prohibited mere "disparage[ment]," Gov't Mot. at 15 (ECF 57)—premised on Defendant's "know[ledge] that when he publicly attacks individuals and institutions, he inspires others to perpetrate threats and harassment against his targets." Gov't Mot. at 3. Amici acknowledge the risk that Defendant, who exercises substantial authority over his followers, could inspire others to engage in violence, and share concerns about his apparent willingness to do so. But the First Amendment does not authorize the Court to impose a judicial gag order on Defendant merely because third parties who hear his public statements may behave badly of their own accord. Of course, where advocacy crosses the line into incitement,[7] or where public speech amounts to a true threat or criminal solicitation,[8] it is unprotected by the First Amendment. If the Court were to find that there is a serious threat that Defendant will engage in those kinds of statements, it might justify a restraint

---

[7] *See Brandenburg*, 395 U.S. at 447.

[8] *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 771 (2023).

11

directed to such speech, but it must sufficiently explain those conclusions and their evidentiary basis before doing so.[9] The mere fact that others have threatened actions against trial participants after hearing Defendant's words is not enough.

Finally, it is unclear that an order limiting the Defendant's speech is necessary to serve the administration of justice more broadly, beyond the narrow albeit serious concern of threats to participants in the trial. *See Nebraska Press*, 427 U.S. at 569, 553–54. This case is already one of the most talked-about trials of all time. There may never have been a better-known criminal case in American history, or a better-known defendant. With that in mind, to the extent that the Court's order seeks to prevent future statements from affecting the impartiality of the potential jury pool, the order seems unlikely to make much of a difference. Where, as here, an order restricts a citizen's ability to speak out on matters of public concern, in the midst of an election campaign in which his words may inform the result of the presidential election, more is required than a generalized concern about further publicity about what is already one of the most public trials in the history of our nation.

## CONCLUSION

With respect, the October 17 order fails the First Amendment, and Amici urge the Court to re-evaluate any court-imposed restrictions of Defendant's speech.

---

[9] While the Court made a finding that Defendant's past statements "us[ed] language communicating . . . that particular individuals involved" in his prosecution "deserve death," Order at 2, the public record does not appear to reflect such language. The government's motion does refer to death threats made by other people against the Court and two Georgia elected officials, but not made by Defendant himself. *See* Gov't Mot. at 4, 5, 12.

DATE: October 25, 2023

Respectfully submitted,

*/s/ Brett Max Kaufman*

Brett Max Kaufman (D.C. Bar No. NY0224)
Ben Wizner
Brian Hauss
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
212.549.2500
bkaufman@aclu.org

Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF THE DISTRICT OF
  COLUMBIA
915 15th Street, NW, Second Floor
Washington, D.C. 20005
202.457.0800
smichelman@acludc.org

David Cole
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
915 15th Street, NW
Washington, D.C. 20005
212.549.2611
dcole@aclu.org

*Counsel for Amici Curiae*

13

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief Amici Curiae of the American Civil Liberties Union & the American Civil Liberties Union of the District of Columbia in Aid of the Court's Re-evaluation of its Gag Order complies with the typeface and type-style requirements set forth in D.D.C. LCvR 1.1(d), because it has been prepared in 12-point, Times New Roman font; as well as with the type-volume limitation set forth in D.D.C. LCvR 7(o)(3), because its length does not exceed twenty-five pages.

DATE: October 25, 2023                    Respectfully submitted,

                                          /s/ Brett Max Kaufman
                                          Brett Max Kaufman (D.C. Bar No. NY0224)

                                          *Counsel for Amici Curiae*

14



# Office of the Attorney General
### Washington, D.C.

March 5, 2008

**TO:**   ALL DEPARTMENT EMPLOYEES

**FROM:**   THE ATTORNEY GENERAL

**RE:**   ELECTION YEAR SENSITIVITIES

Department of Justice employees are entrusted with the authority to enforce the laws of the United States and with the responsibility to do so in a neutral and impartial manner. This is particularly important in an election year. Now that the election season is upon us, I want to remind you of the Department's existing policies with respect to political activities.

## I.    INVESTIGATION AND PROSECUTION OF ELECTION CRIMES

The Department of Justice has a strong interest in the prosecution of election fraud and other election-related crimes, such as those involving federal and state campaign finance laws, federal patronage laws, and corruption of the election process. As Department employees, however, we must be particularly sensitive to safeguarding the Department's reputation for fairness, neutrality and nonpartisanship.

Simply put, politics must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges. Law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution.

If you are faced with a question regarding the timing of charges or overt investigative steps near the time of a primary or general election, please contact the Public Integrity Section of the Criminal Division for further guidance. Please remember also that consultation with the Public Integrity Section of the Criminal Division is required at various stages of all criminal matters that focus on violations of federal and state campaign-finance law, federal patronage crimes, and corruption of the election process. More detailed guidance is available in sections 1-4 and 9-85 of the United States Attorneys' Manual, which can be accessed on line at <http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/>.

## II.    HATCH ACT

As you are aware, the Hatch Act generally prohibits Department employees from engaging in partisan political activity while on duty, in a federal facility or using federal property. Please note that this prohibition includes using the internet at work for any political

Page 2

activities. The Act also prohibits us from using our authority for the purpose of affecting election results; soliciting (or discouraging) political participation; soliciting, accepting or receiving political contributions; and generally from running as a candidate in a partisan election.

In addition to restrictions on what Department employees may and may not do while on duty, using government property, and in off-duty activities, certain employees are further restricted from engaging in certain political activity even while not on duty. The degree to which an employee is restricted in his or her off-duty activities depends on his or her position, *i.e.* career, further restricted, or noncareer appointee. Further restricted employees are members of the career SES, administrative law judges, employees of the Criminal Division, National Security Division and the Federal Bureau of Investigation, Criminal Investigators and Explosives Enforcement Officers of the Bureau of Alcohol, Tobacco and Firearms, and noncareer appointees in the Department. If you are unclear on these restrictions or the classification of your position, please consult with your component's designated ethics official about the limits of permissible activity *prior* to engaging in any political activity. You can also visit the Justice Management Division's Ethics page at <www.usdoj.gov/jmd/ethics/politic.html> for more detailed information.

It is critical that each one of us comply with this Act. For one, it contributes to maintaining a work environment free of political pressure and ensures the public retains its confidence that we are adhering to our responsibility to administer justice in a neutral manner. For another, violations of the Act carry strict penalties, including presumptive removal from federal service.

Thank you.